Nos. 26-1330, 26-1331, 26-1332, 26-1333, 26-1334

# United States Court of Appeals for the First Circuit

————————————————————

Nos. 26-1330, 26-1331, 26-1332, 26-1333, 26-1334

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,

*Debtors*,

*(Caption continued on inside cover)*

————————————————————

Appeal from the U.S. District Court
for the District of Puerto Rico, No. 17-bk-04780-LTS
(The Honorable Laura Taylor Swain)

————————————————————

**APPELLANTS ASSURED GUARANTY INC. AND NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION'S OPENING BRIEF**

————————————————————

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION; U.S. BANK NATIONAL ASSOCIATION, in the capacity as PREPA Bond Trustee; ALLIANCEBERNSTEIN L.P.; ARISTEIA CAPITAL, L.L.C.; BNY MELLON FUNDS TRUST; CAPITAL RESEARCH AND MANAGEMENT COMPANY; COLUMBIA MANAGEMENT INVESTMENT ADVISERS, LLC; DELAWARE MANAGEMENT COMPANY, a series of Nomura Asset Management Co., Ltd.; ELLINGTON MANAGEMENT GROUP, L.L.C.; GOLDMAN SACHS ASSET MANAGEMENT L.P.; INVESCO ADVISERS, INC.; LUXOR CAPITAL GROUP, LP; MACKAY SHIELDS LLC; MASSACHUSETTS FINANCIAL SERVICES COMPANY; OLD ORCHARD CAPITAL MANAGEMENT LP; ONE WILLIAM STREET CAPITAL MANAGEMENT, L.P.; RUSSELL INVESTMENT COMPANY, ON BEHALF OF RUSSELL INVESTMENT COMPANY TAX-EXEMPT HIGH YIELD BOND FUND; SIG STRUCTURED PRODUCTS, LLC; T. ROWE PRICE; TOWER BAY ASSET MANAGEMENT LP; VERITION FUND MANAGEMENT LLC; GOLDENTREE ASSET MANAGEMENT LP; SYNCORA GUARANTEE INC.; ASSURED GUARANTY INC.,

*Movant-Appellants*,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA),

*Debtor-Appellee*,

INSTITUTO DE COMPETITIVIDAD Y SOSTENIBILIDAD ECONÓMICA DE PUERTO RICO (ICSE); EL PUENTE DE WILLIAMSBURG, INC.; ENLACE DE ACCIÓN CLIMÁTICA; COLEGIO DE ABOGADOS Y ABOGADAS DE PUERTO RICO (CAAPR); ASSOCIATION OF PRIVATE COLLEGES AND UNIVERSITIES OF PUERTO RICO (ACUP); LA LIGA DE CIUDADES DE PUERTO RICO; CENTRO UNIDO DE DETALLISTAS (CUD); RAQUEL MARIA GONZÁLEZ SPARKS; COALICÓN NUEVA VISIÓN

DE SALUD; SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA (SREAEE); JUNTE DE ASOCIACIONES CON PENSIONADOS Y JUBILADOS DE PUERTO RICO (JAP); COLEGIO DE PROFESIONALES DEL TRABAJO SOCIAL DE PUERTO RICO; OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PREPA; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY (AAFAF); ELAM, LLC, AS SUCCESSOR-IN-INTEREST TO BLUE BEETLE III, LLC,

*Respondents-Appellees.*

---

Casey J. Servais
William J. Natbony
Thomas J. Curtin
CADWALADER, WICKERSHAM
& TAFT LLP
200 Liberty Street
New York, NY  10281
(212) 504-6000
casey.servais@cwt.com

Miguel A. Estrada
  *Counsel of Record*
Lochlan F. Shelfer
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8257
mestrada@gibsondunn.com

*Counsel for Movant-Appellant Assured Guaranty Inc.*

Gregory Silbert
WEIL, GOTSHAL & MANGES LLP
767 5th Avenue
New York, NY  10153
(212) 310-8000
gregory.silbert@weil.com

*Counsel for Movant-Appellant*
*National Public Finance Guarantee Corporation*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Appellant Assured Guaranty Inc. states:

Appellant Assured Guaranty Inc. is a wholly owned indirect subsidiary of Assured Guaranty Ltd., which is a Bermuda company whose common shares are listed on the New York Stock Exchange. No natural person and no single entity owns for its own account more than 10% of the outstanding stock of Assured Guaranty Ltd.

/s/ *Miguel A. Estrada*
Miguel A. Estrada

*Counsel for Movant-Appellant*
*Assured Guaranty Inc.*

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Appellant National Public Finance Guarantee Corporation states:

MBIA Inc. owns 100% of the stock of National Public Finance Guarantee Holding, Inc., which in turn holds 100% of the stock of National Public Finance Guarantee Corporation.

/s/ *Gregory Silbert*
Gregory Silbert

*Counsel for Movant-Appellant National*
*Public Finance Guarantee Corporation*

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Movant-Appellants Assured Guaranty Inc. and National Public Finance Guarantee Corporation respectfully request oral argument. This appeal presents important questions about whether an administrative-expense claim arises when a Title III debtor consumes special revenues subject to a perfected lien while the automatic stay prevents enforcement of the creditors' non-bankruptcy remedies. This Court has already confirmed that the Bondholders enjoy an unavoidable, perfected lien on the past, present, and future Net Revenues that PREPA generates from electricity sales. And PREPA for years has issued public documents stating that it has "accrued but not transferred" Net Revenues to debt service, instead consuming them for its own purposes. Yet more recently, PREPA and the Board have taken the position that those stacks of contemporaneous business records over the years are wrong, and that no Net Revenues exist. Without permitting any factual investigation of these claims, the district court simply dismissed the Bondholders' administrative-expense request as a legal matter. Assured and National respectfully submit that oral argument would aid the decisional process.

ii

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT..............................................i

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD................ii

INTRODUCTION ..........................................................................1

JURISDICTIONAL STATEMENT.......................................................3

STATEMENT OF THE ISSUES...........................................................4

STATEMENT OF THE CASE ............................................................5

    I.    Factual Background.................................................................5

        A.    Puerto Rico Enacts The Authority Act And
            Issues Billions In Utility Bonds. ...................................5

        B.    PREPA Defaults On Bond Payments And
            Enters Restructuring Proceedings. ..............................9

        C.    This Court Confirms That The Bondholders
            Are Entitled To Protect Their Collateral. ....................11

        D.    The Bondholders Repeatedly, But
            Unsuccessfully, Attempt To Protect Their
            Collateral...................................................................13

        E.    The District Court Erroneously Concludes
            That The Bondholders Have No Lien On
            PREPA's Net Revenues, And This Court
            Unanimously Reverses. ..............................................15

        F.    Despite This Court's Ruling, The District
            Court Continues To Frustrate The
            Bondholders' Efforts To Protect Their
            Collateral...................................................................17

II.   Procedural History ...................................................... 19

    A.   The Bondholders Move For Allowance Of An Administrative-Expense Claim To Provide Compensation For PREPA's Misappropriation Of Their Collateral. .......................... 19

    B.   The District Court Rejects All The Bondholders' Theories Of Relief As A Matter Of Law. ................................................................. 21

STANDARD OF REVIEW .......................................................... 23

SUMMARY OF ARGUMENT ...................................................... 23

ARGUMENT ................................................................................ 26

I.   The District Court Erred By Assuming A Voluntary Post-Petition Contract Was A Necessary Predicate To Administrative Priority Based On PREPA's Unjust Enrichment. .............................. 30

    A.   PREPA's Post-Petition Unjust Enrichment Is A Well-Established Basis For The Bondholders' Claim. ...................................................... 31

    B.   The District Court's Rationales For Rejecting The Bondholders' Unjust-Enrichment Theory Are Meritless. ............................ 33

II.   *Reading* Supports Administrative Priority For Post-Petition Legal Wrongs, Including The Consumption Of Liened Net Revenues. ............................... 45

    A.   The Bondholders Stated A Viable *Reading* Claim Based On PREPA's Post-Petition Wrongdoing. ................................................... 45

B.      The District Court's *Reading* Analysis
        Misunderstands Precedent, The
        Constitution, And The Trust Agreement......................49

III.    The District Court Erred In Denying An
        Administrative-Expense Claim Under 11 U.S.C.
        § 922(c) As A Matter Of Law. ...............................59

        A.      Section 922(c) Creates A Section 503(b)
                Claim Where The Creditor Fails To Provide
                Adequate Protection. ...................................59

        B.      The District Court's Section 922(c) Analysis
                Would Let A Title III Debtor Avoid Priority
                By Refusing Adequate Protection
                Altogether....................................................64

CONCLUSION .................................................................69

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Advisory Info. & Mgmt. Sys., Inc.*,
  50 B.R. 627 (Bankr. M.D. Tenn. 1985)................................................42

*Matter of Al Copeland Enters., Inc.*,
  991 F.2d 233 (5th Cir. 1993)............................................................47

*In re Am. Toy & Furniture Co.*,
  1997 Bankr. LEXIS 2495 (Bankr. E.D. Wisc. Feb. 24,
  1997) ................................................................................................41

*In re Ames Dep't Stores, Inc.*,
  582 F.3d 422 (2d Cir. 2009) .............................................................52

*Armstrong v. United States*,
  364 U.S. 40 (1960)....................................................................28, 48

*In re Baseline Sports, Inc.*,
  393 B.R. 105 (Bankr. E.D. Va. 2008) ...............................................54

*In re Cal. Devices, Inc.*,
  126 B.R. 82 (Bankr. N.D. Cal. 1991)................................................62

*Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*,
  443 F.2d 867 (2d Cir. 1971) .............................................................53

*In re Charlesbank Laundry*,
  755 F.2d 200 (1st Cir. 1985) ...........................................47, 48, 53, 54

*In re Colortex Indus., Inc.*,
  19 F.3d 1371 (11th Cir. 1994)..........................................................31

*In re Ctr. Wholesale, Inc.*,
  759 F.2d 1440 (9th Cir. 1985)..........................................................64

*Ellis v. Westinghouse Elec. Co.*,
  11 F.4th 221 (3d Cir. 2021)..............................................................37

*Fidelity & Guar. Ins. Co. v. Star Equip. Co.*,
541 F.3d 1 (1st Cir. 2008) ................................................................... 69

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
899 F.3d 13 (1st Cir. 2018) ............................................. 12, 35, 59, 67

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
41 F.4th 29 (1st Cir. 2022)...................................................................29

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
91 F.4th 501 (1st Cir. 2024).................................................................17

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
121 F.4th 280 (1st Cir. 2024).................................. 6, 7, 8, 9, 11, 16, 39

*Ford Motor Credit Co. v. Dobbins*,
35 F.3d 860 (4th Cir. 1994).................................................... 41, 63, 65

*Grundy Nat'l Bank v. Rife*,
876 F.2d 361 (4th Cir. 1989)....................................... 27, 31, 44, 60, 61

*In re Hayes Lemmerz Int'l, Inc.*,
340 B.R. 461 (Bankr. D. Del. 2006)............................................... 53, 54

*In re Hemingway Transp., Inc.*,
954 F.2d 1 (1st Cir. 1992) .......................................................... 27, 39

*In re J.F.K. Acquisitions Grp.*,
166 B.R. 207 (Bankr. E.D.N.Y. 1994)................................................. 62

*Knick v. Twp. of Scott*,
588 U.S. 180 (2019)............................................................................. 56

*Louisville Joint Stock Land Bank v. Radford*,
295 U.S. 555 (1935)........................................................ 28, 48, 49, 57

*In re L.V. Monorail Co.*,
429 B.R. 317 (Bankr. D. Nev. 2010).................................................... 63

*In re Mammoth Mart, Inc.*,
536 F.2d 950 (1st Cir. 1976) ........................................................ 32, 39

vii

*In re Mandile*,
   626 B.R. 915 (Bankr. N.D. Ill. 2021) .................................................. 68

*In re Megafoods Stores, Inc.*,
   163 F.3d 1063 (9th Cir. 1998) ............................................................ 47

*In re Mendez*,
   259 B.R. 754 (M.D. Fla. 2001) ................................................ 62, 67, 69

*Mitchell v. W.T. Grant Co.*,
   416 U.S. 600 (1974) ............................................................................ 36

*In re Morad*,
   328 B.R. 264 (B.A.P. 1st Cir. 2005) ..................................................... 3

*Piszel v. United States*,
   833 F.3d 1366 (Fed. Cir. 2016) ........................................................... 58

*In re Provincetown-Boston Airline, Inc.*,
   66 B.R. 632 (Bankr. M.D. Fla. 1986) .................................................. 42

*Reading Co. v. Brown*,
   391 U.S. 471 (1968) ...................................... 2, 4, 20, 24, 27, 45, 46, 50

*In re Sanchez Energy Corp.*,
   2022 WL 2912076 (Bankr. S.D. Tex. July 22, 2022) ........................... 56

*In re Scott Cable Commc'ns, Inc.*,
   227 B.R. 596 (Bankr. D. Conn. 1998) ................................................. 56

*Tamerlane, Ltd. v. United States*,
   80 Fed. Cl. 724 (2008) ........................................................................ 58

*In re TRP Brands LLC*,
   676 B.R. 791 (Bankr. N.D. Ill. 2026) ............................................ 40, 48

*United States v. Cardoza*,
   129 F.3d 6 (1st Cir. 1997) ................................................................... 23

*United States v. Craft*,
   535 U.S. 274 (2002) ............................................................................ 35

*United States v. Noland*,
517 U.S. 535 (1996) ..................................................................52

*United States v. Sec. Indus. Bank*,
459 U.S. 70 (1982) ....................................... 28, 44, 48, 49, 57

*In re United Trucking Serv., Inc.*,
851 F.2d 159 (6th Cir. 1988) ...................... 31, 32, 40, 43, 44

*U.S. ex rel. Lovell v. AthenaHealth, Inc.*,
56 F.4th 152 (1st Cir. 2022) ................................................23

*Villalobos-Santana v. P.R. Police Dep't*,
171 F.4th 544 (1st Cir. 2026) ....................... 25, 26, 27, 45, 47, 51, 53

**Statutes**

11 U.S.C. § 362 ............................................................................ 11

11 U.S.C. § 363 ............................................................................ 34

11 U.S.C. § 503 ....................................................................... 1, 27, 52

11 U.S.C. § 552 ............................................................................ 40

11 U.S.C. § 922 ............................................................................ 59

11 U.S.C. § 928 ..................................................................... 1, 35, 40

28 U.S.C. § 1291 ............................................................................. 3

48 U.S.C. § 2161 .................................................................... 11, 26, 34

48 U.S.C. § 2165 ............................................................................ 37

48 U.S.C. § 2166 ............................................................................. 3

48 U.S.C. § 2174 ...................................................................... 26, 37

22 L.P.R.A. §§ 191-239 .................................................................. 5

22 L.P.R.A. § 206 .......................................................................... 5

22 L.P.R.A. § 207 ...............................................................................5

22 L.P.R.A. § 208 ............................................................................5, 6

**Other Authorities**

*Collier on Bankruptcy* (16th ed. 2026)...............................................40, 60

S. Rep. 100-506 (1988).........................................................................60

# INTRODUCTION

In 2024, this Court held that the holders of bonds issued by the Puerto Rico Electric Power Authority ("PREPA") have a perfected, unavoidable lien on the past, present, and future Net Revenues that PREPA generates from selling electricity. On remand, the Bondholders moved for an administrative-expense claim under 11 U.S.C. § 503(b) to compensate them for PREPA's consumption of billions of dollars of Net Revenues—the Bondholders' collateral—during this decade-long Title III proceeding. While discovery in support of that motion was ongoing, however, the district court abruptly denied the motion, ruling that the Bondholders could not assert an administrative-expense claim as a matter of law.

The district court was wrong. The Supreme Court has long recognized that liens are traditional property rights that may not be impaired under the Constitution absent just compensation, even in bankruptcy. And Congress, in 11 U.S.C. § 928(a), expressly preserved liens on post-petition special revenues. This Court accordingly has warned—as to these very bonds—that serious constitutional concerns would arise if the Bondholders were forced to stand by and watch helplessly as their collateral was consumed. And the Financial Oversight and Management

Board ("Board"), PREPA's representative here, has conceded in other litigation that administrative-expense claims are an appropriate mechanism to provide just compensation when secured creditors' property rights are so impaired.

There thus was no basis to deny the Bondholders' administrative-expense claim as a matter of law. PREPA's own reports reflect that it generated billions of dollars of Net Revenues. And the Board's fiscal-plan materials demonstrate that PREPA used the Net Revenues for expenses subordinate to debt service under the Trust Agreement, such as capital expenditures. The Board disputes the amount and disposition of Net Revenues, but those disputes are precisely why the court below should not have short-circuited discovery into what Net Revenues PREPA generated and what PREPA did with them.

The Bondholders' claim should have been allowed to proceed through discovery under any of the three alternative theories they presented. First, 11 U.S.C. § 503(b) establishes administrative-expense priority where a debtor is unjustly enriched at a creditor's expense—as has occurred from PREPA's misappropriation of the Bondholders' collateral. Second, the Supreme Court in *Reading Co. v. Brown*, 391 U.S. 471 (1968),

recognized that administrative-expense claims under Section 503(b) likewise are appropriate to remedy injuries inflicted by a debtor's post-petition legal wrongdoing, as with PREPA's ongoing misappropriation. And third, 11 U.S.C. § 922(c) expressly creates an allowable claim under Section 503(b) when, as here, a debtor fails to provide adequate protection for a secured creditor's collateral.

This Court should reverse—as it has done in the prior instances where the court below has declined to give effect to the Bondholders' rights under the Trust Agreement and the Constitution. The Bondholders are entitled to pursue an administrative-expense claim under each of their three theories and to obtain the discovery necessary to determine the full extent of PREPA's misuse of their collateral.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 48 U.S.C. § 2166(a). This Court has subject-matter jurisdiction under 28 U.S.C. § 1291 and 48 U.S.C. § 2166(e). The order is final because it conclusively denied the Bondholders' discrete request for allowance of an administrative-expense claim. *See In re Morad,* 328 B.R. 264, 268 (B.A.P. 1st Cir. 2005). The district court issued its opinion and order denying the

3

Bondholders' motion for allowance of an administrative-expense claim "in its entirety" on March 16, 2026, Add.42, and Assured timely noticed its appeal on March 23, 2026, App.109. National timely noticed its appeal on March 24, 2026. App.211.

## STATEMENT OF THE ISSUES

Whether the district court erred when it held as a matter of law that Section 503(b) of the Bankruptcy Code, as incorporated by PROMESA, does not permit the Bondholders to assert an administrative-expense claim:

(1) To counteract PREPA's unjust enrichment from its misappropriation of Net Revenues;

(2) For PREPA's post-petition legal wrongdoing under *Reading Co. v. Brown*, 391 U.S. 471 (1968); or

(3) For PREPA's failure to provide adequate protection under 11 U.S.C. § 922(c).

4

## STATEMENT OF THE CASE

### I.    Factual Background

#### A.    Puerto Rico Enacts The Authority Act And Issues Billions In Utility Bonds.

In 1941, Puerto Rico enacted the Electric Power Authority Act (the "Authority Act" or "Act") creating the public corporation now known as PREPA. 22 L.P.R.A. §§ 191-239. The Authority Act authorized the issuance of revenue bonds and provided that, "to secure payment of the bonds," PREPA could pledge the "entire gross or net revenues and present or future income" it generates. 22 L.P.R.A. § 206(e)(1).

The Authority Act also codified numerous protections for bondholders in the event of PREPA's default. A "trustee" representing bondholders was given "the right to apply … for the appointment of a receiver" to take over PREPA's operations, adjust electricity rates, and collect additional income until PREPA's default is fully cured. 22 L.P.R.A. § 207(a). The Authority Act also permits bondholders or the trustee to sue "at law or in equity to enforce [their] rights against the Authority," and force it to "carry out its … duties and obligations under" its "covenants and agreements with bondholders." *Id.* § 208(a)(1). And the Act permits bondholders to "su[e] in equity to require [PREPA] to account as if [it] were the

trustee of an express trust." *Id.* § 208(a)(2). The Act also specifies that each of these remedies is to be "cumulative and in addition to every other remedy." *Id.* § 208(b).

In 1974, PREPA executed the Trust Agreement with the Bondholders (or their predecessors-in-interest) to provide for the issuance of revenue bonds.[1] All told, $8,477,156,729.59 in principal and interest on those bonds remained outstanding as of the commencement of the restructuring proceedings below. Motion for Allowance of Administrative Expense Claim ("Mot.") at 6, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17-04780 (D.P.R. Apr. 7, 2025).[2] The Trust Agreement secured the bonds with a lien on the past, present, and future stream of revenues that PREPA generates. *In re Fin. Oversight & Mgmt. Bd. for P.R.* ("*Lien Decision*"), 121 F.4th 280, 300 (1st Cir. 2024). The Trust Agreement labeled

---

[1] Assured and National are monoline insurers, insuring the scheduled payments of certain PREPA bonds under insurance policies and other agreements. *See* Claim Nos. 31087, 29020 (Annexes to Proofs of Claim). Since PREPA's default in 2017, Assured and National have paid out claims under those policies and are subrogated to the rights of holders of the insured bonds. *Id.* Assured and National are also deemed to be the sole owners of the bonds under those agreements. *Id.*

[2] "Dkt." refers to No. 17-bk-04780-LTS (D.P.R.) unless otherwise specified.

6

this pledged income stream "Net Revenues"—in short, the "gross reve-
nues" that PREPA generates from electricity sales "minus Current Ex-
penses." *Id.* at 297.  And the Trust Agreement established a comprehen-
sive structure "for distributing" such revenues.  *Id.* at 291.

When it sells electricity, PREPA collects "Revenues."  App.526.
These Revenues are then credited to the General Fund.  App.558.  From
the General Fund, PREPA may pay some of its "Current Expenses"—that
is, PREPA's "reasonable operating expenses."  *Lien Decision*, 121 F.4th
at 291.  The Trust Agreement makes clear, however, that such expenses
must "not exceed an amount which is reasonable and necessary for main-
taining, repairing, and operating the System in an efficient and econom-
ical manner."  App.560.  Such amounts also cannot exceed what is "pro-
vided therefor" in the current fiscal year's Annual Budget.  *Id.*  The funds
left over are "Net Revenues," which must be transferred into the "Sinking
Fund" to cover "debt service" on the bonds.  *Lien Decision*, 121 F.4th at
291.

Other expenditures by PREPA must be paid *after* debt service.  The
"amount, if any, of any balance remaining after making deposits" to the
Sinking Fund, App.566-567, is credited to four "Subordinate Funds,"

which "cover internal PREPA operations, such as extraordinary repairs or capital improvements." *Lien Decision*, 121 F.4th at 291. These post-debt service expenditures also include "Capital Expenditures," which specifically are defined *not* to be part of PREPA's "Current Expenses" (and thus must be paid after the bonds). "Capital Expenditures" include the "cost of Improvements." App.512. The Trust Agreement also provides that if funds in the Sinking Fund are insufficient for debt service, PREPA must draw money back from the Subordinate Funds to pay the bonds. *See Lien Decision*, 121 F.4th at 291.

In addition to these robust lien rights, the Trust Agreement also implements the remedies codified in the Authority Act. Section 804 of the Trust Agreement provides that the Trustee may pursue remedies including "the appointment of a receiver," "specific performance of any covenant or agreement contained herein," and "enforcement of any proper legal or equitable remedy." App.597. These remedies—designed to "enforce payment of … any and all amounts" due to the Bondholders—are "without prejudice to any other right or remedy of the Trustee or of the bondholders." App.598. If the Trustee or Bondholders are awarded such a remedy to "enforce payment" of the bonds, it may be "collect[ed] … from

8

moneys in the Sinking Fund and any other moneys available for such purpose." App.598.

### B. PREPA Defaults On Bond Payments And Enters Restructuring Proceedings.

"In 2017, PREPA defaulted on its fundamental obligations under the Trust Agreement, including its obligation[s] to pay the bondholders" and deposit Net Revenues to the Sinking Fund. *Lien Decision*, 121 F.4th at 292. At present, the Bondholders have not received any payments on their bonds in nearly ten years.

After PREPA's default, the Board filed a Title III petition to initiate the debt-adjustment process for PREPA under the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). Upon the filing of the Title III petition, an automatic stay went into effect, barring the Bondholders and other creditors from exercising their remedies. Throughout the Title III process, PREPA has failed to satisfy its obligations to the Bondholders.

According to PREPA's own documents, PREPA has generated billions of dollars of Net Revenues, but has refused to transfer them for debt service. Under the Trust Agreement, PREPA must provide the Trustee with monthly reports detailing its Revenues, expenses, and allocations of

Net Revenues to the various funds established under the Trust Agreement. *See* App.589-590. Under those provisions, PREPA historically issued monthly reports of its operations. These Monthly Reports reflect that from the filing of PREPA's Title III petition in 2017 through June 2023, PREPA generated approximately $3.7 billion in Net Revenues. App.2511. For each fiscal year ("FY") from FY 2018 through FY 2021, however, the Monthly Reports state that "[t]he 1974 Sinking Fund appropriation ha[s] been *accrued but not paid nor transferred.*" *See, e.g.*, App.2536 (emphasis added). PREPA also disclosed Sinking Fund accruals (that similarly were not transferred to the Sinking Fund) for FY 2022 and 2023 of $511,000,000 and $334,100,000, respectively. App.2636, App.2652.

These figures are consistent with information in the Board's certified fiscal plans for PREPA. App.2514-2516. That financial reporting is also consistent with the rate structure in place since 2019: the "base rate" component for PREPA's electricity rates is based in part on a 2017 rate order from the Puerto Rico Energy Commission, which had contemplated that PREPA would collect no less than $593,319,000 in Net Revenues in each year the base rate remained in place. App.2118; App.2205.

10

In 2023, PREPA stopped issuing Monthly Reports altogether.

### C. This Court Confirms That The Bondholders Are Entitled To Protect Their Collateral.

In response to PREPA's default, the Bondholders *outside* of restructuring proceedings "could have pursued [the] various remedies authorized by the Authority Act and the Trust Agreement" to rectify that default. *Lien Decision*, 121 F.4th at 292. "Congress, however, changed all this by enacting PROMESA," under which "the bondholders' ability to pursue any remedies against PREPA … was automatically stayed." *Id.*; *see* 48 U.S.C. § 2161(a) (incorporating the Code's automatic-stay provision, 11 U.S.C. § 362). Accordingly, the automatic stay has prevented the Bondholders from exercising their statutory and contractual rights against PREPA.

To counteract the automatic stay, the Bondholders first moved on July 18, 2017—days after PREPA's Title III petition was filed—for relief from the stay. Dkt. 74. Citing the lack of adequate protection for their collateral, the Bondholders sought to pursue appointment of a receiver in Puerto Rico court. *See id.* at 28-29. The district court rejected the Bondholders' lift-stay motion, however, holding that it could not lift the stay

11

without the Board's consent. *See In re Fin. Oversight & Mgmt. Bd. for P.R.* ("*Stay Decision*"), 899 F.3d 13, 18 (1st Cir. 2018).

On appeal, this Court unanimously disagreed. Nothing in PROMESA prohibits "the Title III court from lifting the stay when the facts establish a creditor's entitlement to the appointment of a receiver in a different court in order to protect a creditor's collateral should that protection otherwise be necessary and appropriate." *Stay Decision*, 899 F.3d at 21. This Court criticized the district court's failure to assess "the extent to which any collateral of the bondholders might be irreversibly harmed" by PREPA's actions, and for failing to consider the "threat of uncompensated diminution" of that collateral. *Id.* at 22-23. This Court also explained that secured creditors cannot be made "to stand by helplessly as the debtor spen[ds] the creditor's collateral, leaving the debt entirely unsecured." *Id.* at 20. Indeed, the Court "would 'doubt the constitutionality of' a rule that would allow a debtor to 'expend every penny of the Movant's collateral.'" *Id.* This Court thus vacated and remanded so the Bondholders could seek such relief. *Id.* at 23-24.

12

**D.    The Bondholders Repeatedly, But Unsuccessfully, Attempt To Protect Their Collateral.**

Two months after this Court issued its Stay Decision, certain Bondholders renewed their motion for stay relief to seek appointment of a receiver. Dkt. 975. The parties engaged in extensive motion practice and discovery. To accommodate that discovery schedule, the district court granted the respondents various extensions, and a hearing on the motion was set for June 2019. *See* Dkts. 1016, 1064, 1176, 1183, 1204.

As that motion was pending, however, PREPA, the Board, and the Puerto Rico Fiscal Agency and Financial Authority ("AAFAF") promised the Bondholders that PREPA would make adequate-protection payments safeguarding the Bondholders' collateral if the Bondholders joined a Restructuring Support Agreement ("RSA"). Certain Bondholders entered into that agreement in May 2019—the Bondholders' third settlement attempt to consensually resolve the proceeding. Dkt. 1235-1. PREPA and the Board agreed to make monthly adequate-protection payments and implement a "Settlement Charge" (a modest rate increase to fund the payments). App.988. The Board and AAFAF also agreed that the Bondholders were entitled to administrative-expense claims to cover accrued interest on certain of the bonds. App.1050. In exchange, the Bondholders

13

agreed to forbear from exercising their statutory and contractual remedies against PREPA.  App.984-986.

Yet as the parties were working toward that settlement, the Board and AAFAF moved to adjourn all deadlines related to the motion to approve the RSA (which the district court granted).  Publicly, the Board touted that the RSA would "produce tremendous benefits."  Dkt. 2697 ¶ 2.  But in March 2022, AAFAF abruptly purported to terminate the 2019 RSA—without consulting the other RSA parties as required under the RSA.  Dkt. 2747.

After mediation among the parties did not produce a settlement, the Bondholders sought relief once again in September 2022, moving the district court either to dismiss PREPA's Title III case or grant stay relief so that the Bondholders could pursue appointment of a receiver.  Dkt. 2973.  Rather than adjudicating the Bondholders' motion, the district court stayed it pending adjudication of the Board's adversary complaint regarding the Bondholders' security interests and consideration of a proposed plan of adjustment.  Dkt. 3013.  After receiving several extensions of the deadline to file a plan, the Board eventually did so in December 2022.  Dkt. 3110.

**E.    The District Court Erroneously Concludes That The Bondholders Have No Lien On PREPA's Net Revenues, And This Court Unanimously Reverses.**

As the Bondholders were fighting to protect their collateral, the Board developed a new argument: that the Bondholders have virtually no collateral at all. The Board sought a declaration that the Bondholders' lien extends *only* to funds that PREPA chooses to deposit into the Sinking Fund, not to the Net Revenue stream itself. Complaint, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 19-391 (D.P.R. July 2, 2019), Dkt. 1 ¶ 2. In other words, the Board contended that PREPA could defeat the Bondholders' lien rights simply by refusing to deposit Net Revenues into the Sinking Fund. *Id.*

In March 2023, the district court agreed. It held that the Trust Agreement created merely an "'unsecured promis[e]'" that PREPA would deposit Net Revenues into the Sinking Fund, and that the Bondholders' lien attaches only to those moneys actually deposited. Dkt. 147, at 36, No. 19-391. The district court then "estimated" the value of the Bondholders' "unsecured" claim based on the amount of revenues PREPA purportedly could generate over time, on the premise that the Bondholders do not enjoy a "right to payment" of the face amount of their bonds. Dkt.

15

315, at 25 n.14, No. 19-391. The resulting order "estimated" the "value" of the Bondholders' so-called "Unsecured Net Revenue Claim" at just $2.38 billion—a fraction of the bonds' $8.4 billion face amount. *Id.* at 41, 47.

On appeal, this Court once again unanimously reversed the district court, rejecting both its lien-rights and "estimation" decisions. This Court determined that the Bondholders' lien attaches to past, present, and future Net Revenues—not merely whatever PREPA deposits to the Sinking Fund. *Lien Decision*, 121 F.4th at 301. It also held that the Bondholders' lien is perfected, *id.* at 304, and unavoidable, *id.* at 309. And it rejected the district court's view that the "value" of the Bondholders' claim needed to be "estimated" to determine its amount. *Id.* at 311. Instead, this Court confirmed that the Bondholders enjoy a "right to payment" of the face amount of the bonds, making their claim approximately $8.4 billion, plus interest. *Id.* at 312.

Yet while the *Lien Decision* confirmed that the Bondholders enjoy a security interest (and thus a property interest) in all Net Revenues, PREPA has continued to apply those Net Revenues to subordinate expenses.

16

**F.**   **Despite This Court's Ruling, The District Court Continues To Frustrate The Bondholders' Efforts To Protect Their Collateral.**

As the lien-rights appeal was pending, certain Bondholders also moved (once again) for relief from the automatic stay, citing the lack of adequate protection for their collateral. Dkt. 3913. The district court stayed the motion. Dkt. 3917. This Court affirmed the district court's stay on procedural grounds, but pointedly recognized that resolution of the then-pending lien-rights appeal "could open the door to a prompt ruling on a renewed (or entirely new) motion for relief from the automatic stay." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 91 F.4th 501, 511 (1st Cir. 2024).

In light of that statement, certain Bondholders on remand renewed their request for stay relief so that the Bondholders could enforce their right to seek a receiver. Dkt. 4690. The district court, however, responded by imposing a global "litigation stay" on further filings, Dkt. 5510, thereby preventing the Bondholders from seeking stay relief. When combined with the district court's other stay orders, the Bondholders have been precluded from seeking stay relief since at least 2022.

17

While those stays remained in place, PREPA—according to the Board's own documents—used Net Revenues not for debt service (as the Trust Agreement requires) but instead to pay for capital expenditures, including expenses that should have been covered by federal funding. The Board's 2025 Fiscal Plan for PREPA asserted that PREPA expected to incur new expenses far higher than in previous fiscal plans, including large increases in so-called "Necessary Maintenance Expenses." App.1320.  Those expenses appear largely to be capital expenditures for improvements to PREPA—expenditures that could be made only *after* debt service under the Trust Agreement.  Mot.24.  The Board's Fiscal Plan projected that "Necessary Maintenance Expenses" would increase approximately three to five times for FY 2026 as compared to FY 2025, would increase approximately *ten* times by FY 2029 as compared to FY 2025, and then would remain at elevated levels.  App.1317, App.1321, App.1326.

In February 2025, certain Bondholders again moved for relief from the district court's "litigation stay" so that they (once again) could seek relief from the automatic stay.  Dkt. 5510.  But the district court denied that relief—thus prohibiting the Bondholders from even seeking relief

from the automatic stay, and staying such attempts "*sine die*" (*i.e.*, indefinitely).  Dkt. 5572 ¶ 1.

Instead, the district court permitted the Bondholders to move for allowance of an administrative-expense claim seeking compensation for PREPA's misappropriation of their collateral.  Dkt. 5572.  The district court explained that its denial of relief from the litigation stay as to the Bondholders' motion for relief from the automatic stay was "without prejudice to renewal" after discovery into the disposition of Net Revenues had been completed.  *Id.* ¶ 4.

## II.   Procedural History

### A.   The Bondholders Move For Allowance Of An Administrative-Expense Claim To Provide Compensation For PREPA's Misappropriation Of Their Collateral.

The Bondholders accordingly sought an administrative-expense claim under 11 U.S.C. § 503(b)—which recognizes claims for expenses that are accorded priority treatment in bankruptcy.

The Bondholders argued that they were entitled to factual development concerning the amount, location, and use of liened Net Revenues.  The Bondholders advanced three theories of relief under Section 503(b).

19

*First*, the Bondholders contended that an administrative-expense claim arose under Section 503(b) to remedy PREPA's unjust enrichment from its diversion and consumption of Net Revenues. They argued that PREPA had benefited by using liened revenues that should have been transferred for debt service, and that the Bondholders were owed compensation for the actual value conferred on the utility. Mot.26-27.

*Second*, the Bondholders argued that an administrative-expense claim under Section 503(b) also arose under the doctrine articulated in *Reading Co. v. Brown*, 391 U.S. at 471, which recognizes administrative-expense claims for debtors' post-petition unlawful conduct. The Bondholders argued that PREPA's misappropriation of liened revenues while the automatic stay prevented enforcement of the Bondholders' remedies constitutes an uncompensated taking under the Fifth Amendment. Mot.30-31.[3]

*Third*, the Bondholders argued that they are entitled to a claim under 11 U.S.C. § 922(c), which states that failure by the debtor to provide

---

[3] The Bondholders also argued below that PREPA's conduct constitutes conversion. Assured and National adopt the argument regarding conversion set forth in the Brief of GoldenTree Asset Management LP and Syncora Guarantee, Inc.

20

adequate protection for collateral during municipal-bankruptcy proceedings gives rise to an administrative-expense claim under Section 503(b). Mot.31.

In response, the Board contended primarily that the Bondholders have no administrative-expense claim because their "recourse" under the Trust Agreement is limited to Net Revenues, that Net Revenues purportedly now are "[n]onexistent" and "zero," and thus that the Bondholders are owed nothing.  Board's Objection to Administrative-Expense Motion ("Objection") at 47, Dkt. 5621-2; App.2823.

Given that the parties' arguments hinged on whether PREPA generated Net Revenues and, if so, what the utility did with them, the parties began discovery into those issues pursuant to various court orders.  *See* Dkt. 5706 (setting deadlines for discovery productions and deposition requests); Dkt. 5976 (setting deadlines for briefing on motion to compel).

## B.   The District Court Rejects All The Bondholders' Theories Of Relief As A Matter Of Law.

While discovery was underway, and in the middle of meet and confers concerning outstanding discovery and a pending Bondholder motion to compel, the district court abruptly determined that the Bondholders'

21

administrative-expense claim should be disallowed "in its entirety" because all theories of relief fail "as a matter of law."  Add.7; Add.42.

Regarding the Bondholders' unjust-enrichment theory, the district court reasoned that the Bondholders had not entered any (presumably consensual) "postpetition transaction" with PREPA conferring benefits on the utility.  Add.27-28.

As for *Reading*, the district court claimed it would be unfair to provide a so-called "boon" to the Bondholders, which it asserted could impair PREPA's restructuring.  Add.32.  The district court also posited that *Reading* is narrowly construed, that the Bondholders had "contracted away" a takings theory in the Trust Agreement, and that in any event PREPA was engaged in only "'a simple breach of contract,'" not a taking.  Add.34-37.

Finally, the district court rejected the Bondholders' Section 922(c) argument on multiple grounds: that PROMESA imposes no restrictions on how PREPA uses cash collateral, that PREPA's refusal to provide adequate protection defeats Section 922(c) claims as a statutory matter, and that the Bondholders' injury was not a "direct" result of the automatic stay because, despite the district court's numerous orders staying the

22

Bondholders' stay-relief motions, the Bondholders purportedly have not been "vigilant" in seeking stay relief.  Add.37-41.

## STANDARD OF REVIEW

This Court reviews "questions of statutory interpretation de novo." *U.S. ex rel. Lovell v. AthenaHealth, Inc.*, 56 F.4th 152, 157 (1st Cir. 2022). Likewise, "review of constitutional challenges to federal statutes is de novo." *United States v. Cardoza*, 129 F.3d 6, 10 (1st Cir. 1997).

## SUMMARY OF ARGUMENT

**I.**     PREPA's unjust enrichment through its post-petition use of Net Revenues supplies a classic basis to award an administrative-expense claim under Section 503(b) of the Bankruptcy Code, which establishes a procedure for courts to recognize administrative-expense claims to compensate individuals for post-petition benefits conferred on debtors.

As this Court held in the *Lien Decision*, the Bondholders have a perfected and unavoidable lien on all "Net Revenues."  It is undisputed that PREPA has not transferred any Net Revenues to debt service, but instead for years has consumed all Net Revenues that, under the Trust Agreement, should have gone to debt service (or at least should have been maintained pending resolution of the Title III proceeding).   That

23

misappropriation conferred dollar-for-dollar benefits on the utility at the Bondholders' expense, thus giving rise to an administrative-expense claim.

The district court's central rationale for rejecting this claim was that the Bondholders entered no consensual post-petition "transaction" with PREPA. But courts routinely recognize that a debtor who obtains a concrete benefit from using, expending, or damaging the collateral has engaged in the necessary post-petition "transaction." The district court's contrary rule, by contrast, would incentivize debtors to use creditors' collateral *without* permission in order to avoid providing compensation.

**II.** The Supreme Court's decision in *Reading Co. v. Brown*, 391 U.S. 471 (1968), independently supports an administrative-expense claim under Section 503(b) for PREPA's misappropriation. In *Reading*, the Supreme Court held that Section 503(b)'s predecessor provision in the Bankruptcy Act requires compensation for those injured by a debtor's post-petition legal wrongdoing. *Reading* thus entitles the Bondholders to compensation for PREPA's wrongful and uncompensated post-petition misappropriation of their collateral.

24

The district court treated *Reading* as a narrow doctrine limited to regulatory violations and "innocent third parties." But soon after the district court's ruling, this Court issued *Villalobos-Santana v. Puerto Rico Police Department*, 171 F.4th 544 (1st Cir. 2026), which refutes the district court's assumptions.

**III.**    Finally, Section 922(c) of the Code supplies a third basis for an administrative-expense claim under Section 503(b). Section 922(c) specifically recognizes administrative-expense claims in municipal bankruptcy when the debtor fails to adequately protect a creditor's collateral and the creditor thereby suffers diminution of that collateral. The Board argued below that using collateral to operate the utility itself supplied adequate protection. But the Board now contends that the Bondholders' collateral is "zero," so even under the Board's theory that supposed adequate protection has failed.

In any event, even if PREPA provided no adequate protection, it was not for lack of trying by the Bondholders. Section 922(c) should not be read to reward PREPA's conduct by eliminating any administrative-expense claim. The district court erred in holding that the Bondholders

25

were not vigilant, despite their repeated efforts to obtain stay relief, adequate protection, and receivership remedies.

## ARGUMENT

The district court erred in holding that the Bondholders could not obtain an administrative expense under Section 503(b) as a matter of law *even if* PREPA generated, withheld, and consumed Net Revenues—over which the Bondholders have a lien—while the automatic stay barred them from enforcing their non-bankruptcy remedies.

Section 503(b) of the Bankruptcy Code, incorporated into PROMESA by 48 U.S.C. § 2161(a), mandates that, "[a]fter notice and a hearing, there shall be allowed administrative expenses." Expenses qualifying as "administrative expenses" receive priority status and "must be paid by debtors to creditors and claimants earlier than other categories of expenses." *Villalobos-Santana*, 171 F.4th at 550. Allowance of an administrative-expense claim does not require the debtor to immediately pay the claim; rather, it imposes a precondition on plan confirmation: to be confirmed, the plan must provide for cash payment "equal to the allowed amount of such claim," unless the claimholder "has agreed to a different treatment." 48 U.S.C. § 2174(b)(4).

26

Section 503(b) provides an illustrative list of expenses that qualify, "including" "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). "As a general rule," a claim "may qualify" as an administrative expense "if (1) the right to payment arose from a postpetition transaction with the debtor estate, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor." *In re Hemingway Transp., Inc.*, 954 F.2d 1, 5 (1st Cir. 1992). "Notably, however," Section 503(b) "'provid[es] general protection to claimants that are injured by' the debtor's ongoing operations during" reorganization, "even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate." *Villalobos-Santana*, 171 F.4th at 550-51. The prevailing rule under pre-1978 bankruptcy law "was that a debtor's estate is obligated to pay for collateral it controls and uses for the benefit of the estate." *Grundy Nat'l Bank v. Rife*, 876 F.2d 361, 363 (4th Cir. 1989). This concept was codified in the former Bankruptcy Act, *Reading*, 391 U.S. at 475, and then in the modern Bankruptcy Code, 11 U.S.C. § 503(b).

27

The administrative-expense doctrine has constitutional underpinnings. The Supreme Court long ago ruled in *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935), that "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment." Accordingly, bankruptcy statutes may not effect "the taking of substantive rights in specific property acquired … prior" to such statutes' enactment "without just compensation." *Id.* at 590, 602. *Radford* thus invalidated a statute that purported to impair pre-existing lien rights without just compensation. *Id.* at 602. And, in the intervening decades, the Supreme Court has continuously adhered to the view that governmental destruction of liens "has every possible element of a Fifth Amendment 'taking,'" *Armstrong v. United States*, 364 U.S. 40, 48 (1960), even when pursuant to bankruptcy statutes, *United States v. Sec. Indus. Bank*, 459 U.S. 70, 75, 81-82 (1982) (liens are "traditional property interests" that bankruptcy statutes should not be construed to impair).

Indeed, in other litigation, the Board itself has recognized that just compensation is constitutionally mandated—and has admitted that administrative-expense claims are a mechanism to provide it. As the Board previously told this Court, if "the government takes the property during

28

the bankruptcy case, the Fifth Amendment would require full payment of just compensation," and "[t]he debtor's liability for full payment would be an allowable administrative expense." Board Br. 31, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 22-1199, (1st Cir. Apr. 1, 2022). That should not be surprising, given that the Constitution "prohibits the discharge or impairment of claims for just compensation in bankruptcy." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 41 F.4th 29, 45 (1st Cir. 2022). "Accordingly, the denial of adequate (read: just) compensation for a taking is itself constitutionally prohibited." *Id.*

The Bondholders raised three independent theories below supporting an administrative-expense claim under Section 503(b), each of which was legally sufficient and which warranted complete discovery in light of the Board's current, opportunistic claims that the Net Revenues reflected in contemporaneous business records never existed. Section 503(b) recognizes administrative-expense claims where (1) the failure to compensate a creditor would leave the debtor unjustly enriched; (2) the debtor inflicts injury through post-petition legal wrongdoing; or (3) the debtor fails to provide adequate protection for the creditor's collateral under Section 922(c). The district court erred by ruling that those doctrines were

29

all categorically unavailable here before resolving the factual questions its own discovery orders had identified.

In rejecting those theories, the district court ignored basic precedent, this Court's admonition that uncompensated diminution of collateral raises serious constitutional concerns, and the Board's own concession that administrative-expense claims are appropriate to compensate such losses. Worse still, the district court's threshold legal errors short-circuited much-needed discovery into what PREPA actually did with the Bondholders' collateral. The order below should be reversed and the case remanded for that necessary factual development to proceed.

## I.    The District Court Erred By Assuming A Voluntary Post-Petition Contract Was A Necessary Predicate To Administrative Priority Based On PREPA's Unjust Enrichment.

The Bondholders stated a viable administrative-expense theory first because PREPA used Net Revenues subject to the Bondholders' perfected lien for PREPA's own post-petition subordinate expenses, thereby leaving PREPA unjustly enriched at the Bondholders' expense. Unjust enrichment is a classic basis for a Section 503(b) claim where the debtor receives an actual post-petition benefit at a creditor's expense, and the district court's contrary legal rule is unsupportable.

30

### A. PREPA's Post-Petition Unjust Enrichment Is A Well-Established Basis For The Bondholders' Claim.

Courts have consistently recognized that Section 503(b) claims are appropriate where, absent compensation, the debtor's post-petition actions would result in its unjust enrichment at a creditor's expense. "'[T]he purpose of according priority in these cases is fulfillment of the equitable principle of preventing unjust enrichment of the debtor's estate.'" *In re United Trucking Serv., Inc.*, 851 F.2d 159, 162 (6th Cir. 1988); *see Grundy*, 876 F.2d at 364 (affirming administrative-expense claim where debtor was "economically better off" from "disregarding his commitments," and thus "was unjustly enriched at [the creditor's] expense"); *In re Colortex Indus., Inc.*, 19 F.3d 1371, 1383 (11th Cir. 1994) ("'The principal purpose of according administrative priority to claims for benefit to the estate is to prevent unjust enrichment of the debtor's estate.").

The Sixth Circuit's decision in *United Trucking* is particularly instructive. There, a trailer company (TRC) entered into a pre-petition equipment lease with United Trucking. 851 F.2d at 160. United later entered bankruptcy and failed to return the trailers to TRC. After several months, it finally returned some (but not all) of the trailers "in a

31

state of disrepair." *Id.* at 161.  TRC then sought an administrative-expense claim to compensate it for the expenses it incurred repairing and replacing the trailers, which the bankruptcy court allowed.  *Id.*

On appeal, the Sixth Circuit affirmed allowance of the claim.  The Sixth Circuit acknowledged that it had previously adopted this Court's administrative-expense test from *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir. 1976)—which generally contemplates a post-petition transaction in which the debtor induces the creditor's voluntary performance. *United Trucking*, 851 F.2d at 162.  The Sixth Circuit concluded, however, that such inducement is not required when the debtor uses the creditor's property without the creditor's permission.  *Id.*  Even though United had not "induce[d] any action on TRC's part," United nevertheless reaped a "benefit" by failing "to maintain and repair the trailers in accord with [the parties'] lease obligation." *Id.*  That breach permitted United "to use the money saved and not paid for TRC's benefit as contemplated under the lease, to continue its operations," meaning that TRC had "provided benefits to the bankrupt estate." *Id.*  And failing to compensate TRC would violate "'the equitable principle of preventing unjust enrichment of the debtor's estate.'" *Id*.

This unjust-enrichment rationale describes the Bondholders' predicament. Under the Trust Agreement, PREPA was required to transfer Net Revenues—the Bondholders' collateral—into the Sinking Fund for debt service before subordinate uses. Instead, PREPA reported that it has "accrued but not transferred" Net Revenues to the Sinking Fund, then later stopped issuing those reports altogether when they became inconvenient. At the same time, the Board now contends that Net Revenues are "zero" while also touting fiscal-plan projections showing large expenses that appear subordinate to debt service. By using funds that should have supported debt service to fund capital projects, PREPA received a concrete benefit at the Bondholders' expense. Section 503(b) exists to remedy precisely that kind of unjust enrichment.

## B. The District Court's Rationales For Rejecting The Bondholders' Unjust-Enrichment Theory Are Meritless.

Rather than following that straightforward application of Section 503(b), the district court posited various roadblocks to the Bondholders' unjust-enrichment theory. First, it asserted that Section 922(c) is the exclusive means for asserting an administrative-expense claim under PROMESA. Second, the court assumed that an administrative-expense

33

claim based on an unjust-enrichment theory must identify a post-petition "transaction" in which the claimant *agrees* to the debtor's use of the property. Neither argument withstands scrutiny.

**1.** At the outset, the district court contended that the Bondholders may assert a Section 503(b) claim *only* under 11 U.S.C. § 922(c). According to the district court, because PROMESA does not incorporate 11 U.S.C. § 363—which prohibits a debtor's use of cash collateral without either creditors' consent or a court order—there is "no restriction on PREPA's right to use its [*sic*] collateral." Add.39. The district court also asserted that Section 305 of PROMESA (which generally prohibits court interference with the "revenues of the debtor") likewise "denies the Court power to regulate [PREPA's] use of its own cash." Add.27. The district court thus suggested that PROMESA permits administrative-expense claims *only* under Section 922(c).

These attempts to artificially limit the scope of Section 503(b) fail. In the first place, PROMESA's non-incorporation of Section 363 does not mean, as the district court asserted, that there is "no restriction" on how PREPA disposes of the Bondholders' collateral. To the contrary, Section 928(a) of the Code (which PROMESA does incorporate, *see* 48 U.S.C.

34

§ 2161(a)) makes clear that the Bondholders' constitutionally protected lien on Net Revenues continues post-petition.  11 U.S.C. § 928(a) ("special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case").  The district court's characterization of Net Revenues as PREPA's "own revenues" thus does not support the notion that PREPA has *carte blanche* to consume or dissipate the Bondholders' collateral at will.  This Court already recognized as much in its Stay Decision *as to these bonds*, explaining that it "would 'doubt the constitutionality of' a rule that would allow a debtor to 'expend every penny of the Movants' collateral, leaving the debt entirely unsecured.'"  899 F.3d at 20.

More fundamentally, contrary to the district court's assertions, the Net Revenues are not simply PREPA's "own revenues."  Property rights are a "'bundle of sticks[,]' … a collection of individual rights" that are commonly owned by different entities.  *United States v. Craft*, 535 U.S. 274, 278-79 (2002).  In particular, property encumbered by a lien is not "exclusively the property of the … debtor"; rather, there is a "duality" of ownership under which both the debtor and the secured creditor have

35

"current, real interests in the property." *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 604 (1974). And because those property interests are constitutionally protected, the fact that the Bondholders have a lien rather than some other property interest in the Net Revenues cannot be the basis for denying an administrative-expense claim.

Thus, the district court's dubious assertion that PREPA faces "no restriction" on its purported "right" to consume Net Revenues has no relevance to the question whether the Bondholders have a viable administrative-expense claim. Rather, the fact that PROMESA does not incorporate Section 363 simply means a debtor need not comply with the procedures prescribed by that section when it seeks to use cash collateral, not that it may dissipate collateral with impunity and without regard to other provisions Congress included in PROMESA. Section 928(a) preserves the Bondholders' secured interest, and, if the debtor nonetheless dissipates the property, Section 503(b) requires recognition of an administrative-expense claim in favor of the aggrieved secured creditor. The debtor can decide whether to satisfy the claim to confirm a plan of adjustment under PROMESA or not, but the consequences of impairing the secured creditor's property interest remain.

36

Section 305 of PROMESA is similarly beside the point. Though that provision generally bars district courts from "interfer[ing] with" revenues the debtor generates, PROMESA expressly *permits* such interference with the disposition of revenues when "the plan so provides." 48 U.S.C. § 2165(2). And PROMESA likewise requires "the plan" to "provid[e]" for full payment of administrative-expense claims unless the claimholder agrees to "different treatment." 48 U.S.C. § 2174(b)(4). That is exactly what the Bondholders seek: recognition of an administrative-expense claim that must be paid under any plan of adjustment as a condition to confirmation. *See Ellis v. Westinghouse Elec. Co.*, 11 F.4th 221, 238 (3d Cir. 2021) ("[T]he Bankruptcy Code requires any plan to pay valid administrative expense claims in full."). Because such relief operates through the plan itself, it falls squarely within Section 305's express exception. Section 305 poses no barrier to the Bondholders' request.

Thus, contrary to the district court's assumption, recognizing an administrative-expense claim here would not require the Title III court to impermissibly interfere with the debtor's property or revenues. It would determine priority status for plan-confirmation purposes and leave the debtor to propose treatment consistent with PROMESA and any

37

applicable confirmation requirements. The debtor could satisfy the claim in cash, obtain the claimant's agreement to different treatment, or risk inability to confirm a plan that fails to deal with an allowed administrative expense. That is not interference with the use of the debtor's revenues, let alone interference that is precluded under Section 305.

For those reasons, the district court's threshold grounds for asserting that the Bondholders may proceed *only* under Section 922(c) miss the mark.

**2.** The district court's understanding of the Bondholders' unjust-enrichment argument was equally flawed. Citing this Court's decisions in *Hemingway Transport* and *Mammoth Mart*, the district court characterized the Bondholders as "solely prepetition creditor[s]" improperly attempting to elevate a mere "prepetition contract" to priority status under Section 503(b). Add.26. The district court then bolstered this view by characterizing the Trust Agreement as a "nonexecutory contract" entailing no further "action" post-petition. Add.27.

Those conclusions rest on a basic misunderstanding of both the Trust Agreement and the Bankruptcy Code. Unlike a contract where, for

example, goods are provided to a debtor entirely pre-petition and merely happen to confer a benefit on the debtor post-petition, the Trust Agreement involves the continuous generation of *new* collateral post-petition. PREPA continuously generates new Net Revenues as it sells electricity, the Bondholders' lien attaches to those Net Revenues "as soon as PREPA acquires" them, *Lien Decision*, 121 F.4th at 309, and PREPA has consumed those new Net Revenues post-petition. Thus, this is not a situation where the Bondholders' claim has "nothing whatever to do with any *postpetition* operation of the [debtor]," as in *Hemingway Transport*, 954 F.2d at 7, or "where no portion of appellants' claims can be apportioned to their employment after the [bankruptcy] was filed," as in *Mammoth Mart*, 536 F.2d at 953. To the contrary, the post-petition benefit to the utility's operations necessarily arose from newly generated Net Revenues that did not exist pre-petition. The district court was therefore wrong to treat this as a case where purely pre-petition activity "'may have resulted in a direct benefit to the bankrupt estate after the filing.'" Add.26.

The Bankruptcy Code itself also recognizes (and requires) that such pre-petition security agreements continue to impose significant post-petition obligations. While the Code normally terminates pre-petition liens

39

with respect to property the debtor acquires post-petition, *see* 11 U.S.C. § 552, Section 928(a) flips the default rule by specifically preserving special-revenue liens post-petition, making clear that security agreements continue to govern post-petition special revenues, *see* 11 U.S.C. § 928(a). The Bondholders' claim arises because PREPA defied this requirement by misappropriating new post-petition Net Revenues, thereby arrogating "benefits to the bankrupt estate," *United Trucking*, 851 F.2d at 162—a fact that in no way hinges on whether the Trust Agreement is best characterized as "executory" or "nonexecutory."

Because this distinctly post-petition generation and consumption of Net Revenues conferred a benefit on PREPA, the only question is whether a Section 503(b) claim requires the Bondholders to have *assented* to that consumption by "enter[ing] into" a new agreement with PREPA. Add.27. The district court thought so, but the reality is the opposite. As courts have held, "the postpetition transaction between the parties need not be a voluntary one." *In re TRP Brands LLC*, 676 B.R. 791, 802 (Bankr. N.D. Ill. 2026); *accord* 4 *Collier on Bankruptcy* ¶ 503.06 (16th ed. 2026) ("'[The t]ransaction with the estate does not require a contractual relationship with the debtor.'").

40

Courts therefore have recognized that the non-consensual misuse of collateral qualifies as a Section 503(b) "transaction."  As the Fourth Circuit explained in *Ford Motor Credit Co. v. Dobbins*, "a § 503(b) administrative expense can be created by a debtor's postpetition use (*against the secured creditor's wishes*) of collateral which the debtor has also used before going bankrupt."  35 F.3d 860, 867 n.7 (4th Cir. 1994) (emphasis added).  That is because, as a practical matter, "a creditor extends post-petition credit" to a debtor when the creditor "is forced to allow the debtor's continued use of collateral after the debtor slides into bankruptcy." *Id.*  An administrative-expense claim is thus appropriate so long as the debtor's post-petition use of collateral conferred an actual rather than "mere potential" benefit. *Id.*; *accord In re Am. Toy & Furniture Co.*, 1997 Bankr. LEXIS 2495, *17 (Bankr. E.D. Wisc. Feb. 24, 1997) (creditor "was induced to provide cash collateral to the debtor, albeit involuntarily," and "[t]he involuntary nature of the process does not negate the fact that [the parties] engaged in a postpetition transaction.").

The district court ignored *Dobbins* entirely and never grappled with the fact that every court of appeals to confront the question has agreed that a debtor's non-consensual misuse of collateral gives rise to an

41

administrative-expense claim. Instead, the district court relied on *In re Advisory Information & Management Systems, Inc.*, 50 B.R. 627, 630 (Bankr. M.D. Tenn. 1985), and *In re Provincetown-Boston Airline, Inc.*, 66 B.R. 632 (Bankr. M.D. Fla. 1986), for the proposition that no Section 503(b) claim arises from a creditor "sitting back and 'allowing'" the debtor to use collateral. Add.26. Even if correct, those cases involved mere continued use of collateral, not potentially irreversible *destruction* of collateral, as here. PREPA has no statutory right to consume liened Net Revenues without compensation or priority consequences. Moreover, both cases recognized that creditors may seek to "divest" the debtor of "use" of collateral where the debtor's conduct would "impair the creditor's adequate protection." *Provincetown-Boston Airline*, 66 B.R. at 634; *Advisory Info.*, 50 B.R. at 630. That is just what the Bondholders here have done. Far from "sitting back and allowing" PREPA to consume their collateral, the Bondholders have repeatedly pursued adequate protection since this proceeding was first initiated. *See supra* at 11-19.

Ignoring *Dobbins* entirely, the district court focused on the Sixth Circuit's *United Trucking* decision—which similarly held that the non-consensual damage and destruction of the trailers at issue supported a

Section 503(b) claim. The district court deemed *United Trucking* of little relevance for construing Section 503(b) because the parties there had entered into a "postpetition stipulation" to treat those damages to the trailers as an administrative expense. Add.27. But the Sixth Circuit noted the parties' stipulation only in a footnote and expressly did *not* consider it dispositive, explaining that, notwithstanding the stipulation, the court "*must still decide* whether the damages claimed can be accorded § 503 priority." *United Trucking*, 851 F.2d at 161 n.2 (emphasis added).

In conducting that independent analysis, the Sixth Circuit expressly rejected the district court's view that unjust-enrichment claims hinge on whether a debtor has "induce[d]" the creditor's consent to use the property. *United Trucking*, 851 F.2d at 162. The Sixth Circuit did "not believe the key inquiry is on inducement," but on the "actual value conferred on the bankrupt estate by reason of [its] wrongful acts," such that failure to compensate the creditor would lead to "'unjust enrichment of the debtor's estate.'" *Id.* The district court here offered no response to this reasoning.

The district court also assumed that *United Trucking* is inapposite because the creditor in that case was a pre-petition lessor (*i.e.*, owner) of

43

the trailers at issue, rather than a lienholder. Add.27-28. That claimed distinction is irrelevant. The pertinent inquiry under Section 503(b) is whether "actual value [was] conferred on the bankrupt estate by reason of [its] wrongful acts." *United Trucking*, 851 F.2d at 162. Nothing in that inquiry turns on whether the claimant is an owner rather than a secured creditor. Both enjoy "traditional property rights." *Sec. Indus. Bank*, 459 U.S. at 75. And debtors can exploit either type of creditor. *See, e.g.*, *Grundy*, 876 F.2d at 363 (post-petition use of collateral resulted in "the benefit of the estate"). PREPA did so here by consuming the Bondholders' collateral, yielding a direct, dollar-for-dollar benefit to the utility. The district court's ownership-lien distinction thus was irrelevant.

The district court fundamentally erred when it adopted the rule that a debtor may consume a creditor's collateral with impunity so long as it does so without the creditor's permission. Indeed, that ruling, if affirmed, would pose profound consequences for all municipal special-revenue bonds—effectively declaring that bondholders' liens become meaningless in municipal bankruptcy. The district court's rejection of the Bondholders' unjust-enrichment theory should be reversed.

44

## II.    *Reading* Supports Administrative Priority For Post-Petition Legal Wrongs, Including The Consumption Of Liened Net Revenues.

The Bondholders also stated a viable Section 503(b) claim under *Reading*, which makes clear that administrative-expense claims are an appropriate mechanism to compensate parties injured by a debtor's wrongful post-petition conduct.  The district court treated *Reading* as a narrow doctrine limited to negligent torts, regulatory violations, and "innocent third parties."  But numerous cases—including the intervening PROMESA decision by this Court in *Villalobos-Santana*, 171 F.4th at 551, confirm that the *Reading* doctrine applies broadly to post-petition unlawful conduct.  And PREPA's uncompensated misappropriation of Net Revenues inflicted precisely the kind of post-petition harm that *Reading* requires the debtor to remedy.

### A.    The Bondholders Stated A Viable *Reading* Claim Based On PREPA's Post-Petition Wrongdoing.

For decades, courts have recognized that administrative-expense claims arise when a debtor engages in post-petition wrongs that injure others.  That interpretation of Section 503(b) originates in the Supreme Court's decision in *Reading Co. v. Brown*, 391 U.S. 471 (1968), which concerned Section 503(b)'s predecessor provision, Section 64(a) of the

45

Bankruptcy Act. In *Reading*, a receiver operating a business under Chapter XI of the Bankruptcy Act negligently caused a fire that spread beyond the debtor's property and destroyed neighboring buildings. *Id.* at 473. In response, 146 claimants (including Reading Company) asserted administrative-expense claims for the damages incurred. *Id.* at 474. The lower courts disallowed the claims, but the Supreme Court reversed, holding that they fell within Section 64(a) of the Bankruptcy Act. *Id.* at 474-75.

As the Supreme Court explained, it was "linguistically" and "theoretically soun[d]" to treat those claims "as actual and necessary expenses" of the receivership under Section 64(a)—language carried forward into the modern Section 503(b). *Reading*, 391 U.S. at 482. The Court emphasized the "decisive, statutory objective [of] fairness to all persons having claims against an insolvent" due to their "grave financial injury." *Id.* at 477. Thus, even if insulating the estate from liability might have better facilitated "rehabilitation," the Court concluded that denying the claims would have been inconsistent "with the rule of fairness in bankruptcy to seek these objectives at the cost of excluding tort creditors of the arrangement from its assets." *Id.* at 479.

46

While *Reading* arose under the former Bankruptcy Act, "[t]he opinion in *Reading* not only survived the later enactment of the Bankruptcy Code of 1978, but has been expanded by lower courts." *In re Megafoods Stores, Inc.*, 163 F.3d 1063, 1071 (9th Cir. 1998). *Reading* now applies "beyond the field of torts," *In re Charlesbank Laundry*, 755 F.2d 200, 203 (1st Cir. 1985), and has been applied to all manner of claims—ranging from the violation of zoning ordinances, *id.*, to attorneys' fees for debtors' frivolous litigation, *Matter of Al Copeland Enters., Inc.*, 991 F.2d 233, 239 (5th Cir. 1993) (collecting cases).

Crucially, just days after the district court's opinion issued, this Court confirmed in *Villalobos-Santana* that *Reading* is "broad," "expansive," and fully incorporated into PROMESA. 171 F.4th at 551.

These principles squarely apply to PREPA's post-petition consumption of the Bondholders' collateral. The Bondholders' asserted injury is not merely that PREPA failed to pay a pre-petition bond debt. The injury is that PREPA generated special revenues after the petition date, those revenues became subject to the Bondholders' perfected lien, and PREPA then consumed those revenues while the automatic stay and litigation stays prevented the Bondholders from enforcing receivership,

47

specific-performance, and other remedies. *See In re TRP Brands LLC*, 676 B.R. at 807 ("unfairness is inflicted upon the creditor whose property is used by the debtor-in-possession for the benefit of other" creditors without compensation). And that inequity is even more pronounced given that PREPA's conduct amounts to a constitutionally proscribed taking—"an intentional act which violates the law and damages others," *Charlesbank Laundry*, 755 F.2d at 203.

PREPA's actions leave no doubt that a taking has occurred here. The Bondholders' lien continuously attaches to newly generated Net Revenues as they come into existence—conferring a constitutionally protected "property right … in th[at] collateral." *Sec. Indus. Bank*, 459 U.S. at 75; *accord Radford*, 295 U.S. at 589-90. Sheltered by the automatic stay and the litigation stays, however, PREPA has not only consumed that collateral but has also engaged in "total destruction … of all value of these liens," *Armstrong*, 364 U.S. at 48, by abusing PROMESA to deprive the Bondholders of any remedy for that misappropriation. Through the Board, PREPA has stymied the Bondholders from pursuing any of their contractual remedies—such as a receivership or specific performance—to enforce their rights under their lien. At least according to the Board,

48

the net result of this conduct is that "the value of the[ Bondholders'] secured claim" is now "zero"—which, if true, would merely confirm the taking. App.2823.

For those reasons, the Bondholders are entitled to an administrative-expense claim under *Reading* to provide the just compensation the Constitution requires. At a minimum, the canon of constitutional avoidance compels construing Section 503(b) to support such a claim. *See Sec. Indus. Bank*, 459 U.S. at 81-82. And if such a reading is impossible—meaning that PROMESA would result in an uncompensated taking—the statute should be deemed "void" as applied. *Radford*, 295 U.S. at 602.

## B. The District Court's *Reading* Analysis Misunderstands Precedent, The Constitution, And The Trust Agreement.

In rejecting the Bondholders' *Reading* theory, the district court advanced a series of flawed arguments: (1) that *Reading* permits courts to deny otherwise-valid Section 503(b) claims based on generalized "public policy" concerns; (2) that *Reading* is "limited" to regulatory violations affecting "innocent third parties" and does not extend to prepetition creditors; (3) that the Trust Agreement somehow waives or limits the Bondholders' claim; (4) that constitutional-avoidance principles are irrelevant

because PROMESA unambiguously applies to preexisting property rights; and (5) that no taking occurred because PREPA contracted with the Bondholders in a commercial rather than sovereign capacity. Add.31-Add.37. None of these arguments holds water.

**1.** To start, the district court proceeded from the mistaken premise that *Reading* gives courts discretion to deny otherwise-valid Section 503(b) claims based on their own views of "public policy." Add.32. The district court rejected the Bondholders' *Reading* theory because "any prepetition creditor could make the same argument" as the Bondholders; allowing the claim would confer a "boon" on the Bondholders; and permitting such a "boon" could "potentially defeat [Puerto Rico's] ability to rehabilitate the utility." Add.31-32.

That reasoning misreads *Reading* and misstates the facts. *Reading* does not authorize courts to withhold administrative priority based on freewheeling policy judgments about who should benefit from the estate or how reorganization might be affected. Indeed, *Reading* itself rejected the argument that concerns for "facilitat[ing] rehabilitation of insolvent business" could overcome the claims there, holding that "fairness" demanded allowance of those claims even though they were "substantially

50

more than the total assets of the debtor" and the debtor would be "unable to pay its fire debts in full." 391 U.S. at 473, 476-78. In other words, *Reading* itself *already* balanced such competing policy concerns—and concluded that they weigh decisively in favor of allowing administrative-expense claims.

This Court's recent decision in *Villalobos-Santana* confirms the point. There, this Court recognized an administrative-expense claim under PROMESA against the debtor Commonwealth for employment retaliation by the Puerto Rico police department. 171 F.4th at 544. A police department, of course, performs equally essential public services as does an electric utility. But this Court never suggested that such vital public functions would allow a court to refuse an administrative-expense claim against the police department.

The district court's concerns about conferring a "boon" on the Bondholders, Add.32, are equally meritless. The premise of the Bondholders' claim is that they are entitled to *just compensation*—which would simply restore the Bondholders to the position they would have been in without PREPA's unlawful conduct. This is the constitutional *minimum* necessary—no more than is "just." And it makes no sense to

51

say "any prepetition creditor" could make the same argument as the Bondholders. The Bondholders' *Reading* theory is predicated on post-petition wrongdoing specifically directed at *the Bondholders'* collateral and could not be asserted by an unsecured creditor, or even by a secured creditor who, unlike the Bondholders, was not prevented by the district court from seeking stay relief.

The district court thus had no authority to deny a *Reading* claim due to its own policy concerns. Since the Bondholders satisfy *Reading*, Section 503(b) states in "mandatory terms," *In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 430 (2d Cir. 2009), that their claim "shall be allowed," 11 U.S.C. § 503(b). "[B]ankruptcy courts may not take it upon themselves" to substitute their own "policy choice" for the choice Congress itself made. *United States v. Noland*, 517 U.S. 535, 543 (1996).

**2.** The district court's contention that the *Reading* doctrine purportedly has been "limited to violations of regulations" is likewise in error. Add.31-32. That assertion is plainly incompatible with this Court's intervening decision in *Villalobos-Santana*, which emphasized *Reading*'s "broad" and "expansive" application to "unlawful conduct," whether intentional or negligent common-law torts, violations of

52

injunctions, violations of regulations, or claims under employment and discrimination statutes. 171 F.4th at 551. And the district court's reasoning was baseless under existing precedent as well. *Charlesbank Laundry* confirmed the doctrine applies to *any* "violation of law," endorsing a Second Circuit decision extending *Reading* to patent infringement, 755 F.2d at 203 (citing *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 874 (2d Cir. 1971)). That understanding leaves no doubt that *Reading* encompasses injuries to a secured creditor's collateral.

Next, the district court asserted that *Reading* applies only to "innocent third parties," not pre-petition creditors. Add.31-32. Nothing in *Reading* excludes pre-petition creditors: *Reading* is a post-petition-wrong rule, not a claimant-status rule. Courts therefore have routinely permitted *Reading* claims due to post-petition violations of pre-petition obligations. The fact that damage to "property might *also* have constituted a breach" of a pre-petition agreement "does not deprive [such damage] of its status as an independent tort." *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461, 480 (Bankr. D. Del. 2006) (emphasis added). Thus, "an administrative expense is warranted" when a creditor suffers a post-petition

53

wrong even if that wrong is also "a breach of [a pre-petition] obligation." *Id.* Numerous cases prove the point. For example, the administrative expense in *Charlesbank Laundry* arose from post-petition damages for violation of a pre-petition injunction—thus necessarily involving individuals with a pre-petition relationship to the debtor. 755 F.2d at 201. And regardless, the Bondholders' complaint is based on the post-petition misappropriation of their collateral, as to which they are, manifestly, "innocent parties."

The district court's sole contrary citation (at Add.31), to *In re Baseline Sports, Inc.*, 393 B.R. 105 (Bankr. E.D. Va. 2008), is fundamentally different from this case. The secured creditor there had already received "relief from the automatic stay," "released" the debtor from its "obligations" through a settlement, waived its administrative-expense claims, and suffered no injury from the debtor's continued operations, as the debtor no longer "operate[d] as a functioning business" post-petition. *Id.* at 109, 131-32. The circumstances here are the exact inverse—thus demonstrating why a *Reading* claim *is* appropriate on this case's facts.

**3.** The district court also suggested that by entering into the Trust Agreement, the Bondholders "contracted away their ability to claim a

taking." Add.35. According to the district court, because the Bondholders agreed to "recovery solely from moneys available for debt service," they contractually relinquished any *remedy* for their takings theory. *Id.*

That argument cannot be squared with the text of the Trust Agreement or with the Constitution. The district court relied on Section 804, which lists a broad range of remedies that the Bondholders may pursue in the event of default, including a suit "in equity or at law" for appointment of a receiver, specific performance, or "any proper legal or equitable remedy." App.597. The Trustee can sue for "any and all amounts" due "for principal, interest or otherwise" under the Trust Agreement, and may collect "solely from moneys in the Sinking Fund and any other moneys available for such purpose." App.598. This limitation applies only to claims the Trustee asserts for amounts due "under any of the provisions of th[e] [Trust] Agreement or of the bonds." App.598. The limitation therefore applies only to *contractual* rights, not to this separate constitutional and statutory claim. The Trust Agreement itself makes this clear by specifying that this limitation on the ability to enforce contractual rights to payment is "without prejudice to any other right or remedy of the Trustee or of the bondholders." App.598.

Moreover, under the Fifth Amendment, a taking occurs the moment property is taken "in the absence of contemporaneous compensation," regardless of the availability of "post-taking compensation." *Knick v. Twp. of Scott*, 588 U.S. 180, 202 (2019). Thus, the Bondholders have a nondischargeable takings claim regardless of what remedy is available. The existence of an administrative-expense claim does not depend on whether the debtor currently can pay it in full. Even where an administrative-expense claim "has no recourse[, that] does not mean that the claim does not exist." *In re Sanchez Energy Corp.*, 2022 WL 2912076, at *7 n.7 (Bankr. S.D. Tex. July 22, 2022); *see In re Scott Cable Commc'ns, Inc.*, 227 B.R. 596, 600 (Bankr. D. Conn. 1998) (administrative-expense claims exist "even if there are no estate assets to pay them").

In any event, the district court's conclusion fails even under its own theory. Whether "moneys available for such purpose" exist to pay the Bondholders' claim is a *factual* issue to be resolved through discovery. Discovery may well show that PREPA holds substantial Net Revenues sufficient to satisfy the claim—particularly given reporting that PREPA holds over a billion dollars in one of its accounts. Mot.38-39. There was

no basis for the district court to short-circuit the pending discovery even on its own logic.

4. The district court also dismissed constitutional-avoidance concerns as irrelevant because PROMESA unambiguously applies retroactively. Add.36. That misidentifies the ambiguity. The question is not whether PROMESA applies retroactively, but whether it can be construed *to provide just compensation* for its interference with preexisting rights. If Section 503(b) *can* be construed to supply an administrative-expense claim, it *must* be so construed. As *Security Industrial Bank* instructs, bankruptcy statutes impairing "liens acquired before the enactment date" should be construed not to do so where possible, 459 U.S. at 73. If Section 503(b) cannot be interpreted to recognize such a claim, then PROMESA—applied retroactively to the Bondholders' pre-existing liens—effects an uncompensated taking in violation of *Radford*, which held that a bankruptcy statute impairing "pre-existing" property rights offends the Fifth Amendment, 295 U.S. at 581.

5. Finally, the district court erred in concluding that no taking occurred because PREPA acted "in its commercial, not sovereign capacity." Add.35. The Bondholders' takings theory does not hinge on the "capacity"

57

in which PREPA contracted, nor upon PREPA's breach of the Trust Agreement. The Bondholders' theory does not rest solely on PREPA's original decision to issue bonds. It rests on the combination of a lien recognized by this Court, Section 928(a)'s preservation of that lien post-petition, the automatic stay's restraint on enforcement remedies, and PREPA's post-petition consumption of the Bondholders' collateral without compensation.

The district court's cited cases about "'simple breach[es],'" Add.36, are thus inapposite. Those cases presuppose that the injured party retains "'a viable breach remedy,'" *Tamerlane, Ltd. v. United States*, 80 Fed. Cl. 724, 738 (2008). Here, by contrast, the government *also* has "substantially take[n] away the right to damages in the event of a breach" through the automatic stay, which has prevented the Bondholders from exercising any of their contractual remedies (such as a receivership). *Piszel v. United States*, 833 F.3d 1366, 1377 (Fed. Cir. 2016). Far from a "'simple breach of contract,'" the deprivation of contractual rights *and* remedies represents a paradigmatic taking. This Court previously recognized as much in the *Stay Decision*, explaining that forcing a creditor

58

to watch "helplessly" as its collateral is destroyed would be unconstitutional. *Stay Decision*, 899 F.3d at 20.

Accordingly, none of the district court's stated rationales supplies any basis to reject the Bondholders' *Reading* theory.

### III. The District Court Erred In Denying An Administrative-Expense Claim Under 11 U.S.C. § 922(c) As A Matter Of Law.

#### A.    Section 922(c) Creates A Section 503(b) Claim Where The Creditor Fails To Provide Adequate Protection.

In addition to Section 503(b)'s general authorization of a range of administrative-expense claims, Section 922(c) specifies another scenario in which municipal-bankruptcy creditors are entitled to administrative-expense claims: "[i]f the debtor provides" adequate protection, "and if, notwithstanding such protection such creditor has a claim arising from" the automatic stay, "then such claim shall be allowable as an administrative expense under section 503(b)."  11 U.S.C. § 922(c).

Congress enacted Section 922(c) as an analogue to 11 U.S.C. § 507(b)—a similarly worded provision that applies outside of municipal bankruptcy.  Courts traditionally had read Section 507(b) to create administrative-expense claims when creditors suffered diminution of their collateral as a result of the automatic stay.  But Section 507(b) does not

apply in municipal bankruptcy. So Congress added Section 922(c) to remove "any doubt that a failure of adequate protection should give rise to an administrative expenses claim" in the context of municipal bankruptcy. S. Rep. 100-506, at 11 (1988). Courts use Section 507(b) precedent to construe Section 922(c). *See* 6 *Collier on Bankruptcy* ¶ 922.04 ("Section 922(c) should be construed *in pari materia* with Section 507(b)").

Courts applying Section 507(b) routinely recognize that administrative-expense claims are appropriate when the debtor abuses the automatic stay to diminish a secured creditor's collateral without compensation. As the Fourth Circuit explained, "§ 507(b) converts a creditor's claim where there has been a diminution in the value of a creditor's secured collateral by reason of a § 362 stay into an allowable administrative expense claim under § 503(b)." *Grundy*, 876 F.2d at 363-64.

*Grundy*'s application of that principle is particularly instructive. The creditor there (Grundy National Bank) held a security interest in two vehicles of the debtor, Rife. 876 F.2d at 361. Throughout his bankruptcy case, Rife "abused the automatic stay" by retaining and using the vehicles without making payments on his bank loan. *Id.* at 363. And the court

abetted that abuse by (as here) refusing to adjudicate Grundy's motion to lift the automatic stay—"in effect an injunction by inaction of the court" that "violate[d] both the letter and the intent of the law." *Id.* at 365. Eventually, with both parties' agreement, the court lifted the stay as to one vehicle. *Id.* at 363. Grundy then moved for stay relief as to the other and for an administrative-expense claim for Rife's "missed payments or for depreciation in value of the secured automobiles during the nine months the debtor used [them]." *Id.* The court denied any relief. *Id.*

The Fourth Circuit reversed. As it explained, "[t]he bankruptcy judge allowed the debtor to use the automatic stay provision to hold Grundy at bay while the debtor used the secured property." *Grundy*, 876 F.2d at 364. By permitting the debtor to "disregard his commitments," the bankruptcy court left him "economically better off" than if he had made loan payments and "unjustly enriched at Grundy's expense." *Id.* And Grundy's collateral "depreciated significantly" in the interim. *Id.* Thus, Grundy was "entitled to recover the administrative expense" for either the missed payments or diminution in the relevant vehicle's value, "whichever is the greater amount." *Id.* at 365.

61

Like *Grundy*, numerous other courts have concluded that post-petition diminution of collateral gives rise to a Section 503(b) claim under Section 507(b)—and thus Section 922(c). *See In re Cal. Devices, Inc.*, 126 B.R. 82, 84 (Bankr. N.D. Cal. 1991) (allowing administrative-expense claim for "Debtor's use of [creditor's] collateral"); *In re J.F.K. Acquisitions Grp.*, 166 B.R. 207, 212 (Bankr. E.D.N.Y. 1994) (allowing administrative-expense claim because "[t]he use of the collateral was an actual and necessary cost of preserving the estate"); *In re Mendez*, 259 B.R. 754, 759 (M.D. Fla. 2001) (allowing administrative-expense claim where "imposition of the [automatic] stay has caused a decline in the value of [creditor's] collateral").

Under those principles, Section 922(c) creates an administrative-expense claim for the Bondholders for two independent reasons.

*First*, the Board's purported provision of adequate protection plainly has proven inadequate to actually protect the Bondholders' collateral. The Board's primary argument below was that if the Bondholders are correct that PREPA continuously generated and consumed Net Revenues, then PREPA *has* provided adequate protection. Objection.14. In the Board's words, the "use of collateral to operate the business *is itself*

62

*adequate protection*." Objection.14 (emphasis added). Given that adequate protection, the Board argued, the Bondholders have "no cognizable claim." Objection.15.

Under the Board's own theory, however, that purported adequate protection plainly has "proved to be inadequate" here. *Dobbins*, 35 F.3d at 865. Indeed, the Board insisted below that Net Revenues are "[n]on-existent" and "zero." Objection.47; App.2823. Thus, PREPA's supposed adequate protection of the Bondholders' collateral failed to "increase, or at least maintain," that collateral, *In re L.V. Monorail Co.*, 429 B.R. 317, 341 (Bankr. D. Nev. 2010), thereby giving rise to an administrative-expense claim for the diminution.

*Second*, even if PREPA (contrary to the Board's representation) had never provided any adequate protection in the first place, Section 922(c) still should be construed to create an administrative-expense claim. The Ninth Circuit recognized that a contrary construction would mean a debtor could defeat an administrative-expense claim by simply refusing to provide adequate protection in the first place and then diminishing a creditor's collateral. *In re Ctr. Wholesale, Inc.*, 759 F.2d 1440, 1451 (9th Cir. 1985). The Ninth Circuit explained that "section 507(b) offers an

equitable solution" to such intransigence by creating a claim where the debtor "never provided protection in the first place." *Id.* at 1451 & n.23. Otherwise, a debtor (as here) could destroy a creditor's constitutionally protected property interest while unilaterally giving itself impunity by refusing to provide adequate protection.

**B.　The District Court's Section 922(c) Analysis Would Let A Title III Debtor Avoid Priority By Refusing Adequate Protection Altogether.**

After suggesting that Section 922(c) was the Bondholders' only possible administrative-expense route because PROMESA does not incorporate Section 363, *see supra* at 34, the district court again invoked PROMESA's lack of Section 363 to reject the Bondholders' Section 922(c) theory. According to the district court, because PROMESA supposedly imposes "no restriction" on a debtor's use of cash collateral, PREPA's "use of even postpetition Net Revenues" could never "form the basis for a Section 922(c) claim" unless PREPA had assented to an "explicit and operative adequate protection agreement" that later proved inadequate. Add.39. And because no such agreement existed here, the district court reasoned, the Bondholders' claim is foreclosed. Add.39.

64

That reading gives PROMESA's omission of Section 363 far more weight than it can bear. Non-incorporation of Section 363 means that PREPA does not need a court order before using revenues. It does not mean that Section 928(a), Section 503(b), Section 922(c), and the Fifth Amendment disappear once those revenues are used. The district court's contrary rule would convert Section 363's absence into an immunity from any administrative-expense remedy for the debtor's consumption of the Bondholders' collateral.

The district court also ignored contrary precedent. As noted above, the Fourth Circuit in *Dobbins* rejected the view that a voluntary agreement about the disposition of collateral is necessary to create an administrative-expense claim under Section 507(b). It explained that the "post-petition use (against the secured creditor's wishes) of collateral"—*i.e.*, without an express agreement—can itself suffice. 35 F.3d at 867 n.7. The district court purported to distinguish such Section 507(b) precedents by claiming that they sought to remedy violations of Section 363, Add.38-39, but that is no response to *Dobbins*, which involved real property rather than cash collateral, 35 F.3d at 867.

65

Case: 26-1330   Document: 00118446871   Page: 79   Date Filed: 05/14/2026   Entry ID: 6809879

Nor was an express adequate-protection order required under the Board's own theory. Given the Board's argument below that "use of collateral to operate the business is itself adequate protection," Objection.14, the court should have asked whether that *de facto* adequate protection succeeded or failed. The answer obviously is that it failed, especially given the Board's own competing assertion that Net Revenues are now non-existent. The failure of that purported adequate protection establishes a Section 922(c) claim. And to the extent there is any factual dispute as to whether PREPA's misconduct in fact generated more Net Revenues, that is grounds for completing discovery—not for rejecting the Bondholders' theory as a threshold legal matter.

The district court also offered no substantive response to the Bondholders' alternative argument under the Ninth Circuit's *Center Wholesale* decision, which recognized a Section 507(b) claim where the debtor provided *no* adequate protection. The district court said it was "unpersuaded" and invoke the truism that out-of-circuit decisions are not "binding." Add.38. But the reason *Center Wholesale* matters is its logic: a debtor should not be able to defeat administrative priority by refusing to provide adequate protection in the first place and then using the

66

automatic stay to hold the secured creditor at bay while collateral is diminished. If that position were correct, debtors could force creditors "to stand by helplessly" as their collateral was destroyed. *Stay Decision*, 899 F.3d at 20.

The district court next claimed that the Bondholders' injury is not "a *direct* result of" the automatic stay because even if the Bondholders had been granted stay relief, a receiver would not enjoy "'superpowers'" to make the Bondholders fully whole. Add.40. That asks too much. The Bondholders did not need to prove that stay relief would have produced complete recovery—just that it would have "mitigated" diminution of their collateral by permitting enforcement of the Bondholders' numerous remedies. *Mendez*, 259 B.R. at 758. The only authority the district court cited for the notion that a receivership would have been futile was its own "estimation" decision, Add.40, which this Court unanimously reversed, *see supra* 16. And even that flawed decision concluded that a receiver could raise billions of dollars for debt service, *see* Dkt. 315, No. 19-391, far above the "zero" Net Revenues the Board now contends exist. Injury therefore can be traced directly to the automatic stay even on the district court's own logic.

67

The district court also deemed these injuries self-inflicted by claiming that "the Bondholders have not been vigilant" in seeking to protect their rights. Add.41. In reality, the Bondholders have *repeatedly* sought stay relief and related remedies to enforce their rights throughout their ten-year ordeal and have been rebuffed by the district court at every turn. *See* Dkts. 74, 975, 2973, 3913, 4689, 5160, 5510, 6092. Those efforts satisfy the "vigilance" requirement the district court drew from *In re Mandile*, 626 B.R. 915, 920 (Bankr. N.D. Ill. 2021). *Mandile* suggested that creditors must "be vigilant," "by, for example, moving for relief from the stay," *id.*—a requirement the Bondholders have satisfied many times over. And *Mandile* specifically recognized that administrative-expense claims are appropriate when "the debtor fails to make adequate protection payments, and the secured creditor is denied relief from the stay." *Id.* Those are the precise circumstances of this case—not a situation, as in *Mandile*, where the creditor "made a conscious decision not to seek relief from the stay." *Id.* at 921.

Indeed, the only times at which the Bondholders did not have a pending request for stay relief were when (1) the district court ordered them not to pursue such relief through its "litigation stays," and (2) the

68

parties were working toward consensual resolutions, like the 2019 RSA. Creditors should not be penalized for complying with court orders, such as stays. And the district court's suggestion that the Bondholders slept on their rights by seeking a consensual resolution with PREPA, Add.41, is equally meritless. Settlement agreements are supposed to "enjoy great favor with the courts." *Fidelity & Guar. Ins. Co. v. Star Equip. Co.*, 541 F.3d 1, 5 (1st Cir. 2008). But the district court's reasoning would make litigation to the bitter end the only option to stave off allegations of neglect. This is not a case where "the creditor has acquiesced in the harm to the collateral." *Mendez*, 259 B.R. at 758. It is a case where the Bondholders repeatedly tried to protect their lien while the automatic stay and Title III court orders prevented them from enforcing their non-bankruptcy remedies.

## CONCLUSION

The district court's order should be reversed and the case remanded so the Bondholders may complete discovery and pursue allowance of their administrative-expense claim under the proper legal standards.

69

Dated:  May 14, 2026

Respectfully submitted,

Casey J. Servais
William J. Natbony
Thomas J. Curtin
CADWALADER, WICKERSHAM &
TAFT LLP
200 Liberty Street
New York, NY  10281
(212) 504-6000
casey.servais@cwt.com

/s/ Miguel A. Estrada
Miguel A. Estrada
   Counsel of Record
Lochlan F. Shelfer
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8257
mestrada@gibsondunn.com

*Counsel for Movant-Appellant Assured Guaranty Inc.*

/s/ Gregory Silbert
Gregory Silbert
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8000
gregory.silbert@weil.com

*Counsel for Movant-Appellant*
*National Public Finance Guarantee Corporation*

## CERTIFICATE OF COMPLIANCE

1.    The foregoing brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,993 words, as determined by the word-count function of Microsoft Word 2019, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point New Century Schoolbook font.


Dated:  May 14, 2026                      */s/ Miguel A. Estrada*
                                          Miguel A. Estrada

                                          *Counsel for Movant-Appellant*
                                          *Assured Guaranty Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


Dated:  May 14, 2026                    */s/ Miguel A. Estrada*
                                        Miguel A. Estrada

                                        *Counsel for Movant-Appellant*
                                        *Assured Guaranty Inc.*

# ADDENDUM

Opinion and Order Denying PREPA Bondholders' Motion for Allowance of Administrative Expense Claim ……………………............1

11 U.S.C. § 503....…………………………………………………..43

11 U.S.C. § 922………………………………………………………..48

11 U.S.C. § 928………………………………………………….......49

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO <u>et al.</u>,<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as a representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | PROMESA Title III<br><br>Case No. 17-BK-4780-LTS |

OPINION AND ORDER DENYING PREPA BONDHOLDERS'
MOTION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the: (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (v) Puerto Rico Public Buildings Authority ("PBA", and together with the Commonwealth, HTA, ERS, and PREPA, the "Debtors") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations). On October 30, 2024, the Title III case for the Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) was closed.

**Add.1**

APPEARANCES:

RAMOS CRUZ LEGAL
By:     Lydia M. Ramos Cruz
1509 López Landrón Street
American Airlines Building, PH
San Juan, Puerto Rico 00911

WHITE & CASE LLP
By:     Thomas E Lauria
        Glenn M. Kurtz
        Claudine Columbres
        Isaac Glassman
        Thomas E. MacWright
1221 Avenue of the Americas
New York, New York 10036

*and*

        John K. Cunningham
        Michael C. Shepherd
        Jesse L. Green
200 S. Biscayne Blvd., Suite 4900
Miami, Florida 33131

*Co-Counsel for GoldenTree Asset Management LP*

CASELLAS ALCOVER & BURGOS P.S.C.
By:     Heriberto Burgos Pérez
        Ricardo F. Casellas-Sánchez
        Diana Pérez-Seda
P.O. Box 364924
San Juan, Puerto Rico 00936-4924

GIBSON, DUNN & CRUTCHER LLP
By:     Matthew D. McGill
        Lochlan F. Shelfer
1700 M Street, N.W.
Washington, D.C. 20036-4504

CADWALADER, WICKERSHAM
& TAFT LLP
By:     Howard R. Hawkins, Jr.
        Mark C. Ellenberg
        Casey J. Servais

O'NEILL & BORGES LLC
By:     Hermann D. Bauer
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813

PROSKAUER ROSE LLP
By:     Martin J. Bienenstock
        Paul V. Possinger
        Ehud Barak
        Margaret A. Dale
        Elliot R. Stevens
Eleven Times Square
New York, NY 10036

*Counsel for the Financial Oversight and Management Board as representative for the Debtors*

BUFETE EMMANUELLI, LLC
By:     Rolando Emmanuelli-Jiménez
P.O. Box 10779
Ponce, Puerto Rico 00732

ORTIZ MENDOZA & FARINACCI
FERNÓS, LLC
By:     Rafael A. Ortiz Mendoza
Edificio Banco Cooperativo Plaza
623 Avenida Ponce de León, Suite 806-B
San Juan, Puerto Rico 00917-4820

*Counsel for Sistema de Retiro de los Empleados de la Autoridad de Energía Electrica ("SREAEE")*

William J. Natbony
Thomas J. Curtin
200 Liberty Street
New York, New York 10281

*Co-Counsel for Assured
Guaranty Inc.*

REICHARD & ESCALERA, LLC
By:    Rafael Escalera
         Sylvia M. Arizmendi
         Carlos R. Rivera-Ortiz
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, Puerto Rico 00917-1913

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
By:    Susheel Kirpalani
         Eric Kay
295 Fifth Avenue
New York, New York 10016

*Co-Counsel for Syncora Guarantee, Inc.*

ADSUAR MUÑIZ GOYCO SEDA &
PÉREZ OCHOA, P.S.C.
By:    Eric Pérez-Ochoa
         Luis Oliver-Fraticelli
         Alexandra Casellas-Cabrera
P.O. Box 70294
San Juan, Puerto Rico 00936

WEIL, GOTSHAL & MANGES LLP
By:    Matthew S. Barr
         Jonathan Polkes
         Robert Berezin
767 Fifth Avenue
New York, New York 10153

*and*

Gabriel A. Morgan
700 Louisiana Street, Suite 1700
Houston, Texas 77002

*Co-Counsel for National Public Finance
Guarantee Corporation*

MONSERRATE SIMONET &
GIERBOLINI,
LLC
By:    Dora L. Monserrate-Peñagarícano
        Fernando J. Gierbolini-González
        Richard J. Schell
101 San Patricio Ave., Suite 1120
Guaynabo, Puerto Rico 00968

DECHERT LLP
By:    G. Eric Brunstad, Jr.
        Stephen D. Zide
        David A. Herman
1095 Avenue of the Americas
New York, New York 10036

*Co-Counsel for the PREPA Ad Hoc Group*

RIVERA, TULLA AND FERRER, LLC
By:    Eric A. Tulla
Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212

MASLON LLP
By:    Clark T. Whitmore
        Michael C. McCarthy
        John T. Duffey
        Jason M. Reed
225 South Sixth Street, Suite 2900
Minneapolis, MN 55402

*Attorneys for U.S. Bank National Association,
in its capacity as the PREPA Bond Trustee*

LAURA TAYLOR SWAIN, United States District Judge

Before the Court is the *PREPA Bondholders' Motion and Memorandum of Law for Allowance of Administrative Expense Claim* (Docket Entry No. 29173 in Case No. 17-3283 and Docket Entry No. 5599 in Case No. 17-4780)[2] (the "Motion"). The Motion was filed by Assured Guaranty Inc., GoldenTree Asset Management LP, National Public Finance Guarantee Corporation, the PREPA Ad Hoc Group, Syncora Guarantee, Inc., and U.S. Bank National Association as trustee (the "Bond Trustee," or the "Trustee," and together the "Bondholders" or "Movants").[3] The Court has also received and reviewed the *Debtor's Objection to PREPA Bondholders' Motion for Allowance of Administrative Expense Claim* (Docket Entry No. 29280 in Case No. 17-3283 and Docket Entry No. 5629 in Case No. 17-4780) (the "FOMB Objection") filed by the Puerto Rico Electric Power Authority ("PREPA") by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") and additional submissions by the parties and other parties in interest with respect to the Motion.[4]

---

[2] Unless otherwise indicated, all references to "Docket Entry Nos." in this Opinion refer to entries in Case No. 17-4780. Capitalized words used but not defined herein shall have the meanings ascribed to them in the Motion or in any specifically referenced pleading.

[3] Assured, Syncora, and National are all monoline insurers of insured Bonds. The Court will use the lower-case phrase "the bondholders" to refer generally to the holders of bonds issued under the Trust Agreement. When specifically discussing the bondholders and insurers that are parties in this action, the Court will use the capitalized term "Bondholders."

[4] The Court has also received and reviewed the *Expert Declaration of Maureen M. Chakraborty, PHD* (Docket Entry No. 29227-1 in Case No. 17-3283 and Docket Entry No. 5614-1 in Case No. 17-4780) (the "Chakraborty Declaration"); the declaration of Margaret A. Dale in support of the FOMB Objection (Docket Entry No. 29300 in Case No. 17-3283 and Docket Entry No. 5637 in Case No. 17-4780) (the "Dale Declaration"); the Official Committee of Unsecured Creditors' (the "Committee") supplemental brief and joinder to the FOMB Objection (Docket Entry No. 29308 in Case No. 17-3283 and Docket Entry No. 5649 in Case No. 17-4780); the Puerto Rico Fiscal Agency and Financial Advisory Authority's ("AAFAF") joinder to the FOMB Objection (Docket Entry No. 29306 in Case No. 17-3283 and Docket Entry No. 5650 in Case No. 17-4780); multiple additional joinders to the FOMB Objection filed by various parties (Docket

---

Add.5

The Court heard oral argument with respect to the Motion at the July 23, 2025 omnibus hearing. *July 23, 2025 Omnibus Hr'g Tr.* (Docket Entry No. 29725 in Case No. 17-3283 and Docket Entry No. 5757 in Case No. 17-4780.) The Court has considered all of the relevant submissions carefully. The Court has subject matter jurisdiction of this action pursuant to section 306(a) of PROMESA. 48 U.S.C. § 2166(a).[5]

The Bond Trustee, on behalf of the Bondholders, filed Proof of Claim No. 18449 on May 21, 2018, as a fully secured claim in the amount of $8,477,156,729.56, for amounts owed at the time the Title III petition was filed pursuant to that certain trust agreement between PREPA and the Bond Trustee (as successor trustee), dated as of January 1, 1974, as amended and supplemented (the "Trust Agreement" or "TA").[6] Through the Motion, the Bondholders seek the

---

Entry Nos. 29305 and 29307 in Case No. 17-3283 and Docket Entry Nos. 5638-5648 & 5651 in Case No. 17-4780; the Bondholders' response in support of the Motion (Docket Entry No. 29363 in Case No. 17-3283 and Docket Entry No. 5668 in Case No. 17-4780) (the "BH Reply ISO"); the declaration of Wiliam J. Natbony in support of the BH Reply ISO ((Docket Entry No. 29365 in Case No. 17-3283 and Docket Entry No. 5669 in Case No. 17-4780); the Oversight Board's supplemental brief in opposition to the Motion (Docket Entry No. 29425 in Case No. 17-3283 and Docket Entry No. 5685 in Case No. 17-4780) (the "FOMB Supplemental Brief"); and the Bondholders' supplemental brief in response thereto (Docket Entry No. 29497 in Case No. 17-3283 and Docket Entry No. 5700 in Case No. 17-4780) (the "BH Supplemental Response").

[5] The Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")—incorporating the Federal Rules of Civil Procedure (the "Federal Rules") to the extent stated therein—are made applicable in these Title III cases by section 310 of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). 48 U.S.C. § 2170. PROMESA is codified at 48 U.S.C. section 2101 et seq. References herein to "PROMESA" section numbers are to the uncodified version of the legislation. References herein to the provisions of Title 11 of the United States Code (the "Bankruptcy Code") are to sections made applicable in these cases by section 301 of PROMESA. 48 U.S.C. § 2161.

[6] In response to the Court's *Order Concerning PREPA Trust Agreement* (Docket Entry No. 115 in Adv. Proc. No. 19-00391), the Oversight Board and the Defendants filed an agreed-upon conformed copy of the trust agreement as Exhibit A to their *Joint Informative Motion Submitting Conformed Trust Agreement in Response to January 5, 2023 Order Concerning PREPA Trust Agreement [ECF No. 115]* (Docket Entry No. 118

entry of an order allowing an administrative expense priority claim in an amount "no less than $3.7 billion, the amount of which may increase if PREPA continues to use Net Revenues" after the date on which an order granting the Motion is issued without providing adequate protection. (Docket Entry No. 29175-1 in Case No. 17-3283 and Docket Entry No. 5601-1 in Case No. 17-4780 at 2.) The Oversight Board has requested that the Court deny the Motion as a matter of law, arguing that the Bondholders have not demonstrated any entitlement to administrative expense priority under the applicable sections of the Bankruptcy Code, as incorporated into PROMESA. (See, e.g., FOMB Obj. ¶ 27.)

For the following reasons, the Court holds that (a) the Bondholders have not demonstrated that PREPA's postpetition use of their alleged collateral is an "actual, necessary expense" incurred by PREPA postpetition that can be prioritized as an administrative expense under section 503(b)(1)(A) of the Bankruptcy Code ("Section 503(b)(1)(A)"), (b) the Bondholders have failed to show that they are entitled to administrative expense priority under the fundamental fairness doctrine enunciated in Reading v. Brown, 391 U.S. 471, 477 (1967), because that doctrine is inapplicable to their claim and because they have not pleaded cognizable claims sounding in tort, and (c) the Bondholders have not shown that they are entitled to priority claims under section 922(c) of the Bankruptcy Code ("Section 922(c)") because PREPA did not fail to provide any Court-ordered adequate protection payments to the Bondholders. As a result, the Court denies the Motion because it fails as a matter of law to demonstrate that the Bondholders have an allowable administrative expense claim.

---

Ex. A in Adv. Proc. No. 19-00391). All citations to the Trust Agreement are to that conformed version.

I.

BACKGROUND

Unless otherwise indicated, facts presented or recited in this Opinion and Order

are identified as undisputed in the Motion or the FOMB Objection or drawn from evidence as to

which there has been no contrary, non-conclusory factual proffer.

A.      PREPA

PREPA is a public corporation created under the Puerto Rico Electric Power

Authority Act, Act No. 83-1941, codified at 22 L.P.R.A. §§ 191-240 (as amended, the "Authority

Act"),[7] to supply substantially all of the electricity consumed in the Commonwealth.  The

Authority Act authorizes PREPA to issue bonds.  22 L.P.R.A. § 206.  Between the years 1974 and

2016, PREPA made several bond issuances pursuant to the Trust Agreement, totaling

approximately $8.3 billion of bonds (the "Bonds").

---

[7]     Unless otherwise stated, all citations herein to provisions of the Laws of Puerto Rico
Annotated are to the English-language translations, available on Westlaw, by the
Translation Office of the Puerto Rico Government, with one exception: Westlaw does not
provide an English-language translation of the current section 5, titled "Powers and
Authorities," of the Authority Act and certain other sections thereof. Accordingly, for the
English-language translations of the relevant sections of the Authority Act—some of
which have been amended since the version that was in effect on the date relevant to the
Estimation Order (July 3, 2017), which is currently the most recent version available in
English-language translation on Westlaw—the Court has relied upon a translated
compilation of the Authority Act provided by the Puerto Rico Office of Management and
Budget.  Puerto Rico Electric Power Authority Act, Act No. 83-1941 (codified as
amended by Act 33-2019), 22 L.P.R.A. §§ 191-240 (2019),
https://bvirtualogp.pr.gov/ogp/Bvirtual/leyesreferencia/PDF/2-ingles/83-1941.pdf
[https://perma.cc/VU2R-8MM2].  However, consistent with the Spanish-language
version of the Authority Act available on Westlaw, the Court will cite section 5 of the
Authority Act as 22 L.P.R.A. § 195a-1 ("Powers and Authorities"), and section 6 of the
Authority Act as 22 L.P.R.A. § 196 ("Duties and Responsibilities").  Until 1979, PREPA's
name was the Puerto Rico Water Resources Authority.

B.    Relevant Provisions of the Trust Agreement

Article I of the Trust Agreement defines key terms, including "Revenues" and "Net Revenues." PREPA's "Revenues" are (1) "all moneys received by [PREPA] in connection with or as a result of its ownership or operation" of its electricity generation and distribution system, (2) "any proceeds of use and occupancy insurance on the System or any part thereof," and (3) "income from investments made under" either the Trust Agreement or a 1947 predecessor agreement. (TA § 101.) "Current Expenses" are "the Authority's reasonable and necessary current expenses of *maintaining, repairing, and operating* the System" but they do not include certain other transfers, such as deposits to the credit of the Sinking Fund (as discussed immediately hereafter). (Mot. ¶ 5 (quoting TA §101) (emphasis added).) "Net Revenues" are the "amount of the excess of the Revenues for such period over the Current Expenses for such period." (TA § 101.)

Article V of the Trust Agreement establishes a "waterfall" structure for distributing PREPA's Revenues (as the term is defined in Article I) into certain funds. (TA Art. V.) The Revenues (except for certain types of investment income) first flow into the General Fund. (TA § 503.) PREPA pays its Current Expenses out of the General Fund. (TA § 505.) The remaining Revenues—the Net Revenues—then flow into the Revenue Fund, minus a reserve to cover future operating expenses. (TA § 506.) From there, Net Revenues flow first into the Sinking Fund, and then into a series of Subordinate Funds. (See TA § 507.) The Net Revenues deposited into the Sinking Fund are designated to cover debt service. The Net Revenues deposited into the Subordinate Funds are designated to cover internal PREPA operations, such as extraordinary repairs or capital improvements. There are four Subordinate Funds: the Self-Insurance Fund, the Capital Improvement Fund, the Reserve Maintenance Fund,

and the Construction Fund (which is not, technically, included in the waterfall structure).[8] If there is not enough money in the Sinking Fund to cover PREPA's debt service obligations at a given time, Article V (specifically, sections 512 through 512B) broadly requires PREPA to draw on the Subordinate Funds—other than the Construction Fund—to pay bondholders. (See TA §§ 512, 512A, 512B.)

Article VII of the Trust Agreement outlines specific contractual covenants between the bondholders and PREPA. In section 701, PREPA covenants that it will "promptly pay the principal of and the interest on" the Revenue Bonds. (TA § 701.) PREPA also covenants that the Revenue Bonds are "payable solely from the Revenues and said Revenues are hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified." (TA § 701.) In sections 705 and 712, PREPA also agrees not to create—"or suffer to be created"—any lien or charge on "the Revenues ranking equally with or prior to the [Revenue Bonds]." (TA §§ 705, 712.)

Article VIII of the Trust Agreement outlines the bondholders' remedies. Section 804 permits the bondholders to file a suit "in equity or at law . . . for the appointment of a receiver as authorized by the Authority Act[,] or for the specific performance of any covenant or agreement contained herein." (TA § 804.) The same provision entitles the bondholders to "recover and enforce any judgment or decree against the Authority, but solely as provided herein and in such bonds, for any portion of such amounts remaining unpaid . . . and to collect (but

---

[8] Instead, as noted by the Court of Appeals for the First Circuit (the "First Circuit"), "the Construction Fund is replenished by bond proceeds and certain Net Revenues preemptively siphoned off from the Revenue Fund." U.S. Bank Nat'l Assoc. v. Fin. Oversight and Mgmt. Bd. for P.R. (In re Fin. Oversight and Mgmt. Bd. for P.R.), 121 F.4th 280, 291 n.6 (1st Cir. 2024).

solely from moneys in the Sinking Fund and any other moneys available for such purpose) in any manner provided by law, the moneys adjudged or decreed to be payable."  (TA § 804.)

### C.    The PREPA Title III Proceedings

On July 2, 2017 (the "Petition Date"), the Oversight Board filed a petition pursuant to Title III of PROMESA, commencing a debt adjustment proceeding for PREPA under that statute.  (Docket Entry No. 1.)  On May 3, 2019, the Oversight Board, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), and PREPA (together the "Government Parties"), along with the Ad Hoc Group and Assured (followed soon thereafter by Syncora and National), entered into a restructuring support agreement intended to resolve claims related to the Bonds by granting certain treatment of the claims in exchange for support of a corresponding plan of adjustment (the "2019 RSA") (Dale Decl. Ex. 2).  The 2019 RSA contemplated, and according to the Oversight Board was dependent upon, passage by the Commonwealth of legislation authorizing several transactions called for by the RSA.  Such legislation was never passed.

In April 2020, after numerous adjournments of hearings on a motion to approve the settlements embodied in the 2019 RSA, as well as extensions of time due to earthquakes and the COVID-19 pandemic, the Court granted the Oversight Board and AAFAF's unopposed request to stay the deadlines applicable to the settlement motion.  (Docket Entry Nos. 1947, 1954.)  The Government Parties thereafter filed periodic status updates.  (See, e.g., Docket Entry Nos. 1992, 2691.)

On January 18, 2022, the Court confirmed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19784 in

Case No. Case No. 17-3283 (the "Commonwealth Plan").[9] (Docket Entry No. 19813 in Case No. 17-3283.)

On February 18, 2022, the Ad Hoc Group filed an urgent motion (the "Urgent Motion") asking the Court to appoint a mediator and set PREPA plan submission and confirmation deadlines. (Docket Entry No. 2718.)

On March 8, 2022, citing concerns regarding lack of implementing legislation and a comprehensive settlement of PREPA's legacy obligations, along with concerns regarding the affordability of the cost of electricity and the sustainability of the electric system as a result of rising inflation and significant surges in the price of crude oil, AAFAF gave unilateral notice of termination of the 2019 RSA. (See Docket Entry No. 2747 Ex. B (the "RSA Termination Notice").)

Also on March 8, 2022, the Court denied the Urgent Motion's specific requests, but entered an order requiring the Oversight Board, by a certain deadline (the "Path Forward Deadline"), to file (1) a proposed plan of adjustment for PREPA, (2) a detailed term sheet for a plan of adjustment for PREPA, (3) a proposed litigation schedule for significant disputed issues in PREPA's Title III case, including the existence and extent of the Bondholders' secured claim, or (4) a declaration and memorandum of law showing cause as to why the Court should not consider dismissal of PREPA's Title III case. (See Docket Entry No. 2748 ¶ 3(b).)

On April 8, 2022, this Court entered orders appointing the Mediation Team (as defined therein) and establishing terms and conditions to govern mediation, including an initial

---

[9] The Commonwealth Title III case was commenced on May 3, 2017. (Docket Entry No. 1 in Case No. 17-3283.) The PREPA Title III proceedings have been administered jointly with the various other Title III proceedings. (See Docket Entry No. 304 in Case No. 17-4780.)

mediation termination date (the "Termination Date"). (Docket Entry No. 2772 (the

"Appointment Order"); Docket Entry No. 2773 (the "Terms and Conditions Order")).)

The Path Forward Deadline and Termination Date were extended several times.

(See, e.g., Docket Entry No. 2949.) In mid-September 2022, the Mediation Team declined to

extend the deadlines any further, at which time the Bondholders (without the Bond Trustee) filed

a motion to dismiss PREPA's Title III Case or for relief from the automatic stay in order to

enforce their contractual right to a receiver. (See Docket Entry No. 2973.)

On September 29, 2022, this Court entered an order staying the September 2022

motion to dismiss the case or for relief from the automatic stay, establishing a deadline to file a

plan of adjustment, and establishing a litigation schedule for Adversary Proceeding

No. 19-00391. (See Docket Entry No. 3013 (the "Litigation Scheduling Order").)

Throughout these proceedings, in an effort to protect their alleged collateral, the

Bondholders have, at certain times, requested adequate protection. (See Mot. ¶ 20.) Before

2019, the Bondholders moved for relief from the automatic stay and for adequate protection

twice: once on July 18, 2017, and in a renewed motion filed on October 3, 2018.[10] (Mot.

¶¶ 20-21.) Before the Court could decide whether to grant stay relief or adequate protection to

the Bondholders on the 2018 renewed motion, the parties entered into the 2019 RSA. (Mot.

---

[10] On July 18, 2017, certain PREPA bondholders and monoline insurers filed a motion seeking relief from the automatic stay under PROMESA to pursue the appointment of a receiver in a non-Title III court. (Docket Entry No. 74.) Following the denial of the motion by this Court, a partial reversal by the Court of Appeals for the First Circuit, and a renewed motion (Docket Entry No. 975), the briefing schedule for the renewed motion was consensually extended several times. The motion was not resolved before the parties' entry into the 2019 RSA. (See Docket Entry Nos. 299, 1176, 1204, 3364.) See generally Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.), 899 F.3d 13 (1st Cir. 2018). The renewed stay relief motion was administratively terminated for statistical purposes by Court order (Docket Entry No. 3364) after the termination of the 2019 RSA.

---

Add.13

¶ 22.) The 2019 RSA required PREPA to make monthly payments to the Bondholders after it received approval from the Court, and included various other covenants, among them a promise to treat certain Bondholders' claims as administrative expense claims in the event the 2019 RSA was approved by the Court. (Mot. ¶ 22.) On May 10, 2019, the Oversight Board and AAFAF filed a joint motion seeking approval of the 2019 RSA. (Mot. ¶ 23.) However, the Court never approved the 2019 RSA, and on March 8, 2022—nearly two years after the Court granted the motion staying deadlines related to its approval— AAFAF unilaterally terminated the 2019 RSA. (See Mot. ¶ 25.) On September 19, 2022, certain Bondholders moved to dismiss PREPA's case, or alternatively for relief from the automatic stay to enforce their right to appoint a receiver under the terms of the Trust Agreement, but that motion did not seek adequate protection. (Mot. ¶ 25.) Eventually, the Oversight Board filed a plan of adjustment without support from the Bondholders. (Mot. ¶ 25.) On August 24, 2023, certain Bondholders moved again for relief from the automatic stay, now citing lack of adequate protection. (Mot. ¶ 26.) After the Court stayed that motion pending the outcome of related litigation, certain Bondholders renewed their request to lift the stay of that motion in February 2024. (Mot. ¶ 26.)

On February 11, 2025, the Oversight Board certified and filed PREPA's 2025 Fiscal Plan. (Docket Entry No. 5501.) The 2025 Fiscal Plan states that PREPA will not be able to afford "any sustainable rate increases for debt service" because such increases would outstrip the median income household's ability to afford to pay utility rates. (Mot. ¶ 32.) The Oversight Board bases this finding on a projection that "Necessary Maintenance Expenses" ("NMEs") have risen and will rise rapidly, consuming revenues that could otherwise be available for debt service. (Mot. ¶ 32.)

On March 28, 2025, the Oversight Board filed the *Fifth Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* (the "Fifth Amended Plan"). (Mot. ¶ 33; see also Docket Entry No. 29125 in Case No. 17-3283 and Docket Entry No. 5581 in Case No. 17-4780.) The Fifth Amended Plan contemplates the payment of the value of the Bondholders' secured claim in full once it has been determined (the Oversight Board takes the position that the value of the claim is nil) and proposes to pay general unsecured creditors from funds that the Bondholders allege constitute collateral securing PREPA's outstanding obligations under the bonds. (Mot. ¶ 33.) The Fifth Amended Plan remains PREPA's operative proposed plan of adjustment.

D.      Adversary Proceeding No. 19-00391

On July 1, 2019, the Oversight Board commenced Adversary Proceeding No. 19-00391, seeking to disallow in part the Bondholders' claim. (Docket Entry No. 1 in Case No. 19-00391.)

On March 23, 2023, the Court entered an order granting in part and denying in part cross-motions for summary judgment with respect to the allowance or disallowance of Proof of Claim No. 18449. (See Docket Entry No. 147 in Adv. Proc. No. 19-00391 (the "Summary Judgment Order").) In the Summary Judgment Order, the Court held that:

> (a) the Trust Agreement granted the Bondholders security interests only in moneys actually deposited to the Sinking Fund, Self-insurance Fund, Capital Improvement Fund, Reserve Maintenance Fund, and Construction Fund (as defined in the Trust Agreement); (b) the Bondholders have perfected their liens in the Sinking Fund, Self-insurance Fund, and Reserve Maintenance Fund, over which the Trustee has established control (as discussed below);[11] (c) the Bondholders have no

---

[11]    The Court declined to address the Bondholders' possible perfection of their liens on the Capital Improvement Fund and Construction Fund, because the record before the Court provided no evidence from either party as to the form of the assets comprising those

security interest in the covenants and remedies provided for by the Trust Agreement; but (d) based on PREPA's payment and equitable relief covenants in the Trust Agreement, the Bondholders have an unsecured claim (within the meaning of 11 U.S.C. § 101(5)(B)) to be liquidated by reference to the value of future Net Revenues (as defined in the Trust Agreement) that would, under the waterfall provisions of the Trust Agreement and applicable nonbankruptcy law, have become collateral upon being deposited in the specified funds and payable to the Bondholders over the remainder of the term of the Bonds (the "Unsecured Net Revenue Claim").

(Summary Judgment Order at 13-14.) The Court further held that the value of the Unsecured Net Revenue Claim must be determined "either consensually or through proceedings under section 502 of the Bankruptcy Code." (Summary Judgment Order at 62, 70.) The parties were unable to reach consensus as to the value of the Net Revenue Claim.

On May 15, 2023, the Oversight Board filed a motion asserting that Counts III through VII of the Counterclaim Complaint "either (i) were resolved through this Court's [Summary Judgment Order]; (ii) fail to state a claim; (iii) are time-barred; or (iv) are preempted by the Bankruptcy Code." (Docket Entry No. 211 in Adv. Proc. No. 19-00391 (the "FOMB MTD").) The FOMB MTD sought the dismissal of Counts III through VII of the Bondholders' counterclaim complaint. (See Docket Entry No. 47 in Adv. Proc. No. 19-00391.)

On June 26, 2023, after a three-day hearing held earlier that month, this Court issued its *Order Concerning Bondholders' Unsecured Net Revenue Claim Estimation* (Docket

---

Funds and their custodial status, and means of perfection may vary with the form of the asset in question. On August 28, 2023, the Court entered the *Joint Stipulation and Agreed Order of the Financial Oversight and Management Board for Puerto Rico, U.S. Bank National Association as PREPA Bond Trustee, the Ad Hoc Group Of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, and Syncora Guarantee, Inc. Resolving Perfection-Related Issues*, approving a consensual resolution of the remaining lien-perfection issues while reserving certain rights for appeals. (Docket Entry No. 337 in Adversary Proceeding No. 19-00391.)

Entry No. 315 in Adv. Proc. No. 19-00391) (the "Estimation Order"), liquidating the Unsecured Net Revenue Claim in the amount of $2,388,000,000.00. (Estimation Order at 47.)

On November 28, 2023, the Court issued an order granting the FOMB MTD, denying requests (1) for declaratory judgments: (a) that PREPA has breached statutory obligations and contractual covenants, (b) that PREPA is a trustee for the Bondholders, (c) that PREPA has committed certain torts, (d) that PREPA had committed any takings by deciding to file or filing under Title III, and (2) for rescission of contract. (Docket Entry No. 361 in Adv. Proc. No. 19-00391.)

Thereafter, the Court entered judgment in Adversary Proceeding No. 19-00391, and several parties, including the Bondholders, appealed. (See Docket Entry Nos. 362, 363, 365, 366, 368, 369, 371, 372, 386 in Adv. Proc. No. 19-00391.)

E. The First Circuit Lien Decision and Current Procedural Posture

On June 16, 2024, the United States Court of Appeals for the First Circuit (the "First Circuit") issued an opinion (later revised in part and reissued on November 13, 2024) affirming in part and reversing in part this Court's Summary Judgment Order and Estimation Order. See U.S. Bank Nat'l Assoc. v. Fin. Oversight and Mgmt. Bd. for P.R. (In re Fin. Oversight and Mgmt. Bd. for P.R.), 121 F.4th 280, 294 (1st Cir. 2024) (the "First Circuit Lien Decision"). In the First Circuit Lien Decision, the panel held, inter alia, that: the Bondholders possess a lien on Net Revenues under the Trust Agreement, which liens are perfected as to Net Revenues already acquired by PREPA and as to future revenues as acquired; the Bondholders' allowed claim is approximately $8.5 billion (the face value of their bonds plus matured pre-petition interest), although the value of the Net Revenues, if any, securing it is to be determined in the first instance by this Court; the Bondholders are non-recourse creditors; PREPA is not a

Add.17

trustee for the Bondholders; and the Bondholders properly pleaded a claim for an equitable accounting.

On June 17, 2024, this Court requested a joint status report from the parties to the appeal; the report was filed on July 3, 2024. (Docket Entry Nos. 5247 and 5274.) At a status conference on July 10, 2024, the Court stayed litigation in PREPA's Title III case and Adversary Proceeding No. 19-00391 and directed the parties to meet with the Mediation Team; the stay and directive were memorialized in an order dated July 11, 2024. (Docket Entry No. 5286 (the "PREPA Litigation Stay Order" or "PREPA Litigation Stay").) The Court later extended the PREPA Litigation Stay while the Oversight Board and certain other parties sought rehearing at the First Circuit. (Docket Entry Nos. 5338, 5390, 5406, 5480.)

On January 13, 2025, the First Circuit issued its mandate to this Court. (Docket Entry No. 401 in Adversary Proceeding No. 19-00391.) On February 24, 2025, the Bondholders asked the Court to lift the PREPA Litigation Stay to allow several matters to proceed, including a motion for allowance of an administrative expense claim. (Docket Entry No. 5510 ¶¶ 48-50.) On March 20, 2025, the Court granted the parties partial relief from the PREPA Litigation Stay, permitting the Oversight Board to file an amended plan of adjustment for PREPA, and permitting the filing of the instant Motion. (Docket Entry No. 5572.)

F. The Instant Administrative Expense Motion

On April 7, 2025, Movants filed the Motion, in which they made three legal arguments, any one of which would, if valid, suffice to state a claim for an administrative expense claim. (Mot. ¶¶ 43-66.) First, Movants argue that Section 503(b)(1)(A) entitles them to an administrative expense claim for Net Revenues spent or withheld by PREPA during the life of the Title III case, as "actual, necessary costs and expenses of preserving the estate." (Mot. ¶ 44

(quoting 11 U.S.C. § 503(b)(1)(A)).)  Movants contend that PREPA's use of Movants' collateral entitles them to a priority claim under this provision because such use created "actual value conferred on the bankrupt estate."  (Mot. ¶ 45 (quoting In re United Trucking Serv., Inc., 851 F.2d 159, 162-63 (6th Cir. 1988)).)  Second, Movants argue that, even if Section 503(b)(1)(A) does not by its direct application entitle them to an administrative expense claim, the Supreme Court's decision in Reading v. Brown, 391 U.S. 471, 477 (1967), and its progeny provide an alternative basis for their claim because "tort claims arising during a bankruptcy case give rise to administrative expense claims."[12]  (Mot. ¶ 47.)  Invoking Reading, Movants assert two tort claims against PREPA: (1) a claim for conversion under Puerto Rico law; and (2) a claim under the Takings Clause of the Fifth Amendment of the Constitution of the United States for compensation for PREPA's use of Movants' collateral during the pendency of this Title III Case. (See also Mot. ¶¶ 48-52.)  As a fallback, Movants further contend that Section 922(c) should also entitle them to an administrative expense claim because "'there has been a diminution in the value of [Movants'] secured collateral' by reason of the automatic stay."  (Mot. ¶ 53 (quoting Grundy Nat'l Bank v. Rife, 876 F.2d 361, 363 (4th Cir. 1989)).)  Movants argue that PREPA's failure to provide Movants with adequate protection despite their requests for it earlier in the case and, separately, failure to provide the adequate protection payments contemplated by certain provisions of the 2019 RSA, entitle them to an administrative expense claim under Section 922(c).  (Mot. ¶¶ 54-59.)  Finally, Movants argue that the Court must rule in their favor under Section 503(b)(1)(A) and Section 922(c) as a matter of constitutional avoidance.  (Mot. ¶¶ 60-66.)

---

[12]    Reading was decided under section 64(a)(1) of the former Bankruptcy Act, 11 U.S.C. section 104(a)(1), which predated Section 503(b)(1)(A).  The statutory evolution is not material to the parties' arguments.  (Mot. ¶ 47 n.35.)

Add.19

On April 28, 2025, the Oversight Board filed the FOMB Objection, in which it responds to the arguments in the Motion and asserts that Movants fail to state a claim upon which relief may be granted, making four principal arguments. First, the Oversight Board argues that Movants' collateral is limited to Net Revenues as that term is defined in the Trust Agreement, and that no Net Revenues have existed during the Title III Case. (FOMB Obj. ¶¶ 28-30.) Second, the Oversight Board argues that, even if PREPA in fact generated Net Revenues during this time, the Motion should still be denied because the First Circuit Lien Decision made clear that Movants' claims are "nonrecourse," such that Movants "may only reach moneys available for debt service," and no such moneys currently exist. (FOMB Obj. ¶ 32 (quoting First Circuit Lien Decision, 121 F.4th at 316).) To rebut Movants' arguments relating to Section 503(b), the Oversight Board argues that Movants have failed to set forth a prima facie case that PREPA's use of their collateral caused it to diminish in value because, among other things, the monthly operating reports upon which Movants' arguments rely (discussed further below) only show that PREPA used Net Revenues to generate more Net Revenues and that, in any case, claims for administrative expenses do not lie for diminution in the value of a prepetition creditor's collateral. (FOMB Obj. ¶¶ 42-51. See also UCC Suppl. Br. ¶ 20.) Regarding Movants' arguments under Section 922(c), the Oversight Board argues that Movants' claim does not meet the two requirements for administrative priority under that section—that a claimant has (1) been provided adequate protection, but (2) nonetheless has a claim arising from the stay. (FOMB Obj. ¶ 52 (citing 11 U.S.C. § 922(c)).) In this connection, the Oversight Board argues that PREPA has never provided adequate protection to the Bondholders, noting that the Court never expressly entered an order directing PREPA to make such payments, and that the 2019 RSA, which would have provided "adequate protection" payments following court

approval, was never approved by the Court. (FOMB Obj. ¶¶ 53-64.) The Oversight Board further contends that (1) PREPA never "failed" to provide adequate protection, (2) the Bondholders have no claim arising from any such failure, and (3) any diminution claims that they might assert did not "arise from" the automatic stay. (FOMB Obj. ¶¶ 65-73.) With respect to Movants' arguments under Reading v. Brown, the Oversight Board maintains that the Bondholders have not pleaded viable conversion nor Takings Clause claims. (FOMB Obj. ¶¶ 73-87.) Finally, the Oversight Board argues that the evidence would show that PREPA has not generated any Net Revenues since the Petition Date, reducing the actual value of the Bondholders' claim to a level far below the face value of the outstanding bonds and prepetition interest. (FOMB Obj. ¶¶ 90-100.)

According to Movants, the amount owed under the bonds on the Petition Date was $8,477,729.56, and Movants estimate that the total amount owed on the bonds is now over $11 billion with the inclusion of postpetition interest. (Mot. ¶ 2.) To secure these amounts, Movants argue, they hold a perfected lien on PREPA's past, present and future Net Revenues as defined in the Trust Agreement: Revenues minus Current Expenses. (Mot. ¶ 3 (citing 121 F.4th 280, 297 (1st Cir. 2024)).) They further argue that, in monthly financial reports that PREPA issued until recently, PREPA acknowledged and admitted that it was realizing Net Revenues.

The Trust Agreement requires PREPA to generate monthly reports detailing its Revenues and expenses. (Mot. ¶ 11 (citing TA § 710).) PREPA has historically provided the Bond Trustee with monthly reports pursuant to section 710 of the Trust Agreement (the "Monthly Operating Reports"). (Mot. ¶ 12.) According to the Bondholders, PREPA's Monthly Operating Reports show that it accumulated approximately $3.7 billion in Net Revenues from the Petition Date until June 2023. (Mot. ¶ 13 (citing Chakraborty Decl. ¶¶ 12, 16).) Each of the Monthly

Operating Reports from fiscal year 2018 through fiscal year 2021 states that "[t]he 1974 Sinking Fund Appropriation ha[s] been accrued but not transferred." (Mot. ¶ 14.)  Thus, Movants allege, PREPA accrued nearly $2 billion in Net Revenues but did not transfer them to the Sinking Fund as required by the Trust Agreement.  (Mot. ¶ 14.)  In the Monthly Operating Reports for fiscal years 2022 and 2023, Movants allege, PREPA disclosed nearly $900 million in additional accruals to the Sinking Fund that were not transferred, totaling $2.9 billion in Net Revenues from the Petition Date which actually accumulated but have not been transferred to the Sinking Fund.[13]  (Mot. ¶ 15.)  Movants allege that the discrepancy between the amounts of Net Revenues reported in the Monthly Operating Reports and the Net Revenues shown in PREPA's certified Fiscal Plans over the same postpetition period is only 4%.  (Mot. ¶ 16.)  According to Movants, the manner in which PREPA reported Net Revenues in the Monthly Operating Reports was largely consistent with the way it marketed the Bonds to investors and "the electricity rate structure that has been in place since 2019."  (Mot. ¶¶ 18-19.)  Movants claim that PREPA's Monthly Operating Reports show that it has "accumulated and improperly consumed" the Bondholders' collateral in an amount not less than $3.7 billion.  (Mot. ¶ 92.)  They thus contend that they are entitled to compensation for PREPA's postpetition use of billions of dollars labeled Net Revenues in Monthly Operating Reports issued postpetition (presumptively including PREPA's cash on hand in any liened accounts), and that any necessary further determination of the value of their secured claim can be addressed in further proceedings.

---

[13]     Beginning in February 2022, PREPA modified how it reported Net Revenues in the Monthly Operating Reports.  (Mot. ¶ 17.)  Because the Motion can be decided as a matter of law, the distinction is not relevant to the parties' dispute at this stage of the proceedings.

The Oversight Board counters, among other rebuttals, that the term "Net Revenues" in the Monthly Operating Reports is not coextensive with the term as defined by the Trust Agreement, and that the Monthly Operating Reports make clear that those reports contained only preliminary numbers subject to audit. Because, as explained below, the Court concludes that Movants have failed to show a viable legal basis for their administrative claim, the Court will not address the parties' dispute regarding the existence (or not) of Net Revenues at this time.

DISCUSSION

A.    Standard of Review

The Motion, as a motion for the allowance of a claim accorded administrative priority, is a contested matter governed by Bankruptcy Rule 9014. Both parties have offered declarations and other materials in support of their arguments, and neither seeks an evidentiary hearing with respect to the question of whether the Bondholders may be able to sustain a viable administrative expense claim under any of the theories they have put forward. Federal Rule 56 applies in this contested matter by the operation of Bankruptcy Rules 7056 and 9014(c). "[S]ummary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Tera Xtal Tech. Corp. v. GT Adv. Techs., Inc., Civ. No. 16–cv–91–PB, 2017 WL 590340, at *3 (Feb. 13, 2017 Bankr. D.N.H.) (quoting Federal Rule 56(a) to resolve a contested matter). Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fin. Oversight and Mgmt. Bd. for P.R. v. United States Bank Nat'l Assoc. (In re. Fin. Oversight and Mgmt. Bd. for P.R.), 649 B.R. 381, 401 (D.P.R. 2023) (citing Fed. R. Civ.

P. 56(a)).  Material facts are those that "possess[ ] the capacity to sway the outcome of the litigation under the applicable law," and there is a genuine factual dispute where an issue "may reasonably be resolved in favor of either party." Id. (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)) (internal quotation marks and citations omitted).  The Court must "review the material presented in the light most favorable to the non-movant, and . . . must indulge all inferences favorable to that party." Id. (quoting Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990)) (internal quotation marks and citations omitted).  When a properly supported motion for summary judgment is made, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)) (internal quotation marks and citation omitted).  The non-moving party can avoid summary judgment only by providing properly supported evidence of disputed material facts. Id. (citing LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993)).  The Court declines to address assertions proffered by the parties that are immaterial, and disregards conclusory statements of law which the parties proffer as facts.

B.     Administrative Expense Status Under Section 503 of the Bankruptcy Code

The allowance of administrative expense claims is governed by section 503 of the Bankruptcy Code, which is made applicable in this case by section 301 of PROMESA. See 11 U.S.C. § 503; 48 U.S.C. § 2161(a).  Section 503 of the Bankruptcy Code provides, in relevant part, that:

> (a) An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.
>
> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

> (1)(A) the actual, necessary costs and expenses of preserving the estate . . . .

11 U.S.C.A. § 503 (Westlaw through P.L. 119-74).

In <u>Woburn Associates v. Kahn (In re Hemingway Transport, Inc.)</u>, 954 F.2d 1 (1st Cir. 1992), the First Circuit set forth the general criteria that should be considered in determining whether to allow an administrative expense claim.  The court explained that a request for priority payment of an administrative expense under section 503(a) of the Bankruptcy Code "may qualify if (1) the right to payment **arose from a postpetition transaction with the debtor [], rather than from a prepetition transaction with the debtor**, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor."  <u>In re Hemingway Transp., Inc.</u>, 954 F.2d at 5 (emphasis added).  The party asserting the administrative claim bears the burden of demonstrating the entitlement of its claim to such treatment.  <u>Id.</u>  "Provisions that grant priority in bankruptcy are to be narrowly construed."  <u>Bos. Reg'l Med. Ctr., Inc. v. Mass. Div. of Health Care Fin. & Pol'y</u>, 365 F.3d 51, 57 (1st Cir. 2004) (citing <u>Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)</u>, 536 F.2d 950, 953 (1st Cir. 1976) ("<u>Mammoth Mart</u>").  The Court has broad discretion in determining whether to grant a request for such priority treatment.  <u>See In re Jeans.com</u>, 491 B.R. 16, 23 (Bankr. D.P.R. 2013) (citation omitted).

One principal policy behind this section is carry out the "statutory objective of facilitating the rehabilitation of insolvent businesses" by encouraging third parties to provide those businesses with necessary goods and services postpetition.  <u>Mammoth Mart, Inc.</u>, 536 F.2d at 954.  Another "overriding concern" is to keep "fees and administrative expenses at a minimum" so as to preserve as much of an estate as possible to maintain assets and operations that will inure, upon emergence or sale as a going concern, to the benefit of the prepetition

creditor body. <u>See</u> <u>Ala. Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co. Inc.)</u>, 963 F.2d 1449, 1459 (11th Cir. 1992) (citation omitted). There is no exception in the doctrine for creditors secured pursuant to a prepetition contract regardless of whether the postpetition bankruptcy estate benefits from the contract: "It is . . . clear that a claimant who fully performs under a contract prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt estate after the filing." <u>Mammoth Mart, Inc.</u>, 536 F.2d at 954 (citation omitted).

As will be discussed further below, the only way for a solely prepetition creditor to obtain an allowable administrative expense claim under PROMESA is through Section 922(c) of the Bankruptcy Code and fulfillment of its predicates that the claimant obtain adequate protection that, later, proves insufficient. Mainly construing Section 922(c)'s business bankruptcy analog, section 507(b) of the Bankruptcy Code, in ordinary Chapter 11 cases, courts have warned against permitting a prepetition creditor to make an end-run around the adequate protection predicate by instead asserting a direct administrative expense claim. If a creditor wishes to assert a direct administrative expense claim under section 503(b), that creditor must, at a minimum, demonstrate what it has contributed postpetition to benefit the estate or debtor.[14] As one court has put it, where there has been no postpetition contribution to the estate or debtor, no automatic administrative expense should be granted to a creditor secured pursuant to a prepetition contract where the claim is accrued "by sitting back and 'allowing' a [debtor] to use collateral which it already owns and has a statutory right to use." <u>In re Advisory Info. & Mgmt. Sys., Inc.</u>, 50 B.R. 627, 630 (Bankr. M.D. Tenn. 1985); <u>see also</u> <u>In re Provincetown-Boston</u>

---

[14] Section 301(c)(5) of PROMESA provides that the term "property of the estate" in this instance means "property of the debtor." 48 U.S.C. § 2161(c)(5).

Add.26

Airline, Inc., 66 B.R. 632, 634 (Bankr. M.D. Fla. 1986). This rule, applicable in an ordinary Chapter 11 case to the use of equipment, vehicles, and other collateral in which a creditor may have a security interest, applies to the use of cash collateral in this instance because Section 363 of the Bankruptcy Code, which requires bankruptcy court approval of the non-consensual use of cash collateral, is not incorporated into PROMESA, and section 305 of PROMESA denies the Court power to regulate the Debtor's use of its own cash.[15]

Here, the Trust Agreement is a prepetition nonexecutory contract. (See, e.g., Docket Entry No. 361 in Adv. Proc. No. 19-00391 at 26, 29.) The Bondholders, having paid PREPA for the bonds or acquired their interests from others who originally paid PREPA, have no further duties under the Trust Agreement. Nor do they proffer that they took any action, or entered into any transaction with PREPA, following the Title III filing for which they are seeking an administrative expense claim as compensation. PREPA's postpetition expenditure of its own revenues is not a postpetition transaction with the Bondholders.

United Trucking Serv. v. Trailer Rental Co. (In re United Trucking Serv.), is the only case cited by any party wherein a prepetition agreement was the sole basis of an administrative expense claim. 851 F. 2d 159 (6th Cir. 1988). This out-of-circuit case is not controlling precedent with respect to this Court and, contrary to the Bondholders' representations, is not a case in which an administrative expense claim was awarded based only on the use of collateral created prepetition. Critically, the United Trucking parties had entered into a postpetition stipulation to treat the prepetition-based debt as an administrative expense and the court, after much discussion, upheld the parties' decision. Id. at 161 n.2. The case appears to

---

[15] Section 305 of PROMESA provides, in pertinent part, that the court may not interfere with the governmental powers, property and revenues, or use and enjoyment of income-producing property of a Title III debtor. See 11 U.S.C. § 2165.

have involved an arrangement more like a <u>sub rosa</u> agreement to provide postpetition financing than an administrative expense claim based on postpetition value received by the estate at the prepetition creditor's expense. Furthermore, as the Oversight Board notes, the Bondholders' representation that <u>United Trucking</u> involved a security interest <u>is incorrect</u>. The case instead involved the continued use of leased trailers (which were not the property of the debtor) that were damaged by use that benefited the estate without any concomitant benefit to the lessor. (<u>See</u> FOMB Suppl. Br. ¶¶ 4, 9; BH Suppl. Resp. ¶ 19 n.6.) It is unclear whether, without the stipulation of the parties to treat postpetition damages to the trailers as administrative expense claims, there would have been a plausible administrative expense claim at all. In any case, the Bondholders do not proffer an analytical link between the factual situation in <u>United Trucking</u> and their claim in this case, which is based on the use of revenues belonging to PREPA, rather than property held by the debtor under a prepetition lease from a third party, and which does not involve any relevant postpetition agreement with the Debtor regarding the use of the cash collateral.[16]

Accordingly, the Bondholders have not established a viable claim under Section 503(b)(1)(A) of the Bankruptcy Code because there was no postpetition transaction with

---

[16] The Court's own research has disclosed no other cases in which a prepetition creditor was granted administrative expense priority for mere postpetition use of collateral. To the extent courts outside this circuit have suggested that administrative expense provisions may cover secured creditors where the postpetition use of collateral was in connection with for-profit business activity, the Court finds neither support in their facts nor persuasive legal analysis anchoring the suggestion. <u>See</u> Tidewater Fin. Co. v. Henson (<u>In re Henson</u>), 57 Fed. App'x 136, 138 (4th Cir. 2003) (denying administrative expense claim of prepetition retail creditor in Chapter 13 case for failure to make postpetition installment payments); <u>Grundy Nat'l Bank v. Rife</u>, 876 F.2d 361, 363 (4th Cir. 1989) (granting administrative expense claim to prepetition auto financer where debtor failed, <u>inter alia</u>, to make court ordered adequate protection payments and failed to make payments under confirmed Chapter 13 plan).

the Debtor.

        C.        <u>The Fundamental Fairness Doctrine</u>

Movants argue an alternative basis upon which administrative expense claims that are not explicitly contemplated by the Bankruptcy Code have been allowed under section 503 of the Bankruptcy Code. The "<u>Reading</u>," or "fundamental fairness," doctrine, which has its origins in <u>Reading Co. v. Brown</u>, 391 U.S. 471 (1968), has been interpreted within the First Circuit to support administrative expense claim priority for two categories of claims that do not otherwise come within the plain language of section 503 of the Bankruptcy Code: "the 'fundamental fairness' exception is recognized when the debtor's postpetition operations occasion tortious injuries to third parties (<u>Reading</u>[]), or when the claim arises from postpetition actions that deliberately violate applicable law and damage others (<u>Charlesbank</u>[])." <u>See</u> <u>In re Healthco Int'l Inc.</u>, 272 B.R. 510, 513 (B.A.P. 1st Cir. 2002) (emphasis in original) (citing <u>Reading</u>, 391 U.S. at 477; <u>Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)</u>, 755 F.2d 200, 203 (1st Cir. 1985)), <u>aff'd</u>, 310 F.3d 9 (1st Cir. 2002) ("<u>Charlesbank</u>").

As explained above, the traditional test under Section 503(b)(1)(A) provides administrative expense priority when there is (i) a <u>post-petition</u> transaction concerning (ii) "actual and necessary" costs of maintaining the estate. <u>See</u> 11 U.S.C. § 503(b)(1); <u>In re Hemingway Transp., Inc.</u>, 954 F.2d at 5. The second requirement was relaxed under certain circumstances by the Supreme Court in <u>Reading Co. v. Brown</u>, which held that post-petition tort damages caused to a third party by a court-appointed receiver in "operating the debtor's business with a view to rehabilitating it" could be treated as "actual and necessary" costs, even though the

damages themselves were not directly beneficial to the estate.[17]  Reading, 391 U.S. at 475-76.

The underlying rationale was that, when an estate is being operated for the benefit of prepetition

creditors, "fundamental fairness" requires the injuries that the operating debtor causes be given

priority over the prepetition creditors' claims.[18]  Id. at 479 ("[I]t would be inconsistent . . . with

the rule of fairness in bankruptcy to seek these objectives [the 'benefit of creditors' and the 'hope

of rehabilitation'] at the cost of excluding tort creditors of the arrangement from its assets, or

totally subordinating the claims of those on whom the arrangement is imposed to the claims of

---

[17]  See In re Hemingway Transp., Inc., 954 F.2d at 5 ("We have recognized a special category of expense entitled to administrative priority status, based on considerations of fundamental fairness, consisting of amounts due entities 'injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate.'") (citations omitted); In re Charlesbank Laundry, Inc., 755 F.2d at 202 ("The estate [in Reading] put forward much the same argument as appellees here—that allowing first priority for negligence claims would not aid the rehabilitation of the business or preserve a maximum of assets for distribution.").

[18]  See In re Munce's Superior Petroleum Prods., Inc., 736 F.3d 567, 573 (1st Cir. 2013) ("Taken together, our cases interpreting Reading Co. have 'attempted to avoid a situation in which a bankruptcy estate may engage in activities regulated by state law while avoiding the costs associated with that regulation.'"); Cumberland Farms, Inc. v. Fla. Dep't of Env't Prot., 116 F.3d 16, 21 (1st Cir. 1997) ("We hold that the present case does come within the ambit of Reading and Charlesbank.  This was a postpetition claim incurred during the operation of Cumberland Farms' business while it was operating under Chapter 11.  We think it would be fundamentally unfair to allow Cumberland Farms to flout Florida's environmental protection laws and escape paying a penalty for such behavior."); In re Charlesbank Laundry, Inc., 755 F.2d at 203-204 (recognizing applicability of Reading where the debtor "deliberately continued a violation of law month after month presumably because it was more lucrative for the business to operate outside the zoning ordinance than within it"); Mammoth Mart, Inc., 536 F.2d at 954-55 ("Section 64(a)(1) . . . has been interpreted as providing general protection to claimants that are injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate. . . .  When the debtor-in-possession commits a tort, see Reading Co. v. Brown, supra, or accepts services from a third party without paying for them, the debtor-in-possession itself caused legally cognizable injury, and the resulting claims for compensation are entitled to first priority.").

those for whose benefit it is instituted." Here, as prepetition creditors, the Bondholders would surely protest that they are the ones upon whom this arrangement of the Title III cases has been imposed by law, but it cannot be denied that they share (to at least some degree) in the prospective benefit of the successful rehabilitation of PREPA—and that any prepetition creditor could make the same argument in any proceeding.

In short, the Reading exception appears to have been created for "innocent third parties" and not prepetition creditors like the Bondholders who do not fall squarely within its initial ambit. See, e.g., In re Baseline Sports, Inc., 393 B.R. 105, 131 (Bankr. E.D. Va. 2008) ("SunTrust is not an 'innocent third party' for whom the *Reading* exception was created. SunTrust was the largest secured creditor in this case. To the extent that Baseline Sports's Chapter 11 case continued, it was for SunTrust's benefit, as a pre-petition secured creditor, until it received relief to exercise its rights in the Debtor's collateral."). See also Reading Co., 391 U.S. at 482-83 ("Existing creditors are, to be sure, in a dilemma not of their own making, but there is no obvious reason why they should be allowed to attempt to escape that dilemma at the risk of imposing it on others equally innocent."). Subsequent applications of the Reading doctrine, many of which have notably occurred in the First Circuit, have not emerged in circumstances resembling the present instance.

### 1. Reading in the First Circuit

In In re Hemingway Transport, the Court of Appeals for the First Circuit (the "First Circuit") held that "[a] right to payment predicated on an executed prepetition contract is not entitled to priority payment as an administrative expense." 954 F.2d at 5 (citing Mammoth Mart, 536 F.2d at 954).

In the First Circuit, in cases such as Cumberland Farms, Mammoth Mart, and Charlesbank, the application of Reading has generally been limited to violations of regulations

Add.31

that harm the general public to the benefit of the debtor and the detriment of "innocent third parties" or "involuntary creditors"—third parties who are harmed and not benefited in any manner by the debtor's actions.  In In re Boston Regional Medical Center, the First Circuit observed: "this circuit's extension of Reading Co. has relied on concerns of public policy, and has attempted to avoid a situation in which a bankruptcy estate may engage in activities regulated by state law while avoiding the costs associated with that regulation."  291 F.3d 111, 125-26 (1st Cir. 2002).  Here, the Bondholders' asserted administrative expense claim is in tension with countervailing public policy concerns, notably the concern for the supply of electricity to the people of the island as expressed in the PREPA Authority Act, that stand against granting to a creditor constituency a boon that would potentially defeat the island's ability to rehabilitate the utility and "provide customers with reliable energy at the lowest reasonable cost." See, e.g., 22 L.P.R.A. § 194(d)(1)(F).[19]  Thus, regardless of whether the Bondholders have stated claims under the Takings Clause or for conversion based on the postpetition use of alleged collateral to operate PREPA, the public policy rationale of Reading precludes remedial use of administrative expense priority in respect of those claims.[20]

---

[19]   Section 6 of the Authority Act also provides that among the "Duties and Responsibilities" of PREPA is "To provide and allow electric power to be provided in a reliable, clean, efficient, resilient, and affordable manner thus contributing to the general wellbeing and the sustainable development of the people of Puerto Rico[.]"  22 L.P.R.A. § 196(a).

[20]   Furthermore, several courts in the First Circuit and elsewhere have held as a broad proposition that claims for postpetition breaches of prepetition contracts are not entitled to administrative priority under Reading, regardless of the particulars of the underlying claim.  See In re Old Carco, LLC, 424 B.R. 650, 660 (Bankr. S.D.N.Y. 2010) ("The Reading exception does not include a right to payment emanating from a pre-petition contract with a debtor."); In re Baseline Sports, Inc., 393 B.R. 105, 131-32 (Bankr. E.D. Va. 2008) (declining to categorize postpetition state law claims as administrative expenses because secured creditor had prepetition contractual relationship with debtor); In re GT Advanced Techs., Inc., 547 B.R. 3, 13-5 (Bankr. D.N.H. 2016) (no administrative priority for claim arising out of dispute over prepetition breach of contract

2.    The Bondholders do not make out a prima facie case for conversion

The Bondholders argue that the tort of conversion that has been implied by the First Circuit from Commonwealth law is the basis for their postpetition tort claim that they contend gives rise to a Reading claim. (See, e.g., Mot. ¶ 50 (citing Fed. Ins. Co. I.C. v. Banco de Ponce, 751 F.2d 38, 42 (1st Cir. 1984).) The Bondholders argue that "[a] conversion occurs when there is a 'malicious and wrongful privation of the ownership rights, the illegal exercise, or the assumption of authority over another's property, thereby depriving the lawful owner or possessor, permanently or for an indefinite period, of its use and enjoyment,'" and assert that they have been the victims of such tortious conduct. (Mot. ¶ 50 (quoting Hull Dobbs v. Super. Ct., 81 D.P.R. 221, 228-29 (P.R. 1959).)

However, they do not support their conversion claim with legal or factual analysis. Instead, they misrepresent the legal standard, downgrading the terms "malicious and wrongful" to "intentional" without explaining how the tort's basic standard is met. (Mot. ¶¶ 50-51.) In so doing, they fail to establish wrongful intent and fall short of articulating a prima facie claim for conversion that could serve as a basis for their desired Reading claim.

Moreover, a claim for conversion requires that what is taken be "another's property," and here the funds that were allegedly misappropriated were PREPA's own funds, in which the Bondholders merely have a security interest. The Bondholders' pleadings do not even acknowledge this distinction.

Finally, "[i]t is established law that a party cannot support a conversion claim when 'damages suffered arise as a consequence of non-compliance with pre-existing contract'

---

claims). See also generally In re Advisory Info. & Mgmt. Sys., Inc., 50 B.R. 627, 630 (Bankr. M.D. Tenn. 1985).

and plaintiff cannot demonstrate that 'damages also arose from a general (non-contractual) duty not to cause harm.'" TLS Mgmt. & Mktg. Servs. LLC v. Rodriguez-Toledo, No. CV 15-2121 (BJM), 2018 WL 1626100, at *13 (D.P.R. Mar. 30, 2018) (citation omitted), rev'd and remanded on other grounds, 966 F.3d 46 (1st Cir. 2020). "[C]ompensation for damages requires an illegal conduct that causes the damage, either for having breached the agreements of a contract or for breaching the general principle *alterum non laedere* [not to injure another]." Ramos Lozada v. Orientalist Rattan Furniture Inc., 130 D.P.R. 712, 1992 JTS 74 (June 15, 1992).

Here, any alleged harm that the Bondholders have suffered is indistinguishable from the harm allegedly caused by breaches contemplated by the Trust Agreement because all of the duties that the Bondholders allege PREPA owes them were created contractually. The remedies for PREPA's use of its revenues instead of payment of bond debt thus are those provided for under the Trust Agreement, not independent tort remedies.

Accordingly, the Bondholders have not made out a prima facie case of conversion as a basis for their asserted administrative expense claim.

3. The Bondholders do not make out a prima facie case under the Takings Clause

The Oversight Board argues that any ability to assert a takings claim or otherwise object to the allegedly improper use of alleged collateral was waived because the Trust Agreement, pursuant to which the Bondholders hold the bonds and under which they assert their property rights, includes remedial limitations and specific remedy provisions that effect waivers of other remedies. (See, e.g., FOMB Suppl. Br. ¶ 14.) The Bondholders protest that they executed no waiver and that there is no language of waiver in the Trust Agreement. Although the Oversight Board points to Vandevere v. Lloyd, a case using the term "waiver"—viz., the Bondholders "waived" rights they might otherwise have had—Vandevere and the cases cited

therein also characterize the circumstances more accurately as a limitation of remedies or a "contract[ing] away" of rights parties might otherwise have had, including rights that might otherwise have given rise to a takings claim. 644 F.3d 957, 967 (9th Cir. 2011) ("The Supreme Court has instructed that a person may agree contractually, in advance, to accept without compensation what otherwise would be a compensable taking under the Fifth Amendment.") (citing United States v. Petty Motor Co., 327 U.S. 372, 374 (1946) ("The Tool Company had contracted away any rights that it might otherwise have had.")); United States v. Right to Use & Occupy 3.38 Acres of Land, 484 F.2d 1140, 1144 (4th Cir. 1973) (holding that a lessee had contracted away her right to just compensation for a government taking through a valid condemnation clause written into her lease). Such a contractual limitation of remedies and liability applies to any additional right that may come into existence post-contracting when the contract itself limits recovery no matter the circumstances. An explicit "waiver" is not required, so the Oversight Board's legal argument is sound even if its terminology is inartful.

It is not clear whether a taking could, where the "taking" is not of property rights governed by a contract that includes comprehensive remedial provisions, constitute a postpetition tort giving rise to a Reading claim, but there is no ground for such a determination here because, as explained above, the Bondholders contracted away their ability to claim a taking in this context by agreeing to remedies under the Trust Agreement providing for recovery solely from moneys available for debt service in any instance, even if the Bondholders have exercised their Trust Agreement's receivership remedy. (See, e.g., TA § 804.)

Further, the government contracted with the Bondholders in its commercial, not sovereign capacity, a circumstance that also has implications for the viability of a takings claim. See Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001).

Even assuming that a relevant property right exists here, courts have held that where, as here, "a

contract between a private party and the Government creates the property right subject to a Fifth

Amendment claim, the proper remedy for infringement lies in contract, not taking." See, e.g.,

Tamerlane, Ltd. v. U.S., 80 Fed. Cl. 724, 738 (Fed. Cl. 2008), aff'd, 550 F. 3d 1135 (Fed. Cir.

2008) (emphasis added). As the First Circuit has noted: "We have held with a regularity

bordering on the echolalic that a simple breach of contract does not amount to an

unconstitutional deprivation of property. . . . To hold otherwise would run the risk of

transmogrifying virtually every dispute involving an alleged breach of contract by a state or a

state agency into a constitutional case." Masso-Torrellas v. Mun. of Toa Alta, 845 F.3d 461, 467

(1st Cir. 2017) (citing Redondo-Borges v. U.S. Dept. of Hous. and Urb. Dev., 421 F.3d 1, 10

(1st Cir. 2005)).[21]

---

[21] The Bondholders raise the canon of constitutional avoidance to urge the Court to apply
the statute in such a way that it does not effect what they argue is a taking. (See, e.g.,
Mot. ¶¶ 60-66.) However, their reliance on the canon, which the First Circuit has, in
these cases, held can only apply when a statute is ambiguous, is misplaced. See In re Fin.
Oversight & Mgmt. Bd. of P.R., 948 F.3d 457 (1st Cir. 2020). The Bondholders do not
point to any ambiguity in PROMESA, or in the Trust Agreement, and merely urge a
specific interpretation of all provisions, arguing that that they must be considered
forward-looking from the time of PROMESA's enactment or would, the Bondholders
claim, be unconstitutional. However, PROMESA's effective date provision states that
"[s]ubchapters III and VI shall apply with respect to debts, claims, and liens (as such
terms are defined in section 101 of Title 11) created before, on, or after [June 30, 2016],"
48 U.S.C. § 2101(b)(2) (Westlaw P.L. through 119-74) (emphasis added), thus precluding
an interpretation of the legislation as applying to rights created after its enactment only.
As this Court has held, "the canon of constitutional avoidance is not a method of
adjudicating constitutional questions. Rather, it is a tool for choosing between competing
plausible interpretations of statutory text, resting on the reasonable presumption that
Congress did not intend the alternative which raises serious constitutional doubts. The
canon is thus a means of giving effect to congressional intent, not of subverting it." In re
Fin. Oversight & Mgmt. Bd. for P.R., 385 F. Supp. 3d 138, 155 (D.P.R. 2019), aff'd, 948
F.3d 457 (1st Cir. 2020) (quoting Clark v. Martinez, 543 U.S. 371, 380-81 (2005)).
Accordingly, the canon of constitutional avoidance has no application to any provision of
PROMESA to which the Bondholders have pointed, nor to the Trust Agreement, and is
irrelevant in this proceeding.

Accordingly, the Bondholders have not made out a prima facie case for an administrative expense case arising under the Takings Clause because the Trust Agreement limits the Bondholders' remedies and a governmental instrumentality's breach of a contract under these circumstances is not the proper basis for a Takings Clause claim.

### 4. Conclusion under Reading

In conclusion, with respect to Reading, the Bondholders have not supported their asserted administrative claim with relevant authorities, nor have they presented a scenario warranting the identification of a new category of Reading claims for their benefit. Furthermore, the equities of the case militate that the Bondholders be held to the bargain they struck as reflected in the Trust Agreement.

Accordingly, the Bondholders have not established that they have a viable administrative expense claim by virtue of the Fundamental Fairness Doctrine.

### D. Section 922 of the Bankruptcy Code

Movants contend that Section 922(c) should also entitle them to an administrative expense claim because "'there has been a diminution in the value of [Movants'] secured collateral' by reason of the automatic stay." (Mot. ¶ 53 (quoting Grundy Nat'l Bank v. Rife, 876 F.2d 361, 363 (4th Cir. 1989)).) Movants argue that PREPA's failure to provide Movants with adequate protection despite their requests for it earlier in the case and, separately, certain provisions of the 2019 RSA, entitle them to an administrative expense claim under Section 922(c). (Mot. ¶¶ 54-59.)

Under Section 922(c), a creditor is entitled to an administrative expense claim:

> **If the debtor provides**, under section 362, 364, or 922 of this title, **adequate protection** of the interest of the holder of a claim secured by a lien on property of the debtor **and if, notwithstanding such protection** such creditor has a claim **arising from the stay of action**

against such property under section 362 or 922 of this title or from
the granting of a lien under section 364(d) of this title.

11 U.S.C.A. § 922(c) (Westlaw through P.L. 119-74) (emphasis added).

1. Mere use of "cash collateral" does not give rise to an administrative expense claim

Under section 361(3) of the Bankruptcy Code, a court cannot grant administrative status to a secured creditor as adequate protection in the first instance; it may only do so retrospectively after an explicit grant of adequate protection has proven inadequate. The application of Section 922 here is rather straightforward: under its plain language, there must be an explicit agreement or order to provide adequate protection that later proves inadequate before an administrative claim can arise on the grounds of insufficiency of adequate protection. See, e.g., In re James B. Downing & Co., 94 B.R. 515, 521 (Bankr. N.D. Ill. 1988).[22] Here, quite simply, there was never an operative agreement or order to provide adequate protection to the Bondholders.

The Bondholders principally cite case law established under section 507(b) of the Bankruptcy Code, which is largely inapplicable because, unlike section 507(b), neither Chapter 9 nor PROMESA incorporates section 363 of the Bankruptcy Code, and so the Debtor's use of "cash collateral" could not by itself form the predicate for an administrative claim.[23] Because

---

[22] Certain cases cited by the Bondholders—notably In re Center Wholesale, Inc., 759 F.2d 1440, 1451 n.23 (9th Cir. 1985), and In re Prime, 35 B.R. 697 (Bankr. W.D. Mo. 1984)— appear to support the grant of an administrative claim for adequate protection in the first instance (in circumstances not present here), but other courts have correctly characterized these cases as "a minority approach" and this Court is unpersuaded by the outcomes of those cases, which are in no way binding here. See In re James B. Downing & Co., 94 B.R. at 520.

[23] Section 363(c)(2) of the Bankruptcy Code, which applies in Chapter 11 cases but not in Title III proceedings under PROMESA, provides: "(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a

PROMESA lacks section 363, and is thus more deferential to debtors, there is no restriction on PREPA's right to use its collateral, unlike in Chapter 11 cases in which debtors are subject to the restrictions imposed by section 363. Accordingly, the Bondholders' argument fails as a matter of law: they cannot make an end-run around the lack of section 363 of the Bankruptcy Code by working on the (disputed) assumption that PREPA spent Net Revenues on which the Bondholders had a perfected lien, and the Court can rule on the nonapplicability of Section 922(c) notwithstanding any factual dispute because, in the absence of section 363, this debtor's use of even postpetition Net Revenues cannot form the basis for a Section 922(c) claim without an explicit and operative adequate protection agreement.[24] As one court has put it, "[t]he secured creditor is not contributing to the estate by allowing a Debtor[] to use collateral which it already owns and has a statutory right to use." In re Provincetown-Boston Airline, Inc., 66 B.R. 632, 634 (Bankr. M.D. Fla. 1986).[25]

---

hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2) (Westlaw through P.L. 119-74). Section 363(e), which is also inapplicable under PROMESA, provides, in relevant part: "Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e) (Westlaw through P.L. 119-74).

[24] Although there have been apparent exceptions to the postpetition transaction requirement, none of those circumstances are present here: "[t]he Court is cognizant that some courts have ruled previously that the negotiation for continued possession of collateral in return for adequate protection is a post-petition transaction providing additional value to the bankruptcy estate." In re Mary Holder Agency, Inc., No. 11-34280 MBK, 2012 WL 4434362, at *3 (Bankr. D.N.J. Sept. 24, 2012) (citing, e.g., In re Carpet Ctr. Leasing Co., 991 F.2d 682, 687 (11th Cir. 1993)).

[25] Several of the Bondholders' key cases involve prior explicit adequate protection agreements and/or are based upon section 363, which makes them irrelevant here. See, e.g., Grundy Nat'l Bank v. Rife, 876 F.2d at 364 ("the adequate protection order of August 12, 1986").

> 2.     The 2019 RSA does not provide a basis for an adequate protection <u>insufficiency claim because it was never approved by this Court</u>

Alternatively, the Bondholders argue that, by signing on to the 2019 RSA, which would have permitted certain payments characterized as adequate protection payments, the Oversight Board agreed to provide adequate protection.  (Mot. ¶¶ 58-59.)  This argument fails because the Court never approved the 2019 RSA so, by its own terms, that proposed agreement never came into effect, nor did adequate protection obligations thereunder come into effect. (2019 RSA § 14.)

> 3.     <u>There is no adequate protection claim arising solely out of the automatic stay</u>

The Bondholders' argument for an administrative expense claim also fails the second prong of the test governing administrative claims based upon failed adequate protection, because, were the Court to assume, arguendo, a failure of adequate protection, the Bondholders also have not demonstrated that they suffered any loss as a <u>direct</u> result of the automatic stay. The Bondholders argue that they could have attempted to install a receiver had they both persisted and prevailed in their previous lift-stay forays.  (BH Reply ISO ¶¶ 50-51.)  This Court has previously noted that a receiver's powers and discretion would be far more circumscribed than the Bondholders have presented them.  (<u>See</u> Docket Entry No. 315 in Adv. Proc. No. 19-00391 at 31-35 (a receiver would not have "superpowers").)  The Bondholders' receivership-based argument falls short of the requisite demonstration of harm flowing directly from the imposition of the automatic stay.  Indeed, the Bondholders state that they do not even desire the standard remedy for failure of adequate protection due to the automatic stay, turnover of the collateral (apart from PREPA's cash-on-hand in any subordinate funds)—likely because, under section 305 of PROMESA, neither this nor any other court can direct the Oversight Board what to do with PREPA's property and revenues.  <u>See</u> 48 U.S.C. § 2165.  (BH Reply ISO ¶ 2; BH

Suppl. Resp. ¶ 1.)

> Finally, the court in In re Mandile held:

> When determining whether a loss was caused solely by the automatic stay, courts demand that the secured creditor be vigilant in protecting its rights during the case. If the creditor fails to take appropriate steps when adequate protection is insufficient by, for example, moving for relief from the stay, it may not be entitled to a superpriority for its loss.

> 626 B.R. 915, 920 (Bankr. N.D. Ill. 2021) (citation omitted). Here, despite

protestations to the contrary, the Bondholders have not been vigilant. As detailed by the

Committee in its supplemental brief (UCC Suppl. Br. ¶¶ 8-16), the Bondholders have, in the past,

declined to press forward with their 2018 renewed lift-stay motion that requested adequate

protection, agreed to stays of consideration of the settlement motion to approve the 2019 RSA,

moved for relief from the automatic stay without requesting adequate protection (Docket Entry

No. 2973), and moved for relief from the stay for the appointment of a receiver rather than

moving directly to foreclose on any property. (See Docket Entry Nos. 74, 975, 2973, 3913,

4689, 5207.) It was the Bondholders' choice to abandon pursuit of an adequate protection order

through the 2018 renewed motion to lift the automatic stay. Although the Bondholders may now

regret that choice or, in retrospect, would have insisted that different terms be included in the

2019 RSA or the Trust Agreement, they cannot rewrite the consequences of their past strategic

choices. The Bondholders have failed to establish harm attributable solely to the automatic stay.

Accordingly, the Bondholders do not have an administrative expense claim

deriving from Section 922(c) of the Bankruptcy Code.

<u>CONCLUSION</u>

For the foregoing reasons, the Motion is denied in its entirety.[26]

This Opinion and Order resolves Docket Entry No. 29173 in Case No. 17-3283

and Docket Entry No. 5599 in Case No. 17-4780.


SO ORDERED.

Dated:  March 16, 2026


/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE

---

[26]  The Court has considered all of the Bondholders' arguments, whether or not specifically addressed herein.  All alternative arguments for relief are rejected.

11 U.S.C. § 503 provides:

**(a)** An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.

**(b)** After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including–

**(1)(A)** the actual, necessary costs and expenses of preserving the estate including–

**(i)** wages, salaries, and commissions for services rendered after the commencement of the case; and

**(ii)** wages and benefits awarded pursuant to a judicial proceeding or a proceeding of the National Labor Relations Board as back pay attributable to any period of time occurring after commencement of the case under this title, as a result of a violation of Federal or State law by the debtor, without regard to the time of the occurrence of unlawful conduct on which such award is based or to whether any services were rendered, if the court determines that payment of wages and benefits by reason of the operation of this clause will not substantially increase the probability of layoff or termination of current employees, or of nonpayment of domestic support obligations, during the case under this title;

**(B)** any tax–

**(i)** incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in section 507(a)(8) of this title; or

**(ii)** attributable to an excessive allowance of a tentative carryback adjustment that the estate received,

Add.43

whether the taxable year to which such adjustment relates ended before or after the commencement of the case;

**(C)** any fine, penalty, or reduction in credit relating to a tax of a kind specified in subparagraph (B) of this paragraph; and

**(D)** notwithstanding the requirements of subsection (a), a governmental unit shall not be required to file a request for the payment of an expense described in subparagraph (B) or (C), as a condition of its being an allowed administrative expense;

**(2)** compensation and reimbursement awarded under section 330(a) of this title;

**(3)** the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by–

**(A)** a creditor that files a petition under section 303 of this title;

**(B)** a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor;

**(C)** a creditor in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor;

**(D)** a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;

Add.44

**(E)** a custodian superseded under section 543 of this title, and compensation for the services of such custodian; or

**(F)** a member of a committee appointed under section 1102 of this title, if such expenses are incurred in the performance of the duties of such committee;

**(4)** reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

**(5)** reasonable compensation for services rendered by an indenture trustee in making a substantial contribution in a case under chapter 9 or 11 of this title, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title;

**(6)** the fees and mileage payable under chapter 119 of title 28;

**(7)** with respect to a nonresidential real property lease previously assumed under section 365, and subsequently rejected, a sum equal to all monetary obligations due, excluding those arising from or relating to a failure to operate or a penalty provision, for the period of 2 years following the later of the rejection date or the date of actual turnover of the premises, without reduction or setoff for any reason whatsoever except for sums actually received or to be received from an entity other than the debtor, and the claim for remaining sums due for the balance of the term of the lease shall be a claim under section 502(b)(6);

**(8)** the actual, necessary costs and expenses of closing a health care business incurred by a trustee or by a Federal agency (as defined in section 551(1) of title 5) or a department or agency of

a State or political subdivision thereof, including any cost or expense incurred–

> **(A)** in disposing of patient records in accordance with section 351; or

> **(B)** in connection with transferring patients from the health care business that is in the process of being closed to another health care business; and

**(9)** the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

**(c)** Notwithstanding subsection (b), there shall neither be allowed, nor paid–

**(1)** a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that–

> **(A)** the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

> **(B)** the services provided by the person are essential to the survival of the business; and

> **(C)** either–

>> **(i)** the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during

Add.46

the calendar year in which the transfer is made or the obligation is incurred; or

**(ii)** if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

**(2)** a severance payment to an insider of the debtor, unless–

**(A)** the payment is part of a program that is generally applicable to all full-time employees; and

**(B)** the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or

**(3)** other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

Add.47

11 U.S.C. § 922 provides:

**(a)** A petition filed under this chapter operates as a stay, in addition to the stay provided by section 362 of this title, applicable to all entities, of–

**(1)** the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against an officer or inhabitant of the debtor that seeks to enforce a claim against the debtor; and

**(2)** the enforcement of a lien on or arising out of taxes or assessments owed to the debtor.

**(b)** Subsections (c), (d), (e), (f), and (g) of section 362 of this title apply to a stay under subsection (a) of this section the same as such subsections apply to a stay under section 362(a) of this title.

**(c)** If the debtor provides, under section 362, 364, or 922 of this title, adequate protection of the interest of the holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection such creditor has a claim arising from the stay of action against such property under section 362 or 922 of this title or from the granting of a lien under section 364(d) of this title, then such claim shall be allowable as an administrative expense under section 503(b) of this title.

**(d)** Notwithstanding section 362 of this title and subsection (a) of this section, a petition filed under this chapter does not operate as a stay of application of pledged special revenues in a manner consistent with section 927 of this title to payment of indebtedness secured by such revenues.

Add.48

11 U.S.C. § 928 provides:

**(a)** Notwithstanding section 552(a) of this title and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

**(b)** Any such lien on special revenues, other than municipal betterment assessments, derived from a project or system shall be subject to the necessary operating expenses of such project or system, as the case may be.