Nos. 26-1330, 26-1331, 26-1332, 26-1333 and 26-1334

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,

*Debtors*,
*(Caption continued on inside cover)*

Appeal from the U.S. District Court
for the District of Puerto Rico, Case No. 17-BK-4780-LTS
(Hon. Laura Taylor Swain)

## OPENING BRIEF OF MOVANT-APPELLANT
## U.S. BANK NATIONAL ASSOCIATION, AS PREPA BOND TRUSTEE

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION; U.S. BANK NATIONAL ASSOCIATION, in the capacity as PREPA Bond Trustee; ALLIANCEBERNSTEIN L.P.; ARISTEIA CAPITAL, L.L.C.; BNY MELLON FUNDS TRUST; CAPITAL RESEARCH AND MANAGEMENT COMPANY; COLUMBIA MANAGEMENT INVESTMENT ADVISERS, LLC; DELAWARE MANAGEMENT COMPANY, a series of Nomura Asset Management Co., Ltd.; ELLINGTON MANAGEMENT GROUP, L.L.C.; GOLDMAN SACHS ASSET MANAGEMENT L.P.; INVESCO ADVISERS, INC.; LUXOR CAPITAL GROUP, LP; MACKAY SHIELDS LLC; MASSACHUSETTS FINANCIAL SERVICES COMPANY; OLD ORCHARD CAPITAL MANAGEMENT LP; ONE WILLIAM STREET CAPITAL MANAGEMENT, L.P.; RUSSELL INVESTMENT COMPANY, ON BEHALF OF RUSSELL INVESTMENT COMPANY TAX-EXEMPT HIGH YIELD BOND FUND; SIG STRUCTURED PRODUCTS, LLC; T. ROWE PRICE; TOWER BAY ASSET MANAGEMENT LP; VERITION FUND MANAGEMENT LLC; GOLDENTREE ASSET MANAGEMENT LP; SYNCORA GUARANTEE INC.; ASSURED GUARANTY INC.,

Movants-Appellants,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA),

Debtor-Appellee,

INSTITUTO DE COMPETITIVIDAD Y SOSTENIBILIDAD ECONÓMICA DE PUERTO RICO (ICSE); EL PUENTE DE WILLIAMSBURG, INC., ENLACE DE ACCIÓN CLIMÁTICA; COLEGIO DE ABOGADOS Y ABOGADAS DE PUERTO RICO (CAAPR); ASSOCIATION OF PRIVATE COLLEGES AND UNIVERSITIES OF PUERTO RICO (ACUP); LA LIGA DE CIUDADES DE PUERTO RICO; CENTRO UNIDO DE DETALLISTAS (CUD); RAQUEL MARIA GONZÁLEZ SPARKS; COALICIÓN NUEVA VISIÓN DE SALUD; SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA (SREAEE); JUNTE DE ASOCIACIONES CON PENSIONADOS Y JUBILADOS DE PUERTO RICO (JAP); COLEGIO DE PROFESIONALES DEL TRABAJO SOCIAL DE PUERTO RICO; OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PREPA; PUERTO RICO

FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY (AAFAF); ELAM, LLC, AS SUCCESSOR-IN-INTEREST TO BLUE BEETLE III, LLC,

Respondents-Appellees.

Michael C. McCarthy
(First Circuit Bar No. 1207488)
Clark T. Whitmore
(First Circuit Bar No. 1181990)
John T. Duffey
(First Circuit Bar No. 1181992)
MASLON LLP
225 South Sixth Street, Suite 2900
Minneapolis, MN 55402
Tel: (612) 672-8200
mike.mccarthy@maslon.com
clark.whitmore@maslon.com
john.duffey@maslon.com

*Counsel for Movant-Appellant*
*U.S. Bank National Association, as PREPA Bond Trustee*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Appellant U.S. Bank National Association, in its capacity as PREPA Bond Trustee, states as follows:

U.S. Bank National Association is a wholly-owned subsidiary of U.S. Bancorp, a publicly held Delaware corporation. U.S. Bancorp has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## <u>REASONS WHY ORAL ARGUMENT SHOULD BE HEARD</u>

These consolidated appeals, which arise from Title III debt-restructuring proceedings under the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), raise important questions regarding a public bankruptcy debtor's ability to dissipate a secured bondholder's pledged net revenue collateral, under the protection of the bankruptcy automatic stay and other stays imposed by the Title III court during the pendency of a Title III proceeding, without the bondholder having any legal right to an allowed administrative expense claim. Appellant U.S. Bank National Association, in its capacity as Trustee under the Trust Agreement dated January 1, 1974 (the "Trustee"), respectfully submits that the Court would benefit from the opportunity to hear from and question counsel regarding the important issues raised in these appeals with respect to the rights of secured municipal bondholders under PROMESA and the Constitution.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ......................................................... i

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ............................ ii

TABLE OF AUTHORITIES .............................................................................. iv

INTRODUCTION ............................................................................................... 1

JURISDICTIONAL STATEMENT .................................................................... 4

STATEMENT OF THE ISSUE ........................................................................... 4

STATEMENT OF THE CASE ............................................................................ 4

SUMMARY OF ARGUMENT ........................................................................... 5

STANDARD OF REVIEW ................................................................................. 5

ARGUMENT ...................................................................................................... 6

CONCLUSION ................................................................................................... 8

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Reading v. Brown*,
   391 U.S. 471 (1968) ..................................................................................2, 5

*Victor J. Salgado & Assocs. Inc. v. Cestero-Lopategui*,
   34 F.4th 49 (1st Cir. 2022) ...........................................................................5

**Statutes**

11 U.S.C. § 503 .................................................................................... 1, 5, 6

11 U.S.C. § 922 ........................................................................................5, 7

11 U.S.C. § 928 .......................................................................................1, 6

28 U.S.C. § 1291 ........................................................................................4

48 U.S.C. § 2166 ........................................................................................4

**Rules**

Fed. R. App. P. 28 ....................................................................................3, 5

iv

**INTRODUCTION**

Following this Court's ruling that the Trustee and bondholders[1] have a perfected, unavoidable lien on the past, present, and future Net Revenues (as defined in the Trust Agreement) that the Puerto Rico Power Electric Authority ("PREPA") generates from selling electricity, the Bondholders and the Trustee renewed motions for relief from the bankruptcy automatic stay, and after being prohibited from proceeding further on that motion by a court-imposed litigation stay, moved for allowance of an administrative expense claim under Section 503 of the Bankruptcy Code, which is incorporated into PROMESA Title III cases (the "Admin Claim"). The Admin Claim is based on PREPA's failure to provide adequate protection for its post-petition consumption of Net Revenues constituting Bondholder special revenues collateral under Section 928(a) of the Bankruptcy Code. Although PREPA[2] advanced legal arguments why the court should reject the Admin Claim, the district

---

[1] "Bonds" refers to all outstanding bonds issued under the Trust Agreement between PREPA and the Trustee dated January 1, 1974 (the "Trust Agreement"). The holders of all such outstanding Bonds are referred to as "bondholders," while the bondholders who are parties to this appeal are referred to "Bondholders." A copy of the Trust Agreement can be found at App.491.

[2] PREPA is represented in this proceeding by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"). Unless otherwise indicated, references to PREPA in this brief are intended to include the Oversight Board, as applicable.

court initially allowed discovery to proceed before months later denying the Admin Claim, as a matter of law, "in its entirety." Add.42; App.2708.

The Admin Claim is based on three separate theories: that PREPA has been unjustly enriched by its use of Net Revenues constituting bondholder collateral in violation of the Trust Agreement since the commencement of the Title III proceeding; that such post-petition misappropriation of Net Revenues is compensable as an administrative expense claim under *Reading v. Brown*, 391 U.S. 471 (1968); and that the failure of PREPA to provide adequate protection to the Trustee and Bondholders also supports allowance of the Admin Claim. PREPA's primary response was that, despite its having produced regular monthly reports showing several billion dollars of Net Revenues post-petition, there are and have been no Net Revenues, but it also challenged the legal sufficiency of the Admin Claim. The district court did not address the contention that there are no Net Revenues, thereby avoiding PREPA's disavowal of its financial reports to the contrary, and instead ruled that none of the theories advanced in support of the Admin Claim is legally viable.

The district court erred in ruling that the Bankruptcy Code, as incorporated by PROMESA, in effect authorizes PREPA to have consumed and to continue to consume the Trustee's and bondholders' special revenues post-petition collateral without compensation. As is explained in greater detail in the briefs filed by Assured

2

Guaranty, Inc. in No. 26-1334 and National Public Finance Guarantee Corporation in No. 26-1330 (the "Assured/National Brief"), the PREPA Ad Hoc Group[3] in No. 26-1332 (the "AHG Brief"), and GoldenTree Asset Management LP and Syncora Guarantee, Inc. in No. 26-1333 (the "GoldenTree/Syncora Brief" and, together with the Assured/National Brief and the AHG Brief, the "Bondholder-Appellants' Briefs"), the Trustee and Bondholders are entitled to an administrative expense claim, and their Admin Claim should be allowed to proceed and be adjudicated on a complete factual record. Rather than repeat those arguments in detail, the Trustee adopts by reference the legal arguments made in the Bondholder-Appellants' Briefs regarding the bases for reversing the district court's order.[4] *See* Fed. R. App. P. 28(i).

---

[3] As set forth in its filings in No. 26-1332, the PREPA Ad Hoc Group includes SIG Structured Products, LLC, Russell Investment Company Tax-Exempt High Yield Bond Fund, Old Orchard Credit Master Fund, L.P., and funds and accounts managed or advised by AllianceBernstein L.P., Aristeia Capital L.L.C., BNY Mellon ETF Investment Adviser, LLC, Capital Research and Management Company, Columbia Management Investment Advisers, LLC., Delaware Management Company, a series of Macquarie Investment Management Business Trust, Ellington Management Group, L.L.C., Goldman Sachs Asset Management L.P., Invesco Advisers, Inc., Luxor Capital Group, LP, MacKay Shields LLC, MFS Investment Management, One William Street Capital Management L.P., T. Rowe Price, Tower Bay Asset Management LP, and Veriton Fund Management LLC.

[4] The majority of the Bonds are held by the Bondholders who are appellants in these consolidated appeals. (*See generally* Joint Informative Motion of GoldenTree Asset Management LP, Syncora Guarantee, Inc., Assured Guaranty Inc., National Public Finance Guarantee Corporation, the PREPA Ad Hoc Group, and the Paul, Weiss Ad Hoc Group Regarding Second Amendment to and Extension of Term of Cooperation Agreement, Doc. No. 6124 in No. 17-04780-LTS (D.P.R.

3

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under PROMESA § 306(a), 48 U.S.C. § 2166(a). The district court issued its final order on March 16, 2026. (Add.1; App.2667.) The Trustee timely appealed on March 23, 2026. (App.1.)  This Court has jurisdiction under 28 U.S.C. § 1291 and PROMESA § 306(a), 48 U.S.C. § 2166(e)(2).

## STATEMENT OF THE ISSUE

Whether the district court erred in holding, as a matter of law, that the Bankruptcy Code, as incorporated into PROMESA Title III, does not permit, as a matter of law, the allowance of an administrative expense claim based upon PREPA's post-petition use of Net Revenues securing special revenue bonds in violation of the Trust Agreement.

## STATEMENT OF THE CASE

The Statements of the Case in the Assured/National and AHG Briefs include detailed recitations of the facts relevant to the issues on appeal, the relevant procedural history, the ruling by the district court, and appropriate references to the

---

Apr. 22, 2026) at 2 ¶ 1 (movants "hold or insure over 90 percent of the outstanding bonds").)

4

record, consistent with Rule 28(a)(6). Rather than duplicate those statements, the Trustee adopts them by reference.[5] *See* Fed. R. App. P. 28(i).

## SUMMARY OF ARGUMENT

Section 503 of the Bankruptcy Code, as incorporated by PROMESA, entitles the Trustee and bondholders to an administrative expense claim because PREPA has been unjustly enriched by its use of what its own records indicate are several billion dollars of Net Revenues post-petition. Because PREPA's consumption of those Net Revenues constitutes both conversion and a Taking, allowance of the Admin Claim is also required under the principles set forth in *Reading Co. v. Brown*, 391 U.S. 471 (1968). And PREPA's continuing failure to provide the Trustee and Bondholders with adequate protection for their collateral (the Net Revenues), while the Trustee and Bondholders have been prevented from obtaining relief from the automatic stay, provides a third basis for the Admin Claim under Sections 922(c) of the Code.

## STANDARD OF REVIEW

The Court "review[s] de novo the district court's legal determinations." *Victor J. Salgado & Assocs. Inc. v. Cestero-Lopategui*, 34 F.4th 49, 52 (1st Cir. 2022).

---

[5] The Bondholder-Appellants' Briefs at times characterize certain rights under the Trust Agreement as bondholder rights that may be more correctly characterized as rights of the Trustee held on behalf of bondholders or of both the Trustee and bondholders. Because the Trustee does not anticipate that resolution of these appeals will turn on that distinction, it does not in this brief address instances in which that has occurred in those briefs, but it nonetheless reserves all rights under the Trust Agreement.

## ARGUMENT

The arguments detailing the district court's errors are set forth in detail in the Bondholder-Appellants' Briefs, so the Trustee will only briefly summarize certain of those arguments here. The Trustee adopts by reference the legal arguments in those briefs that substantiate all of the errors that led the district court to reject the Trustee's and Bondholders' request that they be compensated for PREPA's post-petition consumption of Net Revenues.

*First*, Section 503 of the Code, as incorporated by PROMESA, authorizes an administrative expense claim when the debtor uses a creditor's collateral, thereby diminishing that collateral, to benefit the estate post-petition. Here PREPA did just that, as demonstrated by its own records, when it generated Net Revenues secured under Section 928(a) of the Bankruptcy Code, but then consumed them for its own purposes in violation of the Trust Agreement. PREPA was thereby unjustly enriched, entitling the Trustee and Bondholders to allowance of an administrative expense claim. The district court ruled, in effect, that Section 503 does not apply to PREPA's use of its own cash, notwithstanding the Trustee's and Bondholders' ongoing post-petition lien rights, and that even if Section 503 applied, the Admin Claim was legally deficient because it did not arise from a post-petition transaction conferring the benefit on PREPA. As explained in the Bondholder-Appellants' Briefs, both rulings are mistaken.

6

*Second*, the district court placed limitations of its own making on *Reading* to reject the Admin Claim, limitations that lack sound legal foundation. PREPA's consumption of post-petition Net Revenues subject to an ongoing post-petition special revenues lien in violation of the Trust Agreement constitutes a Taking under the United States Constitution as well as conversion under Puerto Rico law and is compensable under *Reading*. The district court's assertions that public policy precludes the Admin Claim, that *Reading* does not apply to prepetition creditors, that the Trust Agreement waived the Takings claim, and that in taking the Net Revenues, PREPA acted in a commercial rather than sovereign capacity are all incorrect. Again, as explained in the Bondholder-Appellants' Briefs, none of these bases for rejecting the Admin Claim withstand scrutiny.

*Third*, Section 922(c) of the Code authorizes the Admin Claim under the special circumstances presented because PREPA has used post-petition Net Revenues in violation of the Trust Agreement. The district court, while blocking efforts by the Bondholders and the Trustee to bring a lift-stay motion, interpreted PROMESA to permit PREPA unrestricted use of Net Revenue collateral without even an offer of adequate protection and then relied upon the absence of an order or agreement to provide adequate protection as the basis for denying the Admin Claim under Section 922(c) as a matter of law.  For the reasons set forth in the Bondholder-Appellants' Briefs, the district court construed Section 922(c) too narrowly.

7

The Trustee and Bondholders are entitled to pursue their Admin Claim if the district court erred in its rejection of any of the three bases for that claim. Because the district court erred with respect to all three bases, this Court should correct the district court's rulings and remand to permit the Trustee and Bondholders to obtain a remedy in form of an allowed administrative expense claim for PREPA's past and ongoing use of Net Revenues in violation of the Trust Agreement.

## CONCLUSION

The district court misinterpreted and misapplied the Bankruptcy Code, PROMESA, and *Reading* when it rejected the Trustee's and the Bondholders' Admin Claim as a matter of law. For all of the reasons set forth herein and the legal arguments contained in Bondholder-Appellants' Briefs, this Court should reverse the district court and remand to permit the Trustee and the Bondholders to obtain a remedy for PREPA's past and ongoing consumption of their collateral.

8

Dated:  May 14, 2026

Respectfully submitted,

By: */s/ Michael C. McCarthy*
Michael C. McCarthy
(First Circuit Bar No. 1207488)
Clark T. Whitmore
(First Circuit Bar No. 1181990)
John T. Duffey
(First Circuit Bar No. 1181992)
MASLON LLP
225 South Sixth Street, Suite 2900
Minneapolis, MN 55402
Tel: (612) 672-8200
mike.mccarthy@maslon.com
clark.whitmore@maslon.com
john.duffey@maslon.com

*Counsel for Movant-Appellant*
*U.S. Bank National Association,*
*as PREPA Bond Trustee*

9

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 1,821 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Size 14 Times New Roman.

Dated:  May 14, 2026

Respectfully Submitted,

By: */s/ Michael C. McCarthy*
Michael C. McCarthy

*Counsel for Movant-Appellant*
*U.S. Bank National Association,*
*as PREPA Bond Trustee*

10

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send notifications of such filing to all CM/ECF counsel of record.

By: */s/ Michael C. McCarthy*
Michael C. McCarthy

*Counsel for Movant-Appellant*
*U.S. Bank National Association,*
*as PREPA Bond Trustee*

11

**ADDENDUM**

Opinion and Order Denying PREPA Bondholders' Motion For Allowance
of Administrative Expense Claim, Doc. No. 6063 in No. 17-bk-4780
(D.P.R. March 16, 2026) ...........................................................................Add. 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO <u>et al.</u>,<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as a representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | PROMESA Title III<br><br>Case No. 17-BK-4780-LTS |

OPINION AND ORDER DENYING PREPA BONDHOLDERS'
MOTION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the: (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (v) Puerto Rico Public Buildings Authority ("PBA", and together with the Commonwealth, HTA, ERS, and PREPA, the "Debtors") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).  On October 30, 2024, the Title III case for the Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) was closed.

APPEARANCES:

RAMOS CRUZ LEGAL
By:     Lydia M. Ramos Cruz
1509 López Landrón Street
American Airlines Building, PH
San Juan, Puerto Rico 00911

WHITE & CASE LLP
By:     Thomas E Lauria
        Glenn M. Kurtz
        Claudine Columbres
        Isaac Glassman
        Thomas E. MacWright
1221 Avenue of the Americas
New York, New York 10036

*and*

        John K. Cunningham
        Michael C. Shepherd
        Jesse L. Green
200 S. Biscayne Blvd., Suite 4900
Miami, Florida 33131

*Co-Counsel for GoldenTree Asset Management LP*

CASELLAS ALCOVER & BURGOS P.S.C.
By:     Heriberto Burgos Pérez
        Ricardo F. Casellas-Sánchez
        Diana Pérez-Seda
P.O. Box 364924
San Juan, Puerto Rico 00936-4924

GIBSON, DUNN & CRUTCHER LLP
By:     Matthew D. McGill
        Lochlan F. Shelfer
1700 M Street, N.W.
Washington, D.C. 20036-4504

CADWALADER, WICKERSHAM
& TAFT LLP
By:     Howard R. Hawkins, Jr.
        Mark C. Ellenberg
        Casey J. Servais

O'NEILL & BORGES LLC
By:     Hermann D. Bauer
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813

PROSKAUER ROSE LLP
By:     Martin J. Bienenstock
        Paul V. Possinger
        Ehud Barak
        Margaret A. Dale
        Elliot R. Stevens
Eleven Times Square
New York, NY 10036

*Counsel for the Financial Oversight and Management Board as representative for the Debtors*

BUFETE EMMANUELLI, LLC
By:     Rolando Emmanuelli-Jiménez
P.O. Box 10779
Ponce, Puerto Rico 00732

ORTIZ MENDOZA & FARINACCI
FERNÓS, LLC
By:     Rafael A. Ortiz Mendoza
Edificio Banco Cooperativo Plaza
623 Avenida Ponce de León, Suite 806-B
San Juan, Puerto Rico 00917-4820

*Counsel for Sistema de Retiro de los Empleados de la Autoridad de Energía Electrica ("SREAEE")*

William J. Natbony
Thomas J. Curtin
200 Liberty Street
New York, New York 10281

*Co-Counsel for Assured
Guaranty Inc.*

REICHARD & ESCALERA, LLC
By:     Rafael Escalera
        Sylvia M. Arizmendi
        Carlos R. Rivera-Ortiz
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, Puerto Rico 00917-1913

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
By:     Susheel Kirpalani
        Eric Kay
295 Fifth Avenue
New York, New York 10016

*Co-Counsel for Syncora Guarantee, Inc.*

ADSUAR MUÑIZ GOYCO SEDA &
PÉREZ OCHOA, P.S.C.
By:     Eric Pérez-Ochoa
        Luis Oliver-Fraticelli
        Alexandra Casellas-Cabrera
P.O. Box 70294
San Juan, Puerto Rico 00936

WEIL, GOTSHAL & MANGES LLP
By:     Matthew S. Barr
        Jonathan Polkes
        Robert Berezin
767 Fifth Avenue
New York, New York 10153

*and*

        Gabriel A. Morgan
700 Louisiana Street, Suite 1700
Houston, Texas 77002

*Co-Counsel for National Public Finance*
*Guarantee Corporation*

MONSERRATE SIMONET &
GIERBOLINI,
LLC
By:     Dora L. Monserrate-Peñagarícano
        Fernando J. Gierbolini-González
        Richard J. Schell
101 San Patricio Ave., Suite 1120
Guaynabo, Puerto Rico 00968

DECHERT LLP
By:     G. Eric Brunstad, Jr.
        Stephen D. Zide
        David A. Herman
1095 Avenue of the Americas
New York, New York 10036

*Co-Counsel for the PREPA Ad Hoc Group*

RIVERA, TULLA AND FERRER, LLC
By:     Eric A. Tulla
Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212

MASLON LLP
By:     Clark T. Whitmore
        Michael C. McCarthy
        John T. Duffey
        Jason M. Reed
225 South Sixth Street, Suite 2900
Minneapolis, MN 55402

*Attorneys for U.S. Bank National Association,*
*in its capacity as the PREPA Bond Trustee*

LAURA TAYLOR SWAIN, United States District Judge

Before the Court is the *PREPA Bondholders' Motion and Memorandum of Law for Allowance of Administrative Expense Claim* (Docket Entry No. 29173 in Case No. 17-3283 and Docket Entry No. 5599 in Case No. 17-4780)[2] (the "Motion"). The Motion was filed by Assured Guaranty Inc., GoldenTree Asset Management LP, National Public Finance Guarantee Corporation, the PREPA Ad Hoc Group, Syncora Guarantee, Inc., and U.S. Bank National Association as trustee (the "Bond Trustee," or the "Trustee," and together the "Bondholders" or "Movants").[3] The Court has also received and reviewed the *Debtor's Objection to PREPA Bondholders' Motion for Allowance of Administrative Expense Claim* (Docket Entry No. 29280 in Case No. 17-3283 and Docket Entry No. 5629 in Case No. 17-4780) (the "FOMB Objection") filed by the Puerto Rico Electric Power Authority ("PREPA") by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") and additional submissions by the parties and other parties in interest with respect to the Motion.[4]

---

[2]    Unless otherwise indicated, all references to "Docket Entry Nos." in this Opinion refer to entries in Case No. 17-4780. Capitalized words used but not defined herein shall have the meanings ascribed to them in the Motion or in any specifically referenced pleading.

[3]    Assured, Syncora, and National are all monoline insurers of insured Bonds. The Court will use the lower-case phrase "the bondholders" to refer generally to the holders of bonds issued under the Trust Agreement. When specifically discussing the bondholders and insurers that are parties in this action, the Court will use the capitalized term "Bondholders."

[4]    The Court has also received and reviewed the *Expert Declaration of Maureen M. Chakraborty, PHD* (Docket Entry No. 29227-1 in Case No. 17-3283 and Docket Entry No. 5614-1 in Case No. 17-4780) (the "Chakraborty Declaration"); the declaration of Margaret A. Dale in support of the FOMB Objection (Docket Entry No. 29300 in Case No. 17-3283 and Docket Entry No. 5637 in Case No. 17-4780) (the "Dale Declaration"); the Official Committee of Unsecured Creditors' (the "Committee") supplemental brief and joinder to the FOMB Objection (Docket Entry No. 29308 in Case No. 17-3283 and Docket Entry No. 5649 in Case No. 17-4780); the Puerto Rico Fiscal Agency and Financial Advisory Authority's ("AAFAF") joinder to the FOMB Objection (Docket Entry No. 29306 in Case No. 17-3283 and Docket Entry No. 5650 in Case No. 17-4780); multiple additional joinders to the FOMB Objection filed by various parties (Docket

---

The Court heard oral argument with respect to the Motion at the July 23, 2025 omnibus hearing.  *July 23, 2025 Omnibus Hr'g Tr.*  (Docket Entry No. 29725 in Case No. 17-3283 and Docket Entry No. 5757 in Case No. 17-4780.)  The Court has considered all of the relevant submissions carefully. The Court has subject matter jurisdiction of this action pursuant to section 306(a) of PROMESA.  48 U.S.C. § 2166(a).[5]

The Bond Trustee, on behalf of the Bondholders, filed Proof of Claim No. 18449 on May 21, 2018, as a fully secured claim in the amount of $8,477,156,729.56, for amounts owed at the time the Title III petition was filed pursuant to that certain trust agreement between PREPA and the Bond Trustee (as successor trustee), dated as of January 1, 1974, as amended and supplemented (the "Trust Agreement" or "TA").[6]  Through the Motion, the Bondholders seek the

---

Entry Nos. 29305 and 29307 in Case No. 17-3283 and Docket Entry Nos. 5638-5648 & 5651 in Case No. 17-4780; the Bondholders' response in support of the Motion (Docket Entry No. 29363 in Case No. 17-3283 and Docket Entry No. 5668 in Case No. 17-4780) (the "BH Reply ISO"); the declaration of Wiliam J. Natbony in support of the BH Reply ISO ((Docket Entry No. 29365 in Case No. 17-3283 and Docket Entry No. 5669 in Case No. 17-4780); the Oversight Board's supplemental brief in opposition to the Motion (Docket Entry No. 29425 in Case No. 17-3283 and Docket Entry No. 5685 in Case No. 17-4780) (the "FOMB Supplemental Brief"); and the Bondholders' supplemental brief in response thereto (Docket Entry No. 29497 in Case No. 17-3283 and Docket Entry No. 5700 in Case No. 17-4780) (the "BH Supplemental Response").

[5]  The Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")—incorporating the Federal Rules of Civil Procedure (the "Federal Rules") to the extent stated therein—are made applicable in these Title III cases by section 310 of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").  48 U.S.C. § 2170.  PROMESA is codified at 48 U.S.C. section 2101 et seq.  References herein to "PROMESA" section numbers are to the uncodified version of the legislation.  References herein to the provisions of Title 11 of the United States Code (the "Bankruptcy Code") are to sections made applicable in these cases by section 301 of PROMESA.  48 U.S.C. § 2161.

[6]  In response to the Court's *Order Concerning PREPA Trust Agreement* (Docket Entry No. 115 in Adv. Proc. No. 19-00391), the Oversight Board and the Defendants filed an agreed-upon conformed copy of the trust agreement as Exhibit A to their *Joint Informative Motion Submitting Conformed Trust Agreement in Response to January 5, 2023 Order Concerning PREPA Trust Agreement [ECF No. 115]* (Docket Entry No. 118

---

entry of an order allowing an administrative expense priority claim in an amount "no less than $3.7 billion, the amount of which may increase if PREPA continues to use Net Revenues" after the date on which an order granting the Motion is issued without providing adequate protection. (Docket Entry No. 29175-1 in Case No. 17-3283 and Docket Entry No. 5601-1 in Case No. 17-4780 at 2.) The Oversight Board has requested that the Court deny the Motion as a matter of law, arguing that the Bondholders have not demonstrated any entitlement to administrative expense priority under the applicable sections of the Bankruptcy Code, as incorporated into PROMESA. (See, e.g., FOMB Obj. ¶ 27.)

For the following reasons, the Court holds that (a) the Bondholders have not demonstrated that PREPA's postpetition use of their alleged collateral is an "actual, necessary expense" incurred by PREPA postpetition that can be prioritized as an administrative expense under section 503(b)(1)(A) of the Bankruptcy Code ("Section 503(b)(1)(A)"), (b) the Bondholders have failed to show that they are entitled to administrative expense priority under the fundamental fairness doctrine enunciated in Reading v. Brown, 391 U.S. 471, 477 (1967), because that doctrine is inapplicable to their claim and because they have not pleaded cognizable claims sounding in tort, and (c) the Bondholders have not shown that they are entitled to priority claims under section 922(c) of the Bankruptcy Code ("Section 922(c)") because PREPA did not fail to provide any Court-ordered adequate protection payments to the Bondholders. As a result, the Court denies the Motion because it fails as a matter of law to demonstrate that the Bondholders have an allowable administrative expense claim.

---

Ex. A in Adv. Proc. No. 19-00391). All citations to the Trust Agreement are to that conformed version.

I.

BACKGROUND

Unless otherwise indicated, facts presented or recited in this Opinion and Order

are identified as undisputed in the Motion or the FOMB Objection or drawn from evidence as to

which there has been no contrary, non-conclusory factual proffer.

A.    PREPA

PREPA is a public corporation created under the Puerto Rico Electric Power

Authority Act, Act No. 83-1941, codified at 22 L.P.R.A. §§ 191-240 (as amended, the "Authority

Act"),[7] to supply substantially all of the electricity consumed in the Commonwealth.  The

Authority Act authorizes PREPA to issue bonds.  22 L.P.R.A. § 206.  Between the years 1974 and

2016, PREPA made several bond issuances pursuant to the Trust Agreement, totaling

approximately $8.3 billion of bonds (the "Bonds").

---

[7]    Unless otherwise stated, all citations herein to provisions of the Laws of Puerto Rico Annotated are to the English-language translations, available on Westlaw, by the Translation Office of the Puerto Rico Government, with one exception: Westlaw does not provide an English-language translation of the current section 5, titled "Powers and Authorities," of the Authority Act and certain other sections thereof. Accordingly, for the English-language translations of the relevant sections of the Authority Act—some of which have been amended since the version that was in effect on the date relevant to the Estimation Order (July 3, 2017), which is currently the most recent version available in English-language translation on Westlaw—the Court has relied upon a translated compilation of the Authority Act provided by the Puerto Rico Office of Management and Budget.  Puerto Rico Electric Power Authority Act, Act No. 83-1941 (codified as amended by Act 33-2019), 22 L.P.R.A. §§ 191-240 (2019), https://bvirtualogp.pr.gov/ogp/Bvirtual/leyesreferencia/PDF/2-ingles/83-1941.pdf [https://perma.cc/VU2R-8MM2].  However, consistent with the Spanish-language version of the Authority Act available on Westlaw, the Court will cite section 5 of the Authority Act as 22 L.P.R.A. § 195a-1 ("Powers and Authorities"), and section 6 of the Authority Act as 22 L.P.R.A. § 196 ("Duties and Responsibilities").  Until 1979, PREPA's name was the Puerto Rico Water Resources Authority.

B.      Relevant Provisions of the Trust Agreement

Article I of the Trust Agreement defines key terms, including "Revenues" and "Net Revenues." PREPA's "Revenues" are (1) "all moneys received by [PREPA] in connection with or as a result of its ownership or operation" of its electricity generation and distribution system, (2) "any proceeds of use and occupancy insurance on the System or any part thereof," and (3) "income from investments made under" either the Trust Agreement or a 1947 predecessor agreement. (TA § 101.) "Current Expenses" are "the Authority's reasonable and necessary current expenses of *maintaining, repairing, and operating* the System" but they do not include certain other transfers, such as deposits to the credit of the Sinking Fund (as discussed immediately hereafter). (Mot. ¶ 5 (quoting TA §101) (emphasis added).) "Net Revenues" are the "amount of the excess of the Revenues for such period over the Current Expenses for such period." (TA § 101.)

Article V of the Trust Agreement establishes a "waterfall" structure for distributing PREPA's Revenues (as the term is defined in Article I) into certain funds. (TA Art. V.) The Revenues (except for certain types of investment income) first flow into the General Fund. (TA § 503.) PREPA pays its Current Expenses out of the General Fund. (TA § 505.) The remaining Revenues—the Net Revenues—then flow into the Revenue Fund, minus a reserve to cover future operating expenses. (TA § 506.) From there, Net Revenues flow first into the Sinking Fund, and then into a series of Subordinate Funds. (See TA § 507.) The Net Revenues deposited into the Sinking Fund are designated to cover debt service. The Net Revenues deposited into the Subordinate Funds are designated to cover internal PREPA operations, such as extraordinary repairs or capital improvements. There are four Subordinate Funds: the Self-Insurance Fund, the Capital Improvement Fund, the Reserve Maintenance Fund,

and the Construction Fund (which is not, technically, included in the waterfall structure).[8]  If there is not enough money in the Sinking Fund to cover PREPA's debt service obligations at a given time, Article V (specifically, sections 512 through 512B) broadly requires PREPA to draw on the Subordinate Funds—other than the Construction Fund—to pay bondholders.  (See TA §§ 512, 512A, 512B.)

Article VII of the Trust Agreement outlines specific contractual covenants between the bondholders and PREPA.  In section 701, PREPA covenants that it will "promptly pay the principal of and the interest on" the Revenue Bonds.  (TA § 701.)  PREPA also covenants that the Revenue Bonds are "payable solely from the Revenues and said Revenues are hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified."  (TA § 701.)  In sections 705 and 712, PREPA also agrees not to create—"or suffer to be created"—any lien or charge on "the Revenues ranking equally with or prior to the [Revenue Bonds]."  (TA §§ 705, 712.)

Article VIII of the Trust Agreement outlines the bondholders' remedies.  Section 804 permits the bondholders to file a suit "in equity or at law . . . for the appointment of a receiver as authorized by the Authority Act[,] or for the specific performance of any covenant or agreement contained herein."  (TA § 804.)  The same provision entitles the bondholders to "recover and enforce any judgment or decree against the Authority, but solely as provided herein and in such bonds, for any portion of such amounts remaining unpaid . . . and to collect (but

---

[8]      Instead, as noted by the Court of Appeals for the First Circuit (the "First Circuit"), "the Construction Fund is replenished by bond proceeds and certain Net Revenues preemptively siphoned off from the Revenue Fund." U.S. Bank Nat'l Assoc. v. Fin. Oversight and Mgmt. Bd. for P.R. (In re Fin. Oversight and Mgmt. Bd. for P.R.), 121 F.4th 280, 291 n.6 (1st Cir. 2024).

solely from moneys in the Sinking Fund and any other moneys available for such purpose) in any manner provided by law, the moneys adjudged or decreed to be payable."  (TA § 804.)

C.    The PREPA Title III Proceedings

On July 2, 2017 (the "Petition Date"), the Oversight Board filed a petition pursuant to Title III of PROMESA, commencing a debt adjustment proceeding for PREPA under that statute.  (Docket Entry No. 1.)  On May 3, 2019, the Oversight Board, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), and PREPA (together the "Government Parties"), along with the Ad Hoc Group and Assured (followed soon thereafter by Syncora and National), entered into a restructuring support agreement intended to resolve claims related to the Bonds by granting certain treatment of the claims in exchange for support of a corresponding plan of adjustment (the "2019 RSA") (Dale Decl. Ex. 2).  The 2019 RSA contemplated, and according to the Oversight Board was dependent upon, passage by the Commonwealth of legislation authorizing several transactions called for by the RSA.  Such legislation was never passed.

In April 2020, after numerous adjournments of hearings on a motion to approve the settlements embodied in the 2019 RSA, as well as extensions of time due to earthquakes and the COVID-19 pandemic, the Court granted the Oversight Board and AAFAF's unopposed request to stay the deadlines applicable to the settlement motion.  (Docket Entry Nos. 1947, 1954.)  The Government Parties thereafter filed periodic status updates.  (See, e.g., Docket Entry Nos. 1992, 2691.)

On January 18, 2022, the Court confirmed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19784 in

Case No. Case No. 17-3283 (the "Commonwealth Plan").[9] (Docket Entry No. 19813 in Case No. 17-3283.)

On February 18, 2022, the Ad Hoc Group filed an urgent motion (the "Urgent Motion") asking the Court to appoint a mediator and set PREPA plan submission and confirmation deadlines. (Docket Entry No. 2718.)

On March 8, 2022, citing concerns regarding lack of implementing legislation and a comprehensive settlement of PREPA's legacy obligations, along with concerns regarding the affordability of the cost of electricity and the sustainability of the electric system as a result of rising inflation and significant surges in the price of crude oil, AAFAF gave unilateral notice of termination of the 2019 RSA. (See Docket Entry No. 2747 Ex. B (the "RSA Termination Notice").)

Also on March 8, 2022, the Court denied the Urgent Motion's specific requests, but entered an order requiring the Oversight Board, by a certain deadline (the "Path Forward Deadline"), to file (1) a proposed plan of adjustment for PREPA, (2) a detailed term sheet for a plan of adjustment for PREPA, (3) a proposed litigation schedule for significant disputed issues in PREPA's Title III case, including the existence and extent of the Bondholders' secured claim, or (4) a declaration and memorandum of law showing cause as to why the Court should not consider dismissal of PREPA's Title III case. (See Docket Entry No. 2748 ¶ 3(b).)

On April 8, 2022, this Court entered orders appointing the Mediation Team (as defined therein) and establishing terms and conditions to govern mediation, including an initial

---

[9] The Commonwealth Title III case was commenced on May 3, 2017. (Docket Entry No. 1 in Case No. 17-3283.) The PREPA Title III proceedings have been administered jointly with the various other Title III proceedings. (See Docket Entry No. 304 in Case No. 17-4780.)

mediation termination date (the "Termination Date").  (Docket Entry No. 2772 (the

"Appointment Order"); Docket Entry No. 2773 (the "Terms and Conditions Order")).)

The Path Forward Deadline and Termination Date were extended several times.

(See, e.g., Docket Entry No. 2949.)  In mid-September 2022, the Mediation Team declined to

extend the deadlines any further, at which time the Bondholders (without the Bond Trustee) filed

a motion to dismiss PREPA's Title III Case or for relief from the automatic stay in order to

enforce their contractual right to a receiver.  (See Docket Entry No. 2973.)

On September 29, 2022, this Court entered an order staying the September 2022

motion to dismiss the case or for relief from the automatic stay, establishing a deadline to file a

plan of adjustment, and establishing a litigation schedule for Adversary Proceeding

No. 19-00391.  (See Docket Entry No. 3013 (the "Litigation Scheduling Order")).)

Throughout these proceedings, in an effort to protect their alleged collateral, the

Bondholders have, at certain times, requested adequate protection.  (See Mot. ¶ 20.)  Before

2019, the Bondholders moved for relief from the automatic stay and for adequate protection

twice: once on July 18, 2017, and in a renewed motion filed on October 3, 2018.[10]  (Mot.

¶¶ 20-21.)  Before the Court could decide whether to grant stay relief or adequate protection to

the Bondholders on the 2018 renewed motion, the parties entered into the 2019 RSA.  (Mot.

---

[10]     On July 18, 2017, certain PREPA bondholders and monoline insurers filed a motion
         seeking relief from the automatic stay under PROMESA to pursue the appointment of a
         receiver in a non-Title III court.  (Docket Entry No. 74.)  Following the denial of the
         motion by this Court, a partial reversal by the Court of Appeals for the First Circuit, and a
         renewed motion (Docket Entry No. 975), the briefing schedule for the renewed motion
         was consensually extended several times.  The motion was not resolved before the
         parties' entry into the 2019 RSA. (See Docket Entry Nos. 299, 1176, 1204, 3364.)  See
         generally Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders
         (In re Fin. Oversight & Mgmt. Bd. for P.R.), 899 F.3d 13 (1st Cir. 2018).  The renewed
         stay relief motion was administratively terminated for statistical purposes by Court order
         (Docket Entry No. 3364) after the termination of the 2019 RSA.

¶ 22.)  The 2019 RSA required PREPA to make monthly payments to the Bondholders after it received approval from the Court, and included various other covenants, among them a promise to treat certain Bondholders' claims as administrative expense claims in the event the 2019 RSA was approved by the Court.  (Mot. ¶ 22.)  On May 10, 2019, the Oversight Board and AAFAF filed a joint motion seeking approval of the 2019 RSA.  (Mot. ¶ 23.)  However, the Court never approved the 2019 RSA, and on March 8, 2022—nearly two years after the Court granted the motion staying deadlines related to its approval— AAFAF unilaterally terminated the 2019 RSA.  (See Mot. ¶ 25.)  On September 19, 2022, certain Bondholders moved to dismiss PREPA's case, or alternatively for relief from the automatic stay to enforce their right to appoint a receiver under the terms of the Trust Agreement, but that motion did not seek adequate protection.  (Mot. ¶ 25.)  Eventually, the Oversight Board filed a plan of adjustment without support from the Bondholders.  (Mot. ¶ 25.)  On August 24, 2023, certain Bondholders moved again for relief from the automatic stay, now citing lack of adequate protection.  (Mot. ¶ 26.)  After the Court stayed that motion pending the outcome of related litigation, certain Bondholders renewed their request to lift the stay of that motion in February 2024.  (Mot. ¶ 26.)

On February 11, 2025, the Oversight Board certified and filed PREPA's 2025 Fiscal Plan.  (Docket Entry No. 5501.)  The 2025 Fiscal Plan states that PREPA will not be able to afford "any sustainable rate increases for debt service" because such increases would outstrip the median income household's ability to afford to pay utility rates.  (Mot. ¶ 32.)  The Oversight Board bases this finding on a projection that "Necessary Maintenance Expenses" ("NMEs") have risen and will rise rapidly, consuming revenues that could otherwise be available for debt service.  (Mot. ¶ 32.)

On March 28, 2025, the Oversight Board filed the *Fifth Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* (the "Fifth Amended Plan"). (Mot. ¶ 33; see also Docket Entry No. 29125 in Case No. 17-3283 and Docket Entry No. 5581 in Case No. 17-4780.) The Fifth Amended Plan contemplates the payment of the value of the Bondholders' secured claim in full once it has been determined (the Oversight Board takes the position that the value of the claim is nil) and proposes to pay general unsecured creditors from funds that the Bondholders allege constitute collateral securing PREPA's outstanding obligations under the bonds. (Mot. ¶ 33.) The Fifth Amended Plan remains PREPA's operative proposed plan of adjustment.

> D.      Adversary Proceeding No. 19-00391

On July 1, 2019, the Oversight Board commenced Adversary Proceeding No. 19-00391, seeking to disallow in part the Bondholders' claim. (Docket Entry No. 1 in Case No. 19-00391.)

On March 23, 2023, the Court entered an order granting in part and denying in part cross-motions for summary judgment with respect to the allowance or disallowance of Proof of Claim No. 18449. (See Docket Entry No. 147 in Adv. Proc. No. 19-00391 (the "Summary Judgment Order").) In the Summary Judgment Order, the Court held that:

> (a) the Trust Agreement granted the Bondholders security interests only in moneys actually deposited to the Sinking Fund, Self-insurance Fund, Capital Improvement Fund, Reserve Maintenance Fund, and Construction Fund (as defined in the Trust Agreement); (b) the Bondholders have perfected their liens in the Sinking Fund, Self-insurance Fund, and Reserve Maintenance Fund, over which the Trustee has established control (as discussed below);[11] (c) the Bondholders have no

---

[11]      The Court declined to address the Bondholders' possible perfection of their liens on the Capital Improvement Fund and Construction Fund, because the record before the Court provided no evidence from either party as to the form of the assets comprising those

security interest in the covenants and remedies provided for by the Trust Agreement; but (d) based on PREPA's payment and equitable relief covenants in the Trust Agreement, the Bondholders have an unsecured claim (within the meaning of 11 U.S.C. § 101(5)(B)) to be liquidated by reference to the value of future Net Revenues (as defined in the Trust Agreement) that would, under the waterfall provisions of the Trust Agreement and applicable nonbankruptcy law, have become collateral upon being deposited in the specified funds and payable to the Bondholders over the remainder of the term of the Bonds (the "Unsecured Net Revenue Claim").

(Summary Judgment Order at 13-14.) The Court further held that the value of the Unsecured Net Revenue Claim must be determined "either consensually or through proceedings under section 502 of the Bankruptcy Code." (Summary Judgment Order at 62, 70.) The parties were unable to reach consensus as to the value of the Net Revenue Claim.

On May 15, 2023, the Oversight Board filed a motion asserting that Counts III through VII of the Counterclaim Complaint "either (i) were resolved through this Court's [Summary Judgment Order]; (ii) fail to state a claim; (iii) are time-barred; or (iv) are preempted by the Bankruptcy Code." (Docket Entry No. 211 in Adv. Proc. No. 19-00391 (the "FOMB MTD").) The FOMB MTD sought the dismissal of Counts III through VII of the Bondholders' counterclaim complaint. (See Docket Entry No. 47 in Adv. Proc. No. 19-00391.)

On June 26, 2023, after a three-day hearing held earlier that month, this Court issued its *Order Concerning Bondholders' Unsecured Net Revenue Claim Estimation* (Docket

---

Funds and their custodial status, and means of perfection may vary with the form of the asset in question. On August 28, 2023, the Court entered the *Joint Stipulation and Agreed Order of the Financial Oversight and Management Board for Puerto Rico, U.S. Bank National Association as PREPA Bond Trustee, the Ad Hoc Group Of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, and Syncora Guarantee, Inc. Resolving Perfection-Related Issues*, approving a consensual resolution of the remaining lien-perfection issues while reserving certain rights for appeals. (Docket Entry No. 337 in Adversary Proceeding No. 19-00391.)

Entry No. 315 in Adv. Proc. No. 19-00391) (the "Estimation Order"), liquidating the Unsecured

Net Revenue Claim in the amount of $2,388,000,000.00. (Estimation Order at 47.)

On November 28, 2023, the Court issued an order granting the FOMB MTD,

denying requests (1) for declaratory judgments: (a) that PREPA has breached statutory

obligations and contractual covenants, (b) that PREPA is a trustee for the Bondholders, (c) that

PREPA has committed certain torts, (d) that PREPA had committed any takings by deciding to

file or filing under Title III, and (2) for rescission of contract. (Docket Entry No. 361 in Adv.

Proc. No. 19-00391.)

Thereafter, the Court entered judgment in Adversary Proceeding No. 19-00391,

and several parties, including the Bondholders, appealed. (See Docket Entry Nos. 362, 363, 365,

366, 368, 369, 371, 372, 386 in Adv. Proc. No. 19-00391.)

E.    The First Circuit Lien Decision and Current Procedural Posture

On June 16, 2024, the United States Court of Appeals for the First Circuit (the

"First Circuit") issued an opinion (later revised in part and reissued on November 13, 2024)

affirming in part and reversing in part this Court's Summary Judgment Order and Estimation

Order. See U.S. Bank Nat'l Assoc. v. Fin. Oversight and Mgmt. Bd. for P.R. (In re Fin.

Oversight and Mgmt. Bd. for P.R.), 121 F.4th 280, 294 (1st Cir. 2024) (the "First Circuit Lien

Decision"). In the First Circuit Lien Decision, the panel held, inter alia, that: the Bondholders

possess a lien on Net Revenues under the Trust Agreement, which liens are perfected as to Net

Revenues already acquired by PREPA and as to future revenues as acquired; the Bondholders'

allowed claim is approximately $8.5 billion (the face value of their bonds plus matured pre-

petition interest), although the value of the Net Revenues, if any, securing it is to be determined

in the first instance by this Court; the Bondholders are non-recourse creditors; PREPA is not a

trustee for the Bondholders; and the Bondholders properly pleaded a claim for an equitable accounting.

On June 17, 2024, this Court requested a joint status report from the parties to the appeal; the report was filed on July 3, 2024. (Docket Entry Nos. 5247 and 5274.) At a status conference on July 10, 2024, the Court stayed litigation in PREPA's Title III case and Adversary Proceeding No. 19-00391 and directed the parties to meet with the Mediation Team; the stay and directive were memorialized in an order dated July 11, 2024. (Docket Entry No. 5286 (the "PREPA Litigation Stay Order" or "PREPA Litigation Stay").) The Court later extended the PREPA Litigation Stay while the Oversight Board and certain other parties sought rehearing at the First Circuit. (Docket Entry Nos. 5338, 5390, 5406, 5480.)

On January 13, 2025, the First Circuit issued its mandate to this Court. (Docket Entry No. 401 in Adversary Proceeding No. 19-00391.) On February 24, 2025, the Bondholders asked the Court to lift the PREPA Litigation Stay to allow several matters to proceed, including a motion for allowance of an administrative expense claim. (Docket Entry No. 5510 ¶¶ 48-50.) On March 20, 2025, the Court granted the parties partial relief from the PREPA Litigation Stay, permitting the Oversight Board to file an amended plan of adjustment for PREPA, and permitting the filing of the instant Motion. (Docket Entry No. 5572.)

F.     The Instant Administrative Expense Motion

On April 7, 2025, Movants filed the Motion, in which they made three legal arguments, any one of which would, if valid, suffice to state a claim for an administrative expense claim. (Mot. ¶¶ 43-66.) First, Movants argue that Section 503(b)(1)(A) entitles them to an administrative expense claim for Net Revenues spent or withheld by PREPA during the life of the Title III case, as "actual, necessary costs and expenses of preserving the estate." (Mot. ¶ 44

(quoting 11 U.S.C. § 503(b)(1)(A)).)  Movants contend that PREPA's use of Movants' collateral entitles them to a priority claim under this provision because such use created "actual value conferred on the bankrupt estate."  (Mot. ¶ 45 (quoting In re United Trucking Serv., Inc., 851 F.2d 159, 162-63 (6th Cir. 1988)).)  Second, Movants argue that, even if Section 503(b)(1)(A) does not by its direct application entitle them to an administrative expense claim, the Supreme Court's decision in Reading v. Brown, 391 U.S. 471, 477 (1967), and its progeny provide an alternative basis for their claim because "tort claims arising during a bankruptcy case give rise to administrative expense claims."[12]  (Mot. ¶ 47.)  Invoking Reading, Movants assert two tort claims against PREPA: (1) a claim for conversion under Puerto Rico law; and (2) a claim under the Takings Clause of the Fifth Amendment of the Constitution of the United States for compensation for PREPA's use of Movants' collateral during the pendency of this Title III Case. (See also Mot. ¶¶ 48-52.)  As a fallback, Movants further contend that Section 922(c) should also entitle them to an administrative expense claim because "'there has been a diminution in the value of [Movants'] secured collateral' by reason of the automatic stay."  (Mot. ¶ 53 (quoting Grundy Nat'l Bank v. Rife, 876 F.2d 361, 363 (4th Cir. 1989)).)  Movants argue that PREPA's failure to provide Movants with adequate protection despite their requests for it earlier in the case and, separately, failure to provide the adequate protection payments contemplated by certain provisions of the 2019 RSA, entitle them to an administrative expense claim under Section 922(c).  (Mot. ¶¶ 54-59.)  Finally, Movants argue that the Court must rule in their favor under Section 503(b)(1)(A) and Section 922(c) as a matter of constitutional avoidance.  (Mot. ¶¶ 60-66.)

---

[12]  Reading was decided under section 64(a)(1) of the former Bankruptcy Act, 11 U.S.C. section 104(a)(1), which predated Section 503(b)(1)(A).  The statutory evolution is not material to the parties' arguments.  (Mot. ¶ 47 n.35.)

On April 28, 2025, the Oversight Board filed the FOMB Objection, in which it responds to the arguments in the Motion and asserts that Movants fail to state a claim upon which relief may be granted, making four principal arguments. First, the Oversight Board argues that Movants' collateral is limited to Net Revenues as that term is defined in the Trust Agreement, and that no Net Revenues have existed during the Title III Case. (FOMB Obj. ¶¶ 28-30.) Second, the Oversight Board argues that, even if PREPA in fact generated Net Revenues during this time, the Motion should still be denied because the First Circuit Lien Decision made clear that Movants' claims are "nonrecourse," such that Movants "may only reach moneys available for debt service," and no such moneys currently exist. (FOMB Obj. ¶ 32 (quoting First Circuit Lien Decision, 121 F.4th at 316).) To rebut Movants' arguments relating to Section 503(b), the Oversight Board argues that Movants have failed to set forth a prima facie case that PREPA's use of their collateral caused it to diminish in value because, among other things, the monthly operating reports upon which Movants' arguments rely (discussed further below) only show that PREPA used Net Revenues to generate more Net Revenues and that, in any case, claims for administrative expenses do not lie for diminution in the value of a prepetition creditor's collateral. (FOMB Obj. ¶¶ 42-51. See also UCC Suppl. Br. ¶ 20.) Regarding Movants' arguments under Section 922(c), the Oversight Board argues that Movants' claim does not meet the two requirements for administrative priority under that section—that a claimant has (1) been provided adequate protection, but (2) nonetheless has a claim arising from the stay. (FOMB Obj. ¶ 52 (citing 11 U.S.C. § 922(c)).) In this connection, the Oversight Board argues that PREPA has never provided adequate protection to the Bondholders, noting that the Court never expressly entered an order directing PREPA to make such payments, and that the 2019 RSA, which would have provided "adequate protection" payments following court

**Add. 20**

approval, was never approved by the Court. (FOMB Obj. ¶¶ 53-64.) The Oversight Board further contends that (1) PREPA never "failed" to provide adequate protection, (2) the Bondholders have no claim arising from any such failure, and (3) any diminution claims that they might assert did not "arise from" the automatic stay. (FOMB Obj. ¶¶ 65-73.) With respect to Movants' arguments under Reading v. Brown, the Oversight Board maintains that the Bondholders have not pleaded viable conversion nor Takings Clause claims. (FOMB Obj. ¶¶ 73-87.) Finally, the Oversight Board argues that the evidence would show that PREPA has not generated any Net Revenues since the Petition Date, reducing the actual value of the Bondholders' claim to a level far below the face value of the outstanding bonds and prepetition interest. (FOMB Obj. ¶¶ 90-100.)

According to Movants, the amount owed under the bonds on the Petition Date was $8,477,729.56, and Movants estimate that the total amount owed on the bonds is now over $11 billion with the inclusion of postpetition interest. (Mot. ¶ 2.) To secure these amounts, Movants argue, they hold a perfected lien on PREPA's past, present and future Net Revenues as defined in the Trust Agreement: Revenues minus Current Expenses. (Mot. ¶ 3 (citing 121 F.4th 280, 297 (1st Cir. 2024)).) They further argue that, in monthly financial reports that PREPA issued until recently, PREPA acknowledged and admitted that it was realizing Net Revenues.

The Trust Agreement requires PREPA to generate monthly reports detailing its Revenues and expenses. (Mot. ¶ 11 (citing TA § 710).) PREPA has historically provided the Bond Trustee with monthly reports pursuant to section 710 of the Trust Agreement (the "Monthly Operating Reports"). (Mot. ¶ 12.) According to the Bondholders, PREPA's Monthly Operating Reports show that it accumulated approximately $3.7 billion in Net Revenues from the Petition Date until June 2023. (Mot. ¶ 13 (citing Chakraborty Decl. ¶¶ 12, 16).) Each of the Monthly

Operating Reports from fiscal year 2018 through fiscal year 2021 states that "[t]he 1974 Sinking Fund Appropriation ha[s] been accrued but not transferred." (Mot. ¶ 14.) Thus, Movants allege, PREPA accrued nearly $2 billion in Net Revenues but did not transfer them to the Sinking Fund as required by the Trust Agreement. (Mot. ¶ 14.) In the Monthly Operating Reports for fiscal years 2022 and 2023, Movants allege, PREPA disclosed nearly $900 million in additional accruals to the Sinking Fund that were not transferred, totaling $2.9 billion in Net Revenues from the Petition Date which actually accumulated but have not been transferred to the Sinking Fund.[13] (Mot. ¶ 15.) Movants allege that the discrepancy between the amounts of Net Revenues reported in the Monthly Operating Reports and the Net Revenues shown in PREPA's certified Fiscal Plans over the same postpetition period is only 4%. (Mot. ¶ 16.) According to Movants, the manner in which PREPA reported Net Revenues in the Monthly Operating Reports was largely consistent with the way it marketed the Bonds to investors and "the electricity rate structure that has been in place since 2019." (Mot. ¶¶ 18-19.) Movants claim that PREPA's Monthly Operating Reports show that it has "accumulated and improperly consumed" the Bondholders' collateral in an amount not less than $3.7 billion. (Mot. ¶ 92.) They thus contend that they are entitled to compensation for PREPA's postpetition use of billions of dollars labeled Net Revenues in Monthly Operating Reports issued postpetition (presumptively including PREPA's cash on hand in any liened accounts), and that any necessary further determination of the value of their secured claim can be addressed in further proceedings.

---

[13] Beginning in February 2022, PREPA modified how it reported Net Revenues in the Monthly Operating Reports. (Mot. ¶ 17.) Because the Motion can be decided as a matter of law, the distinction is not relevant to the parties' dispute at this stage of the proceedings.

**Add. 22**

The Oversight Board counters, among other rebuttals, that the term "Net Revenues" in the Monthly Operating Reports is not coextensive with the term as defined by the Trust Agreement, and that the Monthly Operating Reports make clear that those reports contained only preliminary numbers subject to audit. Because, as explained below, the Court concludes that Movants have failed to show a viable legal basis for their administrative claim, the Court will not address the parties' dispute regarding the existence (or not) of Net Revenues at this time.

DISCUSSION

A.     Standard of Review

The Motion, as a motion for the allowance of a claim accorded administrative priority, is a contested matter governed by Bankruptcy Rule 9014. Both parties have offered declarations and other materials in support of their arguments, and neither seeks an evidentiary hearing with respect to the question of whether the Bondholders may be able to sustain a viable administrative expense claim under any of the theories they have put forward. Federal Rule 56 applies in this contested matter by the operation of Bankruptcy Rules 7056 and 9014(c). "[S]ummary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Tera Xtal Tech. Corp. v. GT Adv. Techs., Inc., Civ. No. 16–cv–91–PB, 2017 WL 590340, at *3 (Feb. 13, 2017 Bankr. D.N.H.) (quoting Federal Rule 56(a) to resolve a contested matter). Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fin. Oversight and Mgmt. Bd. for P.R. v. United States Bank Nat'l Assoc. (In re. Fin. Oversight and Mgmt. Bd. for P.R.), 649 B.R. 381, 401 (D.P.R. 2023) (citing Fed. R. Civ.

P. 56(a)).  Material facts are those that "possess[ ] the capacity to sway the outcome of the litigation under the applicable law," and there is a genuine factual dispute where an issue "may reasonably be resolved in favor of either party." Id. (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)) (internal quotation marks and citations omitted).  The Court must "review the material presented in the light most favorable to the non-movant, and . . . must indulge all inferences favorable to that party." Id. (quoting Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990)) (internal quotation marks and citations omitted).  When a properly supported motion for summary judgment is made, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)) (internal quotation marks and citation omitted).  The non-moving party can avoid summary judgment only by providing properly supported evidence of disputed material facts.  Id. (citing LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993)).  The Court declines to address assertions proffered by the parties that are immaterial, and disregards conclusory statements of law which the parties proffer as facts.

> B.     Administrative Expense Status Under Section 503 of the Bankruptcy Code

The allowance of administrative expense claims is governed by section 503 of the Bankruptcy Code, which is made applicable in this case by section 301 of PROMESA.  See 11 U.S.C. § 503; 48 U.S.C. § 2161(a).  Section 503 of the Bankruptcy Code provides, in relevant part, that:

> (a) An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.
>
> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

> (1)(A) the actual, necessary costs and expenses of preserving the estate . . . .

11 U.S.C.A. § 503 (Westlaw through P.L. 119-74).

In <u>Woburn Associates v. Kahn (In re Hemingway Transport, Inc.)</u>, 954 F.2d 1 (1st Cir. 1992), the First Circuit set forth the general criteria that should be considered in determining whether to allow an administrative expense claim. The court explained that a request for priority payment of an administrative expense under section 503(a) of the Bankruptcy Code "may qualify if (1) the right to payment **arose from a postpetition transaction with the debtor [], rather than from a prepetition transaction with the debtor**, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor." <u>In re Hemingway Transp., Inc.</u>, 954 F.2d at 5 (emphasis added). The party asserting the administrative claim bears the burden of demonstrating the entitlement of its claim to such treatment. <u>Id.</u> "Provisions that grant priority in bankruptcy are to be narrowly construed." <u>Bos. Reg'l Med. Ctr., Inc. v. Mass. Div. of Health Care Fin. & Pol'y</u>, 365 F.3d 51, 57 (1st Cir. 2004) (citing <u>Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)</u>, 536 F.2d 950, 953 (1st Cir. 1976) ("<u>Mammoth Mart</u>"). The Court has broad discretion in determining whether to grant a request for such priority treatment. <u>See</u> <u>In re Jeans.com</u>, 491 B.R. 16, 23 (Bankr. D.P.R. 2013) (citation omitted).

One principal policy behind this section is carry out the "statutory objective of facilitating the rehabilitation of insolvent businesses" by encouraging third parties to provide those businesses with necessary goods and services postpetition. <u>Mammoth Mart, Inc.</u>, 536 F.2d at 954. Another "overriding concern" is to keep "fees and administrative expenses at a minimum" so as to preserve as much of an estate as possible to maintain assets and operations that will inure, upon emergence or sale as a going concern, to the benefit of the prepetition

creditor body.  See Ala. Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co. Inc.), 963 F.2d 1449, 1459 (11th Cir. 1992) (citation omitted).  There is no exception in the doctrine for creditors secured pursuant to a prepetition contract regardless of whether the postpetition bankruptcy estate benefits from the contract: "It is . . . clear that a claimant who fully performs under a contract prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt estate after the filing."  Mammoth Mart, Inc., 536 F.2d at 954 (citation omitted).

As will be discussed further below, the only way for a solely prepetition creditor to obtain an allowable administrative expense claim under PROMESA is through Section 922(c) of the Bankruptcy Code and fulfillment of its predicates that the claimant obtain adequate protection that, later, proves insufficient.  Mainly construing Section 922(c)'s business bankruptcy analog, section 507(b) of the Bankruptcy Code, in ordinary Chapter 11 cases, courts have warned against permitting a prepetition creditor to make an end-run around the adequate protection predicate by instead asserting a direct administrative expense claim.  If a creditor wishes to assert a direct administrative expense claim under section 503(b), that creditor must, at a minimum, demonstrate what it has contributed postpetition to benefit the estate or debtor.[14]  As one court has put it, where there has been no postpetition contribution to the estate or debtor, no automatic administrative expense should be granted to a creditor secured pursuant to a prepetition contract where the claim is accrued "by sitting back and 'allowing' a [debtor] to use collateral which it already owns and has a statutory right to use."  In re Advisory Info. & Mgmt. Sys., Inc., 50 B.R. 627, 630 (Bankr. M.D. Tenn. 1985); see also In re Provincetown-Boston

---

[14]    Section 301(c)(5) of PROMESA provides that the term "property of the estate" in this instance means "property of the debtor."  48 U.S.C. § 2161(c)(5).

Airline, Inc., 66 B.R. 632, 634 (Bankr. M.D. Fla. 1986). This rule, applicable in an ordinary Chapter 11 case to the use of equipment, vehicles, and other collateral in which a creditor may have a security interest, applies to the use of cash collateral in this instance because Section 363 of the Bankruptcy Code, which requires bankruptcy court approval of the non-consensual use of cash collateral, is not incorporated into PROMESA, and section 305 of PROMESA denies the Court power to regulate the Debtor's use of its own cash.[15]

Here, the Trust Agreement is a prepetition nonexecutory contract. (See, e.g., Docket Entry No. 361 in Adv. Proc. No. 19-00391 at 26, 29.) The Bondholders, having paid PREPA for the bonds or acquired their interests from others who originally paid PREPA, have no further duties under the Trust Agreement. Nor do they proffer that they took any action, or entered into any transaction with PREPA, following the Title III filing for which they are seeking an administrative expense claim as compensation. PREPA's postpetition expenditure of its own revenues is not a postpetition transaction with the Bondholders.

United Trucking Serv. v. Trailer Rental Co. (In re United Trucking Serv.), is the only case cited by any party wherein a prepetition agreement was the sole basis of an administrative expense claim. 851 F. 2d 159 (6th Cir. 1988). This out-of-circuit case is not controlling precedent with respect to this Court and, contrary to the Bondholders' representations, is not a case in which an administrative expense claim was awarded based only on the use of collateral created prepetition. Critically, the United Trucking parties had entered into a postpetition stipulation to treat the prepetition-based debt as an administrative expense and the court, after much discussion, upheld the parties' decision. Id. at 161 n.2. The case appears to

---

[15] Section 305 of PROMESA provides, in pertinent part, that the court may not interfere with the governmental powers, property and revenues, or use and enjoyment of income-producing property of a Title III debtor. See 11 U.S.C. § 2165.

have involved an arrangement more like a <u>sub rosa</u> agreement to provide postpetition financing than an administrative expense claim based on postpetition value received by the estate at the prepetition creditor's expense. Furthermore, as the Oversight Board notes, the Bondholders' representation that <u>United Trucking</u> involved a security interest <u>is incorrect</u>. The case instead involved the continued use of leased trailers (which were not the property of the debtor) that were damaged by use that benefited the estate without any concomitant benefit to the lessor. (<u>See</u> FOMB Suppl. Br. ¶¶ 4, 9; BH Suppl. Resp. ¶ 19 n.6.) It is unclear whether, without the stipulation of the parties to treat postpetition damages to the trailers as administrative expense claims, there would have been a plausible administrative expense claim at all. In any case, the Bondholders do not proffer an analytical link between the factual situation in <u>United Trucking</u> and their claim in this case, which is based on the use of revenues belonging to PREPA, rather than property held by the debtor under a prepetition lease from a third party, and which does not involve any relevant postpetition agreement with the Debtor regarding the use of the cash collateral.[16]

Accordingly, the Bondholders have not established a viable claim under Section 503(b)(1)(A) of the Bankruptcy Code because there was no postpetition transaction with

---

[16] The Court's own research has disclosed no other cases in which a prepetition creditor was granted administrative expense priority for mere postpetition use of collateral. To the extent courts outside this circuit have suggested that administrative expense provisions may cover secured creditors where the postpetition use of collateral was in connection with for-profit business activity, the Court finds neither support in their facts nor persuasive legal analysis anchoring the suggestion. <u>See</u> Tidewater Fin. Co. v. Henson (<u>In re Henson</u>), 57 Fed. App'x 136, 138 (4th Cir. 2003) (denying administrative expense claim of prepetition retail creditor in Chapter 13 case for failure to make postpetition installment payments); <u>Grundy Nat'l Bank v. Rife</u>, 876 F.2d 361, 363 (4th Cir. 1989) (granting administrative expense claim to prepetition auto financer where debtor failed, <u>inter alia</u>, to make court ordered adequate protection payments and failed to make payments under confirmed Chapter 13 plan).

the Debtor.

C.    The Fundamental Fairness Doctrine

Movants argue an alternative basis upon which administrative expense claims that are not explicitly contemplated by the Bankruptcy Code have been allowed under section 503 of the Bankruptcy Code.  The "Reading," or "fundamental fairness," doctrine, which has its origins in Reading Co. v. Brown, 391 U.S. 471 (1968), has been interpreted within the First Circuit to support administrative expense claim priority for two categories of claims that do not otherwise come within the plain language of section 503 of the Bankruptcy Code: "the 'fundamental fairness' exception is recognized when the debtor's postpetition operations occasion tortious injuries to third parties (Reading[]), or when the claim arises from postpetition actions that deliberately violate applicable law and damage others (Charlesbank[])."  See In re Healthco Int'l Inc., 272 B.R. 510, 513 (B.A.P. 1st Cir. 2002) (emphasis in original) (citing Reading, 391 U.S. at 477; Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.), 755 F.2d 200, 203 (1st Cir. 1985)), aff'd, 310 F.3d 9 (1st Cir. 2002) ("Charlesbank").

As explained above, the traditional test under Section 503(b)(1)(A) provides administrative expense priority when there is (i) a post-petition transaction concerning (ii) "actual and necessary" costs of maintaining the estate.  See 11 U.S.C. § 503(b)(1); In re Hemingway Transp., Inc., 954 F.2d at 5.  The second requirement was relaxed under certain circumstances by the Supreme Court in Reading Co. v. Brown, which held that post-petition tort damages caused to a third party by a court-appointed receiver in "operating the debtor's business with a view to rehabilitating it" could be treated as "actual and necessary" costs, even though the

damages themselves were not directly beneficial to the estate.[17]  Reading, 391 U.S. at 475-76. The underlying rationale was that, when an estate is being operated for the benefit of prepetition creditors, "fundamental fairness" requires the injuries that the operating debtor causes be given priority over the prepetition creditors' claims.[18]  Id. at 479 ("[I]t would be inconsistent . . . with the rule of fairness in bankruptcy to seek these objectives [the 'benefit of creditors' and the 'hope of rehabilitation'] at the cost of excluding tort creditors of the arrangement from its assets, or totally subordinating the claims of those on whom the arrangement is imposed to the claims of

---

[17]     See In re Hemingway Transp., Inc., 954 F.2d at 5 ("We have recognized a special category of expense entitled to administrative priority status, based on considerations of fundamental fairness, consisting of amounts due entities 'injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate.'") (citations omitted); In re Charlesbank Laundry, Inc., 755 F.2d at 202 ("The estate [in Reading] put forward much the same argument as appellees here—that allowing first priority for negligence claims would not aid the rehabilitation of the business or preserve a maximum of assets for distribution.").

[18]     See In re Munce's Superior Petroleum Prods., Inc., 736 F.3d 567, 573 (1st Cir. 2013) ("Taken together, our cases interpreting Reading Co. have 'attempted to avoid a situation in which a bankruptcy estate may engage in activities regulated by state law while avoiding the costs associated with that regulation.'"); Cumberland Farms, Inc. v. Fla. Dep't of Env't Prot., 116 F.3d 16, 21 (1st Cir. 1997) ("We hold that the present case does come within the ambit of Reading and Charlesbank.  This was a postpetition claim incurred during the operation of Cumberland Farms' business while it was operating under Chapter 11.  We think it would be fundamentally unfair to allow Cumberland Farms to flout Florida's environmental protection laws and escape paying a penalty for such behavior."); In re Charlesbank Laundry, Inc., 755 F.2d at 203-204 (recognizing applicability of Reading where the debtor "deliberately continued a violation of law month after month presumably because it was more lucrative for the business to operate outside the zoning ordinance than within it"); Mammoth Mart, Inc., 536 F.2d at 954-55 ("Section 64(a)(1) . . . has been interpreted as providing general protection to claimants that are injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate. . . .  When the debtor-in-possession commits a tort, see Reading Co. v. Brown, supra, or accepts services from a third party without paying for them, the debtor-in-possession itself caused legally cognizable injury, and the resulting claims for compensation are entitled to first priority.").

---

those for whose benefit it is instituted."  Here, as prepetition creditors, the Bondholders would surely protest that they are the ones upon whom this arrangement of the Title III cases has been imposed by law, but it cannot be denied that they share (to at least some degree) in the prospective benefit of the successful rehabilitation of PREPA—and that any prepetition creditor could make the same argument in any proceeding.

In short, the Reading exception appears to have been created for "innocent third parties" and not prepetition creditors like the Bondholders who do not fall squarely within its initial ambit.  See, e.g., In re Baseline Sports, Inc., 393 B.R. 105, 131 (Bankr. E.D. Va. 2008) ("SunTrust is not an 'innocent third party' for whom the *Reading* exception was created.  SunTrust was the largest secured creditor in this case.  To the extent that Baseline Sports's Chapter 11 case continued, it was for SunTrust's benefit, as a pre-petition secured creditor, until it received relief to exercise its rights in the Debtor's collateral.").  See also Reading Co., 391 U.S. at 482-83 ("Existing creditors are, to be sure, in a dilemma not of their own making, but there is no obvious reason why they should be allowed to attempt to escape that dilemma at the risk of imposing it on others equally innocent.").  Subsequent applications of the Reading doctrine, many of which have notably occurred in the First Circuit, have not emerged in circumstances resembling the present instance.

### 1.    Reading in the First Circuit

In In re Hemingway Transport, the Court of Appeals for the First Circuit (the "First Circuit") held that "[a] right to payment predicated on an executed prepetition contract is not entitled to priority payment as an administrative expense."  954 F.2d at 5 (citing Mammoth Mart, 536 F.2d at 954).

In the First Circuit, in cases such as Cumberland Farms, Mammoth Mart, and Charlesbank, the application of Reading has generally been limited to violations of regulations

that harm the general public to the benefit of the debtor and the detriment of "innocent third parties" or "involuntary creditors"—third parties who are harmed and not benefited in any manner by the debtor's actions.  In <u>In re Boston Regional Medical Center,</u> the First Circuit observed: "this circuit's extension of <u>Reading Co.</u> has relied on concerns of public policy, and has attempted to avoid a situation in which a bankruptcy estate may engage in activities regulated by state law while avoiding the costs associated with that regulation."  291 F.3d 111, 125-26 (1st Cir. 2002).  Here, the Bondholders' asserted administrative expense claim is in tension with countervailing public policy concerns, notably the concern for the supply of electricity to the people of the island as expressed in the PREPA Authority Act, that stand against granting to a creditor constituency a boon that would potentially defeat the island's ability to rehabilitate the utility and "provide customers with reliable energy at the lowest reasonable cost." <u>See, e.g.,</u> 22 L.P.R.A. § 194(d)(1)(F).[19]  Thus, regardless of whether the Bondholders have stated claims under the Takings Clause or for conversion based on the postpetition use of alleged collateral to operate PREPA, the public policy rationale of <u>Reading</u> precludes remedial use of administrative expense priority in respect of those claims.[20]

---

[19]    Section 6 of the Authority Act also provides that among the "Duties and Responsibilities" of PREPA is "To provide and allow electric power to be provided in a reliable, clean, efficient, resilient, and affordable manner thus contributing to the general wellbeing and the sustainable development of the people of Puerto Rico[.]"  22 L.P.R.A. § 196(a).

[20]    Furthermore, several courts in the First Circuit and elsewhere have held as a broad proposition that claims for postpetition breaches of prepetition contracts are not entitled to administrative priority under <u>Reading</u>, regardless of the particulars of the underlying claim.  <u>See</u> <u>In re Old Carco, LLC</u>, 424 B.R. 650, 660 (Bankr. S.D.N.Y. 2010) ("The <u>Reading</u> exception does not include a right to payment emanating from a pre-petition contract with a debtor."); <u>In re Baseline Sports, Inc.</u>, 393 B.R. 105, 131-32 (Bankr. E.D. Va. 2008) (declining to categorize postpetition state law claims as administrative expenses because secured creditor had prepetition contractual relationship with debtor); <u>In re GT Advanced Techs., Inc.</u>, 547 B.R. 3, 13-5 (Bankr. D.N.H. 2016) (no administrative priority for claim arising out of dispute over prepetition breach of contract

2.      <u>The Bondholders do not make out a prima facie case for conversion</u>

The Bondholders argue that the tort of conversion that has been implied by the First Circuit from Commonwealth law is the basis for their postpetition tort claim that they contend gives rise to a <u>Reading</u> claim. (See, e.g., Mot. ¶ 50 (citing <u>Fed. Ins. Co. I.C. v. Banco de Ponce</u>, 751 F.2d 38, 42 (1st Cir. 1984).) The Bondholders argue that "[a] conversion occurs when there is a 'malicious and wrongful privation of the ownership rights, the illegal exercise, or the assumption of authority over another's property, thereby depriving the lawful owner or possessor, permanently or for an indefinite period, of its use and enjoyment,'" and assert that they have been the victims of such tortious conduct. (Mot. ¶ 50 (quoting <u>Hull Dobbs v. Super. Ct.</u>, 81 D.P.R. 221, 228-29 (P.R. 1959).)

However, they do not support their conversion claim with legal or factual analysis. Instead, they misrepresent the legal standard, downgrading the terms "malicious and wrongful" to "intentional" without explaining how the tort's basic standard is met. (Mot. ¶¶ 50-51.) In so doing, they fail to establish wrongful intent and fall short of articulating a prima facie claim for conversion that could serve as a basis for their desired <u>Reading</u> claim.

Moreover, a claim for conversion requires that what is taken be "another's property," and here the funds that were allegedly misappropriated were PREPA's own funds, in which the Bondholders merely have a security interest. The Bondholders' pleadings do not even acknowledge this distinction.

Finally, "[i]t is established law that a party cannot support a conversion claim when 'damages suffered arise as a consequence of non-compliance with pre-existing contract'

---

claims). <u>See also generally</u> <u>In re Advisory Info. & Mgmt. Sys., Inc.</u>, 50 B.R. 627, 630 (Bankr. M.D. Tenn. 1985).

and plaintiff cannot demonstrate that 'damages also arose from a general (non-contractual) duty not to cause harm.'" TLS Mgmt. & Mktg. Servs. LLC v. Rodriguez-Toledo, No. CV 15-2121 (BJM), 2018 WL 1626100, at *13 (D.P.R. Mar. 30, 2018) (citation omitted), rev'd and remanded on other grounds, 966 F.3d 46 (1st Cir. 2020). "[C]ompensation for damages requires an illegal conduct that causes the damage, either for having breached the agreements of a contract or for breaching the general principle *alterum non laedere* [not to injure another]." Ramos Lozada v. Orientalist Rattan Furniture Inc., 130 D.P.R. 712, 1992 JTS 74 (June 15, 1992).

Here, any alleged harm that the Bondholders have suffered is indistinguishable from the harm allegedly caused by breaches contemplated by the Trust Agreement because all of the duties that the Bondholders allege PREPA owes them were created contractually. The remedies for PREPA's use of its revenues instead of payment of bond debt thus are those provided for under the Trust Agreement, not independent tort remedies.

Accordingly, the Bondholders have not made out a prima facie case of conversion as a basis for their asserted administrative expense claim.

3.     The Bondholders do not make out a prima facie case under the Takings Clause

The Oversight Board argues that any ability to assert a takings claim or otherwise object to the allegedly improper use of alleged collateral was waived because the Trust Agreement, pursuant to which the Bondholders hold the bonds and under which they assert their property rights, includes remedial limitations and specific remedy provisions that effect waivers of other remedies. (See, e.g., FOMB Suppl. Br. ¶ 14.) The Bondholders protest that they executed no waiver and that there is no language of waiver in the Trust Agreement. Although the Oversight Board points to Vandevere v. Lloyd, a case using the term "waiver"—viz., the Bondholders "waived" rights they might otherwise have had—Vandevere and the cases cited

**Add. 34**

therein also characterize the circumstances more accurately as a limitation of remedies or a "contract[ing] away" of rights parties might otherwise have had, including rights that might otherwise have given rise to a takings claim. 644 F.3d 957, 967 (9th Cir. 2011) ("The Supreme Court has instructed that a person may agree contractually, in advance, to accept without compensation what otherwise would be a compensable taking under the Fifth Amendment.") (citing United States v. Petty Motor Co., 327 U.S. 372, 374 (1946) ("The Tool Company had contracted away any rights that it might otherwise have had.")); United States v. Right to Use & Occupy 3.38 Acres of Land, 484 F.2d 1140, 1144 (4th Cir. 1973) (holding that a lessee had contracted away her right to just compensation for a government taking through a valid condemnation clause written into her lease). Such a contractual limitation of remedies and liability applies to any additional right that may come into existence post-contracting when the contract itself limits recovery no matter the circumstances. An explicit "waiver" is not required, so the Oversight Board's legal argument is sound even if its terminology is inartful.

It is not clear whether a taking could, where the "taking" is not of property rights governed by a contract that includes comprehensive remedial provisions, constitute a postpetition tort giving rise to a Reading claim, but there is no ground for such a determination here because, as explained above, the Bondholders contracted away their ability to claim a taking in this context by agreeing to remedies under the Trust Agreement providing for recovery solely from moneys available for debt service in any instance, even if the Bondholders have exercised their Trust Agreement's receivership remedy. (See, e.g., TA § 804.)

Further, the government contracted with the Bondholders in its commercial, not sovereign capacity, a circumstance that also has implications for the viability of a takings claim. See Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001).

**Add. 35**

Even assuming that a relevant property right exists here, courts have held that where, as here, "a

contract between a private party and the Government creates the property right subject to a Fifth

Amendment claim, the proper remedy for infringement lies in contract, not taking." See, e.g.,

Tamerlane, Ltd. v. U.S., 80 Fed. Cl. 724, 738 (Fed. Cl. 2008), aff'd, 550 F. 3d 1135 (Fed. Cir.

2008) (emphasis added).  As the First Circuit has noted: "We have held with a regularity

bordering on the echolalic that a simple breach of contract does not amount to an

unconstitutional deprivation of property. . . .  To hold otherwise would run the risk of

transmogrifying virtually every dispute involving an alleged breach of contract by a state or a

state agency into a constitutional case." Masso-Torrellas v. Mun. of Toa Alta, 845 F.3d 461, 467

(1st Cir. 2017) (citing Redondo-Borges v. U.S. Dept. of Hous. and Urb. Dev., 421 F.3d 1, 10

(1st Cir. 2005)).[21]

---

[21]  The Bondholders raise the canon of constitutional avoidance to urge the Court to apply the statute in such a way that it does not effect what they argue is a taking.  (See, e.g., Mot. ¶¶ 60-66.)  However, their reliance on the canon, which the First Circuit has, in these cases, held can only apply when a statute is ambiguous, is misplaced.  See In re Fin. Oversight & Mgmt. Bd. of P.R., 948 F.3d 457 (1st Cir. 2020).  The Bondholders do not point to any ambiguity in PROMESA, or in the Trust Agreement, and merely urge a specific interpretation of all provisions, arguing that that they must be considered forward-looking from the time of PROMESA's enactment or would, the Bondholders claim, be unconstitutional.  However, PROMESA's effective date provision states that "[s]ubchapters III and VI shall apply with respect to debts, claims, and liens (as such terms are defined in section 101 of Title 11) created before, on, or after [June 30, 2016]," 48 U.S.C. § 2101(b)(2) (Westlaw P.L. through 119-74) (emphasis added), thus precluding an interpretation of the legislation as applying to rights created after its enactment only.  As this Court has held, "the canon of constitutional avoidance is not a method of adjudicating constitutional questions.  Rather, it is a tool for choosing between competing plausible interpretations of statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts.  The canon is thus a means of giving effect to congressional intent, not of subverting it." In re Fin. Oversight & Mgmt. Bd. for P.R., 385 F. Supp. 3d 138, 155 (D.P.R. 2019), aff'd, 948 F.3d 457 (1st Cir. 2020) (quoting Clark v. Martinez, 543 U.S. 371, 380-81 (2005)).  Accordingly, the canon of constitutional avoidance has no application to any provision of PROMESA to which the Bondholders have pointed, nor to the Trust Agreement, and is irrelevant in this proceeding.

Accordingly, the Bondholders have not made out a prima facie case for an administrative expense case arising under the Takings Clause because the Trust Agreement limits the Bondholders' remedies and a governmental instrumentality's breach of a contract under these circumstances is not the proper basis for a Takings Clause claim.

### 4. Conclusion under Reading

In conclusion, with respect to Reading, the Bondholders have not supported their asserted administrative claim with relevant authorities, nor have they presented a scenario warranting the identification of a new category of Reading claims for their benefit. Furthermore, the equities of the case militate that the Bondholders be held to the bargain they struck as reflected in the Trust Agreement.

Accordingly, the Bondholders have not established that they have a viable administrative expense claim by virtue of the Fundamental Fairness Doctrine.

### D. Section 922 of the Bankruptcy Code

Movants contend that Section 922(c) should also entitle them to an administrative expense claim because "'there has been a diminution in the value of [Movants'] secured collateral' by reason of the automatic stay." (Mot. ¶ 53 (quoting Grundy Nat'l Bank v. Rife, 876 F.2d 361, 363 (4th Cir. 1989)).) Movants argue that PREPA's failure to provide Movants with adequate protection despite their requests for it earlier in the case and, separately, certain provisions of the 2019 RSA, entitle them to an administrative expense claim under Section 922(c). (Mot. ¶¶ 54-59.)

Under Section 922(c), a creditor is entitled to an administrative expense claim:

> **If the debtor provides**, under section 362, 364, or 922 of this title, **adequate protection** of the interest of the holder of a claim secured by a lien on property of the debtor **and if, notwithstanding such protection** such creditor has a claim **arising from the stay of action**

against such property under section 362 or 922 of this title or from the granting of a lien under section 364(d) of this title.

11 U.S.C.A. § 922(c) (Westlaw through P.L. 119-74) (emphasis added).

### 1. Mere use of "cash collateral" does not give rise to an administrative expense claim

Under section 361(3) of the Bankruptcy Code, a court cannot grant administrative status to a secured creditor as adequate protection in the first instance; it may only do so retrospectively after an explicit grant of adequate protection has proven inadequate. The application of Section 922 here is rather straightforward: under its plain language, there must be an explicit agreement or order to provide adequate protection that later proves inadequate before an administrative claim can arise on the grounds of insufficiency of adequate protection. See, e.g., In re James B. Downing & Co., 94 B.R. 515, 521 (Bankr. N.D. Ill. 1988).[22] Here, quite simply, there was never an operative agreement or order to provide adequate protection to the Bondholders.

The Bondholders principally cite case law established under section 507(b) of the Bankruptcy Code, which is largely inapplicable because, unlike section 507(b), neither Chapter 9 nor PROMESA incorporates section 363 of the Bankruptcy Code, and so the Debtor's use of "cash collateral" could not by itself form the predicate for an administrative claim.[23] Because

---

[22]    Certain cases cited by the Bondholders—notably In re Center Wholesale, Inc., 759 F.2d 1440, 1451 n.23 (9th Cir. 1985), and In re Prime, 35 B.R. 697 (Bankr. W.D. Mo. 1984)— appear to support the grant of an administrative claim for adequate protection in the first instance (in circumstances not present here), but other courts have correctly characterized these cases as "a minority approach" and this Court is unpersuaded by the outcomes of those cases, which are in no way binding here. See In re James B. Downing & Co., 94 B.R. at 520.

[23]    Section 363(c)(2) of the Bankruptcy Code, which applies in Chapter 11 cases but not in Title III proceedings under PROMESA, provides: "(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a

PROMESA lacks section 363, and is thus more deferential to debtors, there is no restriction on

PREPA's right to use its collateral, unlike in Chapter 11 cases in which debtors are subject to the

restrictions imposed by section 363. Accordingly, the Bondholders' argument fails as a matter of

law: they cannot make an end-run around the lack of section 363 of the Bankruptcy Code by

working on the (disputed) assumption that PREPA spent Net Revenues on which the

Bondholders had a perfected lien, and the Court can rule on the nonapplicability of

Section 922(c) notwithstanding any factual dispute because, in the absence of section 363, this

debtor's use of even postpetition Net Revenues cannot form the basis for a Section 922(c) claim

without an explicit and operative adequate protection agreement.[24] As one court has put it, "[t]he

secured creditor is not contributing to the estate by allowing a Debtor[] to use collateral which it

already owns and has a statutory right to use." In re Provincetown-Boston Airline, Inc., 66 B.R.

632, 634 (Bankr. M.D. Fla. 1986).[25]

---

hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2) (Westlaw through P.L. 119-74). Section 363(e), which is also inapplicable under PROMESA, provides, in relevant part: "Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e) (Westlaw through P.L. 119-74).

[24] Although there have been apparent exceptions to the postpetition transaction requirement, none of those circumstances are present here: "[t]he Court is cognizant that some courts have ruled previously that the negotiation for continued possession of collateral in return for adequate protection is a post-petition transaction providing additional value to the bankruptcy estate." In re Mary Holder Agency, Inc., No. 11-34280 MBK, 2012 WL 4434362, at *3 (Bankr. D.N.J. Sept. 24, 2012) (citing, e.g., In re Carpet Ctr. Leasing Co., 991 F.2d 682, 687 (11th Cir. 1993)).

[25] Several of the Bondholders' key cases involve prior explicit adequate protection agreements and/or are based upon section 363, which makes them irrelevant here. See, e.g., Grundy Nat'l Bank v. Rife, 876 F.2d at 364 ("the adequate protection order of August 12, 1986").

---

**Add. 39**

2.        The 2019 RSA does not provide a basis for an adequate protection
insufficiency claim because it was never approved by this Court

Alternatively, the Bondholders argue that, by signing on to the 2019 RSA, which would have permitted certain payments characterized as adequate protection payments, the Oversight Board agreed to provide adequate protection. (Mot. ¶¶ 58-59.) This argument fails because the Court never approved the 2019 RSA so, by its own terms, that proposed agreement never came into effect, nor did adequate protection obligations thereunder come into effect. (2019 RSA § 14.)

3.        There is no adequate protection claim arising solely out of the
automatic stay

The Bondholders' argument for an administrative expense claim also fails the second prong of the test governing administrative claims based upon failed adequate protection, because, were the Court to assume, arguendo, a failure of adequate protection, the Bondholders also have not demonstrated that they suffered any loss as a direct result of the automatic stay. The Bondholders argue that they could have attempted to install a receiver had they both persisted and prevailed in their previous lift-stay forays. (BH Reply ISO ¶¶ 50-51.) This Court has previously noted that a receiver's powers and discretion would be far more circumscribed than the Bondholders have presented them. (See Docket Entry No. 315 in Adv. Proc. No. 19-00391 at 31-35 (a receiver would not have "superpowers").) The Bondholders' receivership-based argument falls short of the requisite demonstration of harm flowing directly from the imposition of the automatic stay. Indeed, the Bondholders state that they do not even desire the standard remedy for failure of adequate protection due to the automatic stay, turnover of the collateral (apart from PREPA's cash-on-hand in any subordinate funds)—likely because, under section 305 of PROMESA, neither this nor any other court can direct the Oversight Board what to do with PREPA's property and revenues. See 48 U.S.C. § 2165. (BH Reply ISO ¶ 2; BH

Suppl. Resp. ¶ 1.)

Finally, the court in In re Mandile held:

When determining whether a loss was caused solely by the automatic stay, courts demand that the secured creditor be vigilant in protecting its rights during the case. If the creditor fails to take appropriate steps when adequate protection is insufficient by, for example, moving for relief from the stay, it may not be entitled to a superpriority for its loss.

626 B.R. 915, 920 (Bankr. N.D. Ill. 2021) (citation omitted). Here, despite

protestations to the contrary, the Bondholders have not been vigilant. As detailed by the

Committee in its supplemental brief (UCC Suppl. Br. ¶¶ 8-16), the Bondholders have, in the past,

declined to press forward with their 2018 renewed lift-stay motion that requested adequate

protection, agreed to stays of consideration of the settlement motion to approve the 2019 RSA,

moved for relief from the automatic stay without requesting adequate protection (Docket Entry

No. 2973), and moved for relief from the stay for the appointment of a receiver rather than

moving directly to foreclose on any property. (See Docket Entry Nos. 74, 975, 2973, 3913,

4689, 5207.) It was the Bondholders' choice to abandon pursuit of an adequate protection order

through the 2018 renewed motion to lift the automatic stay. Although the Bondholders may now

regret that choice or, in retrospect, would have insisted that different terms be included in the

2019 RSA or the Trust Agreement, they cannot rewrite the consequences of their past strategic

choices. The Bondholders have failed to establish harm attributable solely to the automatic stay.

Accordingly, the Bondholders do not have an administrative expense claim

deriving from Section 922(c) of the Bankruptcy Code.

CONCLUSION

For the foregoing reasons, the Motion is denied in its entirety.[26]

This Opinion and Order resolves Docket Entry No. 29173 in Case No. 17-3283

and Docket Entry No. 5599 in Case No. 17-4780.


SO ORDERED.

Dated: March 16, 2026


/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE

---

[26] The Court has considered all of the Bondholders' arguments, whether or not specifically addressed herein. All alternative arguments for relief are rejected.