# United States Court of Appeals

*for the*

# First Circuit

---

Case Nos. 26-1330, 26-1331, 26-1332, 26-1333, 26-1334

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Highways and Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative of the Puerto Rico Public Buildings Authority,

*Debtors.*

---

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION; U.S. BANK NATIONAL ASSOCIATION, in the capacity as PREPA Bond Trustee; ALLIANCEBERNSTEIN L.P.; ARISTEIA CAPITAL, L.L.C.; BNY MELLON FUNDS TRUST; CAPITAL RESEARCH AND MANAGEMENT COMPANY;

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT OF PUERTO RICO, SAN JUAN, IN CASE NO. 3:17-bk-03283-LTS

---

## OPENING BRIEF OF APPELLANTS
## THE PREPA AD HOC GROUP

---

FERNANDO J. GIERBOLINI-GONZÁLEZ
DORA MONSERRATE-PEÑAGARÍCANO
RICHARD J. SCHELL
MONSERRATE, SIMONET &
  GIERBOLINI, LLC
101 Avenue San Patricio
Maramar Plaza, Suite 1120
Guaynabo, Puerto Rico 00968
(787) 620-5300

G. ERIC BRUNSTAD, JR.
DAVID A. HERMAN
STEPHEN D. ZIDE
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

*Counsel for Movants-Appellants*

*(For List of Movants-Appellants See Inside Cover)*

---

CP COUNSEL PRESS    (800) 4-APPEAL • (393077)

COLUMBIA MANAGEMENT INVESTMENT ADVISERS, LLC; DELAWARE MANAGEMENT COMPANY, a series of Nomura Asset Management Co., Ltd.; ELLINGTON MANAGEMENT GROUP, L.L.C.; GOLDMAN SACHS ASSET MANAGEMENT L.P.; INVESCO ADVISERS, INC.; LUXOR CAPITAL GROUP, LP; MACKAY SHIELDS LLC; MASSACHUSETTS FINANCIAL SERVICES COMPANY; OLD ORCHARD CAPITAL MANAGEMENT LP; ONE WILLIAM STREET CAPITAL MANAGEMENT, L.P.; RUSSELL INVESTMENT COMPANY, ON BEHALF OF RUSSELL INVESTMENT COMPANY TAX-EXEMPT HIGH YIELD BOND FUND; SIG STRUCTURED PRODUCTS, LLC; T. ROWE PRICE; TOWER BAY ASSET MANAGEMENT LP; VERITION FUND MANAGEMENT LLC; GOLDENTREE ASSET MANAGEMENT LP; SYNCORA GUARANTEE INC.; ASSURED GUARANTY INC.,

*Movants-Appellants,*

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA),

*Debtor-Appellee,*

INSTITUTO DE COMPETITIVIDAD Y SOSTENIBILIDAD ECONÓMICA DE PUERTO RICO (ICSE); EL PUENTE DE WILLIAMSBURG, INC., ENLACE DE ACCIÓN CLIMÁTICA; COLEGIO DE ABOGADOS Y ABOGADAS DE PUERTO RICO (CAAPR); ASSOCIATION OF PRIVATE COLLEGES AND UNIVERSITIES OF PUERTO RICO (ACUP); LA LIGA DE CIUDADES DE PUERTO RICO; CENTRO UNIDO DE DETALLISTAS (CUD); RAQUEL MARIA GONZÁLEZ SPARKS; COALICIÓN NUEVA VISIÓN DE SALUD; SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA (SREAEE); JUNTE DE ASOCIACIONES CON PENSIONADOS Y JUBILADOS DE PUERTO RICO (JAP); COLEGIO DE PROFESIONALES DEL TRABAJO SOCIAL DE PUERTO RICO; OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PREPA; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY (AAFAF); ELAM, LLC, as Successor-In-Interest to Blue Beetle III, LLC,

*Respondents-Appellees.*

MOVANTS-APPELLANTS ARE ALLIANCEBERNSTEIN L.P.; ARISTEIA CAPITAL, L.L.C.; BNY MELLON FUNDS TRUST; CAPITAL RESEARCH AND MANAGEMENT COMPANY; COLUMBIA MANAGEMENT INVESTMENT ADVISERS, LLC; DELAWARE MANAGEMENT COMPANY, A SERIES OF NOMURA ASSET MANAGEMENT CO., LTD.; ELLINGTON MANAGEMENT GROUP, L.L.C.; GOLDMAN SACHS ASSET MANAGEMENT L.P.; INVESCO ADVISERS, INC.; LUXOR CAPITAL GROUP, LP; MACKAY SHIELDS LLC; MASSACHUSETTS FINANCIAL SERVICES COMPANY; OLD ORCHARD CAPITAL MANAGEMENT LP; ONE WILLIAM STREET CAPITAL MANAGEMENT, L.P.; RUSSELL INVESTMENT COMPANY, ON BEHALF OF RUSSELL INVESTMENT COMPANY TAX-EXEMPT HIGH YIELD BOND FUND; SIG STRUCTURED PRODUCTS, LLC; T. ROWE PRICE; TOWER BAY ASSET MANAGEMENT LP AND VERITION FUND MANAGEMENT LLC

# RULE 26.1 DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants disclose the following: The PREPA Ad Hoc Group, formed by holders of revenue bonds issued by the Puerto Rico Electric Power Authority, includes SIG Structured Products, LLC, Russell Investment Company Tax-Exempt High Yield Bond Fund, Old Orchard Credit Master Fund, L.P., and funds and accounts managed or advised by AllianceBernstein L.P., Aristeia Capital L.L.C., BNY Mellon ETF Investment Adviser, LLC, Capital Research and Management Company, Columbia Management Investment Advisers, LLC., Delaware Management Company, a series of Nomura Investment Management Business Trust, Ellington Management Group, L.L.C., Goldman Sachs Asset Management L.P., Invesco Advisers, Inc., Luxor Capital Group, LP, MacKay Shields LLC, MFS Investment Management, One William Street Capital Management L.P., T. Rowe Price, Tower Bay Asset Management LP, and Verition Fund Management LLC.

The AllianceBernstein funds and accounts consist of AB Bond Fund, Inc. – AB Tax-Aware Fixed Income Opportunities Portfolio, AB Corporate Shares – AB Municipal Income Shares, and AB Municipal Income Fund, Inc. – AB High Income Municipal Portfolio. The AllianceBernstein funds and accounts are not corporations subject to the disclosures contemplated under Rule 26.1.

i

The Aristeia Capital funds or entities holding the bonds are Aristeia Master, L.P., ASIG International Limited, Blue Peak Limited, and DS Liquid Div RVA ARST, LLC. No entity organized as a corporation has a parent corporation, and no publicly-held corporation owns 10% or more of such corporation's stock.

The BNY Mellon funds consist of BNY Mellon Municipal Opportunities ETF and BNY Mellon Municipal Intermediate ETF. The BNY Mellon funds are not corporations subject to the disclosures contemplated under Rule 26.1.

The Capital Research and Management funds consist of American High-Income Municipal Bond Fund, Capital Group Multi-Sector Income Select ETF (Canada), Capital Group Core Plus Income ETF, Capital Group Municipal High-Income ETF, Capital Group U.S. Multi-Sector Income ETF, Capital Group Multi-Sector Income Fund (LUX), Capital Group Municipal Income ETF, Capital Group Short Duration Municipal Income ETF, Capital Group Multi-Sector Income Fund (Canada), Capital Group Core Plus Total Return Trust (US), Bridge Builder Municipal High-Income Bond Fund, J.P. Morgan Six Circles Tax Aware Bond Fund Municipal 1-17 Years, American Funds Multi-Sector Income Fund, Capital Group Multi-Sector Fixed Income Trust (US), American Funds Strategic Bond Fund, The Tax-Exempt Bond Fund of America, and The American Funds Tax-Exempt Series

II The Tax-Exempt Fund of California.  The Capital Research and Management funds are not corporations subject to the disclosures contemplated under Rule 26.1.

The Columbia Management funds consist of Columbia Minnesota Tax-Exempt Fund, Columbia High Yield Municipal Fund, Columbia Tax-Exempt Fund, Columbia Strategic New York Municipal Income Fund, Columbia Strategic Municipal Income Fund, and Columbia Strategic California Municipal Income Fund.  The Columbia Management funds are not corporations subject to the disclosures contemplated under Rule 26.1.

The Nomura funds consist of Nomura Tax-Free California Fund, Nomura Tax-Free Colorado Fund, Nomura Tax-free Oregon Fund, Nomura Tax-Free Idaho Fund, Nomura Minnesota High-Yield Municipal Bond Fund, Nomura Tax-Free Minnesota Fund, Nomura National High-Yield Municipal Bond Fund, Nomura Tax-Free New York Fund, Nomura Tax-Free Pennsylvania Fund, Nomura Tax-Free USA Fund, Nomura Tax-Free USA Intermediate Fund, and Nomura National High Yield Municipal Bond ETF.  The Nomura funds are not corporations subject to the disclosures contemplated under Rule 26.1.

The Ellington funds consist of Ellington Credit Opportunities, Ltd., Ellington Private Opportunities Main Master Fund III LP, Ellington Special Relative Value

Fund LLC, and Ellington M Credit Master Fund Ltd. The Ellington funds are not corporations subject to the disclosures contemplated under Rule 26.1.

The Goldman Sachs funds consist of Goldman Sachs High Yield Municipal Fund, Goldman Sachs Dynamic Municipal Income Fund, Goldman Sachs Municipal Income Completion Fund, and Goldman Sachs Short Duration Tax Free Fund. The Goldman Sachs funds are not corporations subject to the disclosures contemplated under Rule 26.1.

The Invesco funds consist of Invesco High Yield Municipal Fund, Invesco Limited Term Municipal Income Fund, Invesco Value Municipal Income Trust, Invesco Quality Municipal Income Trust, Invesco Short Duration High Yield Municipal Fund, Invesco Rochester Limited Term New York Municipal Fund, Invesco Municipal Income Opportunities Trust I, Invesco Pennsylvania Municipal Fund, Invesco California Municipal Fund, Invesco AMT-Free Municipal Fund, Invesco Rochester Municipal Opportunities Fund, Invesco Short Term Municipal Fund, Invesco California Value Municipal Income Trust, Invesco Trust for Investment Grade Municipals, Invesco Advantage Municipal Income Trust II, Invesco Municipal Income Fund, Invesco Municipal Trust, Invesco Municipal Opportunity Trust, and the Invesco Pennsylvania Value Municipal Income Trust.

iv

The Invesco funds are not corporations subject to the disclosures contemplated under Rule 26.1.

The Luxor Capital funds consist of Thebes Offshore Master Fund, LP and Qena Capital Partners Offshore Master Fund, LP. The Luxor Capital funds are not corporations subject to the disclosures contemplated under Rule 26.1.

The MacKay Shields funds consist of Mainstay MacKay High Yield Municipal Bond Fund, Mainstay MacKay New York Tax Free Opportunities Fund, Mainstay MacKay California Tax Free Opportunities Fund, MacKay Municipal Credit Opportunities Master Fund, LP, MacKay Municipal High Yield Select Fund, LP, MacKay Municipal Opportunities Allocation Master Fund LP, MacKay California Opportunities Fund, LP, MacKay Municipal Capital Trading Fund, LP, and MacKay Municipal New York Opportunities Fund, LP. The MacKay Shields funds are not corporations subject to the disclosures contemplated under Rule 26.1.

The MFS funds consist of MFS Active Intermediate Muni Bond ETF, MFS Alabama Municipal Bond Fund, MFS Arkansas Municipal Bond Fund, MFS California Municipal Bond Fund, MFS Georgia Municipal Bond Fund, MFS High Income Municipal Trust, MFS High Yield Municipal Trust, MFS Investment Grade Municipal Trust, MFS Maryland Municipal Bond Fund, MFS Massachusetts Municipal Bond Fund, MFS Mississippi Municipal Bond Fund, MFS Municipal

v

High Income Fund, MFS Municipal Income Fund, MFS Municipal Income Trust, MFS Municipal Intermediate Fund, MFS Municipal Limited Maturity Fund, MFS New York Municipal Bond Fund, MFS North Carolina Municipal Bond Fund, MFS Pennsylvania Municipal Bond Fund, MFS South Carolina Municipal Bond Fund, MFS Virginia Municipal Bond Fund, and MFS West Virginia Municipal Bond Fund. The MFS funds are not corporations subject to the disclosures contemplated under Rule 26.1.

The Old Orchard Credit Master Fund, L.P. holds its own PREPA revenue bonds. The Old Orchard fund is not a corporation subject to the disclosures contemplated under Rule 26.1.

The One William Street Capital funds consist of One William Street Capital Master Fund, Ltd., OWS ABS Master Fund II, L.P., OWS ABS IV, L.P., and OWS Credit Opportunity I, LLC. The One William Street funds are not corporations subject to the disclosures contemplated under Rule 26.1.

The Russell Investment Company Tax-Exempt High Yield Bond Fund holds its own PREPA revenue bonds. The Russell Investment Company fund is not a corporation subject to the disclosures contemplated under Rule 26.1.

SIG Structured Products, LLC holds its own PREPA revenue bonds. SIG Structured Products, LLC is not a corporation subject to the disclosures contemplated under Rule 26.1.

The T. Rowe Price funds consist of T. Rowe Price California Tax-Free Bond Fund, T. Rowe Price Georgia Tax-Free Bond Fund, T. Rowe Price Maryland Tax-Free Bond Fund, T. Rowe Price New Jersey Tax-Free Bond Fund, T. Rowe Price New York Tax-Free Bond Fund, T. Rowe Price Intermediate Tax-Free High Yield Bond Fund, Inc., T. Rowe Price Intermediate Tax-Free Income Fund, Inc., T. Rowe Price Virginia Tax-Free Bond Fund, T. Rowe Price Multi-Strategy Total Return Fund, Inc., T. Rowe Price Summit Municipal Income Fund, T. Rowe Price Summit Municipal Intermediate Fund, T. Rowe Price Dynamic Credit Fund, T. Rowe Price Funds B SICAV-Multi-Strategy Total Return Fund, T. Rowe Price Funds SICAV-Dynamic Credit Fund. The T. Rowe Price funds are not corporations subject to the disclosures contemplated under Rule 26.1.

The Tower Bay fund consists of Tower Bay Municipal Bond Opportunity Master Fund LP, and the Tower Bay account consists of the MAP 204 Segregated Portfolio. Neither the Tower Bay fund nor the Tower Bay account are corporations subject to the disclosures contemplated under Rule 26.1.

The Verition fund is Verition Multi-Strategy Master Fund Ltd.  The Verition

fund is not a corporation subject to the disclosures contemplated under Rule 26.1.

/s/ G. Eric Brunstad, Jr.

G. Eric Brunstad, Jr.
*Counsel of Record*
Stephen D. Zide
David A. Herman
DECHERT LLP
1095 Avenue of the Americas
New York, NY  10036
Phone: (212) 698-3500
Facsimile: (212) 698-3599
eric.brunstad@dechert.com

*Attorney for Movants-Appellants*
Dated: May 14, 2026

# TABLE OF CONTENTS

**Page**

RULE 26.1 DISCLOSURE STATEMENTS ...........................................................i

TABLE OF CONTENTS.............................................................................ix

TABLE OF AUTHORITIES ......................................................................xi

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD.........................xvi

JURISDICTIONAL STATEMENT .................................................................1

STATEMENT OF THE ISSUES....................................................................1

INTRODUCTION ....................................................................................2

STATEMENT OF THE CASE.....................................................................12

    A.    The PREPA Bonds ..................................................................12

    B.    PREPA's Monthly Operating Reports Identifying and Quantifying the Bondholders' Collateral .............................................16

    C.    The Bondholders' Initial Efforts to Obtain Adequate Protection or Relief from Stay .........................................................19

    D.    The Bondholders' Motion for an Administrative Expense Claim .........................................................................26

    E.    The District Court's Resolution of the Motion ................................28

STANDARD OF REVIEW ..........................................................................31

SUMMARY OF THE ARGUMENT ...............................................................31

ARGUMENT .........................................................................................35

I.    THE BONDHOLDERS HAVE A PROPERTY INTEREST IN THEIR COLLATERAL PROTECTED BY THE FIFTH AMENDMENT ................................................................................35

II.    THE BONDHOLDERS' COLLATERAL CONSISTS OF THE NET REVENUES DESIGNATED IN THE MORs .......................................41

III.    THE BONDHOLDERS ARE ENTITLED TO AN ADMINISTRATIVE EXPENSE CLAIM UNDER SECTIONS 503(b) AND 922(c)..............................................................................44

IV.    UNDER THE CANON OF CONSTITUTIONAL AVOIDANCE, SECTIONS 503(b) AND 922(c) SHOULD BE CONSTRUED TO AUTHORIZE AN ADMINISTRATIVE EXPENSE CLAIM......................50

V.    THE BONDHOLDERS DID NOT "CONTRACT AWAY" THEIR RIGHTS ...............................................................................................55

CONCLUSION ...............................................................................................58

x

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Armstrong v. United States*,
364 U.S. 40 (1960)......................................................6, 31, 33, 36

*Bayer Chems. Corp. v. Albemarle Corp.*,
171 F. App'x 392 (3d Cir. 2006) ...................................................43

*Bond v. United States*,
572 U.S. 844 (2014)......................................................................52

*Brooklyn Life Ins. Co. v. Dutcher*,
95 U.S. 269 (1877)........................................................................42

*Clark v. Sweeney*,
607 U.S. 7 (2025).....................................................................55, 56

*Crowell v. Benson*,
285 U.S. 22 (1932)......................................................9, 50, 51, 54

*Edward J. DeBartolo Corp. v.*
*Fla. Gulf Coast Bldg. & Constr. Trades Council*,
485 U.S. 568 (1988)........................................................................9

*Franklin Cal. Tax-Free Tr. v. Commonwealth of P.R.*,
85 F. Supp. 3d 577 (D.P.R. 2015), *aff'd*, 805 F.3d 322 (1st Cir. 2015),
*aff'd*, 579 U.S. 115 (2016) ....................................................7, 35, 56

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015)...........................................................35, 36, 37

*In re Al Copeland Enters., Inc.*,
991 F.2d 233 (5th Cir. 1993) ...................................................48, 49

*In re Carpet Cntr. Leasing Co.*,
991 F.2d 682 (11th Cir. 1993) .......................................27, 34, 49-50

*In re Center Wholesale, Inc.*,
759 F.2d 1440 (9th Cir. 1985) ..................................................27, 34, 49

*In re Charlesbank Laundry, Inc.*,
755 F.2d 200 (1st Cir. 1985).................................................*passim*

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    41 F.4th 29 (1st Cir. 2022)....................................................................*passim*

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    91 F.4th 501 (1st Cir. 2024).............................................................................23

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    121 F.4th 280 (1st Cir. 2024)............................................................*passim*

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    899 F.3d 13 (1st Cir. 2018)................................................................*passim*

*In re H.L.S. Energy Co., Inc.*,
    151 F.3d 434 (5th Cir. 1998) ..........................................................................48

*In re Mammoth Mart, Inc.*,
    536 F.2d 950 (1st Cir. 1976)......................................................................8, 48

*In re P.R. Pub. Fin. Corp.*,
    109 F.4th 37 (1st Cir. 2024).............................................................................21

*In re Stringer*,
    2024 WL 1841456 (Bankr. N.D. Tex. Apr. 26, 2024) .......................................38

*In re United Trucking Serv., Inc.*,
    851 F.2d 159 (6th Cir. 1988) .............................................................27, 34, 49

*In re Wallace*,
    2024 WL 3648551 (Bankr. N.D. Iowa Aug. 2, 2024)........................................39

*Jones v. United States*,
    529 U.S. 848 (2000)..........................................................................................52

*Knick v. Twp. of Scott,*
    588 U.S. 180 (2019)....................................................................................7, 53

*Kong v. United States*,
    62 F.4th 608 (1st Cir. 2023)..............................................................................53

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013)..........................................................................................54

*Louisville Joint Stock Land Bank v. Radford*,
    295 U.S. 555 (1935).................................................................................*passim*

*Nanakuli Paving & Rock Co. v. Shell Oil Co.*,
    664 F.2d 772 (9th Cir. 1981) ...........................................................................43

*Peaje Invs. LLC v. García-Padilla,*
   845 F.3d 505 (1st Cir. 2017)....................................................................*passim*

*Planned Parenthood Fed'n of Am., Inc. v. Kennedy,*
   162 F.4th 155 (1st Cir. 2025)...........................................................52, 54

*Primarque Prods. Co., Inc. v. Williams West & Witts Prods. Co.,*
   988 F.3d 26 (1st Cir. 2021)..............................................................43

*Reading Co. v. Brown,*
   391 U.S. 471 (1968)....................................................................*passim*

*St. Paul Fire & Marine Ins. Co. v.*
   *Caguas Fed. Savings & Loan Ass'n of P.R.,*
   21 P.R. Offic. Trans. 743 (P.R. 1988) ............................................42

*Stockton E. Water Dist. v. United States,*
   583 F.3d 1344 (Fed. Cir. 2009), *on reh'g in part,* 638 F.3d 781 (Fed.
   Cir. 2011) ...............................................................................57

*Tyler v. Hennepin Cnty.,*
   598 U.S. 631 (2023)....................................................................36, 37

*United States v. Coombs,*
   37 U.S. 72 (1838)........................................................................51

*United States v. Sec. Indus. Bank,*
   459 U.S. 70 (1982).................................................................7, 9, 36

*United States v. Whiting Pools, Inc.,*
   462 U.S. 198 (1983)....................................................................31

*Villalobos-Santana v. P.R. Police Dep't,*
   171 F.4th 544 (1st Cir. 2026)......................................................*passim*

*Xynergy Healthcare Cap. II LLC v. Mun. of San Juan,*
   516 F. Supp. 3d 137 (D.P.R. 2021) ..............................................42

*Zadvydas v. Davis,*
   533 U.S. 678 (2001)..............................................................51, 52, 53


**Statutes & Other Authorities:**

U.S. Const., Amend. V ...................................................................*passim*

11 U.S.C. § 104(a)(1)....................................................................46

11 U.S.C. § 361(1) ........................................................................32

11 U.S.C. § 362 ...........................................................................38

11 U.S.C. § 362(a) ...............................................................5, 19, 38

11 U.S.C. § 362(d) ..................................................................*passim*

11 U.S.C. § 363(e) .......................................................................39

11 U.S.C. § 503 ...................................................................26, 34, 44

11 U.S.C. § 503(b) ..................................................................*passim*

11 U.S.C. § 922(c) ..................................................................*passim*

11 U.S.C. § 1101(1) .......................................................................9

28 U.S.C. § 1291 ...........................................................................1

48 U.S.C. § 2101 ...........................................................................2

48 U.S.C. § 2161 .....................................................................*passim*

48 U.S.C. § 2161(a) ..............................................................38, 39, 44

48 U.S.C. § 2161(c)(2) ....................................................................9

48 U.S.C. § 2161(c)(7) ....................................................................9

48 U.S.C. § 2166(a) ........................................................................1

48 U.S.C. § 2166(e)(2) ....................................................................1

48 U.S.C. § 2174(b)(4) ................................................................9, 11

Fed. R. App. P. 28(i) .....................................................................12

19 L.P.R.A. § 2369(a) ...................................................................37

19 L.P.R.A. § 451(3) ...................................................................6, 41

19 L.P.R.A. § 451(32) ...................................................................37

19 L.P.R.A. § 455 ........................................................................42

22 L.P.R.A. § 191 ........................................................................12

22 L.P.R.A. § 193(a) .....................................................................12

22 L.P.R.A. § 196(o) .....................................................................12

22 L.P.R.A. § 206(e)(1) ..................................................................12

22 L.P.R.A. § 207 ................................................................3, 35, 37, 56

22 L.P.R.A. § 208 ................................................................35

22 L.P.R.A. § 208(b)............................................................56

Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U.L.
   Rev. 109 (2010) ..............................................................50, 51

*Brief for Debtors-Appellees/Cross-Appellants, In re Fin. Oversight &*
   *Mgmt. Bd. for P.R.*,
   (1st Cir. Apr. 1,2022) (No. 22-1119), 2022 WL 1032007 .......................7, 40, 55

H.R. REP. NO. 95-595 (1977).................................................40

PREPA, *Reportes Mensuales (Intermedio, no-auditado*), available at
   https://aeepr.com/#/finanzas (accessed May 14, 2026)......................17

Tex. Tax Code § 111.060.......................................................49

UCC § 1-201(b)(29)............................................................37

UCC § 1-201(b)(3)............................................................6, 41

UCC § 1-303 ..................................................................42

UCC § 9-609(a)...............................................................37

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Appellants respectfully request oral argument. Appellants submit that oral argument would be beneficial to the consideration and disposition of this appeal. This matter involves important issues of bankruptcy and constitutional law, such that the Court would benefit from an oral presentation and the opportunity for counsel to address the Court's questions.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 48 U.S.C. § 2166(a).  The district court entered a final judgment on March 16, 2026.  Case No. 17-03283, ECF No. 30762.  Appellants timely appealed on March 23, 2026.  Case No. 17-03283, ECF No. 30972.  This Court has jurisdiction under 28 U.S.C. § 1291 and 48 U.S.C. § 2166(e)(2).

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in denying the bondholders' request for allowance of an administrative expense claim in the bankruptcy case of the Puerto Rico Electric Power Authority ("PREPA") for PREPA's consumption of the bondholders' collateral in the form of Net Revenues (defined below), which request the bondholders made under 11 U.S.C. § 503(b) and 48 U.S.C. § 2161, 11 U.S.C. § 922(c) and 48 U.S.C. § 2161, and the Fifth Amendment.

2.     Whether the district court erred in concluding that PREPA is not required to provide just compensation for its consumption of the bondholders' collateral.

3.     Whether the district court erred in failing to interpret the statutory provisions listed above as authorizing an administrative expense claim for PREPA's consumption of the bondholders' collateral to avoid a constitutional conflict.

1

4.      Whether the district court erred in concluding that the bondholders are not entitled to an allowed administrative expense for PREPA's consumption of their collateral under the rationale articulated in *Reading Co. v. Brown*, 391 U.S. 471 (1968).

5.      Whether the district court erred in concluding that the bondholders are not entitled to an allowed administrative expense for PREPA's consumption of their collateral notwithstanding, among other things, that PREPA benefited from the consumption, the value of the collateral to the bondholders has correspondingly diminished, and the bondholders have been systematically prevented from pursuing their rights since the commencement of PREPA's Title III case.

6.      Whether the district court erred in concluding that the bondholders had "contracted away" their constitutional rights.

7.      Whether PREPA's reporting and identification of the bondholders' collateral, as required by the parties' contractual agreement, establishes the identity and amount of the bondholders' collateral for the periods reported.

## INTRODUCTION

This appeal arises out of PREPA's bankruptcy case, commenced under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").  48 U.S.C. § 2101, *et seq*.  PREPA is a provider of electric utility

2

services and is one of the public corporations of the Commonwealth of Puerto Rico ("Commonwealth").  PREPA is supervised by an oversight board (the "Oversight Board" or "Board"), which acts on PREPA's behalf in PREPA's Title III bankruptcy case.

Appellants are an ad hoc group of bondholders (the "Ad Hoc Group") holding revenue bonds that PREPA issued (together with all other such outstanding bonds, the "Bonds") under a 1974 trust agreement (the "Trust Agreement" or "Agreement").[1]  The Bonds evidence approximately $8.5 billion in indebtedness secured by a lien on PREPA's net revenues (the "Net Revenues").  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 121 F.4th 280, 312 (1st Cir. 2024) ("First Circuit Lien Ruling").  In addition to the bondholders' lien rights, the Trust Agreement also vests the bondholders and U.S. Bank National Association as Bond trustee (the "Bond Trustee" or "Trustee") with various other rights and protections.  In conjunction with relevant statutory provisions, these additional protections include the right to have a receiver appointed, and to have sufficient rates charged and collected to pay both PREPA's ongoing Current Expenses (as defined below) and amounts owing on the Bonds.  *See, e.g.,* App.597; 22 L.P.R.A. § 207.

---

[1] The term "bondholders" refers collectively to all holders of Bonds issued and outstanding under the Agreement.

As this Court has explained, Net Revenues are what is left in a particular period after deducting certain of PREPA's current expenses (as defined in the Agreement, "Current Expenses") from PREPA's gross revenues (as defined in the Agreement, "Revenues"). *First Circuit Lien Ruling*, 121 F.4th at 295, 297 (observing that the Trust Agreement grants the Bondholders "a lien on PREPA's Net Revenues"—that is, PREPA's "gross revenues minus Current Expenses," as defined in the Agreement).[2] Under the Trust Agreement, PREPA is required periodically to transfer the Net Revenues into a designated fund (the "Sinking Fund") to "cover debt service" on the Bonds. *First Circuit Lien Ruling*, 121 F.4th at 291.[3] PREPA has failed to transfer any Net Revenues to the Sinking Fund since the commencement of its bankruptcy case on July 2, 2017 (the "Petition Date"). Rather, PREPA has been consuming the bondholders' collateral, including to fund costs of improvements and other expenditures that are subordinate to debt service.

Since the Petition Date, PREPA has had the benefit of the automatic stay—a statutory injunction prohibiting the bondholders from taking steps to exercise their

---

[2] Specifically, the Trust Agreement defines Net Revenues for any given period as "the amount of the excess of the Revenues for such period over the Current Expenses for such period." *See* App.1533.

[3] *See* App.564; *see also* App.565 (Trust Agr. §§ 507(a)–(c)) (describing the three accounts within the Sinking Fund).

rights (including the right to have a receiver appointed) while PREPA seeks to reorganize. *See* 11 U.S.C. § 362(a) (applicable in PREPA's Title III case as provided in 48 U.S.C. § 2161); *In re Fin. Oversight & Mgmt. Bd. for P.R.,* 899 F.3d 13, 18 (1st Cir. 2018) (discussing the automatic stay in PREPA's case). By statute, secured creditors such as the bondholders may obtain relief from the automatic stay to enforce their rights if the debtor is consuming their collateral without providing them with "adequate protection"—*i.e.*, adequate compensation for the diminution in the collateral's value to the secured creditors occasioned by the debtor's consumption. *See id*. at 20 (stating that a "court 'shall' provide relief from the automatic stay 'for cause, including the lack of adequate protection of [a creditor's] interest in property.'") (quoting 11 U.S.C. § 362(d)) (alteration in original). As detailed below, the bondholders have sought repeatedly over the course of many years to obtain relief from the automatic stay because PREPA has been consuming their collateral *without* providing sufficient adequate protection. The district court, however, has consistently prevented the bondholders from pursuing this relief—most recently by imposing a "litigation stay" that has limited the bondholders to pursuing only a subset of issues and claims they have sought to litigate. *See* App.1489. Meanwhile, PREPA has continued to consume the Net Revenues.

5

Under the Trust Agreement, PREPA is required to file monthly operating reports ("MORs") identifying and disclosing the Net Revenues generated from its operations. App.589–90. From the Petition Date through fiscal year 2023, PREPA's MORs identified and disclosed an aggregate of approximately $3.7 billion in Net Revenues. ECF No. 5668 at 3. [4] Because PREPA is obligated to identify the bondholders' collateral in this way under the Agreement, App. 589–90, and PREPA in fact did so consistently *for decades* without objection by the bondholders, App.2508; ECF No. 5668 at 4, PREPA's course of performance is part of the terms of the Agreement and properly identifies the bondholders' collateral. *See First Circuit Lien Ruling*, 121 F.4th at 296 (concluding that the Agreement is a "security agreement" under Article 9 of the Uniform Commercial Code ("UCC")); UCC § 1-201(b)(3) (an "agreement," including a security agreement, is "the bargain of the parties in fact, as found in their language or inferred from other circumstances, *including course of performance* …."); 19 L.P.R.A. § 451(3).

A lienholder's right to its collateral is a property interest protected under the Fifth Amendment, including in bankruptcy cases. *See Armstrong v. United States*, 364 U.S. 40, 48 (1960) (destruction of lien rights violated the Takings Clause);

---

[4] Unless otherwise stated, all docket cites (ECF) refer to Case No. 17-04780 (D.P.R.).

6

*Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 594–95, 601–02 (1935); *Franklin Cal. Tax-Free Tr. v. Commonwealth of P.R.*, 85 F. Supp. 3d 577, 610–13 (D.P.R. 2015) (right to receiver with statutory authority to levy, maintain, and collect rates is a property right of bondholders), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 579 U.S. 115 (2016); *see also United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982) (discussing *Radford*).

And as the Board has conceded previously in this Court, if "the government takes" property during a bankruptcy case in which a litigant has a property interest, then "the Fifth Amendment would require full payment of just compensation" in the form of "an allowable administrative expense." Brief for Debtors-Appellees/Cross-Appellants, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, (1st Cir. Apr. 1, 2022) (No. 22-1119), 2022 WL 1032007 at *31 ("Board 1st Cir. Br."); *see also Knick v. Twp. of Scott*, 588 U.S. 180, 185 (2019) (a "property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation[.]"); *Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505, 511 (1st Cir. 2017) ("[C]reditors are constitutionally entitled to protection 'to the extent of the value of the[ir] property'") (citations omitted); *In re Fin. Oversight & Mgmt. Bd.*, 41 F.4th 29 (1st Cir. 2022) ("[T]he Fifth Amendment

contemplates a 'constitutional obligation to pay just compensation.'") (citations omitted).

Consistent with the Board's prior concession, the bondholders are entitled to an administrative expense claim for PREPA's consumption of their collateral under (a) section 503(b) of the Bankruptcy Code, 11 U.S.C. § 503(b) (applicable in PREPA's Title III case as provided in 48 U.S.C. § 2161); (b) section 922(c) of the Code, 11 U.S.C. § 922(c) (also applicable as provided in 48 U.S.C. § 2161); and (c) the Supreme Court's rationale set forth in *Reading Co. v. Brown*, 391 U.S. 471 (1968). *See Villalobos-Santana v. P.R. Police Dep't*, 171 F.4th 544, 550–52 (1st Cir. 2026) (discussing and applying *Reading*'s "expansive" rationale); *In re Charlesbank Laundry, Inc.*, 755 F.2d 200, 203 (1st Cir. 1985) (damages from a violation of law during the bankruptcy case give rise to an administrative expense claim under *Reading*); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 955 (1st Cir. 1976) ("When the debtor-in-possession commits a tort, … or accepts services from a third party without paying for them, the debtor-in-possession itself caused legally cognizable injury, and the resulting claims for compensation are entitled to first priority.") (citation omitted); *see also In re Fin. Oversight & Mgmt. Bd.*, 41 F.4th at 38, 41 n.4 (noting that full "payment of just compensation" means "the full monetary

8

equivalent of the property taken").[5]   Notably, administrative expense claims are entitled to full payment under any plan confirmed in PREPA's Title III case, except as the claimholders may agree otherwise.  48 U.S.C. § 2174(b)(4).

If the bondholders cannot obtain compensation for the taking of their collateral, then PROMESA would be unconstitutional.  *See, e.g., Radford*, 295 U.S. at 601–02 (holding that a bankruptcy statute as applied is void because it failed to require just compensation for the taking of a secured party's collateral).  And to assist in saving a statute from unconstitutionality, courts are obliged, if "fairly possible," to construe the statutory provisions at issue in a manner that avoids a constitutional conflict.  *Crowell v. Benson*, 285 U.S. 22, 62 (1932); *see also Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *Sec. Indus. Bank*, 459 U.S. at 78; *Peaje Invs. LLC*, 845 F.3d at 511–12 (applying *Crowell* in construing PROMESA to avoid a conflict with the Fifth Amendment).  Because the relevant vehicle for compensating creditors for the taking of their property during PREPA's bankruptcy case is an administrative expense claim (as the Board has conceded previously), the court below, if "fairly possible,"

---

[5] In Chapter 11 reorganization cases, the debtor is known as the "debtor-in-possession."  11 U.S.C. § 1101(1).  In a Title III bankruptcy case under PROMESA, PREPA is the "debtor."  48 U.S.C. § 2161(c)(2).  The Board is designated as a "trustee."  48 U.S.C. § 2161(c)(7).

was obliged to construe the relevant statutory provisions cited above to authorize an administrative expense claim for the value of the property PREPA has taken, and thus avoid having to confront PROMESA's unconstitutionality.

Rather than do so, however, the court below took a different (and legally erroneous) approach:  it gave the relevant statutory provisions an unjustifiably cramped construction (in ways that conflict not only with the text of these provisions but also the relevant case law interpreting them, including decisions of this Court and the Supreme Court), misconstrued the bondholders' constitutional rights, and even subordinated these rights to "policy concerns."  *See, e.g.*, App.2698 (the bondholders' claim "is in tension with countervailing public policy concerns" implicated by PREPA's efforts to reorganize, and thus "regardless of whether the Bondholders have stated claims under the Taking Clause," consideration of public policy "precludes remedial use of administrative expense priority in respect of those claims.").  But in sweeping language, the Supreme Court has rejected *precisely* that approach:

> [T]he Fifth Amendment commands that, however great the nation's need, private property shall not be thus taken even for a wholly public use without just compensation.  If the public interest requires, and permits, the taking of property of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be had to proceedings by eminent domain; so that, through taxation, the burden of the relief afforded in the public interest may be borne by the public.

10

*Radford*, 295 U.S. at 602.  Because the decision below applied an incorrect legal analysis, and because the bondholders are entitled to an administrative expense claim for PREPA's taking of their collateral under any reasonable construction of the relevant statutory provisions, the district court's ruling cannot stand.

The Board will undoubtedly contend that, if the bondholders are permitted an administrative expense claim for the $3.7 billion worth of collateral PREPA has taken, then PREPA will not be able to reorganize.  But nothing could be further from the truth.  As noted, administrative expense claims must be paid in full as part of the bankruptcy case, *except as the claimholders agree otherwise*, 48 U.S.C. § 2174(b)(4), and the bondholders have already publicly offered not only to compromise their claims, but also to provide PREPA with an additional $2.5 billion in financing to fund its capital expenditure needs on an ongoing basis.  App.3068; ECF No. 5668 at 7.  That is because PREPA's projected revenues are more than sufficient to justify both a reasonable recovery to the bondholders *and* the additional financing the bondholders have offered, while at the same time permitting PREPA to cover its reasonable expenses (as approved recently by PREPA's regulator) and access the billions of dollars in federal funds already appropriated and available to PREPA to improve its utility infrastructure (which federal funds PREPA has been

11

negligent in utilizing, resulting in its resort to the bondholders' collateral).[6]  As a result, even if considerations of "public policy" could override constitutional rights (which they cannot), there are simply no countervailing "public policy concerns" at play here.  The decision below should be reversed.[7]

## STATEMENT OF THE CASE

### A.    The PREPA Bonds

In 1941, the Commonwealth enacted the Puerto Rico Electric Power Authority Act (the "Authority Act" or "Act"), establishing PREPA as a public electric utility. *See* 22 L.P.R.A. §§ 191, 193(a). The Authority Act authorized PREPA to "make and issue bonds … and to secure payment of its bonds …." *id*. § 196(o); *see also id*. §206(e)(1).

In accordance with the Authority Act, PREPA entered into the Trust Agreement in 1974 and began issuing the Bonds.  The Bonds are secured by a lien on all of PREPA's Net Revenues.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 121 F.4th at 289–90.  Under the Trust Agreement, in any particular period, PREPA's

---

[6] *See PREB Final Resolution and Order*, Chapter One, at 9, 21, 43 (Case No. NEPR-AP-2023-0003) (Apr. 15, 2026).

[7] Appellants also adopt by reference the arguments made by Appellant Assured Guaranty Inc. ("Assured") and Appellants Golden Tree Asset Management LP and Syncora Guarantee, Inc. in their opening briefs. *See* Fed. R. App. P. 28(i).

Net Revenues are its "Revenues" minus certain of its "Current Expenses." *Id.* at 290; *see* App.518.

The Trust Agreement defines "Revenues" as "all moneys received by the Authority in connection with or as a result of its ownership or operation of the System," including but not limited to all "income derived by" PREPA "from the sale of electricity generated or distributed" by PREPA. App.526. The Agreement defines "Current Expenses" as "the Authority's reasonable and necessary current expenses of *maintaining, repairing and operating* the System." App.513 (emphasis added); *see also First Circuit Lien Ruling*, 121 F.4th at 291 (describing Current Expenses as PREPA's "reasonable *operating* expenses") (emphasis added); App.560.

The term "Capital Expenditures" is defined separately. It means "all expenditures made on account of … the cost of Improvements under this Agreement …." App.512. "Improvements," in turn, are defined in relevant part as "such improvements, renewals and replacements of the System or any part thereof … as may be necessary or desirable … to keep the same in proper condition for the safe, efficient and economic operation thereof …" App.517.

Unlike "Current Expenses," which are paid out of PREPA's general fund ("General Fund"), extraordinary repairs, asset replacements, renewals, and capital

13

improvements are paid only *after* permissible Current Expenses and debt service have been paid. *See First Circuit Lien Ruling*, 121 F.4th at 291 (the Net Revenues that are credited to "the Sinking Fund cover debt service," and after debt service has been paid, the remaining Net Revenues are credited to "the Subordinate Funds [that] cover internal PREPA operations, such as extraordinary repairs or capital improvements."); App.573–75. The Agreement directs that Improvements "shall be financed in whole or in substantial part from the proceeds of bonds issued under … this Agreement or from moneys deposited to the credit of the … [Subordinate Funds consisting of] the Construction Fund or the Renewal and Replacement Fund." App.517.[8]

As this Court has explained, Article V of the Trust Agreement establishes a "structure for distributing PREPA's Revenues (as the term is defined in Article I) into certain funds." *First Circuit Lien Ruling*, 121 F.4th at 291. That structure governs how Revenues are allocated to Current Expenses, debt service, capital

---

[8] The definition of Capital Expenses also references the "Capital Improvement Program." App.512. The Capital Improvement Program involved funds for "additional generating capacity" and for "necessary extensions of the transmission and distribution lines for the System" and other improvements to increase capacity. App.496.

14

improvements, and other uses, each by way of specified funds established under the Agreement.

Specifically, all Revenues must be credited first to the General Fund.[9] App.558. From that General Fund, PREPA must pay its Current Expenses, provided that, *inter alia*, "such expenses will not exceed an amount which is reasonable and necessary for maintaining, repairing and operating the System in an efficient and economical manner." App.560; *see also First Circuit Lien Ruling*, 121 F.4th at 291 (PREPA pays its "reasonable operating expenses" from the General Fund).[10]

The Revenues that remain after payment of valid Current Expenses are the Net Revenues, which are subject to the Bondholders' lien. *See First Circuit Lien Ruling*, 121 F.4th at 290–91. Those Net Revenues flow from the General Fund into a revenue fund ("Revenue Fund"), to be distributed to a series of other specified funds. App.563–64. Under this structure, Net Revenues must be credited first to accounts designated for debt service on the Bonds *and then*, if any Net Revenues are

---

[9] This excludes "income from investments made under the provisions of the Trust Agreement." *See* App.558.

[10] The Trust Agreement requires Current Expenses and Capital Expenditures to be addressed separately in the Annual Budget. App.558–59.

15

left over, for other purposes, such as capital improvements.  *See* App.464–68.[11]

Specifically, Net Revenues in the Revenue Fund must be credited first to the Sinking

Fund, which is for debt service.  *Id.*; *see also* App.565–66 (Trust Agr. §§ 507(a)–

(c)) (describing the three accounts within the Sinking Fund); *First Circuit Lien

Ruling*, 121 F.4th at 291.  After Net Revenues have been credited to the Sinking

Fund, the "amount, if any, of any balance remaining after making the deposits [to

the Sinking Fund]" is credited to four Subordinate Funds:  a construction fund

("Construction Fund"), a self-insurance fund ("Self-Insurance Fund"), a capital

improvement fund ("Capital Improvement Fund"), and a reserve maintenance fund

("Reserve Maintenance Fund").  App.560, App.566–68.

### B.    PREPA's Monthly Operating Reports Identifying and Quantifying the Bondholders' Collateral

Under the Trust Agreement, PREPA is obligated to provide the Bond Trustee

with monthly reports (the aforementioned MORs) detailing its Revenues and its

expenses, and designating Net Revenues, which are supposed to be distributed to the

various special funds established under the Agreement, as detailed above.

---

[11] Under section 506 of the Trust Agreement, PREPA "may determine" to hold an amount in its General Fund to cover future Current Expenses, provided that the amount of Current Expenses is not "more than one-sixth the amount shown by the Annual Budget to be necessary for Current Expenses for the current fiscal year." App.563–64.

Specifically, PREPA must provide "a separate income and expense statement for Revenue Fund purposes of the System for the preceding calendar month and the twelve (12) months' period ending with such month." App.589. In addition, the monthly reports must include "a statement for the preceding calendar month and for the fiscal year to date of all deposits and transfers to the credit of and withdrawals from each special fund and account created under the provisions of this Agreement, showing the balance to the credit of each such fund or account." *Id.*

In accordance with these requirements, PREPA historically provided the Bond Trustee with MORs that include, among other things, the required reporting specified in section 710 of the Agreement. *See* App.2503. PREPA's MORs from January 2009 through June 2023 are publicly available on PREPA's website, App.2526,[12] and examples of those MORs are included in the record.[13]

Each MOR contains a section titled "Statement of Revenues and Expenses for Revenue Fund Purposes Per Trust Agreement." *See, e.g.*, App.2547–49. In that section, PREPA reports its Revenues, Current Expenses, Net Revenues, and allocations of Net Revenues to the specific funds. In accordance with section 710

---

[12] *See* PREPA, *Reportes Mensuales (Intermedio, no-auditado)*, available at https://aeepr.com/#/finanzas (accessed May 14, 2026).

[13] App.2527–660.

of the Agreement, the report provides such information "for the preceding calendar month and for the fiscal year to date." *See* App.589–91; *see also, e.g.*, App.2549 (month of June); App.2550 (fiscal year to date).

PREPA's MORs show that, from the Petition Date (*i.e.*, July 2, 2017) through June 2023, PREPA accrued approximately $3.7 billion in Net Revenues. App.2508. PREPA's MORs are consistent with the Oversight Board's certified fiscal plans for PREPA, which show approximately the same amount in post-petition Net Revenue for fiscal years 2018 through 2023. *See* App.2514–16.

In addition, the MORs through fiscal year 2023 show that PREPA generated almost $3 billion of accruals to the Sinking Fund to cover debt service. App.2508, 2636, 2652. The MORs state, however, that "[t]he 1974 Sinking Fund Appropriation ha[s] been accrued but not transferred."[14]

Beginning in February 2022, PREPA modified its MORs to omit the disclosures of how Net Revenues were allocated, including how much of the Net Revenues were accrued (but not transferred) to the Sinking Fund. *See* App.1638, 1654. Nevertheless, PREPA reported Net Revenues of approximately $1.6 billion in the aggregate during fiscal years 2022 and 2023. App.2510. In 2023, PREPA

---

[14] *See, e.g.,* App.2537, App.2602, App.2624.

stopped issuing Monthly Reports altogether, thus obscuring from the bondholders the extent to which PREPA was continuing to make use of the bondholders' collateral. Discovery has revealed that PREPA has continued to produce MORs internally, and they continued to show the accumulation of Net Revenues.

### C.    The Bondholders' Initial Efforts to Obtain Adequate Protection or Relief from Stay

Since the Petition Date, the automatic stay has prevented the bondholders from exercising their rights while PREPA seeks to reorganize. *See* 11 U.S.C. § 362(a) (applicable in Title III case under 48 U.S.C. § 2161); *In re Fin. Oversight & Mgmt. Bd. for P.R.,* 899 F.3d at 18. Under section 362(d), the bondholders are entitled to relief from the automatic stay to enforce their rights, including their right to the appointment of a receiver, if they are not receiving just compensation ("adequate protection") in exchange for the consumption of their collateral. 11 U.S.C. § 362(d) (the court "shall" grant relief from stay in such circumstances).

The bondholders have attempted repeatedly to prevent the consumption of their collateral without just compensation. On July 18, 2017, just days after the Petition Date, bondholders moved for relief from the automatic stay to pursue the appointment of a receiver, citing, among other things, a lack of adequate protection. *See* App.801. On September 14, 2017, the district court denied that motion, holding

19

that it was without authority to grant such relief. *See* App.844. On August 8, 2018, this Court reversed, ruling that the district court had the necessary authority and must determine "the extent to which any collateral of the bondholders might be irreversibly harmed" and "whether PREPA could demonstrate that it was adequately protecting that interest." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d at 22. The Court also ruled that the bondholders could file a new motion for relief from the automatic stay. *See id.* at 23–24. The Court explained that it would "doubt the constitutionality" of a rule that would leave a creditor to "stand by helplessly as the debtor spent the creditor's collateral" without the ability to seek relief to protect its rights. *Id.* at 20.

Certain bondholders filed that renewed motion on October 3, 2018, again citing a lack of adequate protection and seeking the appointment of a receiver. *See* App.891–97. Before that hearing, however, the Board, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), PREPA, and certain bondholders entered into a restructuring support agreement dated May 3, 2019 (the

20

"2019 RSA") App.962.[15]   The 2019 RSA required monthly payments to the bondholders, as well as administrative expense priority claims to cover interest accrual on the restructuring bonds.  The 2019 RSA also called for the stay of all deadlines for the pending stay-relief motion and provided protections for the bondholders' interests in the Net Revenues, including, among other things, covenants obligating the Board and AAFAF to use commercially reasonable efforts to implement a rate charge to fund bondholder payments and seek legislative approval of the contemplated structures.  Further, if a plan of adjustment consistent with the terms of the 2019 RSA did not go into effect on or before March 31, 2021, the RSA provided for additional forms of adequate protection for the bondholders.  *See* App.983 (monthly "Adequate Protection Payments"), App.997–99 (additional terms related to adequate protection).

On May 10, 2019, the Board and AAFAF filed a joint motion seeking approval of the 2019 RSA (the "Settlement Motion").  App.907.  On March 27, 2020,

---

[15] A "restructuring support agreement" (or "RSA") is an agreement in bankruptcy to support a debtor's reorganization efforts, upon certain terms and conditions.  *See, e.g., In re P.R. Pub. Fin. Corp.*, 109 F.4th 37, 42 (1st Cir. 2024) ("[N]egotiations resulted in a Restructuring Support Agreement (the "RSA") with GDB's major creditors, which outlined the terms of a consensual reorganization of GDB's debts. The RSA was executed … and included a Term Sheet detailing important aspects of the proposed [restructuring arrangements].")

21

however, the Board and AAFAF—citing the COVID-19 pandemic—asked the district court to adjourn all deadlines in connection with the Settlement Motion, which the court did.  ECF No. 1947; App.1089.

Between 2020 and early 2022, the Board and AAFAF remained parties to the 2019 RSA and repeatedly reaffirmed their commitments to its terms.[16]  In reliance on the 2019 RSA and the Board's commitments, the bondholders refrained from pursuing their receivership rights, intervening in PREPA's privatization, or taking other actions inconsistent with the 2019 RSA's terms.  On March 8, 2022, however, AAFAF abruptly purported to terminate the 2019 RSA.  *See* App.1092.

After mediation expired on September 19, 2022, certain bondholders moved

---

[16] *See, e.g.* App.914-15 ("[PREPA, the Oversight Board, and AAFAF] submit the instant agreement is eminently justifiable" since the 2019 RSA would resolve "the complex litigation…attendant to the creditors' claims"); ECF No. 1832 ¶ 2 ("[PREPA, the Oversight Board and AAFAF] share Assured and National's desire to resolve the 9019 Motion as soon as reasonably practicable to conclude this litigation, establish further certainty regarding the path forward in PREPA's restructuring, and move forward with a plan of adjustment and transformation of the utility"); ECF No. 2165 ¶ 19 (PREPA, the Oversight Board, and AAFAF jointly stating that, if there was an "unwanted termination" of the 2019 RSA, "the prejudice to PREPA would be material because once the RSA is terminated, the settlement framework would be lost and piecing it together would be an arduous undertaking…"); ECF No. 2476 ¶ 18 (PREPA, the Oversight Board and AAFAF jointly stating that they "remain supportive of the terms of the [2019] RSA. The Oversight Board members have publicly voiced their continued support for the [2019] RSA. [PREPA, the Oversight Board, and AAFAF] intend[] to preserve the [2019] RSA by evaluating different means of implementation…").

to dismiss PREPA's Title III case or, alternatively, for relief from the automatic stay (the "2022 Motion for Relief"). *See* App.1103. The district court stayed the 2022 Motion for Relief, privileging the Board's filing of a plan of adjustment for PREPA. *See* App.1147, 1150. Following several extensions granted by the district court, the Board ultimately filed a plan without support from Appellants, which plan was never approved and has since been abandoned.

On August 24, 2023, certain bondholders filed a *fourth* motion for relief from the automatic stay, again citing a lack of adequate protection. *See* App.1152. The district court stayed that motion pending resolution of an "adversary proceeding" (the "Adversary Proceeding")[17] involving a determination of the bondholders' lien rights and the amount of their claim (discussed below). *See* App.1187. On appeal, this Court affirmed, on the basis that the fourth lift-stay motion was subject to the district court's litigation stay order pending resolution of the Adversary Proceeding, but noted that the district court's "final summary judgment order in the Adversary Proceeding could open the door to a prompt ruling on a renewed (or entirely new) motion for relief from the automatic stay." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 91 F.4th 501, 511 (1st Cir. 2024).

---

[17] *See* App.351.

On March 22, 2023, the district court issued a decision in the Adversary Proceeding (the "Lien Ruling"), App.619, holding, among other things, that the bondholders held a security interest only in negligible amounts.  The district court also held that the bondholders had an unsecured claim based *not* on the outstanding unpaid amount of the Bonds, but rather on the value of future Net Revenues the bondholders could acquire through a receiver, which the district court estimated at $2.388 billion (the "Estimation Ruling"), App.695–96.  On November 28, 2023, the district court adjudicated the remaining counts and counterclaims in the Adversary Proceeding, concluding that PREPA did not have to disgorge, via an accounting, any misappropriated moneys.  *See* App.774–77.  After the district court entered its final judgment in the Adversary Proceeding, on February 16, 2024, certain bondholders renewed their request to lift the automatic stay to allow them to enforce their right to obtain a receiver.  *See* App.1191.

On June 12, 2024, this Court reversed the Lien Ruling and the Estimation Ruling.  It held that the bondholders have a claim against PREPA for the full principal amount of the Bonds plus matured interest as of the Petition Date.  *See First Circuit Lien Ruling*, 121 F.4th at 310–11.  The Court further held that the bondholders' claim is secured by a valid, perfected, and unavoidable security interest in PREPA's past, present, and future Net Revenues.  *See id.* at 306.  In addition, the

24

Court held that the bondholders properly pleaded an "accounting" claim regarding any "Net Revenues wrongly diverted from debt service." *Id.* at 315. On November 13, 2024, the Court issued a revised opinion clarifying that PREPA's Net Revenues may be classified as "general intangibles" but otherwise reaffirming its initial rulings. *First Circuit Lien Ruling*, 121 F.4th at 305–06.

Following this Court's initial decision in June of 2024, the district court, in July of 2024, entered an order imposing a further litigation stay on all litigation between the Board and the bondholders, including the bondholders' pursuit of relief from stay for lack of adequate protection. *See* App.1203. After this Court entered its *First Circuit Lien Ruling* in November of 2024, certain bondholders, on February 24, 2025, moved to lift the litigation stay to prosecute, among other things, a renewed (sixth) motion to lift the automatic stay for lack of adequate protection with the benefit of this Court's clarification of the nature and scope of the bondholders' lien rights. *See* App.1381. Once again, the bondholders pointed out that PREPA was continuing to consume their collateral without providing just compensation. The district court, however, denied the bondholders' request for relief from the litigation stay to pursue a renewed motion for relief from the automatic stay, permitting the bondholders to pursue only their motion for an administrative expense claim. *See* App.1489–90. As a result, the bondholders' ability to seek relief from the automatic

25

stay for lack of adequate protection both remained stayed and remains stayed "*sine die*." *See* App.1490.

### D.    The Bondholders' Motion for an Administrative Expense Claim

On April 7, 2025, the bondholders filed their motion for allowance of an administrative expense claim for PREPA's use and consumption of their collateral— *i.e.*, the Net Revenues (the "Administrative Expense Motion" or "Motion"). *See* ECF No. 5599. In their Motion, the bondholders asserted an entitlement to an administrative expense claim under sections 503(b) and 922(c) of the Bankruptcy Code (each applicable under 48 U.S.C. § 2161), and the Fifth Amendment of the U.S. Constitution. ECF No. 5599 at 1.

The bondholders explained that they were entitled to an administrative expense claim for several reasons. First, PREPA's consumption of their collateral during the Title III case entitles the bondholders to an administrative expense claim under the rationale articulated by the Supreme Court in *Reading v. Brown*, 391 U.S. 471 (1968), because it constitutes a taking under the Fifth Amendment and conversion under applicable law. *See* ECF No. 5599 at 3, 28–31; *Charlesbank Laundry*, 755 F.2d at 203 (explaining that "an intentional act which violates the law and damages others" gives rise to an administrative expense claim"). Second, the bondholders are entitled to an administrative expense claim under section 503 for

the debtor's use of the bondholders' property to support its operations and efforts to reorganize. *See* ECF No. 5599 at 26–27; *In re United Trucking Serv., Inc.*, 851 F.2d 159, 162–63 (6th Cir. 1988) (claimants are entitled to compensation for the "value conferred"); *see also In re Carpet Cntr. Leasing Co.*, 991 F.2d 682, 685 (11th Cir. 1993). Third, PREPA's collateral consumption entitles the bondholders to an administrative expense claim under section 922(c) because the adequate protection afforded the bondholders under the 2019 RSA has been insufficient and the bondholders were otherwise denied a meaningful opportunity to seek an adequate protection order. *See, e.g., In re Center Wholesale, Inc.*, 759 F.2d 1440, 1451 (9th Cir. 1985) ("If the debtor in possession … fails to provide adequate protection of a creditor's security interest, section 507(b) offers an equitable solution.").

The bondholders also explained why PREPA's consumption of their collateral constituted a taking under the Fifth Amendment, entitling them to just compensation. *See* ECF No. 5599 at 31. Likewise, the bondholders explained that, in order to avoid a conflict between PROMESA and the Constitution, the district court was required to construe the relevant provisions of the Code to provide them with just compensation. *See id.* at 35–38. In addition, the bondholders explained why the MORs conclusively established the identity and amount of the bondholders' collateral that PREPA appropriated. That is because the MORs constitute a legally

27

binding course of performance under applicable law.  *See id.* at 24–26.

### E.      The District Court's Resolution of the Motion

Following briefing, the district court held a hearing on legal issues related to the Administrative Expense Motion.  *See* App.2672.  Subsequently, while discovery remained ongoing, the district court denied the Motion "as a matter of law." App.2673.

Assuming without deciding that PREPA had consumed approximately $3.7 billion of the bondholders' collateral, the district court concluded that the bondholders' request for compensation nonetheless did not constitute an "actual, necessary expense" within the meaning of section 503(b) of the Bankruptcy Code. *See* App.2673.   The court determined that the bondholders' entitlement to compensation for the use of their collateral did not fall within the scope of either the text of section 503(b) (as the court construed it) or the doctrine articulated in *Reading*.  *See id*.  The district court concluded further that the bondholders' request did not fall within the purview of section 922(c) on the theory that section 922(c) only applies if the court specifically *orders* adequate protection and the debtor then fails to provide it after being ordered to do so.  *Id*.  According to the district court, regardless of whether PREPA had agreed to provide adequate protection, the fact

that the court never entered an order directing the relief means that section 922(c) is unavailable. *See* App.2673.

In conducting its analysis, the district court acknowledged that the bondholders have requested "[t]hroughout these proceedings" that they be provided with adequate protection for the use of their collateral. App.2679. Likewise, the court acknowledged that, under the terms of the 2019 RSA, PREPA and AAFAF "promise[d]" to provide adequate protection, including by treating certain of the bondholders' claims "as administrative expense claims …" App.2680. The court noted, however, that the court had "never approved the 2019 RSA," which AAFAF "unilaterally terminated …" *Id*. And because there was no court-ordered adequate protection, the court found that section 922(c) would not apply. *See* App.2673, App.2704–06.

Regarding the bondholders' rights under the Fifth Amendment, the Board contended in the proceedings below that the bondholders had "waived" any right to a takings claim, or to otherwise object to the use of their collateral, because the Trust Agreement includes certain "remedial limitations." App.2700. Characterizing the Board's waiver theory as "inartful," the district court instead adopted a "contracting away" approach that none of the parties below had advocated, and applied it to conclude that the bondholders had contracted away any Fifth Amendment right. *Id*.

29

Without citing or construing any of the provisions of the Trust Agreement (other than a passing reference to section 804), the court stated that, by agreeing to a specific range of remedies under the Trust Agreement, the bondholders "contracted away their ability to claim a taking in this context …." App.2701. The court also subordinated the bondholders' constitutional rights to "policy concerns." *See, e.g.,* App.2698 (the bondholders' claim "is in tension with countervailing public policy concerns" implicated by PREPA's efforts to reorganize, and thus "regardless of whether the Bondholders have stated claims under the Taking Clause," consideration of public policy "precludes remedial use of administrative expense priority in respect of those claims.").

Regarding its obligation to construe the relevant statutory provisions in a manner that avoids a conflict with the Fifth Amendment (*i.e.*, the "canon of constitutional avoidance"), the district court stated that the obligation "can only apply when a statute is ambiguous …." App.2702 n. 21. Finding that PROMESA was intended to apply retrospectively to lien rights already in place when the statute was enacted in 2016, and characterizing the bondholders' argument as involving merely a request that PROMESA be "considered forward-looking," the court concluded that the "canon of constitutional avoidance" was "irrelevant in this proceeding." App.2702.

## STANDARD OF REVIEW

This Court reviews the district court's legal conclusions *de novo* and factual findings for clear error. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 41 F.4th at 39. Because the district court expressly rendered its decision "as a matter of law," this appeal involves only questions of law, each of which is subject to *de novo* review.

## SUMMARY OF THE ARGUMENT

The Fifth Amendment commands that property may not be taken without just compensation. U.S. CONST., AMEND. V. This protection applies to government action or laws that destroy otherwise valid lien rights. *See Armstrong*, 364 U.S. at 48. It likewise applies to the destruction of lien rights and remedies in bankruptcy, including the destruction of a secured creditor's right to the value of its collateral realizable through the appointment of a receiver. *See Radford*, 295 U.S. at 589, 594–95.

To guard against such harm in the bankruptcy setting, Congress has directed in section 362(d) that, if the debtor's possession, use, or consumption of a secured creditor's collateral causes harm to the secured creditor by diminishing the collateral's value to the secured creditor, the court "shall" grant relief from the automatic stay unless the secured creditor receives "adequate protection." 11 U.S.C. § 362(d); *see United States v. Whiting Pools, Inc.*, 462 U.S. 198, 207, 211–12 (1983)

31

(a secured creditor is "entitled to adequate protection to protect its interests").[18]  As

this Court has noted, this protection is designed to protect against the uncompensated

destruction of a secured creditor's lien rights in violation of the Fifth Amendment.

*See Peaje Invs. LLC*, 845 F.3d at 511.  *A fortiori*, if a secured creditor's collateral is

consumed while the creditor is affirmatively prevented from pursuing relief from the

automatic stay, the creditor's Fifth Amendment rights have been violated and the

Bankruptcy Code's mechanism for preventing this harm set forth in section 362(d)

has necessarily failed.

Because PREPA has been consuming the bondholders' collateral since the

very inception of its bankruptcy case without providing the bondholders with

adequate protection, the bondholders have repeatedly sought relief from stay to

exercise their rights.  In every instance, however, the court below turned them away,

as summarized above.  Worse, with PREPA having spent billions of dollars of the

bondholders' collateral for years, the Board now contends that the bondholders are

entitled to *exactly nothing* in PREPA's Title III case.  ECF No. 5668 at 3–5, 9.

Currently, the bondholders' latest effort to pursue relief from stay filed over two

---

[18] Examples of adequate protection include "periodic cash payments" sufficient to compensate the secured party for the diminution in the value of its collateral.  11 U.S.C. § 361(1).

years ago remains subject to an indefinite litigation stay. The question is whether the bondholders have any recourse for the property interests in their collateral that have been taken from them. The answer is that they do—in the form of an administrative expense claim.

First, it is clear, once again, that the bondholders have a constitutionally protected property interest in their collateral. As this Court has already determined, the bondholders have a valid lien in PREPA's Net Revenues. *See First Circuit Lien Ruling*, 121 F.4th at 312. The problem is that PREPA has been consuming the bondholders' collateral for years without providing just compensation—a classic taking*, see Armstrong*, 364 U.S. at 48—while the bondholders have been thwarted from seeking relief from stay.

Second, the identity of the bondholders' collateral is also clear—*i.e.*, the Net Revenues designated in the MORs. Under the Trust Agreement, PREPA is required to differentiate between funds constituting the bondholders' collateral and other funds (*e.g.*, those used to pay Current Expenses), and report that designation as part of the MORs. PREPA did so, and its designation is properly binding on PREPA as a valid course of performance.

Third, as the Supreme Court and this Court have made abundantly clear, when a debtor causes injury to property during the course of a bankruptcy case, the injured

33

party is entitled to compensation for its loss in the form of an administrative expense claim. The district court construed section 503(b) narrowly to deny such relief. But that is not how either the Supreme Court or this Court have construed the availability of the administrative expense remedy. *See Reading*, 391 U.S. at 477–83; *Villalobos-Santana*, 171 F.4th at 550–52 (construing section 503 "expansively"); *In re Charlesbank Laundry, Inc.*, 755 F.2d at 203. Consistent with these precedents, the bondholders are entitled to an administrative expense claim. In addition, courts have properly recognized that when the debtor agrees to provide adequate protection but fails to do so, or when the creditor is prevented from exercising its statutory rights to protect its interests, the creditor is entitled to compensation as an administrative expense. *In re United Trucking Serv., Inc.*, 851 F.2d at 162–63; *In re Center Wholesale, Inc.*, 759 F.2d at 1451; *see also In re Carpet Cntr. Leasing Co.*, 991 F.2d at 685.

Fourth, because it is "fairly possible" to interpret the relevant statutory provisions as authorizing an administrative expense claim in this instance, the court below was required to do so to avoid a conflict with the Constitution. This Court has repeatedly invoked the canon of constitutional avoidance to construe PROMESA to avoid the destruction of a secured creditor's lien rights. *See Peaje Invs. LLC*, 845 F.3d at 511; *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d at 20. The district

34

court's failure to apply the canon in this instance is inconsistent with this Court's precedents and the Supreme Court's direction that, when "fairly possible," a court must construe a federal statute to avoid a constitutional conflict. *Peaje Invs. LLC*, 845 F.3d at 511.

Fifth, the bondholders did not "contract away" any of their constitutional or other rights. As noted, both the Trust Agreement and applicable Puerto Rico statutes provide the bondholders with a robust assortment of cumulative remedies. *See, e.g.,* App.597–98, 602; 22 L.P.R.A. §§ 207, 208. Nothing in this remedial scheme provides any support for the district court's conclusion that the bondholders somehow contracted away their constitutional rights. On the contrary, the bondholders' assortment of remedies is precisely the kind the Fifth Amendment protects. *See Radford*, 295 U.S. at 589, 594–95, 601–02; *Franklin*, 85 F. Supp. 3d at 610–13. The decision of the district court should be reversed.

## ARGUMENT

I. **THE BONDHOLDERS HAVE A PROPERTY INTEREST IN THEIR COLLATERAL PROTECTED BY THE FIFTH AMENDMENT.**

As the Supreme Court has held, the Takings Clause "protects 'private property' without any distinction between different [property] types …." *Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015). Hence, the Takings Clause applies

equally to both real and personal property, whether it be liens in specific collateral, *Armstrong*, 364 U.S. at 48, raisins, *Horne*, 576 U.S. at 362, or funds left over from a foreclosure sale, *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 639 (2023).  The Takings Clause's protection for private property rights "'was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'"  *Id.* at 647 (quoting *Armstrong*, 364 U.S. at 49).

Bankruptcy laws, whether they take the form of the Bankruptcy Code, PROMESA, or state fraudulent transfer statutes, do not grant public debtors immunity from the Takings Clause.  As this Court has put it, "the Supreme Court has been very clear:  The bankruptcy laws are subordinate to the Takings Clause." *In re Fin. Oversight & Mgmt. Bd.*, 41 F.4th at 42.  Indeed, the Supreme Court has explained *repeatedly* that "[t]he bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation." *United States v. Sec. Indus. Bank*, 459 U.S. 70, 75 (1982) (*citing Radford*, 295 U.S. at 589); *see also In re Fin. Oversight & Mgmt. Bd. for P.R.*, 41 F.4th at 42 (citing these cases).  As the Supreme Court has likewise made plain, this prohibition applies to the destruction of lien rights in specific collateral.  *See Armstrong*, 364 U.S. at 48. Thus, PROMESA does not shield PREPA from its obligation to pay the bondholders

just compensation for the taking of their "bundle of property rights in the appropriated [collateral]—the right[] to possess, use and dispose of [it]." *Horne*, 576 U.S. at 361–62 (quotation marks and citation omitted).

The bondholders' property interest for the purposes of the Takings Clause analysis is determined "by existing rules or understandings about property rights." *Tyler*, 598 U.S. at 638. In this case, the bondholders' lien rights are governed by the Trust Agreement, which, in turn, is a security agreement governed by Article 9 of the UCC. *See First Circuit Lien Ruling*, 121 F.4th at 296, 302 (concluding that the Agreement is a "security agreement" under Article 9 of the UCC). Under the UCC, the bondholders' lien rights are a type of "purchase" of the relevant collateral. *See* UCC § 1-201(b)(29), 19 L.P.R.A. § 451(32) (defining "purchase" to include an interest in property by virtue of a security interest). Because PREPA has defaulted, the bondholders are entitled to possession of their collateral under the Trust Agreement and applicable Puerto Rico law. *See* UCC § 9-609(a), 19 L.P.R.A. § 2369(a) (stating that after default, a secured party is entitled to possession of its collateral); *see also* App.597-98; 22 L.P.R.A. § 207 (stating that PREPA's bondholders have a right to receivership upon PREPA's default). The interest of a purchaser in specific property with a right of possession following the debtor's default is a quintessential property interest entitled to Fifth Amendment protection.

37

*See Radford*, 295 U.S. at 589, 601–02 (interest of mortgagee in real property protected by the Fifth Amendment). Because the bondholders' lien rights have been destroyed with respect to the approximately $3.7 billion of their collateral that PREPA has consumed through fiscal year 2023, the bondholders are entitled to compensation for this loss.

It is easy to understand how such a loss may occur in bankruptcy. When a debtor commences a bankruptcy case, the automatic stay blocks a secured party from exercising its rights to its collateral. *See* 11 U.S.C. § 362(a); 48 U.S.C. § 2161(a) (rendering section 362 applicable under PROMESA); *In re Fin. Oversight & Mgmt. Bd. for P.R.,* 899 F.3d at 18 (discussing the automatic stay in PREPA's case). In the meantime, while the stay remains in place, the value of the collateral may decline, owing either to the debtor's continued possession of the collateral, the debtor's use of it, or the debtor's consumption of the property in the course of its operations.

The debtor's mere possession may be sufficient to cause the secured creditor harm, if, for example, the collateral is declining in value (*e.g.*, the collateral is perishable goods). *See, e.g., In re Stringer*, 2024 WL 1841456 (Bankr. N.D. Tex. Apr. 26, 2024) (debtor's possession of hay and silage that was declining in value was causing harm to secured creditors). The debtor's use of the collateral may also cause its value to decline (*e.g.*, the collateral is equipment that depreciates in value

38

with use).  *See, e.g., In re Wallace*, 2024 WL 3648551, at *5 (Bankr. N.D. Iowa Aug. 2, 2024) (debtor's use of farm equipment collateral that was depreciating in value with use gave rise to an adequate protection claim).  The debtor's consumption of the collateral may likewise cause its value to the secured creditor to decline.  To prevent such harm to the secured creditor occasioned by the automatic stay, Congress has prescribed a number of protections.

First, in a typical bankruptcy case, section 363(e) permits a secured creditor to request the court to prevent the continued use, possession, or consumption of the secured creditor's collateral unless and until the secured creditor is provided with adequate protection.  11 U.S.C. § 363(e).  Under PROMESA, however, section 363(e) does not apply.  *See* 48 U.S.C. § 2161(a) (excluding section 363(e) from provisions incorporated into PROMESA).

Second, section 362(d) permits a secured creditor to request relief from the automatic stay to exercise its rights against its collateral, unless the debtor provides the secured creditor with adequate protection to compensate the creditor for the diminution in the collateral's value occasioned by the debtor's ongoing possession, use, or consumption.  11 U.S.C. § 362(d).  Unlike section 363(e), section 362(d) *does* apply in cases under PROMESA.  *See* 48 U.S.C. § 2161; *In re Fin. Oversight & Mgmt. Bd. for P.R.,* 899 F.3d at 21–22.  As this Court has explained, the point of

39

section 362(d) is to provide a remedy when the Board does not consent to provide adequate protection. *See id*. at 21. In this matter, however, the bondholders have been prevented from pursuing such relief. Meanwhile, PREPA has consumed the bondholders' collateral, causing them harm.

This complete destruction of the bondholders' lien rights in the collateral PREPA has consumed is precisely the kind of Fifth Amendment violation the Bankruptcy Code was designed to prevent. *See Peaje Invs. LLC*, 845 F.3d at 511 (citing H.R. REP. NO. 95-595, at 339 (1977) (explaining that the concept of adequate protection "is derived from the [F]ifth [A]mendment protection of property interests")). Yet, it has occurred in this case, notwithstanding the bondholders' repeated efforts to obtain relief from stay. As this Court has determined in a related context, PROMESA does not permit a debtor to avoid paying just compensation for violating the Fifth Amendment. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 41 F.4th at 37 (an "otherwise valid Fifth Amendment takings claims … cannot be discharged in Title III bankruptcy proceedings without payment of just compensation[.]"). And as the Board has conceded previously, the proper remedy for the taking of a claimant's property during a bankruptcy case is the allowance of an administrative expense claim. *Board 1st Cir. Br.*, 2022 WL 1032007 at *31. That is the proper

40

remedy in this instance for PREPA's destruction of the bondholders' lien rights in the collateral PREPA has consumed.

## II.    THE BONDHOLDERS' COLLATERAL CONSISTS OF THE NET REVENUES DESIGNATED IN THE MORs.

The amount of the bondholders' collateral that PREPA has consumed is also readily apparent. That is because, for decades, PREPA designated and reported the bondholders' collateral—the Net Revenues—in its MORs. PREPA's designation of the bondholders' collateral in this manner is binding on PREPA as a course of performance.

As this Court has determined, the Trust Agreement is a "security agreement" under Article 9 of the UCC. *See First Circuit Lien Ruling*, 121 F.4th at 296. In turn, a "security agreement" under Article 9 is an "agreement" under Article 1 as defined in UCC § 1-201. And an "agreement" is "the bargain of the parties in fact, as found in their language or inferred from other circumstances, *including course of performance* …." UCC § 1-201 (b)(3) (emphasis added); 19 L.P.R.A. § 451(3). Section 1-303 recognizes a "course of performance" to mean the post-contracting performance of a party with respect to a transaction that involves repeated occasions for performance in which the other party, with knowledge of the nature of the

41

performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection. UCC § 1-303; *see also* 19 L.P.R.A. § 455.[19]

The basic idea behind treating a course of performance as part of the parties' agreement is straightforward. As the Supreme Court explained long ago, "[t]here is no surer way to find out what parties meant, than to see what they have done …." *Brooklyn Life Ins. Co. v. Dutcher*, 95 U.S. 269, 273 (1877). In this instance, the MORs establish PREPA's course of performance. PREPA produced these designations, which are mandated under sections 504, 505, and 710 of the Trust Agreement, in the ordinary course and the bondholders accepted them for years as accurately accounting for PREPA's Revenues, Current Expenses, and Net Revenues, as those terms are defined in the Agreement. Under the UCC, that course of performance is not extrinsic evidence of the parties' intent, but rather part of "the

---

[19] Puerto Rico's version of section 1-303 does not define "course of performance." 19 L.P.R.A. § 455. Under Puerto Rico law, the meaning of the term is properly determined by looking to other decisions under the UCC. *See Xynergy Healthcare Cap. II LLC v. Mun. of San Juan*, 516 F. Supp. 3d 137 (D.P.R. 2021) ("Because the text of the [Puerto Rico] Commercial Transactions Act comes from the [UCC], the court has looked to equivalent statutes in other jurisdictions."); *St. Paul Fire & Marine Ins. Co. v. Caguas Fed. Savings & Loan Ass'n of P.R.*, 21 P.R. Offic. Trans. 743, 750 (P.R. 1988) ("[G]eneral rule of construction … presumes that when a Puerto Rican lawmaker adopts a statute from another jurisdiction he also adopts the construction of the same made by the highest court of said jurisdiction[.]").

42

bargain of the parties in fact" and is thus binding on PREPA. *See, e.g.*, *Primarque Prods. Co., Inc. v. Williams West & Witts Prods. Co.*, 988 F.3d 26, 34–35 (1st Cir. 2021) (holding, under the Massachusetts' UCC, that the existence of a contract can be inferred from the course of performance); *Bayer Chems. Corp. v. Albemarle Corp.*, 171 F. App'x 392, 399–400 (3d Cir. 2006) (holding that course of performance may clarify contractual terms); *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772, 795 (9th Cir. 1981) (holding that "the most important evidence of the agreement of the parties is their actual performance of the contract.").

This Court's prior opinion in *Primarque* is particularly instructive. In that case, this Court held that "[s]uccessive and consistent purchase orders and invoices" are admissible and appropriate evidence of the parties' course of performance that can establish not only the existence of a contract but also establish its terms. *Primarque*, 988 F.3d at 34. The Court went on to hold that there was sufficient course-of-performance evidence before the jury to conclude that the parties in *Primarque* had a distribution contract, noting, among other things, the continuous relationship going back decades and the sharing of business information. *Id.* at 37. So, too, here, as PREPA continuously shared information regarding and designating the bondholders' collateral in its MORs for decades.

43

### III.    THE BONDHOLDERS ARE ENTITLED TO AN ADMINISTRATIVE EXPENSE CLAIM UNDER SECTIONS 503(b) AND 922(c).

Because the bondholders have shown that they have constitutionally protected property interests in their collateral and lien rights and have shown that the value of that loss may be ascertained by reference to the parties' course of performance, the only remaining question is what the appropriate remedy for that loss should be.  In this case, section 503(b) of the Bankruptcy Code provides such a remedy, by authorizing an administrative expense claim for "the actual, necessary costs and expenses of preserving the estate …."  11 U.S.C. § 503(b)(1)(A).  As this Court has recently explained, that statute was incorporated into PROMESA, and the payment of administrative expense claims under PROMESA follows a "similar rationale" to the payment of administrative expenses under the Bankruptcy Code.  *Villalobos-Santana*, 171 F.4th at 550; *see also* 48 U.S.C. § 2161(a).

Section 503 provides a non-exhaustive list of examples of "actual, necessary costs and expenses," including secured and unsecured tax obligations incurred after the debtor files for bankruptcy.  The district court held that, in order to meet the "actual, necessary" standard, a creditor must "at a minimum, demonstrate what it has contributed [after the debtor has filed for bankruptcy] to benefit the estate or debtor."  App.2691.  That narrow approach, however, does not square with the

44

statutory text, as a post-bankruptcy tax obligation would never satisfy it, yet is properly an administrative expense. Moreover, the bondholders *did* contribute something—their collateral, albeit involuntarily. The district court reasoned that a creditor cannot simply "sit[] back" and allow the debtor to use its collateral in order to claim an administrative expense for such use. App.2692 (citation omitted). But that is not at all what the bondholders have done. They repeatedly attempted to diligently pursue their rights, but were prevented by the district court from doing so.

The district court identified two policies behind the administrative expense provision: encouraging parties to do business with the debtor in bankruptcy, facilitated by granting such parties administrative expense priority, and minimizing bankruptcy expenses. *See* App.2691–92. But those policies do not exhaust the rationale behind the statutory authorization for the allowance of an administrative expense claim. Once again, treating a tax debt as an administrative expense is not explained by reference to such considerations. More importantly, that is not how either the Supreme Court or this Court have interpreted the availability of the administrative expense remedy. In particular, the district court's view is inconsistent with what this Court has called "*Reading*'s broad definition of administrative expenses." *Villalobos-Santana*, 171 F.4th at 551.

45

In *Reading*, the Supreme Court considered "whether the negligence of a receiver administering an estate under a Chapter XI arrangement gives rise to an 'actual and necessary' cost of operating the debtor's business." 391 U.S. at 475.[20] Observing that the bankruptcy statute "does not define" the phrase "actual and necessary," the Court looked for guidance to the general purposes of the provision, as well as to the statute as a whole. *See id.* Explicitly rejecting the idea (adopted by the district court in this case) that the relevant purpose was merely to encourage parties to do business with the debtor and minimize expenses to permit greater recoveries to creditors, the Court observed that focusing on those considerations alone would "overlook[] one important, and here decisive, statutory objective: fairness to all persons having claims against an insolvent." *Id.* at 477. Since no other potential remedy would have been satisfactory to compensate the claimant consistent with the policies and purposes of the bankruptcy statute as a whole, the Court concluded that the claimant was entitled to an administrative expense claim. *See id.* at 477–83.

---

[20] In *Reading*, the Supreme Court construed section 64(a)(1) of the former Bankruptcy Act, 11 U.S.C. § 104(a)(1), which is the predecessor to § 503(b)(1). *See In re Charlesbank Laundry, Inc.*, 755 F. 2d 200, 202 n.2 (1st Cir. 1985).

When Congress codified section 503(b) as part of the Bankruptcy Code in 1978, it included the "actual and necessary" standard and, with it, the Supreme Court's interpretation in *Reading*. Unsurprisingly, this Court has followed *Reading* in construing section 503(b), and has also "conclude[d] that a claim for payment that would qualify as a claim for an administrative expense under the Bankruptcy Code based on *Reading* also qualifies as such a claim under PROMESA." *Villalobos-Santana*, 171 F.4th at 551–52.

In *Charlesbank*, the Court considered whether a civil compensatory fine for the violation of an injunction qualified as an "actual, necessary" administrative expense. 755 F.2d at 201. The bankruptcy court had denied the claim. On appeal, the district court affirmed, distinguishing *Reading* on the theory that a civil compensatory fine was not the equivalent of a tort. This Court reversed, concluding that the obligation fell "within the clearly enunciated rationale of *Reading* …." *Id*. at 202. The Court reasoned that "[t]he same fairness principle favors plaintiffs here, whose premises, lives, or businesses were adversely affected by Charlesbank's continuing conduct in violation of the temporary injunction." *Id*. The same principle applies in this case: the bondholders have been injured by PREPA's consumption of their collateral, which constitutes a taking of their property for which they are entitled to just compensation.

This is not a situation in which the bondholders are seeking to elevate a pre-bankruptcy indebtedness to administrative expense status. *See In re Mammoth Mart, Inc.*, 536 F.2d at 955 (claim for severance based on pre-bankruptcy services not entitled to priority). The bondholders seek compensation for the post-bankruptcy taking of their property: in other words, the debtor's post-bankruptcy failure to abide by its "inescapable obligation[s]" to follow "[state] and federal law." *In re H.L.S. Energy Co., Inc.*, 151 F.3d 434, 438 (5th Cir. 1998). The bondholders' administrative expense claim for the debtor's post-petition unlawful activity closely tracks the administrative expense claim recognized by the Fifth Circuit in *In re Al Copeland Enters., Inc.*, 991 F.2d 233, 234 (5th Cir. 1993). In that case, the debtors, operators of fast-food restaurants, delayed payment of the sales taxes collected by the debtors to the State of Texas during their bankruptcy. *Id.* at 234–35. Under Texas law, when a business fails to timely pay sales taxes to the Texas State Comptroller, the State is entitled to interest on the delinquent amounts, which accrue according to a statutory interest rate. *Id.* at 236–38. "Applying section 503" in the *Copeland* case, the Fifth Circuit concluded that Texas' claim for post-petition interest was "controlled by the Supreme Court's opinion in *Reading* ... and its progeny," including *Charlesbank*. *Id.* at 238.

48

Specifically, the Fifth Circuit held that Copeland's decision to hold the sales tax revenue owed to the state "constituted a decision [by the debtor] not to carry out its statutory obligations under Texas law in a prompt manner." *Id.* at 239–40. "This post-petition decision on the part of Copeland resulted in monetary harm to the State resulting from the State being deprived of the use of its $1,817,151.38," and likewise resulted in the debtor's estate "incurring a statutory award of interest in favor of the State." *Id.* The Fifth Circuit thus concluded that, under the circumstances, "an award of interest to the State pursuant to section 111.060 of the Texas Tax Code constitutes an administrative expense under 11 U.S.C. § 503(b)." *Id.*

That same reasoning should guide the result in this case, as PREPA made a post-petition decision to take the bondholders' collateral without the payment of just compensation. As in *Copeland*, that decision was contrary to applicable law, and gives rise to an administrative expense claim.

Courts have also properly recognized that when the debtor agrees to provide adequate protection but fails to do so, or when the creditor is prevented from exercising its statutory rights to protect its interests, the creditor is entitled to compensation as an administrative expense. *See In re United Trucking Serv., Inc.*, 851 F.2d at 162–63; *In re Center Wholesale, Inc.*, 759 F.2d at 1451; *see also In re*

49

*Carpet Cntr. Leasing Co.*, 991 F.2d at 685.  As these cases and principles are treated comprehensively in the brief filed by Assured, Appellants do not repeat those arguments here, but rather adopt them by reference.

**IV.**  **UNDER THE CANON OF CONSTITUTIONAL AVOIDANCE, SECTIONS 503(b) AND 922(c) SHOULD BE CONSTRUED TO AUTHORIZE AN ADMINISTRATIVE EXPENSE CLAIM.**

As this Court has explained, "when confronted with a statute of questionable constitutional validity, we must 'first ascertain whether a construction … is *fairly possible* by which the [constitutional] question may be avoided.'"  *Peaje Invs. LLC*, 845 F.3d at 511 (quoting *Crowell*) (emphasis added); *In re Fin. Oversight & Mgmt. Bd. for P.R.,* 899 F.3d at 20 (invoking the canon and citing *Peaje*).

This understanding is embodied in the constitutional avoidance canon of statutory interpretation, first articulated by Justice Story in 1814.  *See* Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U.L. Rev. 109, 140 (2010). As Justice Story went on to write in 1838, when statutory text

> [a]dmits of two interpretations, one of which brings it within, and the other presses it beyond the constitutional authority of congress; it is the duty of the Supreme Court to adopt the former construction: because a presumption never ought to be indulged, that congress meant to exercise or usurp any unconstitutional authority; unless that conclusion is forced on the Court, by language altogether unambiguous"

*United States v. Coombs*, 37 U.S. 72, 74 (1838). In other words, "while a court may not twist the text beyond what it will bear, a judge ought to eschew the best, but unconstitutional interpretation in favor of a less plausible, but constitutional one." Barrett, *Substantive Canons and Faithful Agency*, 90 B.U.L. Rev. at 141–42.

More recent cases from the Supreme Court and this Court similarly require adopting a saving construction of statutory text when possible, "effecting the legislature's desire that its laws be constitutional." *Id.* at 143. In *Zadvydas v. Davis*, 533 U.S. 678 (2001), for example, the Supreme Court applied the constitutional avoidance canon to conclude that a statute that facially appeared to authorize the indefinite detention of removable aliens "contain[ed] an implicit 'reasonable time' limitation, the application of which is subject to federal-court review." *Id.* at 682. In conducting its analysis, the Court notably rejected the government's purely text-based argument on the ground that it would create a conflict between the statute and the Constitution by authorizing potentially indefinite detention for some aliens. Because reading a "significant limitation" into the language of the statute was "fairly possible" under the *Crowell* standard, and would avoid "a serious constitutional problem," the Court charted that course. *Id.* at 690.

The Supreme Court has since applied the constitutional avoidance doctrine in a variety of cases to avoid interpreting federal statutes in ways that conflict with the

51

Constitution.  Most notably, in *Bond v. United States*, 572 U.S. 844, 860 (2014), the Court adopted a narrower reading of the term "chemical weapon" to avoid reaching purely local crimes, as the Court sought to avoid a reading of the statute that would unconstitutionally intrude on the traditional police powers of the States and undermine traditional principles of federalism.  In doing so, the Court relied in particular on its analysis in *Jones v. United States*, 529 U.S. 848, 855–59 (2000), in which the Court invoked the doctrine of constitutional avoidance to conclude that the federal arson statute was "most sensibly read" to reach only buildings used in "active employment for commercial purposes," and not owner-occupied private residences, in order to avoid a conflict between the statute and the Interstate Commerce Clause.  *Bond*, 572 U.S. at 859.

This Court recently cited *Zadvydas* and the canon of constitutional avoidance in *Planned Parenthood Fed'n of Am., Inc. v. Kennedy*, 162 F.4th 155, 171 (1st Cir. 2025).  In that case, this Court concluded that the district court's embrace of the ordinary meaning of "affiliates," an undefined statutory term, risked "unconstitutionally conditioning federal funds on protected expressive activity," and thus should not be adopted. *Id.* 173.  The Court explained:

> We should not credit a definition that would introduce constitutional difficulties.  'It is a cardinal principle of statutory interpretation that when an Act of Congress raises a serious doubt as to its

52

> constitutionality,' this Court will assess 'whether a construction of the statute is fairly possible by which the question may be avoided.' *Kong v. United States*, 62 F.4th 608, 615 (1st Cir. 2023) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001)). So even if we were to find likely that there is 'serious doubt' about the constitutionality of the 'affiliates' clause, our answer would be clear: it is 'fairly possible,' indeed it is the best reading, to interpret the statute as adopting the narrower, control-based definition that we described above. *Id.*

*Id.* So, too, here. As noted above, this Court has already held that *Reading*'s broad definition of administrative expenses is applicable to PROMESA. *Villalobos-Santana*, 171 F.4th at 551. Concluding that PREPA's consumption of the bondholders' collateral without just compensation falls within the *Reading* line of cases—including *Charlesbank*, *Capone*, and others—is not only consistent with the logic of those cases, as described above, but also avoids a conflict between PROMESA and the Fifth Amendment. Indeed, it is more than "fairly possible" to construe sections 503(b) and 922(c) to extend to the bondholders' claim for the destruction of their property rights, as otherwise they would be left without any remedy for PREPA's spending of the entirety of their collateral. That is a taking, and as the Supreme Court has repeatedly admonished, "no matter what sort of procedures the government puts in place to remedy a taking, a property owner has a Fifth Amendment entitlement to compensation as soon as the government takes his property without paying for it." *Knick v. Twp. of Scott*, 588 U.S. 180, 190 (2019);

53

*see also Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 608–09 (2013) ("[T]he Fifth Amendment mandates a particular *remedy*—just compensation—only for takings.").

Taking a different approach, the district court concluded that the canon of constitutional avoidance is "irrelevant" in this instance on the theory that section 503(b) is not "ambiguous." App.2702 n.21. But that does not square with the "fairly possible" standard of *Crowell*, and the fact that reading the Code as the district court does presents a grave constitutional problem. Nor does it square with the open-natured text of section 503(b).

To begin with, the phrase "actual, necessary," much like the phrase "affiliates" in *Planned Parenthood*, is not defined in the statute. This leaves it open to construction. In addition, the illustrative list of items that qualify as administrative expenses is both non-exhaustive and expansive, encompassing a potpourri of wage claims, tax claims, fees, expenses of closing a health care business, and even the value of goods the debtor received within 20 days *before* commencing a bankruptcy case. 11 U.S.C. § 503(b). Given the open-ended nature of the relevant statute, it is indeed "fairly possible" to construe it to include the bondholders' claim in this instance for the post-bankruptcy destruction of their property interests, and the district court should have done so in this instance. Indeed, the Board itself

54

previously adopted such a construction, *see Board 1st Cir. Br.* 2022 WL 1032007 at 31, further illustrating how it is "fairly possible" to read the statute in a manner that avoids a conflict with the Fifth Amendment.

## V.    THE BONDHOLDERS DID NOT "CONTRACT AWAY" THEIR RIGHTS.

Finally, the district court improperly concluded that the bondholders had somehow "contracted away" their constitutional rights.  To begin with, the district court's theory was not one any party advocated below.  *See Clark v. Sweeney*, 607 U.S. 7 (2025) (reversing lower court decision resting on an argument that the parties had not presented and had no opportunity to address).  In addition, nothing in the Trust Agreement supports it.  On the contrary, review of the Agreement affirmatively refutes the district court's "contracting away" theory.

Section 804 of the Agreement recites a broad assortment of rights and remedies that PREPA agreed the bondholders could pursue.  These include the right of the Bond Trustee "to protect and enforce its rights and the rights of the bondholders under applicable laws *or* under this Agreement," including by "suits, actions or special proceedings in equity or at law," the right to the "appointment of a receiver as authorized by the Authority Act," and the right to "specific performance."  App.597 (emphasis added).  The Trustee is further authorized "to sue

for …. principal [and] interest," together with "all costs and expenses of collection" expressly "without prejudice to any other right or remedy of the Trustee or of the bondholders …." App.598.  In a suit to recover principal and interest, the Trustee may collect "in any manner provided by law, the moneys adjudged and decreed to be payable" subject to the caveat:  "but solely from moneys in the Sinking Fund and any other moneys available for such purpose"—*i.e.*, the Net Revenues.  *Id*.  Notably, this last limitation applies, by its terms, *only* to the Trustee's breach of contract suit against PREPA for the recovery of principal and interest, not other remedies the Trustee or bondholders may pursue, including the right to the appointment of a receiver.    Under the Authority Act, the receiver's powers are broad and encompassing.  *See* 22 L.P.R.A. § 207.  Moreover, under both the Agreement and the Act, the bondholders' remedies are cumulative, not exclusive.  *See* App.602 (remedies are "cumulative"); *see also* 22 L.P.R.A. § 208(b).

The relevant contractual language provides no basis to conclude that the bondholders "contracted away" their constitutional rights under the Fifth Amendment.    Rather, the bondholders' assortment of rights and remedies is precisely the kind the Fifth Amendment protects.  *See Radford*, 295 U.S. at 589, 594–95, 601–02; *Franklin*, 85 F. Supp. 3d at 610–13.

56

Contrary to the district court's view, the bondholders' injury likewise cannot be described merely as a breach of contract matter—their injury also includes the destruction of their property rights in their collateral and the denial of various other rights and remedies. Nor does the contention that the government engaged with the bondholders in its commercial, rather than sovereign, capacity foreclose the bondholders' takings claims. *See* App.2701–02 (stating that "the government contracted with the Bondholders in its commercial, not sovereign capacity" with "implications for the viability of a takings claims," and citing decisions of the Federal Circuit). The district court's invocation of the idea that constitutional rights are foresworn when a governmental agency acts in its commercial capacity rests on what the Federal Circuit itself has described as "language [that] is nothing more than a passing comment about government contract law, and has to be understood in that context." *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1368 (Fed. Cir. 2009*), on reh'g in part*, 638 F.3d 781 (Fed. Cir. 2011). The mere existence of a contract between a private party and the government (operating in its commercial capacity) does not preclude a private party from asserting a takings claim, as the Federal Circuit has expressly held. *Id.*

57

## **CONCLUSION**

For the foregoing reasons, the Court should reverse the decision of the district court, and direct that the bondholders have established an entitlement to an administrative claim for the amounts of their collateral that PREPA has consumed as set forth in the MORs.

Dated:  May 14, 2026

Respectfully submitted,

/s/ G. Eric Brunstad, Jr.
G. Eric Brunstad, Jr.
*Counsel of Record*
Stephen D. Zide
David A. Herman
DECHERT LLP
1095 Avenue of the Americas
New York, NY  10036
Phone: (212) 698-3500
Facsimile: (212) 698-3599
eric.brunstad@dechert.com

Dora L. Monserrate-Peñagarícano
Fernando J. Gierbolini-González
Richard J. Schell
MONSERRATE SIMONET & GIERBOLINI, LLC
101 San Patricio Ave., Suite 1120
Guaynabo, PR  00968
Phone: (787) 620-5300
Facsimile: (787) 620-5305
dmonserrate@msglawpr.com

*Attorneys for Movants-Appellants*
*The PREPA Ad Hoc Group*

Case: 26-1330   Document: 00118446919   Page: 77   Date Filed: 05/14/2026   Entry ID: 6809897

# <u>CERTIFICATION OF COMPLIANCE</u>

This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,864 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word, typeface Times New Roman, 14-point type.

*/s/* G. Eric Brunstad, Jr.
G. Eric Brunstad, Jr.
*Counsel of Record*
Stephen D. Zide
David A. Herman
DECHERT LLP
1095 Avenue of the Americas
New York, NY  10036
Phone: (212) 698-3500
Facsimile: (212) 698-3599
eric.brunstad@dechert.com

*Attorney for Movants-Appellants*
Dated: May 14, 2026

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 14, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send a notice of filing to all registered users.

/s/ G. Eric Brunstad, Jr.
G. Eric Brunstad, Jr.
*Counsel of Record*
Stephen D. Zide
David A. Herman
DECHERT LLP
1095 Avenue of the Americas
New York, NY  10036
Phone: (212) 698-3500
Facsimile: (212) 698-3599
eric.brunstad@dechert.com

*Attorney for Movants-Appellants*
Dated: May 14, 2026

# ADDENDUM

# ADDENDUM

Opinion and Order Denying PREPA Bondholders' Motion for Allowance of Administrative Expense Claim …………………............1

11 U.S.C. § 503....……………………………………………....43

11 U.S.C. § 922…………………………………………………...48

11 U.S.C. § 928…………………………………………….......49

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO <u>et al.</u>,<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as a representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | PROMESA Title III<br><br>Case No. 17-BK-4780-LTS |

OPINION AND ORDER DENYING PREPA BONDHOLDERS'
MOTION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the: (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (v) Puerto Rico Public Buildings Authority ("PBA", and together with the Commonwealth, HTA, ERS, and PREPA, the "Debtors") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).  On October 30, 2024, the Title III case for the Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) was closed.

Add.1

APPEARANCES:

RAMOS CRUZ LEGAL
By:     Lydia M. Ramos Cruz
1509 López Landrón Street
American Airlines Building, PH
San Juan, Puerto Rico 00911

WHITE & CASE LLP
By:     Thomas E Lauria
        Glenn M. Kurtz
        Claudine Columbres
        Isaac Glassman
        Thomas E. MacWright
1221 Avenue of the Americas
New York, New York 10036

*and*

        John K. Cunningham
        Michael C. Shepherd
        Jesse L. Green
200 S. Biscayne Blvd., Suite 4900
Miami, Florida 33131

*Co-Counsel for GoldenTree Asset
Management LP*

CASELLAS ALCOVER & BURGOS P.S.C.
By:     Heriberto Burgos Pérez
        Ricardo F. Casellas-Sánchez
        Diana Pérez-Seda
P.O. Box 364924
San Juan, Puerto Rico 00936-4924

GIBSON, DUNN & CRUTCHER LLP
By:     Matthew D. McGill
        Lochlan F. Shelfer
1700 M Street, N.W.
Washington, D.C. 20036-4504

CADWALADER, WICKERSHAM
& TAFT LLP
By:     Howard R. Hawkins, Jr.
        Mark C. Ellenberg
        Casey J. Servais

O'NEILL & BORGES LLC
By:     Hermann D. Bauer
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813

PROSKAUER ROSE LLP
By:     Martin J. Bienenstock
        Paul V. Possinger
        Ehud Barak
        Margaret A. Dale
        Elliot R. Stevens
Eleven Times Square
New York, NY 10036

*Counsel for the Financial Oversight and
Management Board as representative for the
Debtors*

BUFETE EMMANUELLI, LLC
By:     Rolando Emmanuelli-Jiménez
P.O. Box 10779
Ponce, Puerto Rico 00732

ORTIZ MENDOZA & FARINACCI
FERNÓS, LLC
By:     Rafael A. Ortiz Mendoza
Edificio Banco Cooperativo Plaza
623 Avenida Ponce de León, Suite 806-B
San Juan, Puerto Rico 00917-4820

*Counsel for Sistema de Retiro de los
Empleados de la Autoridad de Energía
Electrica ("SREAEE")*

William J. Natbony
Thomas J. Curtin
200 Liberty Street
New York, New York 10281

*Co-Counsel for Assured
Guaranty Inc.*

REICHARD & ESCALERA, LLC
By: Rafael Escalera
Sylvia M. Arizmendi
Carlos R. Rivera-Ortiz
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, Puerto Rico 00917-1913

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
By: Susheel Kirpalani
Eric Kay
295 Fifth Avenue
New York, New York 10016

*Co-Counsel for Syncora Guarantee, Inc.*

ADSUAR MUÑIZ GOYCO SEDA &
PÉREZ OCHOA, P.S.C.
By: Eric Pérez-Ochoa
Luis Oliver-Fraticelli
Alexandra Casellas-Cabrera
P.O. Box 70294
San Juan, Puerto Rico 00936

WEIL, GOTSHAL & MANGES LLP
By: Matthew S. Barr
Jonathan Polkes
Robert Berezin
767 Fifth Avenue
New York, New York 10153

*and*

Gabriel A. Morgan
700 Louisiana Street, Suite 1700
Houston, Texas 77002

**Add.3**

*Co-Counsel for National Public Finance*
*Guarantee Corporation*

MONSERRATE SIMONET &
GIERBOLINI,
LLC
By:      Dora L. Monserrate-Peñagarícano
         Fernando J. Gierbolini-González
         Richard J. Schell
101 San Patricio Ave., Suite 1120
Guaynabo, Puerto Rico 00968

DECHERT LLP
By:      G. Eric Brunstad, Jr.
         Stephen D. Zide
         David A. Herman
1095 Avenue of the Americas
New York, New York 10036

*Co-Counsel for the PREPA Ad Hoc Group*

RIVERA, TULLA AND FERRER, LLC
By:      Eric A. Tulla
Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212

MASLON LLP
By:      Clark T. Whitmore
         Michael C. McCarthy
         John T. Duffey
         Jason M. Reed
225 South Sixth Street, Suite 2900
Minneapolis, MN 55402

*Attorneys for U.S. Bank National Association,*
*in its capacity as the PREPA Bond Trustee*

LAURA TAYLOR SWAIN, United States District Judge

Before the Court is the *PREPA Bondholders' Motion and Memorandum of Law for Allowance of Administrative Expense Claim* (Docket Entry No. 29173 in Case No. 17-3283 and Docket Entry No. 5599 in Case No. 17-4780)[2] (the "Motion"). The Motion was filed by Assured Guaranty Inc., GoldenTree Asset Management LP, National Public Finance Guarantee Corporation, the PREPA Ad Hoc Group, Syncora Guarantee, Inc., and U.S. Bank National Association as trustee (the "Bond Trustee," or the "Trustee," and together the "Bondholders" or "Movants").[3] The Court has also received and reviewed the *Debtor's Objection to PREPA Bondholders' Motion for Allowance of Administrative Expense Claim* (Docket Entry No. 29280 in Case No. 17-3283 and Docket Entry No. 5629 in Case No. 17-4780) (the "FOMB Objection") filed by the Puerto Rico Electric Power Authority ("PREPA") by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") and additional submissions by the parties and other parties in interest with respect to the Motion.[4]

---

[2] Unless otherwise indicated, all references to "Docket Entry Nos." in this Opinion refer to entries in Case No. 17-4780. Capitalized words used but not defined herein shall have the meanings ascribed to them in the Motion or in any specifically referenced pleading.

[3] Assured, Syncora, and National are all monoline insurers of insured Bonds. The Court will use the lower-case phrase "the bondholders" to refer generally to the holders of bonds issued under the Trust Agreement. When specifically discussing the bondholders and insurers that are parties in this action, the Court will use the capitalized term "Bondholders."

[4] The Court has also received and reviewed the *Expert Declaration of Maureen M. Chakraborty, PHD* (Docket Entry No. 29227-1 in Case No. 17-3283 and Docket Entry No. 5614-1 in Case No. 17-4780) (the "Chakraborty Declaration"); the declaration of Margaret A. Dale in support of the FOMB Objection (Docket Entry No. 29300 in Case No. 17-3283 and Docket Entry No. 5637 in Case No. 17-4780) (the "Dale Declaration"); the Official Committee of Unsecured Creditors' (the "Committee") supplemental brief and joinder to the FOMB Objection (Docket Entry No. 29308 in Case No. 17-3283 and Docket Entry No. 5649 in Case No. 17-4780); the Puerto Rico Fiscal Agency and Financial Advisory Authority's ("AAFAF") joinder to the FOMB Objection (Docket Entry No. 29306 in Case No. 17-3283 and Docket Entry No. 5650 in Case No. 17-4780); multiple additional joinders to the FOMB Objection filed by various parties (Docket

The Court heard oral argument with respect to the Motion at the July 23, 2025 omnibus hearing. *July 23, 2025 Omnibus Hr'g Tr.* (Docket Entry No. 29725 in Case No. 17-3283 and Docket Entry No. 5757 in Case No. 17-4780.) The Court has considered all of the relevant submissions carefully. The Court has subject matter jurisdiction of this action pursuant to section 306(a) of PROMESA. 48 U.S.C. § 2166(a).[5]

The Bond Trustee, on behalf of the Bondholders, filed Proof of Claim No. 18449 on May 21, 2018, as a fully secured claim in the amount of $8,477,156,729.56, for amounts owed at the time the Title III petition was filed pursuant to that certain trust agreement between PREPA and the Bond Trustee (as successor trustee), dated as of January 1, 1974, as amended and supplemented (the "Trust Agreement" or "TA").[6] Through the Motion, the Bondholders seek the

---

Entry Nos. 29305 and 29307 in Case No. 17-3283 and Docket Entry Nos. 5638-5648 & 5651 in Case No. 17-4780; the Bondholders' response in support of the Motion (Docket Entry No. 29363 in Case No. 17-3283 and Docket Entry No. 5668 in Case No. 17-4780) (the "BH Reply ISO"); the declaration of Wiliam J. Natbony in support of the BH Reply ISO ((Docket Entry No. 29365 in Case No. 17-3283 and Docket Entry No. 5669 in Case No. 17-4780); the Oversight Board's supplemental brief in opposition to the Motion (Docket Entry No. 29425 in Case No. 17-3283 and Docket Entry No. 5685 in Case No. 17-4780) (the "FOMB Supplemental Brief"); and the Bondholders' supplemental brief in response thereto (Docket Entry No. 29497 in Case No. 17-3283 and Docket Entry No. 5700 in Case No. 17-4780) (the "BH Supplemental Response").

[5] The Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")—incorporating the Federal Rules of Civil Procedure (the "Federal Rules") to the extent stated therein—are made applicable in these Title III cases by section 310 of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). 48 U.S.C. § 2170. PROMESA is codified at 48 U.S.C. section 2101 et seq. References herein to "PROMESA" section numbers are to the uncodified version of the legislation. References herein to the provisions of Title 11 of the United States Code (the "Bankruptcy Code") are to sections made applicable in these cases by section 301 of PROMESA. 48 U.S.C. § 2161.

[6] In response to the Court's *Order Concerning PREPA Trust Agreement* (Docket Entry No. 115 in Adv. Proc. No. 19-00391), the Oversight Board and the Defendants filed an agreed-upon conformed copy of the trust agreement as Exhibit A to their *Joint Informative Motion Submitting Conformed Trust Agreement in Response to January 5, 2023 Order Concerning PREPA Trust Agreement [ECF No. 115]* (Docket Entry No. 118

---

entry of an order allowing an administrative expense priority claim in an amount "no less than $3.7 billion, the amount of which may increase if PREPA continues to use Net Revenues" after the date on which an order granting the Motion is issued without providing adequate protection. (Docket Entry No. 29175-1 in Case No. 17-3283 and Docket Entry No. 5601-1 in Case No. 17-4780 at 2.)  The Oversight Board has requested that the Court deny the Motion as a matter of law, arguing that the Bondholders have not demonstrated any entitlement to administrative expense priority under the applicable sections of the Bankruptcy Code, as incorporated into PROMESA.  (See, e.g., FOMB Obj. ¶ 27.)

For the following reasons, the Court holds that (a) the Bondholders have not demonstrated that PREPA's postpetition use of their alleged collateral is an "actual, necessary expense" incurred by PREPA postpetition that can be prioritized as an administrative expense under section 503(b)(1)(A) of the Bankruptcy Code ("Section 503(b)(1)(A)"), (b) the Bondholders have failed to show that they are entitled to administrative expense priority under the fundamental fairness doctrine enunciated in Reading v. Brown, 391 U.S. 471, 477 (1967), because that doctrine is inapplicable to their claim and because they have not pleaded cognizable claims sounding in tort, and (c) the Bondholders have not shown that they are entitled to priority claims under section 922(c) of the Bankruptcy Code ("Section 922(c)") because PREPA did not fail to provide any Court-ordered adequate protection payments to the Bondholders.  As a result, the Court denies the Motion because it fails as a matter of law to demonstrate that the Bondholders have an allowable administrative expense claim.

---

Ex. A in Adv. Proc. No. 19-00391).  All citations to the Trust Agreement are to that conformed version.

I.

BACKGROUND

Unless otherwise indicated, facts presented or recited in this Opinion and Order

are identified as undisputed in the Motion or the FOMB Objection or drawn from evidence as to

which there has been no contrary, non-conclusory factual proffer.

A.      PREPA

PREPA is a public corporation created under the Puerto Rico Electric Power

Authority Act, Act No. 83-1941, codified at 22 L.P.R.A. §§ 191-240 (as amended, the "Authority

Act"),[7] to supply substantially all of the electricity consumed in the Commonwealth.  The

Authority Act authorizes PREPA to issue bonds.  22 L.P.R.A. § 206.  Between the years 1974 and

2016, PREPA made several bond issuances pursuant to the Trust Agreement, totaling

approximately $8.3 billion of bonds (the "Bonds").

---

[7]     Unless otherwise stated, all citations herein to provisions of the Laws of Puerto Rico
Annotated are to the English-language translations, available on Westlaw, by the
Translation Office of the Puerto Rico Government, with one exception: Westlaw does not
provide an English-language translation of the current section 5, titled "Powers and
Authorities," of the Authority Act and certain other sections thereof.  Accordingly, for the
English-language translations of the relevant sections of the Authority Act—some of
which have been amended since the version that was in effect on the date relevant to the
Estimation Order (July 3, 2017), which is currently the most recent version available in
English-language translation on Westlaw—the Court has relied upon a translated
compilation of the Authority Act provided by the Puerto Rico Office of Management and
Budget.  Puerto Rico Electric Power Authority Act, Act No. 83-1941 (codified as
amended by Act 33-2019), 22 L.P.R.A. §§ 191-240 (2019),
https://bvirtualogp.pr.gov/ogp/Bvirtual/leyesreferencia/PDF/2-ingles/83-1941.pdf
[https://perma.cc/VU2R-8MM2].  However, consistent with the Spanish-language
version of the Authority Act available on Westlaw, the Court will cite section 5 of the
Authority Act as 22 L.P.R.A. § 195a-1 ("Powers and Authorities"), and section 6 of the
Authority Act as 22 L.P.R.A. § 196 ("Duties and Responsibilities").  Until 1979, PREPA's
name was the Puerto Rico Water Resources Authority.

B.        Relevant Provisions of the Trust Agreement

Article I of the Trust Agreement defines key terms, including "Revenues" and "Net Revenues." PREPA's "Revenues" are (1) "all moneys received by [PREPA] in connection with or as a result of its ownership or operation" of its electricity generation and distribution system, (2) "any proceeds of use and occupancy insurance on the System or any part thereof," and (3) "income from investments made under" either the Trust Agreement or a 1947 predecessor agreement. (TA § 101.) "Current Expenses" are "the Authority's reasonable and necessary current expenses of *maintaining, repairing, and operating* the System" but they do not include certain other transfers, such as deposits to the credit of the Sinking Fund (as discussed immediately hereafter). (Mot. ¶ 5 (quoting TA §101) (emphasis added).) "Net Revenues" are the "amount of the excess of the Revenues for such period over the Current Expenses for such period." (TA § 101.)

Article V of the Trust Agreement establishes a "waterfall" structure for distributing PREPA's Revenues (as the term is defined in Article I) into certain funds. (TA Art. V.) The Revenues (except for certain types of investment income) first flow into the General Fund. (TA § 503.) PREPA pays its Current Expenses out of the General Fund. (TA § 505.) The remaining Revenues—the Net Revenues—then flow into the Revenue Fund, minus a reserve to cover future operating expenses. (TA § 506.) From there, Net Revenues flow first into the Sinking Fund, and then into a series of Subordinate Funds. (See TA § 507.) The Net Revenues deposited into the Sinking Fund are designated to cover debt service. The Net Revenues deposited into the Subordinate Funds are designated to cover internal PREPA operations, such as extraordinary repairs or capital improvements. There are four Subordinate Funds: the Self-Insurance Fund, the Capital Improvement Fund, the Reserve Maintenance Fund,

and the Construction Fund (which is not, technically, included in the waterfall structure).[8]  If there is not enough money in the Sinking Fund to cover PREPA's debt service obligations at a given time, Article V (specifically, sections 512 through 512B) broadly requires PREPA to draw on the Subordinate Funds—other than the Construction Fund—to pay bondholders.  (See TA §§ 512, 512A, 512B.)

Article VII of the Trust Agreement outlines specific contractual covenants between the bondholders and PREPA.  In section 701, PREPA covenants that it will "promptly pay the principal of and the interest on" the Revenue Bonds.  (TA § 701.)  PREPA also covenants that the Revenue Bonds are "payable solely from the Revenues and said Revenues are hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified."  (TA § 701.)  In sections 705 and 712, PREPA also agrees not to create—"or suffer to be created"—any lien or charge on "the Revenues ranking equally with or prior to the [Revenue Bonds]."  (TA §§ 705, 712.)

Article VIII of the Trust Agreement outlines the bondholders' remedies.  Section 804 permits the bondholders to file a suit "in equity or at law . . . for the appointment of a receiver as authorized by the Authority Act[,] or for the specific performance of any covenant or agreement contained herein."  (TA § 804.)  The same provision entitles the bondholders to "recover and enforce any judgment or decree against the Authority, but solely as provided herein and in such bonds, for any portion of such amounts remaining unpaid . . . and to collect (but

---

[8]     Instead, as noted by the Court of Appeals for the First Circuit (the "First Circuit"), "the Construction Fund is replenished by bond proceeds and certain Net Revenues preemptively siphoned off from the Revenue Fund."  U.S. Bank Nat'l Assoc. v. Fin. Oversight and Mgmt. Bd. for P.R. (In re Fin. Oversight and Mgmt. Bd. for P.R.), 121 F.4th 280, 291 n.6 (1st Cir. 2024).

solely from moneys in the Sinking Fund and any other moneys available for such purpose) in any manner provided by law, the moneys adjudged or decreed to be payable." (TA § 804.)

> C. The PREPA Title III Proceedings

On July 2, 2017 (the "Petition Date"), the Oversight Board filed a petition pursuant to Title III of PROMESA, commencing a debt adjustment proceeding for PREPA under that statute. (Docket Entry No. 1.) On May 3, 2019, the Oversight Board, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), and PREPA (together the "Government Parties"), along with the Ad Hoc Group and Assured (followed soon thereafter by Syncora and National), entered into a restructuring support agreement intended to resolve claims related to the Bonds by granting certain treatment of the claims in exchange for support of a corresponding plan of adjustment (the "2019 RSA") (Dale Decl. Ex. 2). The 2019 RSA contemplated, and according to the Oversight Board was dependent upon, passage by the Commonwealth of legislation authorizing several transactions called for by the RSA. Such legislation was never passed.

In April 2020, after numerous adjournments of hearings on a motion to approve the settlements embodied in the 2019 RSA, as well as extensions of time due to earthquakes and the COVID-19 pandemic, the Court granted the Oversight Board and AAFAF's unopposed request to stay the deadlines applicable to the settlement motion. (Docket Entry Nos. 1947, 1954.) The Government Parties thereafter filed periodic status updates. (See, e.g., Docket Entry Nos. 1992, 2691.)

On January 18, 2022, the Court confirmed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19784 in

Case No. Case No. 17-3283 (the "Commonwealth Plan").[9] (Docket Entry No. 19813 in Case No. 17-3283.)

On February 18, 2022, the Ad Hoc Group filed an urgent motion (the "Urgent Motion") asking the Court to appoint a mediator and set PREPA plan submission and confirmation deadlines. (Docket Entry No. 2718.)

On March 8, 2022, citing concerns regarding lack of implementing legislation and a comprehensive settlement of PREPA's legacy obligations, along with concerns regarding the affordability of the cost of electricity and the sustainability of the electric system as a result of rising inflation and significant surges in the price of crude oil, AAFAF gave unilateral notice of termination of the 2019 RSA. (See Docket Entry No. 2747 Ex. B (the "RSA Termination Notice").)

Also on March 8, 2022, the Court denied the Urgent Motion's specific requests, but entered an order requiring the Oversight Board, by a certain deadline (the "Path Forward Deadline"), to file (1) a proposed plan of adjustment for PREPA, (2) a detailed term sheet for a plan of adjustment for PREPA, (3) a proposed litigation schedule for significant disputed issues in PREPA's Title III case, including the existence and extent of the Bondholders' secured claim, or (4) a declaration and memorandum of law showing cause as to why the Court should not consider dismissal of PREPA's Title III case. (See Docket Entry No. 2748 ¶ 3(b).)

On April 8, 2022, this Court entered orders appointing the Mediation Team (as defined therein) and establishing terms and conditions to govern mediation, including an initial

---

[9] The Commonwealth Title III case was commenced on May 3, 2017. (Docket Entry No. 1 in Case No. 17-3283.) The PREPA Title III proceedings have been administered jointly with the various other Title III proceedings. (See Docket Entry No. 304 in Case No. 17-4780.)

Add.12

mediation termination date (the "Termination Date"). (Docket Entry No. 2772 (the "Appointment Order"); Docket Entry No. 2773 (the "Terms and Conditions Order")).)

The Path Forward Deadline and Termination Date were extended several times. (See, e.g., Docket Entry No. 2949.) In mid-September 2022, the Mediation Team declined to extend the deadlines any further, at which time the Bondholders (without the Bond Trustee) filed a motion to dismiss PREPA's Title III Case or for relief from the automatic stay in order to enforce their contractual right to a receiver. (See Docket Entry No. 2973.)

On September 29, 2022, this Court entered an order staying the September 2022 motion to dismiss the case or for relief from the automatic stay, establishing a deadline to file a plan of adjustment, and establishing a litigation schedule for Adversary Proceeding No. 19-00391. (See Docket Entry No. 3013 (the "Litigation Scheduling Order").)

Throughout these proceedings, in an effort to protect their alleged collateral, the Bondholders have, at certain times, requested adequate protection. (See Mot. ¶ 20.) Before 2019, the Bondholders moved for relief from the automatic stay and for adequate protection twice: once on July 18, 2017, and in a renewed motion filed on October 3, 2018.[10] (Mot. ¶¶ 20-21.) Before the Court could decide whether to grant stay relief or adequate protection to the Bondholders on the 2018 renewed motion, the parties entered into the 2019 RSA. (Mot.

---

[10]    On July 18, 2017, certain PREPA bondholders and monoline insurers filed a motion seeking relief from the automatic stay under PROMESA to pursue the appointment of a receiver in a non-Title III court. (Docket Entry No. 74.) Following the denial of the motion by this Court, a partial reversal by the Court of Appeals for the First Circuit, and a renewed motion (Docket Entry No. 975), the briefing schedule for the renewed motion was consensually extended several times. The motion was not resolved before the parties' entry into the 2019 RSA. (See Docket Entry Nos. 299, 1176, 1204, 3364.) See generally Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.), 899 F.3d 13 (1st Cir. 2018). The renewed stay relief motion was administratively terminated for statistical purposes by Court order (Docket Entry No. 3364) after the termination of the 2019 RSA.

¶ 22.) The 2019 RSA required PREPA to make monthly payments to the Bondholders after it received approval from the Court, and included various other covenants, among them a promise to treat certain Bondholders' claims as administrative expense claims in the event the 2019 RSA was approved by the Court. (Mot. ¶ 22.) On May 10, 2019, the Oversight Board and AAFAF filed a joint motion seeking approval of the 2019 RSA. (Mot. ¶ 23.) However, the Court never approved the 2019 RSA, and on March 8, 2022—nearly two years after the Court granted the motion staying deadlines related to its approval— AAFAF unilaterally terminated the 2019 RSA. (See Mot. ¶ 25.) On September 19, 2022, certain Bondholders moved to dismiss PREPA's case, or alternatively for relief from the automatic stay to enforce their right to appoint a receiver under the terms of the Trust Agreement, but that motion did not seek adequate protection. (Mot. ¶ 25.) Eventually, the Oversight Board filed a plan of adjustment without support from the Bondholders. (Mot. ¶ 25.) On August 24, 2023, certain Bondholders moved again for relief from the automatic stay, now citing lack of adequate protection. (Mot. ¶ 26.) After the Court stayed that motion pending the outcome of related litigation, certain Bondholders renewed their request to lift the stay of that motion in February 2024. (Mot. ¶ 26.)

On February 11, 2025, the Oversight Board certified and filed PREPA's 2025 Fiscal Plan. (Docket Entry No. 5501.) The 2025 Fiscal Plan states that PREPA will not be able to afford "any sustainable rate increases for debt service" because such increases would outstrip the median income household's ability to afford to pay utility rates. (Mot. ¶ 32.) The Oversight Board bases this finding on a projection that "Necessary Maintenance Expenses" ("NMEs") have risen and will rise rapidly, consuming revenues that could otherwise be available for debt service. (Mot. ¶ 32.)

On March 28, 2025, the Oversight Board filed the *Fifth Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* (the "Fifth Amended Plan"). (Mot. ¶ 33; see also Docket Entry No. 29125 in Case No. 17-3283 and Docket Entry No. 5581 in Case No. 17-4780.) The Fifth Amended Plan contemplates the payment of the value of the Bondholders' secured claim in full once it has been determined (the Oversight Board takes the position that the value of the claim is nil) and proposes to pay general unsecured creditors from funds that the Bondholders allege constitute collateral securing PREPA's outstanding obligations under the bonds. (Mot. ¶ 33.) The Fifth Amended Plan remains PREPA's operative proposed plan of adjustment.

D.     Adversary Proceeding No. 19-00391

On July 1, 2019, the Oversight Board commenced Adversary Proceeding No. 19-00391, seeking to disallow in part the Bondholders' claim. (Docket Entry No. 1 in Case No. 19-00391.)

On March 23, 2023, the Court entered an order granting in part and denying in part cross-motions for summary judgment with respect to the allowance or disallowance of Proof of Claim No. 18449. (See Docket Entry No. 147 in Adv. Proc. No. 19-00391 (the "Summary Judgment Order").) In the Summary Judgment Order, the Court held that:

> (a) the Trust Agreement granted the Bondholders security interests only in moneys actually deposited to the Sinking Fund, Self-insurance Fund, Capital Improvement Fund, Reserve Maintenance Fund, and Construction Fund (as defined in the Trust Agreement); (b) the Bondholders have perfected their liens in the Sinking Fund, Self-insurance Fund, and Reserve Maintenance Fund, over which the Trustee has established control (as discussed below);[11] (c) the Bondholders have no

---

[11]     The Court declined to address the Bondholders' possible perfection of their liens on the Capital Improvement Fund and Construction Fund, because the record before the Court provided no evidence from either party as to the form of the assets comprising those

> security interest in the covenants and remedies provided for by the Trust Agreement; but (d) based on PREPA's payment and equitable relief covenants in the Trust Agreement, the Bondholders have an unsecured claim (within the meaning of 11 U.S.C. § 101(5)(B)) to be liquidated by reference to the value of future Net Revenues (as defined in the Trust Agreement) that would, under the waterfall provisions of the Trust Agreement and applicable nonbankruptcy law, have become collateral upon being deposited in the specified funds and payable to the Bondholders over the remainder of the term of the Bonds (the "Unsecured Net Revenue Claim").

(Summary Judgment Order at 13-14.) The Court further held that the value of the Unsecured Net Revenue Claim must be determined "either consensually or through proceedings under section 502 of the Bankruptcy Code." (Summary Judgment Order at 62, 70.) The parties were unable to reach consensus as to the value of the Net Revenue Claim.

On May 15, 2023, the Oversight Board filed a motion asserting that Counts III through VII of the Counterclaim Complaint "either (i) were resolved through this Court's [Summary Judgment Order]; (ii) fail to state a claim; (iii) are time-barred; or (iv) are preempted by the Bankruptcy Code." (Docket Entry No. 211 in Adv. Proc. No. 19-00391 (the "FOMB MTD").) The FOMB MTD sought the dismissal of Counts III through VII of the Bondholders' counterclaim complaint. (See Docket Entry No. 47 in Adv. Proc. No. 19-00391.)

On June 26, 2023, after a three-day hearing held earlier that month, this Court issued its *Order Concerning Bondholders' Unsecured Net Revenue Claim Estimation* (Docket

---

Funds and their custodial status, and means of perfection may vary with the form of the asset in question. On August 28, 2023, the Court entered the *Joint Stipulation and Agreed Order of the Financial Oversight and Management Board for Puerto Rico, U.S. Bank National Association as PREPA Bond Trustee, the Ad Hoc Group Of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, and Syncora Guarantee, Inc. Resolving Perfection-Related Issues*, approving a consensual resolution of the remaining lien-perfection issues while reserving certain rights for appeals. (Docket Entry No. 337 in Adversary Proceeding No. 19-00391.)

Entry No. 315 in Adv. Proc. No. 19-00391) (the "Estimation Order"), liquidating the Unsecured

Net Revenue Claim in the amount of $2,388,000,000.00. (Estimation Order at 47.)

On November 28, 2023, the Court issued an order granting the FOMB MTD,

denying requests (1) for declaratory judgments: (a) that PREPA has breached statutory

obligations and contractual covenants, (b) that PREPA is a trustee for the Bondholders, (c) that

PREPA has committed certain torts, (d) that PREPA had committed any takings by deciding to

file or filing under Title III, and (2) for rescission of contract. (Docket Entry No. 361 in Adv.

Proc. No. 19-00391.)

Thereafter, the Court entered judgment in Adversary Proceeding No. 19-00391,

and several parties, including the Bondholders, appealed. (See Docket Entry Nos. 362, 363, 365,

366, 368, 369, 371, 372, 386 in Adv. Proc. No. 19-00391.)

E.       The First Circuit Lien Decision and Current Procedural Posture

On June 16, 2024, the United States Court of Appeals for the First Circuit (the

"First Circuit") issued an opinion (later revised in part and reissued on November 13, 2024)

affirming in part and reversing in part this Court's Summary Judgment Order and Estimation

Order. See U.S. Bank Nat'l Assoc. v. Fin. Oversight and Mgmt. Bd. for P.R. (In re Fin.

Oversight and Mgmt. Bd. for P.R.), 121 F.4th 280, 294 (1st Cir. 2024) (the "First Circuit Lien

Decision"). In the First Circuit Lien Decision, the panel held, inter alia, that: the Bondholders

possess a lien on Net Revenues under the Trust Agreement, which liens are perfected as to Net

Revenues already acquired by PREPA and as to future revenues as acquired; the Bondholders'

allowed claim is approximately $8.5 billion (the face value of their bonds plus matured pre-

petition interest), although the value of the Net Revenues, if any, securing it is to be determined

in the first instance by this Court; the Bondholders are non-recourse creditors; PREPA is not a

Add.17

trustee for the Bondholders; and the Bondholders properly pleaded a claim for an equitable accounting.

On June 17, 2024, this Court requested a joint status report from the parties to the appeal; the report was filed on July 3, 2024.  (Docket Entry Nos. 5247 and 5274.)  At a status conference on July 10, 2024, the Court stayed litigation in PREPA's Title III case and Adversary Proceeding No. 19-00391 and directed the parties to meet with the Mediation Team; the stay and directive were memorialized in an order dated July 11, 2024.  (Docket Entry No. 5286 (the "PREPA Litigation Stay Order" or "PREPA Litigation Stay").)  The Court later extended the PREPA Litigation Stay while the Oversight Board and certain other parties sought rehearing at the First Circuit.  (Docket Entry Nos. 5338, 5390, 5406, 5480.)

On January 13, 2025, the First Circuit issued its mandate to this Court.  (Docket Entry No. 401 in Adversary Proceeding No. 19-00391.)  On February 24, 2025, the Bondholders asked the Court to lift the PREPA Litigation Stay to allow several matters to proceed, including a motion for allowance of an administrative expense claim.  (Docket Entry No. 5510 ¶¶ 48-50.)  On March 20, 2025, the Court granted the parties partial relief from the PREPA Litigation Stay, permitting the Oversight Board to file an amended plan of adjustment for PREPA, and permitting the filing of the instant Motion.  (Docket Entry No. 5572.)

F.     The Instant Administrative Expense Motion

On April 7, 2025, Movants filed the Motion, in which they made three legal arguments, any one of which would, if valid, suffice to state a claim for an administrative expense claim.  (Mot. ¶¶ 43-66.)  First, Movants argue that Section 503(b)(1)(A) entitles them to an administrative expense claim for Net Revenues spent or withheld by PREPA during the life of the Title III case, as "actual, necessary costs and expenses of preserving the estate."  (Mot. ¶ 44

(quoting 11 U.S.C. § 503(b)(1)(A)).) Movants contend that PREPA's use of Movants' collateral entitles them to a priority claim under this provision because such use created "actual value conferred on the bankrupt estate." (Mot. ¶ 45 (quoting In re United Trucking Serv., Inc., 851 F.2d 159, 162-63 (6th Cir. 1988)).) Second, Movants argue that, even if Section 503(b)(1)(A) does not by its direct application entitle them to an administrative expense claim, the Supreme Court's decision in Reading v. Brown, 391 U.S. 471, 477 (1967), and its progeny provide an alternative basis for their claim because "tort claims arising during a bankruptcy case give rise to administrative expense claims."[12] (Mot. ¶ 47.) Invoking Reading, Movants assert two tort claims against PREPA: (1) a claim for conversion under Puerto Rico law; and (2) a claim under the Takings Clause of the Fifth Amendment of the Constitution of the United States for compensation for PREPA's use of Movants' collateral during the pendency of this Title III Case. (See also Mot. ¶¶ 48-52.) As a fallback, Movants further contend that Section 922(c) should also entitle them to an administrative expense claim because "'there has been a diminution in the value of [Movants'] secured collateral' by reason of the automatic stay." (Mot. ¶ 53 (quoting Grundy Nat'l Bank v. Rife, 876 F.2d 361, 363 (4th Cir. 1989)).) Movants argue that PREPA's failure to provide Movants with adequate protection despite their requests for it earlier in the case and, separately, failure to provide the adequate protection payments contemplated by certain provisions of the 2019 RSA, entitle them to an administrative expense claim under Section 922(c). (Mot. ¶¶ 54-59.) Finally, Movants argue that the Court must rule in their favor under Section 503(b)(1)(A) and Section 922(c) as a matter of constitutional avoidance. (Mot. ¶¶ 60-66.)

---

[12]     Reading was decided under section 64(a)(1) of the former Bankruptcy Act, 11 U.S.C. section 104(a)(1), which predated Section 503(b)(1)(A). The statutory evolution is not material to the parties' arguments. (Mot. ¶ 47 n.35.)

On April 28, 2025, the Oversight Board filed the FOMB Objection, in which it responds to the arguments in the Motion and asserts that Movants fail to state a claim upon which relief may be granted, making four principal arguments. First, the Oversight Board argues that Movants' collateral is limited to Net Revenues as that term is defined in the Trust Agreement, and that no Net Revenues have existed during the Title III Case. (FOMB Obj. ¶¶ 28-30.) Second, the Oversight Board argues that, even if PREPA in fact generated Net Revenues during this time, the Motion should still be denied because the First Circuit Lien Decision made clear that Movants' claims are "nonrecourse," such that Movants "may only reach moneys available for debt service," and no such moneys currently exist. (FOMB Obj. ¶ 32 (quoting First Circuit Lien Decision, 121 F.4th at 316).) To rebut Movants' arguments relating to Section 503(b), the Oversight Board argues that Movants have failed to set forth a prima facie case that PREPA's use of their collateral caused it to diminish in value because, among other things, the monthly operating reports upon which Movants' arguments rely (discussed further below) only show that PREPA used Net Revenues to generate more Net Revenues and that, in any case, claims for administrative expenses do not lie for diminution in the value of a prepetition creditor's collateral. (FOMB Obj. ¶¶ 42-51. See also UCC Suppl. Br. ¶ 20.) Regarding Movants' arguments under Section 922(c), the Oversight Board argues that Movants' claim does not meet the two requirements for administrative priority under that section—that a claimant has (1) been provided adequate protection, but (2) nonetheless has a claim arising from the stay. (FOMB Obj. ¶ 52 (citing 11 U.S.C. § 922(c)).) In this connection, the Oversight Board argues that PREPA has never provided adequate protection to the Bondholders, noting that the Court never expressly entered an order directing PREPA to make such payments, and that the 2019 RSA, which would have provided "adequate protection" payments following court

approval, was never approved by the Court. (FOMB Obj. ¶¶ 53-64.) The Oversight Board further contends that (1) PREPA never "failed" to provide adequate protection, (2) the Bondholders have no claim arising from any such failure, and (3) any diminution claims that they might assert did not "arise from" the automatic stay. (FOMB Obj. ¶¶ 65-73.) With respect to Movants' arguments under Reading v. Brown, the Oversight Board maintains that the Bondholders have not pleaded viable conversion nor Takings Clause claims. (FOMB Obj. ¶¶ 73-87.) Finally, the Oversight Board argues that the evidence would show that PREPA has not generated any Net Revenues since the Petition Date, reducing the actual value of the Bondholders' claim to a level far below the face value of the outstanding bonds and prepetition interest. (FOMB Obj. ¶¶ 90-100.)

According to Movants, the amount owed under the bonds on the Petition Date was $8,477,729.56, and Movants estimate that the total amount owed on the bonds is now over $11 billion with the inclusion of postpetition interest. (Mot. ¶ 2.) To secure these amounts, Movants argue, they hold a perfected lien on PREPA's past, present and future Net Revenues as defined in the Trust Agreement: Revenues minus Current Expenses. (Mot. ¶ 3 (citing 121 F.4th 280, 297 (1st Cir. 2024)).) They further argue that, in monthly financial reports that PREPA issued until recently, PREPA acknowledged and admitted that it was realizing Net Revenues.

The Trust Agreement requires PREPA to generate monthly reports detailing its Revenues and expenses. (Mot. ¶ 11 (citing TA § 710).) PREPA has historically provided the Bond Trustee with monthly reports pursuant to section 710 of the Trust Agreement (the "Monthly Operating Reports"). (Mot. ¶ 12.) According to the Bondholders, PREPA's Monthly Operating Reports show that it accumulated approximately $3.7 billion in Net Revenues from the Petition Date until June 2023. (Mot. ¶ 13 (citing Chakraborty Decl. ¶¶ 12, 16).) Each of the Monthly

Operating Reports from fiscal year 2018 through fiscal year 2021 states that "[t]he 1974 Sinking Fund Appropriation ha[s] been accrued but not transferred." (Mot. ¶ 14.) Thus, Movants allege, PREPA accrued nearly $2 billion in Net Revenues but did not transfer them to the Sinking Fund as required by the Trust Agreement. (Mot. ¶ 14.) In the Monthly Operating Reports for fiscal years 2022 and 2023, Movants allege, PREPA disclosed nearly $900 million in additional accruals to the Sinking Fund that were not transferred, totaling $2.9 billion in Net Revenues from the Petition Date which actually accumulated but have not been transferred to the Sinking Fund.[13] (Mot. ¶ 15.) Movants allege that the discrepancy between the amounts of Net Revenues reported in the Monthly Operating Reports and the Net Revenues shown in PREPA's certified Fiscal Plans over the same postpetition period is only 4%. (Mot. ¶ 16.) According to Movants, the manner in which PREPA reported Net Revenues in the Monthly Operating Reports was largely consistent with the way it marketed the Bonds to investors and "the electricity rate structure that has been in place since 2019." (Mot. ¶¶ 18-19.) Movants claim that PREPA's Monthly Operating Reports show that it has "accumulated and improperly consumed" the Bondholders' collateral in an amount not less than $3.7 billion. (Mot. ¶ 92.) They thus contend that they are entitled to compensation for PREPA's postpetition use of billions of dollars labeled Net Revenues in Monthly Operating Reports issued postpetition (presumptively including PREPA's cash on hand in any liened accounts), and that any necessary further determination of the value of their secured claim can be addressed in further proceedings.

---

[13] Beginning in February 2022, PREPA modified how it reported Net Revenues in the Monthly Operating Reports. (Mot. ¶ 17.) Because the Motion can be decided as a matter of law, the distinction is not relevant to the parties' dispute at this stage of the proceedings.

The Oversight Board counters, among other rebuttals, that the term "Net Revenues" in the Monthly Operating Reports is not coextensive with the term as defined by the Trust Agreement, and that the Monthly Operating Reports make clear that those reports contained only preliminary numbers subject to audit. Because, as explained below, the Court concludes that Movants have failed to show a viable legal basis for their administrative claim, the Court will not address the parties' dispute regarding the existence (or not) of Net Revenues at this time.

DISCUSSION

A.     <u>Standard of Review</u>

The Motion, as a motion for the allowance of a claim accorded administrative priority, is a contested matter governed by Bankruptcy Rule 9014. Both parties have offered declarations and other materials in support of their arguments, and neither seeks an evidentiary hearing with respect to the question of whether the Bondholders may be able to sustain a viable administrative expense claim under any of the theories they have put forward. Federal Rule 56 applies in this contested matter by the operation of Bankruptcy Rules 7056 and 9014(c). "[S]ummary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" <u>Tera Xtal Tech. Corp. v. GT Adv. Techs., Inc.</u>, Civ. No. 16–cv–91–PB, 2017 WL 590340, at *3 (Feb. 13, 2017 Bankr. D.N.H.) (quoting Federal Rule 56(a) to resolve a contested matter). Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Fin. Oversight and Mgmt. Bd. for P.R. v. United States Bank Nat'l Assoc. (In re. Fin. Oversight and Mgmt. Bd. for P.R.)</u>, 649 B.R. 381, 401 (D.P.R. 2023) (citing Fed. R. Civ.

P. 56(a)). Material facts are those that "possess[ ] the capacity to sway the outcome of the litigation under the applicable law," and there is a genuine factual dispute where an issue "may reasonably be resolved in favor of either party." Id. (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)) (internal quotation marks and citations omitted). The Court must "review the material presented in the light most favorable to the non-movant, and . . . must indulge all inferences favorable to that party." Id. (quoting Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990)) (internal quotation marks and citations omitted). When a properly supported motion for summary judgment is made, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)) (internal quotation marks and citation omitted). The non-moving party can avoid summary judgment only by providing properly supported evidence of disputed material facts. Id. (citing LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993)). The Court declines to address assertions proffered by the parties that are immaterial, and disregards conclusory statements of law which the parties proffer as facts.

B.      Administrative Expense Status Under Section 503 of the Bankruptcy Code

The allowance of administrative expense claims is governed by section 503 of the Bankruptcy Code, which is made applicable in this case by section 301 of PROMESA. See 11 U.S.C. § 503; 48 U.S.C. § 2161(a). Section 503 of the Bankruptcy Code provides, in relevant part, that:

> (a) An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.
>
> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

> (1)(A) the actual, necessary costs and expenses of preserving the estate . . . .

11 U.S.C.A. § 503 (Westlaw through P.L. 119-74).

In <u>Woburn Associates v. Kahn (In re Hemingway Transport, Inc.)</u>, 954 F.2d 1 (1st Cir. 1992), the First Circuit set forth the general criteria that should be considered in determining whether to allow an administrative expense claim. The court explained that a request for priority payment of an administrative expense under section 503(a) of the Bankruptcy Code "may qualify if (1) the right to payment **arose from a postpetition transaction with the debtor [], rather than from a prepetition transaction with the debtor**, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor." <u>In re Hemingway Transp., Inc.</u>, 954 F.2d at 5 (emphasis added). The party asserting the administrative claim bears the burden of demonstrating the entitlement of its claim to such treatment. <u>Id.</u> "Provisions that grant priority in bankruptcy are to be narrowly construed." <u>Bos. Reg'l Med. Ctr., Inc. v. Mass. Div. of Health Care Fin. & Pol'y</u>, 365 F.3d 51, 57 (1st Cir. 2004) (citing <u>Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)</u>, 536 F.2d 950, 953 (1st Cir. 1976) ("<u>Mammoth Mart</u>"). The Court has broad discretion in determining whether to grant a request for such priority treatment. <u>See In re Jeans.com</u>, 491 B.R. 16, 23 (Bankr. D.P.R. 2013) (citation omitted).

One principal policy behind this section is carry out the "statutory objective of facilitating the rehabilitation of insolvent businesses" by encouraging third parties to provide those businesses with necessary goods and services postpetition. <u>Mammoth Mart, Inc.</u>, 536 F.2d at 954. Another "overriding concern" is to keep "fees and administrative expenses at a minimum" so as to preserve as much of an estate as possible to maintain assets and operations that will inure, upon emergence or sale as a going concern, to the benefit of the prepetition

creditor body.  See Ala. Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co. Inc.), 963 F.2d 1449, 1459 (11th Cir. 1992) (citation omitted).  There is no exception in the doctrine for creditors secured pursuant to a prepetition contract regardless of whether the postpetition bankruptcy estate benefits from the contract: "It is . . . clear that a claimant who fully performs under a contract prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt estate after the filing."  Mammoth Mart, Inc., 536 F.2d at 954 (citation omitted).

As will be discussed further below, the only way for a solely prepetition creditor to obtain an allowable administrative expense claim under PROMESA is through Section 922(c) of the Bankruptcy Code and fulfillment of its predicates that the claimant obtain adequate protection that, later, proves insufficient.  Mainly construing Section 922(c)'s business bankruptcy analog, section 507(b) of the Bankruptcy Code, in ordinary Chapter 11 cases, courts have warned against permitting a prepetition creditor to make an end-run around the adequate protection predicate by instead asserting a direct administrative expense claim.  If a creditor wishes to assert a direct administrative expense claim under section 503(b), that creditor must, at a minimum, demonstrate what it has contributed postpetition to benefit the estate or debtor.[14]  As one court has put it, where there has been no postpetition contribution to the estate or debtor, no automatic administrative expense should be granted to a creditor secured pursuant to a prepetition contract where the claim is accrued "by sitting back and 'allowing' a [debtor] to use collateral which it already owns and has a statutory right to use."  In re Advisory Info. & Mgmt. Sys., Inc., 50 B.R. 627, 630 (Bankr. M.D. Tenn. 1985); see also In re Provincetown-Boston

_____

[14]     Section 301(c)(5) of PROMESA provides that the term "property of the estate" in this instance means "property of the debtor."  48 U.S.C. § 2161(c)(5).

Add.26

Airline, Inc., 66 B.R. 632, 634 (Bankr. M.D. Fla. 1986). This rule, applicable in an ordinary Chapter 11 case to the use of equipment, vehicles, and other collateral in which a creditor may have a security interest, applies to the use of cash collateral in this instance because Section 363 of the Bankruptcy Code, which requires bankruptcy court approval of the non-consensual use of cash collateral, is not incorporated into PROMESA, and section 305 of PROMESA denies the Court power to regulate the Debtor's use of its own cash. [15]

Here, the Trust Agreement is a prepetition nonexecutory contract. (See, e.g., Docket Entry No. 361 in Adv. Proc. No. 19-00391 at 26, 29.) The Bondholders, having paid PREPA for the bonds or acquired their interests from others who originally paid PREPA, have no further duties under the Trust Agreement. Nor do they proffer that they took any action, or entered into any transaction with PREPA, following the Title III filing for which they are seeking an administrative expense claim as compensation. PREPA's postpetition expenditure of its own revenues is not a postpetition transaction with the Bondholders.

United Trucking Serv. v. Trailer Rental Co. (In re United Trucking Serv.), is the only case cited by any party wherein a prepetition agreement was the sole basis of an administrative expense claim. 851 F. 2d 159 (6th Cir. 1988). This out-of-circuit case is not controlling precedent with respect to this Court and, contrary to the Bondholders' representations, is not a case in which an administrative expense claim was awarded based only on the use of collateral created prepetition. Critically, the United Trucking parties had entered into a postpetition stipulation to treat the prepetition-based debt as an administrative expense and the court, after much discussion, upheld the parties' decision. Id. at 161 n.2. The case appears to

---

[15] Section 305 of PROMESA provides, in pertinent part, that the court may not interfere with the governmental powers, property and revenues, or use and enjoyment of income-producing property of a Title III debtor. See 11 U.S.C. § 2165.

Add.27

have involved an arrangement more like a <u>sub rosa</u> agreement to provide postpetition financing than an administrative expense claim based on postpetition value received by the estate at the prepetition creditor's expense.  Furthermore, as the Oversight Board notes, the Bondholders' representation that <u>United Trucking</u> involved a security interest <u>is incorrect</u>.  The case instead involved the continued use of leased trailers (which were not the property of the debtor) that were damaged by use that benefited the estate without any concomitant benefit to the lessor. (<u>See</u> FOMB Suppl. Br. ¶¶ 4, 9; BH Suppl. Resp. ¶ 19 n.6.)  It is unclear whether, without the stipulation of the parties to treat postpetition damages to the trailers as administrative expense claims, there would have been a plausible administrative expense claim at all.  In any case, the Bondholders do not proffer an analytical link between the factual situation in <u>United Trucking</u> and their claim in this case, which is based on the use of revenues belonging to PREPA, rather than property held by the debtor under a prepetition lease from a third party, and which does not involve any relevant postpetition agreement with the Debtor regarding the use of the cash collateral.[16]

> Accordingly, the Bondholders have not established a viable claim under Section 503(b)(1)(A) of the Bankruptcy Code because there was no postpetition transaction with

---

[16] The Court's own research has disclosed no other cases in which a prepetition creditor was granted administrative expense priority for mere postpetition use of collateral.  To the extent courts outside this circuit have suggested that administrative expense provisions may cover secured creditors where the postpetition use of collateral was in connection with for-profit business activity, the Court finds neither support in their facts nor persuasive legal analysis anchoring the suggestion.  <u>See</u> Tidewater Fin. Co. v. Henson (<u>In re Henson</u>), 57 Fed. App'x 136, 138 (4th Cir. 2003) (denying administrative expense claim of prepetition retail creditor in Chapter 13 case for failure to make postpetition installment payments); <u>Grundy Nat'l Bank v. Rife</u>, 876 F.2d 361, 363 (4th Cir. 1989) (granting administrative expense claim to prepetition auto financer where debtor failed, <u>inter alia</u>, to make court ordered adequate protection payments and failed to make payments under confirmed Chapter 13 plan).

the Debtor.

C.     The Fundamental Fairness Doctrine

Movants argue an alternative basis upon which administrative expense claims that are not explicitly contemplated by the Bankruptcy Code have been allowed under section 503 of the Bankruptcy Code.  The "Reading," or "fundamental fairness," doctrine, which has its origins in Reading Co. v. Brown, 391 U.S. 471 (1968), has been interpreted within the First Circuit to support administrative expense claim priority for two categories of claims that do not otherwise come within the plain language of section 503 of the Bankruptcy Code: "the 'fundamental fairness' exception is recognized when the debtor's postpetition operations occasion tortious injuries to third parties (Reading[]), or when the claim arises from postpetition actions that deliberately violate applicable law and damage others (Charlesbank[])."  See In re Healthco Int'l Inc., 272 B.R. 510, 513 (B.A.P. 1st Cir. 2002) (emphasis in original) (citing Reading, 391 U.S. at 477; Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.), 755 F.2d 200, 203 (1st Cir. 1985)), aff'd, 310 F.3d 9 (1st Cir. 2002) ("Charlesbank").

As explained above, the traditional test under Section 503(b)(1)(A) provides administrative expense priority when there is (i) a post-petition transaction concerning (ii) "actual and necessary" costs of maintaining the estate.  See 11 U.S.C. § 503(b)(1); In re Hemingway Transp., Inc., 954 F.2d at 5.  The second requirement was relaxed under certain circumstances by the Supreme Court in Reading Co. v. Brown, which held that post-petition tort damages caused to a third party by a court-appointed receiver in "operating the debtor's business with a view to rehabilitating it" could be treated as "actual and necessary" costs, even though the

damages themselves were not directly beneficial to the estate.[17] <u>Reading</u>, 391 U.S. at 475-76. The underlying rationale was that, when an estate is being operated for the benefit of prepetition creditors, "fundamental fairness" requires the injuries that the operating debtor causes be given priority over the prepetition creditors' claims.[18] <u>Id.</u> at 479 ("[I]t would be inconsistent . . . with the rule of fairness in bankruptcy to seek these objectives [the 'benefit of creditors' and the 'hope of rehabilitation'] at the cost of excluding tort creditors of the arrangement from its assets, or totally subordinating the claims of those on whom the arrangement is imposed to the claims of

---

[17]  See <u>In re Hemingway Transp., Inc.</u>, 954 F.2d at 5 ("We have recognized a special category of expense entitled to administrative priority status, based on considerations of fundamental fairness, consisting of amounts due entities 'injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate.'") (citations omitted); <u>In re Charlesbank Laundry, Inc.</u>, 755 F.2d at 202 ("The estate [in <u>Reading</u>] put forward much the same argument as appellees here—that allowing first priority for negligence claims would not aid the rehabilitation of the business or preserve a maximum of assets for distribution.").

[18]  See <u>In re Munce's Superior Petroleum Prods., Inc.</u>, 736 F.3d 567, 573 (1st Cir. 2013) ("Taken together, our cases interpreting <u>Reading Co.</u> have 'attempted to avoid a situation in which a bankruptcy estate may engage in activities regulated by state law while avoiding the costs associated with that regulation.'"); <u>Cumberland Farms, Inc. v. Fla. Dep't of Env't Prot.</u>, 116 F.3d 16, 21 (1st Cir. 1997) ("We hold that the present case does come within the ambit of <u>Reading</u> and <u>Charlesbank</u>. This was a postpetition claim incurred during the operation of Cumberland Farms' business while it was operating under Chapter 11. We think it would be fundamentally unfair to allow Cumberland Farms to flout Florida's environmental protection laws and escape paying a penalty for such behavior."); <u>In re Charlesbank Laundry, Inc.</u>, 755 F.2d at 203-204 (recognizing applicability of <u>Reading</u> where the debtor "*deliberately* continued a violation of law month after month presumably because it was more lucrative for the business to operate outside the zoning ordinance than within it"); <u>Mammoth Mart, Inc.</u>, 536 F.2d at 954-55 ("Section 64(a)(1) . . . has been interpreted as providing general protection to claimants that are injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate. . . . When the debtor-in-possession commits a tort, <u>see</u> <u>Reading Co. v. Brown</u>, <u>supra</u>, or accepts services from a third party without paying for them, the debtor-in-possession itself caused legally cognizable injury, and the resulting claims for compensation are entitled to first priority.").

---

Add.30

those for whose benefit it is instituted." Here, as prepetition creditors, the Bondholders would surely protest that they are the ones upon whom this arrangement of the Title III cases has been imposed by law, but it cannot be denied that they share (to at least some degree) in the prospective benefit of the successful rehabilitation of PREPA—and that any prepetition creditor could make the same argument in any proceeding.

In short, the <u>Reading</u> exception appears to have been created for "innocent third parties" and not prepetition creditors like the Bondholders who do not fall squarely within its initial ambit. <u>See</u>, <u>e.g.</u>, <u>In re Baseline Sports, Inc.</u>, 393 B.R. 105, 131 (Bankr. E.D. Va. 2008) ("SunTrust is not an 'innocent third party' for whom the *Reading* exception was created. SunTrust was the largest secured creditor in this case. To the extent that Baseline Sports's Chapter 11 case continued, it was for SunTrust's benefit, as a pre-petition secured creditor, until it received relief to exercise its rights in the Debtor's collateral."). <u>See</u> <u>also</u> <u>Reading Co.</u>, 391 U.S. at 482-83 ("Existing creditors are, to be sure, in a dilemma not of their own making, but there is no obvious reason why they should be allowed to attempt to escape that dilemma at the risk of imposing it on others equally innocent."). Subsequent applications of the <u>Reading</u> doctrine, many of which have notably occurred in the First Circuit, have not emerged in circumstances resembling the present instance.

### 1. Reading in the First Circuit

In <u>In re Hemingway Transport</u>, the Court of Appeals for the First Circuit (the "First Circuit") held that "[a] right to payment predicated on an executed prepetition contract is not entitled to priority payment as an administrative expense." 954 F.2d at 5 (citing <u>Mammoth Mart</u>, 536 F.2d at 954).

In the First Circuit, in cases such as <u>Cumberland Farms</u>, <u>Mammoth Mart</u>, and <u>Charlesbank</u>, the application of <u>Reading</u> has generally been limited to violations of regulations

that harm the general public to the benefit of the debtor and the detriment of "innocent third parties" or "involuntary creditors"—third parties who are harmed and not benefited in any manner by the debtor's actions. In <u>In re Boston Regional Medical Center,</u> the First Circuit observed: "this circuit's extension of <u>Reading Co.</u> has relied on concerns of public policy, and has attempted to avoid a situation in which a bankruptcy estate may engage in activities regulated by state law while avoiding the costs associated with that regulation." 291 F.3d 111, 125-26 (1st Cir. 2002). Here, the Bondholders' asserted administrative expense claim is in tension with countervailing public policy concerns, notably the concern for the supply of electricity to the people of the island as expressed in the PREPA Authority Act, that stand against granting to a creditor constituency a boon that would potentially defeat the island's ability to rehabilitate the utility and "provide customers with reliable energy at the lowest reasonable cost." <u>See, e.g.,</u> 22 L.P.R.A. § 194(d)(1)(F).[19] Thus, regardless of whether the Bondholders have stated claims under the Takings Clause or for conversion based on the postpetition use of alleged collateral to operate PREPA, the public policy rationale of <u>Reading</u> precludes remedial use of administrative expense priority in respect of those claims.[20]

---

[19]    Section 6 of the Authority Act also provides that among the "Duties and Responsibilities" of PREPA is "To provide and allow electric power to be provided in a reliable, clean, efficient, resilient, and affordable manner thus contributing to the general wellbeing and the sustainable development of the people of Puerto Rico[.]" 22 L.P.R.A. § 196(a).

[20]    Furthermore, several courts in the First Circuit and elsewhere have held as a broad proposition that claims for postpetition breaches of prepetition contracts are not entitled to administrative priority under <u>Reading</u>, regardless of the particulars of the underlying claim. <u>See In re Old Carco, LLC</u>, 424 B.R. 650, 660 (Bankr. S.D.N.Y. 2010) ("The <u>Reading</u> exception does not include a right to payment emanating from a pre-petition contract with a debtor."); <u>In re Baseline Sports, Inc.</u>, 393 B.R. 105, 131-32 (Bankr. E.D. Va. 2008) (declining to categorize postpetition state law claims as administrative expenses because secured creditor had prepetition contractual relationship with debtor); <u>In re GT Advanced Techs., Inc.</u>, 547 B.R. 3, 13-5 (Bankr. D.N.H. 2016) (no administrative priority for claim arising out of dispute over prepetition breach of contract

**Add.32**

2.    The Bondholders do not make out a prima facie case for conversion

The Bondholders argue that the tort of conversion that has been implied by the First Circuit from Commonwealth law is the basis for their postpetition tort claim that they contend gives rise to a Reading claim.  (See, e.g., Mot. ¶ 50 (citing Fed. Ins. Co. I.C. v. Banco de Ponce, 751 F.2d 38, 42 (1st Cir. 1984).)  The Bondholders argue that "[a] conversion occurs when there is a 'malicious and wrongful privation of the ownership rights, the illegal exercise, or the assumption of authority over another's property, thereby depriving the lawful owner or possessor, permanently or for an indefinite period, of its use and enjoyment,'" and assert that they have been the victims of such tortious conduct.  (Mot. ¶ 50 (quoting Hull Dobbs v. Super. Ct., 81 D.P.R. 221, 228-29 (P.R. 1959).)

However, they do not support their conversion claim with legal or factual analysis.  Instead, they misrepresent the legal standard, downgrading the terms "malicious and wrongful" to "intentional" without explaining how the tort's basic standard is met.  (Mot. ¶¶ 50-51.)  In so doing, they fail to establish wrongful intent and fall short of articulating a prima facie claim for conversion that could serve as a basis for their desired Reading claim.

Moreover, a claim for conversion requires that what is taken be "another's property," and here the funds that were allegedly misappropriated were PREPA's own funds, in which the Bondholders merely have a security interest.  The Bondholders' pleadings do not even acknowledge this distinction.

Finally, "[i]t is established law that a party cannot support a conversion claim when 'damages suffered arise as a consequence of non-compliance with pre-existing contract'

---

claims).  See also generally In re Advisory Info. & Mgmt. Sys., Inc., 50 B.R. 627, 630 (Bankr. M.D. Tenn. 1985).

and plaintiff cannot demonstrate that 'damages also arose from a general (non-contractual) duty not to cause harm.'" TLS Mgmt. & Mktg. Servs. LLC v. Rodriguez-Toledo, No. CV 15-2121 (BJM), 2018 WL 1626100, at *13 (D.P.R. Mar. 30, 2018) (citation omitted), rev'd and remanded on other grounds, 966 F.3d 46 (1st Cir. 2020). "[C]ompensation for damages requires an illegal conduct that causes the damage, either for having breached the agreements of a contract or for breaching the general principle *alterum non laedere* [not to injure another]." Ramos Lozada v. Orientalist Rattan Furniture Inc., 130 D.P.R. 712, 1992 JTS 74 (June 15, 1992).

Here, any alleged harm that the Bondholders have suffered is indistinguishable from the harm allegedly caused by breaches contemplated by the Trust Agreement because all of the duties that the Bondholders allege PREPA owes them were created contractually. The remedies for PREPA's use of its revenues instead of payment of bond debt thus are those provided for under the Trust Agreement, not independent tort remedies.

Accordingly, the Bondholders have not made out a prima facie case of conversion as a basis for their asserted administrative expense claim.

### 3. The Bondholders do not make out a prima facie case under the Takings Clause

The Oversight Board argues that any ability to assert a takings claim or otherwise object to the allegedly improper use of alleged collateral was waived because the Trust Agreement, pursuant to which the Bondholders hold the bonds and under which they assert their property rights, includes remedial limitations and specific remedy provisions that effect waivers of other remedies. (See, e.g., FOMB Suppl. Br. ¶ 14.) The Bondholders protest that they executed no waiver and that there is no language of waiver in the Trust Agreement. Although the Oversight Board points to Vandevere v. Lloyd, a case using the term "waiver"—viz., the Bondholders "waived" rights they might otherwise have had—Vandevere and the cases cited

therein also characterize the circumstances more accurately as a limitation of remedies or a "contract[ing] away" of rights parties might otherwise have had, including rights that might otherwise have given rise to a takings claim. 644 F.3d 957, 967 (9th Cir. 2011) ("The Supreme Court has instructed that a person may agree contractually, in advance, to accept without compensation what otherwise would be a compensable taking under the Fifth Amendment.") (citing United States v. Petty Motor Co., 327 U.S. 372, 374 (1946) ("The Tool Company had contracted away any rights that it might otherwise have had.")); United States v. Right to Use & Occupy 3.38 Acres of Land, 484 F.2d 1140, 1144 (4th Cir. 1973) (holding that a lessee had contracted away her right to just compensation for a government taking through a valid condemnation clause written into her lease). Such a contractual limitation of remedies and liability applies to any additional right that may come into existence post-contracting when the contract itself limits recovery no matter the circumstances. An explicit "waiver" is not required, so the Oversight Board's legal argument is sound even if its terminology is inartful.

It is not clear whether a taking could, where the "taking" is not of property rights governed by a contract that includes comprehensive remedial provisions, constitute a postpetition tort giving rise to a Reading claim, but there is no ground for such a determination here because, as explained above, the Bondholders contracted away their ability to claim a taking in this context by agreeing to remedies under the Trust Agreement providing for recovery solely from moneys available for debt service in any instance, even if the Bondholders have exercised their Trust Agreement's receivership remedy. (See, e.g., TA § 804.)

Further, the government contracted with the Bondholders in its commercial, not sovereign capacity, a circumstance that also has implications for the viability of a takings claim. See Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001).

Even assuming that a relevant property right exists here, courts have held that where, as here, "a contract between a private party and the Government creates the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in contract, not taking." See, e.g., Tamerlane, Ltd. v. U.S., 80 Fed. Cl. 724, 738 (Fed. Cl. 2008), aff'd, 550 F. 3d 1135 (Fed. Cir. 2008) (emphasis added). As the First Circuit has noted: "We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property. . . . To hold otherwise would run the risk of transmogrifying virtually every dispute involving an alleged breach of contract by a state or a state agency into a constitutional case." Masso-Torrellas v. Mun. of Toa Alta, 845 F.3d 461, 467 (1st Cir. 2017) (citing Redondo-Borges v. U.S. Dept. of Hous. and Urb. Dev., 421 F.3d 1, 10 (1st Cir. 2005)).[21]

---

[21] The Bondholders raise the canon of constitutional avoidance to urge the Court to apply the statute in such a way that it does not effect what they argue is a taking. (See, e.g., Mot. ¶¶ 60-66.) However, their reliance on the canon, which the First Circuit has, in these cases, held can only apply when a statute is ambiguous, is misplaced. See In re Fin. Oversight & Mgmt. Bd. of P.R., 948 F.3d 457 (1st Cir. 2020). The Bondholders do not point to any ambiguity in PROMESA, or in the Trust Agreement, and merely urge a specific interpretation of all provisions, arguing that that they must be considered forward-looking from the time of PROMESA's enactment or would, the Bondholders claim, be unconstitutional. However, PROMESA's effective date provision states that "[s]ubchapters III and VI shall apply with respect to debts, claims, and liens (as such terms are defined in section 101 of Title 11) created before, on, or after [June 30, 2016]," 48 U.S.C. § 2101(b)(2) (Westlaw P.L. through 119-74) (emphasis added), thus precluding an interpretation of the legislation as applying to rights created after its enactment only. As this Court has held, "the canon of constitutional avoidance is not a method of adjudicating constitutional questions. Rather, it is a tool for choosing between competing plausible interpretations of statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts. The canon is thus a means of giving effect to congressional intent, not of subverting it." In re Fin. Oversight & Mgmt. Bd. for P.R., 385 F. Supp. 3d 138, 155 (D.P.R. 2019), aff'd, 948 F.3d 457 (1st Cir. 2020) (quoting Clark v. Martinez, 543 U.S. 371, 380-81 (2005)). Accordingly, the canon of constitutional avoidance has no application to any provision of PROMESA to which the Bondholders have pointed, nor to the Trust Agreement, and is irrelevant in this proceeding.

Accordingly, the Bondholders have not made out a prima facie case for an administrative expense case arising under the Takings Clause because the Trust Agreement limits the Bondholders' remedies and a governmental instrumentality's breach of a contract under these circumstances is not the proper basis for a Takings Clause claim.

### 4.    Conclusion under Reading

In conclusion, with respect to <u>Reading</u>, the Bondholders have not supported their asserted administrative claim with relevant authorities, nor have they presented a scenario warranting the identification of a new category of <u>Reading</u> claims for their benefit. Furthermore, the equities of the case militate that the Bondholders be held to the bargain they struck as reflected in the Trust Agreement.

Accordingly, the Bondholders have not established that they have a viable administrative expense claim by virtue of the Fundamental Fairness Doctrine.

### D.    Section 922 of the Bankruptcy Code

Movants contend that Section 922(c) should also entitle them to an administrative expense claim because "'there has been a diminution in the value of [Movants'] secured collateral' by reason of the automatic stay." (Mot. ¶ 53 (quoting <u>Grundy Nat'l Bank v. Rife</u>, 876 F.2d 361, 363 (4th Cir. 1989)).) Movants argue that PREPA's failure to provide Movants with adequate protection despite their requests for it earlier in the case and, separately, certain provisions of the 2019 RSA, entitle them to an administrative expense claim under Section 922(c). (Mot. ¶¶ 54-59.)

Under Section 922(c), a creditor is entitled to an administrative expense claim:

> **If the debtor provides**, under section 362, 364, or 922 of this title, **adequate protection** of the interest of the holder of a claim secured by a lien on property of the debtor **and if, notwithstanding such protection** such creditor has a claim **arising from the stay of action**

**Add.37**

against such property under section 362 or 922 of this title or from the granting of a lien under section 364(d) of this title.

11 U.S.C.A. § 922(c) (Westlaw through P.L. 119-74) (emphasis added).

1. Mere use of "cash collateral" does not give rise to an administrative expense claim

Under section 361(3) of the Bankruptcy Code, a court cannot grant administrative status to a secured creditor as adequate protection in the first instance; it may only do so retrospectively after an explicit grant of adequate protection has proven inadequate. The application of Section 922 here is rather straightforward: under its plain language, there must be an explicit agreement or order to provide adequate protection that later proves inadequate before an administrative claim can arise on the grounds of insufficiency of adequate protection. See, e.g., In re James B. Downing & Co., 94 B.R. 515, 521 (Bankr. N.D. Ill. 1988).[22] Here, quite simply, there was never an operative agreement or order to provide adequate protection to the Bondholders.

The Bondholders principally cite case law established under section 507(b) of the Bankruptcy Code, which is largely inapplicable because, unlike section 507(b), neither Chapter 9 nor PROMESA incorporates section 363 of the Bankruptcy Code, and so the Debtor's use of "cash collateral" could not by itself form the predicate for an administrative claim.[23] Because

---

[22] Certain cases cited by the Bondholders—notably In re Center Wholesale, Inc., 759 F.2d 1440, 1451 n.23 (9th Cir. 1985), and In re Prime, 35 B.R. 697 (Bankr. W.D. Mo. 1984)— appear to support the grant of an administrative claim for adequate protection in the first instance (in circumstances not present here), but other courts have correctly characterized these cases as "a minority approach" and this Court is unpersuaded by the outcomes of those cases, which are in no way binding here. See In re James B. Downing & Co., 94 B.R. at 520.

[23] Section 363(c)(2) of the Bankruptcy Code, which applies in Chapter 11 cases but not in Title III proceedings under PROMESA, provides: "(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a

---

Add.38

PROMESA lacks section 363, and is thus more deferential to debtors, there is no restriction on

PREPA's right to use its collateral, unlike in Chapter 11 cases in which debtors are subject to the

restrictions imposed by section 363. Accordingly, the Bondholders' argument fails as a matter of

law: they cannot make an end-run around the lack of section 363 of the Bankruptcy Code by

working on the (disputed) assumption that PREPA spent Net Revenues on which the

Bondholders had a perfected lien, and the Court can rule on the nonapplicability of

Section 922(c) notwithstanding any factual dispute because, in the absence of section 363, this

debtor's use of even postpetition Net Revenues cannot form the basis for a Section 922(c) claim

without an explicit and operative adequate protection agreement.[24] As one court has put it, "[t]he

secured creditor is not contributing to the estate by allowing a Debtor[] to use collateral which it

already owns and has a statutory right to use." In re Provincetown-Boston Airline, Inc., 66 B.R.

632, 634 (Bankr. M.D. Fla. 1986).[25]

---

hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2) (Westlaw through P.L. 119-74). Section 363(e), which is also inapplicable under PROMESA, provides, in relevant part: "Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e) (Westlaw through P.L. 119-74).

[24] Although there have been apparent exceptions to the postpetition transaction requirement, none of those circumstances are present here: "[t]he Court is cognizant that some courts have ruled previously that the negotiation for continued possession of collateral in return for adequate protection is a post-petition transaction providing additional value to the bankruptcy estate." In re Mary Holder Agency, Inc., No. 11-34280 MBK, 2012 WL 4434362, at *3 (Bankr. D.N.J. Sept. 24, 2012) (citing, e.g., In re Carpet Ctr. Leasing Co., 991 F.2d 682, 687 (11th Cir. 1993)).

[25] Several of the Bondholders' key cases involve prior explicit adequate protection agreements and/or are based upon section 363, which makes them irrelevant here. See, e.g., Grundy Nat'l Bank v. Rife, 876 F.2d at 364 ("the adequate protection order of August 12, 1986").

---

      2.      <u>The 2019 RSA does not provide a basis for an adequate protection insufficiency claim because it was never approved by this Court</u>

Alternatively, the Bondholders argue that, by signing on to the 2019 RSA, which would have permitted certain payments characterized as adequate protection payments, the Oversight Board agreed to provide adequate protection. (Mot. ¶¶ 58-59.) This argument fails because the Court never approved the 2019 RSA so, by its own terms, that proposed agreement never came into effect, nor did adequate protection obligations thereunder come into effect. (2019 RSA § 14.)

      3.      <u>There is no adequate protection claim arising solely out of the automatic stay</u>

The Bondholders' argument for an administrative expense claim also fails the second prong of the test governing administrative claims based upon failed adequate protection, because, were the Court to assume, arguendo, a failure of adequate protection, the Bondholders also have not demonstrated that they suffered any loss as a <u>direct</u> result of the automatic stay. The Bondholders argue that they could have attempted to install a receiver had they both persisted and prevailed in their previous lift-stay forays. (BH Reply ISO ¶¶ 50-51.) This Court has previously noted that a receiver's powers and discretion would be far more circumscribed than the Bondholders have presented them. (<u>See</u> Docket Entry No. 315 in Adv. Proc. No. 19-00391 at 31-35 (a receiver would not have "superpowers").) The Bondholders' receivership-based argument falls short of the requisite demonstration of harm flowing directly from the imposition of the automatic stay. Indeed, the Bondholders state that they do not even desire the standard remedy for failure of adequate protection due to the automatic stay, turnover of the collateral (apart from PREPA's cash-on-hand in any subordinate funds)—likely because, under section 305 of PROMESA, neither this nor any other court can direct the Oversight Board what to do with PREPA's property and revenues. <u>See</u> 48 U.S.C. § 2165. (BH Reply ISO ¶ 2; BH

Suppl. Resp. ¶ 1.)

    Finally, the court in <u>In re Mandile</u> held:

> When determining whether a loss was caused solely by the automatic stay, courts demand that the secured creditor be vigilant in protecting its rights during the case. If the creditor fails to take appropriate steps when adequate protection is insufficient by, for example, moving for relief from the stay, it may not be entitled to a superpriority for its loss.

    626 B.R. 915, 920 (Bankr. N.D. Ill. 2021) (citation omitted). Here, despite

protestations to the contrary, the Bondholders have not been vigilant. As detailed by the

Committee in its supplemental brief (UCC Suppl. Br. ¶¶ 8-16), the Bondholders have, in the past,

declined to press forward with their 2018 renewed lift-stay motion that requested adequate

protection, agreed to stays of consideration of the settlement motion to approve the 2019 RSA,

moved for relief from the automatic stay without requesting adequate protection (Docket Entry

No. 2973), and moved for relief from the stay for the appointment of a receiver rather than

moving directly to foreclose on any property. (<u>See</u> Docket Entry Nos. 74, 975, 2973, 3913,

4689, 5207.) It was the Bondholders' choice to abandon pursuit of an adequate protection order

through the 2018 renewed motion to lift the automatic stay. Although the Bondholders may now

regret that choice or, in retrospect, would have insisted that different terms be included in the

2019 RSA or the Trust Agreement, they cannot rewrite the consequences of their past strategic

choices. The Bondholders have failed to establish harm attributable <u>solely</u> to the automatic stay.

    Accordingly, the Bondholders do not have an administrative expense claim

deriving from Section 922(c) of the Bankruptcy Code.

<u>C</u>ONCLUSION

For the foregoing reasons, the Motion is denied in its entirety.[26]

This Opinion and Order resolves Docket Entry No. 29173 in Case No. 17-3283

and Docket Entry No. 5599 in Case No. 17-4780.


SO ORDERED.

Dated: March 16, 2026


/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE

---

[26] The Court has considered all of the Bondholders' arguments, whether or not specifically addressed herein. All alternative arguments for relief are rejected.

11 U.S.C. § 503 provides:

**(a)** An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.

**(b)** After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including–

**(1)(A)** the actual, necessary costs and expenses of preserving the estate including–

**(i)** wages, salaries, and commissions for services rendered after the commencement of the case; and

**(ii)** wages and benefits awarded pursuant to a judicial proceeding or a proceeding of the National Labor Relations Board as back pay attributable to any period of time occurring after commencement of the case under this title, as a result of a violation of Federal or State law by the debtor, without regard to the time of the occurrence of unlawful conduct on which such award is based or to whether any services were rendered, if the court determines that payment of wages and benefits by reason of the operation of this clause will not substantially increase the probability of layoff or termination of current employees, or of nonpayment of domestic support obligations, during the case under this title;

**(B)** any tax–

**(i)** incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in section 507(a)(8) of this title; or

**(ii)** attributable to an excessive allowance of a tentative carryback adjustment that the estate received,

Add.43

whether the taxable year to which such adjustment relates ended before or after the commencement of the case;

**(C)** any fine, penalty, or reduction in credit relating to a tax of a kind specified in subparagraph (B) of this paragraph; and

**(D)** notwithstanding the requirements of subsection (a), a governmental unit shall not be required to file a request for the payment of an expense described in subparagraph (B) or (C), as a condition of its being an allowed administrative expense;

**(2)** compensation and reimbursement awarded under section 330(a) of this title;

**(3)** the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by–

**(A)** a creditor that files a petition under section 303 of this title;

**(B)** a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor;

**(C)** a creditor in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor;

**(D)** a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;

Add.44

(E) a custodian superseded under section 543 of this title, and compensation for the services of such custodian; or

(F) a member of a committee appointed under section 1102 of this title, if such expenses are incurred in the performance of the duties of such committee;

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

(5) reasonable compensation for services rendered by an indenture trustee in making a substantial contribution in a case under chapter 9 or 11 of this title, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title;

(6) the fees and mileage payable under chapter 119 of title 28;

(7) with respect to a nonresidential real property lease previously assumed under section 365, and subsequently rejected, a sum equal to all monetary obligations due, excluding those arising from or relating to a failure to operate or a penalty provision, for the period of 2 years following the later of the rejection date or the date of actual turnover of the premises, without reduction or setoff for any reason whatsoever except for sums actually received or to be received from an entity other than the debtor, and the claim for remaining sums due for the balance of the term of the lease shall be a claim under section 502(b)(6);

(8) the actual, necessary costs and expenses of closing a health care business incurred by a trustee or by a Federal agency (as defined in section 551(1) of title 5) or a department or agency of

Add.45

a State or political subdivision thereof, including any cost or expense incurred–

**(A)** in disposing of patient records in accordance with section 351; or

**(B)** in connection with transferring patients from the health care business that is in the process of being closed to another health care business; and

**(9)** the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

**(c)** Notwithstanding subsection (b), there shall neither be allowed, nor paid–

**(1)** a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that–

**(A)** the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

**(B)** the services provided by the person are essential to the survival of the business; and

**(C)** either–

**(i)** the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during

Add.46

the calendar year in which the transfer is made or the obligation is incurred; or

**(ii)** if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

**(2)** a severance payment to an insider of the debtor, unless–

**(A)** the payment is part of a program that is generally applicable to all full-time employees; and

**(B)** the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or

**(3)** other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

Add.47

11 U.S.C. § 922 provides:

**(a)** A petition filed under this chapter operates as a stay, in addition to the stay provided by section 362 of this title, applicable to all entities, of–

**(1)** the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against an officer or inhabitant of the debtor that seeks to enforce a claim against the debtor; and

**(2)** the enforcement of a lien on or arising out of taxes or assessments owed to the debtor.

**(b)** Subsections (c), (d), (e), (f), and (g) of section 362 of this title apply to a stay under subsection (a) of this section the same as such subsections apply to a stay under section 362(a) of this title.

**(c)** If the debtor provides, under section 362, 364, or 922 of this title, adequate protection of the interest of the holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection such creditor has a claim arising from the stay of action against such property under section 362 or 922 of this title or from the granting of a lien under section 364(d) of this title, then such claim shall be allowable as an administrative expense under section 503(b) of this title.

**(d)** Notwithstanding section 362 of this title and subsection (a) of this section, a petition filed under this chapter does not operate as a stay of application of pledged special revenues in a manner consistent with section 927 of this title to payment of indebtedness secured by such revenues.

Add.48

11 U.S.C. § 928 provides:

(a) Notwithstanding section 552(a) of this title and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Any such lien on special revenues, other than municipal betterment assessments, derived from a project or system shall be subject to the necessary operating expenses of such project or system, as the case may be.