Nos. 26-1330, 26-1331, 26-1332, 26-1333, 26-1334

## UNITED STATES COURT OF APPEALS
### For the First Circuit

———————————

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE OF THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,

*Debtors*,
(*Caption continued on inside cover*)

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO NO. 17-BK-03283-LTS

———————————

## OPENING BRIEF OF APPELLANTS GOLDENTREE ASSET MANAGEMENT LP AND SYNCORA GUARANTEE, INC.

———————————

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION; U.S. BANK NATIONAL ASSOCIATION, in the capacity as PREPA Bond Trustee; ALLIANCEBERNSTEIN L.P.; ARISTEIA CAPITAL, L.L.C.; BNY MELLON FUNDS TRUST; CAPITAL RESEARCH AND MANAGEMENT COMPANY; COLUMBIA MANAGEMENT INVESTMENT ADVISERS, LLC; DELAWARE MANAGEMENT COMPANY, a series of Nomura Asset Management Co., Ltd.; ELLINGTON MANAGEMENT GROUP, L.L.C.; GOLDMAN SACHS ASSET MANAGEMENT L.P.; INVESCO ADVISERS, INC.; LUXOR CAPITAL GROUP LP; MACKAY SHIELDS LLC; MASSACHUSSETTS FINANCIAL SERVICES COMPANY; OLD ORCHARD CAPITAL MANAGEMENT LP; ONE WILLIAM STREET CAPITAL MANAGEMENT, L.P.; RUSSELL INVESTMENT COMPANY, ON BEHALF OF RUSSELL INVESTMENT COMPANY TAX-EXEMPT HIGH YIELD BOND FUND; SIG STRUCTURED PRODUCTS, LLC; T. ROWE PRICE; TOWER BAY ASSET MANAGEMENT LP; VERITION FUND MANAGEMENT LLC; GOLDENTREE ASSET MANAGEMENT LP; SYNCORA GUARANTEE INC.; ASSURED GUARANTY INC.,

*Movants-Appellants*,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA),

*Debtor-Appellee*,

INSTITUTO DE COMPETITIVIDAD Y SOSTENIBILIDAD ECONÓMICA DE PUERTO RICO (ICSE); EL PUENTE DE WILLIAMSBURG, INC.; ENLACE DE ACCIÓN CLIMÁTICA; COLEGIO DE ABOGADOS Y ABOGADAS DE PUERTO RICO (CAAPR); ASSOCIATION OF PRIVATE COLLEGES AND UNIVERSITIES OF PUERTO RICO (ACUP); LA LIGA DE CIUDADES DE PUERTO RICO; CENTRO UNIDO DE DETALLISTAS (CUD); RAQUEL MARIA GONZÁLEZ SPARKS; COALICIÓN NUEVA VISIÓN DE SALUD; SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA (SREAEE); JUNTE DE ASOCIACIONES CON PENSIONADOS Y JUBILADOS DE PUERTO RICO (JAP); COLEGIO DE PROFESIONALES DEL TRABAJO SOCIAL DE PUERTO RICO; OFFICIAL

COMMITTEE OF UNSECURED CREDITORS OF PREPA; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY (AAFAF); ELAM, LLC, AS SUCCESSOR-IN-INTEREST TO BLUE BEETLE III, LLC,

*Respondents-Appellees*.

**WHITE & CASE LLP**

Glenn M. Kurtz
    *Counsel of Record*
Claudine Columbres
Isaac Glassman
Thomas E. MacWright
1221 Avenue of the Americas
New York, NY 10036
Tel.:  (212) 819-8200
Fax:  (212) 354-8113
gkurtz@whitecase.com


Thomas E Lauria
John K. Cunningham
Michael C. Shepherd
Jesse L. Green
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel.:  (305) 371-2700
Fax:  (305) 358-5744
tlauria@whitecase.com

**RAMOS CRUZ LEGAL**

Lydia M. Ramos Cruz
1509 López Landrón Street
American Airlines Building, PH
San Juan, Puerto Rico 00911
Tel.:  (787) 508-2525
lramos@ramoscruzlegal.com

*Attorneys for Defendant-Appellant GoldenTree Asset Management LP*


**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Susheel Kirpalani
Eric Kay
295 Fifth Avenue
New York, New York 10016
susheelkirpalani@quinnemanuel.com
erickay@quinnemanuel.com

**REICHARD & ESCALERA**

Rafael Escalera
Carlos R. Rivera-Ortiz
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, Puerto Rico 00917-1913
escalera@reichardescalera.com
riverac@reichardescalera.com

*Attorneys for Defendant-Appellant Syncora Guarantee, Inc.*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Appellants states as follows:

GoldenTree Asset Management LP is a limited partnership. It does not have a parent corporation and no public corporation owns 10% or more of its stock.

Syncora Guarantee, Inc. is a wholly-owned subsidiary of Syncora FinanceCo LLC, which is owned by funds and accounts managed by GoldenTree Asset Management LP. No public corporation owns 10% or more of its stock.

*/s/ Glenn M. Kurtz*
Attorney for GoldenTree Asset
Management LP

*/s/ Susheel Kirpalani*
Attorney for Syncora Guarantee, Inc.

# TABLE OF CONTENTS

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ........................ i

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF THE ISSUES .................................................................1

STATEMENT OF THE CASE ....................................................................6

    A.   The Authority Act and the Trust Agreement ...........................6

    B.   PREPA Reports At Least $3.7 Billion In Postpetition Net Revenues ....9

    C.   The Board Blocks The Bondholders' Efforts To Obtain Adequate Protection Of Its Collateral ......................................11

    D.   The Board's Strategy To Wipe Out The Bondholders' Collateral ........12

    E.   Procedural History ..................................................................15

I.   THE DISTRICT COURT ERRED IN DENYING THE BONDHOLDERS' ADMINISTRATIVE EXPENSE UNDER SECTION 503(B)(1)(A)...........20

    A.   The District Court's Ruling That The Debtor's Use Of A Creditor's Cash Collateral Has To Be Consensual Is Erroneous..........................22

    B.   The District Court Erred In Ruling That The Bondholders' Collateral Was Exclusively PREPA's Property ...............................................30

II.   THE DISTRICT COURT ERRED IN DENYING THE BONDHOLDERS' ADMINISTRATIVE EXPENSE CLAIM UNDER *READING* ...................31

    A.   The Board's Misappropriation Of The Bondholders' Collateral Constitutes Conversion....................................................32

        1.   The District Court Erred In Finding That the Bondholders Failed To Make A *Prima Facie* Case Of Intent By Showing That PREPA Misappropriated More Than $3.7 Billion........................33

        2.   The District Court Erred In Rejecting The Conversion Claim Based On An Erroneous Finding That The Bondholders' Collateral Belonged Exclusively To PREPA...............................37

i

3.    The District Court Erred In Finding That The Conversion Damages Are The Same As Breach Of Contract Damages, Which Then Somehow Extinguishes The Conversion Claim..................39

B.    PREPA's Misappropriation Of The Bondholders' Collateral And Corresponding Destruction Of Their Liens Is A Taking ......................42

1.    The Bondholders Did Not Waive Their Takings Clause Claim ...43

2.    The Government's Alleged Capacity Is Irrelevant ......................46

3.    The District Court Erred In Rejecting The Takings Claim As Replicating A Claim For Breach of the Prepetition Contract.......47

C.    The District Court Erred In Ruling That The Bondholders Are Not Eligible For An Administrative Expense Because They Are Prepetition Creditors, Not "Innocent Third Parties" ............................49

D.    The District Court Erred In Rejecting The Administrative Expense Through An Unprecedented And Factually Incorrect Public Policy Bar That It Raised *Sua Sponte*................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Acushnet River & New Bedford Harbor*,
712 F. Supp. 994 (D. Mass. 1989) ..............................................41

*In re Am. Toy & Furniture Co.*,
No. 92-27686, 1997 Bankr. LEXIS 2495 (Bankr. E.D. Wis. Feb.
24, 1997) ....................................................................... 26, 27

*In re Ames Dep't Stores, Inc.*,
582 F.3d 422 (2d Cir. 2009) ..................................................... 21, 48

*Arcam Pharm. Corp. v. Faria*,
513 F.3d 1 (1st Cir. 2007) ..........................................................26

*Armstrong v. United States*,
364 U.S. 40 (1960) ................................................ 31, 38, 42, 43, 46

*In re Athens/Alpha Gas Corp.*,
332 B.R. 580 (B.A.P. 8th Cir. 2009) ......................................... 26, 28

*Bailey v. Fed. Nat. Mortg. Ass'n*,
209 F.3d 740 (D.C. Cir. 2000) .....................................................37

*Barreto Peat, Inc. v. Luis A. Ayala Colon Sucrs., Inc.*,
709 F. Supp. 321 (D.P.R. 1989) ...................................................34

*Beall v. Conoco Phillips Co.*,
No. 08-289-JVP-DLD, 2008 WL 2433579 (M.D. La. June 16,
2008) ............................................................................ 44, 45

*In re Bos. Reg'l Med. Ctr. Inc.*,
291 F.3d 111 (1st Cir. 2002) .......................................................52

*In re Carpet Center Leasing Co. Inc.*,
991 F.2d 682 (11th Cir. 1993) ................................................ 41, 48

iii

*Cecort Realty Dev. Inc. v. Llompart-Zeno*,
    100 F. Supp. 3d 145 (D.P.R. 2015) ........................................................46

*CLogic LLC v. United State*,
    170 Fed. Cl. 450 (2024)..........................................................................46

*In re Colortex Indus., Inc.*,
    19 F.3d 1371 (11th Cir. 1994) ................................................................23

*In re Contento*,
    37 B.R. 853 (S.D.N.Y. 1984) .................................................................39

*Doyle v. Huntress, Inc.*,
    301 F. Supp. 2d 135 (D.R.I. 2004) .........................................................44

*In re Enron Corp.*,
    279 B.R. 79 (Bankr. S.D.N.Y. 2002) .....................................................23

*In re Espinosa*,
    542 B.R. 403 (Bankr. S.D. Tex. 2015)....................................................26

*Fed. Ins. Co. I.C. v. Banco de Ponce*,
    751 F.2d 38 (1st Cir. 1984).....................................................................32

*Fin. Oversight & Mgmt. Bd. for P.R. v. Cooperative De Ahorro Y Credito
    Abraham Rosa, et al.*,
    143 S. Ct. 774, 2022 WL 15525732 (2022) .............................................42

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    79 F.4th 95, 2022 WL 1032007 (1st Cir. 2022)........................................42

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    121 F.4th 280 (1st Cir. 2024) ........................... 7, 8, 9, 13, 14, 30, 31, 33, 38

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    301 F. Supp. 3d 278 (D.P.R. 2018) ...........................................................3

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
    899 F.3d 19 (1st Cir. 2018)...................................................... 3, 12, 31, 38

iv

*First Nat'l Bank v. Am. Gen. Fire & Cas. Co.*,
  927 F.2d 1126, 1128 (10th Cir. 1991) .......................................................39

*Ford Motor Credit Co. v. Dobbins*,
  35 F.3d 860 (4th Cir. 1994) .......................................................................26

*Garcia-Navarro v. Hogar La Bella Union, Inc.*,
  3:17-cv-01271-JAW, 2020 WL 7052942 (D.P.R. Nov. 30, 2020) ..............41

*Grundy Nat'l Bank v. Rife*,
  876 F.2d 361 (4th Cir. 1989) ................................................................ 24, 25

*In re GT Advanced Techs., Inc.*,
  547 B.R. 3 (Bankr. D.N.H. 2016)................................................................49

*Harley-Davidson Motor Co., Inc. v. Bank of New England-Old Colony, N.A.*,
  897 F.2d 611 (1st Cir. 1990)........................................................................38

*In re Hayes Lemmerz Intern., Inc.*,
  340 B.R. 461 (Bankr. D. Del. 2006)....................................................... 39, 40

*In re Hemingway Transp.*,
  954 F.2d 1 (1st Cir. 1992)............................................................... 21, 40, 49

*Hull Dobbs Co. v. Super. Ct.*,
  81 D.P.R. 221 (P.R. 1959).........................................................................32

*In re Iaquinta*,
  98 Bankr. 919 (Bankr. N.D. Ill. 1989).......................................................39

*Life Product Clearing, LLC v. Angel*,
  530 F. Supp. 2d 646 (S.D.N.Y. 2008) .......................................................37

*Louisville Joint Stock Land Bank v. Radford*,
  295 U.S. 555 (1935)..................................................................................43

*In re Lucre, Inc.*,
    434 B.R. 807 (Bankr. W.D. Mich. 2010) ......................................................28

*Ocasio-Hernandez v. Fortuno-Burset*,
    640 F.3d 1 (1st Cir. 2011)...........................................................................34

*In re Old Carco, LLC*,
    424 B.R. 650 (Bankr. S.D.N.Y. 2010) ........................................................49

*Oto Analytics, LLC v. Benworth Capital Partners PR, LLC*,
    No. 23-01034 (GMM), 2025 WL 989954 (D.P.R. Apr. 2, 2025) .... 35, 38, 40

*In re Patrick*,
    143 B.R. 200 (Bankr. N.D. Ill. 1992) .........................................................40

*Pullman–Standard v. Swint*,
    456 U.S. 273 (1982)....................................................................................37

*R&G Eng'g, Inc. v. Transcontainer Transp., Inc.*,
    213 F. Supp. 2d 72 (D.P.R. 2002) ..............................................................40

*Ramos Lozada v. Orientalist Rattan Furniture Inc.*,
    130 D.P.R. 712 (P.R. 1992).........................................................................41

*Reading Co. v. Brown*,
    391 U.S. 471 (1968)............................................................... 19, 32, 52

*Rossiter v. Potter*,
    357 F.3d 26 (1st Cir. 2004).........................................................................26

*In re Sanchez Energy Corp.*,
    No. 19-34508, 2022 WL 2912076 (Bankr. S.D. Tex. July 22, 2022)...........44

*Schatz v. Rep. State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012).........................................................................34

*Sleeper Farm v. Agway, Inc.*,
    506 F.3d 98 (1st Cir. 2007).........................................................................17

*United States v. GZ Constr. St., Inc.*,
      155 F. Supp. 3d 147 (D.P.R. 2015) ........................................................ 35, 38

*United States v. Petty Motor Co.*,
      327 U.S. 372 (1946)................................................................................45

*United States v. Sec. Industrial Bank*,
      459 U.S. 70 (1982)................................................................ 30, 31, 47, 48

*In re United Trucking Service, Inc.*,
      851 F.2d 159 (6th Cir. 1988) ...................................................... 23, 24, 25, 27

*Vandevere v. Lloyd*,
      644 F.3d 957 (9th Cir. 2011) ..................................................................45

*Villalobos-Santana v. Puerto Rico Police Department*,
      171 F.4th 544 (1st Cir. 2026) ..................................................................32

*In re Whistler Energy II, L.L.C.*,
      931 F.3d 4343 (5th Cir. 2019) ............................................................ 21, 28

*Wilkicki v. Brady*,
      882 F. Supp. 1227 (D.R.I. 1995) ............................................................44

## STATUTES

11 U.S.C. § 503(b) .................................................................................. 1, 15, 21

11 U.S.C. § 922(c) ........................................................................................15

22 L.P.R.A. § 191-217 ....................................................................................6

28 U.S.C. § 1291 ............................................................................................1

31 L.P.R.A. § 5141 ......................................................................................40

48 U.S.C. § 2166............................................................................................1

## FEDERAL RULES

Fed. R. App. P. 26.1 ..................................................................................... ii

Fed. R. App. P. 28(i) ..................................................................................6, 7

Fed. R. App. P. 32(a)(5)-(7)..........................................................................57

Fed. R. App. P. 32(f)....................................................................................57

## OTHER AUTHORITIES

Merriam-Webster, available at
     https://www.merriamwebster.com/dictionary/misappropriate (last
     visited May 14, 2026) .................................................................................34

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Appellants respectfully request oral argument.  This appeal concerns an order that denied an administrative expense claim where the Title III debtor consumed billions of dollars of special revenues that this Court determined are subject to a perfected and unavoidable lien while the automatic stay prevented Appellants from enforcing their remedies. Resolution of this appeal implicates important and complex issues of municipal finance and bankruptcy and constitutional law, which Appellants submit would benefit from an oral presentation and the opportunity to address questions from the Court.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 48 U.S.C. § 2166(a).  The district court entered a final judgment on March 16, 2026.  App.2667.  Appellants timely appealed on March 23, 2026.  App.160.  This Court has jurisdiction under 28 U.S.C. § 1291 and 48 U.S.C. § 2166(e)(2).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in ruling that the Bondholders do not have an administrative expense claim under 11 U.S.C. § 503(b) for the postpetition benefits PREPA derived from its postpetition use of at least $3.7 billion of the Bondholders' collateral to improve the electric system.

2. Whether the district court erred in ruling that the Bondholders do not have an administrative expense claim under the fundamental fairness doctrine in *Reading Co. v. Brown* for PREPA's postpetition conversion and unconstitutional taking of the Bondholders' collateral and the destruction of the Bondholders' property interest in their collateral.

## INTRODUCTION

An administrative expense claim is a priority claim for postpetition expenditures that benefit the estate.  For purposes of this appeal, there is no dispute that PREPA misappropriated and used over $3.7 billion of the Bondholders' cash collateral postpetition, and continues to misappropriate and use the Bondholders'

collateral for improvements to the electric system and other capital projects, which has conferred, and continues to confer, a dollar-for-dollar benefit on the debtor. Creditors also are entitled to administrative expense priority for postpetition torts and other violations of law under the fundamental fairness doctrine established in *Reading v. Brown*. 391 U.S.471 (1968). Here, the Board's misappropriation of the Bondholders' collateral and the corresponding destruction of the Bondholders' liens constitutes a conversion and a violation of the Takings Clause. The Bondholders have a clear right to an administrative expense claim.

The district court rejected these straightforward grounds for an administrative expense claim, erroneously ruling that the Bondholders have no remedy whatsoever for that improper taking and use of their cash collateral. That ruling is unprecedented and disregards basic rules of law and fairness. There is no basis in law or equity for allowing PREPA to misappropriate the property of a secured creditor with impunity, leaving the Bondholders with no remedy whatsoever for the billions of dollars that PREPA spent, and continues to spend, to improve the utility.

This is the third chapter in a trilogy of rulings adopting the Board's arguments for stripping the Bondholders' liens to allow PREPA to take the Bondholders' collateral and relegate them to the position of unsecured creditors. Indeed, the district court's Opinion goes further by not merely rendering the Bondholders' claim unsecured, but absolving the Board of any consequences of its improper use

2

133370457

of the Bondholders' property.   Importantly, as a former Board member revealed, the Board has been trying to "bludgeon bondholders into submission" by "mov[ing] the goalposts again and again" to "wear [them] down" in order to "pay[] as little as possible," an approach that is totally inconsistent with the Board's duties under PROMESA.

In the first chapter, the district court adopted the Board's argument that the court could not lift the stay to allow the Bondholders to protect their collateral. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 301 F.Supp.3d 278 (D.P.R. 2018).  This Court reversed, explaining that it would "doubt the constitutionality" of a rule that left creditors "to standby helplessly as the debtor spent the creditor's collateral, leaving the debt entirely unsecured." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d 13, 20 (1st Cir. 2018).

In the second chapter, the district court ruled that PREPA's special revenue bonds were not secured by a lien on Net Revenues, but rather only by the monies PREPA decided to deposit in a specific fund for bond service.  The district court also held that the Bondholders' claim for their $8.2 billion of revenue bonds was limited to approximately $2.4 billion based on the district court's estimation of a hypothetical amount that might have been collected had the utility not filed for bankruptcy, rather than the amount that had been loaned. Not even the Board defended this unprecedented position.  This Court reversed both of those rulings on

June 12, 2024, holding that PREPA's revenue bonds are secured by a perfected, non-avoidable lien on PREPA's past, present, and future Net Revenues, and that the Bondholders' allowable claim was equal to the amounts owed. The Board sought reconsideration twice, and also sought *en banc* review, and this Court confirmed that the Bondholders had liens on all Net Revenues and a claim for the full amount of the outstanding principal and interest.

And now, in this third chapter, the district court essentially overrides this Court's ruling that the Bondholders hold a valid, properly perfected, unavoidable lien on PREPA's Net Revenues by placing the Bondholders back into the position of unsecured creditors. The district court held, as a matter of law, that the Bondholders are not entitled to compensation for, and that PREPA bears no consequence from, PREPA's postpetition nonconsensual use and consumption of the Bondholders' collateral. The district court ruled that the Bondholders' "mere" lien can be disregarded and that PREPA is free to misappropriate and use the Bondholders' collateral with impunity. The ruling simply wipes out the Bondholders' lien for the nearly ten-year and counting course of this Title III case.

The district court's decision is erroneous for two independent reasons. *First*, the court erred in finding that the Bondholders are not entitled to an administrative expense claim under section 503(b) because the Bondholders did not enter into a postpetition agreement with PREPA. As the text of section 503(b) shows, there is

4

133370457

no requirement that the creditor enter a postpetition agreement with the debtor. Rather, the test for section 503(b) is whether the debtor benefitted from the postpetition use of the Bondholders' collateral, and PREPA's nonconsensual use of at least $3.7 billion in Net Revenues more than satisfies that test. *Second*, the district court erred in finding that the Bondholders are not entitled to an administrative expense claim under the fundamental fairness doctrine of *Reading*, incorrectly ruling that (i) the Bondholders failed to state cognizable conversion and Takings Clause claims, (ii) the *Reading* doctrine is inapplicable when the injured party is also a prepetition creditor, and (iii) allowing an administrative expense claim would be "in tension" with a never-before-found public policy concern about rehabilitating PREPA. The Bondholders easily proved both claims, and *Reading* does not exclude victims of torts and violations of law because they are also and separately prepetition creditors. To the contrary, it is well-established that *Reading* confers priority status to such creditors harmed by a debtor's postpetition wrongdoing. Moreover, the district court's attempt to impose a public policy bar is unprecedented, wrong, and based on factual findings unsupported by any record evidence. Indeed, the record is that the Bondholders have proactively supported, and indeed have offered to finance, PREPA's rehabilitation.

After this Court's lien ruling, the Bondholders formulated and presented a global restructuring proposal that, with no electricity rate increases over the Board's

5

own forecast, would: (i) promptly end PREPA's bankruptcy with a default-proof, sustainable capital structure, (ii) ensure that it has sufficient liquidity to pay current expenses on a going-forward basis, (iii) finance improvements to the grid, and (iv) restore PREPA's access to the capital markets.  The Bondholders proposed to (1) take back 50-year bonds that provide flexible terms for payment of principal or interest and would be subordinated to PREPA's legacy pension obligations, and (2) fund $2.5 billion of additional loans to PREPA so that it could settle with its other creditors, and immediately begin to fund capital expenses in a manner consistent with standard utility practice.  The Board rejected the Bondholders' proposal out-of-hand, preferring instead to take another shot at misappropriating the Bondholders' collateral with impunity.

The Opinion should be reversed.[1]

## STATEMENT OF THE CASE

### A.    The Authority Act and the Trust Agreement

The Puerto Rico Electric Power Authority Act, 22 L.P.R.A. §§ 191–240 (the "Authority Act"), established PREPA as a public electric utility and authorized it to raise money by entering trust agreements to issue revenue bonds secured by its "entire gross or net revenues."  Authority Act § 206(e)(1).

---

[1] Appellants also adopt by reference the arguments made by Appellants Assured Guaranty Inc., National Public Finance Guarantee Corporation, and the PREPA Ad Hoc Group in their opening briefs.  *See* Fed. R. App. P. 28(i).

6

The Authority Act also provides various protections for the benefit of bondholders, including the requirement that PREPA set rates to accrue revenues sufficient for payment of the bonds. *Id.* § 196(1). Moreover, if PREPA fails to pay the bonds as they come due, the Authority Act affords bondholders certain remedies, including the right to appoint a receiver to ensure payment of the bonds. *Id.* §§ 207-208.

Consistent with the Authority Act, PREPA entered into the Trust Agreement and issued the Bonds at issue here, which it secured with a perfected and unavoidable lien on PREPA's past, present, and future Net Revenues. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 121 F.4th 280, 301-02, 306 (1st Cir. 2024) (the "First Circuit Lien Ruling"). "Net Revenues" are PREPA's "gross revenues minus Current Expenses." *Id.* at 295, 297. The Trust Agreement defines Revenues broadly to include "all moneys received by [PREPA]," including all income PREPA derives "from the sale of electricity generated or distributed" by PREPA. App.526.[2] "Current Expenses" are defined as PREPA's "reasonable and necessary current expenses of *maintaining, repairing and operating* the System," App.513 (emphasis added); *see also id.* at § 505 (App.560), and excludes capital expenditures. App.512. Further, whereas "Current Expenses" are paid out of PREPA's General Fund,

---

[2] This excludes income "from the investment of moneys" already deposited in certain subordinate funds. *Id.*

7

extraordinary repairs and capital improvements can only be paid after Current Expenses and debt service. *See* T.A. §§ 512–512B (App.573-75); *First Circuit Lien Ruling*, 121 F.4th at 291 (Net Revenues credited to "the Sinking Fund cover debt service," and Net Revenues remaining after payment of debt service are credited to "the Subordinate Funds [that] cover internal PREPA operations, such as extraordinary repairs or capital improvements").

As this Court explained, Article V of the Trust Agreement creates a "structure for distributing PREPA's Revenues … into certain funds." *Id.* All Revenues must first be credited to the General Fund and PREPA then "pays its reasonable operating expenses ('Current Expenses') out of the General Fund" (*id.*), provided that, among other things, "such expenses will not exceed an amount which is reasonable and necessary for maintaining, repairing and operating the System in an efficient and economical manner," and the total Current Expenses do not "exceed the amount provided therefor in [that year's] Annual Budget." T.A. § 505 (App.560).

The Revenues that remain after the payment of valid Current Expenses are Net Revenues subject to the Bondholders' lien. *See First Circuit Lien Ruling*, 121 F.4th at 290–91. Those Net Revenues flow from the General Fund into the Revenue Fund, and are then distributed according to a waterfall. T.A. § 506 (App.563-64). Specifically, Net Revenues are first credited to a fund covering debt service called the Sinking Fund. T.A. § 507 (App.564); *First Circuit Lien Ruling*, 121 F.4th at 291

8

("[t]he Net Revenues deposited into the Sinking Fund cover debt service").  The "amount, if any, of any balance remaining after making the deposits [to the Sinking Fund]" is credited to four Subordinate Funds: the Construction Fund, the Self-Insurance Fund, the Capital Improvement Fund, and the Reserve Maintenance Fund.  T.A. §§ 507(d)–(h) (App.566-68).  In addition, "[i]f there is not enough money in the Sinking Fund to cover PREPA's debt service obligations, Article V (specifically, Sections 512–512B) requires PREPA to draw on the Subordinate Funds—other than the Construction Fund—to pay bondholders." *First Circuit Lien Ruling*, 121 F.4th at 291.

### B.    PREPA Reports At Least $3.7 Billion In Postpetition Net Revenues

Section 710 of the Trust Agreement requires PREPA to provide the Bond Trustee with monthly operating reports (the "<u>MORs</u>") detailing its Revenues, expenses, and allocation of Net Revenues to the funds listed in Article V.  T.A. § 710 (App.589-90).  Each MOR contains a section titled "Statement of Revenues and Expenses for Revenue Fund Purposes Per Trust Agreement." *See, e.g.*, App.2623-24 (June 2021 MOR at 11); App.2639-40 (June 2022 MOR at 8-9).  In that section, PREPA reports its Revenues, Current Expenses, Net Revenues, and allocations of Net Revenues to the specific funds "for the preceding calendar month and for the fiscal year to date." *See* T.A. §§ 710(a), (b) (App. 589); App.2623-24 (June 2021 MOR at 11).  In accordance with Section 710 of the Trust Agreement, PREPA

submitted the MORs to the Bond Trustee in the ordinary course, for decades.

PREPA's MORs reported approximately $3.7 billion in Net Revenues from the Petition Date through June 2023. App.2511-2512. Additionally, the MORs through June 2020 reveal that PREPA generated approximately $2 billion in Net Revenues to cover debt service. *Id.* For each year from FY2018 through FY2021, however, the MORs state that "[t]he 1974 Sinking Fund Appropriation ha[s] been accrued but not transferred." *See, e.g.*, App.2547 (June 2018 MOR at 18); App.2623 (June 2021 MOR at 11). Thus, by PREPA's own admission, it generated over $2 billion in Net Revenues from FY2018 through FY2021, but did not transfer those Net Revenues to the Sinking Fund for debt service. PREPA subsequently also disclosed Sinking Fund accruals (that were similarly not transferred to the Sinking Fund) for FY2022 and FY2023 of $511,000,000 and $334,100,000, respectively, in the "Results of Operations-Budget Comparison" section of each fiscal year-end Monthly Report. *See* App.2636 (June 2022 Monthly Report at 5); App.2652 (June 2023 Monthly Report at 5). Adding these figures to the total Sinking Fund Accruals since the Petition Date results in a total of approximately $2.9 billion in Net Revenues that PREPA failed to transfer to the Sinking Fund for debt service.

Beginning in February 2022, PREPA stopped including the allocation of Net Revenues in its MORs, including the amount of Net Revenues accrued (but not transferred) to the Sinking Fund. *See* App.1638 (January 2022 MOR at 11);

10

133370457

App.1654 (February 2022 MOR at 11).  Despite this change, the fiscal year-end MORs show that PREPA reported Net Revenues of approximately $1.6 billion during FY2022 and FY2023.  PREPA stopped disclosing MORs altogether in 2023. Document discovery revealed that PREPA continued to generate them internally, but stopped disclosing them, thus concealing the fact that PREPA continues to misappropriate the Bondholders' collateral.

### C.    The Board Blocks The Bondholders' Efforts To Obtain Adequate Protection Of Its Collateral

From the outset of PREPA's Title III case, the Bondholders have made repeated, persistent efforts to protect their collateral by obtaining adequate protection or by seeking relief from the automatic stay to enforce their rights.[3]  On July 18, 2017—just sixteen days after the Petition Date—certain Bondholders moved for relief from the automatic stay, App.801, but the district court denied it on the ground that section 305 of PROMESA precluded such relief.  App.847.  This Court reversed that ruling:

> to read Section 305 broadly as barring the Title III court from lifting the automatic stay … would effectively wipe out section 362(d)(1) whenever the creditor needed protection of its interest in that property.  The creditor would be left to stand by helplessly as the debtor spent the creditor's collateral, leaving the creditor entirely unsecured…we would 'doubt the constitutionality of' a rule that would allow a debtor to 'expend every penny of the Movant's collateral, leaving the debt entirely unsecured.'  Such a marked change in the status quo ante undercutting creditor rights would be an ambitious

---

[3] App.801; App.860; App.1103; App.1152; App.1381 (Lift-Stay Motions).

11

undertaking unlikely to have been implemented by Congress without some discussion and expression of awareness.

*See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d at 19-20.

### D.    The Board's Strategy To Wipe Out The Bondholders' Collateral

A former Board member testified in connection with an unsuccessful confirmation hearing of a stale PREPA plan of adjustment that the Board had adopted a strategy to "bludgeon bondholders into submission and to jam them," "move the goalposts again and again" until "you just wear the other side down" in order "to justify paying as little as possible."  App.3168, 3175, 3181-3182.  The Board has followed that playbook throughout this nearly decade-long bankruptcy.

For example, despite the express text of the Authority Act authorizing PREPA to issue revenue bonds secured by gross or net revenues, the plain language of the Trust Agreement stating that PREPA had pledged Net Revenues as security using the language of the Authority Act, PREPA's execution and filing of a UCC financing statement to perfect the Bondholders' security interest, and PREPA's admissions in its bankruptcy petition filings that the bonds "were secured by a lien on all of Debtors' Revenues" (ECF No. 2, 6 at ¶ 6),[4] the Board challenged the Bondholders' security interest in Net Revenues (the "Lien Adversary Proceeding").  Adv. Pro. 19-00391 (LTS), ECF No. 26.  The Board also asserted that the Bondholders had no

---

[4] Unless otherwise stated, all docket cites (ECF) refer to Case No. 17-BK-4780 (D.P.R.).

133370457

allowable claim for the approximately $8.26 billion they loaned PREPA beyond the mere $19 million that PREPA chose to credit to the Sinking Fund, *i.e.*, 0.2% of the amount owed on the bonds. The district court agreed, granting summary judgment against the Bondholders, and estimating the Bondholders' unsecured claim at approximately $2.388 billion. App.619; App.689.

On June 12, 2024, this Court reversed, holding that the Trust Agreement grants the Bondholders a valid, perfected, and unavoidable lien on PREPA's past, present, and future Net Revenues—including Net Revenues that should have been (but were not) placed in the Sinking Fund, and that the Bondholders had an allowable claim for the full amount of the outstanding principal and interest. *First Circuit Lien Ruling*, 121 F.4th at 295, 306. This Court noted that "[w]e find it very unlikely that an objectively reasonable party to the transaction giving rise to the Revenue Bonds would have expected the source of repayment not to be subject to a lien while in the debtor's hands." *Id.* at 300.

Undeterred by this Court's decision, the Board set the stage for its next effort to strip the Bondholders' liens, publicly touting that it was "gratified" by the reversal and that PREPA does not generate any net revenues. App.2709. Despite its purported "gratification" of the lien decision, the Board moved for reargument twice, and then *en banc* review. This Court issued a revised opinion on November 13, 2024 and reaffirmed all its prior holdings in full, including the Bondholders' perfected,

unavoidable lien on past, present, and future Net Revenues. *First Circuit Lien Ruling*, 1121 F.4th at 305-06.

The Board then filed a new PREPA fiscal plan on February 11, 2025 eliminating the Bondholders' collateral even though the Board had previously acknowledged billions of dollars of Net Revenues when it was treating the Bondholders as essentially unsecured. The Board simply saddled the utility with billions of dollars of new "expenses." App.1207. For example, Necessary Maintenance Expenses–which are largely capital expenditures–were all of a sudden projected by the Board to "almost quadruple from FY 2025 to FY 2026" and "increase by 10X" from FY 2025 to FY2029. App.1317, 1321. Based on these projections, the Board stated that PREPA could no longer provide for debt service. App.1207. Notably, the Puerto Rico Energy Bureau (the local energy regulator) recently rejected an inflated expense forecast proposed by PREPA which includes costs the Board has admitted are comparable to its fiscal plan costs for PREPA. Final Resolution and Order On Electricity Rates, NEPR-AP-2023-003, Ch.1, p. 44-45 (the "Final Rate Order")[5]; ECF No. 6064 at ¶ 30.

While the Board's efforts have been focused on transforming the Bondholders from secured creditors into unsecured creditors, the Bondholders have been trying to negotiate a deal with the Board to end the bankruptcy and better serve the people

---

[5] Available at 20260415-AP20230003-Final-Resolution-and-Order.pdf

of Puerto Rico.  Indeed, the Bondholders have offered billions of dollars of new financing to pay for capital expenditures and 50-year take back bonds that with no fixed payment obligations and interest that can be accrued in lieu of cash payment, App.1447.  The Bondholders' proposal included no rate increase relative to the rates forecasted by the Board.  Those rehabilitation efforts have been blocked by the Board, which prefers to misappropriate the Net Revenues.

### E.    Procedural History

On April 7, 2025, the Bondholders filed a motion for an administrative expense claim (the "Administrative Expense Motion") and asserted entitlement to administrative expense priority on three independent grounds: (i) section 503(b) of the Bankruptcy Code; (ii) the fundamental fairness doctrine established by *Reading Co. v. Brown*; and (iii) section 922(c) of the Bankruptcy Code.  ECF No. 5599.  The Bondholders supported the motion with PREPA's own ordinary course MORs. PREPA is contractually required under the Trust Agreement to identify and disclose Net Revenues in those reports—and had done that consistently for decades without objection, which constitutes a binding course of performance. The MORs identify and disclose at least $3.7 billion in postpetition Net Revenues.

Notwithstanding the billions of dollars in Net Revenues reported by PREPA itself, the Board claimed that there are no, and there never will be any, Net Revenues. *See, e.g.*, App.2873 (Mar. 19, 2025 Hr'g Tr. 75:18); App.2823 at 25:8 ("net revenues

are zero," and that is "the value of the [Bondholders'] secured claim."); App.2978 (June 11, 2025 Hr'g Tr. 70:15-17) ("We believe that there are significant data issues and significant methodology issues with the MORs, and at the end of the day, fixing those leads to zero net revenues."). Moreover, PREPA's most recent fiscal plan states that PREPA will not be able to afford "any sustainable rate increases for debt service." App.2680. The Board's position is that PREPA's present and future Net Revenues—the Bondholders' collateral—is "nil." App.2681.

The Board's position was that the Administrative Expense Motion could be decided as a matter of law and that no discovery was needed. The district court held argument and acknowledged that a primary fact question was "whether and to what extent PREPA generated [N]et [R]evenues that the bondholders were entitled to receive during the post-petition period," App.2972 (June 11, 2025 Omnibus Hr'g Tr. 64:15-23), and allowed discovery for the Bondholders to test, among other things, the Board's attempts to disavow PREPA's ordinary course reporting of Net Revenues and contention that no Net Revenues have existed since the Petition Date App.2973. The parties engaged in document discovery for several months. The Board refused to produce, among other things, its purported calculations to support its positions that PREPA's ordinary course business records are wrong, and there were no Net Revenues. In January 2026, the Bondholders filed a motion to compel the production of key information being withheld. ECF No. 5995.

16

On March 16, 2026, while the Board was still producing documents and two days before argument on the Bondholders' motion to compel, the district court abruptly denied the Administrative Expense Motion as a matter of law. App.2708. The district court assumed without deciding that PREPA had consumed approximately $3.7 billion of the Bondholders' collateral, but held that the Bondholders were nonetheless entitled to no compensation. App.2705-2707.

The district court denied the section 503(b) claim because there was no postpetition transaction even though PREPA benefitted from the nonconsensual, postpetition use of at least $3.7 billion of the Bondholders' collateral. App.2693. The district court also held that the *Reading* doctrine was inapplicable and that the Bondholders had not established prima facie cases for conversion or a takings claim. The Bondholders timely appealed on March 23, 2026. App.160.

## STANDARD OF REVIEW

This Court reviews the district court's legal determinations *de novo*. *Sleeper Farm v. Agway, Inc.*, 506 F.3d 98, 104 (1st Cir. 2007). The district court rendered its Opinion "as a matter of law," *see* App.2673, so it is subject to *de novo* review.

## SUMMARY OF THE ARGUMENT

Public utilities like PREPA need access to capital to fund projects necessary to serve residents, and that capital is provided to utilities through secured loans. Because entities like PREPA cannot obtain financing by pledging public assets like

17

power plants as security, they instead pledge their revenue stream to secure affordable financing for capital expenses. PREPA issued bonds pursuant to the Trust Agreement and, in accordance with the Authority Act, secured those bonds through a pledge of Net Revenues. This Court has confirmed that the Bondholders hold a valid, perfected, and unavoidable lien on PREPA's past, present, and future Net Revenues.

The district court's ruling below effectively overrides that holding by again stripping the Bondholders of their liens. Since the Petition Date, PREPA has misappropriated billions of dollars of the Bondholders' collateral for expenses that do not constitute Current Expenses. In denying the Bondholders' motion for an administrative expense claim for such expenditures, the district court held, as a matter of law, that the Bondholders are not entitled to compensation for PREPA's nonconsensual use and consumption of Net Revenues during this nearly decade long Title III case. The Opinion allows a debtor to steal and destroy collateral with total impunity, and is unprecedented and unsupported by any authority, principle of law, or policy.

The Bondholders are entitled to an administrative expense claim for two independent and separate reasons addressed in this brief. *First*, the Bondholders are entitled to administrative expense priority for value conferred through PREPA's postpetition use of at least $3.7 billion in Net Revenues that benefited the debtor.

The district court erroneously held that section 503(b)(1)(A) did not apply because there was no postpetition transaction between PREPA and the Bondholders. But section 503(b)(1)(A) does not require that a creditor enter into a postpetition contract with the debtor. Rather, the test for an administrative expense claim is whether there was a postpetition expenditure that benefitted the debtor. Here, PREPA's postpetition use of the Bondholders' collateral conferred a postpetition benefit of at least $3.7 billion. A debtor cannot avoid an administrative expense by misappropriating, rather than negotiating to use, the collateral. Indeed, there would be no reason for a debtor to ever enter a postpetition agreement if such misappropriation were permissible.

*Second*, the Bondholders are entitled to an administrative expense claim under *Reading Co. v. Brown*, 391 U.S. 471 (1968) and its progeny for PREPA's postpetition conversion and taking of Net Revenues and corresponding destruction of the Bondholders' liens. The district court erred in ruling that the Bondholders failed to state cognizable conversion and Takings Clause claims. The Bondholders easily proved conversion as PREPA improperly took and consumed least $3.7 billion of the Bondholders' collateral with the malicious and wrongful intent to "bludgeon bondholders into submission" by "mov[ing] the goalposts again and again" in order to "pay as little as possible." Moreover, the Bondholders established a straightforward takings claim for PREPA's postpetition consumption of Net

19

Revenues and destruction of their liens. The Bondholders also did not waive their takings claim by agreeing to limit remedies for breach of contract claims. The Bondholders' claims arise from PREPA's wrongful postpetition conduct that is separate from and independent of PREPA's prepetition breaches of contract.

The district court also erroneously held that *Reading* doctrine is inapplicable when the injured party is also a prepetition creditor, and that allowing an administrative expense claim would be "in tension" with a never-before-found public policy concern about rehabilitating PREPA. The *Reading* doctrine does not exclude victims of torts and violations of law because they are also separately prepetition creditors. And the district court's *sua sponte* public policy bar is unprecedented, wrong, and not supported by any law or evidence.

## ARGUMENT

## I.

## THE DISTRICT COURT ERRED IN DENYING THE BONDHOLDERS' ADMINISTRATIVE EXPENSE UNDER SECTION 503(B)(1)(A)

Section 503(b)(1)(A) is unambiguous in requiring courts to allow administrative expense claims for the actual, necessary expenses of preserving the estate. 11 U.S.C. § 503(b)(1)(A) ("[T]here *shall* be allowed administrative expenses…[for] the actual, necessary costs and expenses of preserving the estate." (emphasis added)). Qualifying expenses of preserving the estate is broadly

20

133370457

interpreted, and include all the expenses that benefit the estate. *In re Hemingway Transp.*, 954 F.2d 1, 5 (1st Cir. 1992) (holding that "[p]reservation of the estate includes protections of the assets of the estate, as well as postpetition operation of the business of the debtor," and administrative expense priority is appropriate for postpetition expenses that were "beneficial to the estate of the debtor"); *see also In re Whistler Energy II, L.L.C.*, 931 F.3d 432, 443 (5th Cir. 2019) (holding that "the question of whether the estate has been benefitted cannot be so narrowly confined," and may include "less readily calculable benefits, such as the ability to continue to conduct business as usual."). Administrative expense treatment is mandatory for such expenditures. 11 U.S.C. § 503(b) ("there *shall* be allowed administrative expenses…") (emphasis added); *In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 430 (2d Cir. 2009) (recognizing section 503(b) has "mandatory terms").

Here, the Board took and spent over $3.7 billion of the Bondholders' collateral through fiscal year 2023 on improvements and other capital projects. App. 2512-2513. The Bondholders seek compensation under section 503 for PREPA's consumption of that collateral, which was used to fund expenditures the Board has repeatedly characterized as beneficial to the estate. App.1206-07. Consequently, the Bondholders are entitled to an administrative expense claim.

21

### A.    The District Court's Ruling That The Debtor's Use Of A Creditor's Cash Collateral Has To Be Consensual Is Erroneous

The district court rejected this straightforward administrative expense because the Bondholders "took no action, or entered into any [consensual] transaction with PREPA" postpetition. App.2693; *see also* App.2694-95.  There is no authority whatsoever for limiting administrative expense claims to just those parties who consented to the debtor's use of their property to benefit the debtor.

As the text makes clear, section 503(b)(1)(A) does not require that a creditor enter into a consensual postpetition contract with the debtor.  Rather, an administrative expense is provided based on the benefit to the estate, not whether the creditor agreed to have its collateral used to benefit the estate.  There is nothing in section 503 or otherwise that even remotely supports an interpretation excluding a creditor's administrative expense claim arising from the debtor's postpetition use of collateral simply because that use was non-consensual.  A debtor cannot avoid an administrative expense simply by taking, rather than negotiating, to use a creditor's cash collateral postpetition.  Indeed, there is no conceivable support for an interpretation of section 503 (or any other law) that rewards misappropriation—sanctioning, indeed incentivizing, theft—particularly where there is not a word of supporting text, legislative history, or other authority.  In short, section 503 is triggered by the debtor's postpetition use of collateral to preserve the estate, and it does not differentiate between consensual and nonconsensual uses.  As the district

22

133370457

court itself recognized, a creditor is entitled to an administrative expense claim if it can "demonstrate what it has contributed postpetition to benefit the estate or debtor." App.2692. Here, the Bondholders contributed over $3.7 billion dollars (and counting), which was used to make improvements to the system, and that is no less a contribution and benefit because the money was used non-consensually. Indeed, the courts have stressed that section 503(b) protects against unjust enrichment, and there can be no serious dispute here that PREPA was unjustly enriched by taking $3.7 billion of the Bondholders' collateral to improve its electric system. *See In re Colortex Indus., Inc.,* 19 F.3d 1371, 1383 (11th Cir. 1994) ("The principal purpose of according administrative priority to claims for benefit to the estate is to prevent unjust enrichment of the debtor's estate…"); *In re Enron Corp.*, 279 B.R. 79, 85 (Bankr. S.D.N.Y. 2002) ("The focus on allowance of priority [under section 503] is to prevent unjust enrichment of the estate…").

The Sixth Circuit's decision in *In re United Trucking Service, Inc.*, 851 F.2d 159 (6th Cir. 1988) is on point. There, the Court held that an administrative expense claim under section 503(b) is not limited to consensual postpetition transactions between the debtor and the creditor. Rather, administrative expenses include damages arising from a debtor's non-consensual postpetition actions and misuse of a creditor's property that benefitted the debtor. In *United Trucking*, the debtor rented 55 trailers from a trailer rental company, TRC, pursuant to a prepetition equipment

23

lease. The debtor continued to use the trailers after filing its Chapter 11 case, but breached its prepetition contractual obligation to maintain or repair the trailers under the prepetition lease. *Id.* at 160. The bankruptcy court allowed TRC's administrative expense claim based on United Trucking's postpetition misuse of, and failure to comply with its prepetition contractual obligation to maintain, the trailers because such use benefitted the estate. In affirming, the Sixth Circuit held:

> [W]e conclude that the bankruptcy court was correct in treating TRC's post-petition damages claim as an administrative expense under [section] 503. United's asserted failure to maintain and repair the trailers in accord with the lease obligation allowed United, the debtor, to use the money saved and not paid for TRC's benefit as contemplated under the lease, to continue its operations. This breach and misuse of TRC's trailers did benefit the bankrupt estate. Accordingly, the damages under the breached [prepetition] lease covenant, to the extent that they occurred post-petition, provided benefits to the bankrupt estate and were properly accorded priority under [section] 503 to TRC.

851 F.2d at 162. The court further explained that the right to an administrative expense claim for the postpetition benefit to the estate "is an equitable right based upon the reasonable value of the benefits conferred" and "prevent[s] unjust enrichment of the debtor's estate." *Id.* The "damages under the breached [prepetition] lease covenant, to the extent that they occurred post-petition, provided benefits to the bankrupt estate and were properly accorded priority under § 503 to [creditor]." *Id*. And it would be classic unjust enrichment for PREPA to take the Bondholders' collateral for itself. *Grundy Nat'l Bank v. Rife*, 876 F.2d 361, 364 (4th Cir. 1989) (affirming administrative-expense claim where debtor was "economically

24

better off" from "disregarding his commitments," and thus "was unjustly enriched at [the creditor's] expense").

Here too, the Bondholders' administrative expense claim is for the postpetition misuse of the Bondholders' collateral, which conferred a dollar-for-dollar benefit on the estate. Those misappropriated Net Revenues are properly accorded priority as administrative expenses, as in *United Trucking*, because "they occurred post-petition [and] provided benefits to the bankrupt estate," (*id.*), and PREPA would be unjustly enriched if it can simply take that collateral without consequences.

The district court distinguished *United Trucking* on the basis that there was no need for the Sixth Circuit to analyze whether section 503(b) was satisfied because the parties had stipulated that postpetition damages to the trailers would constitute administrative expenses. *See* App.2693-94. The district court's reading is wrong. The Sixth Circuit did not rely on, or even mention, the stipulation at all in its substantive analysis. Indeed, the court explicitly found that, although, "according to the bankruptcy court," there was a stipulation, "[w]e must still decide whether the damages claimed can be accorded § 503 priority. . . ." *United Trucking*, 851 F.2d at 161 n.2. The Sixth Circuit then held that the postpetition use of a prepetition creditor's property results in an administrative expense claim for the "actual value conferred on the bankrupt estate by reason of wrongful acts or breach of agreement."

*In re United Trucking Service, Inc.*, 851 F.2d at 162. Notably, the district court's reading improperly renders the entirety of the Sixth Circuit's legal analysis dictum. *See Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 2 (1st Cir. 2007) (explaining that both the judgment and "those portions of the opinion necessary to the result, are binding" and, thus, cannot constitute dicta (citing *Rossiter v. Potter*, 357 F.3d 26, 31 (1st Cir. 2004)).

The Fourth Circuit's decision in *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860 (4th Cir. 1994) is likewise on point in holding that non-consensual use of cash collateral is covered by section 503(b)(1)(A): "a § 503(b) administrative expense can be created by a debtor's postpetition use (*against the secured creditor's wishes*) of collateral." *Id.* at 867 n.7 (emphasis added). Other courts have likewise confirmed that section 503(b) applies to a debtor's non-consensual use of collateral or property. *See, e.g.*, *In re Athens/Alpha Gas Corp.*, 332 B.R. 578, 581 (B.A.P. 8th Cir. 2009) (granting § 503(b) claim based on debtor's postpetition use of claimant's share of revenues in violation of prepetition revenue distribution agreement, which "unwittingly forced" claimant into "involuntary" financing transaction); *In re Espinosa*, 542 B.R. 403 (Bankr. S.D. Tex. 2015) (granting § 503(b) claim based on debtor's postpetition, non-consensual use and occupation of a creditor's property, which constituted "a continuing involuntary transaction" sufficient to satisfy the postpetition transaction requirement of section 503(b)(1)(A)); *In re Am. Toy &*

26

133370457

*Furniture Co.*, 1997 Bankr. LEXIS 2495, at \*17 (Bankr. E.D. Wis. Feb. 24, 1997) (granting § 503(b) claim based on debtor's nonconsensual use of claimant's cash collateral following denial of creditor's lift stay request, as "[t]he involuntary nature of the process" did not negate that it was a postpetition transaction that "provid[ed] new value to the estate").

The district court cited cases that considered consensual agreements for "postpetition transactions," noting the policy of encouraging third parties to engage in postpetition business with the debtor.  App.2691.  But those cases only inform that the debtor's postpetition use of a creditor's property gives rise to an administrative claim, they do not limit section 503 administrative expense claims to situations involving consensual use of the debtor's property, as numerous courts have explained.  *See United Trucking*, 851 F.2d at 162 (rejecting that the inquiry is "inducement," and holding that "appropriate rationale" was the postpetition use that conferred actual value on the estate"); *In re Bluestem Brands, Inc.*, 2021 Bankr. LEXIS 1980, at \*15 (Bankr. D. Del.  July 27, 2021 (finding that cases cited for the "postpetition transaction" standard did not support denial of § 503(b) claim because, "[w]hile those cases involved executory or post-petition contracts, the courts were not asked to decide whether the <u>lack</u> of such a contract prohibited the allowance of an administrative expense" (internal citations omitted)); *In re Am. Toy & Furniture Co.*, 1997 Bankr. LEXIS 2495, at \*17 (rejecting argument that "the policy of

27

encouraging suppliers" conflicts with treating claims based on non-consensual cash collateral use as administrative expense claims because the debtor was "consuming" and "taking the secured creditor's money" to pay for the provision of necessary goods and services, which is "the classic example of an administrative expense").

Moreover, the phrase "postpetition transaction" does not contemplate a formal postpetition contract between the parties, as the district court required. *See In re Whistler Energy II, L.L.C.*, 931 F.3d at 443-44 (finding that while "an explicit post-petition agreement is certainly helpful," it is not "the only way" to satisfy requirement that expenses arose postpetition and "were incurred as a result of actions taken by the debtor-in-possession" (internal citations and quotation marks omitted)); *In re Lucre, Inc.*, 434 B.R. 807, 821, 824-25 (Bankr. W.D. Mich. 2010) (explaining that the "postpetition transaction" standard in *Mammoth Mart* is only relevant in determining whether a claim related to a prepetition contract is "deserving of administrative priority because its incursion was actually incidental to the estate's continued operation" and the estate or postpetition debtor was "involved in some way regarding the provision of" such benefit, as opposed to a residual benefit from the terms of a prepetition contract); COLLIER ON BANKRUPTCY ¶ 503.06[3][a], at 503–37 (16th ed) (collecting cases that "transaction" is not construed narrowly as section 503(b) does not require a formal agreement or contractual relationship for the benefit to be conferred.); *see also In re Athens/Alpha Gas Corp.*, 332 B.R. at 580

28

("The term 'transaction' is broadly defined.  Distilled to its essence, it is an act between parties which alters their legal relationship[.]").

PREPA's nonconsensual use of the Bondholders' collateral postpetition to improve the electric system is plainly a postpetition transaction.  Indeed, utilities normally fund capital expenditures through loans, the very definition of a postpetition transaction.  *See* ECF No. 5668 ¶ 13;  Final Rate Order, Ch.1, page 4 ("Capital expenditures are long-lived repairs and long-lived assets—repairs and assets that will have benefits for decades.  In normal situations, the utility finances these expenditures with external funds—fund from lenders and shareholders—which the utility recovers from customers over long periods of time that match the lifetimes of the repaired assets.").  There is no authority or reason for excluding the very same postpetition expenditures because PREPA misappropriated, rather than borrowed, the funds.  Indeed, the district court tried to distinguish *United Trucking* as more like a "postpetition financing," App.2694, but that is precisely the case here, as the Bondholders' Net Revenues are involuntarily funding PREPA's capital projects with postpetition financing.

Lastly, the district court's interpretation of section 503, as addressed below, allows PREPA to violate the Fifth Amendment and take the Bondholders' property without just compensation.  Under the avoidance doctrine, statutes must be construed to avoid a conflict with the Constitution if such construction is "fairly

29

133370457

possible," *Sec. Indus. Bank*, 459 U.S. at 75, which is the case here as not a word of section 503 supports the district court's imposition of the requirement that the creditor have no prepetition relationship with the debtor.

### B.    The District Court Erred In Ruling That The Bondholders' Collateral Was Exclusively PREPA's Property

The district court also rejected the administrative claim under section 503 based on an erroneous finding that PREPA spent "its own revenues," so the Bondholders did not confer a benefit on the estate. *See* App.2693. The Trust Agreement does not permit PREPA to use Net Revenues other than for debt service. Indeed, PREPA agreed to deposit all Net Revenues into depositary accounts to be held in trust for the Bondholders. *See* § 601 (App.580).[6] And the Trust Agreement prohibits PREPA's use of Net Revenues to fund improvements and other capital projects, which is what the Board spent the collateral on. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 121 F.4th at 291 (the Net Revenues credited to "the Sinking Fund cover debt service," and after debt service has been paid, the remaining Net Revenues are credited to "the Subordinate Funds [that] cover internal PREPA operations, such as extraordinary repairs or capital improvements").

---

[6] As this Court has previously determined, though the language in § 601 does not "state[] that PREPA receives and holds its money in trust in the first instance," it does "requir[e] PREPA to deposit moneys with Depositories, who then hold the moneys in trust and apply them in accordance with the Trust Agreement." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 121 F.4th 280, 314 (1st Cir. 2024)

133370457

Additionally, this Court has determined that the Bondholders hold a "valid, perfected, and unavoidable security interest" in all "past, present, and future Net Revenues." *Id.* at 301, 306. Thus, PREPA destroyed those liens, conferring a dollar-for-dollar benefit on its estate. *See United States v. Security Indus. Bank*, 459 U.S. 70, 74–75 (1982) (lien rights constitute "traditional property interests" distinct from "mere contractual obligations"); *Armstrong v. United States*, 364 U.S. 40, 48 (1960) (destruction of lien rights violated the Takings Clause). The Opinion undermines this Court's prior decision by allowing PREPA to strip the Bondholders' perfected and unavoidable liens, thereby leaving secured creditors "to stand by helplessly as the debtor spent the creditor's collateral, leaving the debt entirely unsecured." *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d 13, 20 (1st Cir. 2018). The district court has again converted the Bondholders to unsecured creditors.

*   *   *

The district court erred in rejecting the Bondholders' administrative expense under section 503(b)(1)(A).

**II.**

**THE DISTRICT COURT ERRED IN DENYING THE BONDHOLDERS' ADMINISTRATIVE EXPENSE CLAIM UNDER *READING***

The Bondholders are also entitled to an administrative expense for PREPA's postpetition misappropriation of their collateral under the *Reading* or fundamental fairness doctrine, which confers administrative expense status on creditors harmed

31

133370457

by a debtor's postpetition torts and other violations of law. *See Reading*, 391 U.S. at 482 ("it is theoretically sounder, as well as linguistically more comfortable, to treat tort claims arising during [bankruptcy] as actual and necessary expenses of the [bankruptcy case] rather than [prepetition] debts of the bankrupt"); *Villalobos-Santana v. Puerto Rico Police Department*, 171 F.4th 544, 551 (1st Cir. 2026) (noting *Reading's* "expansive" application to all manner of postpetition "unlawful conduct," including in the PROMESA context). PREPA's postpetition misappropriation of Net Revenues and corresponding destruction of the Bondholders' liens constitute both a postpetition conversion and a violation of the Takings Clause.

## A.    The Board's Misappropriation Of The Bondholders' Collateral Constitutes Conversion

Under Puerto Rico law, a conversion occurs where there is a "malicious and wrongful privation of the ownership rights, illegal exercise, or the assumption of authority over another's property, thereby depriving the lawful owner or possessor, permanently or for an indefinite period, of its use and enjoyment." *Hull Dobbs Co. v. Super. Ct.*, 81 D.P.R. 221, 228-29 (P.R. 1959); *see also Fed. Ins. Co. I.C. v. Banco de Ponce*, 751 F.2d 38, 42 (1st Cir. 1984) ("Puerto Rico allows recovery for conversion upon a showing of 'malicious and wrongful' privation of ownership rights."). The Bondholders easily satisfy these elements. *See generally* Mot. ¶¶ 50-51.

32

The Bondholders proved that PREPA improperly took and exhausted over $3.7 billion of Net Revenues, and continues to do so, which are the Bondholders' collateral. Those Net Revenues, in fact, were required to be given to a Depositary to be held in trust for the Bondholders." *See supra* at 30. And, as the MORs state over and over, the Net Revenues were "accrued [for the Bondholders' account] but not transferred." *Supra* at 10. Instead, PREPA improperly misappropriated and spent the Bondholders' collateral to fund improvements and other capital projects for the benefit of the estate. Mot. ¶ 51. Additionally, the Bondholders had a perfected and unavoidable security interest in those Net Revenues, and the Board assumed authority over and took away those liens by consuming the underlying collateral. *See First Circuit Lien Ruling*, 121 F.4th at 301-02. There can be no serious dispute that taking the Bondholders' collateral and destroying the Bondholders' perfected and unavoidable security interest constitutes conversion.

**1. The District Court Erred In Finding That the Bondholders Failed To Make A *Prima Facie* Case Of Intent By Showing That PREPA Misappropriated More Than $3.7 Billion**

The district court first erred in ruling that the Bondholders "misrepresent[ed] the legal standard, downgrading the terms 'malicious and wrongful' to 'intentional.'" Opinion 33. To the contrary, the Bondholders explicitly recited the legal standard as requiring "malicious and wrongful" intent. *See* Mot. ¶ 50 ("A conversion occurs when there is a "malicious and wrongful privation…."). The fact

that the Bondholders *also* characterized PREPA's "misappropriation" as "willful"—which it was—does not misrepresent or downgrade the specifically stated standard. Indeed, "misappropriate" means: "to appropriate wrongly (as by theft or by embezzlement)," which is exactly what PREPA did here. *See* Merriam-Webster, available at https://www.merriamwebster.com/dictionary/misappropriate (last visited May 14, 2026). Moreover, the issue is whether adequate facts were identified, not the name given to the facts (or, here, how many times the name is used). Courts do not credit "buzzwords" or mere "legal conclusions" but evaluate whether the claim is "backed by well-pled facts" and not "allegations that merely parrot the elements of the cause of action." *See Schatz v. Rep. State Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012), *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

The district court further erred in ruling that the Bondholders failed to establish that PREPA's intentional and willful theft of Net Revenues was sufficient "to establish wrongful intent." *See* Opinion 33. The Bondholders proved that PREPA misappropriated over $3.7 billion that were to be held in trust by a Depository for them. *See supra* at 30. It is beyond peradventure that stealing $3.7 billion is "malicious and wrongful." *See Barreto Peat, Inc. v. Luis A. Ayala Colon Sucrs., Inc.*, 709 F. Supp. 321, 323 (D.P.R. 1989) ("The facts as alleged in the complaint are to the effect that defendant illegally exercised or assumed authority

34

over plaintiff's property, thereby depriving plaintiff of its use. Thus, the alleged acts and/or omissions of the defendant could give rise to a finding of conversion[.]"). Put simply, where a party improperly takes and consumes billions of dollars that was subject to a perfected and unavoidable lien and required to be held in trust, it is malicious, wrongful and a conversion. *See Oto Analytics, LLC v. Benworth Capital Partners PR, LLC*, 2025 WL 989954, at *9 (D.P.R. Apr. 2, 2025) (finding plaintiff stated conversion claim and sufficiently pled facts "to support a reasonable inference that the [d]efendants maliciously and wrongfully deprived [plaintiff] of its lawful property" based on defendant's exercise of dominion over collateral in which plaintiff held a first-priority lien).

*United States v. GZ Constr. St., Inc.* is instructive. 155 F. Supp. 3d 147, 152 (D.P.R. 2015). In that case, the federal government alleged that the defendant, with knowledge of a federal tax lien on an aircraft, transferred title to his son, who then sold it to a third party. *Id.* The court held that those allegations were adequate to infer the defendant's "intent [and] maliciousness" for a conversion claim. *Id.* Here too, PREPA had knowledge of the Bondholders' liens and its obligation to transfer Net Revenues to the Sinking Fund for debt service, as it repeatedly admitted in the MORs, but instead improperly took and used them.

Additionally, the Bondholders proved that the Board is intentionally trying to wipe out Net Revenues, persistently advancing incorrect legal theories and value-

35

depressing assumptions, as a former Board member testified, to "pay as little as possible" and "bludgeon bondholders into submission and jam them" by "mov[ing] the goalposts again and again" until "you just wear the other side down."  App.3168, 3175,3181-3182.  Indeed, after this Court confirmed that the Bondholders had a secured lien on Net Revenues, the Board maintained its strategy to wipe out the Bondholders' collateral, including claiming that Net Revenues do not exist now and will never exist by submitting a fiscal plan that eliminated all debt service, claiming that PREPA's expenses had skyrocketed.  *Supra* at 14; App.1206-201.  The Puerto Rico Energy Bureau has denied those value-decreasing expenses as, among other things, "excessive relative to actual needs or for which there is no need" and "eligible for coverage by federal sources."  Final Rate Order at Ch. 1, p. 44.  The Board has also tried to conceal PREPA's own calculations of Net Revenues, while simultaneously and repeatedly represented that there were none.  *Supra* at 15-16. Specifically, the Board stopped submitting the MORs to the Bond Trustee, its ordinary course of business records that calculated Net Revenues under the Trust Agreement, but discovery revealed that it had continued to create them, and those MORs demonstrated that PREPA continued to generate and misappropriate the Bondholders' collateral.  *See* App.2636 (June 2022 Monthly Report at 5); App.2652 (June 2023 Monthly Report at 5).

In any case, intent is an issue of fact and the district court denied the Bondholders the opportunity to complete discovery and present that record in support of their conversion claim. *See Bailey v. Fed. Nat. Mortg. Ass'n*, 209 F.3d 740, 743 (D.C. Cir. 2000) ("Normally, the determination of intent is a question of fact.") (citing *Pullman–Standard v. Swint*, 456 U.S. 273, 288 (1982)); *Life Product Clearing, LLC v. Angel*, 530 F.Supp.2d 646, 652 (S.D.N.Y. 2008) ("Cases that hinge on an issue relating to state of mind should generally not be disposed of summarily."). Indeed, the district court ruled before document discovery was completed and before there was even a single deposition. *See supra* at 16-17.

### 2. The District Court Erred In Rejecting The Conversion Claim Based On An Erroneous Finding That The Bondholders' Collateral Belonged Exclusively To PREPA

The district court also erroneously held that the Bondholders could not state a claim for conversion because "the funds that were allegedly misappropriated were PREPA's own funds, in which the Bondholders merely have a security interest." App.2699. As addressed above, the Net Revenues were, in fact, the Bondholders' property, required to be held in trust for them, and PREPA had no right to use them. *See supra* at 13. Thus, PREPA possessed the Net Revenues, but did not own them, much less exclusively.

Additionally, the taking of that "mere" lien supports the conversion claim. The conversion claim is not just for the misappropriation of the Net Revenues, but

also for the destruction of the Bondholders' liens on the misappropriated Net Revenues. This Court has held that the Bondholders have a lien on all Net Revenues. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 121 F.4th at 301. A lien is a property right. *See Armstrong*, 364 U.S. at 46 (holding that liens are constitutionally protected "property interests"); *Harley-Davidson Motor Co., Inc. v. Bank of New England-Old Colony, N.A.,* 897 F.2d 611, 619 (1st Cir. 1990) ("[A] secured party may bring an action for conversion to recover collateral that has found its way into the hands of a third party whose interest is inferior."); *GZ Constr. St., Inc.*, 155 F. Supp. 3d at 152 (federal government stated a claim for conversion where it alleged that defendant sold its own aircraft in which the government held a federal tax lien). PREPA took away over $3.7 billion of the Bondholders' liens. The district court's erroneous ruling that PREPA did not take "another's property" ignores the Bondholders' liens. *See Oto Analytics, LLC*, 2025 WL 989954, at *9 (conversion claim sufficiently pled based on misappropriation of collateral subject to a perfected and unavoidable lien). The district court also ignores this Court's decision recognizing the Bondholders' property rights in the collateral and their right to protect the collateral from being spent. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d at 20 (1st Cir. 2018) (stating Court "would 'doubt the constitutionality' of a rule that would allow a debtor to 'expend every penny of the Movants' collateral, leaving the debt entirely unsecured.'").

38

Notably, other courts recognize a conversion claim when a borrower spends proceeds in which a creditor has a security interest. *See, e.g.*, *First Nat'l Bank v. Am. Gen. Fire & Cas. Co.*, 927 F.2d 1126, 1128 (10th Cir. 1991) ("Defendant's transfer of these [proceeds] . . . contrary to plaintiff's perfected security interest, of which defendant had constructive notice, amounted to a conversion."); *In re Iaquinta,* 98 Bankr. 919, 924-25 (Bankr. N.D. Ill. 1989) (sale of vehicles without remitting proceeds to secured party was "willful and malicious conversion"); *In re Contento*, 37 B.R. 853, 856 (S.D.N.Y. 1984) (finding that "debtor willfully and maliciously converted the proceeds" of collateral).

### 3. The District Court Erred In Finding That The Conversion Damages Are The Same As Breach Of Contract Damages, Which Then Somehow Extinguishes The Conversion Claim

The district court's ruling that the Bondholders cannot state a conversion claim because their damages are "indistinguishable from the harm allegedly caused by breaches contemplated by the Trust Agreement" misunderstands the Bondholders' claim and applicable Puerto Rico law. App.2700. The Bondholders' conversion claim is not for PREPA's breach of the Trust Agreement. The conversion claim is for PREPA's separate, postpetition conversion of Net Revenues and the destruction of the Bondholders' liens, which is an independent claim.

*In re Hayes Lemmerz Intern., Inc.*, 340 B.R. 461 (Bankr. D. Del. 2006) is on point that a creditor cannot be deprived of its conversion claim simply because such

conversion is also a breach of the creditor's prepetition agreement. There, the debtor, an automotive wheel supplier, entered into a master lease of equipment with a lessor. Postpetition, the debtor stripped parts from the leased equipment "to keep [the debtor's] machines operating in production." 340 B.R. at 480. The lessor was allowed an administrative expense claim arising from the debtor's postpetition use of the leased equipment. The debtor argued that *Reading* did not apply, arguing that under this Court's decision in *Hemingway,* the *Reading* doctrine does not encompass a right to payment originating from a prepetition contract with the debtor. 954 F.2d at 7. The court rejected that argument, holding that the lessor's conversion claim "in no way 'originates' in the Master Lease. That debtor's conversion of [the lessor's] property might also have constituted a breach of the Master Lease does not deprive it of its status as an independent tort." 340 BR at 480; *see Oto Analytics*, 2025 WL 989954, at *9 (finding conversion claim, based on defendant's misappropriation of collateral subject to a perfected and unavoidable lien, is "separate from [plaintiff's] claims for breach of contract"); *R&G Eng'g, Inc. v. Transcontainer Transp., Inc.*, 213 F. Supp.2d 72, 78 (D.P.R. 2002) (finding allegation that retaining insurance proceeds, in violation of insurance contract, stated a separate conversion claim); *see infra* at p. 45-57. And that claim raises independent harm. Conversion damages are for the amount of the misappropriated collateral. *See* 31 L.P.R.A. § 5141 (tortfeasor required to "repair the damage so done"); *In re Patrick*, 143 B.R. 200, 203 (Bankr.

40

N.D. Ill. 1992) ("The fair market value of the converted collateral is the appropriate measure of damages for conversion."). Contract damages are for the amounts owed under the Trust Agreement. *See Garcia-Navarro v. Hogar La Bella Union, Inc.*, 2020 WL 7052942, at *21 (D.P.R. Nov. 30, 2020) ("The usual remedy for a breach of contract is expectancy damages."). The misappropriated Net Revenues and the destruction of the corresponding liens, in fact, bear no relationship to the contractual debt service payments. Accordingly, those amounts are not "indistinguishable"— they are totally different. *See In re Carpet Center Leasing Co. Inc.*, 991 F.2d 682, 685, 688 (11th Cir. 1993) (an administrative expense claim is based on "an actual decrease in the value of…the collateral," not the "underlying prepetition obligation").

Moreover, as the district court recognized, a conversion claim is stated where there is a breach of a general obligation not to injure another. *See* App.2700 (citing *Ramos Lozada v. Orientalist Rattan Furniture Inc.*, 130 D.P.R. 712 (P.R. 1992) ("[A] claim for noncontractual damages resulting from the breach of a contract lies if the act that caused the damage constitutes a breach of the general duty not to injure anyone and, at the same time, a breach of contract.")). Misappropriating the Bondholders' collateral and destroying their liens breaches the general duty not to injure another. *In re Acushnet River & New Bedford Harbor*, 712 F. Supp. 994,

41

999-1001 (D. Mass. 1989) ("The common law has long recognized a duty not to injury the property of another.").

## B.    PREPA's Misappropriation Of The Bondholders' Collateral And Corresponding Destruction Of Their Liens Is A Taking

The Supreme Court in *Armstrong v. United States* held that where a government entity destroys a secured creditor's lien, such destruction constitutes a taking and requires just compensation under the Fifth Amendment.  364 U.S. 40, 48 (1960).  Even the Board has acknowledged this uncontroversial principle, conceding to this Court that where, as here, a creditor's security interest is a property interest to which the Fifth Amendment applies, and if **"the government takes the property during the bankruptcy case," then "the Fifth Amendment would require" that "the debtor's liability for full payment would be an allowable administrative expense."**  Brief for Debtors-Appellees/Cross-Appellants at 31, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 79 F.4th 95 (1st Cir. 2023), 2022 WL 1032007 at *31 (emphasis added); *see Petition for a Writ of Certiorari* at *19, *Fin. Oversight & Mgmt. Bd. for P.R. v. Cooperative De Ahorro Y Credito Abraham Rosa, et al.*, 143 S. Ct. 774 (2023), 2022 WL 15525732 at *19 ("**[T]he Taking[s] Clause…constrains the bankruptcy power from effectuating a deprivation of secured interests in specific property during bankruptcy.**") (emphasis added).

There is no dispute here that PREPA is a government entity, that it took and consumed over $3.7 billion of the Bondholders' cash collateral through fiscal year

42

2023, destroying the Bondholders' lien dollar-for-dollar, and that it has paid no compensation. *See supra* at 17. These facts establish a violation of the Takings Clause. *See Armstrong*, 364 U.S. at 48 ("[t]he total destruction by the Government of all value of these liens, which constitute compensable property, has every possible element of a Fifth Amendment 'taking'"); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 594–95 (1935) (bankruptcy law that impaired lienholder's right to a receiver violated the Fifth Amendment). The district court completely ignored *Armstrong*, the controlling authority, even though it had specifically requested supplemental briefing on the case. ECF No. 5679.

Notwithstanding the clear law and undisputed facts, the district court rejected the Takings claim, ruling that: (i) the Bondholders waived their constitutional claim by agreeing to limit remedies for claims under the Trust Agreement; (ii) PREPA could not violate the Takings Clause because it allegedly acted in a commercial, not sovereign, capacity, and (iii) "a simple breach of contact does not amount to an unconstitutional deprivation of property." App.2700-2703. The district court's rulings are erroneous.

### 1. The Bondholders Did Not Waive Their Takings Clause Claim

The district court held that the Bondholders waived their takings claim in Section 804 of the Trust Agreement (App.2701), which provides in relevant part:

> In the enforcement of any remedy under this Agreement the Trustee shall be entitled to sue for, enforce payment of and receive any and all amounts then … due from [PREPA] … without prejudice to any other right or remedy of the Trustee or the bondholders, and to recover and enforce any judgment or decree against [PREPA], but solely as provided herein and in such bonds, for any portion of such amounts remaining unpaid … and to collect (but solely from moneys in the Sinking Fund and any other moneys available for such purpose) in any manner provided by law, the moneys adjudged or decreed to be payable.

App.598. A waiver requires an "intentional or voluntary relinquishment of a known legal right," *Doyle v. Huntress*, Inc., 301 F.Supp.2d 135, 149 (D.R.I. 2004) (citations omitted), and it must be must be "voluntary, knowing and intelligent." *Wilkicki v. Brady*, 882 F. Supp. 1227, 1231 (D.R.I. 1995). There was no intentional waiver of the Bondholders' constitutional rights or of any other claim.

*First*, Section 804 does not waive any claims, it merely limits the sources of recovery. Specifically, Section 804 limits only "the enforcement of any *remedy* under this Agreement." Liability and enforcement are distinct matters. A limitation on the source for execution on a judgment is not a defense to liability. *See In re Sanchez Energy Corp.*, 2022 WL 2912076, at *7 n. 7 (Bankr. S.D. Tex. July 22, 2022) ("The fact that the claim has no recourse does not mean that the claim does not exist."); *Beall v. Conoco Phillips Co.*, 2008 WL 2433579, at *3 (M.D. La. June 16, 2008) ("Just because plaintiff may not be able to collect a judgment does not mean that plaintiff should not have the ability to pursue his claim and obtain a judgment, if possible."). In simple terms, a claim is not barred because a defendant

44

133370457

lacks sufficient funds to pay a judgment.  *See Beall*, 2008 WL 2433579, at *3 ("The inability to collect on a judgment (if such is even the case)…does not equate to their being no valid claim.").

*Second*, the limitation on remedies applies only to claims "under this Agreement."  App.598.  The Bondholders' takings claim is made under the Fifth Amendment of the Constitution, not the Trust Agreement, and the Bondholders seek no remedy whatsoever "under this Agreement."

*Third*, Section 804 explicitly preserves the Bondholders' other rights and remedies, providing that the Trust Agreement's limitation on contractual remedies is "without prejudice to any other right or remedy of the Trustee or of the bondholders."  App.598.[7]

*Fourth*, even the limitation on remedies for breach of the Trust Agreement— which is irrelevant to the administrative expense claim—includes recourse against the "moneys in the Sinking Fund and any other moneys available for such purpose." App.598.  There are Net Revenues both in the Sinking Fund and in other accounts.

---

[7] The district court's waiver cases are inapposite as each involved contracts that *expressly* waived Takings Clause claims or expressly terminated upon the occurrence of a taking.  *United States v. Right to Use & Occupy 3.38 Acres of Land*, 484 F.2d 1140, 1143 n.3-4 (4th Cir. 1973) (lease explicitly terminated rights if eminent-domain powers were exercised); *Vandevere v. Lloyd*, 644 F.3d 957, 968 (9th Cir. 2011) (lessees expressly waived takings claim); *United States v. Petty Motor Co.*, 327 U.S. 372, 375 & n.4 (1946) (lessee's rights expressly terminated upon a taking).  The Trust Agreement includes no such language.

App. 2507; App. 2675. Indeed, there are hundreds of millions of Net Revenues in PREPA bank accounts. *See, e.g.*, App.2513; App.2636; App.2652. Thus, there was no waiver, even for a breach of the Trust Agreement, because the Bondholders would have a right to pursue exactly the remedy explicitly made available under the Trust Agreement.

### 2.    The Government's Alleged Capacity Is Irrelevant

The district court also erred in rejecting takings claim because "the government contracted with the Bondholders in its commercial, not sovereign capacity." App.2701. It is irrelevant whether PREPA was acting in a commercial or sovereign capacity when it entered into the Trust Agreement. The relevant inquiry is whether there was a taking of constitutionally protected property without just compensation because the government cannot take protected property without just compensation in any capacity. *See Cecort Realty Dev. Inc. v. Llompart-Zeno*, 100 F. Supp. 3d 145, 154 (D.P.R. 2015) ("There is clearly a constitutional prohibition against a government entity taking private property without just compensation."). Indeed, the leading case that a government's destruction of a plaintiff's lien is a taking, *Armstrong,* involved the government acting in its commercial capacity. *See Armstrong*, 364 U.S. at 48 (finding Fifth Amendment violation where the U.S. seized uncompleted boats from a defaulting contractor); *CLogic LLC v. United State*, 170

Fed. Cl. 450, 457 (2024) (finding contractor stated viable Takings Clause claim where the Air Force took the contractor's property without compensation).

### 3. The District Court Erred In Rejecting The Takings Claim As Replicating A Claim For Breach of the Prepetition Contract

The district court erred in rejecting the takings claim as duplicating a claim for breach of the prepetition contract. *See* App.2702. The Bondholders' claim for the Board's taking and destruction of their collateral is not a claim for breach of contract, nor are the remedies the same.[8] *See supra* at 38-40. Moreover, a takings claim is not eliminated by the fact that the government has also separately breached a contract.

*United States v. Security Industrial Bank*, 459 U.S. 70 (1982) is on point. There, the Supreme Court considered whether a newly enacted bankruptcy provision could be retroactively applied to destroy lien rights arising from preexisting non-possessory liens. The government argued that "traditional property rights are entitled to no greater protection under the takings clause than traditional contract rights." *Id.* at 75. The Supreme Court disagreed, explaining that "our cases recognize, as did the common law, that the contractual right of a secured creditor to obtain repayment of his debt may be quite different in legal contemplation from the

---

[8] The district court relies on irrelevant cases that address a governmental entity's contractual relationship with unsecured counterparties who, unlike the Bondholders, have no property interest other than an unsecured contract right. *See, e.g.,* App.2702 (*citing Tamerlane, Ltd. v. U.S.*, 80 Fed. Cl. 724, 738 (Fed. Cl. 2008)).

property right of the same creditor in the collateral." *Id.* The Supreme Court found that the destruction of the lien, even for a "wholly for public use," was a taking and required just compensation. *Id.* at 77. Notably, the district court also asked for additional briefing about *Security Industrial*, *see* ECF No. 5679 at 3, but then did not mention that controlling decision in its Opinion.

*In re Carpet Center Leasing Co. Inc.*, 991 F.2d 682, 685, 688 (11th Cir. 1993) is also on point. In that case, the Eleventh Circuit likewise recognized the distinction between a takings claim based on the postpetition destruction of collateral and a prepetition contract claim. There, the court allowed an administrative expense for the diminution in the value of its collateral under a prepetition contract, based on the debtor's postpetition use, explaining that an administrative expense claim "is distinct from" the prepetition finance transaction because it is based on "an actual decrease in the value of…the collateral," not the "underlying prepetition obligation." *Id.* at 688. Thus, that court held a prepetition contract claim does not bar an administrative expense claim. *Id.*; *see also In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 429 (2d Cir. 2009) (noting that "administrative expense claims are claims that are entitled to distinct treatment separate and apart from pre-petition, or deemed pre-petition, creditor claims" and collecting cases).

48

**C.** **The District Court Erred In Ruling That The Bondholders Are Not Eligible For An Administrative Expense Because They Are Prepetition Creditors, Not "Innocent Third Parties"**

The district court erroneously held that the Bondholders are not entitled to an administrative expense claim under the *Reading* doctrine because they are "prepetition creditors," not "innocent third parties."[9] App.2697. *Reading* and its progeny do not exclude claims made for postpetition torts and other violations of law because the person making the claim is party to a prepetition contract. Indeed, there is no authority whatsoever for limiting administrative expense claims to parties who had no prepetition relationship with a debtor.

The court relied on *Hemingway Transport, Inc.*, but that case did not rule that a debtor can avoid an administrative expense for postpetition torts or other violations of law if the victim had a prepetition relationship with the debtor. 954 F.2d 1 (1st Cir. 1992). *Hemingway* simply rejected an administrative expense claim brought by a prepetition creditor for attorneys' fees spent opposing the trustee's liquidation because the expenses "had nothing whatever to do with any *postpetition* operation of the [debtor's] business," and conferred no benefit on the estate.[10] *Id.* at 7.

---

[9] The Bondholders are innocent third parties. The Board has taken over $3.7 billion from the Bondholders, and does not intend to repay any of it. App. 1207. Victims of a multi-billion dollar theft are plainly "innocent third parties."

[10] The various other cases cited by the district court involving breaches of prepetition obligations are similarly irrelevant. *See* App.2698, n.20 (citing *In re Old Carco, LLC*, 424 B.R. 650, 660 (Bankr. S.D.N.Y. 2010) (holding that the *Reading* exception

49

Moreover, no tort or constitutional claims were alleged. Here, in contrast, the expenditures at issue were all made postpetition on improvements to PREPA and conferred a dollar-for-dollar benefit on the debtor, and the Bondholders stated tort and constitutional claims.

The district court took *Reading's* rationale of not "excluding tort creditors…or totally subordinating the claims of those on whom the [bankruptcy] is imposed to the claims of those whose benefit it is instituted" as a basis for rejecting administrative expenses for prepetition creditors because "it cannot be denied that [the Bondholders] share (to at least some degree) in the prospective benefit of the successful rehabilitation of PREPA." App.2696-97.  That ruling is legally and factually incorrect.  It is legally incorrect because there is no exception under *Reading* for victims of torts and other violations of law that have a prepetition relationship with the debtor.  To the contrary, any such exception would essentially swallow the rule given the district court's assumption that all creditors benefit from a bankruptcy case.

And the ruling is factually incorrect because the Bondholders have been harmed and not benefitted in any manner by PREPA's actions.  Over the course of

---

did not apply because "[t]here is no allegation that the Debtors…committed an intentional tort"); *In re GT Advanced Techs., Inc.*, 547 B.R. 3, 13-15 (Bankr. D.N.H. 2016) (no administrative expense claim arising from dispute over prepetition breach of contract and where no tort claim was adequately alleged)).

this nearly decade-long proceeding, the Board has engaged in scorched-earth litigation designed to deprive the Bondholders of their collateral and destroy their perfected lien rights. *See supra* at 15-17. The Bondholders have not received a single dollar from PREPA since 2017—nine years ago. To the contrary, the Board has taken over $3.7 billion of the Bondholders' cash collateral, and is fighting to not repay any of it. Every time something occurs that generates more Net Revenues, the Board "moves the goalposts again and again" to "bludgeon the Bondholders into submission" "to justify paying as little as possible." App.3168, 3175,3181-3182. Indeed, the Board recently tried to push through billions of dollars of unnecessary expenses to retain the value of the Bondholders' collateral, which were rejected by PREB. *Id.* Moreover, outside of bankruptcy, PREPA was required to set rates in an amount sufficient to repay the bonds, *see* Act 57-2014 § 6.3(p), which is exactly how every utility sets rates and which would make the Bondholders whole. That obligation is not being enforced in the bankruptcy case. *See, e.g.*, App.1147; App.1203. The Bondholders are not benefitting in any fashion from the bankruptcy case.

**D.    The District Court Erred In Rejecting The Administrative Expense Through An Unprecedented And Factually Incorrect Public Policy Bar That It Raised *Sua Sponte***

The court also rejected the Bondholders' administrative expense claim based on "countervailing public policy concerns, notably the concerns for the supply of

51

electricity to the island as expressed the Authority Act, that stand against granting to a creditor constituency boon that would potentially defeat the island's abilities to rehabilitate the utility and provide customers with reliable energy at the lowest reasonable cost." App.2698. Even PREPA had not argued any such defense, which the court raised *sua sponte* in its Opinion. This ruling also is legally incorrect and unsupported by any evidence.

The court's ruling is legally incorrect because there is no authority whatsoever for overriding the governing Supreme Court precedent to deny an otherwise allowable administrative expense claim based on some notion of public policy. The sole case that the district court relied on does not remotely support an exception to the *Reading* doctrine. Indeed, the case actually *extended* the *Reading* doctrine in this Circuit due to "concerns of public policy" to ensure that a debtor cannot violate the law without paying damages, exactly as PREPA is trying to do here. *In re Bos. Reg'l Med. Ctr. Inc.*, 291 F.3d 111, 126 (1st Cir. 2002)). Moreover, the court's ruling is inconsistent with the actual policy of *Reading* that section 503(b) is available to a party harmed by a debtor's wrongful postpetition conduct, here PREPA's misappropriation. *Reading*, 397 U.S. at 482.

The court's ruling is also erroneous because it is based on factual findings that were made without any record evidence and which are incorrect. The Bondholders would receive no "boon" by receiving an administrative claim, but rather would

52

133370457

merely receive back the monies improperly taken from them, and over which the Bondholders have a perfected and unavoidable lien. Moreover, there is no evidence whatsoever in the record that paying an administrative expense claim would defeat the ability to rehabilitate the utility or raise costs, and it would not. It is the Board's decade-long failure to improve the grid and reestablish access to the capital markets that is impeding PREPA's rehabilitation, as the Board tries to "bludgeon bondholders into submission" by "mov[ing] the goalposts again and again" to "wear them down." App.3168, 3175,3181-3182.

The Bondholders, in contrast, have offered to provide billions of dollars on a pari passu basis to fix the grid—with no rate increase relative to the rates forecasted by the Board. App.1447. But PREPA instead wants to use the Bondholders' collateral to improve its system and wipe out recoveries to a creditor group that compromises virtually the entirety of the municipal bond market that needs to be accessed in order for PREPA to be able to operate the utility going forward, when it will not be possible to misappropriate Net Revenues. *See* App.2824-2826. Furthermore, the Bondholders were owed $8.5 billion as of the Petition Date, and are receiving no payments whatsoever in this almost decade-long bankruptcy case, so they are highly interested in a reorganization here—which is the reason that they have offered billions of dollars to help Puerto Rico, while remaining within the Board's stated metrics for affordable electricity rates.

Lastly, although there is no public policy exception for a *Reading* claim, the proper public policy issue raised here is that a debtor cannot steal a secured creditor's cash collateral and destroy its liens with impunity, as the court's Opinion allows, in violation of the Fifth Amendment and the Bankruptcy Code. The Opinion creates a playbook for debtors to steal creditor property without consequence, and to delay reorganization in order to maintain its new-found cash flow, something acutely obvious in this case in its ninth year. [11]

## CONCLUSION

The district court's conclusion that "the equities of the case militate that the Bondholders be held to the bargain they struck as reflected in the Trust Agreement" misunderstands the Trust Agreement. App.2703. The Bondholders did not agree that PREPA could misappropriate their collateral and destroy their liens. To the contrary, the bargain that the Bondholders struck was that PREPA could not take their collateral. For the foregoing reasons, Appellants respectfully request that the Court reverse the district court's Opinion and remand the case for further proceedings.

---

[11] Alternatively, the Bondholders are entitled to an administrative expense claim under section 922. To avoid duplication, Appellants adopt by reference the arguments concerning section 922 in the opening brief filed by Appellant Assured Guaranty Inc. and National Public Finance Guarantee Corporation.

133370457

Dated:  May 14, 2026                           Respectfully submitted,

*/s/ Lydia M. Ramos Cruz*
Lydia M. Ramos Cruz
1509 López Landrón Street
American Airlines Building, PH
San Juan, Puerto Rico 00911
Tel.:  (787) 508-2525
lramos@ramoscruzlegal.com

*/s/ Glenn M. Kurtz*

Glenn M. Kurtz
Claudine Columbres
Isaac Glassman
Thomas E. MacWright
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel.:  (212) 819-8200
Fax:  (212) 354-8113
gkurtz@whitecase.com

Thomas E Lauria
John K. Cunningham
Michael C. Shepherd
Jesse L. Green
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel.:  (305) 371-2700
Fax:  (305) 358-5744
tlauria@whitecase.com
jcunningham@whitecase.com

*Attorneys for Appellant GoldenTree Asset Management LP*

| | |
|---|---|
| */s/ Rafael Escalera* | */s/ Susheel Kirpalani* |
| Rafael Escalera | Susheel Kirpalani |
| Carlos R. Rivera-Ortiz | Eric Kay |
| REICHARD & ESCALERA | QUINN EMANUEL URQUHART & |
| 255 Ponce de León Avenue | SULLIVAN, LLP |
| MCS Plaza, 10th Floor | 295 Fifth Avenue |
| San Juan, Puerto Rico 00917- | New York, New York 10016 |
| 1913 | susheelkirpalani@quinnemanuel.com |
| escalera@reichardescalera.com | erickay@quinnemanuel.com |
| riverac@reichardescalera.com | |

*Attorneys for Appellant Syncora Guarantee, Inc.*

56

133370457

## CERTIFICATION

This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,908 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word, typeface Times New Roman, 14-point type.

*/s/ Glenn M. Kurtz*
Attorney for Defendants-Appellants

I hereby certify that on May 14, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send a notice of filing to all registered users.

*/s/ Glenn M. Kurtz*
Attorney for Defendants-Appellants

# ADDENDUM

**Page(s)**

1.    *Opinion and Order Denying PREPA Bondholders' Motion for Allowance of Administrative Expense Claim*, D.I. 6063, Case No. 17-BK-4780-LTS…………………………………………Add.1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO <u>et al.</u>,<br><br>    Debtors.[1] | PROMESA Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as a representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | PROMESA Title III<br><br>Case No. 17-BK-4780-LTS |

OPINION AND ORDER DENYING PREPA BONDHOLDERS'
MOTION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the: (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (v) Puerto Rico Public Buildings Authority ("PBA", and together with the Commonwealth, HTA, ERS, and PREPA, the "Debtors") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations). On October 30, 2024, the Title III case for the Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) was closed.

APPEARANCES:

RAMOS CRUZ LEGAL
By:    Lydia M. Ramos Cruz
1509 López Landrón Street
American Airlines Building, PH
San Juan, Puerto Rico 00911

WHITE & CASE LLP
By:    Thomas E Lauria
       Glenn M. Kurtz
       Claudine Columbres
       Isaac Glassman
       Thomas E. MacWright
1221 Avenue of the Americas
New York, New York 10036

*and*

       John K. Cunningham
       Michael C. Shepherd
       Jesse L. Green
200 S. Biscayne Blvd., Suite 4900
Miami, Florida 33131

*Co-Counsel for GoldenTree Asset*
*Management LP*

CASELLAS ALCOVER & BURGOS P.S.C.
By:    Heriberto Burgos Pérez
       Ricardo F. Casellas-Sánchez
       Diana Pérez-Seda
P.O. Box 364924
San Juan, Puerto Rico 00936-4924

GIBSON, DUNN & CRUTCHER LLP
By:    Matthew D. McGill
       Lochlan F. Shelfer
1700 M Street, N.W.
Washington, D.C. 20036-4504

CADWALADER, WICKERSHAM
& TAFT LLP
By:    Howard R. Hawkins, Jr.
       Mark C. Ellenberg
       Casey J. Servais

O'NEILL & BORGES LLC
By:    Hermann D. Bauer
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813

PROSKAUER ROSE LLP
By:    Martin J. Bienenstock
       Paul V. Possinger
       Ehud Barak
       Margaret A. Dale
       Elliot R. Stevens
Eleven Times Square
New York, NY 10036

*Counsel for the Financial Oversight and*
*Management Board as representative for the*
*Debtors*

BUFETE EMMANUELLI, LLC
By:    Rolando Emmanuelli-Jiménez
P.O. Box 10779
Ponce, Puerto Rico 00732

ORTIZ MENDOZA & FARINACCI
FERNÓS, LLC
By:    Rafael A. Ortiz Mendoza
Edificio Banco Cooperativo Plaza
623 Avenida Ponce de León, Suite 806-B
San Juan, Puerto Rico 00917-4820

*Counsel for Sistema de Retiro de los*
*Empleados de la Autoridad de Energía*
*Electrica ("SREAEE")*

William J. Natbony
Thomas J. Curtin
200 Liberty Street
New York, New York 10281

*Co-Counsel for Assured
Guaranty Inc.*

REICHARD & ESCALERA, LLC
By:     Rafael Escalera
          Sylvia M. Arizmendi
          Carlos R. Rivera-Ortiz
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, Puerto Rico 00917-1913

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
By:     Susheel Kirpalani
          Eric Kay
295 Fifth Avenue
New York, New York 10016

*Co-Counsel for Syncora Guarantee, Inc.*

ADSUAR MUÑIZ GOYCO SEDA &
PÉREZ OCHOA, P.S.C.
By:     Eric Pérez-Ochoa
          Luis Oliver-Fraticelli
          Alexandra Casellas-Cabrera
P.O. Box 70294
San Juan, Puerto Rico 00936

WEIL, GOTSHAL & MANGES LLP
By:     Matthew S. Barr
          Jonathan Polkes
          Robert Berezin
767 Fifth Avenue
New York, New York 10153

*and*

Gabriel A. Morgan
700 Louisiana Street, Suite 1700
Houston, Texas 77002

*Co-Counsel for National Public Finance
Guarantee Corporation*

MONSERRATE SIMONET &
GIERBOLINI,
LLC
By:    Dora L. Monserrate-Peñagarícano
        Fernando J. Gierbolini-González
        Richard J. Schell
101 San Patricio Ave., Suite 1120
Guaynabo, Puerto Rico 00968

DECHERT LLP
By:    G. Eric Brunstad, Jr.
        Stephen D. Zide
        David A. Herman
1095 Avenue of the Americas
New York, New York 10036

*Co-Counsel for the PREPA Ad Hoc Group*

RIVERA, TULLA AND FERRER, LLC
By:    Eric A. Tulla
Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212

MASLON LLP
By:    Clark T. Whitmore
        Michael C. McCarthy
        John T. Duffey
        Jason M. Reed
225 South Sixth Street, Suite 2900
Minneapolis, MN 55402

*Attorneys for U.S. Bank National Association,
in its capacity as the PREPA Bond Trustee*

LAURA TAYLOR SWAIN, United States District Judge

Before the Court is the *PREPA Bondholders' Motion and Memorandum of Law for Allowance of Administrative Expense Claim* (Docket Entry No. 29173 in Case No. 17-3283 and Docket Entry No. 5599 in Case No. 17-4780)[2] (the "Motion"). The Motion was filed by Assured Guaranty Inc., GoldenTree Asset Management LP, National Public Finance Guarantee Corporation, the PREPA Ad Hoc Group, Syncora Guarantee, Inc., and U.S. Bank National Association as trustee (the "Bond Trustee," or the "Trustee," and together the "Bondholders" or "Movants").[3] The Court has also received and reviewed the *Debtor's Objection to PREPA Bondholders' Motion for Allowance of Administrative Expense Claim* (Docket Entry No. 29280 in Case No. 17-3283 and Docket Entry No. 5629 in Case No. 17-4780) (the "FOMB Objection") filed by the Puerto Rico Electric Power Authority ("PREPA") by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") and additional submissions by the parties and other parties in interest with respect to the Motion.[4]

---

[2] Unless otherwise indicated, all references to "Docket Entry Nos." in this Opinion refer to entries in Case No. 17-4780. Capitalized words used but not defined herein shall have the meanings ascribed to them in the Motion or in any specifically referenced pleading.

[3] Assured, Syncora, and National are all monoline insurers of insured Bonds. The Court will use the lower-case phrase "the bondholders" to refer generally to the holders of bonds issued under the Trust Agreement. When specifically discussing the bondholders and insurers that are parties in this action, the Court will use the capitalized term "Bondholders."

[4] The Court has also received and reviewed the *Expert Declaration of Maureen M. Chakraborty, PHD* (Docket Entry No. 29227-1 in Case No. 17-3283 and Docket Entry No. 5614-1 in Case No. 17-4780) (the "Chakraborty Declaration"); the declaration of Margaret A. Dale in support of the FOMB Objection (Docket Entry No. 29300 in Case No. 17-3283 and Docket Entry No. 5637 in Case No. 17-4780) (the "Dale Declaration"); the Official Committee of Unsecured Creditors' (the "Committee") supplemental brief and joinder to the FOMB Objection (Docket Entry No. 29308 in Case No. 17-3283 and Docket Entry No. 5649 in Case No. 17-4780); the Puerto Rico Fiscal Agency and Financial Advisory Authority's ("AAFAF") joinder to the FOMB Objection (Docket Entry No. 29306 in Case No. 17-3283 and Docket Entry No. 5650 in Case No. 17-4780); multiple additional joinders to the FOMB Objection filed by various parties (Docket

The Court heard oral argument with respect to the Motion at the July 23, 2025 omnibus hearing. *July 23, 2025 Omnibus Hr'g Tr.* (Docket Entry No. 29725 in Case No. 17-3283 and Docket Entry No. 5757 in Case No. 17-4780.) The Court has considered all of the relevant submissions carefully. The Court has subject matter jurisdiction of this action pursuant to section 306(a) of PROMESA. 48 U.S.C. § 2166(a).[5]

The Bond Trustee, on behalf of the Bondholders, filed Proof of Claim No. 18449 on May 21, 2018, as a fully secured claim in the amount of $8,477,156,729.56, for amounts owed at the time the Title III petition was filed pursuant to that certain trust agreement between PREPA and the Bond Trustee (as successor trustee), dated as of January 1, 1974, as amended and supplemented (the "Trust Agreement" or "TA").[6] Through the Motion, the Bondholders seek the

---

Entry Nos. 29305 and 29307 in Case No. 17-3283 and Docket Entry Nos. 5638-5648 & 5651 in Case No. 17-4780; the Bondholders' response in support of the Motion (Docket Entry No. 29363 in Case No. 17-3283 and Docket Entry No. 5668 in Case No. 17-4780) (the "BH Reply ISO"); the declaration of Wiliam J. Natbony in support of the BH Reply ISO ((Docket Entry No. 29365 in Case No. 17-3283 and Docket Entry No. 5669 in Case No. 17-4780); the Oversight Board's supplemental brief in opposition to the Motion (Docket Entry No. 29425 in Case No. 17-3283 and Docket Entry No. 5685 in Case No. 17-4780) (the "FOMB Supplemental Brief"); and the Bondholders' supplemental brief in response thereto (Docket Entry No. 29497 in Case No. 17-3283 and Docket Entry No. 5700 in Case No. 17-4780) (the "BH Supplemental Response").

[5]  The Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")—incorporating the Federal Rules of Civil Procedure (the "Federal Rules") to the extent stated therein—are made applicable in these Title III cases by section 310 of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). 48 U.S.C. § 2170. PROMESA is codified at 48 U.S.C. section 2101 et seq. References herein to "PROMESA" section numbers are to the uncodified version of the legislation. References herein to the provisions of Title 11 of the United States Code (the "Bankruptcy Code") are to sections made applicable in these cases by section 301 of PROMESA. 48 U.S.C. § 2161.

[6]  In response to the Court's *Order Concerning PREPA Trust Agreement* (Docket Entry No. 115 in Adv. Proc. No. 19-00391), the Oversight Board and the Defendants filed an agreed-upon conformed copy of the trust agreement as Exhibit A to their *Joint Informative Motion Submitting Conformed Trust Agreement in Response to January 5, 2023 Order Concerning PREPA Trust Agreement [ECF No. 115]* (Docket Entry No. 118

---

entry of an order allowing an administrative expense priority claim in an amount "no less than $3.7 billion, the amount of which may increase if PREPA continues to use Net Revenues" after the date on which an order granting the Motion is issued without providing adequate protection. (Docket Entry No. 29175-1 in Case No. 17-3283 and Docket Entry No. 5601-1 in Case No. 17-4780 at 2.)  The Oversight Board has requested that the Court deny the Motion as a matter of law, arguing that the Bondholders have not demonstrated any entitlement to administrative expense priority under the applicable sections of the Bankruptcy Code, as incorporated into PROMESA.  (See, e.g., FOMB Obj. ¶ 27.)

For the following reasons, the Court holds that (a) the Bondholders have not demonstrated that PREPA's postpetition use of their alleged collateral is an "actual, necessary expense" incurred by PREPA postpetition that can be prioritized as an administrative expense under section 503(b)(1)(A) of the Bankruptcy Code ("Section 503(b)(1)(A)"), (b) the Bondholders have failed to show that they are entitled to administrative expense priority under the fundamental fairness doctrine enunciated in Reading v. Brown, 391 U.S. 471, 477 (1967), because that doctrine is inapplicable to their claim and because they have not pleaded cognizable claims sounding in tort, and (c) the Bondholders have not shown that they are entitled to priority claims under section 922(c) of the Bankruptcy Code ("Section 922(c)") because PREPA did not fail to provide any Court-ordered adequate protection payments to the Bondholders.  As a result, the Court denies the Motion because it fails as a matter of law to demonstrate that the Bondholders have an allowable administrative expense claim.

---

Ex. A in Adv. Proc. No. 19-00391).  All citations to the Trust Agreement are to that conformed version.

I.

BACKGROUND

Unless otherwise indicated, facts presented or recited in this Opinion and Order are identified as undisputed in the Motion or the FOMB Objection or drawn from evidence as to which there has been no contrary, non-conclusory factual proffer.

A.    PREPA

PREPA is a public corporation created under the Puerto Rico Electric Power Authority Act, Act No. 83-1941, codified at 22 L.P.R.A. §§ 191-240 (as amended, the "Authority Act"),[7] to supply substantially all of the electricity consumed in the Commonwealth.  The Authority Act authorizes PREPA to issue bonds.  22 L.P.R.A. § 206.  Between the years 1974 and 2016, PREPA made several bond issuances pursuant to the Trust Agreement, totaling approximately $8.3 billion of bonds (the "Bonds").

---

[7]    Unless otherwise stated, all citations herein to provisions of the Laws of Puerto Rico Annotated are to the English-language translations, available on Westlaw, by the Translation Office of the Puerto Rico Government, with one exception: Westlaw does not provide an English-language translation of the current section 5, titled "Powers and Authorities," of the Authority Act and certain other sections thereof.  Accordingly, for the English-language translations of the relevant sections of the Authority Act—some of which have been amended since the version that was in effect on the date relevant to the Estimation Order (July 3, 2017), which is currently the most recent version available in English-language translation on Westlaw—the Court has relied upon a translated compilation of the Authority Act provided by the Puerto Rico Office of Management and Budget.  Puerto Rico Electric Power Authority Act, Act No. 83-1941 (codified as amended by Act 33-2019), 22 L.P.R.A. §§ 191-240 (2019), https://bvirtualogp.pr.gov/ogp/Bvirtual/leyesreferencia/PDF/2-ingles/83-1941.pdf [https://perma.cc/VU2R-8MM2].  However, consistent with the Spanish-language version of the Authority Act available on Westlaw, the Court will cite section 5 of the Authority Act as 22 L.P.R.A. § 195a-1 ("Powers and Authorities"), and section 6 of the Authority Act as 22 L.P.R.A. § 196 ("Duties and Responsibilities").  Until 1979, PREPA's name was the Puerto Rico Water Resources Authority.

---

260316 BH ADMIN MOT OP & ORD              VERSION MARCH 16, 2026              8

**Add.8**

B.      Relevant Provisions of the Trust Agreement

Article I of the Trust Agreement defines key terms, including "Revenues" and "Net Revenues."  PREPA's "Revenues" are (1) "all moneys received by [PREPA] in connection with or as a result of its ownership or operation" of its electricity generation and distribution system, (2) "any proceeds of use and occupancy insurance on the System or any part thereof," and (3) "income from investments made under" either the Trust Agreement or a 1947 predecessor agreement.  (TA § 101.)  "Current Expenses" are "the Authority's reasonable and necessary current expenses of *maintaining, repairing, and operating* the System" but they do not include certain other transfers, such as deposits to the credit of the Sinking Fund (as discussed immediately hereafter).  (Mot. ¶ 5 (quoting TA §101) (emphasis added).)  "Net Revenues" are the "amount of the excess of the Revenues for such period over the Current Expenses for such period."  (TA § 101.)

Article V of the Trust Agreement establishes a "waterfall" structure for distributing PREPA's Revenues (as the term is defined in Article I) into certain funds.  (TA Art. V.)  The Revenues (except for certain types of investment income) first flow into the General Fund.  (TA § 503.)  PREPA pays its Current Expenses out of the General Fund.  (TA § 505.)  The remaining Revenues—the Net Revenues—then flow into the Revenue Fund, minus a reserve to cover future operating expenses.  (TA § 506.)  From there, Net Revenues flow first into the Sinking Fund, and then into a series of Subordinate Funds.  (See TA § 507.)  The Net Revenues deposited into the Sinking Fund are designated to cover debt service.  The Net Revenues deposited into the Subordinate Funds are designated to cover internal PREPA operations, such as extraordinary repairs or capital improvements.  There are four Subordinate Funds: the Self-Insurance Fund, the Capital Improvement Fund, the Reserve Maintenance Fund,

and the Construction Fund (which is not, technically, included in the waterfall structure).[8] If there is not enough money in the Sinking Fund to cover PREPA's debt service obligations at a given time, Article V (specifically, sections 512 through 512B) broadly requires PREPA to draw on the Subordinate Funds—other than the Construction Fund—to pay bondholders. (See TA §§ 512, 512A, 512B.)

Article VII of the Trust Agreement outlines specific contractual covenants between the bondholders and PREPA. In section 701, PREPA covenants that it will "promptly pay the principal of and the interest on" the Revenue Bonds. (TA § 701.) PREPA also covenants that the Revenue Bonds are "payable solely from the Revenues and said Revenues are hereby pledged to the payment thereof in the manner and to the extent hereinabove particularly specified." (TA § 701.) In sections 705 and 712, PREPA also agrees not to create—"or suffer to be created"—any lien or charge on "the Revenues ranking equally with or prior to the [Revenue Bonds]." (TA §§ 705, 712.)

Article VIII of the Trust Agreement outlines the bondholders' remedies. Section 804 permits the bondholders to file a suit "in equity or at law . . . for the appointment of a receiver as authorized by the Authority Act[,] or for the specific performance of any covenant or agreement contained herein." (TA § 804.) The same provision entitles the bondholders to "recover and enforce any judgment or decree against the Authority, but solely as provided herein and in such bonds, for any portion of such amounts remaining unpaid . . . and to collect (but

---

8       Instead, as noted by the Court of Appeals for the First Circuit (the "First Circuit"), "the Construction Fund is replenished by bond proceeds and certain Net Revenues preemptively siphoned off from the Revenue Fund." U.S. Bank Nat'l Assoc. v. Fin. Oversight and Mgmt. Bd. for P.R. (In re Fin. Oversight and Mgmt. Bd. for P.R.), 121 F.4th 280, 291 n.6 (1st Cir. 2024).

solely from moneys in the Sinking Fund and any other moneys available for such purpose) in any manner provided by law, the moneys adjudged or decreed to be payable." (TA § 804.)

      C.      <u>The PREPA Title III Proceedings</u>

On July 2, 2017 (the "Petition Date"), the Oversight Board filed a petition pursuant to Title III of PROMESA, commencing a debt adjustment proceeding for PREPA under that statute. (Docket Entry No. 1.) On May 3, 2019, the Oversight Board, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), and PREPA (together the "Government Parties"), along with the Ad Hoc Group and Assured (followed soon thereafter by Syncora and National), entered into a restructuring support agreement intended to resolve claims related to the Bonds by granting certain treatment of the claims in exchange for support of a corresponding plan of adjustment (the "2019 RSA") (Dale Decl. Ex. 2). The 2019 RSA contemplated, and according to the Oversight Board was dependent upon, passage by the Commonwealth of legislation authorizing several transactions called for by the RSA. Such legislation was never passed.

In April 2020, after numerous adjournments of hearings on a motion to approve the settlements embodied in the 2019 RSA, as well as extensions of time due to earthquakes and the COVID-19 pandemic, the Court granted the Oversight Board and AAFAF's unopposed request to stay the deadlines applicable to the settlement motion. (Docket Entry Nos. 1947, 1954.) The Government Parties thereafter filed periodic status updates. (<u>See, e.g.</u>, Docket Entry Nos. 1992, 2691.)

On January 18, 2022, the Court confirmed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19784 in

Case No. Case No. 17-3283 (the "Commonwealth Plan").[9]  (Docket Entry No. 19813 in Case No. 17-3283.)

On February 18, 2022, the Ad Hoc Group filed an urgent motion (the "Urgent Motion") asking the Court to appoint a mediator and set PREPA plan submission and confirmation deadlines.  (Docket Entry No. 2718.)

On March 8, 2022, citing concerns regarding lack of implementing legislation and a comprehensive settlement of PREPA's legacy obligations, along with concerns regarding the affordability of the cost of electricity and the sustainability of the electric system as a result of rising inflation and significant surges in the price of crude oil, AAFAF gave unilateral notice of termination of the 2019 RSA.  (See Docket Entry No. 2747 Ex. B (the "RSA Termination Notice").)

Also on March 8, 2022, the Court denied the Urgent Motion's specific requests, but entered an order requiring the Oversight Board, by a certain deadline (the "Path Forward Deadline"), to file (1) a proposed plan of adjustment for PREPA, (2) a detailed term sheet for a plan of adjustment for PREPA, (3) a proposed litigation schedule for significant disputed issues in PREPA's Title III case, including the existence and extent of the Bondholders' secured claim, or (4) a declaration and memorandum of law showing cause as to why the Court should not consider dismissal of PREPA's Title III case.  (See Docket Entry No. 2748 ¶ 3(b).)

On April 8, 2022, this Court entered orders appointing the Mediation Team (as defined therein) and establishing terms and conditions to govern mediation, including an initial

---

[9]  The Commonwealth Title III case was commenced on May 3, 2017.  (Docket Entry No. 1 in Case No. 17-3283.)  The PREPA Title III proceedings have been administered jointly with the various other Title III proceedings.  (See Docket Entry No. 304 in Case No. 17-4780.)

mediation termination date (the "Termination Date"). (Docket Entry No. 2772 (the

"Appointment Order"); Docket Entry No. 2773 (the "Terms and Conditions Order")).)

The Path Forward Deadline and Termination Date were extended several times.

(See, e.g., Docket Entry No. 2949.) In mid-September 2022, the Mediation Team declined to

extend the deadlines any further, at which time the Bondholders (without the Bond Trustee) filed

a motion to dismiss PREPA's Title III Case or for relief from the automatic stay in order to

enforce their contractual right to a receiver. (See Docket Entry No. 2973.)

On September 29, 2022, this Court entered an order staying the September 2022

motion to dismiss the case or for relief from the automatic stay, establishing a deadline to file a

plan of adjustment, and establishing a litigation schedule for Adversary Proceeding

No. 19-00391. (See Docket Entry No. 3013 (the "Litigation Scheduling Order")).)

Throughout these proceedings, in an effort to protect their alleged collateral, the

Bondholders have, at certain times, requested adequate protection. (See Mot. ¶ 20.) Before

2019, the Bondholders moved for relief from the automatic stay and for adequate protection

twice: once on July 18, 2017, and in a renewed motion filed on October 3, 2018.[10] (Mot.

¶¶ 20-21.) Before the Court could decide whether to grant stay relief or adequate protection to

the Bondholders on the 2018 renewed motion, the parties entered into the 2019 RSA. (Mot.

---

[10]    On July 18, 2017, certain PREPA bondholders and monoline insurers filed a motion
        seeking relief from the automatic stay under PROMESA to pursue the appointment of a
        receiver in a non-Title III court. (Docket Entry No. 74.) Following the denial of the
        motion by this Court, a partial reversal by the Court of Appeals for the First Circuit, and a
        renewed motion (Docket Entry No. 975), the briefing schedule for the renewed motion
        was consensually extended several times. The motion was not resolved before the
        parties' entry into the 2019 RSA. (See Docket Entry Nos. 299, 1176, 1204, 3364.) See
        generally Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. of PREPA Bondholders
        (In re Fin. Oversight & Mgmt. Bd. for P.R.), 899 F.3d 13 (1st Cir. 2018). The renewed
        stay relief motion was administratively terminated for statistical purposes by Court order
        (Docket Entry No. 3364) after the termination of the 2019 RSA.

¶ 22.) The 2019 RSA required PREPA to make monthly payments to the Bondholders after it received approval from the Court, and included various other covenants, among them a promise to treat certain Bondholders' claims as administrative expense claims in the event the 2019 RSA was approved by the Court. (Mot. ¶ 22.) On May 10, 2019, the Oversight Board and AAFAF filed a joint motion seeking approval of the 2019 RSA. (Mot. ¶ 23.) However, the Court never approved the 2019 RSA, and on March 8, 2022—nearly two years after the Court granted the motion staying deadlines related to its approval— AAFAF unilaterally terminated the 2019 RSA. (See Mot. ¶ 25.) On September 19, 2022, certain Bondholders moved to dismiss PREPA's case, or alternatively for relief from the automatic stay to enforce their right to appoint a receiver under the terms of the Trust Agreement, but that motion did not seek adequate protection. (Mot. ¶ 25.) Eventually, the Oversight Board filed a plan of adjustment without support from the Bondholders. (Mot. ¶ 25.) On August 24, 2023, certain Bondholders moved again for relief from the automatic stay, now citing lack of adequate protection. (Mot. ¶ 26.) After the Court stayed that motion pending the outcome of related litigation, certain Bondholders renewed their request to lift the stay of that motion in February 2024. (Mot. ¶ 26.)

On February 11, 2025, the Oversight Board certified and filed PREPA's 2025 Fiscal Plan. (Docket Entry No. 5501.) The 2025 Fiscal Plan states that PREPA will not be able to afford "any sustainable rate increases for debt service" because such increases would outstrip the median income household's ability to afford to pay utility rates. (Mot. ¶ 32.) The Oversight Board bases this finding on a projection that "Necessary Maintenance Expenses" ("NMEs") have risen and will rise rapidly, consuming revenues that could otherwise be available for debt service. (Mot. ¶ 32.)

On March 28, 2025, the Oversight Board filed the *Fifth Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* (the "Fifth Amended Plan"). (Mot. ¶ 33; <u>see</u> <u>also</u> Docket Entry No. 29125 in Case No. 17-3283 and Docket Entry No. 5581 in Case No. 17-4780.) The Fifth Amended Plan contemplates the payment of the value of the Bondholders' secured claim in full once it has been determined (the Oversight Board takes the position that the value of the claim is nil) and proposes to pay general unsecured creditors from funds that the Bondholders allege constitute collateral securing PREPA's outstanding obligations under the bonds. (Mot. ¶ 33.) The Fifth Amended Plan remains PREPA's operative proposed plan of adjustment.

> D.     <u>Adversary Proceeding No. 19-00391</u>

On July 1, 2019, the Oversight Board commenced Adversary Proceeding No. 19-00391, seeking to disallow in part the Bondholders' claim. (Docket Entry No. 1 in Case No. 19-00391.)

On March 23, 2023, the Court entered an order granting in part and denying in part cross-motions for summary judgment with respect to the allowance or disallowance of Proof of Claim No. 18449. (<u>See</u> Docket Entry No. 147 in Adv. Proc. No. 19-00391 (the "Summary Judgment Order").) In the Summary Judgment Order, the Court held that:

> (a) the Trust Agreement granted the Bondholders security interests only in moneys actually deposited to the Sinking Fund, Self-insurance Fund, Capital Improvement Fund, Reserve Maintenance Fund, and Construction Fund (as defined in the Trust Agreement); (b) the Bondholders have perfected their liens in the Sinking Fund, Self-insurance Fund, and Reserve Maintenance Fund, over which the Trustee has established control (as discussed below);[11] (c) the Bondholders have no

---

[11]     The Court declined to address the Bondholders' possible perfection of their liens on the Capital Improvement Fund and Construction Fund, because the record before the Court provided no evidence from either party as to the form of the assets comprising those

security interest in the covenants and remedies provided for by the Trust Agreement; but (d) based on PREPA's payment and equitable relief covenants in the Trust Agreement, the Bondholders have an unsecured claim (within the meaning of 11 U.S.C. § 101(5)(B)) to be liquidated by reference to the value of future Net Revenues (as defined in the Trust Agreement) that would, under the waterfall provisions of the Trust Agreement and applicable nonbankruptcy law, have become collateral upon being deposited in the specified funds and payable to the Bondholders over the remainder of the term of the Bonds (the "Unsecured Net Revenue Claim").

(Summary Judgment Order at 13-14.) The Court further held that the value of the Unsecured Net Revenue Claim must be determined "either consensually or through proceedings under section 502 of the Bankruptcy Code." (Summary Judgment Order at 62, 70.) The parties were unable to reach consensus as to the value of the Net Revenue Claim.

On May 15, 2023, the Oversight Board filed a motion asserting that Counts III through VII of the Counterclaim Complaint "either (i) were resolved through this Court's [Summary Judgment Order]; (ii) fail to state a claim; (iii) are time-barred; or (iv) are preempted by the Bankruptcy Code." (Docket Entry No. 211 in Adv. Proc. No. 19-00391 (the "FOMB MTD").) The FOMB MTD sought the dismissal of Counts III through VII of the Bondholders' counterclaim complaint. (See Docket Entry No. 47 in Adv. Proc. No. 19-00391.)

On June 26, 2023, after a three-day hearing held earlier that month, this Court issued its *Order Concerning Bondholders' Unsecured Net Revenue Claim Estimation* (Docket

---

Funds and their custodial status, and means of perfection may vary with the form of the asset in question. On August 28, 2023, the Court entered the *Joint Stipulation and Agreed Order of the Financial Oversight and Management Board for Puerto Rico, U.S. Bank National Association as PREPA Bond Trustee, the Ad Hoc Group Of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, and Syncora Guarantee, Inc. Resolving Perfection-Related Issues*, approving a consensual resolution of the remaining lien-perfection issues while reserving certain rights for appeals. (Docket Entry No. 337 in Adversary Proceeding No. 19-00391.)

Entry No. 315 in Adv. Proc. No. 19-00391) (the "Estimation Order"), liquidating the Unsecured Net Revenue Claim in the amount of $2,388,000,000.00. (Estimation Order at 47.)

On November 28, 2023, the Court issued an order granting the FOMB MTD, denying requests (1) for declaratory judgments: (a) that PREPA has breached statutory obligations and contractual covenants, (b) that PREPA is a trustee for the Bondholders, (c) that PREPA has committed certain torts, (d) that PREPA had committed any takings by deciding to file or filing under Title III, and (2) for rescission of contract. (Docket Entry No. 361 in Adv. Proc. No. 19-00391.)

Thereafter, the Court entered judgment in Adversary Proceeding No. 19-00391, and several parties, including the Bondholders, appealed. (See Docket Entry Nos. 362, 363, 365, 366, 368, 369, 371, 372, 386 in Adv. Proc. No. 19-00391.)

E.    The First Circuit Lien Decision and Current Procedural Posture

On June 16, 2024, the United States Court of Appeals for the First Circuit (the "First Circuit") issued an opinion (later revised in part and reissued on November 13, 2024) affirming in part and reversing in part this Court's Summary Judgment Order and Estimation Order. See U.S. Bank Nat'l Assoc. v. Fin. Oversight and Mgmt. Bd. for P.R. (In re Fin. Oversight and Mgmt. Bd. for P.R.), 121 F.4th 280, 294 (1st Cir. 2024) (the "First Circuit Lien Decision"). In the First Circuit Lien Decision, the panel held, inter alia, that: the Bondholders possess a lien on Net Revenues under the Trust Agreement, which liens are perfected as to Net Revenues already acquired by PREPA and as to future revenues as acquired; the Bondholders' allowed claim is approximately $8.5 billion (the face value of their bonds plus matured pre-petition interest), although the value of the Net Revenues, if any, securing it is to be determined in the first instance by this Court; the Bondholders are non-recourse creditors; PREPA is not a

trustee for the Bondholders; and the Bondholders properly pleaded a claim for an equitable accounting.

On June 17, 2024, this Court requested a joint status report from the parties to the appeal; the report was filed on July 3, 2024. (Docket Entry Nos. 5247 and 5274.) At a status conference on July 10, 2024, the Court stayed litigation in PREPA's Title III case and Adversary Proceeding No. 19-00391 and directed the parties to meet with the Mediation Team; the stay and directive were memorialized in an order dated July 11, 2024. (Docket Entry No. 5286 (the "PREPA Litigation Stay Order" or "PREPA Litigation Stay").) The Court later extended the PREPA Litigation Stay while the Oversight Board and certain other parties sought rehearing at the First Circuit. (Docket Entry Nos. 5338, 5390, 5406, 5480.)

On January 13, 2025, the First Circuit issued its mandate to this Court. (Docket Entry No. 401 in Adversary Proceeding No. 19-00391.) On February 24, 2025, the Bondholders asked the Court to lift the PREPA Litigation Stay to allow several matters to proceed, including a motion for allowance of an administrative expense claim. (Docket Entry No. 5510 ¶¶ 48-50.) On March 20, 2025, the Court granted the parties partial relief from the PREPA Litigation Stay, permitting the Oversight Board to file an amended plan of adjustment for PREPA, and permitting the filing of the instant Motion. (Docket Entry No. 5572.)

F.     The Instant Administrative Expense Motion

On April 7, 2025, Movants filed the Motion, in which they made three legal arguments, any one of which would, if valid, suffice to state a claim for an administrative expense claim. (Mot. ¶¶ 43-66.) First, Movants argue that Section 503(b)(1)(A) entitles them to an administrative expense claim for Net Revenues spent or withheld by PREPA during the life of the Title III case, as "actual, necessary costs and expenses of preserving the estate." (Mot. ¶ 44

(quoting 11 U.S.C. § 503(b)(1)(A)).)  Movants contend that PREPA's use of Movants' collateral entitles them to a priority claim under this provision because such use created "actual value conferred on the bankrupt estate."  (Mot. ¶ 45 (quoting In re United Trucking Serv., Inc., 851 F.2d 159, 162-63 (6th Cir. 1988)).)  Second, Movants argue that, even if Section 503(b)(1)(A) does not by its direct application entitle them to an administrative expense claim, the Supreme Court's decision in Reading v. Brown, 391 U.S. 471, 477 (1967), and its progeny provide an alternative basis for their claim because "tort claims arising during a bankruptcy case give rise to administrative expense claims."[12]  (Mot. ¶ 47.)  Invoking Reading, Movants assert two tort claims against PREPA: (1) a claim for conversion under Puerto Rico law; and (2) a claim under the Takings Clause of the Fifth Amendment of the Constitution of the United States for compensation for PREPA's use of Movants' collateral during the pendency of this Title III Case. (See also Mot. ¶¶ 48-52.)  As a fallback, Movants further contend that Section 922(c) should also entitle them to an administrative expense claim because "'there has been a diminution in the value of [Movants'] secured collateral' by reason of the automatic stay."  (Mot. ¶ 53 (quoting Grundy Nat'l Bank v. Rife, 876 F.2d 361, 363 (4th Cir. 1989)).)  Movants argue that PREPA's failure to provide Movants with adequate protection despite their requests for it earlier in the case and, separately, failure to provide the adequate protection payments contemplated by certain provisions of the 2019 RSA, entitle them to an administrative expense claim under Section 922(c).  (Mot. ¶¶ 54-59.)  Finally, Movants argue that the Court must rule in their favor under Section 503(b)(1)(A) and Section 922(c) as a matter of constitutional avoidance.  (Mot. ¶¶ 60-66.)

---

[12]    Reading was decided under section 64(a)(1) of the former Bankruptcy Act, 11 U.S.C. section 104(a)(1), which predated Section 503(b)(1)(A).  The statutory evolution is not material to the parties' arguments.  (Mot. ¶ 47 n.35.)

On April 28, 2025, the Oversight Board filed the FOMB Objection, in which it responds to the arguments in the Motion and asserts that Movants fail to state a claim upon which relief may be granted, making four principal arguments. First, the Oversight Board argues that Movants' collateral is limited to Net Revenues as that term is defined in the Trust Agreement, and that no Net Revenues have existed during the Title III Case. (FOMB Obj. ¶¶ 28-30.) Second, the Oversight Board argues that, even if PREPA in fact generated Net Revenues during this time, the Motion should still be denied because the First Circuit Lien Decision made clear that Movants' claims are "nonrecourse," such that Movants "may only reach moneys available for debt service," and no such moneys currently exist. (FOMB Obj. ¶ 32 (quoting First Circuit Lien Decision, 121 F.4th at 316).) To rebut Movants' arguments relating to Section 503(b), the Oversight Board argues that Movants have failed to set forth a prima facie case that PREPA's use of their collateral caused it to diminish in value because, among other things, the monthly operating reports upon which Movants' arguments rely (discussed further below) only show that PREPA used Net Revenues to generate more Net Revenues and that, in any case, claims for administrative expenses do not lie for diminution in the value of a prepetition creditor's collateral. (FOMB Obj. ¶¶ 42-51. See also UCC Suppl. Br. ¶ 20.) Regarding Movants' arguments under Section 922(c), the Oversight Board argues that Movants' claim does not meet the two requirements for administrative priority under that section—that a claimant has (1) been provided adequate protection, but (2) nonetheless has a claim arising from the stay. (FOMB Obj. ¶ 52 (citing 11 U.S.C. § 922(c)).) In this connection, the Oversight Board argues that PREPA has never provided adequate protection to the Bondholders, noting that the Court never expressly entered an order directing PREPA to make such payments, and that the 2019 RSA, which would have provided "adequate protection" payments following court

approval, was never approved by the Court. (FOMB Obj. ¶¶ 53-64.) The Oversight Board further contends that (1) PREPA never "failed" to provide adequate protection, (2) the Bondholders have no claim arising from any such failure, and (3) any diminution claims that they might assert did not "arise from" the automatic stay. (FOMB Obj. ¶¶ 65-73.) With respect to Movants' arguments under Reading v. Brown, the Oversight Board maintains that the Bondholders have not pleaded viable conversion nor Takings Clause claims. (FOMB Obj. ¶¶ 73-87.) Finally, the Oversight Board argues that the evidence would show that PREPA has not generated any Net Revenues since the Petition Date, reducing the actual value of the Bondholders' claim to a level far below the face value of the outstanding bonds and prepetition interest. (FOMB Obj. ¶¶ 90-100.)

According to Movants, the amount owed under the bonds on the Petition Date was $8,477,729.56, and Movants estimate that the total amount owed on the bonds is now over $11 billion with the inclusion of postpetition interest. (Mot. ¶ 2.) To secure these amounts, Movants argue, they hold a perfected lien on PREPA's past, present and future Net Revenues as defined in the Trust Agreement: Revenues minus Current Expenses. (Mot. ¶ 3 (citing 121 F.4th 280, 297 (1st Cir. 2024)).) They further argue that, in monthly financial reports that PREPA issued until recently, PREPA acknowledged and admitted that it was realizing Net Revenues.

The Trust Agreement requires PREPA to generate monthly reports detailing its Revenues and expenses. (Mot. ¶ 11 (citing TA § 710).) PREPA has historically provided the Bond Trustee with monthly reports pursuant to section 710 of the Trust Agreement (the "Monthly Operating Reports"). (Mot. ¶ 12.) According to the Bondholders, PREPA's Monthly Operating Reports show that it accumulated approximately $3.7 billion in Net Revenues from the Petition Date until June 2023. (Mot. ¶ 13 (citing Chakraborty Decl. ¶¶ 12, 16).) Each of the Monthly

Operating Reports from fiscal year 2018 through fiscal year 2021 states that "[t]he 1974 Sinking Fund Appropriation ha[s] been accrued but not transferred." (Mot. ¶ 14.) Thus, Movants allege, PREPA accrued nearly $2 billion in Net Revenues but did not transfer them to the Sinking Fund as required by the Trust Agreement. (Mot. ¶ 14.) In the Monthly Operating Reports for fiscal years 2022 and 2023, Movants allege, PREPA disclosed nearly $900 million in additional accruals to the Sinking Fund that were not transferred, totaling $2.9 billion in Net Revenues from the Petition Date which actually accumulated but have not been transferred to the Sinking Fund. [13] (Mot. ¶ 15.) Movants allege that the discrepancy between the amounts of Net Revenues reported in the Monthly Operating Reports and the Net Revenues shown in PREPA's certified Fiscal Plans over the same postpetition period is only 4%. (Mot. ¶ 16.) According to Movants, the manner in which PREPA reported Net Revenues in the Monthly Operating Reports was largely consistent with the way it marketed the Bonds to investors and "the electricity rate structure that has been in place since 2019." (Mot. ¶¶ 18-19.) Movants claim that PREPA's Monthly Operating Reports show that it has "accumulated and improperly consumed" the Bondholders' collateral in an amount not less than $3.7 billion. (Mot. ¶ 92.) They thus contend that they are entitled to compensation for PREPA's postpetition use of billions of dollars labeled Net Revenues in Monthly Operating Reports issued postpetition (presumptively including PREPA's cash on hand in any liened accounts), and that any necessary further determination of the value of their secured claim can be addressed in further proceedings.

---

[13] Beginning in February 2022, PREPA modified how it reported Net Revenues in the Monthly Operating Reports. (Mot. ¶ 17.) Because the Motion can be decided as a matter of law, the distinction is not relevant to the parties' dispute at this stage of the proceedings.

The Oversight Board counters, among other rebuttals, that the term "Net Revenues" in the Monthly Operating Reports is not coextensive with the term as defined by the Trust Agreement, and that the Monthly Operating Reports make clear that those reports contained only preliminary numbers subject to audit. Because, as explained below, the Court concludes that Movants have failed to show a viable legal basis for their administrative claim, the Court will not address the parties' dispute regarding the existence (or not) of Net Revenues at this time.

## DISCUSSION

### A.     Standard of Review

The Motion, as a motion for the allowance of a claim accorded administrative priority, is a contested matter governed by Bankruptcy Rule 9014. Both parties have offered declarations and other materials in support of their arguments, and neither seeks an evidentiary hearing with respect to the question of whether the Bondholders may be able to sustain a viable administrative expense claim under any of the theories they have put forward. Federal Rule 56 applies in this contested matter by the operation of Bankruptcy Rules 7056 and 9014(c). "[S]ummary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Tera Xtal Tech. Corp. v. GT Adv. Techs., Inc., Civ. No. 16–cv–91–PB, 2017 WL 590340, at *3 (Feb. 13, 2017 Bankr. D.N.H.) (quoting Federal Rule 56(a) to resolve a contested matter). Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fin. Oversight and Mgmt. Bd. for P.R. v. United States Bank Nat'l Assoc. (In re. Fin. Oversight and Mgmt. Bd. for P.R.), 649 B.R. 381, 401 (D.P.R. 2023) (citing Fed. R. Civ.

P. 56(a)). Material facts are those that "possess[ ] the capacity to sway the outcome of the litigation under the applicable law," and there is a genuine factual dispute where an issue "may reasonably be resolved in favor of either party." Id. (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)) (internal quotation marks and citations omitted). The Court must "review the material presented in the light most favorable to the non-movant, and . . . must indulge all inferences favorable to that party." Id. (quoting Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990)) (internal quotation marks and citations omitted). When a properly supported motion for summary judgment is made, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)) (internal quotation marks and citation omitted). The non-moving party can avoid summary judgment only by providing properly supported evidence of disputed material facts. Id. (citing LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993)). The Court declines to address assertions proffered by the parties that are immaterial, and disregards conclusory statements of law which the parties proffer as facts.

B.    Administrative Expense Status Under Section 503 of the Bankruptcy Code

The allowance of administrative expense claims is governed by section 503 of the Bankruptcy Code, which is made applicable in this case by section 301 of PROMESA. See 11 U.S.C. § 503; 48 U.S.C. § 2161(a). Section 503 of the Bankruptcy Code provides, in relevant part, that:

> (a) An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.
>
> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

> (1)(A) the actual, necessary costs and expenses of preserving the estate . . . .

11 U.S.C.A. § 503 (Westlaw through P.L. 119-74).

In <u>Woburn Associates v. Kahn (In re Hemingway Transport, Inc.)</u>, 954 F.2d 1 (1st Cir. 1992), the First Circuit set forth the general criteria that should be considered in determining whether to allow an administrative expense claim. The court explained that a request for priority payment of an administrative expense under section 503(a) of the Bankruptcy Code "may qualify if (1) the right to payment **arose from a postpetition transaction with the debtor [], rather than from a prepetition transaction with the debtor**, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor." <u>In re Hemingway Transp., Inc.</u>, 954 F.2d at 5 (emphasis added). The party asserting the administrative claim bears the burden of demonstrating the entitlement of its claim to such treatment. <u>Id.</u> "Provisions that grant priority in bankruptcy are to be narrowly construed." <u>Bos. Reg'l Med. Ctr., Inc. v. Mass. Div. of Health Care Fin. & Pol'y</u>, 365 F.3d 51, 57 (1st Cir. 2004) (citing <u>Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)</u>, 536 F.2d 950, 953 (1st Cir. 1976) ("<u>Mammoth Mart</u>"). The Court has broad discretion in determining whether to grant a request for such priority treatment. <u>See In re Jeans.com</u>, 491 B.R. 16, 23 (Bankr. D.P.R. 2013) (citation omitted).

One principal policy behind this section is carry out the "statutory objective of facilitating the rehabilitation of insolvent businesses" by encouraging third parties to provide those businesses with necessary goods and services postpetition. <u>Mammoth Mart, Inc.</u>, 536 F.2d at 954. Another "overriding concern" is to keep "fees and administrative expenses at a minimum" so as to preserve as much of an estate as possible to maintain assets and operations that will inure, upon emergence or sale as a going concern, to the benefit of the prepetition

creditor body. See Ala. Surface Mining Comm'n v. N.P. Mining Co. (In re N.P. Mining Co. Inc.), 963 F.2d 1449, 1459 (11th Cir. 1992) (citation omitted). There is no exception in the doctrine for creditors secured pursuant to a prepetition contract regardless of whether the postpetition bankruptcy estate benefits from the contract: "It is . . . clear that a claimant who fully performs under a contract prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt estate after the filing." Mammoth Mart, Inc., 536 F.2d at 954 (citation omitted).

As will be discussed further below, the only way for a solely prepetition creditor to obtain an allowable administrative expense claim under PROMESA is through Section 922(c) of the Bankruptcy Code and fulfillment of its predicates that the claimant obtain adequate protection that, later, proves insufficient. Mainly construing Section 922(c)'s business bankruptcy analog, section 507(b) of the Bankruptcy Code, in ordinary Chapter 11 cases, courts have warned against permitting a prepetition creditor to make an end-run around the adequate protection predicate by instead asserting a direct administrative expense claim. If a creditor wishes to assert a direct administrative expense claim under section 503(b), that creditor must, at a minimum, demonstrate what it has contributed postpetition to benefit the estate or debtor.[14] As one court has put it, where there has been no postpetition contribution to the estate or debtor, no automatic administrative expense should be granted to a creditor secured pursuant to a prepetition contract where the claim is accrued "by sitting back and 'allowing' a [debtor] to use collateral which it already owns and has a statutory right to use." In re Advisory Info. & Mgmt. Sys., Inc., 50 B.R. 627, 630 (Bankr. M.D. Tenn. 1985); see also In re Provincetown-Boston

---

[14]     Section 301(c)(5) of PROMESA provides that the term "property of the estate" in this instance means "property of the debtor." 48 U.S.C. § 2161(c)(5).

Airline, Inc., 66 B.R. 632, 634 (Bankr. M.D. Fla. 1986). This rule, applicable in an ordinary Chapter 11 case to the use of equipment, vehicles, and other collateral in which a creditor may have a security interest, applies to the use of cash collateral in this instance because Section 363 of the Bankruptcy Code, which requires bankruptcy court approval of the non-consensual use of cash collateral, is not incorporated into PROMESA, and section 305 of PROMESA denies the Court power to regulate the Debtor's use of its own cash.[15]

Here, the Trust Agreement is a prepetition nonexecutory contract. (See, e.g., Docket Entry No. 361 in Adv. Proc. No. 19-00391 at 26, 29.) The Bondholders, having paid PREPA for the bonds or acquired their interests from others who originally paid PREPA, have no further duties under the Trust Agreement. Nor do they proffer that they took any action, or entered into any transaction with PREPA, following the Title III filing for which they are seeking an administrative expense claim as compensation. PREPA's postpetition expenditure of its own revenues is not a postpetition transaction with the Bondholders.

United Trucking Serv. v. Trailer Rental Co. (In re United Trucking Serv.), is the only case cited by any party wherein a prepetition agreement was the sole basis of an administrative expense claim. 851 F. 2d 159 (6th Cir. 1988). This out-of-circuit case is not controlling precedent with respect to this Court and, contrary to the Bondholders' representations, is not a case in which an administrative expense claim was awarded based only on the use of collateral created prepetition. Critically, the United Trucking parties had entered into a postpetition stipulation to treat the prepetition-based debt as an administrative expense and the court, after much discussion, upheld the parties' decision. Id. at 161 n.2. The case appears to

---

[15]  Section 305 of PROMESA provides, in pertinent part, that the court may not interfere with the governmental powers, property and revenues, or use and enjoyment of income-producing property of a Title III debtor. See 11 U.S.C. § 2165.

have involved an arrangement more like a <u>sub rosa</u> agreement to provide postpetition financing than an administrative expense claim based on postpetition value received by the estate at the prepetition creditor's expense. Furthermore, as the Oversight Board notes, the Bondholders' representation that <u>United Trucking</u> involved a security interest <u>is incorrect</u>. The case instead involved the continued use of leased trailers (which were not the property of the debtor) that were damaged by use that benefited the estate without any concomitant benefit to the lessor. (<u>See</u> FOMB Suppl. Br. ¶¶ 4, 9; BH Suppl. Resp. ¶ 19 n.6.) It is unclear whether, without the stipulation of the parties to treat postpetition damages to the trailers as administrative expense claims, there would have been a plausible administrative expense claim at all. In any case, the Bondholders do not proffer an analytical link between the factual situation in <u>United Trucking</u> and their claim in this case, which is based on the use of revenues belonging to PREPA, rather than property held by the debtor under a prepetition lease from a third party, and which does not involve any relevant postpetition agreement with the Debtor regarding the use of the cash collateral. [16]

Accordingly, the Bondholders have not established a viable claim under Section 503(b)(1)(A) of the Bankruptcy Code because there was no postpetition transaction with

---

[16] The Court's own research has disclosed no other cases in which a prepetition creditor was granted administrative expense priority for mere postpetition use of collateral. To the extent courts outside this circuit have suggested that administrative expense provisions may cover secured creditors where the postpetition use of collateral was in connection with for-profit business activity, the Court finds neither support in their facts nor persuasive legal analysis anchoring the suggestion. <u>See</u> Tidewater Fin. Co. v. Henson (<u>In re Henson</u>), 57 Fed. App'x 136, 138 (4th Cir. 2003) (denying administrative expense claim of prepetition retail creditor in Chapter 13 case for failure to make postpetition installment payments); <u>Grundy Nat'l Bank v. Rife</u>, 876 F.2d 361, 363 (4th Cir. 1989) (granting administrative expense claim to prepetition auto financer where debtor failed, <u>inter alia</u>, to make court ordered adequate protection payments and failed to make payments under confirmed Chapter 13 plan).

the Debtor.

        C.        <u>The Fundamental Fairness Doctrine</u>

Movants argue an alternative basis upon which administrative expense claims that are not explicitly contemplated by the Bankruptcy Code have been allowed under section 503 of the Bankruptcy Code. The "<u>Reading</u>," or "fundamental fairness," doctrine, which has its origins in <u>Reading Co. v. Brown</u>, 391 U.S. 471 (1968), has been interpreted within the First Circuit to support administrative expense claim priority for two categories of claims that do not otherwise come within the plain language of section 503 of the Bankruptcy Code: "the 'fundamental fairness' exception is recognized when the debtor's postpetition operations occasion tortious injuries to third parties (<u>Reading</u>[]), or when the claim arises from postpetition actions that deliberately violate applicable law and damage others (<u>Charlesbank</u>[])." <u>See</u> <u>In re Healthco Int'l Inc.</u>, 272 B.R. 510, 513 (B.A.P. 1st Cir. 2002) (emphasis in original) (citing <u>Reading</u>, 391 U.S. at 477; <u>Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)</u>, 755 F.2d 200, 203 (1st Cir. 1985)), <u>aff'd</u>, 310 F.3d 9 (1st Cir. 2002) ("<u>Charlesbank</u>").

As explained above, the traditional test under Section 503(b)(1)(A) provides administrative expense priority when there is (i) a <u>post-petition</u> transaction concerning (ii) "actual and necessary" costs of maintaining the estate. <u>See</u> 11 U.S.C. § 503(b)(1); <u>In re Hemingway Transp., Inc.</u>, 954 F.2d at 5. The second requirement was relaxed under certain circumstances by the Supreme Court in <u>Reading Co. v. Brown</u>, which held that post-petition tort damages caused to a third party by a court-appointed receiver in "operating the debtor's business with a view to rehabilitating it" could be treated as "actual and necessary" costs, even though the

damages themselves were not directly beneficial to the estate.[17]  Reading, 391 U.S. at 475-76.

The underlying rationale was that, when an estate is being operated for the benefit of prepetition

creditors, "fundamental fairness" requires the injuries that the operating debtor causes be given

priority over the prepetition creditors' claims.[18]  Id. at 479 ("[I]t would be inconsistent . . . with

the rule of fairness in bankruptcy to seek these objectives [the 'benefit of creditors' and the 'hope

of rehabilitation'] at the cost of excluding tort creditors of the arrangement from its assets, or

totally subordinating the claims of those on whom the arrangement is imposed to the claims of

---

[17]   See In re Hemingway Transp., Inc., 954 F.2d at 5 ("We have recognized a special category of expense entitled to administrative priority status, based on considerations of fundamental fairness, consisting of amounts due entities 'injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate.'") (citations omitted); In re Charlesbank Laundry, Inc., 755 F.2d at 202 ("The estate [in Reading] put forward much the same argument as appellees here—that allowing first priority for negligence claims would not aid the rehabilitation of the business or preserve a maximum of assets for distribution.").

[18]   See In re Munce's Superior Petroleum Prods., Inc., 736 F.3d 567, 573 (1st Cir. 2013) ("Taken together, our cases interpreting Reading Co. have 'attempted to avoid a situation in which a bankruptcy estate may engage in activities regulated by state law while avoiding the costs associated with that regulation.'"); Cumberland Farms, Inc. v. Fla. Dep't of Env't Prot., 116 F.3d 16, 21 (1st Cir. 1997) ("We hold that the present case does come within the ambit of Reading and Charlesbank.  This was a postpetition claim incurred during the operation of Cumberland Farms' business while it was operating under Chapter 11.  We think it would be fundamentally unfair to allow Cumberland Farms to flout Florida's environmental protection laws and escape paying a penalty for such behavior."); In re Charlesbank Laundry, Inc., 755 F.2d at 203-204 (recognizing applicability of Reading where the debtor "deliberately continued a violation of law month after month presumably because it was more lucrative for the business to operate outside the zoning ordinance than within it"); Mammoth Mart, Inc., 536 F.2d at 954-55 ("Section 64(a)(1) . . . has been interpreted as providing general protection to claimants that are injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate. . . .  When the debtor-in-possession commits a tort, see Reading Co. v. Brown, supra, or accepts services from a third party without paying for them, the debtor-in-possession itself caused legally cognizable injury, and the resulting claims for compensation are entitled to first priority.").

---

those for whose benefit it is instituted." Here, as prepetition creditors, the Bondholders would surely protest that they are the ones upon whom this arrangement of the Title III cases has been imposed by law, but it cannot be denied that they share (to at least some degree) in the prospective benefit of the successful rehabilitation of PREPA—and that any prepetition creditor could make the same argument in any proceeding.

In short, the Reading exception appears to have been created for "innocent third parties" and not prepetition creditors like the Bondholders who do not fall squarely within its initial ambit. See, e.g., In re Baseline Sports, Inc., 393 B.R. 105, 131 (Bankr. E.D. Va. 2008) ("SunTrust is not an 'innocent third party' for whom the *Reading* exception was created. SunTrust was the largest secured creditor in this case. To the extent that Baseline Sports's Chapter 11 case continued, it was for SunTrust's benefit, as a pre-petition secured creditor, until it received relief to exercise its rights in the Debtor's collateral."). See also Reading Co., 391 U.S. at 482-83 ("Existing creditors are, to be sure, in a dilemma not of their own making, but there is no obvious reason why they should be allowed to attempt to escape that dilemma at the risk of imposing it on others equally innocent."). Subsequent applications of the Reading doctrine, many of which have notably occurred in the First Circuit, have not emerged in circumstances resembling the present instance.

### 1. Reading in the First Circuit

In In re Hemingway Transport, the Court of Appeals for the First Circuit (the "First Circuit") held that "[a] right to payment predicated on an executed prepetition contract is not entitled to priority payment as an administrative expense." 954 F.2d at 5 (citing Mammoth Mart, 536 F.2d at 954).

In the First Circuit, in cases such as Cumberland Farms, Mammoth Mart, and Charlesbank, the application of Reading has generally been limited to violations of regulations

that harm the general public to the benefit of the debtor and the detriment of "innocent third parties" or "involuntary creditors"—third parties who are harmed and not benefited in any manner by the debtor's actions.  In In re Boston Regional Medical Center, the First Circuit observed: "this circuit's extension of Reading Co. has relied on concerns of public policy, and has attempted to avoid a situation in which a bankruptcy estate may engage in activities regulated by state law while avoiding the costs associated with that regulation."  291 F.3d 111, 125-26 (1st Cir. 2002).  Here, the Bondholders' asserted administrative expense claim is in tension with countervailing public policy concerns, notably the concern for the supply of electricity to the people of the island as expressed in the PREPA Authority Act, that stand against granting to a creditor constituency a boon that would potentially defeat the island's ability to rehabilitate the utility and "provide customers with reliable energy at the lowest reasonable cost." See, e.g., 22 L.P.R.A. § 194(d)(1)(F).[19]  Thus, regardless of whether the Bondholders have stated claims under the Takings Clause or for conversion based on the postpetition use of alleged collateral to operate PREPA, the public policy rationale of Reading precludes remedial use of administrative expense priority in respect of those claims.[20]

---

[19]  Section 6 of the Authority Act also provides that among the "Duties and Responsibilities" of PREPA is "To provide and allow electric power to be provided in a reliable, clean, efficient, resilient, and affordable manner thus contributing to the general wellbeing and the sustainable development of the people of Puerto Rico[.]"  22 L.P.R.A. § 196(a).

[20]  Furthermore, several courts in the First Circuit and elsewhere have held as a broad proposition that claims for postpetition breaches of prepetition contracts are not entitled to administrative priority under Reading, regardless of the particulars of the underlying claim.  See In re Old Carco, LLC, 424 B.R. 650, 660 (Bankr. S.D.N.Y. 2010) ("The Reading exception does not include a right to payment emanating from a pre-petition contract with a debtor."); In re Baseline Sports, Inc., 393 B.R. 105, 131-32 (Bankr. E.D. Va. 2008) (declining to categorize postpetition state law claims as administrative expenses because secured creditor had prepetition contractual relationship with debtor); In re GT Advanced Techs., Inc., 547 B.R. 3, 13-5 (Bankr. D.N.H. 2016) (no administrative priority for claim arising out of dispute over prepetition breach of contract

2.    The Bondholders do not make out a prima facie case for conversion

The Bondholders argue that the tort of conversion that has been implied by the First Circuit from Commonwealth law is the basis for their postpetition tort claim that they contend gives rise to a Reading claim. (See, e.g., Mot. ¶ 50 (citing Fed. Ins. Co. I.C. v. Banco de Ponce, 751 F.2d 38, 42 (1st Cir. 1984).) The Bondholders argue that "[a] conversion occurs when there is a 'malicious and wrongful privation of the ownership rights, the illegal exercise, or the assumption of authority over another's property, thereby depriving the lawful owner or possessor, permanently or for an indefinite period, of its use and enjoyment,'" and assert that they have been the victims of such tortious conduct. (Mot. ¶ 50 (quoting Hull Dobbs v. Super. Ct., 81 D.P.R. 221, 228-29 (P.R. 1959).)

However, they do not support their conversion claim with legal or factual analysis. Instead, they misrepresent the legal standard, downgrading the terms "malicious and wrongful" to "intentional" without explaining how the tort's basic standard is met. (Mot. ¶¶ 50-51.) In so doing, they fail to establish wrongful intent and fall short of articulating a prima facie claim for conversion that could serve as a basis for their desired Reading claim.

Moreover, a claim for conversion requires that what is taken be "another's property," and here the funds that were allegedly misappropriated were PREPA's own funds, in which the Bondholders merely have a security interest. The Bondholders' pleadings do not even acknowledge this distinction.

Finally, "[i]t is established law that a party cannot support a conversion claim when 'damages suffered arise as a consequence of non-compliance with pre-existing contract'

_____

claims). See also generally In re Advisory Info. & Mgmt. Sys., Inc., 50 B.R. 627, 630 (Bankr. M.D. Tenn. 1985).

and plaintiff cannot demonstrate that 'damages also arose from a general (non-contractual) duty not to cause harm.'" TLS Mgmt. & Mktg. Servs. LLC v. Rodriguez-Toledo, No. CV 15-2121 (BJM), 2018 WL 1626100, at *13 (D.P.R. Mar. 30, 2018) (citation omitted), rev'd and remanded on other grounds, 966 F.3d 46 (1st Cir. 2020). "[C]ompensation for damages requires an illegal conduct that causes the damage, either for having breached the agreements of a contract or for breaching the general principle *alterum non laedere* [not to injure another]." Ramos Lozada v. Orientalist Rattan Furniture Inc., 130 D.P.R. 712, 1992 JTS 74 (June 15, 1992).

Here, any alleged harm that the Bondholders have suffered is indistinguishable from the harm allegedly caused by breaches contemplated by the Trust Agreement because all of the duties that the Bondholders allege PREPA owes them were created contractually. The remedies for PREPA's use of its revenues instead of payment of bond debt thus are those provided for under the Trust Agreement, not independent tort remedies.

Accordingly, the Bondholders have not made out a prima facie case of conversion as a basis for their asserted administrative expense claim.

3. The Bondholders do not make out a prima facie case under the Takings Clause

The Oversight Board argues that any ability to assert a takings claim or otherwise object to the allegedly improper use of alleged collateral was waived because the Trust Agreement, pursuant to which the Bondholders hold the bonds and under which they assert their property rights, includes remedial limitations and specific remedy provisions that effect waivers of other remedies. (See, e.g., FOMB Suppl. Br. ¶ 14.) The Bondholders protest that they executed no waiver and that there is no language of waiver in the Trust Agreement. Although the Oversight Board points to Vandevere v. Lloyd, a case using the term "waiver"—viz., the Bondholders "waived" rights they might otherwise have had—Vandevere and the cases cited

therein also characterize the circumstances more accurately as a limitation of remedies or a "contract[ing] away" of rights parties might otherwise have had, including rights that might otherwise have given rise to a takings claim. 644 F.3d 957, 967 (9th Cir. 2011) ("The Supreme Court has instructed that a person may agree contractually, in advance, to accept without compensation what otherwise would be a compensable taking under the Fifth Amendment.") (citing United States v. Petty Motor Co., 327 U.S. 372, 374 (1946) ("The Tool Company had contracted away any rights that it might otherwise have had.")); United States v. Right to Use & Occupy 3.38 Acres of Land, 484 F.2d 1140, 1144 (4th Cir. 1973) (holding that a lessee had contracted away her right to just compensation for a government taking through a valid condemnation clause written into her lease). Such a contractual limitation of remedies and liability applies to any additional right that may come into existence post-contracting when the contract itself limits recovery no matter the circumstances. An explicit "waiver" is not required, so the Oversight Board's legal argument is sound even if its terminology is inartful.

It is not clear whether a taking could, where the "taking" is not of property rights governed by a contract that includes comprehensive remedial provisions, constitute a postpetition tort giving rise to a Reading claim, but there is no ground for such a determination here because, as explained above, the Bondholders contracted away their ability to claim a taking in this context by agreeing to remedies under the Trust Agreement providing for recovery solely from moneys available for debt service in any instance, even if the Bondholders have exercised their Trust Agreement's receivership remedy. (See, e.g., TA § 804.)

Further, the government contracted with the Bondholders in its commercial, not sovereign capacity, a circumstance that also has implications for the viability of a takings claim. See Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001).

Even assuming that a relevant property right exists here, courts have held that where, as here, "a contract between a private party and the Government creates the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in contract, not taking." See, e.g., Tamerlane, Ltd. v. U.S., 80 Fed. Cl. 724, 738 (Fed. Cl. 2008), aff'd, 550 F. 3d 1135 (Fed. Cir. 2008) (emphasis added).  As the First Circuit has noted: "We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property. . . .  To hold otherwise would run the risk of transmogrifying virtually every dispute involving an alleged breach of contract by a state or a state agency into a constitutional case." Masso-Torrellas v. Mun. of Toa Alta, 845 F.3d 461, 467 (1st Cir. 2017) (citing Redondo-Borges v. U.S. Dept. of Hous. and Urb. Dev., 421 F.3d 1, 10 (1st Cir. 2005)).[21]

---

[21] The Bondholders raise the canon of constitutional avoidance to urge the Court to apply the statute in such a way that it does not effect what they argue is a taking.  (See, e.g., Mot. ¶¶ 60-66.)  However, their reliance on the canon, which the First Circuit has, in these cases, held can only apply when a statute is ambiguous, is misplaced. See In re Fin. Oversight & Mgmt. Bd. of P.R., 948 F.3d 457 (1st Cir. 2020).  The Bondholders do not point to any ambiguity in PROMESA, or in the Trust Agreement, and merely urge a specific interpretation of all provisions, arguing that that they must be considered forward-looking from the time of PROMESA's enactment or would, the Bondholders claim, be unconstitutional.  However, PROMESA's effective date provision states that "[s]ubchapters III and VI shall apply with respect to debts, claims, and liens (as such terms are defined in section 101 of Title 11) created before, on, or after [June 30, 2016]," 48 U.S.C. § 2101(b)(2) (Westlaw P.L. through 119-74) (emphasis added), thus precluding an interpretation of the legislation as applying to rights created after its enactment only.  As this Court has held, "the canon of constitutional avoidance is not a method of adjudicating constitutional questions.  Rather, it is a tool for choosing between competing plausible interpretations of statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts.  The canon is thus a means of giving effect to congressional intent, not of subverting it." In re Fin. Oversight & Mgmt. Bd. for P.R., 385 F. Supp. 3d 138, 155 (D.P.R. 2019), aff'd, 948 F.3d 457 (1st Cir. 2020) (quoting Clark v. Martinez, 543 U.S. 371, 380-81 (2005)).  Accordingly, the canon of constitutional avoidance has no application to any provision of PROMESA to which the Bondholders have pointed, nor to the Trust Agreement, and is irrelevant in this proceeding.

---

Accordingly, the Bondholders have not made out a prima facie case for an administrative expense case arising under the Takings Clause because the Trust Agreement limits the Bondholders' remedies and a governmental instrumentality's breach of a contract under these circumstances is not the proper basis for a Takings Clause claim.

### 4. Conclusion under Reading

In conclusion, with respect to Reading, the Bondholders have not supported their asserted administrative claim with relevant authorities, nor have they presented a scenario warranting the identification of a new category of Reading claims for their benefit. Furthermore, the equities of the case militate that the Bondholders be held to the bargain they struck as reflected in the Trust Agreement.

Accordingly, the Bondholders have not established that they have a viable administrative expense claim by virtue of the Fundamental Fairness Doctrine.

### D. Section 922 of the Bankruptcy Code

Movants contend that Section 922(c) should also entitle them to an administrative expense claim because "'there has been a diminution in the value of [Movants'] secured collateral' by reason of the automatic stay." (Mot. ¶ 53 (quoting Grundy Nat'l Bank v. Rife, 876 F.2d 361, 363 (4th Cir. 1989)).) Movants argue that PREPA's failure to provide Movants with adequate protection despite their requests for it earlier in the case and, separately, certain provisions of the 2019 RSA, entitle them to an administrative expense claim under Section 922(c). (Mot. ¶¶ 54-59.)

Under Section 922(c), a creditor is entitled to an administrative expense claim:

> **If the debtor provides**, under section 362, 364, or 922 of this title, **adequate protection** of the interest of the holder of a claim secured by a lien on property of the debtor **and if, notwithstanding such protection** such creditor has a claim **arising from the stay of action**

against such property under section 362 or 922 of this title or from the granting of a lien under section 364(d) of this title.

11 U.S.C.A. § 922(c) (Westlaw through P.L. 119-74) (emphasis added).

### 1. Mere use of "cash collateral" does not give rise to an administrative expense claim

Under section 361(3) of the Bankruptcy Code, a court cannot grant administrative status to a secured creditor as adequate protection in the first instance; it may only do so retrospectively after an explicit grant of adequate protection has proven inadequate. The application of Section 922 here is rather straightforward: under its plain language, there must be an explicit agreement or order to provide adequate protection that later proves inadequate before an administrative claim can arise on the grounds of insufficiency of adequate protection. See, e.g., In re James B. Downing & Co., 94 B.R. 515, 521 (Bankr. N.D. Ill. 1988).[22] Here, quite simply, there was never an operative agreement or order to provide adequate protection to the Bondholders.

The Bondholders principally cite case law established under section 507(b) of the Bankruptcy Code, which is largely inapplicable because, unlike section 507(b), neither Chapter 9 nor PROMESA incorporates section 363 of the Bankruptcy Code, and so the Debtor's use of "cash collateral" could not by itself form the predicate for an administrative claim.[23] Because

---

[22]   Certain cases cited by the Bondholders—notably In re Center Wholesale, Inc., 759 F.2d 1440, 1451 n.23 (9th Cir. 1985), and In re Prime, 35 B.R. 697 (Bankr. W.D. Mo. 1984)— appear to support the grant of an administrative claim for adequate protection in the first instance (in circumstances not present here), but other courts have correctly characterized these cases as "a minority approach" and this Court is unpersuaded by the outcomes of those cases, which are in no way binding here. See In re James B. Downing & Co., 94 B.R. at 520.

[23]   Section 363(c)(2) of the Bankruptcy Code, which applies in Chapter 11 cases but not in Title III proceedings under PROMESA, provides: "(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a

PROMESA lacks section 363, and is thus more deferential to debtors, there is no restriction on PREPA's right to use its collateral, unlike in Chapter 11 cases in which debtors are subject to the restrictions imposed by section 363. Accordingly, the Bondholders' argument fails as a matter of law: they cannot make an end-run around the lack of section 363 of the Bankruptcy Code by working on the (disputed) assumption that PREPA spent Net Revenues on which the Bondholders had a perfected lien, and the Court can rule on the nonapplicability of Section 922(c) notwithstanding any factual dispute because, in the absence of section 363, this debtor's use of even postpetition Net Revenues cannot form the basis for a Section 922(c) claim without an explicit and operative adequate protection agreement.[24] As one court has put it, "[t]he secured creditor is not contributing to the estate by allowing a Debtor[] to use collateral which it already owns and has a statutory right to use." In re Provincetown-Boston Airline, Inc., 66 B.R. 632, 634 (Bankr. M.D. Fla. 1986).[25]

---

hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2) (Westlaw through P.L. 119-74). Section 363(e), which is also inapplicable under PROMESA, provides, in relevant part: "Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e) (Westlaw through P.L. 119-74).

[24]    Although there have been apparent exceptions to the postpetition transaction requirement, none of those circumstances are present here: "[t]he Court is cognizant that some courts have ruled previously that the negotiation for continued possession of collateral in return for adequate protection is a post-petition transaction providing additional value to the bankruptcy estate." In re Mary Holder Agency, Inc., No. 11-34280 MBK, 2012 WL 4434362, at *3 (Bankr. D.N.J. Sept. 24, 2012) (citing, e.g., In re Carpet Ctr. Leasing Co., 991 F.2d 682, 687 (11th Cir. 1993)).

[25]    Several of the Bondholders' key cases involve prior explicit adequate protection agreements and/or are based upon section 363, which makes them irrelevant here. See, e.g., Grundy Nat'l Bank v. Rife, 876 F.2d at 364 ("the adequate protection order of August 12, 1986").

2.      The 2019 RSA does not provide a basis for an adequate protection insufficiency claim because it was never approved by this Court

Alternatively, the Bondholders argue that, by signing on to the 2019 RSA, which would have permitted certain payments characterized as adequate protection payments, the Oversight Board agreed to provide adequate protection.  (Mot. ¶¶ 58-59.)  This argument fails because the Court never approved the 2019 RSA so, by its own terms, that proposed agreement never came into effect, nor did adequate protection obligations thereunder come into effect.  (2019 RSA § 14.)

3.      There is no adequate protection claim arising solely out of the automatic stay

The Bondholders' argument for an administrative expense claim also fails the second prong of the test governing administrative claims based upon failed adequate protection, because, were the Court to assume, arguendo, a failure of adequate protection, the Bondholders also have not demonstrated that they suffered any loss as a direct result of the automatic stay. The Bondholders argue that they could have attempted to install a receiver had they both persisted and prevailed in their previous lift-stay forays.  (BH Reply ISO ¶¶ 50-51.)  This Court has previously noted that a receiver's powers and discretion would be far more circumscribed than the Bondholders have presented them.  (See Docket Entry No. 315 in Adv. Proc. No. 19-00391 at 31-35 (a receiver would not have "superpowers").)  The Bondholders' receivership-based argument falls short of the requisite demonstration of harm flowing directly from the imposition of the automatic stay.  Indeed, the Bondholders state that they do not even desire the standard remedy for failure of adequate protection due to the automatic stay, turnover of the collateral (apart from PREPA's cash-on-hand in any subordinate funds)—likely because, under section 305 of PROMESA, neither this nor any other court can direct the Oversight Board what to do with PREPA's property and revenues.  See 48 U.S.C. § 2165.  (BH Reply ISO ¶ 2; BH

Suppl. Resp. ¶ 1.)

Finally, the court in <u>In re Mandile</u> held:

When determining whether a loss was caused solely by the automatic stay, courts demand that the secured creditor be vigilant in protecting its rights during the case. If the creditor fails to take appropriate steps when adequate protection is insufficient by, for example, moving for relief from the stay, it may not be entitled to a superpriority for its loss.

626 B.R. 915, 920 (Bankr. N.D. Ill. 2021) (citation omitted). Here, despite protestations to the contrary, the Bondholders have not been vigilant. As detailed by the Committee in its supplemental brief (UCC Suppl. Br. ¶¶ 8-16), the Bondholders have, in the past, declined to press forward with their 2018 renewed lift-stay motion that requested adequate protection, agreed to stays of consideration of the settlement motion to approve the 2019 RSA, moved for relief from the automatic stay without requesting adequate protection (Docket Entry No. 2973), and moved for relief from the stay for the appointment of a receiver rather than moving directly to foreclose on any property. (<u>See</u> Docket Entry Nos. 74, 975, 2973, 3913, 4689, 5207.) It was the Bondholders' choice to abandon pursuit of an adequate protection order through the 2018 renewed motion to lift the automatic stay. Although the Bondholders may now regret that choice or, in retrospect, would have insisted that different terms be included in the 2019 RSA or the Trust Agreement, they cannot rewrite the consequences of their past strategic choices. The Bondholders have failed to establish harm attributable <u>solely</u> to the automatic stay.

Accordingly, the Bondholders do not have an administrative expense claim deriving from Section 922(c) of the Bankruptcy Code.

CONCLUSION

For the foregoing reasons, the Motion is denied in its entirety.[26]

This Opinion and Order resolves Docket Entry No. 29173 in Case No. 17-3283

and Docket Entry No. 5599 in Case No. 17-4780.


       SO ORDERED.

Dated:  March 16, 2026


                    /s/ Laura Taylor Swain_____
                    LAURA TAYLOR SWAIN
                    UNITED STATES DISTRICT JUDGE

---

[26]    The Court has considered all of the Bondholders' arguments, whether or not specifically addressed herein.  All alternative arguments for relief are rejected.