# United States Court of Appeals

*for the*

# First Circuit

Case Nos. 26-1330, 26-1331, 26-1332, 26-1333, 26-1334

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Highways and Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative of the Puerto Rico Public Buildings Authority,

*Debtors,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO, IN CASE NOS. 17-BK-3283-LTS AND 17-BK-4780-LTS, HONORABLE LAURA TAYLOR SWAIN, DISTRICT JUDGE

## BRIEF OF RESPONDENT-APPELLEE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY (AAFAF)

MANUEL A. PIETRANTONI
IGNACIO LABARCA MORALES
MARINI PIETRANTONI MUNIZ LLC
250 Ponce de Leon Americas, Suite 900
San Juan, Puerto Rico 00918
(787) 705-2171

PETER FRIEDMAN
    *Counsel of Record*
MARIA J. DICONZA
GABRIEL OLIVERA
O'MELVENY & MYERS LLP
1301 Avenue of the Americas,
    Suite 1700
New York, New York 10019
(212) 326-2000

JASON ZARROW
O'MELVENY & MYERS LLP
400 South Hope Street, Suite 1900
Los Angeles, California 90071
(213) 430-6000

*Attorneys for Respondents-Appellees Puerto Rico Fiscal Agency
and Financial Advisory Authority*

COUNSEL PRESS
A Proceed Service
The Appellate Experts®

(800) 4-APPEAL • (321000)

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION; U.S. BANK NATIONAL ASSOCIATION, in the capacity as PREPA Bond Trustee; ALLIANCEBERNSTEIN L.P.; ARISTEIA CAPITAL, L.L.C.; BNY MELLON FUNDS TRUST; CAPITAL RESEARCH AND MANAGEMENT COMPANY; COLUMBIA MANAGEMENT INVESTMENT ADVISERS, LLC; DELAWARE MANAGEMENT COMPANY, a series of Nomura Asset Management Co., Ltd.; ELLINGTON MANAGEMENT GROUP, L.L.C.; GOLDMAN SACHS ASSET MANAGEMENT L.P.; INVESCO ADVISERS, INC.; LUXOR CAPITAL GROUP, LP; MACKAY SHIELDS LLC; MASSACHUSETTS FINANCIAL SERVICES COMPANY; OLD ORCHARD CAPITAL MANAGEMENT LP; ONE WILLIAM STREET CAPITAL MANAGEMENT, L.P.; RUSSELL INVESTMENT COMPANY, on behalf of Russell Investment Company Tax-Exempt High Yield Bond Fund; SIG STRUCTURED PRODUCTS, LLC; T. ROWE PRICE; TOWER BAY ASSET MANAGEMENT LP; VERITION FUND MANAGEMENT LLC; GOLDENTREE ASSET MANAGEMENT LP; SYNCORA GUARANTEE INC.; ASSURED GUARANTY INC,

*Movants-Appellants,*

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA),

*Debtor-Appellee,*

INSTITUTO DE COMPETITIVIDAD Y SOSTENIBILIDAD ECONÓMICA DE PUERTO RICO (ICSE); EL PUENTE DE WILLIAMSBURG, INC., ENLACE DE ACCIÓN CLIMÁTICA; COLEGIO DE ABOGADOS Y ABOGADAS DE PUERTO RICO (CAAPR); ASSOCIATION OF PRIVATE COLLEGES AND UNIVERSITIES OF PUERTO RICO (ACUP); LA LIGA DE CIUDADES DE PUERTO RICO; CENTRO UNIDO DE DETALLISTAS (CUD); RAQUEL MARIA GONZÁLEZ SPARKS; COALICIÓN NUEVA VISIÓN DE SALUD; SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGÍA ELECTRICA (SREAEE); JUNTE DE ASOCIACIONES CON PENSIONADOS Y JUBILADOS DE PUERTO RICO (JAP); COLEGIO DE PROFESIONALES DEL TRABAJO SOCIAL DE PUERTO RICO; OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PREPA; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY (AAFAF); ELAM, LLC, as Successor-In-Interest to Blue Beetle III, LLC,

*Respondents-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") is the "fiscal agent, financial advisor, and reporting agent of all entities of the Government of Puerto Rico."  Act 2-2017 § 5(a).  AAFAF is not required to file a corporate disclosure statement under Rule 26.1 of the Federal Rules of Appellate Procedure because it is not a non-governmental corporate party.  AAFAF is a governmental public corporation.

*/s/ Peter Friedman*
Peter Friedman

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................1

STATEMENT OF THE ISSUES.....................................................................5

STATEMENT OF THE CASE..........................................................................5

    A.    Statutory Background.............................................................................5

        1.    The Code's protections for secured creditors ...........................6

        2.    Administrative expense claims .....................................................9

    B.    Factual and Procedural Background ...................................................11

SUMMARY OF ARGUMENT .......................................................................15

ARGUMENT ................................................................................................18

I.    THE BONDHOLDERS CANNOT BRING AN ADMINISTRATIVE EXPENSE CLAIM UNDER SECTION 503(b) ..........................................21

    A.    Section 503(b) Does Not Apply To Creditors Who Supplied Pre-Petition Consideration To The Debtor ...............................................21

    B.    The Bondholders' "Unjust Enrichment" Theory Should Be Rejected ...........................................................................................29

        1.    The Bondholders' unjust enrichment theory is foreclosed by Circuit precedent.................................................................30

        2.    The Bondholders' unjust enrichment theory is not needed to avoid uncompensated takings ...............................................31

        3.    The Bondholders' unjust enrichment theory conflicts with Congress's design .........................................................36

        4.    United Trucking does not save the Bondholders.......................38

II.    *READING* DOES NOT SUPPORT ADMINISTRATIVE EXPENSE PRIORITY .......................................................................................42

    A.    *Reading* Does Not Apply to Pre-Petition Creditors Like The Bondholders..................................................................................42

    B.    The Bondholders Do Not Have a Takings Claim ..............................46

III.    THE BONDHOLDERS HAVE NO ADMINISTRATIVE EXPENSE CLAIM UNDER SECTION 922(c) ...................................................48

CONCLUSION ............................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Armstrong v. United States*,
364 U.S. 40 (1960).................................................................................47

*Cumberland Farms, Inc. v. Fla. Dep't of Env't Prot.*,
116 F.3d 16 (1st Cir. 1997).....................................................................23

*Ford Motor Credit Co. v. Dobbins*,
35 F.3d 860 (4th Cir. 1994).............................................................. 38, 50

*Grundy Nat'l Bank v. Rife*,
876 F.2d 361 (4th Cir. 1989)...................................................................50

*Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*,
547 U.S. 651 (2006)................................................................... 10, 18, 19

*In re Advisory Info. & Mgmt. Sys., Inc.*,
50 B.R. 627 (Bankr. M.D. Tenn. 1985) ............................................. 31, 41

*In re Al Copeland Enterprises, Inc.*,
991 F.2d 233 (5th Cir. 1993).....................................................................44

*In re Blankenship*,
610 B.R. 831 (Bankr. W.D. Tenn. 2019)........................................... 40, 41

*In re Bos. Reg'l Med. Ctr., Inc.*,
291 F.3d 111 (1st Cir. 2002)....................................................................23

*In re Briggs Transp. Co.*,
47 B.R. 6 (D. Minn. 1984)................................................................ 31, 38

*In re Briggs Transp. Co.*,
780 F.2d 1339 (8th Cir. 1985) ......................................................... 7, 32

*In re Cal. Devices, Inc.*,
126 B.R. 82 (Bankr. N.D. Cal. 1991) .....................................................50

*In re Cardinal Indus., Inc.*,
142 B.R. 801 (Bankr. S.D. Ohio 1992)............................................. 40, 41

*In re Carpet Ctr. Leasing Co.*,
991 F.2d 682 (11th Cir. 1993) ...............................................................32

*In re Center Wholesale, Inc.*,
759 F.2d 1440 (9th Cir. 1985) ....................................................... 51, 52, 53

*In re Charlesbank Laundry, Inc.*,
755 F.2d 200 (1st Cir. 1985).................................................................43

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*In re Econ. Lodging Sys., Inc.*,
234 B.R. 691 (B.A.P. 6th Cir. 1999)..................................................................41

*In re FBI Distrib. Corp.*,
330 F.3d 36 (1st Cir. 2003) ...................................................... passim

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
121 F.4th 280 (1st Cir. 2024).................................................. 11, 12, 36

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
7 F.4th 31 (1st Cir. 2021)...................................................... 15, 23

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
899 F.3d 13 (1st Cir. 2018) ................................................... passim

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
927 F.3d 597 (1st Cir. 2019) .............................................................33

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
931 F.3d 111 (1st Cir. 2019) ................................................ 9, 32, 34, 35

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
954 F.3d 1 (1st Cir. 2020) ...............................................................5

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,,*
91 F.4th 501 (1st Cir. 2024).............................................................14

*In re Gasel Transp. Lines, Inc.*,
326 B.R. 683 (B.A.P. 6th Cir. 2005)..................................................41

*In re Hayes Lemmerz Int'l, Inc.*,
340 B.R. 461 (Bankr. D. Del. 2006) ..................................................44

*In re Hemingway Transport, Inc.*,
954 F.2d 1 (1st Cir. 1992) ..................................................... passim

*In re J.F.K. Acquisitions Grp.*,
166 B.R. 207 (Bankr. E.D.N.Y. 1994)................................................50

*In re James B. Downing & Co.*,
94 B.R. 515 (Bankr. N.D. Ill. 1988) .................................................53

*In re James River Coal Co.*,
2006 WL 2548456 (M.D. Tenn. Aug. 31, 2006)................................40

*In re Leroy M. Hull Co.*,
344 B.R. 466 (Bankr. W.D. Va. 2004) ..............................................46

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*In re Mammoth Mart, Inc.*,
    536 F.2d 950 (1st Cir. 1976) ............................................................... passim

*In re Mendez*,
    259 B.R. 754 (Bankr. M.D. Fla. 2001) ................................................51

*In re Minkina*,
    79 F.4th 142 (1st Cir. 2023) ................................................................52

*In re Servisense.com*,
    382 F.3d 68 (1st Cir. 2004) ........................................................... 23, 25

*In re Sunarhauserman, Inc.*,
    126 F.3d 811 (6th Cir. 1997) ...............................................................43

*In re United Trucking Service, Inc.*,
    851 F.2d 159 (6th Cir. 1988) ....................................................... passim

*In re Williams*,
    246 B.R. 591 (B.A.P. 8th Cir. 1999) ...................................................28

*Internal Revenue Serv. v. Murphy*,
    892 F.3d 29 (1st Cir. 2018) ...................................................................6

*Massó-Torrellas v. Municipality of Toa Alta*,
    845 F.3d 461 (1st Cir. 2017) ......................................................... 46, 47

*Matter of Cont'l Airlines, Inc.*,
    146 B.R. 520 (Bankr. D. Del. 1992) ...................................................40

*Nevor v. Moneypenny Holdings, LLC*,
    842 F.3d 113 (1st Cir. 2016) ...............................................................30

*Peaje Inv. LLC v. García-Padilla*,
    845 F.3d 505 (1st Cir. 2017) ......................................................... passim

*Preston Hollow Capital L.L.C. v. Cottonwood Dev. Corp.*,
    23 F.4th 550 (5th Cir. 2022) ...............................................................47

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ...................................................................... 36, 37

*Reading Co. v. Brown*,
    391 U.S. 471 (1968) ...................................................................... passim

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
    421 F.3d 1 (1st Cir. 2005) ...................................................................46

iv

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
484 U.S. 365 (1988) ................................................................7

*United States v. Whiting Pools, Inc.*,
462 U.S. 198 (1983) ...............................................................31

*Villalobos-Santana v. Puerto Rico Police Department*,
171 F.4th 544 (1st Cir. 2026) ................................................44

**Statutes**

11 U.S.C. § 361 ............................................................... 7, 31

11 U.S.C. § 362 .......................................................... 6, 7, 31

11 U.S.C. § 362(a) ...............................................................34

11 U.S.C. § 362(d) ........................................................ passim

11 U.S.C. § 363 ...................................................... 7, 8, 28, 33

11 U.S.C. § 364 .....................................................................7

11 U.S.C. § 503(b) ........................................................ passim

11 U.S.C. § 507(a)(2) .................................................... 10, 18

11 U.S.C. § 507(b) ...............................................................51

11 U.S.C. § 901 .............................................................. 8, 33

11 U.S.C. § 904 .............................................................. 8, 33

11 U.S.C. § 922(c) ........................................................ passim

11 U.S.C. § 928(b) .......................................................... 1, 13

48 U.S.C. § 2161(a) ................................................. 6, 8, 28, 48

48 U.S.C. § 2165 .............................................................. 8, 28

48 U.S.C. § 2174(b)(4) .........................................................18

48 U.S.C. § 2194 .................................................................34

**Other Authorities**

Collier on Bankruptcy (16th ed. 2026) ............................. passim

Norton Bankruptcy Law & Practice (2026) ......................... 6, 7, 27

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

Appellee AAFAF respectfully requests that the Court schedule oral argument to address the important questions presented by this appeal. This appeal concerns the interpretation of numerous provisions of the Bankruptcy Code, incorporated into the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), governing when a secured creditor is entitled to an administrative expense claim, especially in the municipal bankruptcy context.  The Bondholders here seek administrative expense payments alleged to amount to billions of dollars, allowance of which could create significant obstacles to approval of a plan of adjustment and conclusion of the Puerto Rico Electric Power Authority's (PREPA) restructuring proceeding.  Oral argument would aid the Court's decision process, in light of the issues in this case and their effects on the people of Puerto Rico.

## INTRODUCTION

For many years, Puerto Rico's electrical system has been in a state of financial and operational disrepair. PREPA starved its system of vital maintenance and underfunded its pension system in an attempt to pay its debt. That effort failed—and PREPA entered into a cycle of issuing new debt just to repay existing debts, which only delayed the inevitable. In July 2017, the Financial Oversight and Management Board (the Board) commenced a restructuring case for PREPA under Title III of PROMESA. The same year, Hurricanes Irma and Maria devastated the Island and its electric grid, leaving many in Puerto Rico without power and making the need for repairs critical.

To keep Puerto Rico's lights on, PREPA has spent revenues on operations and much-needed repairs, as was its right. Under the terms of the Trust Agreement governing PREPA's bonds, the Bondholders' lien does not attach to "reasonable and necessary" sums spent for "maintaining, repairing, and operating" PREPA's system. Further, the Bankruptcy Code provides that a creditor's lien on municipal debtors' revenues is "subject to the necessary operating expenses of such project or system." 11 U.S.C. § 928(b). These provisions allow the debtor to spend on infrastructure repairs that, among other things, will provide the only possible source of funds to repay non-recourse creditors in the future.

1

In this case, PREPA's Bondholders argue that PREPA should not have repaired the system and should have put the money to debt service instead. According to the Bondholders, the money PREPA spent on repairs was subject to their lien on Net Revenues. And, say the Bondholders, because PREPA spent their collateral while shielded by the Code's automatic stay, they are entitled to an administrative expense claim—which would give them priority in recovery and a chokehold over any future plan of adjustment.

The Bondholders are mistaken. As this Court has made clear, Congress protected secured creditors' lien rights through *other* mechanisms—namely, adequate protection and stay relief *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico (Stay Decision)*, 899 F.3d 13, 20-21 (1st Cir. 2018); *see also Peaje Inv. LLC v. García-Padilla*, 845 F.3d 505, 511-12 (1st Cir. 2017). Where municipal creditors and debtors agree to adequate protection, Congress provided an administrative expense claim *if* (but only if) adequate protection fails. 11 U.S.C. § 922(c). But where a creditor has a right to adequate protection and a municipal debtor refuses to provide it, that secured creditor's remedy is stay relief. In Section 362(d), Congress provided that the "lack of adequate protection" is cause to lift the Code's stay (assuming, of course, the creditor has a property interest entitled to adequate protection). "In so providing, section 362(d)(1) guards against the possibility that the automatic stay

2

could deprive a creditor of its property interest by precluding the creditor from exercising any rights it possesses to protect that interest from destruction." *Stay Decision*, 899 F.3d at 20.

Together, these remedies—adequate protection, backstopped by an administrative expense claim, or stay relief—ensure that debtors do not have free rein to destroy creditors' collateral during the pendency of a bankruptcy case. Set against this framework, it is easy to see why the Bondholders' arguments for an administrative expense claim fail.

*First*, under this Court's longstanding case law, a contract creditor can bring an administrative expense claim under Section 503(b) only to the extent the creditor supplied consideration or performed after the debtor filed its bankruptcy petition. *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954-55 (1st Cir. 1976). The Bondholders supplied consideration (cash) well before the Board commenced PREPA's restructuring case. If the Bondholders were right that Section 503(b) applied here, secured creditors like the Bondholders would not need to seek adequate protection or stay relief, contrary to Congress's design. They would just receive administrative expense priority every time the debtor breached its pre-petition agreement to protect their collateral, practically handing the keys to most bankruptcy cases to secured creditors.

3

*Second*, the rule in *Reading Co. v. Brown*, 391 U.S. 471 (1968), does not extend to creditors, like the Bondholders, whose "right to payment originat[es] in a prepetition contract with the debtor." *In re Hemingway Transport, Inc.*, 954 F.2d 1, 7 (1st Cir. 1992).  In *Reading*, the Supreme Court extended Section 503(b)'s precursor provision to innocent third-parties injured by, and unable to protect themselves from, the debtor's ongoing operations.  Secured creditors, by contrast, can protect themselves from the debtor's conduct by seeking adequate protection and stay relief.  They would have no reason to do so under the Bondholders' reading of *Reading*.

*Finally*, the Bondholders are not entitled to an administrative expense claim under Section 922(c) because they did not secure court-approved adequate protection, a necessary requirement for an administrative expense claim under 922(c).  Had they proven an entitlement to adequate protection that was not granted, they would be able to protect their collateral (if any) by seeking stay relief under Section 362(d).  The Bondholders complain the court below has improperly denied them the opportunity to seek stay relief, but the remedy for *that* alleged wrong is an appeal, not an alternative claim.

In short, Congress was well aware of the Bondholders' concerns about secured creditors' property.  But its solution was adequate protection and stay relief.

4

Granting the Bondholders an administrative expense claim would frustrate Congress's design and is incompatible with decades of this Court's case law. This Court should affirm.

## STATEMENT OF THE ISSUES

1. Whether the Bondholders are entitled to an administrative expense claim under 11 U.S.C. § 503(b).

2. Whether the Bondholders are entitled to an administrative expense claim under *Reading*.

3. Whether the Bondholders are entitled to an administrative expense claim under 11 U.S.C. § 922(c).

## STATEMENT OF THE CASE

### A.    Statutory Background

"Unlike a commercial bankruptcy, which attempts to balance the rights of creditors and debtors, the principal purpose of chapter 9, and by analogy PROMESA, is to allow municipal debtors the opportunity to continue operations while adjusting or refinancing their creditor obligations." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 954 F.3d 1, 7-8 (1st Cir. 2020) (cleaned up). In effectuating that purpose, Congress also implemented protections for creditors like the Bondholders here.

### 1.    *The Code's protections for secured creditors*

When a debtor seeks bankruptcy protection, the Code automatically stays collection efforts by creditors.  *See* 11 U.S.C. § 362; *see also* 48 U.S.C. § 2161(a) (incorporating Section 362).  The automatic stay is "one of the fundamental debtor protections," designed to give "a 'breathing spell' to the debtor." *Internal Revenue Serv. v. Murphy*, 892 F.3d 29, 36 (1st Cir. 2018) (citations omitted).  That breathing spell protects not only the debtor but also creditors by ensuring an orderly distribution under which creditors are treated equally.

"One of the most fundamental and pervasive problems in the administration of bankruptcy cases is reconciling the trustee's [or debtor's] need to use collateral with the secured creditor's right to maintain the full measure of protection that the collateral was designed to afford."  2 Norton Bankr. L. & Prac. 3d § 49:4 (2026).  The debtor/trustee needs to use collateral to rehabilitate the estate and maximize recovery for creditors.  But the debtor's/trustee's use of collateral can inflict harm on secured creditors, and the Code's automatic stay disables secured creditors from exercising traditional remedies to remedy that harm.  *See, e.g.*, Ad Hoc Br. 38-39.  In crafting the Code, Congress was well aware of the problem and provided mechanisms for secured creditors to protect their interests.

6

The Code's principal "resolution, of course, is to allow the trustee access to the collateral, with the quid pro quo to the secured creditor being 'adequate protection.'" 2 Norton, *supra*, § 49:4; *see* 11 U.S.C. §§ 361-64. "[A]dequate protection means that the value of the creditor's interest in the collateral must be protected from diminution while the property is being used or retained during the bankruptcy proceeding." *Stay Decision*, 899 F.3d at 23 (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 370 (1988)); *see* 3 Collier on Bankr. ¶ 361.02 (16th ed. 2026). Congress authorized adequate protection to address "constitutional concerns": It is one mechanism to ensure that the Code does not effect a taking. *Peaje*, 845 F.3d at 511; *see also, e.g.*, *In re Briggs Transp. Co.*, 780 F.2d 1339, 1342 (8th Cir. 1985). Under 11 U.S.C. § 361, adequate protection may consist of cash payments, replacement liens, and other relief that protects the secured creditor's collateral, other than providing them with administrative expense priority under Section 503(b). As explained in greater detail below, an administrative expense claim is a powerful tool that ensures priority of recovery, contrary to the principle of equal distribution.

Secured creditors are not automatically provided with "adequate protection." In traditional (i.e., non-municipal) bankruptcy cases, bankruptcy courts may, on motion, condition the debtor's use of collateral on the provision of adequate protection.

7

11 U.S.C. § 363(e).  Section 363(c)(2), moreover, prohibits the trustee from disposing of a debtor's cash collateral without consent or court approval.  But Congress, in deference to sovereign authority, did not incorporate these provisions into Chapter 9 of the Bankruptcy Code, which governs municipal bankruptcies, *see* 11 U.S.C. § 901(a), or PROMESA, 48 U.S.C. § 2161(a).  Indeed, under PROMESA, the court may not "interfere with" the debtor's "political or governmental powers," "property or revenues," or "use or enjoyment … of any income-producing property."  48 U.S.C. § 2165; *see also* 11 U.S.C. § 904.  As a consequence, debtors and creditors under PROMESA (as under Chapter 9) must agree to adequate protection, subject to court approval.  *See* 3 Collier, *supra*, ¶ 361.01.

What happens if the creditor's protection later proves to be inadequate?  Congress answered that question in 11 U.S.C. § 922(c), incorporated into PROMESA by 48 U.S.C. § 2161(a).  There, Congress provided that *if* a municipal debtor provides a secured creditor adequate protection under Sections 362, 364, or 922 of the Code, and "notwithstanding such protection such creditor has a claim arising from the stay," *then* the creditor is entitled to an administrative expense claim under Section 503(b).  11 U.S.C. § 922(c).

But what if a municipal debtor like PREPA refuses to agree to adequate protection?  Congress thought about that too.  If a creditor is entitled to adequate pro-

8

tection and a municipal debtor does not provide it, "cause" may exist to lift the automatic stay. *Id*. § 362(d). Like adequate protection, stay relief ensures the Code does not effect a taking. *See Peaje*, 845 F.3d at 511-12. It ensures that a secured creditor is not "left to stand by helplessly as the debtor spend the creditor's collateral leaving the debt entirely unsecured," by "allow[ing] the processes of state or territorial law to operate in normal course as if there were no bankruptcy." *Stay Decision*, 899 F.3d at 20-21; *see also In re Fin. Oversight & Mgmt. Bd. for Puerto Rico (Special Revenues Order)*, 931 F.3d 111, 118 (1st Cir. 2019) (Kayatta, J., statement respecting the denial of rehearing en banc, joined by Howard, C.J., and Torruella and Thompson JJ.) (explaining that "stay relief" is no "paper tiger"). Of course, for stay relief to issue, a creditor must first demonstrate a protected property interest, entitled to adequate protection, and the lack of that adequate protection.

In sum, secured creditors can protect their property rights by demanding and establishing a right to adequate protection. When they do, municipal debtors face a choice. They can agree to adequate protection, backstopped by an administrative expense claim. Or they can forfeit the protection of the automatic stay. Under both paths, the secured creditor's property rights are protected.

### 2.    *Administrative expense claims*

The Bondholders here did not obtain adequate protection. And although they claim harm from the automatic stay, the obvious remedy is to appeal the continued

9

stay on their lift-stay motions, which the Bondholders have attempted to do in a separate appeal. Notice of Appeal, No. 17-04780-LTS9 (D.P.R. June 3, 2026), Dkt. No. 6175.[1] Yet in this appeal, the Bondholders effectively claim that stay relief is unnecessary because they have been entitled to administrative expense priority under Section 503(b) all along.

As noted above, Section 503(b) is a "narrow[,]" *In re FBI Distrib. Corp.*, 330 F.3d 36, 41-42 (1st Cir. 2003), exception to the overarching rule of equal distribution. Relevant here, creditors are entitled to an administrative expense claim for "the actual, necessary costs and expenses of preserving the estate," 11 U.S.C. § 503(b)(1)(A), which entitles them to priority in recovery, *id.* § 507(a)(2). Section 503(b) "must be tightly construed" because "[e]very claim granted priority status reduces the funds available to general unsecured creditors and may diminish the recovery of other claimants qualifying for equal or lesser priorities." *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006).

Section 503(b) serves a distinct purpose. "Congress recognized that, if a business is to be reorganized, third parties must be willing to provide the necessary goods and services," yet they "clearly will not do so" unless there is some assurance their claims for payment will be reimbursed in full. *Mammoth Mart*, 536 F.2d at 954.

---

[1] That appeal lacks merit for reasons to be set forth therein.

Section 503(b) solves that problem by "provid[ing] an incentive for creditors to continue doing business with a debtor and an incentive for others to engage in business transactions with the debtor."  4 Collier, *supra*, ¶ 503.06.

For 50 years, this Court has interpreted Section 503(b) (or its precursor, Section 64(a)(1) of the Bankruptcy Act) to effectuate this purpose.  Under this Court's cases, for a claim originating in contract to qualify as an administrative expense, the creditor must supply consideration (or perform) post-petition.  *Mammoth Mart*, 536 F.2d at 954-55 & n.4; *accord FBI Distrib.*, 330 F.3d at 42; *Hemingway*, 954 F.2d at 5.  In this Circuit, what "matter[s]" is "*when* the consideration supporting the claim was supplied."  *FBI Distrib.*, 330 F.3d at 43; *see also Hemingway*, 954 F.2d at 7 (finding "no authority" for applying *Reading* to "a right to payment originating in a prepetition contract with the debtor").

### B.     Factual and Procedural Background

1. The Bondholders here are pre-petition creditors of PREPA.  From 1974 to 2016, PREPA issued revenue bonds to finance the operation and upkeep of Puerto Rico's electrical grid pursuant to a Trust Agreement, as well as to service debt on existing bonds.  Add.8.  The Bondholders' consideration was the money they paid for the bonds.  PREPA's consideration was (among other things) a promise to repay, with a lien on PREPA's Net Revenues to ensure repayment.  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico (Lien Decision)*, 121 F.4th 280, 290-91 (1st Cir. 2024).

11

The phrase "Net Revenues" is defined in the Trust Agreement as Revenues in excess of Current Expenses. *See id.* at 291; *see also* App.518.  Current Expenses, in turn, are defined as the "reasonable and necessary current expenses of maintaining, repairing, and operating" PREPA's system, including expenses "permitted by standard practices for public utility systems."  App.513.

By the mid-2010s, PREPA was in dire straits.  Years of deferred infrastructure investment resulted in frequent and costly outages.  App.1222, 2129-34. PREPA repaid its debt by depleting reserves and through additional borrowings.  Faced with these problems, at the request of the then-governor, the Board initiated a Title III case in July 2017 as PREPA defaulted on obligations under the Trust Agreement. Add.11.

Two months later, PREPA's situation got vastly worse.  Hurricanes Irma and Maria pounded Puerto Rico, causing thousands of deaths, a nearly year-long blackout (the longest in U.S. history), and billions of dollars in damage to PREPA's already-battered grid.  *See* App.1233.[2]  Earthquakes added to the chaos, as did Hurricane Fiona, which followed in 2022.  *Id.*

To save the system from collapse, PREPA spent some of its revenues on repairs and maintenance.  While PREPA maintains those expenditures constituted

---

[2] The Bondholders incredibly argue that PREPA generated hundreds of millions of dollars of Net Revenues during this period.

"Current Expenses" under the Trust Agreement and/or necessary operating expenses under Section 928(b), the Bondholders claim they are instead "Net Revenues" that should have been deposited in a "Sinking Fund" designated for debt service. Add.9-10; Debtor's Objection at 8, No. 17-04780-LTS9 (D.P.R. April 28, 2025), Dkt. No. 5621-2.[3]

2. Recognizing that their principal remedy under the Code was stay relief, the Bondholders moved in 2017 to lift the automatic stay. There, they argued that PREPA had not generated *enough* Net Revenues to cover debt service, so the stay should be lifted to appoint a receiver to raise rates on the people of Puerto Rico. *Stay Decision*, 899 F.3d at 18. The Title III court denied the Bondholders' motion, but this Court vacated and remanded, clarifying that PROMESA did not prohibit lifting the stay to allow Bondholders to protect existing collateral. *Id.* at 18-24. The Bondholders filed a new lift-stay motion, but consensually paused it to negotiate a restructuring support agreement (the 2019 RSA). Add.11. That agreement provided that,

---

[3] The Ad Hoc Group asks this Court to find that the amount of Net Revenues to which the Bondholders are entitled as administrative expenses is $3.7 billion, as reflected in monthly operating reports. Ad Hoc Br. 18, 27-28, 41-43. The amount of any Net Revenues, however, is a question of fact, on which the Title III court did not pass. Accordingly, even if this Court decided that the Bondholders had a cognizable administrative expense claim, it should remand for the Title III court to decide, in the first instance, the amount of any Net Revenues to be given priority treatment. *See, e.g.*, *Stay Decision*, 899 F.3d at 22-23.

if approved, the Bondholders might get adequate protection under certain circumstances, but those circumstances never came to pass.  *See* Add.40.

A complex procedural history followed, as recounted in this Court's decision in *In re Financial Oversight & Management Board for Puerto Rico*, 91 F.4th 501, 506-08 (1st Cir. 2024).  With the exception of that appeal, the Bondholders had not, until last month, appealed the Title III court's decisions that they now claim have effectively denied them stay relief.  *See* Notice of Appeal, No. 17-04780-LTS9 (D.P.R. June 3, 2026), Dkt. No. 6175.  Instead, starting in 2025, the Bondholders prosecuted an administrative expense claim.  The crux of their motion for administrative expense priority was the allegation that PREPA had spent Net Revenues on which the Bondholders' had a lien, rather than deposit those Net Revenues in the Sinking Fund, and that the Bondholders were being harmed by the automatic stay because they could not enforce their contractual remedies to protect this collateral.

3.  The Title III court denied the Bondholders' motion.

*First*, the court rejected the Bondholders' argument that they had an administrative expense claim under Section 503(b) because PREPA had allegedly enriched itself at their expense.  As the court observed, the law in this Circuit is "that a claimant," like the Bondholders here, "who fully performs under a contract prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt estate after the filing."  Add.25-26

(quoting *Mammoth Mart*, 536 F.2d at 954). Contrary to Assured's assertion, the Title III court did not "suggest[] that PROMESA permits administrative expense claims *only* under Section 922(c)." Assured Br. 34. Rather, the court held that, under this Circuit's rule, the *Bondholders'* remedy was under Section 922(c), whereas post-petition PROMESA creditors could bring a claim under Section 503(b). *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 7 F.4th 31 (1st Cir. 2021) (affirming Title III court's grant of Section 503(b) claim under PROMESA).

*Second*, the court declined to apply *Reading* "prepetition creditors like the Bondholders," Add.31, and held that they did not state viable underlying claims in any event, *id*. at 33-37.

*Last*, the court held that, under the "plain language" of Section 922(c), the Bondholders were not entitled to an administrative expense claim because "there was never an operative agreement or order to provide adequate protection." Add.38.

## SUMMARY OF ARGUMENT

In PROMESA, Congress allowed Puerto Rico's instrumentalities restructuring their debts to use their assets to continue operating—or here, to invest in infrastructure repairs—free of judicial interference. But Congress did not leave creditors unprotected. Secured creditors may demand adequate protection. When adequate protection is required, municipal debtors, like PREPA, have a choice. They

15

can either agree to adequate protection, subject to an administrative expense claim if adequate protection fails to protect the creditors' property, 11 U.S.C. § 922(c); or they can forfeit the protection of the automatic stay, exposing themselves to litigation in the ordinary course, *id.* § 362(d).  Both paths prevent takings.  And both help explain why the Bondholders' claim to administrative expense priority is wrong.

I.  The Bondholders are not entitled to a claim under Section 503(b).

A.  For 50 years, this Court has interpreted Section 503(b) and its predecessor to grant priority to contract creditors only when they supply consideration or perform post-petition, consistent with Section 503(b)'s purpose of inducing creditors to extend credit to distressed entities.  The Bondholders here performed pre-petition, providing consideration well before the petition date.

B.  The Bondholders' argument that they are entitled to priority under Section 503(b) because PREPA allegedly unjustly enriched itself should be rejected for four reasons.

*First*, it is foreclosed by this Court's case law, which holds that "a claimant who fully performs under a contract prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt estate after the filing." *Mammoth Mart*, 536 F.2d at 954.

*Second*, a Section 503(b) claim is not required to avoid uncompensated

16

takings. Sections 922(c) and 362(d), when properly invoked, already do that.

*Third*, the Bondholders' theory would undermine Sections 922(c) and 362(d) by granting secured creditors full relief when they have not availed themselves of the remedies Congress granted them.

*Fourth*, the Sixth Circuit case on which the Bondholders rely is inapposite. By its terms, the decision applies in the small window between the petition date and the acceptance/rejection of an executory contract or unexpired lease. Those are not the circumstances here.

II. The Bondholders are not entitled to a claim under *Reading*.

A. *Reading* does not protect creditors, like the Bondholders here, whose claims originate in a pre-petition contract. For good reason. Unlike the creditors protected by *Reading*, pre-petition contract creditors can protect themselves through other provisions of the Code—namely, adequate protection and stay relief.

B. The Bondholders' underlying takings claim is meritless. The Takings Clause applies only to the government's exercise of sovereign power. Here, PREPA undertook the conduct at issue—investing in repairs, rather than saving money for debt service—in its proprietary capacity, no different than any private party that invests money subject to a lien.

III. The Bondholders are not entitled to a claim under Section 922(c). Section 922(c) applies only if the debtor has provided adequate protection under the Code.

As the Bondholders correctly alleged below, the Board (on behalf of PREPA) did not provide them adequate protection.

## ARGUMENT

It is a "fundamental principle of bankruptcy law that the debtor's limited resources are to be distributed equally among similarly situated creditors." *FBI Distrib.*, 330 F.3d at 41-42; *see Howard Delivery*, 547 U.S. at 667. This case involves an exception to the equal-distribution principle for administrative expense claims. An administrative expense claim takes priority over other claims, 11 U.S.C. § 507(a)(2), and under PROMESA, a plan cannot be confirmed unless a creditor holding an administrative claim is paid full value or agrees to different treatment, 48 U.S.C. § 2174(b)(4). As a practical matter, granting a significant administrative expense claim—as the Bondholders seek—makes plan confirmation extremely difficult.

An administrative expense claim conflicts with "the equal distribution objective underlying the Bankruptcy Code" because "[e]very claim granted priority status reduces the funds available to general unsecured creditors and may diminish the recovery of other claimants qualifying for equal or lesser priorities." *Howard Delivery*, 547 U.S. at 667. Indeed, "[t]o give priority to a claimant not clearly entitled thereto is not only inconsistent with the policy of equality of distribution; it dilutes the value of the priority for those creditors Congress intended to prefer." *Id*.

18

(quoting *Mammoth Mart*, 536 F.2d at 953). For these reasons, "provisions allowing preferences must be tightly construed," *id*., "and the burden of proving entitlement rests with the party seeking it," *FBI Distrib.*, 330 F.3d at 42.

The special treatment afforded administrative expense claims thus requires special justifications. This case implicates two provisions of the Code founded on such justifications. In Section 503(b)(1)(A), Congress granted administrative expense priority for the "actual, necessary costs and expenses of preserving the estate" to induce creditors to extend credit to debtors during bankruptcy. *See, e.g.*, *Mammoth Mart*, 536 F.2d at 954 (interpreting precursor provision). The precursor to this provision was interpreted in *Reading* as also granting priority to tort creditors who are injured by the debtor's ongoing post-petition operations and who have no other way of protecting their interests. Section 922(c) is founded on a similar rationale. It grants priority to secured creditors in municipal bankruptcies who have taken all steps to protect their interests (i.e., secured adequate protection) but are nonetheless harmed by the operation of the Code's automatic stay.

The Bondholders here are pre-petition creditors. They extended credit to PREPA before its Title III restructuring case, fully performing (by paying money for PREPA's bonds) years before the petition date. During PREPA's restructuring, however, the Bondholders did not secure adequate protection. Yet they claim they must be permitted to jump the queue because PREPA has not performed its end of

19

the parties' contractual bargain. According to the Bondholders, they are entitled to an administrative expense claim because (they allege) PREPA spent Net Revenues to repair its crumbling infrastructure instead of paying them or stashing the money in the Sinking Fund. That approach, they maintain, is necessary to prevent an unconstitutional taking of their property.

The Bondholders are wrong. For half a century, this Court has recognized that, under Section 503(b)(1)(A) (or its precursor), administrative expense claims stemming from a contractual debt are available only to creditors who supply consideration to the debtor post-petition. *See Mammoth Mart*, 536 F.2d at 954-55. That rule does not leave secured pre-petition creditors helpless against takings. Secured creditors like the Bondholders can seek adequate protection. If they are entitled to adequate protection and the debtor refuses to provide it, creditors can move to lift the stay and file suit to enforce their rights directly. 11 U.S.C. § 362(d). And if the debtor provides adequate protection that later fails, then—but only then— can they seek administrative expense priority. *Id.* § 922(c). These mechanisms protect secured creditors' property rights.

The district court thus got it right in holding that the Bondholders were not entitled to an administrative expense claim. Section 503(b) is inapplicable under this Court's case law because the Bondholders supplied consideration pre-petition. *Reading* does not apply to pre-petition creditors who can protect themselves via

20

adequate protection or stay relief.  And Section 922(c), by its terms, is inapplicable because the Bondholders did not obtain adequate protection.  This Court should affirm.[4]

## I.    THE BONDHOLDERS CANNOT BRING AN ADMINISTRATIVE EXPENSE CLAIM UNDER SECTION 503(b)

This Court has consistently held that Section 503(b) does not apply to creditors who supplied consideration before the petition date.  That rule forecloses the Bondholders' 503(b) claims.  The Bondholders supplied consideration when they purchased the bonds, many years before PREPA's Title III petition.

The Bondholders argue that an administrative expense claim should be available to pre-petition creditors when the debtor has been unjustly enriched at their expense.  That position is foreclosed by Circuit case law, is not required to avoid takings, and conflicts with Congress's careful design by creating an administrative expense claim when the creditor has not first availed itself of the remedies Congress provided.

### A.    Section 503(b) Does Not Apply To Creditors Who Supplied Pre-Petition Consideration To The Debtor

In Section 503(b), Congress enacted a narrow exception to the equal-distribution principle, granting administrative expense priority for "the actual,

---

[4] Any of the Bondholders' arguments not directly discussed in this brief are amply addressed in the briefs filed by the Board and the Committee of Unsecured Creditors.

necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). The manifest purpose of this provision is to "encourage creditors, otherwise wary of dealing with [bankrupt] businesses, to provide the goods and services required for successful rehabilitation." *FBI Distrib.*, 330 F.3d at 41. Absent a guarantee that "their claims for payment will be paid ahead of the pre-petition debts and liabilities of the debtor," creditors would not extend to the debtor the funds needed "to maintain, preserve, or rehabilitate the bankrupt estate." *Mammoth Mart*, 536 F.2d at 954.

This rationale applies only when a creditor is induced to do business with and supply consideration to the debtor post-petition. A creditor who supplies consideration before bankruptcy does not deal with the debtor as a debtor; awarding priority status to a creditor in that circumstance needlessly reduces the assets available to repay similarly situated pre-petition creditors. *See FBI Distrib.*, 330 F.3d at 41.

Accordingly, this Court has held in a line of cases beginning with *Mammoth Mart*, 536 F.2d at 954, that, for a claim to qualify as an administrative expense, "(1) it must have arisen from a transaction with the trustee or debtor in possession, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the claim must have benefitted the estate in some demonstrable way." *FBI Distrib. Corp.*, 330 F.3d at 42; *see also In re Fin. Oversight & Mgmt. Bd. for*

22

*Puerto Rico*, 7 F.4th 31, 39 (1st Cir. 2021); *In re Servisense.com*, 382 F.3d 68, 72-73 (1st Cir. 2004); *Cumberland Farms, Inc. v. Fla. Dep't of Env't Prot.*, 116 F.3d 16, 21 (1st Cir. 1997); *Hemingway Transport*, 954 F.2d at 5 & n.4.

Under this Court's cases, a contract creditor enters into a transaction with the debtor when it supplies consideration after the petition date.  As the Court put it in *Mammoth Mart*:   "When the claim is based upon a contract between the debtor and the claimant, the case law teaches that a creditor's right to payment will be afforded first priority only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business."  536 F.2d at 954; *see also FBI Distrib.*, 330 F.3d at 42-43; *In re Bos. Reg'l Med. Ctr., Inc.*, 291 F.3d 111, 124 (1st Cir. 2002); *Servisense.com*, 382 F.3d at 72-73; *Hemingway*, 954 F.2d at 5 n.4.  What matters, in other words, is "*when* the consideration supporting the claim was supplied."  *FBI Distrib.*, 330 F.3d at 43.  A claimant "who fully performs under a contract prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt estate after the filing." *Mammoth Mart*, 536 F.2d at 954.[5]

---

[5] The Court has recognized that Section 503(b) would also apply where the debtor, post-petition, induces a pre-petition creditor to perform.  *See Mammoth Mart*, 536 F.2d at 955 n.4.  As this Court explained in *FBI Distribution*, where the debtor-in-possession "induces a nondebtor to render performance pursuant to an *unassumed*

This Court has consistently applied this rule.  In *Mammoth Mart*, for instance, discharged employees sought to claim as an administrative expense severance pay allegedly due to them after their employer, post-petition, terminated their employment.  536 F.2d at 952.  The debtor-in-possession there undoubtedly reaped a benefit by retaining the severance payments, which instead could go toward supporting the continued operations of the estate.  Yet this Court rejected the claim because the "consideration supporting the claim"—the services the employees provided over the course of their employment—was not "supplied during the reorganization" but rather pre-petition.  *Id.* at 955.

In *FBI Distribution* and *Servisense.com*, the Court again dealt with employees who sought administrative expense priority for unpaid severance packages.  In *FBI Distribution*, the Court acknowledged that the employee's "right to payment arose after the petition date," when the employee was terminated.  330 F.3d at 48. But

---

prepetition executory contract, pending its decision to reject or assume, the nondebtor party will be entitled to administrative priority," but "only to the extent that the consideration supporting the claim was supplied to the debtor in possession during the reorganization and was beneficial to the estate."  330 F.3d at 42-43.  A more accurate formulation of this Circuit's rule, then, might be that what matters is not when consideration is supplied (for consideration may be an un-performed promise) but when performance is delivered.  Regardless, the induced-performance rationale has no application here, as the bondholders fully performed pre-petition. And "[u]nder a nonexecutory contract, in which the nondebtor owes no future performance, the nondebtor provides no consideration *after* the commencement of the case, and thus is not entitled to priority."  *Id*. at 48 (citations omitted).

24

what mattered was that the "consideration supporting the Retention Agreement—to forgo other employment opportunities—was supplied the moment she signed the agreement," pre-petition. *Id.* Under those circumstances, "in which the nondebtor owes no future performance, the nondebtor provides no consideration '*after* the commencement of the case,' and thus is not entitled to priority." *Id.* (citation omitted); *see also id*. at 46-48. Likewise, in *Servisense.com*, the Court observed that the former employee would be entitled to administrative priority "only if he provided consideration *after* [the debtor] filed its bankruptcy petition." *Servisense.com*, 382 F.3d at 74 (emphasis added). Because, under the terms of the severance agreement, he had "earned the right to severance once he had performed twelve months of service, which occurred pre-petition," the Court denied the claim to priority. *Id.*; *see also, e.g.*, *Hemingway*, 954 F.2d at 5 & n.4 (claim for attorneys' fees based on pre-petition agreement "cannot meet the traditional *Mammoth Mart* criteria").

Under a straightforward application of *Mammoth Mart* and its progeny, the Bondholders are not entitled to Section 503(b) priority. The Bondholders' claim to administrative expenses originates in the 1974 Trust Agreement. Under that Agreement, PREPA raised money by issuing bonds to the Bondholders in exchange for a promise to repay secured by a lien on Net Revenues. The Bondholders' consideration was the money they spent to purchase the bonds—money paid many

25

years before PREPA's petition date.  Thus, as in *Mammoth Mart*, *FBI Distribution*, *Servisense.com*, and *Hemingway*, once the Bondholders purchased the revenue bonds, they "owe[d] no future performance" and "provide[d] no consideration '*after* the commencement of the case.'"  *FBI Distrib.*, 330 F.3d at 48.  They are therefore "not entitled to priority."  *Id.*; *see* Add.24-26 (concluding that Bondholders are "solely prepetition creditor[s]").

Two groups of Bondholders take issue with the Title III court's application of this Court's case law.  Assured, echoed to some extent by GoldenTree, asserts that the court erred in treating the Bondholders as pre-petition creditors because this case involves the alleged creation and consumption of collateral post-petition.  *See, e.g.*, Assured Br. 39, 42; GoldenTree Br. 29.  But as just explained, the first element of this Court's test focuses on "*when* the consideration" was supplied by the *creditor*, *FBI Distrib.*, 330 F.3d at 43, not on when the funds were generated or when the *debtor's* contractual obligation attached.[6]

---

[6] Assured cites Collier's observation that a "transaction with the estate does not require a contractual relationship with the debtor."  Assured Br. 40 (citing 4 Collier, *supra*, ¶ 503.06).  True enough, there can be a post-petition performance that does not arise out of a formal contract with the party seeking administrative expenses. But that line of cases does not address the circumstances here—a security agreement in which the Bondholders have fully performed pre-petition—which Collier treats separately.  *See* 4 Collier, *supra*, ¶ 503.06 (explaining that there is "no inducement by a debtor in possession that uses property subject to a secured creditor's lien" unless the debtor provides adequate protection).

As the Norton treatise notes, "[c]reditors sometimes seek damages for a postpetition breach of a prepetition contract," but it is well established that such claims do "not arise out of a postpetition transaction" and therefore "are not entitled to administrative priority regardless of whether the estate benefited by saving money by not completing performance." 2 Norton, *supra*, § 49:23. Indeed, that is exactly what happened in cases like *Mammoth Mart* and *FBI Distribution*, where the debtor retained the creditors' funds. Assured does not explain why the rule is different when the debtor generates new funds (as alleged here), as opposed to improperly retaining existing funds (as in *Mammoth Mart*, *FBI Distribution*, and *Servisense.com*). After all, a debtor who retains the creditor's funds (or collateral) can use them to generate new funds (or collateral) by investing in the business.

To be sure, the generation of new funds may confer more of a benefit on the estate. But that would go to the *value* of a hypothetical claim, not whether it exists in the first place. And under this Court's case law, the existence of a benefit to the estate, no matter how large, is not enough to create an administrative expense claim. Post-petition consideration is required: "[A] claimant who fully performs under a contract prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt estate after the filing." *Mammoth Mart*, 536 F.2d at 954.

"Courts commonly recognize that § 503(b) is not intended to provide an

27

administrative expense award to a prepetition secured lender based on the debtor's postpetitition possession and use of collateral." *In re Williams*, 246 B.R. 591, 595 (B.A.P. 8th Cir. 1999).  But Assured insists this case is different because PREPA consumed its collateral, as opposed to merely causing its value to diminish through use.  Assured Br. 42.  That, too, is a distinction without a difference.  A partial decrease in value is not distinguishable from a total decrease (what the Bondholders call "destruction"); one just causes more harm than the other.  Besides, this Court's test does not ask about what the debtor did with the creditor's assets.  If the creditor supplied consideration post-petition and that consideration benefited the estate, then an administrative expense claim is available.  *See, e.g.*, *Mammoth Mart*, 536 F.2d at 954.  If not, not.  *Id.*[7]

Ultimately, Assured's argument boils down to the assertion that the complete

---

[7] Assured's long digression (Assured Br. 34-38) on the parties' respective property rights in PREPA's Net Revenues is irrelevant and wrong.  It is irrelevant because the existence of a Section 503(b) claim turns on when consideration was supplied, *supra* at 21-26, not on the parties' rights in the property.  It is wrong because PREPA *did* have a right to use—one of the sticks in the bundle—the revenues generated by the system, free from judicial interference.  *See* 48 U.S.C. § 2165(2).  In this respect, and by declining to incorporate Section 363, PROMESA eliminates the distinction between the use of cash collateral and non-cash collateral.  *See* 48 U.S.C. § 2161(a); 11 U.S.C. § 363(c).  And in cases involving non-cash collateral, courts hold that the debtor's continued use of the secured asset does not give rise to an administrative expense claim, Add.26-27, unless adequate protection fails, 11 U.S.C. § 922(c).  *That* was the point the Title III court was making in citing Section 305 of PROMESA, 48 U.S.C. § 2165, and PROMESA's non-incorporation of Section 363.

destruction of collateral must be treated differently to avoid an uncompensated taking. "PREPA," Assured argues, "has no statutory right to consume liened Net Revenues without compensation or priority consequences." Assured Br. 42. PREPA has not consumed Assured's collateral. *See supra* at 12-13. But even assuming it had, Congress addressed Assured's takings concerns through *other* provisions of the Code, as explained in the sections that follow.

### B.    The Bondholders' "Unjust Enrichment" Theory Should Be Rejected

Unable to bring a Section 503(b) claim under this Court's case law, the Bondholders ask the panel to change this Circuit's rule. Relying principally on a Sixth Circuit case that departed from this Court's test, *In re United Trucking Service, Inc.*, 851 F.2d 159, 162 (6th Cir. 1988), the Bondholders argue that administrative expense priority is warranted so long as the debtor "unjustly enriches" itself at the creditor's expense. Assured Br. 31; GoldenTree Br. 23-24.

The Court should reject the Bondholders' unjust enrichment theory for four reasons. *First*, it is foreclosed by longstanding Circuit case law. *Second*, it is unnecessary to protect pre-petition creditors or avoid uncompensated takings. *Third*, it conflicts with the design and structure of the Code. *Last*, *United Trucking* does not support the application of Section 503(b) in the circumstances here.

29

1.    *The Bondholders' unjust enrichment theory is foreclosed by Circuit precedent*

The law-of-the-circuit doctrine "requires this Court … to respect, in the absence of supervening authority, the decisions of prior panels on the same issue." *Nevor v. Moneypenny Holdings, LLC*, 842 F.3d 113, 125 (1st Cir. 2016).  For decades, the law of this Circuit has been that a contract creditor is entitled to a Section 503(b) claim only when it supplies consideration (or performs) post-petition. *See supra* at 21-29.  And that is true even when the debtor enriches itself at the creditor's expense.  It is "clear," this Court emphasized, "that a claimant who fully performs under a contract prior to the filing of the petition will not be entitled to first priority even though his services may have resulted in a direct benefit to the bankrupt estate after the filing." *Mammoth Mart*, 536 F.2d at 954.

Indeed, many of this Court's cases would have come out differently under the Bondholders' theory.  In *Mammoth Mart*, *FBI Distribution*, and *Servisense.com*, the debtor enriched itself to the benefit of the estate by withholding severance payments that should have been made to discharged employees.  Yet in each case, a Section 503(b) claim was available *only* to the extent the creditor-employees supplied consideration post-petition.

If the Bondholders are dissatisfied with that rule, they may ask the Supreme Court or the *en banc* Court to change it.  But as things stand, the district court was right to conclude that the Bondholders' could not bring a Section 503(b) claim on an

30

unjust enrichment theory.

2.    *The Bondholders' unjust enrichment theory is not needed to avoid uncompensated takings*

The Bondholders assert that a Section 503(b) administrative expense claim is necessary to avoid uncompensated takings. *See* Assured Br. 28-29, 47-49; Ad Hoc Br. 38-40. Not so. "A secured creditor is protected against depreciation [or destruction] of collateral during the reorganization period through various *other* provisions of the Bankruptcy Code." *In re Advisory Info. & Mgmt. Sys., Inc.*, 50 B.R. 627, 629 (Bankr. M.D. Tenn. 1985) (emphasis added). Congress was aware of the problem the Bondholders' identify, but it "has already dealt with this situation in another manner." *In re Briggs Transp. Co.*, 47 B.R. 6, 7 (D. Minn. 1984).

In particular, secured creditors may obtain "adequate protection" to safeguard their property interests in their collateral. *See* 11 U.S.C. §§ 361-62; *see also United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203-04 (1983); Collier, *supra* ¶ 361.02. "[A]dequate protection means that the value of the creditor's interest in the collateral must be protected from diminution while the property is being used or retained during the bankruptcy proceeding." *Stay Decision*, 899 F.3d at 23 (citation omitted). "Under 11 U.S.C. §§ 361 and 362, adequate protection of the creditor's interests may be required through periodic cash payments, replacement liens, or other relief *except* the granting of a § 503(b)(1) administrative expense." *Advisory Info.*, 50 B.R. at 629; *see* 11 U.S.C. § 361.

As this Court and others have recognized, "[t]he concept of adequate protection is derived from the Fifth Amendment protection of property interests." *Peaje*, 845 F.3d at 511 (citation and brackets omitted). "By providing a creditor with a means of protecting its interest through section 362(d)'s adequate protection requirement, the competing interests of the debtor's need to reorganize and the secured creditor's entitlement to constitutional protection of its bargained-for property interests are reconciled." *Briggs*, 780 F.2d at 1342; *see also Special Revenues Order*, 931 F.3d at 118 (Kayatta, J., respecting the denial of rehearing en banc).

A debtor and creditor may agree to adequate protection. 3 Collier, *supra*, ¶ 361.05. When they do, a pre-petition creditor stands in the same position as a post-petition creditor—the creditor will have entered into an agreement with the debtor permitting the debtor to use collateral in exchange for a promise to protect the value of the collateral. *See In re Carpet Ctr. Leasing Co.*, 991 F.2d 682, 687 (11th Cir. 1993) ("The negotiation for continued possession of the tractors in return for adequate protection is a post-petition transaction providing new value to the bankruptcy estate."); *see also* Collier, *supra*, ¶ 503.06[3][a] (no post-petition inducement "by a debtor in possession that uses property subject to a secured creditor's lien unless the debtor has agreed to pay, or has been ordered to pay, adequate protection"). Both creditors are thus entitled to an administrative expense

32

claim if the value of their collateral is diminished, the former under Section 922(c), the latter under Section 503(b).

In non-municipal bankruptcies, creditors can also obtain court-ordered adequate protection. *See* 11 U.S.C. § 363(e). That option is not open to municipal creditors because federal restrictions on municipal creditors' use of property unduly restrict their sovereign operations. 11 U.S.C. §§ 901, 904; *see In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 927 F.3d 597, 602-03 (1st Cir. 2019). But, contrary to Assured's concerns (Assured Br. 66-67), municipal creditors are not left without recourse if the debtor does not agree to adequate protection.

"As this Court has explained, the point of section 362(d) is to provide a remedy when the Board does not consent to provide adequate protection." Ad Hoc Br. 39-40 (citing *Stay Decision*, 899 F.3d at 21). In that Section, Congress provided that "the lack of adequate protection" (where adequate protection is warranted) is cause to lift the automatic stay. 11 U.S.C. § 362(d)(1). And, with the stay lifted, a creditor may pursue whatever remedies it believes it's entitled to, including foreclosing on its collateral. *See Stay Decision*, 899 F.3d at 21. "In so providing, section 362(d)(1) guards against the possibility that the automatic stay could deprive a creditor of its property interest by precluding the creditor from exercising any rights is possesses to protect that interest from destruction." *Id*. at 20.

Stay relief thus operates as an avenue should a municipal creditor refuse

33

adequate protection to a creditor entitled to it.  *See id.*; *Peaje*, 845 F.3d at 511-52; *cf. Special Revenues Order*, 931 F.3d at 118 (Kayatta, J., respecting the denial of rehearing en banc) ("Courts, including the U.S. Supreme Court, have time and again affirmed the constitutionality of section 362 of the bankruptcy code against Fifth Amendment Takings Clause claims.").  In fact, the Bondholders themselves have argued to this Court that "[i]n providing that a secured creditor who is not adequately protected must be granted relief from the automatic stay, Bankruptcy Code section 362(d) was designed to avoid issues with the Takings Clause of the Fifth Amendment."  Br. of Movants-Appellants at 37, *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico* (No. 17-2079), 2018 WL 889582, at *37 (Feb. 6, 2018).

Unsurprisingly, this Court has repeatedly indicated in cases under PROMESA that the remedy for the debtor's alleged diminution of collateral is adequate protection or stay relief.  In *Peaje* for instance, a bondholder argued that the Puerto Rico Highways and Transportation Authority (PRHTA) was "diverting toll revenues pledged as collateral for the bonds," thereby "diminishing the value of [its] collateral."  845 F.3d at 510.  This Court held that, absent adequate protection, stay relief was available under PROMESA's temporary litigation stay, 48 U.S.C. § 2194, to avoid these "constitutional concerns."  845 F.3d at 511-12.

This Court expanded on *Peaje* in a case brought by PREPA's Bondholders. There, the Title III court held that relief from the automatic stay, 11 U.S.C. § 362(a),

34

was unavailable under PROMESA. *Stay Decision*, 899 F.3d at 17-18. This Court disagreed, following *Peaje* in holding that stay relief must be available to avoid requiring creditors "to stand by helplessly as the debtor spent the creditor's collateral, leaving the debt entirely unsecured." *Id*. at 20. Absent the possibility of stay relief, this Court explained, "[t]he creditor would have no forum that could provide any protection." *Id*. at 22; *see also Special Revenues Order*, 931 F.3d at 132-33 (Lynch, J., dissenting from denial of reh'g en banc) (indicating panel decision relegated creditors "to seeking a lift-stay motion as the only recourse for the debtor's misappropriation of pledged revenues"). That statement would be false under the Bondholders' new theory. A federal forum would be available to protect the Bondholders' interests under Section 503(b).

To summarize, when a secured creditor demands and proves entitlement to adequate protection, a municipal debtor must make a choice: It can agree to adequate protection, subject to administrative expense claim if adequate protection fails, 11 U.S.C. § 922(c); or it can refuse adequate protection and subject itself to stay relief and litigation in the ordinary course, *id*. § 362(d)(2). Either way, the municipal creditor's collateral is protected against an uncompensated taking. Municipal debtors cannot "dissipate collateral with impunity," Assured Br. 36, so long as the creditor avails itself of the remedies Congress provided. As the Supreme Court stated in another bankruptcy case, "Congress has enacted a comprehensive scheme

and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation omitted). Those solutions—here, Sections 922(c) and 362(d)—control over a general provision like Section 503(b).

The Bondholders do not really disagree with this description of the statutory scheme. The Ad Hoc Group, for example, explains the statutory framework the same way. *See* Ad Hoc Br. 38-40; GoldenTree Br. 11-12. The Bondholders' gripe, it seems, is that they asked the Title III court to lift the stay (at times because PREPA was not generating *enough* revenue) but the court has thus far refused or found other litigation should proceed first. *See* Assured Br. 17-19, 22-23, 26, 47-48; Ad Hoc Br. 33; GoldenTree Br. 11-12. But the obvious remedy for that concern is not the creation of an administrative expense claim. It is for the Bondholders to appeal the Title III court's allegedly erroneous denial of their attempts to pursue a stay motion, which the Bondholders have now done. Their remedy, if any, lies in a *different* appeal, not this one.[8]

   3. *The Bondholders' unjust enrichment theory conflicts with Congress's design*

Aside from being unnecessary, the Bondholders' theory would "undermine"

---

[8] The Bondholders also have an altogether different remedy in the form of an accounting claim, which is pending in the Title III court following this Court's *Lien Decision*, 121 F.4th at 314-16.

the design and structure of the Code. *Mammoth Mart*, 536 F.2d at 955. As just shown, "Congress clearly gave careful consideration to" the risk that debtors would consume or diminish liened property while protected by the stay, *id*., and granted creditors powerful remedies in the form of adequate protection and stay relief. But there would be no reason for a creditor to avail itself of those remedies if it were guaranteed administrative expense priority whenever the debtor misuses collateral.

A creditor concerned that the debtor will misuse its collateral would have no reason to seek adequate protection under the Bondholders' theory, for the misuse of collateral would automatically trigger a Section 503(b) claim. Indeed, under the Bondholders' rule, a secured creditor who obtained adequate protection that failed would be treated the same as a secured creditor who never sought adequate protection in the first place. That result is obviously incompatible with Section 922(c), which conditions the provision of an administrative expense claim on the secured creditor *obtaining* adequate protection. As the Title III court correctly observed, the Bondholders' rule would perversely allow "a prepetition creditor to make an end-run around the adequate protection predicate by instead asserting a direct administrative expense claim." Add.26. Or, to borrow the Supreme Court's phrasing in *RadLAX*, Section 922(c) would be "swallowed" by Section 503(b). 566 U.S. at 645.

The same is true of stay relief. Why bother with motions practice and judicial

37

remedies when the Code itself grants a remedy for the alleged misuse of collateral? No rational creditor would. Hence, the Bondholders themselves sought stay relief before they conceived of their theory that they were entitled to an administrative expense claim.

The Bondholders' rule is also contrary to the principle that "Congress intended to put the burden on the creditor to seek relief from the stay or otherwise demand adequate protection in order to receive adequate protection." *Briggs*, 47 B.R. at 8. Under the Bondholders' rule, a creditor can sit back, knowing its collateral will be protected from misuse by Section 503(b).

### 4. United Trucking *does not save the Bondholders*

With so little to commend to their position, it is unsurprising the Bondholders marshal virtually no case law in support. They rely principally on the Sixth Circuit's decision in *United Trucking*. That decision does not help their cause. [9]

In *United Trucking*, Great Dane Trailers entered into a lease with United Trucking before it filed for bankruptcy. 851 F.2d at 160. Concerned about the state of the trailers, the successor to Great Dane moved to compel United either to assume

---

[9] The Bondholders also cite *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860 (4th Cir. 1994). But *Dobbins*'s "suggest[ion]," in a footnote, that a Section 503(b) administrative expense might be created "by a debtor's postpetition use (against the secured creditor's wishes) of collateral which the debtor had also used before going bankrupt" was *dicta*, as the court there held that the debtor-in-possession did not use or benefit from the collateral at all. 35 F.3d at 867 & n.7. *Dobbins* also involved a situation where adequate protection had proved inadequate. *Id.* at 864-65.

the lease or reject it and return the property. *Id.* United failed to respond to court orders and, after the court deemed the lease rejected, finally returned most of the trailers, all in disrepair. *Id.* at 161. The claimant then sought administrative expenses to cover the cost of fixing and replacing the trailers. *Id.* The Sixth Circuit acknowledged *Mammoth Mart*'s rule that Section 503(b)(1) applies only if the debt "arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession)." *Id.* at 161 (citation omitted). But despite identifying no performance or consideration rendered by the claimant, the court allowed the claim anyway, reasoning that United's "failure to maintain and repair the trailers" allowed it "to use the money saved" to "benefit the bankrupt estate." *Id.* at 162.

The Bondholders read *United Trucking* to stand for the proposition that a creditor is entitled to an administrative expense claim whenever the debtor unjustly enriches itself at a creditor's expense. Read that broadly, *United Trucking* is incompatible with this Court's case law, which holds that a claimant "who fully performs under a contract prior to the filing of the petition" cannot obtain administrative expenses, "*even though* his services may have resulted in a direct benefit to the bankrupt estate after the filing." *Mammoth Mart*, 536 F.2d at 954 (emphasis added). In *Mammoth Mart*, *FBI Distribution*, and *Servisense.com*, the debtor's alleged post-petition breach of its pre-petition contractual obligation

39

allowed the debtor "to use the money saved and not paid," *United Trucking*, 851 F.2d at 162, yet this Court denied priority treatment in each case.[10]

There is no reason to read *United Trucking* that broadly. Indeed, many courts since *United Trucking* have expressed discomfort with the decision and have "limited" the case to its "facts." *In re Cardinal Indus., Inc.*, 142 B.R. 801, 806 (Bankr. S.D. Ohio 1992); *see also, e.g.*, *In re Blankenship*, 610 B.R. 831, 847-48 (Bankr. W.D. Tenn. 2019); *In re James River Coal Co.*, 2006 WL 2548456, at *5 (M.D. Tenn. Aug. 31, 2006); *Matter of Cont'l Airlines, Inc.*, 146 B.R. 520, 527 (Bankr. D. Del. 1992). Here, three facts distinguish this case from *United Trucking*.

*First*, *United Trucking* concerned the "interval between the filing of the debtor's petition" and the rejection or assumption of an executory contact or unexpired lease, under Section 365. 851 F.2d at 160-61 (citation omitted). This case involves neither an executory contract in which performance is still possible on nor the assumption/rejection period at issue there.

*Second*, as multiple courts have recognized, *United Trucking* involved a pre-petition lease agreement, and "[t]here is a fundamental difference between security

---

[10] In *United Trucking*, "[n]either party on appeal challenge[d] the applicability of § 503(b)(1)(A)" because the parties stipulated that administrative expense treatment was appropriate. 851 F.2d at 161 n.2. Although the court conducted its own analysis of that question anyway, its flaws might well be a result of the lack of adversarial briefing.

agreements and lease agreements." *Blankenship*, 610 B.R. at 848 (quoting *Advisory Info.*, 50 B.R. at 630); *see In re Gasel Transp. Lines, Inc.*, 326 B.R. 683, 691 (B.A.P. 6th Cir. 2005) (Gregg, J., concurring). While, "[i]n lease situations the lessor is the owner of the property and the lessee must compensate the lessor for the benefit to the estate of using the lessor's property," in the context of a security agreement, "the secured lender is not the owner of the collateral but instead merely has a lien for which it is entitled to adequate protection." *In re Advisory Info.*, 50 B.R. at 630. Citing these cases, the Collier treatise explains that there is "no inducement by a debtor in possession that uses property subject to a secured creditor's lien unless and until the debtor has agreed to pay, or has been ordered to pay, adequate protection," discussing the analysis that applies to claims by equipment lessors in a separate section. 4 Collier, *supra*, ¶ 503.06 (emphasis added).

*Third*, the equities were vastly different in *United Trucking*. There, the court was faced with an uncooperative debtor who, as a lessee of the creditor's trailers, disregarded not only the creditor's requests but also court orders, eventually returning the trucks to the creditor in a state of complete disrepair. 851 F.2d at 160-61. Even within the Sixth Circuit, courts have held that *United Trucking*'s "theory of unjust enrichment should be limited to the egregious facts that gave rise to the decision." *Cardinal Indus.*, 142 B.R. at 805-06; *see In re Econ. Lodging Sys., Inc.*, 234 B.R. 691, 699 (B.A.P. 6th Cir. 1999). United's conduct bears no resemblance

41

to PREPA's conduct here. In the wake of devastating hurricanes that destroyed Puerto Rico's electrical grid, PREPA spent money repairing the very system the operation of which was necessary to generate the future revenues that would constitute Bondholders' collateral.

## II. *READING* DOES NOT SUPPORT ADMINISTRATIVE EXPENSE PRIORITY

The Bondholders fare no better under *Reading*. Though *Reading* was decided more than fifty years ago, neither this Court nor any other has applied *Reading* to a claim originating in a pre-petition contract. Even if *Reading* applied, the Bondholders have no viable underlying claim.

### A. *Reading* Does Not Apply to Pre-Petition Creditors Like The Bond-holders

In *Reading*, the Supreme Court interpreted Section 503(b)'s precursor "as providing general protection to claimants that are injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the estate." *Mammoth Mart*, 536 F.2d at 954.

There, the question was whether victims of a fire caused by the debtor's estate "should be subordinated to, should share equally with, or should collect ahead of those creditors for whose benefit the continued operation of the business … was allowed." *Reading*, 391 U.S. at 478. Recognizing that the post-petition tort claimant

42

needed "to have some means of asserting its claim against the business whose operation" damaged it, the Court held that the most logical solution was "to treat tort claims arising during an arrangement as actual and necessary expenses to the arrangement rather than debts of the bankrupt." *Id.* at 479, 482. It is unfair, the Supreme Court held, to deny a post-petition tort creditor meaningful recovery when it has no means to protect itself from the debtor's operations and has "had an insolvent business thrust upon it," and where the operations that harmed the tort creditor were meant to benefit creditors at large. *Id*. at 478. This Court's seminal case following *Reading* is *In re Charlesbank Laundry, Inc.*, in which the Court held that *Reading* applies "beyond the field of torts." 755 F.2d 200, 203 (1st Cir. 1985). (For ease of understanding, AAFAF refers to the class of *Reading* claimants as tort creditors, even though the doctrine applies beyond torts.)

*Reading* has no application here. In "*Reading* and cases following it, the debt at issue arose post-petition." *In re Sunarhauserman, Inc.*, 126 F.3d 811, 817 (6th Cir. 1997). "*Reading* does not eliminate the requirement that a debt arise post-petition in order to be accorded administrative expense priority." *Id*. Indeed, as this Court observed, there is "no authority that the *Reading-Charlesbank* exception encompasses a right to payment originating in a prepetition contract with the

43

debtor." *Hemingway*, 954 F.2d at 7.  The same is true today.[11]

The Bondholders' claims originate in the pre-petition Trust Agreement.  The underlying debt is PREPA's failure to repay the Bondholders pursuant to the Agreement.  And the basis for applying *Reading* is PREPA's alleged failure to deposit Net Revenues secured for repayment of that debt in the Sinking Fund, as required by the Trust Agreement, and the Code's disabling of the Bondholders' contractual remedies.  *See* Assured Br. 47.

It makes no sense to apply *Reading* in this context.  For one thing, "the *Reading-Charlesbank* exception," *Hemingway*, 954 F.2d at 7, would swallow the rule.  The Bondholders argue "that the *Reading* doctrine applies broadly to post-petition unlawful conduct."  Assured Br. 45.  But a breach of contract is "unlawful"

---

[11] The Ad Hoc Group cites *In re Al Copeland Enterprises, Inc.*, 991 F.2d 233 (5th Cir. 1993).  But that case involved the debtor's liability for *post-petition* interest on unpaid taxes.  *Id.* at 234, 238, 240.  The same goes for *Villalobos-Santana v. Puerto Rico Police Department*, 171 F.4th 544 (1st Cir. 2026), which applied *Reading* to a *post-petition* employment-retaliation claim.  *Id.* at 552.  Last, Assured relies on *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461 (Bankr. D. Del. 2006), but in addition to being an out-of-circuit lower court decision, it is inapposite.  The claimant there sought administrative expenses based on post-petition damage to machines in its possession under a pre-petition lease.  *Id.* at 479-80.  The district court applied *Reading* because the claim for conversion of the machines "in no way 'originate[d]' in the Master Lease," even though the conversion "might also have constituted a breach of the Master Lease."  *Id.* at 480.  In other words, if the debtor had had no lease with the claimant at all, its destruction of the machines would still have constituted the tort of conversion.  Here, by contrast, the Bondholders' alleged taking claim very much "originate[d]" in the Trust Agreement.

44

yet this Court has not applied *Reading* to post-petition breaches.  In fact, the *Mammoth Mart* rule—requiring post-petition consideration, not merely a post-petition breach—was fashioned in *Reading*'s shadow.  536 F.2d at 954.

For another, tort creditors and pre-petition creditors are not similarly situated. Tort creditors cannot protect themselves from the debtor's misconduct.  The claimants in *Reading*, for example, could not ask a court for an order requiring the receiver not to negligently start a fire.  An after-the-fact administrative expense claim is the only way to protect the tort creditor's interest in recovery after an "insolvent business" has been "thrust upon it."  391 U.S. at 478.

The same is not true of the Bondholders.  Unlike the claimants in *Reading*, pre-petition creditors *do* have tools at their disposal.  They can seek adequate protection or stay relief, both of which safeguard their property interests.  *Supra* at 31-36.  But where the secured creditor has not availed itself of these tools, "the rule of fairness" does not require allowing the pre-petition creditor to cut others in line. *Reading*, 391 U.S. at 479.

Adopting the Bondholders' capacious interpretation of *Reading* would also conflict with the design of the Code in all the same ways as their unjust enrichment theory.  If *Reading* gives pre-petition creditors the right to pursue an administrative expense claim to protect their collateral, then those creditors would have no reason to seek adequate protection or stay relief.  *Supra* at 37; *see In re Leroy M. Hull Co.*,

45

344 B.R. 466, 470 (Bankr. W.D. Va. 2004).

### B.       The Bondholders Do Not Have a Takings Claim

In addition, the Bondholders cannot state a *Reading* claim because they have no viable claim under the Takings Clause.[12]

This Court has "held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property." *Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005). "To hold otherwise" would risk "transmogrifying virtually every dispute involving an alleged breach of contract by a state or a state agency into a constitutional case." *Id.* Thus, where, as here, a government entity "acts in a contractual or proprietary capacity," actions such as "detention of property under the contract that would constitute a simple breach of contract when a non-governmental entity is involved do not become a constitutional violation" merely because the contracting party is a municipal entity. *Massó-Torrellas v. Municipality of Toa Alta*, 845 F.3d 461, 468 (1st Cir. 2017).

This case law forecloses the Bondholders' takings claim. The Bondholders maintain that the Trust Agreement secured repayment with a lien on Net Revenues, and that PREPA allegedly spent Net Revenues rather than depositing them in the

---

[12] Only GoldenTree argues PREPA is liable for conversion. *See* GoldenTree Br. Part II.A. The Board ably explains why the Bondholders cannot state a conversion claim.

Sinking Fund, in breach of the Agreement. The Bondholders' claim sounds in contract, not the Constitution. *See* Add.35-37.

The Bondholders offer different arguments in response. The Ad Hoc Group argues (Ad Hoc Br. 57) that there is no distinction under the Takings Clause between proprietary and sovereign conduct. This Court's case law forecloses that argument. *See Massó-Torrellas*, 845 F.3d at 468; *see also Preston Hollow Capital L.L.C. v. Cottonwood Dev. Corp.*, 23 F.4th 550, 554 (5th Cir. 2022) ("[A] government must be acting in its sovereign capacity to effect a taking").

In a similar vein, GoldenTree argues that *Armstrong v. United States*, 364 U.S. 40 (1960), found a taking when the government was "acting in its commercial capacity." GoldenTree Br. 46. That argument misreads *Armstrong*. In *Armstrong*, private parties had liens under state law for materials furnished to a contractor building boats for the United States. 364 U.S. at 41. When the contractor defaulted, the government exercised its option to take title to and possession of those materials. *Id*. Transfer to the government constituted a taking of the petitioners' liens, the Supreme Court held, because the government's "sovereign immunity" prevented the liens from being enforced. *Id*. at 46. The government's sovereign attributes, in other words, effected the taking.

Finally, Assured argues that it has a takings claim against PREPA because the Title III court's denial of stay relief has destroyed its ability to exercise its

47

"remedies." Assured Br. 57-58. But PREPA did not "take" Assured's remedies. To the extent *the Code* would effect a taking by virtue of the automatic stay, Assured's relief lies in an appeal of the denial of stay relief, as this Court indicated in *Peaje*, 845 F.3d at 511-12, and the *Stay Decision*, 899 F.3d at 20-21.

## III. THE BONDHOLDERS HAVE NO ADMINISTRATIVE EXPENSE CLAIM UNDER SECTION 922(c)

In Section 922(c), Congress created a path for pre-petition secured creditors to obtain an administrative expense claim. As relevant here, that statute states:

> If the debtor provides, under section 362, 364, or 922 of this title, adequate protection of the interest of the holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection such creditor has a claim arising from the stay of action against such property under section 362 or 922 of this title …, then such claim shall be allowable as an administrative expense under section 503(b) of this title.

11 U.S.C. § 922(c); *see* 48 U.S.C. § 2161(a) (incorporating Section 922).

By its terms, Section 922(c) imposes two requirements for an administrative expense claim. First, the debtor must have provided adequate protection under Section 362, 364, or 922. *See* 4 Collier, *supra*, ¶ 507.14[1][a] (explaining that under Section 507(b), Section 922(c)'s sister provision, "the trustee must have affirmatively provided adequate protection to the creditor under one of the three relevant sections"). Second, notwithstanding the adequate protection, the secured creditor must have a claim arising from the operation of the Code's automatic stay.

The Bondholders vigorously argue that they've been harmed by operation of

the automatic stay.  But as the Title III court correctly concluded, Section 922(c) is inapplicable because its first precondition has not been satisfied.  PREPA never provided adequate protection under Sections 362, 364, or 922.  *See* Add.38-39.

Only Assured offers a response, which lacks merit.[13]

1.  The Bondholders conceded in their motion that PREPA never gave "any adequate protection at all."  Mot. ¶ 54, No. 17-04780-LTS (D.P.R. Apr. 7, 2025), Dkt. No. 5599.  Perhaps recognizing that a debtor must provide adequate protection as a precondition to a claim under Section 922(c), Assured now argues that the Board (on behalf of PREPA) gave "*de facto* adequate protection."  Assured Br. 66.  By *de facto* adequate protection, Assured means that the Board allegedly used the Bondholders' collateral in the hopes of generating more revenues.  *See id*. (citing the Board's Objection at 14 ¶ 18).

This theory is a non-starter.  There is no such thing as "*de facto* adequate protection" under the Code.  Section 922(c), by its terms, requires the debtor to provide adequate protection "under section 362, 364, or 922."  11 U.S.C. § 922(c).  PREPA's alleged disposition of Assured's collateral was not adequate protection

---

[13] GoldenTree mentions Section 922(c) only in a footnote.  *See* GoldenTree Br. 54.  And although the Ad Hoc Group references Section 922(c) in section headers and asserts that "it is more than 'fairly possible' to construe sections 503(b) and 922(c)" to cover the Bondholders' claims, Ad Hoc Br. 53, it offers no interpretation of Section 922(c)'s text that would allow that outcome.

provided under those provisions. And an adequate protection agreement "is subject to court approval," Collier, *supra*, ¶ 361.01, a requirement plainly inconsistent with the concept of *de facto* adequate protection. Contrary to Assured's position, "[a]dequate protection cannot be assumed or implied from the circumstances." 4 *Id*. ¶ 507.14[1][a].

Given the plain language of Section 922(c), Assured is unable to marshal any authority in support of its *de facto* adequate protection theory. Instead, in all of Assured's cases, the creditor had received adequate protection. For instance, Assured contends that the Fourth Circuit's decision in *Grundy National Bank v. Rife* is "particularly instructive," Assured Br. 60-61, but there the claimant *had received* an adequate protection order, providing that it would "receive a monthly payment of $236.00 for a period of 48 months," *Grundy Nat'l Bank v. Rife*, 876 F.2d 361, 362 (4th Cir. 1989), and the court allowed Grundy to claim an administrative expense only *after* the debtor had "fail[ed] to pay adequate protection" consistent with that order, *id.* at 363. *Grundy* is thus "particularly instructive," but not for the reason Assured thinks. *Grundy* confirms that adequate protection under the statute is required. The same goes for the other cases Assured cites. *See Dobbins*, 35 F.3d at 865; *In re Cal. Devices, Inc.*, 126 B.R. 82, 83-85 (Bankr. N.D. Cal. 1991); *In re J.F.K. Acquisitions Grp.*, 166 B.R. 207, 212 (Bankr. E.D.N.Y. 1994); *In re Mendez*,

50

259 B.R. 754, 757 (Bankr. M.D. Fla. 2001).[14]

2.    Assured asserts as an "alternative" that Section 922(c) "should be construed to create an administrative expense claim" even where, as here, the debtor "never provided any adequate protection." Assured Br. 63, 66. That argument is plainly inconsistent with Section 922(c)'s text, and the Title III court was right to reject it. Section 922(c) states that an administrative expense claim is available *if* the debtor provides adequate protection and it fails. This Court has no license to rewrite the statute to eliminate the adequate protection requirement.

Assured relies exclusively on the Ninth Circuit's decision in *In re Center Wholesale, Inc.*, 759 F.2d 1440 (9th Cir. 1985). In that case, the debtor "never provided [adequate] protection." *Id*. at 1451 n.23. Yet the Ninth Circuit stated in a footnote that, "although not literally within the provisions of section 507, [the creditor's] injury is clearly within its spirit and deserves to be remedied by granting its claim a superpriority." *Id*. This Court should not adopt *Center Wholesale*'s footnote.

---

[14] The district court's discussion (Add.38-39) of Section 363 is relevant because Section 363(c) requires court-ordered adequate protection for the use of cash collateral. Under those circumstances, an adequate protection agreement is not required because court-ordered adequate protection would satisfy Section 922(c)'s sister provision, 11 U.S.C. § 507(b). But Section 363 does not apply under PROMESA, so cases involving court-ordered adequate protection of cash (or other) collateral are not relevant.

To start, it is flatly incompatible with the text of the Bankruptcy Code, as the *Center Wholesale* court itself recognized when it observed that the creditor's claim was "not literally within the provisions of section 507." The "spirit" of the law "cannot trump [this Court's] obligation to follow the plain text of a statute." *In re Minkina*, 79 F.4th 142, 152 (1st Cir. 2023).

Further, the *Center Wholesale* court was (according to Assured) motivated by the concern that "a debtor could defeat an administrative-expense claim by simply refusing to provide adequate protection in the first place and then diminishing a creditor's collateral." Assured Br. 63 (citing *Ctr. Wholesale*, 759 F.2d at 1451); *see also id*. at 66-67. But as explained throughout, Congress was aware of the problem and addressed it through a *different* provision. In Section 362(d), Congress provided that the lack of adequate protection is cause to lift the Code's automatic stay. *Center Wholesale* did not need to rewrite Section 507(b) to protect creditors from the diminishment of their collateral. Section 362(d) already does that. *Supra* at 31-36.

Still more, *Center Wholesale* did not even hold that an administrative expense claim was warranted. The court's actual holding was that the bankruptcy court had provided inadequate notice before a hearing to approve a cash-collateral order, such that a lien-holder's Rule 60(b) motion should be granted based on a denial of due process. 759 F.2d at 1444, 1448. The court merely "suggest[ed] that the bankruptcy court consider granting [the creditor] a superpriority under section 507(b)," after the

52

judgment was reopened on remand, in order to avoid disturbing reliance interests. *Id*. at 1451. This Court should not elevate into the law of this Circuit a non-binding suggestion from a forty-year-old, out-of-circuit case that conflicts plainly with statutory text. *See, e.g.*, *In re James B. Downing & Co.*, 94 B.R. 515, 520-21 (Bankr. N.D. Ill. 1988).

3. Finally, Assured warns that applying Section 922(c) according to its text would let debtors consume secured creditors' collateral without consequence. *See* Assured Br. 65. At the risk of repetition, that simply is not true. Debtors who refuse to provide adequate protection (where warranted) forfeit their right to claim the benefit of the automatic stay. *See* 11 U.S.C. § 362(d). So while Congress did not grant creditors like the Bondholders an "administrative-expense remedy," Assured Br. 65, it gave them an alternative remedy that everyone, the Bondholders included, accepts is constitutionally sufficient. *Supra* at 31-36.

\*        \*        \*

Take a step back and Congress's design is readily apparent. Administrative expense priority is disfavored because it results in unequal distribution of the debtor's assets. But Congress (with an assist from the Supreme Court) recognized that administrative expense claims are warranted in narrow circumstances: (1) when a creditor supplies consideration to the debtor post-petition, 11 U.S.C. § 503(b)(1); (2) when the helpless tort creditor is injured by the debtor's continued operation,

53

*Reading*, 391 U.S. at 477-48, 483-84; and (3) when the secured creditor's protection proves inadequate, 11 U.S.C. § 922(c).

Although different in meaningful respects, it makes sense to treat all three of those creditors the same. A pre-petition creditor who agreed to adequate protection is functionally the same as a post-petition creditor—it will have entered into a post-petition agreement with the debtor that allows the debtor to continue to use its property. And a pre-petition creditor who agreed to adequate protection stands in the same position as a tort creditor when adequate protection fails. At that point, there is nothing more the pre-petition creditor can do to protect itself.

The Bondholders' interpretation of the Code would destroy this equality of treatment. They would treat a pre-petition creditor who never obtained—or even sought—adequate protection the same as one who went through the trouble of securing adequate protection only to see it fail. There is no logic or equity in that. Creditors who have been given the tools to protect themselves should be encouraged to use them.

In structuring the Code as it did, moreover, Congress accounted for all the concerns the Bondholders raise. Whether through adequate protection backed by an administrative expense claim, 11 U.S.C. § 922(c), or through stay relief, *id*. § 362(d), Congress ensured that secured creditors' property rights are protected. There is no basis or need to distort the Code to afford the Bondholders' relief in this appeal

54

because the scheme Congress designed already affords the Bondholders all the relief they require.

## CONCLUSION

The judgment below should be affirmed.

Dated:  July 10, 2026

Respectfully submitted,

Manuel A. Pietrantoni
Ignacio Labarca Morales
250 Ponce de Leon Ave., Suite 900
San Juan, PR 00918
(787) 705-2171
mpietrantoni@mpmlawpr.com
ilabarca@mpmlawpr.com

*/s/ Peter Friedman*
Peter Friedman
  *Counsel of Record*
Maria J. DiConza
Gabriel Olivera
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, Suite 1700
New York, NY 10018
(212) 326-2000
pfriedman@omm.com
mdiconza@omm.com
golivera@omm.com

Jason Zarrow
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
(213) 430-6000
jzarrow@omm.com

## CERTIFICATE OF COMPLIANCE

I, Peter Friedman, counsel for AAFAF and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(7)(B), that the foregoing Brief of Appellee AAFAF is proportionately spaced, has a typeface of 14 points or more, and contains 12,974 words.

*/s/ Peter Friedman*
Peter Friedman

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on July 10, 2026. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Peter Friedman
Peter Friedman