# United States Court of Appeals

*for the*

# First Circuit

Case Nos. 26-1330,
26-1331, 26-1332,
26-1333 and
26-1334

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth Of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Highways and Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative of the Puerto Rico Public Buildings Authority,

*Debtors*,

(*For Continuation of Caption See Inside Cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO, SAN JUAN,
IN CASE NOS. 17-BK-03283-LTS AND 3:17-BK-04780-LTS

## BRIEF FOR RESPONDENT-APPELLEE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PREPA

LUC A. DESPINS
PEDRO A. JIMENEZ
PAUL HASTINGS, LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

ERIC D. STOLZE
PAUL HASTINGS, LLP
1197 Peachtree Street, NE, Suite 200
Atlanta, Georgia 30361
(404) 815-2400

*Counsel for Respondent-Appellee
Official Committee of Unsecured Creditors of Prepa*

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION; U.S. BANK NATIONAL ASSOCIATION, in the capacity as PREPA Bond Trustee; ALLIANCEBERNSTEIN L.P.; ARISTEIA CAPITAL, L.L.C.; BNY MELLON FUNDS TRUST; CAPITAL RESEARCH AND MANAGEMENT COMPANY; COLUMBIA MANAGEMENT INVESTMENT ADVISERS, LLC; DELAWARE MANAGEMENT COMPANY, a series of Nomura Asset Management Co., Ltd.; ELLINGTON MANAGEMENT GROUP, L.L.C.; GOLDMAN SACHS ASSET MANAGEMENT L.P.; INVESCO ADVISERS, INC.; LUXOR CAPITAL GROUP, LP; MACKAY SHIELDS LLC; MASSACHUSSETTS FINANCIAL SERVICES COMPANY; OLD ORCHARD CAPITAL MANAGEMENT LP; ONE WILLIAM STREET CAPITAL MANAGEMENT, L.P.; RUSSELL INVESTMENT COMPANY, on behalf of Russell Investment Company Tax-Exempt High Yield Bond Fund; SIG STRUCTURED PRODUCTS, LLC; T. ROWE PRICE; TOWER BAY ASSET MANAGEMENT LP; VERITION FUND MANAGEMENT LLC; GOLDENTREE ASSET MANAGEMENT LP; SYNCORA GUARANTEE INC.; ASSURED GUARANTY INC.,

*Movants-Appellants,*

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA),

*Debtor-Appellee*,

INSTITUTO DE COMPETITIVIDAD Y SOSTENIBILIDAD ECONÓMICA DE PUERTO RICO (ICSE); EL PUENTE DE WILLIAMSBURG, INC.; ENLACE DE ACCIÓN CLIMÁTICA; COLEGIO DE ABOGADOS Y ABOGADAS DE PUERTO RICO (CAAPR); ASSOCIATION OF PRIVATE COLLEGES AND UNIVERSITIES OF PUERTO RICO (ACUP); LA LIGA DE CIUDADES DE PUERTO RICO; CENTRO UNIDO DE DETALLISTAS (CUD); RAQUEL MARIA GONZÁLEZ SPARKS; COALICIÓN NUEVA VISIÓN DE SALUD; SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGÍA ELÉCTRICA (SREAEE); JUNTE DE ASOCIACIONES CON PENSIONADOS Y JUBILADOS DE PUERTO RICO (JAP); COLEGIO DE PROFESIONALES DEL TRABAJO SOCIAL DE PUERTO RICO; OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PREPA; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY (AAFAF); ELAM, LLC, as Successor-in-Interest to Blue Beetle III, LLC,

*Respondents-Appellees*.

## CORPORATE DISCLOSURE STATEMENT

The Official Committee of Unsecured Creditors (the "Committee") is not required to file a corporate disclosure statement under Federal Rule of Appellate Procedure 26.1 because it is not a non-governmental corporate party.

i

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF ISSUES ....................................................................4

STANDARD OF REVIEW ....................................................................5

STATEMENT OF CASE .......................................................................6

    I.    Bondholders' First and Second Lift Stay Motions............................6

    II.   2019 RSA .......................................................................8

    III.  Third Lift Stay Motion .......................................................9

    IV.  Fourth Lift Stay Motion ....................................................10

    V.   Fifth Lift Stay Motion ......................................................11

    VI.  Bondholders' Motion to Lift Litigation Stay and Motion for Administrative Expense Treatment......................................12

    VII.  Administrative Expense Opinion ..........................................14

    VIII. Subsequent Developments .................................................15

SUMMARY OF ARGUMENT ............................................................16

    I.    Relevant Statutory Framework............................................16

    II.   Bondholders Are Not Entitled to Administrative Expense Claim.....20

ARGUMENT .......................................................................................23

    I.    District Court Correctly Determined That Bondholders Failed to Satisfy Requirements for Entitlement to Administrative Expense Under Section 922(c).........................................23

        A.   PREPA Never Provided Bondholders Any Adequate Protection .............................................................24

        B.   Any Diminution Was Not Caused by the Automatic Stay, But Was the Result of Bondholders' Own Choices.................27

    II.   District Court Correctly Held PREPA's Use of Its Cash Receipts to Operate Its Business Does Not Entitle Bondholders to Administrative Expense Status Under Section 503(b)(1)(A) of the Bankruptcy Code.........................................31

        A.   PREPA Received No Postpetition Benefit from Use of Its Net Revenues .........................................................32

# TABLE OF CONTENTS
(continued)

**Page**

    i.    Any Postpetition Net Revenues Are PREPA's Property ........................................................... 34

    ii.    Section 503(b)(1)(A) Applies to a Debtor's Use of Property It Does Not Own, Not Use of Its Property ..... 37

B.    PREPA's Use of Any Net Revenues It Owns Is Not a Postpetition Transaction ............................................ 39

    i.    Bondholders' Section 507(b) Cases Do Not Help Them Because Section 507(b) Requires Existence of a Postpetition Transaction in the Form of Adequate Protection ........................................ 41

    ii.    Bondholders Would Nullify Multiple Sections of the Bankruptcy Code ....................................... 44

C.    Bankruptcy Code's Other Priorities Have No Bearing on Section 503(b)(1)(A) ................................................ 45

III.    District Court Correctly Determined that Bondholders Failed to Establish Entitlement to Administrative Expense Based on "*Reading* Exception" ............................................................ 47

IV.    District Court's Ruling Is Consistent with Fifth Amendment of U.S. Constitution .......................................................... 51

CONCLUSION ....................................................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 800Ideas.com, Inc.*,
    496 B.R. 165 (B.A.P. 9th Cir. 2013) ...................................................46

*In re Abercrombie*,
    139 F.3d 755 (9th Cir. 1998) ...........................................................47

*Matter of Al Copeland Enters., Inc.*,
    991 F.2d 233 (5th Cir. 1993) ...........................................................48

*In re Am. Toy & Furniture Co.*,
    1997 Bankr. LEXIS 2495 (Bankr. E.D. Wis. Feb. 24, 1997).................26, 43, 45

*In re Arts Dairy, LLC*,
    414 B.R. 219 (Bankr. N.D. Ohio 2009).......................................45, 46

*In re Athens/Alpha Gas Corp.*,
    332 B.R. 578 (B.A.P. 8th Cir. 2005) ...................................................38

*In re Baseline Sports, Inc.*,
    393 B.R. 105 (Bankr. E.D. Va. 2008)...................................................48

*In re California Devices, Inc.*,
    126 B.R. 82 (Bankr. N.D. Cal. 1991) .................................................41

*In re Center Wholesale, Inc.*,
    759 F.2d 1440 (9th Cir. 1985) ...........................................................26

*In re City of Desert Hot Springs*,
    339 F.3d 782 (9th Cir. 2003) ...........................................................17

*Clark v. Rameker*,
    573 U.S. 122 (2014)................................................................16, 52

*Díaz-Alarcón v. Flández-Marcel*,
    944 F.3d 303 (1st Cir. 2019).............................................................29

*In re Eckert*,
    414 B.R. 404 (Bankr. N.D. Ill. 2009) .......................................45, 46

*In re Espinosa*,
　　542 B.R. 403 (Bankr. S.D. Tex. 2015) ........................................................38, 39

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
　　104 F.4th 367 (1st Cir. 2024)................................................................................12

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
　　121 F.4th 280 (1st Cir. 2024)................................................................................12

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
　　7 F.4th 31 (1st Cir. 2021).....................................................................................32

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
　　899 F.3d 13 (1st Cir. 2018).................................................................2, 7, 17, 52

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
　　91 F.4th 501 (1st Cir. 2024).................................................................................8

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
　　92 F.4th 355 (1st Cir. 2024)............................................................................5, 46

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
　　931 F.3d 111 (1st Cir. 2019)...........................................................................35, 53

*Ford Motor Credit Co. v. Dobbins*,
　　35 F.3d 860 (4th Cir. 1994) ............................................................................25, 43

*Grundy Nat'l Bank v. Rife*,
　　876 F.2d 361 (4th Cir. 1989) ..............................................................................41

*In re GT Advanced Techs., Inc.*,
　　547 B.R. 3 (Bankr. D.N.H. 2016).......................................................................47

*In re Healthco Int'l, Inc.*,
　　272 B.R. 510 (B.A.P. 1st Cir. 2002), *aff'd*, 310 F.3d 9 (1st Cir.
　　2002) ...................................................................................................................47

*In re Hemingway Transp. Inc.*,
　　954 F.2d 1 (1st Cir. 1992)...................................................................................49

*In re Henson*,
　　57 F. App'x 136 (4th Cir. 2003).....................................................................28, 50

*In re J.F.K. Acquisitions Grp.*,
166 B.R. 207 (Bankr. E.D.N.Y. 1994) ........................................................*passim*

*Law v. Siegel*,
571 U.S. 415 (2014)...................................................................................26

*In re Leroy M. Hull Co., Inc.*,
344 B.R. 466 (Bankr. W.D. Va. 2004) ..................................................50

*Lyda v. City of Detroit (In re City of Detroit)*,
841 F.3d 684 (6th Cir. 2016) ..................................................................17

*In re Mammoth Mart, Inc.*,
536 F.2d 950 (1st Cir. 1976)....................................................................32

*In re Mandile*,
626 B.R. 915 (Bankr. N.D. Ill. 2021) ..................................................28

*In re Mendez*,
259 B.R. 754 (Bankr. M.D. Fla. 2001).............................................25, 41

*In re Nolan*,
2011 WL 782267 (N.D. Ill. Feb. 22, 2011) ........................................29

*In re Norwalk Furniture Corp.*,
418 B.R. 631 (Bankr. N.D. Ohio 2009).............................................32, 39

*Ochadleus v. City of Detroit (In re City of Detroit)*,
838 F.3d 792 (6th Cir. 2016) ..................................................................17

*Oto Analytics, LLC v. Benworth Cap. Partners PR, LLC*,
2025 WL 989954 (D.P.R. Apr. 2, 2025) ..............................................49

*In re Provincetown-Boston Airline, Inc.*,
66 B.R. 632 (Bankr. M.D. Fla. 1986)..................................................34

*Puerto Rico Tel. Co. v. SprintCom, Inc.*,
662 F.3d 74 (1st Cir. 2011).......................................................................22

*Raymond v. Eli Lilly & Co.*,
556 F.2d 628 (1st Cir. 1977)....................................................................29

v

*Reading Co. v. Brown*,
  391 U.S. 471 (1967)..................................................................................*passim*

*In re Rudler*,
  576 F.3d 37 (1st Cir. 2009).....................................................................26

*In re SuperMedia, Inc.*,
  2014 WL 7403448 (Bankr. D. Del. Dec. 29, 2014) ...........................47

*Tidewater Finance Co. v. Henson*,
  272 B.R. 135 (D. Md. 2001).....................................................................28

*United States v. GZ Constr. St, Inc.*,
  155 F. Supp. 3d 147 (D.P.R. 2015) .......................................................49

*United States v. Oliveira*,
  907 F.3d 88 (1st Cir. 2018).....................................................................31

*United States v. Whiting Pools, Inc.*,
  462 U.S. 198 (1983).........................................................................2, 17, 19

*In re United Trucking Service, Inc.*,
  851 F.2d 159 (6th Cir. 1988) .................................................................37

*Villalobos-Santana v. Puerto Rico Police Dep't*,
  171 F.4th 544 (1st Cir. 2026)..................................................................49

*In re Western Real Estate Fund, Inc.*,
  83 B.R. 52 (Bankr. W.D. Okla. 1988) .................................................36

*Williams v. IMC Mortg. Co. (In re Williams)*,
  246 B.R. 591 (B.A.P. 8th Cir.1999) .....................................................33

*WMF/Huntoon, Paige Assocs. v. Citi-Equity Grp., Inc. (In re Citi-Equity Grp., Inc.)*,
  1996 Bankr. LEXIS 2016 (Bankr. D. Minn. May 1, 1996)..............33, 36

*In re WorldCom, Inc.*,
  304 B.R. 611 (Bankr. S.D.N.Y. 2004)..................................................19

*Wright v. Union Cent. Life Ins. Co.*,
  311 U.S. 273 (1940)...................................................................................52

## Statutes

11 U.S.C.

§ 101(37)........................................................................................................37

§ 305.........................................................................................................7, 16

§ 361......................................................................................................*passim*

§ 361(3).........................................................................................................44

§ 362......................................................................................................*passim*

§ 362(a) .........................................................................................................17

§ 362(d) ......................................................................................................6, 17

§ 362(e)(1) .........................................................................................11, 12, 15

§ 363..........................................................................................................2, 18

§ 363(c) .........................................................................................................18

§ 503(b)................................................................................................*passim*

§ 503(b)(1)(A)......................................................................................*passim*

§ 503(b)(9) ....................................................................................................46

§ 507(b)................................................................................................*passim*

§ 552(a) .........................................................................................................35

§ 552(b) .........................................................................................................35

§ 904.............................................................................................................16

§ 922(c) ................................................................................................*passim*

§ 922(d) .........................................................................................................53

§ 928(a) ....................................................................................................35, 53

§ 928(b) ...........................................................................................................1

§ 1108.............................................................................................................16

## Other Authorities

Merriam-Webster, available at https://www.merriam-
webster.com/dictionary/potpourri (last visited July 9, 2026)............................46

Fed. R. Civ. P. 28(i) ........................................................................................6, 16

U.S. Constitution Tenth Amendment ...................................................................17

U.S. Constitution Fifth Amendment..............................................................*passim*

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

The Committee believes that oral argument will be helpful, particularly considering the number of issues raised by Appellants and the voluminous briefing.

## INTRODUCTION[1]

Starting in 1974, PREPA issued various series of bonds (the "Bonds"); to secure repayment of the funds advanced by the purchasers of those Bonds (the "Bondholders"), PREPA granted (under the "Trust Agreement" governing the Bonds) a lien in its cash receipts remaining after payment of Current Expenses—*i.e.*, its "Net Revenues."  Decades later, in July 2017, PREPA commenced its bankruptcy case under Title III of PROMESA, during which it generated cash receipts in the ordinary course of its business and used those receipts to continue its operations and provide electricity to Puerto Rico's residents and businesses. None of this is disputed.[2]

---

[1]  Capitalized terms used but not defined in this Introduction have the meaning ascribed to such terms later in this brief.

[2]  Currently being litigated in the District Court is whether (and to what extent) the funds PREPA used qualify as (i) "Net Revenues" under the Trust Agreement or (ii) "necessary operating expenses" under section 928(b) of the Bankruptcy Code.  For the purpose of this appeal the Committee assumes (as the District Court did), *arguendo*, that PREPA generated and used Net Revenues during its Title III case—because the answers to these questions are entirely irrelevant to the issues raised in this appeal, such as whether PREPA's use of its own cash receipts (even if Net Revenues) gives rise to an administrative expense claim.

1

Also undisputed is that because section 363 of the Bankruptcy Code does not apply to municipal debtors, PREPA is statutorily authorized to use its cash receipts to operate its business, ***regardless*** of whether that cash is subject to a lien (and is, therefore, "cash collateral"). Congress could have protected secured creditors by outright "excluding from the estate any property subject to a [lien]," but it chose not to. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203-04 (1983). Instead, Congress "provide[d] secured creditors with 'adequate protection' for their interests." *Id*. at 204. Adequate protection "means that the value of the creditor's interest in the collateral must be protected from diminution while the property is being used or retained during the bankruptcy proceeding." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d 13, 22-23 (1st Cir. 2018) (internal citation omitted). Obtaining this protection, though, is the ***secured creditor's*** responsibility. It is only "[a]t the secured creditor's insistence" that a bankruptcy court limits or conditions the debtor's use of its property as necessary to provide adequate protection. *Whiting Pools*, 462 U.S. at 204.

The Bondholders never insisted. Despite filing numerous motions to lift the automatic stay, the Bondholders never pressed the District Court to adjudicate whether their interest in PREPA's Net Revenues was adequately protected while PREPA used its cash receipts to fund its operations.[3] Having failed to obtain an

---

[3] In fact, and as detailed below, the Bondholders' Third Lift Stay Motion

adequate protection ruling from the District Court, the Bondholders now insist that any diminution in the value of their collateral must be compensable as an administrative expense under either section 503(b)(1)(A) or section 922(c) of the Bankruptcy Code.  Their arguments ignore the Bankruptcy Code's framework and, if accepted, would nullify many of its provisions, including sections 361 and 922(c).  Section 361 states that adequate protection is not available as an administrative expense.  And section 922(c) expressly provides that diminution in the value of collateral gives rise to an administrative expense *only if* the debtor previously provided adequate protection and the secured creditor, notwithstanding such adequate protection, suffered diminution as the result of the imposition of the automatic stay.

Nor have the Bondholders demonstrated an entitlement to administrative expense status under section 503(b)(1)(A), which, under decades of this Court's precedents, is limited to a party that (i) provides the debtor with a new, postpetition, benefit, that (ii) is the result of a new, postpetition transaction.  The Bondholders cannot point to a postpetition transaction with PREPA, and caselaw is clear that a debtor receives no new, postpetition benefit simply by using its own property postpetition, even if that property is subject to a prepetition lien.

---

expressly was "not premised on a lack of adequate protection."

3

Finally, the Bondholders ask this Court to grant them an administrative expense under the "*Reading* Exception" because PREPA, by using its own property to operate its business in bankruptcy, committed the tort of conversion and/or an unconstitutional taking simply because that property is subject to a lien in favor of the Bondholders.  The District Court correctly rejected this as a matter of law, as no conversion under Puerto Rico law or an unconstitutional taking occurred in this situation.  PREPA could not convert, steal or "take" its own cash receipts (even if some of those receipts constituted Net Revenues) because PREPA has a statutory right to use its cash receipts during its Title III case, subject to the Bankruptcy Code's provisions governing adequate protection and/or relief from the automatic stay.  A contrary result would make PREPA liable for doing exactly what PROMESA and the Bankruptcy Code expressly permit it to do.

For all these reasons, and as further detailed below, this Court should affirm the District Court.

## STATEMENT OF ISSUES

1.    Whether the District Court correctly determined that the Bondholders failed to establish an entitlement to an administrative expense under section 922(c) of the Bankruptcy Code because the Bondholders failed to satisfy that section's requirements.

4

2.    Whether the District Court correctly determined that PREPA's mere use of its Net Revenues in its Title III case does not entitle the Bondholders to administrative expense status under section 503(b)(1)(A) of the Bankruptcy Code.

3.    Whether the District Court correctly determined that the Bondholders failed to establish an entitlement to an administrative expense under section 503(b)(1)(A) of the Bankruptcy Code based on the "*Reading* Exception."

4.    Whether the District Court's failure to grant the Bondholders an administrative expense conflicts with the Fifth Amendment of the United States Constitution.

## STANDARD OF REVIEW

The District Court's legal analysis of sections 503(b)(1)(A) and 922(c) of the Bankruptcy Code is reviewed *de novo,* and its factual determination that any harm the Bondholders suffered was caused by their own decisions and not imposed on them by the automatic stay is reviewed for abuse of discretion. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 92 F.4th 355, 361 (1st Cir. 2024) ("determination of whether a claim qualifies for administrative-expense treatment under § 503(b)(1)(A) is reviewed for abuse of discretion").

5

**STATEMENT OF CASE**[4]

As this Court has previously held, the Bonds are secured by PREPA's present and future Net Revenues. As secured creditors, the Bondholders are entitled to demand adequate protection of their interest in PREPA's Net Revenues or, alternatively, for relief from the automatic stay—and the Bondholders have filed multiple such motions. However, they have never pressed their rights thereunder.

## I.    Bondholders' First and Second Lift Stay Motions

PREPA commenced its Title III case on July 2, 2017, and, on July 18, 2017, certain Bondholders filed a motion (the "First Lift Stay Motion"), pursuant to section 362(d) of the Bankruptcy Code, for relief from the automatic stay so they could seek the appointment of a receiver for PREPA.[5] In their motion, the Bondholders argued that as a result of mismanagement and corruption, "PREPA has been unable to generate adequate cash flow to service PREPA's debt

---

[4]    Citations to Appellants' opening briefs are abbreviated as follows: "AHG Br." refers to the opening brief of the PREPA Ad Hoc Group (Case No. 26-1332); "Assured Br." refers to the opening brief of Assured Guaranty Inc. (Case No. 26-1334); and "GoldenTree/Syncora Br." refers to the opening brief of GoldenTree Asset Management LP and Syncora Guarantee, Inc. (Case No. 26-1333). Because these appeals are consolidated and Appellants have adopted each other's arguments under Rule 28(i), citations to a particular brief are for convenience and pinpoint citation only.

[5]    *See* Bondholder Appendix ("App.") at App.801.

6

obligations on the Bonds" and that, therefore, they are "entitled to the appointment of a receiver."[6]

The District Court denied the First Lift Stay Motion, holding that (i) section 305 of PROMESA barred the requested relief and (ii) even if the relief was available, application of the so-called *Sonnax* factors weighed against stay relief.[7] This Court reversed in part, holding that section 305 did not preclude stay relief and remanding for an analysis of the *Sonnax* factors as to whether there was cause to lift the automatic stay. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d at 23.

On remand, the Bondholders filed their "Second Lift Stay Motion," reiterating their intention to seek the appointment of a receiver.[8] The District Court set June 13, 2019 as the hearing date on the Second Lift Stay Motion but, prior to that hearing, the Oversight Board, PREPA, AAFAF, and certain Bondholders entered into the Restructuring Support Agreement, dated as of May 3, 2019 (the "2019 RSA"),[9] contemplating Bondholder recoveries up to 77.5% of their claims.[10]

---

[6]   App.807.
[7]   *See* App.844, App.855-59.
[8]   *See* App.867.
[9]   *See* App.961.
[10]  *See* App.919-20.  In its objection to the 2019 RSA, the Committee pointed out that the Bondholders' recovery percentage could reach 86%.  *See* Supplemental Appendix ("SA") at SA.119.

## II.   **2019 RSA**

The 2019 RSA contemplated certain "Adequate Protection Payments," but expressly provided that unless and until the Distrct Court approved the 2019 RSA, "the Government Parties shall have no obligation to . . . make Adequate Protection Payments."[11]  Moreover, the 2019 RSA could be terminated by any party if it was not consummated by August 30, 2019 (mutually extended once to September 20, 2019), without any obligations to make any payments thereunder.

The 2019 RSA also provided that the Bondholders would not pursue their pending stay relief motion or seek other adequate protection.[12]  At the parties' joint request, the District Court indefinitely stayed the Second Lift Stay Motion.[13]  As this Court later explained, the Bondholders eventually abandoned the Second Lift Stay Motion.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 91 F.4th 501, 506 n.2 (1st Cir. 2024) (the "Fourth Lift Stay Decision").

Originally scheduled for July 24, 2019,[14] the hearing on the motion to approve the 2019 RSA was adjourned several times.[15]  Yet, the Bondholders never sought to terminate the 2019 RSA, which they could have done at any time after September 20, 2019.  Nor did the Bondholders press for court approval of the

---

[11]  *See* App.1003.
[12]  *See* App.984-86.
[13]  *See* SA.109-10.
[14]  *See* SA.106.
[15]  *See, e.g.*, App.1089.

Adequate Protection Payments.  In fact, no hearing would ever take place on the 2019 Motion and, on March 8, 2022, AAFAF terminated the 2019 RSA.[16]

## III.    Third Lift Stay Motion

On September 19, 2022, certain Bondholders filed a motion to dismiss PREPA's Title III case or, in the alternative, for relief from the automatic stay to seek the appointment of a receiver (the "Third Lift Stay Motion").[17]  The Third Lift Stay Motion was expressly "***not*** premised on a lack of adequate protection or the extent of bondholders' collateral" but (according to the Bondholders) on the Oversight Board's "unreasonable delay" in prosecuting PREPA's Title III case.[18]

On September 29, 2022, the District Court entered an order (the "September 2022 Litigation Stay Order")[19] staying the Third Lift Stay Motion pending (among other things) resolution of litigation regarding the scope of the Bondholders' lien rights and the non-recourse nature of the Bonds (the "Lien Scope Litigation").[20] The Bondholders did not appeal the September 2022 Litigation Stay Order.  In fact, as this Court would later find, that order was based on the Bondholders' express consent to waive their rights to have the Third Lift Stay Motion heard on an expedited basis.  Fourth Lift Stay Decision at 506-507.

---

[16]  *See* SA.149.
[17]  *See* App.1103.
[18]  *See* App.1139 (emphasis added).
[19]  *See* App.1147.
[20]  App.1149-50.

9

In the ensuing months, the parties litigated the Lien Scope Litigation, which resulted in the District Court's partial summary judgment order issued on March 22, 2023, holding, among other things, that the Bondholders' security interest under the Trust Agreement was limited to moneys deposited into the sinking fund.[21]  The Bondholders appealed the District Court's ruling (the "Lien Scope Appeal").

## IV.    Fourth Lift Stay Motion

Notwithstanding their waiver of an immediate hearing and the continued litigation stay, on August 24, 2023, the Bondholders filed a "Fourth Lift Stay Motion."[22]  In that motion, the Bondholders asserted, for the first time, that PREPA purportedly generated more than $3 billion in Net Revenues during its Title III case without depositing such Net Revenues into the sinking fund.[23]

The District Court *sua sponte* entered an order staying the Fourth Lift Stay Motion, holding it was substantially duplicative of the Third Lift Stay Motion and thus subject to the September 2022 Litigation Stay Order.[24]  On appeal, this Court affirmed, holding that the Fourth Lift Stay Motion was "fundamentally identical"

---

[21]  *See* App.620, App.631.
[22]  *See* App.1152.
[23]  *See* App.1158.  The "sinking fund" is an account, maintained by the bond trustee, into which, under the Trust Agreement, Net Revenues subject to the Bondholders' lien are to be deposited.
[24]  *See* App.1187-88.

to the Third Lift Stay Motion and, therefore, subject to the Bondholders' prior waiver. *See* Fourth Lift Stay Decision at 510; *see also id.* at 504 (by accepting "a litigation schedule that postponed any hearing" on the Third Lift Stay Motion until resolution of the Lien Scope Litigation, Bondholders had "waived their right to prompt notice and hearing on" the Fourth Lift Stay Motion).

## V.     Fifth Lift Stay Motion

On February 16, 2024, the Bondholders filed their "Fifth Lift Stay Motion," again seeking relief from the automatic stay to pursue the appointment of a receiver.[25]  Among other things, the Bondholders again alleged that PREPA was misappropriating Net Revenues and failing to deposit those Net Revenues into the sinking fund.[26]

The Bondholders also renewed their assertion that, under section 362(e)(1) of the Bankruptcy Code, they were entitled to an immediate hearing.[27]  The District Court held otherwise, finding that the waiver this Court identified in the Fourth Lift Stay Decision was still in effect.[28]  The District Court also found that the Bondholders had engaged in conduct that was, separately, grounds for waiver of an immediate hearing, including the Bondholders' failure to comply with the District

---

[25]  *See* SA.239.
[26]  SA.247.
[27]  *See* App.1191.
[28]  *See* SA.288-89.

11

Court's order governing the filing of, and seeking hearings on, motions.[29]  The

Bondholders did not appeal this ruling.

While the Bondholders had waived any right to an immediate hearing, the

District Court did schedule the Fifth Lift Stay Motion for a hearing, on regular

notice, on May 22, 2024.  However, prior to that hearing, the Bondholders

requested an adjournment until July 31, 2024.[30]

## VI.   Bondholders' Motion to Lift Litigation Stay and Motion for Administrative Expense Treatment

On June 12, 2024, this Court issued its ruling in the Lien Scope Appeal,

holding, among other things, that the Bonds are non-recourse obligations secured

by PREPA's present and future Net Revenues.[31]  Following that ruling, the

Oversight Board asked the District Court to reopen the confirmation hearing in

order to value the Bondholders' collateral (*i.e.*, PREPA's present and future Net

Revenues).[32]  After hearing all parties regarding their views as to next steps, the

District Court entered an order on July 11, 2024 (the "July 2024 Litigation Stay

---

[29]  SA.291, SA.292 ("Movants' gambit to avoid waiver . . . is unavailing, and their invocation of section 362(e) in order to maximize inconvenience for other parties and the Court does not justify hearing the Motion on an expedited schedule.").

[30]  *See* SA.301.

[31]  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 104 F.4th 367, 376 (1st Cir. 2024).  The Court later withdrew that opinion, issuing a revised opinion on November 13, 2024.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 121 F.4th 280 (1st Cir. 2024).

[32]  *See* SA.311.

Order") staying all confirmation and bond-related litigation in PREPA's Title III case, including the Fifth Lift Stay Motion, for at least 60 days and directed the parties to engage in mediation.[33]  At the request of the mediation team, the District Court extended the litigation stay several times—also adjourning the hearing on the Fifth Lift Stay Motion—until March 2025.[34]  The Bondholders did not object to the litigation stay, the extensions thereof, or the adjournment of the hearing on the Fifth Lift Stay Motion.[35]

On February 24, 2025, the Bondholders sought relief from the litigation stay to, among other things, proceed with their Fifth Lift Stay Motion.[36]  After briefing, the District Court entered an order (the "February 24, 2025 Stay Order") keeping the litigation stay in place as to the Fifth Lift Stay Motion, but permitting the Bondholders to file their motion for an administrative expense claim.[37]  The Bondholders did not appeal this order and filed their "Administrative Expense Motion" on April 7, 2025.[38]

---

[33]  *See* App.1203-04.

[34]  *See* SA.380, SA.382, SA.384, SA.386.

[35]  On January 29, 2025, the Bondholders filed an informative motion raising concerns about the prospect of success of mediation in light of the continued litigation stay.  *See* SA.388-90. They did not, however, object to the extension of the litigation stay.

[36]  *See* App.1381.

[37]  *See* App.1490.

[38]  *See* SA.400.

## VII. Administrative Expense Opinion

On March 16, 2026, the District Court issued an opinion denying the Administrative Expense Motion as a matter of law.[39]  In its opinion (the "Administrative Expense Opinion"), the District Court held that the Bondholders failed to show that they are entitled to an administrative expense claim under section 922(c) of the Bankruptcy Code, including because PREPA did not provide any adequate protection, which is a necessary predicate for a claim under section 922(c).  The District Court also found that the Bondholders chose not to press their motions for relief from the automatic stay and, therefore, could not show they were harmed by the imposition of the automatic stay.

Separately, the District Court rejected the Bondholders' arguments under section 503(b)(1)(A), holding that PREPA's use of its own Net Revenues (i) was not pursuant to a postpetition transaction with the Bondholders, nor did it provide PREPA a new, postpetition benefit and (ii) is not subject to the fundamental fairness doctrine enunciated in *Reading Co. v. Brown*, 391 U.S. 471, 477-78 (1967).  Finally, the District Court rejected the Bondholders' arguments that failure to grant them administrative expense status is inconsistent with the Fifth Amendment.

---

[39]  *See* App.2667.

14

## VIII. Subsequent Developments

Shortly after the District Court issued the Administrative Expense Opinion, the Bondholders filed a renewed motion to lift the litigation stay (the "Renewed Motion to Lift Litigation Stay"), seeking (among other things) to pursue their Fifth Lift Stay Motion and to litigate their accounting counterclaim in the Lien Scope Litigation.[40]

The District Court partially lifted the litigation stay to allow the Bondholders to litigate their accounting counterclaim regarding PREPA's use of past revenues, but otherwise kept the litigation stay in place, including as to the Fifth Lift Stay Motion.[41]  Among other things, the District Court noted that, "as previously recognized, resolution of the Lift Stay Motions depends on determinations concerning the property rights asserted in the Counterclaim Complaint that includes the Accounting Counterclaim."[42]  Moreover, the District Court reiterated this Court's ruling that the Bondholders waived their right to a prompt hearing under section 362(e)(1) of the Bankruptcy Code.[43]  On June 3, 2026, the Bondholders appealed the denial of the Renewed Motion to Lift Litigation Stay.[44]

---

[40]  *See* SA.465-74.
[41]  *See* SA.487-90, SA.491-92.
[42]  *See* SA.496.
[43]  SA.498.
[44]  *See, e.g.*, SA501.

**SUMMARY OF ARGUMENT**[45]

The Bondholders' collateral (*i.e.*, PREPA's Net Revenues, if any) is PREPA's property, which it has a statutory right to use and which use, without more, does not give rise to an administrative expense claim. The arguments advanced by the Bondholders are contrary to decades of case law and would nullify numerous provisions of the Bankruptcy Code.

## I.    Relevant Statutory Framework

The Bankruptcy Code is designed to "effectuate a careful balance between the interests of creditors and debtors." *Clark v. Rameker*, 573 U.S. 122, 129 (2014). As relevant here, that careful balance is reflected in (i) the rules governing a debtor's use of its own property (including collateral) and (ii) the preferred (*i.e.*, priority) treatment extended to specific claimants, including secured creditors in certain, carefully defined, circumstances.

In a reorganization case, the Bankruptcy Code's default rule is that the debtor may continue to operate its business during the case; in doing so, the debtor is permitted to use its own property in the ordinary course and without express permission from either its creditors or the bankruptcy court.[46] This rule extends to

---

[45]  The Committee adopts by reference the arguments made by the Oversight Board and AAFAF. *See* Fed. R. App. P. 28(i).

[46]  *See* 11 U.S.C. § 1108. Section 1108 is not incorporated into chapter 9 because it is not necessary—under section 904 of the Bankruptcy Code (and section 305 of PROMESA), the court is prohibited from interfering with a municipal

16

the debtor's property "in which a creditor has a secured interest," because

Congress recognized that "reorganization effort[s] would have small chance of

success, however, if property essential to running the business were excluded from

the estate." *Whiting Pools*, 462 U.S. at 203. At the same time, a debtor benefits

from the broad application of the automatic stay.[47]

Balanced against these rights, the Bankruptcy Code "safeguard[s] the

interests of secured creditors" through its adequate protection and stay relief

provisions. *Whiting Pools*, 462 U.S. at 203-04. In particular, the Bankruptcy Code

permits a lien-holder to seek adequate protection of its interest in collateral or,

failing that, relief from the automatic stay.[48] In a municipal case under chapter 9,

the bankruptcy court may not order the debtor to provide adequate protection

without its consent. *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899

F.3d at 21. However, as this Court has confirmed, if the bankruptcy court

---

debtor's use of its property or revenues. Indeed, the Tenth Amendment of the U.S. Constitution requires this. *See Lyda v. City of Detroit (In re City of Detroit)*, 841 F.3d 684, 695-96 (6th Cir. 2016). Moreover, in a municipal case, the Bankruptcy Code's balancing of creditor and debtor interests tilts heavily in favor of the municipal debtor. *See Ochadleus v. City of Detroit (In re City of Detroit)*, 838 F.3d 792, 803 (6th Cir. 2016) ("Chapter 9 provides a municipal debtor with an array of bankruptcy powers to enable it to achieve financial rehabilitation with very few, if any, corresponding limitations and duties of the type to which a Chapter 11 debtor is subject."); *In re City of Desert Hot Springs*, 339 F.3d 782, 789 (9th Cir. 2003) ("Many of the protections afforded to creditors in the other [bankruptcy] chapters are missing in [C]hapter 9.").

[47] *See* 11 U.S.C. § 362(a).

[48] *See* 11 U.S.C. §§ 361, 362(d).

determines that the secured creditor is not adequately protected and a municipal

debtor (or, in this case, the Oversight Board) does not agree to provide adequate

protection, the court can grant the secured creditor relief from the automatic stay.

*Id*. The specifics of adequate protection, including the process by which a secured

creditor seeks adequate protection or stay relief are set out in sections 361 and 362

of the Bankruptcy Code; the consequence of the failure of any adequate protection

provided is found in sections 507(b) and (in a municipal case) 922(c) of the

Bankruptcy Code.[49]

Additionally, the Bankruptcy Code provides additional protection to holders

of liens in a specific type of estate property: cash collateral. Section 363(c) of the

Bankruptcy Code requires a debtor to obtain the consent of the secured creditor or

court authorization prior to using cash collateral. However, this limitation does ***not***

apply in a municipal bankruptcy case, such as PREPA's Title III case. Because

section 363 is omitted from chapter 9 and Title III, the requirement for consent to

use cash collateral does not apply to a municipal debtor, and a municipal debtor

may use its cash collateral in the ordinary course and any party asserting an interest

in that cash may protect that interest by seeking relief under sections 361 and/or

362 of the Bankruptcy Code. Thus, in a municipal bankruptcy case, cash collateral

is treated like any other property in which a debtor has granted a lien—*i.e.*, the

---

[49]  The language of section 507(b) and 922(c) is substantially the same.

debtor has the statutory right to use cash collateral, subject to sections 361 and 362 of the Bankruptcy Code.

"Congress' choice of methods to protect secured creditors," *Whiting Pools*, 462 U.S. at 204 (*i.e.*, adequate protection and stay relief), also ensures the Bankruptcy Code's consistency with the United States Constitution.  The Bankruptcy Code's legislative history explains that the concept of adequate protection is derived from the Fifth Amendment.  *See, e.g.*, *In re WorldCom, Inc.*, 304 B.R. 611, 619 n.5 (Bankr. S.D.N.Y. 2004) (quoting legislative history).  Outside bankruptcy, a secured creditor has various rights, including the right of foreclosure, and the Bankruptcy Code interferes with those rights.  However, it does not eliminate those rights.  Because the rights of a secured creditor are delayed, but not eliminated, decades of jurisprudence has held that this interference is constitutional.

The Administrative Expense Motion also implicates a second set of rules under the Bankruptcy Code; namely, the rules governing priority treatment of certain types of claims.  Bankruptcy contemplates that not all creditors will be paid in full, and thus creditors should share ratably in available distributions.  However (for policy reasons discussed below), the Bankruptcy Code creates exceptions to that rule, including by elevating certain claims to "administrative expense" status that a debtor must pay in full to confirm a plan of reorganization.  While there are

19

many such priorities, the Administrative Expense Motion seeks priority treatment under two provisions of the Bankruptcy Code.

The first is section 922(c) of the Bankruptcy Code,[50] which grants a secured creditor an administrative expense if the debtor provides adequate protection and such adequate protection fails—*i.e.*, notwithstanding the grant of adequate protection, the secured creditor's interest in the collateral declines in value. The amount of such an administrative expense is equal to the diminution the secured creditor suffered, after taking into account the amount of adequate protection the debtor provided. The second provision implicated in the Administrative Expense Motion is section 503(b)(1)(A) of the Bankruptcy Code, which grants administrative expense priority for the "actual, necessary costs and expenses of preserving the estate."

## II.     Bondholders Are Not Entitled to Administrative Expense Claim

Against this backdrop, it is clear why the District Court's ruling is correct. The Bondholders insist their collateral has diminished in value, entitling them to administrative expense status under section 922(c) of the Bankruptcy Code. However, whether there was any diminution becomes relevant only if the Bondholders establish that (i) PREPA provided adequate protection and (ii) any

---

[50]   As noted above, section 922(c) of the Bankruptcy Code applies in a municipal bankruptcy case, while section 507(b) applies in a chapter 11 case.

such diminution occurred as of the result of the automatic stay. The District Court correctly concluded that the Bondholders failed to establish either.

The Bondholders chose not to press their rights and, as such, never obtained any adequate protection from PREPA. The prior provision of adequate protection is a *prima facie* requirement of section 922(c), which protects against the failure ***of*** adequate protection—not, as the Bondholders assert, the failure ***to provide*** adequate protection.[51] Nor can the Bondholders satisfy the second element of section 922(c), as any harm they may have suffered was the result of their own choices, not the automatic stay. As the District Court found, the Bondholders, for whatever reason, repeatedly chose not to press for the District Court to adjudicate their requests for stay relief. That finding is reversible only for clear error, yet the record reveals no such error. In fact, this Court, like the District Court, has already held that the Bondholders consented to delay pressing their rights.

The Bondholders are also outside the ambit of section 503(b)(1)(A) of the Bankruptcy Code.[52] That section grants administrative expense priority to third

---

[51] Some courts have held that this requirement is satisfied if a court denies a request for adequate protection on the basis that the creditor is already adequately protected—for example, where the collateral is worth more than the amount of the creditor's claim (*i.e.*, an equity cushion). No such finding was made, or even truly sought, in this case. Indeed, the Bondholders' Third Lift Stay Motion (which, in any event, the Bondholders consented to delay) expressly was "not premised on a lack of adequate protection." Third Lift Stay Motion at 30.

[52] The Bondholders argue that an administrative expense claim under section

parties who provide a debtor with a new, postpetition, benefit based on a postpetition transaction. Here, PREPA's use of its Net Revenues to operate its business during the pendency of its Title III case satisfies neither. A secured creditor does not confer a new benefit if, postpetition, the debtor uses its own property, even if such property is subject to a security interest granted by a prepetition agreement. Nor does the debtor's postpetition use of its own property constitute a postpetition transaction. And none of the limited exceptions to the strict requirements for an administrative expense claim help the Bondholders; in each case they cite, the debtor used, postpetition, property it **did not own** to obtain a benefit that it would not otherwise have had. This has no bearing on PREPA's use of its own Net Revenues.

The other notable exception to the postpetition transaction requirement is the "fundamental fairness doctrine," also known as the "*Reading* Exception." Under this exception, the victim of a debtor's postpetition tort may be entitled to an administrative expense claim. But this rule has no application here. The

---

503(b)(1)(A) arises upon a showing that a debtor has been unjustly enriched. *See, e.g.*, Assured Br. at 30. This argument was not raised below and should not be considered now. In any event, no unjust enrichment claim can lie where the alleged enrichment arises from breach of a contract. *See Puerto Rico Tel. Co. v. SprintCom, Inc.*, 662 F.3d 74, 97 (1st Cir. 2011) ("under Puerto Rico law, the doctrine of unjust enrichment does not apply where . . . there is a contract that governs the dispute at issue."). Further, for the reasons set forth herein, there was no unjust enrichment.

fundamental fairness doctrine is a policy-based rule that protects a debtor's involuntary creditors who would otherwise have no recourse. By contrast, the Bondholders' claims arise entirely out of their prepetition relationship with PREPA and the Trust Agreement governing that relationship. Indeed, this Court has consistently held that the *Reading* Exception is inapplicable to claims based on a prepetition relationship. Additionally, unlike innocent tort victims, the Bondholders have a clear remedy for any harm they suffered: seek adequate protection or obtain relief from the automatic stay. They simply chose not to press for that remedy. In any event, as the District Court held, the Bondholders failed to adequately allege a claim for conversion or unconstitutional taking.

## ARGUMENT

**I.    District Court Correctly Determined That Bondholders Failed to Satisfy Requirements for Entitlement to Administrative Expense Under Section 922(c)**

Section 922(c) of the Bankruptcy Code provides that:

> If the debtor provides, under section 362, 364, or 922 of this title, adequate protection of the interest of the holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection such creditor has a claim arising from the stay of action against such property under section 362 or 922 of this title or from the granting of a lien under section 364(d) of this title, then such claim shall be allowable as an administrative expense under section 503(b) of this title.

23

This language is unambiguous: to obtain administrative expense priority under section 922(c), a secured creditor must establish two elements; <u>first</u>, that the debtor provided the secured creditor with some form of adequate protection and, <u>second</u>, the diminution in the value of the secured creditor's interest was "notwithstanding" that adequate protection and ***arose from*** the automatic stay.[53] The District Court correctly held that the Bondholders failed to satisfy either element.

## A.    PREPA Never Provided Bondholders Any Adequate Protection

The Bondholders assert that section 922(c) "expressly creates" an administrative expense claim when "a debtor fails to provide adequate protection."[54] This is not the law. By its terms, section 922(c) applies only where a "debtor ***provides***" adequate protection to a secured creditor. Congress could easily have crafted a different rule, one that granted administrative expense status automatically upon any showing of diminution in value of a secured creditor's interest in the debtor's collateral, even if adequate protection was never sought or provided. It did not do that. Instead, administrative expense treatment for a failure of adequate protection requires exactly that: a failure ***of*** adequate protection—not a failure to provide adequate protection. A failure of adequate protection arises only

---

[53] As discussed below, section 922(c) also requires a showing that the estate received a post-petition benefit from the use of the collateral.

[54] Assured Br. at 3.

if, prior to any diminution in the value of collateral, the court "expressly award[ed] adequate protection to the creditor." *In re J.F.K. Acquisitions Grp.*, 166 B.R. 207, 212 (Bankr. E.D.N.Y. 1994). *See also In re Mendez*, 259 B.R. 754, 757 (Bankr. M.D. Fla. 2001) ("to receive superpriority status . . . the court must expressly award adequate protection to the creditor").

Adequate protection is often provided pursuant to a court-approved agreement between the debtor and the secured creditor, but it can also be "provided" when a court denies a secured creditor's motion for stay relief based on the finding that the creditor is already adequately protected and, based on that finding, permits the debtor to use collateral. This is what happened in several of the cases cited by the Bondholders. In *In re J.F.K. Acquisitions* the secured lender, in support of its motion for relief from the automatic stay, argued that the hotel at issue was worth $16.7 million; the bankruptcy court, though, disagreed and valued the property at $21 million and ordered the debtor to make certain adequate protection payments. 166 B.R. at 208. Later, when the hotel decreased in value, the secured lender received an administrative expense claim even though the debtor had never "agreed" to provide adequate protection.

Similarly, in *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860 (4th Cir. 1994), the bankruptcy court denied Ford's (the secured lender) motion for stay relief because the court found Ford was adequately protected by an equity cushion.

25

When this later proved incorrect, Ford requested an administrative expense under section 507(b). *In re American Toy & Furniture Co.*, also cited by the Bondholders, similarly demonstrates that a secured lender can receive administrative expense status if a court's finding of adequate protection later proves inaccurate, as "it would be strange indeed" if the lender received such status based on an agreement, but would be denied that status "if it litigated its rights and was forced by court order to put its interests at risk." No. 92-27686, 1997 Bankr. LEXIS 2495, at *17 (Bankr. E.D. Wis. Feb. 24, 1997).

None of these cases, though, contradict the plain language of section 922(c), which conditions administrative expense priority on the prior provision of adequate protection.[55] In fact, these cases expose the fallacy in the Bondholders' assertion

---

[55] Arguing that no such prior provision is necessary, the Bondholders point to *In re Center Wholesale, Inc.*, 759 F.2d 1440, 1451 (9th Cir. 1985), where the court granted administrative expense status under section 507(b) even though there had been no prior provision of adequate protection. *See* Assured Br. at 63-67. In that case, the court acknowledged that its ruling was "not literally within the provisions of section 507" but was animated, instead, by "its spirit." 759 F.2d at 1451 n.23. This runs contrary to well-established rules that a statute should be interpreted according to its clear language, *In re Rudler*, 576 F.3d 37, 44 (1st Cir. 2009), as well as the Supreme Court's admonishment that bankruptcy courts should not act as courts of roving equity to disregard unambiguous provisions of the Bankruptcy Code. *See Law v. Siegel*, 571 U.S. 415, 423 (2014). The District Court, therefore, properly rejected this approach. Further, *Center Wholesale* found that the lender's harm was within the "spirit" of section 507(b) because the lender was never given the opportunity to seek adequate protection, having received constitutionally defective notice of the debtor's proposed cash collateral order. *See In re Ctr. Wholesale*, 759 F.2d at 1451 n.23. Thus, any equitable rationale that led the court in *Center Wholesale*

26

that a debtor could "defeat an administrative-expense claim by simply refusing to provide adequate protection in the first place."[56]  A secured creditor's recourse in such a circumstance is obvious: file a motion demanding either adequate protection or relief from the automatic stay.  If granted, the creditor's fears will be allayed.  If denied on the basis that the creditor is already adequately protected, some courts (such as *J.F.K. Acquisitions*, *Ford Motor Credit*, and *American Toy & Furniture*) have held that denial of stay relief satisfies the requirement for a "provision" of adequate protection.  These cases are irrelevant here, as PREPA never provided the Bondholders any adequate protection, whether by agreement or by court order.[57] In fact, and as the District Court found, there is a reason for this: the Bondholders chose to forgo a ruling on their motions for relief from the automatic stay.

### B.    Any Diminution Was Not Caused by the Automatic Stay, But Was the Result of Bondholders' Own Choices

A secured creditor seeking an administrative expense under section 922(c) must also show that it "has a claim arising from the stay of action against such

---

to disregard the express language of section 507(b) does not exist here given the Bondholders' active and continuous involvement in PREPA's Title III case.

[56]  Assured Br. at 63.

[57]  The District Court properly rejected the argument that the 2019 RSA qualifies as the requisite prior provision of adequate protection, as the adequate protection payments contemplated therein were expressly contingent on court approval, which never came.

[collateral] under section 362 or 922 of this title." *Id.* The Bondholders cannot make this showing.

Courts have consistently held this language imposes an affirmative obligation on secured creditors. A secured creditor that decides (for whatever reason) to delay enforcing its rights is not entitled to administrative expense status under section 507(b) or 922(c) because, in such circumstances, the diminution in the value of its collateral was not "caused solely by the imposition of the automatic stay," but "was the result of its own inaction." *In re Mandile*, 626 B.R. 915, 919, 921 (Bankr. N.D. Ill. 2021) (collecting cases and denying superpriority claim where secured lender "made a conscious decision" not to "protect its interest" even after debtor "debtor failed to make the court ordered adequate protection payment"). As the *Mandile* court explained:

> When determining whether a loss was caused solely by the automatic stay, courts demand that the secured creditor be vigilant in protecting its rights during the case. If the creditor fails to take appropriate steps when adequate protection is insufficient by, for example, moving for relief from the stay, it may not be entitled to a superpriority for its loss.

*Id.* at 920. *See also Tidewater Finance Co. v. Henson*, 272 B.R. 135, 140 (D. Md. 2001), *aff'd sub nom.*, 57 F. App'x 136 (4th Cir. 2003) (secured creditor "could have requested adequate protection from the court," but "did nothing, allowing the

collateral to diminish in value for over a year," and creditor "may not now 'use §

503(b) as an alternate means' to accomplish the same end").

Whether creditors have taken the requisite affirmative steps or, instead, sat

on their rights, is a question of fact. *See Raymond v. Eli Lilly & Co.*, 556 F.2d 628,

629 (1st Cir. 1977) (lower court's finding that plaintiff acted with reasonable

diligence "should be overturned only if it is clearly erroneous"); *see also In re*

*Nolan*, 2011 WL 782267, at \*4 (N.D. Ill. Feb. 22, 2011) (upholding bankruptcy

court's determination that movants "sat on their rights" where "bankruptcy court's

findings of fact were not clearly erroneous").

"[S]howing clear error—which [the Bondholders] must do to prevail—is no

easy task." *Díaz-Alarcón v. Flández-Marcel*, 944 F.3d 303, 311-12 (1st Cir. 2019)

(collecting cases). Here, the District Court found that the Bondholders failed to

press their multiple motions to lift the automatic stay to conclusion. It was these

choices—and not the automatic stay—that caused the harm the Bondholders claim

they suffered from PREPA's use of its Net Revenues to operate its Title III case.[58]

The District Court's findings find ample support in the record. For example:

---

[58] The District Court also found that, even if the Bondholders had succeeded in having a receiver appointed for PREPA, any receiver would face the same challenges and limitations as PREPA—thus, the harm the Bondholders allege may be the result of those challenges, and not the automatic stay. *See* Administrative Expense Opinion at 40. Those factual findings have not been reversed.

29

- On remand from this Court, the Bondholders did not press for a ruling on the Second Lift Stay Motion, but instead chose to enter into a restructuring support agreement, *i.e.*, the 2019 RSA, with the Oversight Board and PREPA.

- While the 2019 RSA provided that PREPA would make "Adequate Protection Payments" if approved by the District Court, the Bondholders did not press for such approval, even though it was highly uncertain that the District Court would approve such payments, given the vigorous opposition from numerous parties, including the Committee.

- The Bondholders did not seek to terminate the 2019 RSA—as they could have done at any time after September 2019—to pursue the Second Lift Stay Motion. Nor did the Bondholders oppose the Oversight Board's motion to indefinitely adjourn the hearing on the 9019 Motion, seek to terminate such adjournment, or appeal the Court's order granting the adjournment.

- Nor did the Bondholders press forward with their Third Lift Stay Motion—a motion that was not even based on any lack of adequate protection. Instead, as this Court would later confirm, the Bondholders waived their right to have the Third Lift Stay Motion heard on a short-term basis and accepted proceeding first with the Lien Scope Litigation. Moreover, as this Court also confirmed, that waiver continued to apply to the Fourth Lift Stay Motion.

- As the District Court correctly found, the same waiver also applied to the Fifth Lift Stay Motion, which was filed on the eve of PREPA's confirmation hearings in March 2024. And even though the District Court scheduled the Fifth Lift Stay Motion for a hearing on regular notice after the conclusion of the confirmation hearing, the Bondholders chose to adjourn the hearing on their motion.

- The Bondholders did not seek relief from the Distrct Court's litigation stay until February 2025 and did not appeal any of the District Court's litigation stay rulings until June 3, 2026, when they appealed the District Court's denial of their Renewed Motion to Lift Litigation Stay.

The Bondholders' arguments rest on their repeated refrains that they have suffered great injustice, first at the hands of PREPA and the Oversight Board and, later, at the hands of the District Court. In reality, though, any loss to the value of the Bondholders' interest in PREPA's Net Revenues is the result of their choices. The Bondholders—who have been represented by no less than 13 law firms—are highly sophisticated and aware of the choices they make and the ramifications thereof. These choices make it impossible for the Bondholders to satisfy the elements of section 922(c). The District Court's factual findings are also consistent with this Court's findings that the Bondholders waived their right to expedited consideration of any relief under section 362. As such, the District Court's findings should not be disturbed. *See United States v. Oliveira*, 907 F.3d 88, 92 (1st Cir. 2018) ("But, under the clear error standard, as long as these inferences were 'rational,' and we believe that they were, we cannot reverse.").

II.  **District Court Correctly Held PREPA's Use of Its Cash Receipts to Operate Its Business Does Not Entitle Bondholders to Administrative Expense Status Under Section 503(b)(1)(A) of the Bankruptcy Code**

Section 503(b)(1)(A) of the Bankruptcy Code grants an administrative expense priority to parties that provide the "actual, necessary costs and expenses of preserving the estate." In this Circuit, it is black-letter law that a party seeking administrative expense status must (i) provide the debtor with a new, postpetition, benefit, that (ii) is the result of a new, postpetition transaction. This fundamental

principle traces back to this Court's opinion in *In re Mammoth Mart, Inc.*, which held that for a claim to be entitled to administrative expense priority status, it "must arise ***from a transaction with the debtor-in-possession***."  536 F.2d 950, 954 (1st Cir. 1976) (emphasis added).  That holding has been affirmed numerous times since then, including in Puerto Rico's Title III cases.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 7 F.4th 31, 39 (1st Cir. 2021) (repeating administrative expense standard).

This rule is also consistent with the policy underlying section 503(b)(1)(A).  That section is designed "to encourage the provision of goods and services to the estate, and to compensate those who expend new resources attempting to rehabilitate the estate."  *In re J.F.K. Acquisitions*, 166 B.R. at 211; *In re Norwalk Furniture Corp.*, 418 B.R. 631, 634 (Bankr. N.D. Ohio 2009) (priority status "compensate[s] those who expend new resources attempting to rehabilitate the estate").  This policy has no application to the facts here, where, as the District Court correctly explained, PREPA's use of its Net Revenues neither constituted a postpetition transaction with PREPA, nor provided PREPA with a new postpetition benefit.

A.    **PREPA Received No Postpetition Benefit from Use of Its Net Revenues**

The Bondholders repeatedly assert that PREPA benefitted by using its Net Revenues to operate and argue that this benefit entitles the Bondholders to an

32

administrative expense. According to the Bondholders, an "administrative expense claim is [] appropriate so long as the debtor's postpetition use of collateral conferred an actual [] benefit."[59] This argument makes several fundamental mistakes—chief among them is conflating a debtor's use of property it does not own with a debtor's use of its own property.

"Courts commonly recognize that § 503(b) is not intended to provide an administrative expense award to a prepetition secured lender based on the debtor's postpetition possession and use of collateral." *Williams v. IMC Mortg. Co. (In re Williams)*, 246 B.R. 591, 595 (B.A.P. 8th Cir.1999). This is because a "prepetition secured creditor is not contributing a benefit to the estate because the debtor is merely continuing to use property that the debtor already owns." *Id.* Indeed, this is the rule even if a debtor benefits from the postpetition use of its own property and that use constitutes a breach of the parties' prepetition agreement, as "the mere beneficial breach by an estate, postpetition, of a prepetition contract does [not] elevate the status of the resulting claim to an administrative expense." *WMF/Huntoon, Paige Assocs. v. Citi-Equity Grp., Inc. (In re Citi-Equity Grp., Inc.)*, 1996 Bankr. LEXIS 2016, at *34 (Bankr. D. Minn. May 1, 1996) (denying administrative expense for rent diverted postpetition because bank "rendered no postpetition performance to the estate" and its "entire performance was rendered

---

[59]  Assured Br. at 41.

prepetition in lending the money"). To hold otherwise would undermine a central tenet of the Bankruptcy Code, as the "ability of estates to breach prepetition contracts, without resulting administrative expense liability, is an important feature" of the Bankruptcy Code. *Id*.

It would also be inconsistent with the purpose of section 503(b)(1)(A), which is to compensate third parties "who expend ***new resources***" towards a reorganization. *In re J.F.K. Acquisitions*, 166 B.R. at 211 (emphasis added). A debtor that uses its own property in which, prepetition, it granted a security interest, is not receiving anything new from its prepetition lenders. As one court aptly summarized:

> Even though the secured creditor may be entitled to adequate protection of its lien interest, absent other demonstrated cause, it cannot divest the debtor of its right to use collateral necessary to reorganization unless the creditor can show that postpetition retention and use of the collateral will impair the creditor's adequate protection. ***The secured creditor is not contributing to the estate*** [as required for an administrative expense priority under section 503(b)(1)(A)] ***by allowing a Debtor-in-Possession to use collateral which [the debtor] already owns and has a statutory right to use***.

*In re Provincetown-Boston Airline, Inc.*, 66 B.R. 632, 634 (Bankr. M.D. Fla. 1986) (emphasis added).

### i. Any Postpetition Net Revenues Are PREPA's Property

In the face of this long-standing body of law, the Bondholders argue that a different standard should apply to PREPA's property created postpetition because

34

"the post-petition benefit to the utility's operations necessarily arose from newly generated Net Revenues that did not exist pre-petition."[60]  Based on this argument, the Bondholders assert the District Court was "wrong to treat this as a case where purely pre-petition activity 'may have resulted in a direct benefit to the bankrupt estate.'"[61]

But the Bondholders' arguments reinforce, rather than undermines, the District Court's ruling that any benefit PREPA did receive had its genesis in the parties' prepetition relationship.  The Bondholders point to section 928(a) of the Bankruptcy Code, pursuant to which they (correctly) observe their "***pre-petition security agreements continue to impose***" postpetition obligations.[62]  This is because section 928(a) creates an exception to section 552(a) of the Bankruptcy Code, which normally cuts off liens in "property ***acquired by the [] debtor***" post-petition.  11 U.S.C. § 928(a) (emphasis added).  It does not, however, "create new rights." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 931 F.3d 111, 116 (1st Cir. 2019) (internal citation omitted).

Section 552(b) of the Bankruptcy Code, which creates a similar exception for post-petition rent, is instructive.  If the Bondholders were correct, one would expect to see many cases in which a debtor's use of postpetition rent subject to a

---

[60]  Assured Br. at 39.
[61]  *Id*.
[62]  *Id*. at 39-40 (emphasis added).

prepetition mortgage resulted in priority status under section 503(b)(1)(A). Those cases do not exist. Instead, cases treat postpetition rent like any other collateral: entitled to adequate protection and, if that fails, entitled to a section 507(b) claim. In fact, at least two cases have expressly rejected a section 503(b)(1)(A) claim based on a debtor's use of postpetition rent. In *In re Western Real Estate Fund, Inc.*, the creditor argued, as the Bondholders do here, "that the debtor's use of postpetition revenues from the Oaks of Cypress Apartments" was, effectively, "the contribution of those funds by Transamerica for the preservation of the estate, therefore entitling Transamerica to an administrative claim under 11 U.S.C. § 503(b)(1)(A)." 83 B.R. 52, 53 (Bankr. W.D. Okla. 1988). The court rejected this argument, explaining that "Transamerica offers no authority whatever for the proposition, vital to its asserted administrative claim, that the post-petition rents and revenues derived from the Oaks are its property, and not property of the debtor estate, in which it may have an interest as collateral." *Id.*; *see also WMF/Huntoon*, 1996 Bankr. LEXIS 2016, at *5 (no administrative expense where, postpetition, debtor "stopped making the monthly payments" on debt and "applied the rental income to its own operating expenses"). PREPA's use of property it owns does not confer a new, postpetition benefit, as contemplated by section 503(b)(1)(A).

36

ii.    Section 503(b)(1)(A) Applies to a Debtor's Use of Property It Does Not Own, Not Use of Its Property

An owner of property is distinct from a lien holder, who has only an interest in its debtor's property.[63]  Recognizing this difference, courts have granted administrative expense status when a debtor uses property it ***does not own***, even (or especially) if that use was nonconsensual.  In so holding, these cases unsurprisingly note that the debtor benefits from such use, a rule well-represented in the cases cited by the Bondholders.  But these cases offer no support for the Bondholders' conflation of collateral and outright ownership.

For example, the Bondholders cite *In re United Trucking Service, Inc.*, 851 F.2d 159, 162 (6th Cir. 1988), for the proposition "that the right to an administrative expense claim for the postpetition benefit to the estate is an equitable right based upon the reasonable value of the benefits conferred."[64]  But as the District Court observed, there is no "analytical link" between, on the one hand, *United Trucking*, which involved the "continued use of leased trailers (which were not property of the estate)," and, on the other hand, "the use of revenues belonging to PREPA."[65]  Stated otherwise, the debtor in *United Trucking* did receive a new

---

[63]  *See, e.g.*, 11 U.S.C. § 101(37) (defining lien "charge against or ***interest in*** property to secure payment of a debt or performance of an obligation") (emphasis added).

[64]  GoldenTree/Syncora Br. at 24 (internal quotation marks omitted).

[65]  Administrative Expense Opinion at 28.  Certain Bondholders attack the District Court's treatment of *United Trucking*, claiming that the District Court

37

benefit: postpetition, it used ***property it did not own*** and which (absent the prepetition lease) it had no right to use.

The Bondholders find no more support in *In re Athens/Alpha Gas Corp.*, 332 B.R. 578 (B.A.P. 8th Cir. 2005). In that case, the debtor co-owned an oil and gas well and was entitled to approximately 50 percent of any profits—yet "instead of distributing the [co-owners'] share of the funds to them" the debtor took 100% of the postpetition profits. *Id.* at 579. The court granted the co-owner administrative expense status, as the debtor's use of its co-owner's property "depriv[ed] the [co-owners] of ***their*** revenue." *Id.* at 581 (emphasis added).[66] Finally, the Bondholders also cite *In re Espinosa*, 542 B.R. 403 (Bankr. S.D. Tex. 2015). In that chapter 13 case, the individual debtors lived in a property the movant had purchased at a prepetition foreclosure sale—meaning that the debtors were living in property that, as of the petition date, they did not own.

The Bondholders, nonetheless, argue that the distinction between property and collateral is irrelevant. According to the Bondholders, the "pertinent inquiry

---

incorrectly relied on the parties' postpetition stipulation even though (they argue) that stipulation had no impact on the Sixth Circuit's ruling, and that by focusing on the stipulation the District Court essentially ignored the Sixth Circuit's holding. *See* GoldenTree/Syncora Br. at 25-26. The Bondholders conveniently ignore that, in addition to its discussion of the postpetition stipulation, the District Court did focus on the Sixth Circuit's holding, including to point out the Bondholders' misrepresentation of that very holding.

[66] Indeed, the "debtor did not dispute the amount of the claim nor did it dispute the claim's status as an administrative expense." *Id*. at 580.

under Section 503(b) is whether actual value was conferred on the bankrupt estate by reason of its wrongful acts" and "[n]othing in that inquiry turns on whether the claimant is an owner rather than a secured creditor."[67]  The Bondholders' argument finds no support in their own cases, basic principles of bankruptcy and property law, or even in common sense.  In fact, the inquiry into what value the estate receives is, by definition, related to whether the property the debtor uses is its own or someone else's.  As noted, section 503(b) compensates third parties who aid the debtor's reorganization efforts through the expenditure of "new resources." *Norwalk Furniture Corp.*, 418 B.R at 634.

In each of the cases cited by the Bondholders, the estate used, and benefitted from, property owned by a third party, thereby obtaining, at that third party's expense, resources the estate would not otherwise have had.  In so holding, the courts recognized that equity demands that a "debtor can't get something for nothing." *In re Espinosa*, 542 B.R. at 414.  This does not apply to PREPA, which owns its Net Revenues.

B.　**PREPA's Use of Any Net Revenues It Owns Is Not a Postpetition Transaction**

The Bondholders next posit that PREPA's postpetition use of Net Revenues in and of itself satisfies the "transaction" requirement for administrative priority

---

[67]  Assured Br. at 44 (as modified) (internal quotations omitted).

status under section 503(b)(1)(A).[68]  They argue that, because PREPA benefitted by spending postpetition Net Revenues, "the only question" is whether section 503(b)(1)(A) "requires the Bondholders to have **assented** to that" use.[69]  The Bondholders further argue it would be unfair to exclude from section 503(b) "a creditor's administrative expense claim arising from the debtor's postpetition use of collateral simply because that use was non-consensual."[70]  These arguments find no support in the caselaw or in the structure of the Bankruptcy Code.

The Bondholders' argument rests on the incorrect premise that a debtor's use of collateral, without more, gives rise to an administrative expense.  As explained above, a debtor's mere use of its own property (*i.e.*, collateral) does not create an administrative expense even if that use is (i) postpetition and (ii) benefits the estate.  The District Court simply, and correctly, held that this rule remains true even if (as the Bondholders allege) the postpetition use is non-consensual.

Nor is it true that, as the Bondholders assert, "[c]ourts have recognized that the non-consensual misuse of collateral qualifies as a Section 503(b) 'transaction.'"[71]  The cases the Bondholders marshal simply do not support this

---

[68]  *See, e.g.*, GoldenTree/Syncora Br. at 29.
[69]  Assured Br. at 40 (emphasis in original).
[70]  GoldenTree/Syncora Br. at 22.
[71]  Assured Br. at 40-41.  The Committee does not agree with the Bondholders' characterization that the non-consensual use of collateral is a misuse.  As explained in detail herein, a municipal debtor like PREPA is statutorily authorized to use its cash to operate while in bankruptcy.  And the Bondholders

40

proposition but, instead, stand for two different propositions.  First (as discussed

above), the nonconsensual use of property the debtor does not own can create a

section 503(b)(1)(A) claim.  Second, the nonconsensual use of collateral might

give rise to a section 507(b) claim—but it does not create a standalone section

503(b)(1)(A) claim.

><table><tr><td>i.</td><td>Bondholders' Section 507(b) Cases Do Not Help Them Because Section 507(b) Requires Existence of a Postpetition Transaction in the Form of Adequate Protection</td></tr></table>

The Bondholders point to cases in which two things happen: (i) a debtor

uses, and benefits from, collateral, and (ii) the secured lender receives an

administrative expense claim.  But correlation is not causation—and the

Bondholders' reliance on these cases ignores that, as even a cursory review

demonstrates, these cases arise under section 507(b), not section 503(b)(1)(A).[72]

These cases discuss whether the debtor's use benefitted the estate because in order

for a claim to have administrative expense status under section 507(b), there needs

---

have conceded that, since the Petition Date, PREPA has used its cash receipts (including cash receipts that may constitute Net Revenues) to maintain its properties and operate its business.  *See* SA.410-11, SA.413.  Thus, there has been no "misuse" of collateral.

[72] *See, e.g.*, *Grundy Nat'l Bank v. Rife*, 876 F.2d 361, 363–64 (4th Cir. 1989) ("We are persuaded that § 507(b) converts a creditor's claim where there has been a diminution in the value of a creditor's secured collateral by reason of a § 362 stay into an allowable administrative expense claim under § 503(b)."); *In re California Devices, Inc.*, 126 B.R. 82 (Bankr. N.D. Cal. 1991) (applying section 507(b)); *In re J.F.K. Acquisitions*, 166 B.R. at 209 (same); *In re Mendez*, 259 B.R. at 757 (same).

to have been a failure of adequate protection and the claim must *also* be allowable as an administrative expense under section 503(b).  Stated otherwise, benefit to the estate from use of collateral is *necessary* for a section 507(b) claim but that benefit is not, on its own, *sufficient* to obtain section 503(b) status.  Accordingly, the true cause of the administrative expense claims granted by these cases was the failure of adequate protection *combined with* the benefit to the estate—not, as the Bondholders argue, the simple fact that a debtor used collateral postpetition.

The Bondholders rely heavily on *Ford Motor Credit* which, they argue, establishes that the "non-consensual misuse of collateral qualifies as a Section 503(b) 'transaction.'"[73]  The Bondholders are wrong.  *Ford Motor Credit*, like the other cases the Bondholders cite, is about the failure of adequate protection and application of section 507(b).  In that case, Ford (the secured lender) sought administrative priority under section 507(b) of the Bankruptcy Code (not section 503(b)(1)(A)) after the bankruptcy court's ruling, earlier in the case, that Ford was adequately protected by an equity cushion—a ruling later proven inaccurate.  Because section 507(b) requires, in addition to a failure of adequate protection, satisfaction of the section 503(b) elements, the Fourth Circuit addressed whether Ford had satisfied those requirements.  Based on this analysis the court denied

---

[73] Assured Br. at 41; *see also* GoldenTree/Syncora Br. at 26-29 (arguing PREPA's use of the Bondholders' collateral postpetition to improve the electric system is a postpetition transaction).

Ford's section 507(b) claim, holding that the debtor did not benefit from its possession of the collateral.

This was enough to deny Ford's claim.  Nonetheless, in a footnote, the court provided *dicta* explaining that it was willing to "suggest" that the "debtor's postpetition use (against the secured creditor's wishes) of collateral" may satisfy the requirement for a postpetition transaction when the creditor "is forced to allow the debtor's continued use of collateral."  *Ford Motor Credit*, 35 F.3d at 867 n.7. In other words, under the specific facts of that case, the Fourth Circuit was willing to "suggest" that the bankruptcy court's finding of adequate protection, and denial of Ford's motion for relief from the automatic stay, satisfied the postpetition transaction requirement.  The same is true of another case the Bondholders cite, *In re Am. Toy & Furniture Co.*, 1997 Bankr. LEXIS 2495, at *17, in which the court held that administrative expense status was available to a creditor whose stay relief motion was denied.

But nothing in *American Toy & Furniture* or the *dicta* of *Ford Motor Credit* suggests that (as the Bondholders argue) an "administrative expense claim is [] appropriate so long as the debtor's post-petition use of collateral conferred an actual [] benefit."[74]  This ignores the facts and holdings of these cases, where the debtor's postpetition use was over the explicit objection of the secured creditor and

---

[74]  Assured Br. at 41.

based on the court's affirmative finding of adequate protection. These cases stand, instead, for the proposition that a secured lender does provide something new when it is induced—whether by stipulation with the debtor or by court order—to permit the debtor to use collateral beyond the debtor's prepetition rights. But these cases do not negate the need for such inducement, and no such agreement was ever reached, nor such order entered, in this case.

ii.    Bondholders Would Nullify Multiple Sections of the Bankruptcy Code

Absent from the Bondholders' framework is any requirement for a postpetition transaction with the debtor or the provision of new resources to the debtor—as noted, this is inconsistent with decades of caselaw applying section 503(b)(1)(A). Furthermore, according to the Bondholders' arguments, a secured lender could sit back and, at the end of the case, obtain administrative expense status without any engagement with the debtor, nullifying the requirements of section 507(b) and 922(c) that a secured lender must seek adequate protection.

Lastly, this interpretation of section 503(b)(1)(A) (and, indeed, all the Bondholders' arguments) is contrary to section 361(3) of the Bankruptcy Code, which expressly provides that adequate protection cannot be in the form of an administrative expense. Taken together with sections 507(b) and 922(c), this means that a secured creditor can obtain administrative expense only "retroactively

44

after adequate protection proves to have been inadequate." *In re Am. Toy & Furniture Co.*, 1997 Bankr. LEXIS 2495, at *9.

###### C.    **Bankruptcy Code's Other Priorities Have No Bearing on Section 503(b)(1)(A)**

The District Court's insistence that administrative expense status is reserved for claimants that provide the estate with new, postpetition benefits under a new, postpetition, agreement is consistent with decades of caselaw.  Nonetheless, the Bondholders complain that this standard is a "narrow approach" that "does not square with the statutory text."[75]  In support of their broad reading of the statute, the Bondholders point to other subsections of section 503 that grant administrative expense priority to, for example, certain tax claims and for "the value of goods the debtor received within 20 days ***before*** commencing a bankruptcy case."[76]  This argument is grounded in a flawed statutory analysis.

Section 503 of the Bankruptcy Code (and its sister provision, section 507) "is the result of Congressional policy that affords certain classes of claimants preference in payment." *In re Eckert*, 414 B.R. 404, 413 (Bankr. N.D. Ill. 2009). The various priorities in those two sections are distinct from each other, with different policies and different requirements, and one does not dictate how

---

[75]  AHG Br. at 43-44.

[76]  AHG Br. at 54 (emphasis in original); *see also id.* at 43-44 (arguing that tax obligations "would never" satisfy benefit to the estate requirement).

bankruptcy courts are to apply the other.  *See, e.g.*, *In re 800Ideas.com, Inc.*, 496 B.R. 165, 181 (B.A.P. 9th Cir. 2013) ("although we hold that the tax penalties are not entitled to administrative expense status under § 503(b)(1)(A) as 'costs of preserving the estate', we remand this matter to the bankruptcy court to decide if the penalties qualify as administrative expenses for other reasons").

For example, section 503(b)(9) of the Bankruptcy Code, which grants priority status to sellers that provide goods shortly before a bankruptcy case, was added to the Bankruptcy Code as part of the 2005 "BAPCPA" amendments and reflects Congress's concern of potential "abuse by debtors who seek to acquire goods at a time when it is known that bankruptcy is imminent and that payment for the goods will not have to be tendered."  *In re Arts Dairy, LLC*, 414 B.R. 219, 220 (Bankr. N.D. Ohio 2009).  This policy is separate from the policy underlying section 503(b)(1)(A) and in no way undermines decades of controlling authority establishing the requirements for priority status under section 503(b)(1)(A).  Indeed, the only policy common to the "potpourri"[77] of different claims—as the Bondholders themselves characterize section 503—is, as this Court has repeatedly explained, that "administrative-expense provisions are narrowly construed."  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 92 F.4th at 362.

---

[77]  AHG Br. at 54.  A potpourri is "a miscellaneous collection."  Merriam-Webster, available at https://www.merriam-webster.com/dictionary/potpourri (last visited July 9, 2026).

46

**III.**    **District Court Correctly Determined that Bondholders Failed to Establish Entitlement to Administrative Expense Based on "*Reading* Exception"**

The Bondholders' attempts to cobble together a right to priority status under the fundamental fairness doctrine, or the so-called *Reading* Exception, fare no better than their efforts to evade the requirements for administrative expense treatment under section 503(b)(1)(A).

"Claims without the required components may qualify for administrative treatment only in limited circumstances, where 'fundamental fairness' requires it." *In re Healthco Int'l, Inc.*, 272 B.R. 510, 512 (B.A.P. 1st Cir. 2002), *aff'd*, 310 F.3d 9 (1st Cir. 2002). "In a nutshell, the 'fundamental fairness' exception is recognized when the debtor's postpetition operations occasion tortious injuries to third parties (*Reading*), or when the claim arises from postpetition actions that deliberately violate applicable law and damage others (*Charlesbank* )." *Id.* at 513. Like all administrative expenses, it is narrowly construed, and will not be extended beyond its intended ambit. *See, e.g.*, *In re Abercrombie*, 139 F.3d 755, 758 (9th Cir. 1998) ("*Reading* [] created a venerable but limited exception"); *In re GT Advanced Techs., Inc.*, 547 B.R. 3, 9 (Bankr. D.N.H. 2016) (denying administrative expense claim and referring to "narrow exception" created by *Reading*) (subsequent history omitted); *In re SuperMedia, Inc.*, 2014 WL 7403448, at *19 (Bankr. D. Del. Dec. 29, 2014) (same).

47

The *Reading* Exception does not apply to the Bondholders, for three distinct reasons.  <u>First</u>, as explained by the District Court, the *Reading* Exception is not intended to benefit "prepetition creditors like the Bondholders" who undisputably share, at least in part, "in the prospective benefit of the successful rehabilitation of PREPA."[78]  In support of this proposition, the District Court cited *In re Baseline Sports, Inc.*, 393 B.R. 105, 131 (Bankr. E.D. Va. 2008), which itself collects multiple rulings.  Yet, the Bondholders simply ignore this precedent and offer no rebuttal to this limitation on the Reading Exception.[79]

<u>Second</u>, the *Reading* Exception protects innocent victims of a debtor's wrongdoing, including tortious conduct and violations of statutory or regulatory law.  For example, in *Copeland*, cited by the Bondholders, the Fifth Circuit held that the *Reading* Exception applied to a debtor's decision to retain $1.8 million in postpetition sales tax revenues.  *See Matter of Al Copeland Enters., Inc.*, 991 F.2d 233, 240 (5th Cir. 1993).  And in *Villalobos*, also cited by the Bondholders, this Court held that the *Reading* Exception applied to postpetition employment

---

[78]  Administrative Expense Opinion at 31.

[79]  Only one of the Bondholder briefs even cites *Baseline Sports*.  But its efforts to undermine the District Court focus only on the court's ruling that *Reading* was not applicable because, for example, the debtor was no longer operating a business, which is not the case for PREPA.  *See* Assured Br. at 54.  But Assured entirely ignores *Baseline Sports'* additional, and separate, holding that "SunTrust is not an 'innocent third party' for whom the *Reading* exception was created."  393 B.R. at 131.  But it is this aspect of *Baseline Sports* that the District Court relied on, and Assured offers nothing in response.

48

discrimination and retaliation claims brought by two members of the Puerto Rico Police Department. *See Villalobos-Santana v. Puerto Rico Police Dep't*, 171 F.4th 544 (1st Cir. 2026).

These cases have no relevance to PREPA's use of any Net Revenues. As explained above, the Bankruptcy Code permits a debtor to use its property during its bankruptcy case, including (in a municipal case) cash collateral. At most, PREPA's "wrongdoing" was a violation of its prepetition contract with the Bondholders.[80] But, as this Court has explained, there is "no authority that the *Reading-Charlesbank* exception encompasses a right to payment originating in a prepetition contract with the debtor." *In re Hemingway Transp. Inc.*, 954 F.2d 1, 6-7 (1st Cir. 1992) (even though lawsuit may create postpetition expenses, "its prepetition **genesis** ultimately distinguishes it from the **postpetition losses** accorded priority in *Reading*") (emphasis in original).[81]

---

[80]  PREPA's right to use its property, and the Bondholders' recognition that the funds at issue were used, literally, to keep the lights on and with the Bondholders' knowledge, also distinguishes cases cited by the Bondholders holding that a plaintiff stated a claim for conversion under Puerto Rico law. *See, e.g.*, *Oto Analytics, LLC v. Benworth Cap. Partners PR, LLC*, 2025 WL 989954, at *9 (D.P.R. Apr. 2, 2025) (plaintiff plausibly alleged transfers constituting intentional fraud designed to avoid repayment to plaintiff and frustrate collection); *United States v. GZ Constr. St, Inc.*, 155 F. Supp. 3d 147, 152 (D.P.R. 2015) (same).

[81]  The genesis of the Bondholders' claims in the Trust Agreement also demonstrates why the Bondholders' reference to *Villalobos* has no applicability here. Like the Bondholders, the police officers in *Villalobos* had a prepetition relationship with the debtor. However, the harms they suffered were

49

Third, the *Reading* Exception grants relief to parties that, otherwise, would be without recourse. As prepetition secured creditors, the *Reading* Exception simply does not apply to the Bondholders because the Bankruptcy Code already provides the Bondholders statutory protections and rights regarding PREPA's use of its Net Revenues. *See In re Henson*, 57 F. App'x at 138 ("Pre-petition secured creditors, while not privy to administrative-expense priority, are protected under the Bankruptcy Code's provisions for adequate protection."). Extending the *Reading* Exception to the Bondholders "would transgress the principle that a secured creditor must demand 'adequate protection' of its secured rights in bankruptcy or waive any administrative claim for loss which occurs to the secured value of its claim occurring during the administration of the bankruptcy case." *In re Leroy M. Hull Co., Inc.*, 344 B.R. 466, 470 (Bankr. W.D. Va. 2004). Indeed, this is the exact circumstance presented here: the Bondholders' own choices led to the harm they now allege, and their Administrative Expense Motion and this appeal are nothing more than an effort to escape the consequences of their choices. But the *Reading* Exception protects those harmed by a debtor's actions—not by their own choices.

---

postpetition torts that violated separate common law and statutory duties (such as the duty not to discriminate against protected classes) and, unlike the Bondholders, the police officers in *Villalobos* had no recourse to any recompense for this harm other than through *Reading*.

Lastly, the Bondholders' invocation of the *Reading* Exception fails for the separate reason that, as the District Court held, the Bondholders fail to allege any tort. The Committee joins the arguments of the Oversight Board and AAFAF, including that (i) the Bondholders' conversion claim under Puerto Rico law does not meet the *prima facie* elements of such a claim and (ii) there can be no takings claim arising out of a contractual relationship between the plaintiff and the government, entered into in the government's commercial (rather than sovereign) capacity.

## IV.    District Court's Ruling Is Consistent with Fifth Amendment of U.S. Constitution

Hand in hand with the injustice they claim to have suffered, the Bondholders repeatedly insist that the District Court's ruling cannot be reconciled with the U.S. Constitution.[82] There is no such conflict, and no constitutional crisis is imminent.

Only a government actor can violate the Fifth Amendment's Takings Clause. Here, there are two: PREPA, an instrumentality of the Commonwealth of Puerto Rico, and the U.S. Government, which, through Congress, passed the Bankruptcy Code. As explained by AAFAF and the Oversight Board, the Bondholders' assertion that PREPA committed an unconstitutional taking when it allegedly used its Net Revenues fails to state a claim. That leaves only the U.S. Government, and

---

[82] *See, e.g.*, GoldenTree/Syncora Br. at 42-43; Assured Br. at 57-58.

nothing in the Administrative Expense Opinion enables or endorses a violation of the Fifth Amendment by the U.S. Government.

As detailed above, the Bankruptcy Code "effectuate[s] a careful balance between the interests of creditors and debtors." *Clark*, 573 U.S. at 129. Decades of jurisprudence have explained that this careful balance recognizes and protects property rights, including the rights of a secured creditor to the value of its interest in debtor property. *See, e.g.*, *Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273, 278 (1940) ("Safeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the property. There is no constitutional claim of the creditor to more than that.").

Outside of bankruptcy, a secured creditor has various rights, including the right of foreclosure, and it is beyond peradventure that bankruptcy interferes with those rights. However, the Bankruptcy Code does not eliminate those rights. The Bondholders' various briefs all quote this Court's statement that the Court would "'doubt the constitutionality of' a rule that would allow a debtor to 'expend every penny'" of a secured lender's collateral, while the "creditor would be left to stand by helplessly." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d at 20. However, the Bondholders ignore the import, and context, of that statement, which was issued in connection with this Court's determination that the District Court's inability to interfere with PREPA's use of its property does not bar it from granting

relief from the automatic stay.  In other words, secured creditors' access to the Bankruptcy Code's stay relief provisions is *precisely* what ensures they are *not* left helpless, avoiding the constitutional concern this Court identified.

Judge Kayatta, joined by three other members of this Court, repeated this point in his opinion denying rehearing *en banc*.  As that opinion observed, sections 922(d) and 928(a) do not create an exception to the automatic stay for holders (like the Bondholders here) of special revenue bonds.  This Court specifically held that such holders' interest in the debtor's special revenues is protected by the right of such holders to seek stay relief, protecting them from "the possibility that the automatic stay could deprive a creditor of its property interest by precluding the creditor from exercising any rights it possesses to protect that interest from destruction."  931 F.3d at 118 (internal references omitted).  Finally, this Court explained that this structure—in which secured creditors must seek stay relief if they believe their interest in property is being devalued—"raises no new issues of constitutional dimension." *Id.*  "Courts, including the U.S. Supreme Court, have time and again affirmed the constitutionality of section 362 of the Bankruptcy Code against Fifth Amendment Takings Clause claims." *Id.*

The Bondholders' real problem is that, even though this Court has made it crystal clear how a secured creditor must protect itself, the Bondholders chose not to.  The District Court did two things: First, it held that the Bondholders, in fact,

53

54

made that choice; that other paths were open to them and they chose not to pursue them.  Second, it declined to rewrite decades of case law and the Bankruptcy Code to allow the Bondholders to escape their own choices.  Neither violates the Fifth Amendment.

## CONCLUSION

For the reasons set out above, the District Court should be affirmed.


*(Signature appears on following page)*

Dated: July 10, 2026

Respectfully submitted,

By:  _/s/ Luc A. Despins_
       Luc A. Despins


*Counsel to Official Committee of Unsecured Creditors*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this document complies as follows:

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,824 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word within Microsoft 365 in 14-point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: July 10, 2026   Respectfully submitted,

By: */s/ Luc A. Despins*
   Luc A. Despins

*Counsel to the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send a notice of filing to all registered users.

By: */s/ Luc A. Despins*
Luc A. Despins

*Counsel to the Official Committee of Unsecured Creditors*