# United States Court of Appeals
## *for the*
# First Circuit

---

Case Nos. 26-1330, 26-1331, 26-1332, 26-1333, 26-1334

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Highways and Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative of the Puerto Rico Public Buildings Authority,

*Debtors,*

---

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO, SAN JUAN,
IN CASE NO. 3:17-BK-04780-LTS
HONORABLE LAURA TAYLOR SWAIN, DISTRICT JUDGE

## BRIEF FOR APPELLEE THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO

MARTIN J. BIENENSTOCK
EHUD BARAK
ELLIOT R. STEVENS
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000

JOHN E. ROBERTS
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
(617) 526-9600

PAUL V. POSSINGER
PROSKAUER ROSE LLP
70 West Madison, Suite 3800
Chicago, Illinois 60602
(312) 962-3550

*Attorneys for the Financial Oversight and Management Board for Puerto Rico,
as representative of the Puerto Rico Electric Power Authority*

NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION; U.S. BANK NATIONAL ASSOCIATION, in the capacity as PREPA Bond Trustee; ALLIANCEBERNSTEIN L.P.; ARISTEIA CAPITAL, L.L.C.; BNY MELLON FUNDS TRUST; CAPITAL RESEARCH AND MANAGEMENT COMPANY; COLUMBIA MANAGEMENT INVESTMENT ADVISERS, LLC; DELAWARE MANAGEMENT COMPANY, a series of Nomura Asset Management Co., Ltd.; ELLINGTON MANAGEMENT GROUP, L.L.C.; GOLDMAN SACHS ASSET MANAGEMENT L.P.; INVESCO ADVISERS, INC.; LUXOR CAPITAL GROUP, LP; MACKAY SHIELDS LLC; MASSACHUSETTS FINANCIAL SERVICES COMPANY; OLD ORCHARD CAPITAL MANAGEMENT LP; ONE WILLIAM STREET CAPITAL MANAGEMENT, L.P.; RUSSELL INVESTMENT COMPANY, on behalf of Russell Investment Company Tax-Exempt High Yield Bond Fund; SIG STRUCTURED PRODUCTS, LLC; T. ROWE PRICE; TOWER BAY ASSET MANAGEMENT LP; VERITION FUND MANAGEMENT LLC; GOLDENTREE ASSET MANAGEMENT LP; SYNCORA GUARANTEE INC.; ASSURED GUARANTY INC,

*Movants-Appellants,*

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA),

*Debtor-Appellee,*

INSTITUTO DE COMPETITIVIDAD Y SOSTENIBILIDAD ECONÓMICA DE PUERTO RICO (ICSE); EL PUENTE DE WILLIAMSBURG, INC., ENLACE DE ACCIÓN CLIMÁTICA; COLEGIO DE ABOGADOS Y ABOGADAS DE PUERTO RICO (CAAPR); ASSOCIATION OF PRIVATE COLLEGES AND UNIVERSITIES OF PUERTO RICO (ACUP); LA LIGA DE CIUDADES DE PUERTO RICO; CENTRO UNIDO DE DETALLISTAS (CUD); RAQUEL MARIA GONZÁLEZ SPARKS; COALICIÓN NUEVA VISIÓN DE SALUD; SISTEMA DE RETIRO DE LOS EMPLEADOS DE LA AUTORIDAD DE ENERGÍA ELECTRICA (SREAEE); JUNTE DE ASOCIACIONES CON PENSIONADOS Y JUBILADOS DE PUERTO RICO (JAP); COLEGIO DE PROFESIONALES DEL TRABAJO SOCIAL DE PUERTO RICO; OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PREPA; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY (AAFAF); ELAM, LLC, as Successor-In-Interest to Blue Beetle III, LLC,

*Respondents-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

Appellee the Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Electric Power Authority, is not required to file a corporate disclosure statement pursuant to Federal Rule of Appellate Procedure 26.1 because it is not a non-governmental corporate party.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF THE ISSUES..............................................................................8

STATEMENT OF THE CASE..................................................................................9

     A.     PREPA and the PREPA Bonds .............................................................9

     B.     Monthly Operating Reports..................................................................11

     C.     PREPA's Title III Case .........................................................................12

     D.     The Bondholders' Actions During the Title III Case...........................13

          1.     The 2017 Lift-Stay Motion .......................................................13

          2.     The 2018 Lift-Stay Motion .......................................................15

          3.     Abandonment of the 2018 Lift-Stay Motion ............................16

          4.     Termination of the 2019 RSA.....................................................18

          5.     The 2022 Lift-Stay Motion .......................................................18

          6.     The Lien-Challenge Litigation...................................................19

          7.     The 2023 Lift-Stay Motion .......................................................20

          8.     The 2024 Lift-Stay Motion .......................................................21

     E.     The Order Under Review .......................................................................22

SUMMARY OF ARGUMENT ..............................................................................24

STANDARD OF REVIEW ....................................................................................31

ARGUMENT ..........................................................................................................32

I.     THE TITLE III COURT CORRECTLY HELD THE BONDHOLDERS DO NOT HAVE AN ALLOWABLE ADMINISTRATIVE-EXPENSE CLAIM UNDER § 922(c)...................................................................................32

A.    By Its Plain Terms, § 922(c) Does Not Provide the Bondholders with an Administrative-Expense Claim ...............................................32

    1.    The Bondholders Were Never Provided with Adequate Protection .................................................................................33

    2.    The Bondholders' Alleged Harm Did Not Arise from the Automatic Stay.................................................................................38

    3.    The Mere Use of Property by a Debtor Does Not Give Rise to an Administrative-Expense Claim Under § 922(c) ......41

B.    The Bondholders' Contrary Contentions Fail ....................................47

II.    APPELLANTS' ADMINISTRATIVE-EXPENSE PRIORITY CLAIM UNDER § 503(b) FAILS...........................................................................50

A.    Section 503(b)(1) Priority Was Properly Denied Because There Was No Post-Petition Transaction Between PREPA and the Bondholders.................................................................................51

B.    The Bondholders Cannot Invoke § 503(b)(1)(A) to Circumvent § 922(c)...................................................................................59

III.    *READING* DOES NOT ENTITLE THE BONDHOLDERS TO AN ADMINISTRATIVE-EXPENSE CLAIM ...................................................62

A.    The *Reading* Doctrine Does Not Apply to Claims Based on Pre-Petition Non-Executory Contracts.................................................63

B.    The Bondholders' Arguments to the Contrary Are Unavailing..........69

C.    The Title III Court Correctly Held that the Bondholders Have No Allowable *Reading* Claim in Any Event.......................................74

    1.    The Bondholders Have No Conversion Claim .........................74

    2.    The Bondholders Have No Takings Claim..............................79

        a.    PREPA Was Acting in a Commercial, Not Governmental, Capacity .................................................79

        b.    The Bondholders Are Limited to the Contractual Limitations They Agreed to in the Trust Agreement ....84

iii

IV.     THE NONRECOURSE LIMITATIONS IN THE TRUST
        AGREEMENT BAR APPELLANTS' ASSERTED CLAIMS ....................86

V.      COURSE OF PERFORMANCE IS NOT BEFORE THIS COURT............90

CONCLUSION....................................................................................................92

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.J. Cunningham Packing Corp. v. Florence Beef Co.*,
  785 F.2d 348 (1st Cir. 1986)..................................................................91

*Abercrombie v. Hayden Corp. (In re Abercrombie)*,
  139 F.3d 755 (9th Cir. 1998) ...............................................................52

*Abraham Giménez Plaintiff Grp. v. Dep't of Transp. & Pub. Works
  (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
  92 F.4th 355 (1st Cir. 2024)...............................................................31

*Am. Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*,
  280 F.2d 119 (2d Cir. 1960) ...............................................................55

*Armstrong v. United States*,
  364 U.S. 40 (1960)..............................................................................82

*Assoc. of Retired Emps. v. City of Stockton (In re City of Stockton)*,
  478 B.R. 8 (Bankr. E.D. Cal. 2012)....................................................44

*Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re
  Fin. Oversight & Mgmt. Bd. for P.R.)*,
  919 F.3d 121 (1st Cir. 2019)...............................................................48

*Aurelius Cap. Master, Ltd. v. Puerto Rico*,
  919 F.3d 638 (1st Cir. 2019)..........................................................46, 49

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)............................................................................88

*Barretto Peat, Inc. v. Luis Ayala Colón Sucrs., Inc.*,
  896 F.2d 656 (1st Cir. 1990)...............................................................78

*Bartenwerfer v. Buckley*,
  598 U.S. 69 (2023)..............................................................................42

*Baybank-Middlessex v. Ralar Distribs. (In re Ralar Distribs.)*,
  182 B.R. 81 (D. Mass. 1995)...............................................................87

v

*Bos. Reg'l Med. Ctr., Inc. v. Mass. Div. of Health Care Fin. & Pol'y*,
365 F.3d 51 (1st Cir. 2004)...................................................................52

*Columbia Nitrogen Corp. v. Royster Co.*,
451 F.2d 3 (4th Cir. 1971) ....................................................................91

*Cont'l Ill. Nat'l Bank & Trust Co. v. Chi., R. I. & P. R. Co.*,
294 U.S. 648 (1935).............................................................................85

*Cumberland Farms, Inc. v. Fla. Dep't of Env't Prot.*,
116 F.3d 16 (1st Cir. 1997)...................................................................67

*Doolittle v. County of Santa Cruz (In re Metzger)*,
346 B.R. 806 (Bankr. N.D. Ill. 2006) ...................................................38

*Ford Motor Credit Co. v. Dobbins*,
35 F.3d 860 (4th Cir. 1994) .......................................................39, 56, 57

*Franconia Assocs. v. United States*,
61 Fed. Cl. 718 (2004)..........................................................................80

*Grundy Nat'l Bank v. Rife*,
876 F.2d 361 (4th Cir. 1989) .....................................................36, 37, 47

*Hardt v. Reliance Std. Life Ins. Co.*,
560 U.S. 242 (2010)..............................................................................91

*Helvering v. Griffiths*,
318 U.S. 371 (1943)..............................................................................82

*Hughes Commc'ns Galaxy, Inc. v. United States*,
271 F.3d 1060 (Fed. Cir. 2001) ............................................................80

*Hull-Dobbs Co. v. Sup. Ct.*,
81 D.P.R. 221 (1959)..............................................................28, 75, 78

*In re Advisory Info. & Mgmt. Sys., Inc.*,
50 B.R. 627 (Bankr. M.D. Tenn. 1985)...........................................54, 61

*In re Al Copeland Enters., Inc.*,
991 F.2d 233 (5th Cir. 1993) ................................................................70

vi

*In re Alyucan Interstate Corp.*,
  12 B.R. 803 (Bankr. D. Utah 1981)......................................................39

*In re Am. Toy & Furniture Co.*,
  1997 Bankr. LEXIS 2495 (Bankr. E.D. Wis. Feb. 24, 1997)............................57

*In re Athens/Alpha Gas Corp.*,
  332 B.R. 578 (B.A.P. 8th Cir. 2009) ....................................................57

*In re Baseline Sports, Inc.*,
  393 B.R. 105 (Bankr. E.D. Va. 2008).....................................................68

*In re Bluestem Brands, Inc.*,
  2021 Bankr. LEXIS 1980 (Bankr. D. Del. Jul. 27, 2021) ..............................57

*In re Bos. Reg'l Med. Ctr., Inc.*,
  291 F.3d 111 (1st Cir. 2002).........................................................27, 65

*In re Briggs Transp. Co.*,
  47 B.R. 6 (Bankr. D. Mass. 1984) .........................................................61

*In re Cal. Devices, Inc.*,
  126 B.R. 82 (Bankr. N.D. Cal. 1991) ...................................................37

*In re Callister*,
  15 B.R. 521 (Bankr. D. Utah 1981)......................................................39

*In re Charlesbank Laundry, Inc.*,
  755 F.2d 200 (1st Cir. 1985)..........................................................66, 72

*In re City of Desert Hot Springs*,
  339 F.3d 782 (9th Cir. 2003) .............................................................45

*In re City of Stockton*,
  486 B.R. 194 (Bankr. E.D. Cal. 2013)...................................................44

*In re County of Orange*,
  179 B.R. 195 (Bankr. C.D. Cal. 1995) ..................................................45

*In re Cross Baking Co.*,
  818 F.2d 1027 (1st Cir. 1987)............................................................43

*In re Ctr. Wholesale, Inc.*,
  759 F.2d 1440 (9th Cir. 1985) ...............................................................37

*In re Espinosa*,
  542 B.R. 403 (Bankr. S.D. Tex. 2015) ....................................................57

*In re F.B.F. Indus., Inc.*,
  165 B.R. 544 (Bankr. E.D. Pa. 1994) .....................................................58

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  899 F.3d 13 (1st Cir. 2018).....................................................................15

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  91 F.4th 501 (1st Cir. 2024)....................................................................21

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
  121 F.4th 280 (1st Cir. 2024)............................................................passim

*In re Hardeman Cnty. Hosp. Dist.*,
  540 B.R. 229 (Bankr. N.D. Tex. 2015)....................................................45

*In re Hemingway Transp., Inc.*,
  954 F.2d 1 (1st Cir. 1992)..................................................................passim

*In re J.F.K. Acquisitions Grp.*,
  166 B.R. 207 (Bankr. E.D.N.Y. 1994) ....................................................37

*In re James B. Downing & Co.*,
  94 B.R. 515 (Bankr. N.D. Ill. 1988) ..................................................35, 38

*In re Jartran, Inc.*,
  732 F.2d 584 (7th Cir. 1984) ..................................................................53

*In re Leroy M. Hull Co., Inc.*,
  344 B.R. 466 (Bankr. W.D. Va. 2004) ....................................................68

*In re Lucre, Inc.*,
  434 B.R. 807 (Bankr. W.D. Mich. 2010) ................................................58

*In re Mammoth Mart, Inc.*,
  536 F.2d 950 (1st Cir. 1976)....................................................52, 54, 64, 87

*In re Mandile,*
   626 B.R. 915 (Bankr. N.D. Ill. 2021) ...................................................39

*In re Mendez,*
   259 B.R. 754 (Bankr. M.D. Fla. 2001) ................................................37

*In re Munce's Superior Petroleum Prods., Inc.,*
   736 F.3d 567 (1st Cir. 2013)...............................................................66

*In re Old Carco, LLC,*
   424 B.R. 650 (Bankr. S.D.N.Y. 2010)................................................65

*In re Provincetown-Bos. Airline, Inc.,*
   66 B.R. 632 (Bankr. M.D. Fla. 1986)..............................................54, 61

*In re Richmond Unified Sch. Dist.,*
   133 B.R. 221 (Bankr. N.D. Cal. 1991) ...........................................44, 45

*In re Second Timmon Hotel Co., Ltd.,*
   91 B.R. 985 (Bankr. M.D. Fla. 1988)...............................3, 24, 39, 51

*In re U.S. Lines, Inc.,*
   79 B.R. 542 (Bankr. S.D.N.Y. 1987)...................................................38

*In re United Trucking Serv.,*
   851 F.2d 159 (6th Cir. 1988) ..........................................................55, 56

*In re Whistler Energy II, L.L.C.,*
   931 F.3d 432 (5th Cir. 2019) ..............................................................57

*Johnson v. Home State Bank,*
   501 U.S. 78 (1991)..............................................................................88

*Klamath Irrigation Dist. v. United States,*
   67 Fed. Cl. 504 (2005)....................................................................80, 81

*LNC Invs., Inc. v. First Fid. Bank, N.A.,*
   247 B.R. 38 (S.D.N.Y. 2000) ......................................2, 24, 34, 50

*Louisville Joint Stock Land Bank v. Radford,*
   295 U.S. 555 (1935)..........................................................................6, 82

*Lyda v. City of Detroit (In re City of Detroit)*,
841 F.3d 684 (6th Cir. 2016) ................................................................44, 45

*Marathon Petroleum Co., LLC v. Cohen (In re Delco Oil, Inc.)*,
599 F.3d 1255 (11th Cir. 2010) ....................................................................43

*Massó-Torrellas v. Mun. of Toa Alta*,
845 F.3d 461 (1st Cir. 2017)................................................................29, 80, 81

*NLRB v. Bildisco & Bildisco*,
465 U.S. 513 (1984)......................................................................................58

*Ochadleus v. City of Detroit (In re City of Detroit)*,
838 F.3d 792 (6th Cir. 2016) ........................................................................45

*Oto Analytics, LLC v. Benworth Cap. Partners PR, LLC*,
2025 WL 989954 (D.P.R. Apr. 2, 2025) ........................................................78

*Peaje Invs. LLC v. García-Padilla*,
845 F.3d 505 (1st Cir. 2017)..........................................................................36

*Pension Benefit Guar. Corp. v. LTV Corp.*,
87 B.R. 779 (S.D.N.Y. 1988) ........................................................................53

*Piszel v. United States*,
833 F.3d 1366 (Fed. Cir. 2016) ................................................................84, 85

*Preston Hollow Cap., LLC v. Cottonwood Dev. Corp.*,
23 F.4th 550 (5th Cir. 2022) ..........................................................29, 80, 81, 85

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)................................................................................59, 60

*Ramos Lozada v. Orientalist Rattan Furniture Inc.*,
130 D.P.R. 712 (1992)............................................................................28, 76

*Reading Co. v. Brown*,
391 U.S. 471 (1968)................................................................................passim

*Russello v. United States*,
464 U.S. 16 (1983)......................................................................................42

x

*Sakab Saudi Holding Co. v. Aljabri*,
58 F.4th 585 (1st Cir. 2023)..................................................................86

*Singleton v. Wulff*,
428 U.S. 106 (1976)...............................................................................90

*Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*,
897 F.3d 797 (7th Cir. 2018) ................................................................80

*Stockton E. Water Dist. v. United States*,
583 F.3d 1344 (Fed. Cir. 2009) ............................................................81

*Tamerlane, Ltd. v. United States*,
80 Fed. Cl. 724 (2008)....................................................................29, 80

*TLS Mgmt. & Mktg. Servs. LLC v. Rodríguez-Toledo*,
2018 WL 1626100 (D.P.R. Mar. 30, 2018)......................................28, 76

*U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*,
2021 U.S. Dist. LEXIS 64017 (S.D.N.Y. Mar. 31, 2021)....................88, 89

*United States v. GZ Constr. ST, Inc.*,
155 F. Supp. 3d 147 (D.P.R. 2015) .......................................................78

*United States v. Santana-Avilés*,
120 F.4th 7 (1st Cir. 2024)....................................................................31

*United States v. Sec. Indus. Bank*,
459 U.S. 70 (1982).........................................................................6, 82

*USX Corp. v. Prime Leasing, Inc.*,
988 F.2d 433 (3d Cir. 1993) .................................................................89

*UTIER v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight
& Mgmt. Bd. for P.R.)*,
7 F.4th 31 (1st Cir. 2021)..........................................................26, 31, 52

*Vandevere v. Lloyd*,
644 F.3d 957 (9th Cir. 2011) ................................................................90

*Villalobos-Santana v. P.R. Police Dep't*,
171 F.4th 544 (1st Cir. 2026)...........................................................66, 69

*Volvo Commer. Fin. L.L.C. Ams. v. Gasel Transp. Lines, Inc. (In re Gasel Transp. Lines, Inc.)*,
326 B.R. 683 (B.A.P. 6th Cir. 2005) ...................................................34

*Williams v. IMC Mortg. Co. (In re Williams)*,
246 B.R. 591 (B.A.P. 8th Cir. 1999) ..........................................55, 61

*Williams v. United States*,
858 F.3d 708 (1st Cir. 2013)..............................................................86

*WMF/Huntoon, Paige Assocs. v. Citi-Equity Grp., Inc. (In re Citi-Equity Grp., Inc.)*,
1996 Bankr. LEXIS 2016 (Bankr. D. Minn. 1996) ..............54, 59, 88

*Wright v. Union Cent. Life Ins.*,
311 U.S. 273 (1940).............................................................................82

*Wright v. Vinton Branch of Mountain Tr. Bank*,
300 U.S. 440 (1937).............................................................................82

*Zions Credit Corp. v. Rebel Rents, Inc. (In re Rebel Rents, Inc.)*,
291 B.R. 520 (Bankr. C.D. Cal. 2003) ..............................................35

*Zucker v. Rodriguez*,
919 F.3d 649 (1st Cir. 2019)..............................................................86

**STATUTES & CONSTITUTIONAL PROVISIONS**

19 L.P.R.A. § 455 ....................................................................................91

22 L.P.R.A. §§ 191–240 ...........................................................................9

22 L.P.R.A. § 196 ......................................................................................9

22 L.P.R.A. § 240a..............................................................................15, 16

11 U.S.C. § 109 ........................................................................................47

11 U.S.C. § 363 .................................................................................6, 43, 44

11 U.S.C. § 503 ..................................................................................passim

11 U.S.C. § 507 ..................................................................................passim

11 U.S.C. § 552 ................................................................................48

11 U.S.C. § 901 ................................................................................43

11 U.S.C. § 903 ................................................................................44

11 U.S.C. § 904 ................................................................................44

11 U.S.C. § 922 ..........................................................................passim

11 U.S.C. § 928 ..........................................................................passim

11 U.S.C. § 1129 ..............................................................................60

48 U.S.C. § 2161 ..........................................................................1, 43

48 U.S.C. § 2165 ........................................................................passim

48 U.S.C. § 2194 ........................................................................12, 13

Ga. Code Ann. § 36-80-5 .................................................................47

Iowa Code Ann. §§ 76.16, 76.16A ..................................................47

La. Stat. Ann. §§ 39:1410.60, 39:1410.64 .......................................47

Neb. Rev. Stat. § 13-402(2)(a).........................................................47

U.C.C. § 1-303 .................................................................................91

U.S. Const. amend. V........................................................................79

## LEGISLATIVE MATERIALS

H.R. Rep. No. 95-595 .......................................................................88

H.R. Rep. No. 100-1011 (1988).....................................................34, 36

S. Rep. 100-506................................................................................48

## OTHER AUTHORITIES

Antonin Scalia & Bryan A. Garner,
    *Reading Law: The Interpretation of Legal Texts* 107–12 (2012).......................59

Report of the National Bankruptcy Conference on Proposed
    Municipal Bankruptcy Amendments, reprinted in 134 Cong. Rec.
    H596–H600 (daily ed. Feb. 2, 1988) .................................................................48

## PRELIMINARY STATEMENT

This Court previously held that Appellant bondholders' collateral is limited to the Puerto Rico Electric Power Authority ("PREPA")'s Net Revenues—that is, the revenues remaining after PREPA pays expenses provided for in the Trust Agreement and Bankruptcy Code § 928(b).  The bondholders now claim entitlement to an administrative-expense claim merely because PREPA allegedly consumed that collateral.  The Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") says otherwise.  Under PROMESA, a Title III debtor's expenditure of collateral can give rise to an administrative-expense claim only if (*i*) the debtor previously provided adequate protection; (*ii*) that protection proves insufficient; and (*iii*) the creditor has a claim arising from the automatic stay due to lost collateral value.  11 U.S.C. § 922(c) (incorporated into PROMESA by 48 U.S.C. § 2161(a)).  The bondholders do not satisfy those statutory criteria, primarily because they were never provided adequate protection.

Congress could easily, but wisely did not, enact a statute granting administrative claims to creditors who contend only that their collateral is consumed by the debtor.[1]  It was wise because collateral can be consumed for

---

[1] Notably, the bondholders conceded in their last pleading below that the administrative claim they seek only has recourse to Net Revenues, in line with this Court's ruling that their remedies for defaults under the Trust Agreement are all limited in recourse to the Net Revenues.  Dkt. No. 5700 at 1, No. 17-bk-4780 (D.P.R.) ("[The bondholders] are not seeking to execute on PREPA's physical

1

many reasons, including to create or support other collateral or, where the creditor contends it is fully secured (as the bondholders sometimes have claimed), consumption of collateral leaves the creditor whole. Here, the bondholders alleged that their collateral was consumed "for the maintenance of the debtor," and that PREPA continuously generated more collateral following that maintenance. Joint Supplemental Appendix ("SA") at 410, 420. There is no cognizable claim for that.

In light of such issues, unsurprisingly, Congress enacted Bankruptcy Code § 922(c) to impose the three conditions listed above to the allowance of an administrative expense under § 503(b) for consumption of collateral. Section 922(c) accords with decades of practice under which (absent a post-petition debtor-creditor agreement) a debtor provides adequate protection only if the court orders it after considering how and for what purpose the debtor is using collateral.

Here, none of § 922(c)'s requirements were satisfied, as the Title III court recognized. *First*, the court never ordered adequate protection and PREPA never provided what was not ordered. The Title III court's opinion meticulously explains how, for their own reasons, the bondholders never followed through to decision any request for adequate protection even though, as this Court observed, the Trust Agreement had pledged revenues (to be defined in subsequent litigation), and the

---

assets, nor does an administrative expense claim confer such a right."); *In re Fin. Oversight & Mgmt. Bd. for P.R.* (*Lien-Challenge Appeal*), 121 F.4th 280, 313–14 (1st Cir. 2024).

2

bondholders repeatedly asserted a security interest in all revenues until this Court limited the security interest to Net Revenues. For years the bondholders have never argued their collateral was being wrongfully expended. Instead, for strategic reasons, they argued there was no collateral to expend. Bondholders note they asked for stay relief and the like multiple times. That is true. But between 2017 and 2023 they did not once argue that PREPA had been generating Net Revenues and misappropriating them. To the contrary, their position in each of the lift-stay motions filed during that time was that PREPA was not generating any Net Revenues, let alone misusing Net Revenues. They made these arguments despite having access to—indeed, citing for other purposes—the same "monthly operating reports" they now claim clearly show misappropriation of collateral. It was only after a change in counsel and litigation strategy in 2023 that the bondholders suddenly asserted the reports were "binding" demonstrations of collateral misappropriation that entitled them to a retroactive allowance of an administrative claim.

*Second*, the Title III court explained that the bondholders did not aver facts showing that any loss was directly attributable to the automatic stay, especially in light of the bondholders having only requested permission to have a receiver appointed who would undertake to create collateral by requesting rate hikes (as this Court observed), but not to grab PREPA's Net Revenues—which the bondholders

3

then contended did not exist. Thus, the bondholders' allegations, if true, did not show the automatic stay caused losses.

That their § 922(c) claim was doomed to failure is likely why the bondholders provide only scant discussion or no discussion of it. Instead, they repeatedly suggest that Congress did grant administrative claims whenever collateral is consumed. But they cite no authority to back that up because there is none.

Despite § 922(c) imposing three specific conditions for the grant of an administrative claim for consumption of collateral under § 503(b), the bondholders ask this Court to interpret the general language of § 503(b)(1)(A) ("expenses of preserving the estate") to grant the same kind of administrative claim without satisfaction of the three conditions. Basic statutory interpretation bars interpreting the generalized authority of § 503(b) to allow without conditions what § 922(c) subjects to three conditions. If the bondholders can have an administrative claim under § 503(b) on these facts, § 922(c) would serve no purpose. In all events, § 503(b) grants an administrative claim only where a creditor furnishes new property or services to the debtor post-petition. Here, the only value provided by the bondholders to PREPA occurred pre-petition, which makes § 503(b) inapplicable.

4

Contrary to the bondholders' assertions, this appeal is not about whether they are left "without any remedy" for the misappropriation of their collateral. As noted, they could have sought stay relief based on these assertions at any time since PREPA filed—but they did not. And even now, they have a remedy for the alleged misuse they complain about: their accounting claim. Although it cannot give rise to an administrative claim, the bondholders are concurrently prosecuting their accounting claim—the claim this Court reinstated in 2024—to address the contentions that PREPA had misused their collateral by spending it on "unreasonable" Current Expenses. As this Court ruled, that claim can only be satisfied from Net Revenues, but it is nevertheless a remedy for the same contentions they raise in this appeal. The bondholders' complaint that they lack a remedy is thus erroneous. They were not deprived of a remedy—they just believed their prior litigation strategy was not obtaining enough success and tried to change horses mid-race.

The only question before this Court is whether the bondholders are entitled to an administrative-expense claim in addition to the accounting claim. Under settled law, the answer is "no." Their claims under §§ 922(c) and 503(b) fail for the reasons summarized above. And their claim under *Reading Co. v. Brown*, 391 U.S. 471 (1968), fails because (*i*) *Reading* does not apply to claims asserting a post-petition breach of a pre-petition contract and (*ii*) *Reading* only holds post-

5

petition torts by a bankruptcy trustee yield administrative liability and there is no tort here. PREPA used its own property to pay its own expenses—that is not a tort or inherently wrongful in any sense. PREPA used its own Net Revenues (if that is what they were) to pay expenses because Bankruptcy Code § 363 and its subsection (c)(2) are not incorporated into Title III, thereby not requiring consent or court approval to use cash collateral, and § 928(b) subordinates the bondholders' lien to the system's "necessary operating expenses."

The bondholders' Fifth Amendment takings claim fails because, among other reasons, they at most allege a breach of contract entered into by PREPA in its commercial (not governmental) capacity. Moreover, the bondholders agreed in the Trust Agreement on their remedies for all defaults, including defaults on covenants governing use of Net Revenues. As this Court held, the remedies are limited to resort to Net Revenues. At an even more fundamental level, the bondholders' taking claim fails because they neglect that the Fifth Amendment only applies to governmental takings and the bondholders do not even allege PREPA, a utility not empowered to enact laws, took Net Revenues in a governmental capacity. When the Supreme Court refers to the Fifth Amendment applying in bankruptcy cases, it refers to Congressional bankruptcy enactments effectuating takings.[2] Here,

---

[2] *See, e.g.*, *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 602 (1935) (applied Fifth Amendment to the Frazier-Lemke Act which deprived mortgagees of rights in their collateral in the public interest of sustaining farmers); *United*

PROMESA Title III does not create a taking.  It simply leaves PREPA and the bondholders to their respective rights, one of which enabled the bondholders to satisfy the requirements of § 922(c) to obtain an administrative claim (in their case, nonrecourse), but they failed to do so.  PREPA simply continued doing during its Title III case what it did before, namely use its monies to keep operating.  At no time was there a governmental taking.

The bondholders admit they seek a nonrecourse administrative-expense claim only to give them the ability to effectively veto PREPA's plan of adjustment by insisting on full payment in cash of that claim on the effective date of the plan—something PREPA may not have the cash needed to accomplish.[3]  *See* Dkt. No. 5700 at 1.[4]  At the same time, they have been actively resisting attempts to value their collateral so as to determine how much they need to be paid in a plan of adjustment for PREPA, because it might show they are undersecured and not entitled to payment in full.  The Title III court correctly held they are not entitled to

---

*States v. Security Industrial Bank*, 459 U.S. 70, 75 (1982) (statute exempted property serving as creditor's collateral and the Fifth Amendment question was "whether the enactment takes property within the prohibition of the Fifth Amendment").

[3] *See* n.1, *supra*.

[4] "Dkt. No." cites refer to the Title III case below, No. 17-bk-4780 (D.P.R.), unless stated otherwise.

an administrative-expense claim on these facts, for the express purpose of giving themselves more leverage over the case.  The decision below should be affirmed.

## STATEMENT OF THE ISSUES

1.     Did the Title III court correctly determine that the bondholders are not entitled to an administrative-expense claim under 11 U.S.C. § 922(c) because (*i*) they were never provided adequate protection that proved inadequate, and (*ii*) they have no claim arising from the automatic stay, both of which are requirements under the statute?

2.     Did the Title III court correctly determine that the bondholders are not entitled to an administrative-expense claim under 11 U.S.C. § 503(b) because there is no qualifying post-petition transaction between PREPA and the bondholders?

3.     Did the Title III court correctly hold that the bondholders fall outside the ambit of the "fundamental fairness" doctrine of *Reading Co. v. Brown*, 391 U.S. 471 (1968), given that their right to payment arises from a pre-petition contract?

4.     As an alternative ground for affirmance, do the nonrecourse limitations in the Trust Agreement preclude the administrative-expense claim asserted by the bondholders, especially in light of the bondholders' concession below (Dkt. No. 5700 at 1) that "they are not seeking to execute on PREPA's

physical assets, nor does an administrative expense claim confer such a right."?

## STATEMENT OF THE CASE

### A.    PREPA and the PREPA Bonds

PREPA is a public corporation charged with managing Puerto Rico's energy resources. *See* 22 L.P.R.A. §§ 191–240 (the "Authority Act"). PREPA is the sole utility provider of electricity in Puerto Rico.

The Authority Act authorizes PREPA to issue bonds and to secure them by "pledging or placing a lien on all or any of its contracts, revenues, and income." 22 L.P.R.A. § 196(o). PREPA has issued a series of bonds pursuant to that authorization under a Trust Agreement. Joint Appendix ("App") at 491–618. Appellants hold and insure bonds issued under the Trust Agreement.

The Trust Agreement gives PREPA broad authority to pay the expenses needed to keep its public electricity system operational before paying debt service. Specifically, the Trust Agreement provides that "all Revenues . . . will be deposited as received . . . to the credit of the General Fund" and "will be used first for the payment of Current Expenses of the System." App558, 560 (TA §§ 503, 505). Only after operating expenses are paid, and a reserve for two months of future expenses reserved, will the remaining revenues (the "Net Revenues") be transferred to other funds to pay debt service on the bonds. App563–68 (TA

9

§§ 506–507).  The term "Current Expenses" is broadly defined to cover all of PREPA's "reasonable and necessary current expenses of maintaining, repairing and operating the System," including "all . . . expenses required to be paid by [PREPA] . . . by law, or permitted by standard practices for public utility systems, similar to the properties and business of [PREPA]."  App513 (TA § 101).

Sections 701, 804 and 805 of the Trust Agreement provide that the bonds are nonrecourse obligations—meaning they are payable solely from the collateral securing those bonds.  *See* App583 (TA § 701) (bonds are "payable solely" from "Revenues" made payable to bondholders under the Trust Agreement); App598 (TA § 804) (the Trustee may "collect" a judgment relating to the bonds "solely from moneys in the Sinking Fund and any other moneys available for such purpose"); *id.* (TA § 805) (bonds payable from "moneys . . . available . . . for" the "purpose" of paying bonds, *i.e.*, Net Revenues).  The bondholders' only claim under their bonds and the Trust Agreement is therefore to the "Net Revenues" in which they have a security interest; they are not entitled to any deficiency claim if their collateral proves insufficient.  *See Lien-Challenge Appeal*, 121 F.4th at 313–14.  Those nonrecourse limitations apply to any claim asserting that PREPA wrongly diverted Net Revenues from debt service.  *Id.* at 315.

10

## B.    Monthly Operating Reports

For decades until 2023, PREPA automatically issued "monthly operating reports" ("MORs") using pre-set software templates, which reflected certain unaudited information about PREPA's finances.  The MORs were interim reports subject to change; in fact, the MORs state on every page that the information is "INTERIM OPERATIONAL AND FINANCIAL INFORMATION SUBJECT TO CHANGE."  *See, e.g.*, App2528–2660.  Each MOR contained an unaudited schedule purporting to represent the "Net Revenues" for the applicable fiscal year. *See, e.g.*, App2547–48.

The MORs were prepared using a methodology that PREPA had been using for decades to prepare these public-facing financial reports.  Later independent investigations found that PREPA's financial disclosures to the bondholders "inflated revenue figures and represented . . . that the debt coverage met the requirements under the PREPA Trust Agreement" when in fact "PREPA's rates were insufficient to cover its operating expenses."  SA214–15.  As a result, the MORs both overstate revenues (by including, for example, revenue from municipalities that do not pay for their electricity) and understate "Current Expenses."

The bondholders never previously treated the MORs as accurately stating PREPA's Net Revenues despite having access to them before and during PREPA's

11

Title III case and using them for other purposes during the Title III case.  To the contrary, prior to PREPA's Title III case, the bondholders negotiated forbearances of PREPA's repayment obligations even though the MORs indicated that hundreds of millions of dollars' worth of Net Revenues were supposedly being generated each year.  *See, e.g.*, SA22–97.  After the Title III case commenced, the bondholders filed motions acknowledging that for years, "PREPA has been unable to generate adequate cash flow to service PREPA's debt obligations on the Bonds as required by the Trust Agreement."  App807.  The bondholders only began invoking the MORs as evidence of the existence of Net Revenues in 2023 after certain of them changed counsel.

### C.    PREPA's Title III Case

In 2016, Congress enacted PROMESA to address Puerto Rico's mounting financial crisis.  Congress found that a "combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing has created a fiscal emergency in Puerto Rico" that has jeopardized the government's ability to "provide its citizens with effective services."  48 U.S.C. § 2194(m)(1)–(2).

PREPA suffered from those same issues and more.  Due to "chronic underinvestment," for "decades, PREPA has suffered from aging infrastructure, deferred maintenance, and operational and financial challenges."  SA220.

Historically, PREPA has "underinvested in its electrical infrastructure relative to other utilities." SA221. As a result, "PREPA's generation plants significantly underperform with respect to forced outages when compared to virtually all power plants throughout the United States." *Id*. PREPA's customers nevertheless pay some of the highest electricity rates in the United States. SA222.

On July 2, 2017, the Board filed on behalf of PREPA a petition for relief under Title III of PROMESA. At the time, approximately $8.4 billion in principal and interest on PREPA's bonds remained outstanding.

### D.    The Bondholders' Actions During the Title III Case

From 2017 until early 2023, the bondholders never alleged that PREPA was generating and spending Net Revenues in which the bondholders held a security interest. Instead, they took positions directly to the contrary and consistent with reality.

### 1.    *The 2017 Lift-Stay Motion*

Within two weeks of the commencement of PREPA's Title III case, certain bondholders filed a lift-stay motion. App801. That motion did not mention the MORs or contend that PREPA was generating or misappropriating Net Revenues. To the contrary, that motion asserted that stay relief was necessary precisely because PREPA was failing to generate Net Revenues. According to the motion, PREPA's "current rate is inadequate to generate sufficient revenues to pay debt"

13

and "PREPA has been unable to generate adequate cash flow to service PREPA's debt obligations on the Bonds as required by the Trust Agreement." App806–07. The motion further recognized that because of those "cash flow issues," the movants had been required to "advance[] hundreds of millions of dollars of new liquidity to PREPA to avoid payment defaults." App807. These assertions were made even though the bondholders had access to the MORs, which stated that PREPA had supposedly been generating millions in Net Revenues. Indeed, the bondholders even cited recent MORs in the 2017 lift-stay motion for other purposes, showing they were aware of them but were not relying on them as evidence of the existence and diversion of Net Revenues. App820.

The 2017 lift-stay motion did not ask for adequate protection of the bondholders' security interest in Net Revenues. Instead, it asked the Title III court to grant stay relief to allow the movants to seek appointment of a receiver to run PREPA in the hopes that the receiver would create collateral, Net Revenues. App807. In connection with the 2017 lift-stay motion, PREPA submitted a declaration stating that PREPA had no Net Revenues. SA100. The bondholders did not contest that declaration.

The Title III court denied the 2017 lift-stay motion. On appeal, this Court vacated that decision and remanded to allow the bondholders to file a new motion that took into account the two major hurricanes that had recently struck Puerto

14

Rico.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d 13, 18–22 (1st Cir. 2018).  The Court held that, in any future motion for stay relief, the parties should consider the "value of the bondholders' collateral (if any exists), whether the bondholders face a threat of uncompensated diminution in such value," and "whether the bondholders are seeking the protection of existing collateral or, instead, the creation of new collateral."  *Id.* at 23.[5]

### 2.    *The 2018 Lift-Stay Motion*

While the 2017 lift-stay motion was on appeal, Puerto Rico was hit by two major hurricanes that devastated PREPA's grid, "damag[ing] more than 2,700 transmission poles, 41 percent of PREPA's inspected substations, and 75 percent of PREPA's T&D circuits."  SA220.  Given the extent of the damage, Puerto Rico's Governor declared a state of emergency, which pursuant to Puerto Rico law halted the collection of electricity bills.  22 L.P.R.A. § 240a(a) (preventing PREPA from billing customers during a state of emergency).[6]

Approximately two months after this Court's ruling on the 2017 lift-stay motion, certain bondholders filed a new lift-stay motion seeking the appointment

---

[5] As explained below, the Court later held that the bondholders' collateral is limited to Net Revenues acquired by PREPA.  *Lien-Challenge Appeal*, 121 F.4th at 306–07.

[6] Even during the period when PREPA was not collecting any revenues, the unreliable MORs showed PREPA generating Net Revenues based on accrued revenue rather than money actually received.  *See, e.g.*, App2527–53.

15

of a receiver.  App860–903.  Like the prior motion, the 2018 lift-stay motion did not contend that PREPA was generating or misappropriating Net Revenues.  To the contrary, the 2018 lift-stay motion alleged that PREPA's "collection efforts remain abysmal"; PREPA had "missed opportunities for fiscal stabilization"; and PREPA relied on loans from other governmental entities "to mask its liquidity issues" and "set its budget based on the expectation that it would receive sufficient funding to balance the budget."  App868, 872.  The 2018 lift-stay motion further alleged that PREPA was not "transparent about its financial condition."  App875; *see also* App877 ("PREPA also fails to reliably forecast its own revenues and expenses").  The 2018 lift-stay motion requested stay relief not to address misappropriation of Net Revenues (which was not alleged) but rather to obtain appointment of a receiver to address PREPA's "unnecessary expenses and lost revenue" that was allegedly hampering PREPA's ability to generate positive cash flow.  *Id.*  The MORs were again cited for other purposes, but not to argue that PREPA had been generating Net Revenues or misusing them.  *See* App875.

### 3.    *Abandonment of the 2018 Lift-Stay Motion*

The movants agreed to several extensions for PREPA to oppose the 2018 lift-stay motion.  Then, in May 2019, the Board, PREPA, AAFAF, and certain bondholders entered into a restructuring support agreement (the "RSA").  App961–1088.  The RSA was amended in September 2019 to allow more bondholders to

16

become parties. *See* Dkt. No. 1702-4, Ex. 4. The RSA required movants to withdraw the 2018 lift-stay motion, which the bondholders acknowledged in a September 2019 joint filing. *See id.* at § 3(a); Dkt. No. 1637 at 3. The Title III court accordingly stayed all deadlines with respect to the lift-stay motion. SA109–11.

The RSA was subject to approval by the Title III court, and any party could terminate the RSA if court approval under Federal Rule of Bankruptcy Procedure 9019 was not secured by August 30, 2019. App999. The RSA further provides that if such termination occurs, the "RSA shall be deemed to have been void *ab initio* and shall be of no further force and effect." App1003.

In May 2019, PREPA sought approval of the RSA from the Title III court. In the face of objection by other PREPA stakeholders, the deadlines related to approval of the RSA were consensually adjourned into 2020, without objection by the bondholders. Dkt. Nos. 1697, 1700, 1701; App1090–91.

Then the COVID-19 pandemic hit. In March 2020, the Board and AAFAF moved to adjourn all deadlines related to the RSA's approval *sine die*. Dkt. No. 1947. Once again, no bondholder objected, and the deadlines were indefinitely adjourned. App1090–91. No action was then taken by the bondholders for more than two years.

#### 4.    Termination of the 2019 RSA

In February 2022, certain bondholders moved to compel mediation related to the RSA and to require the Board to file a plan of adjustment.  SA120–46.  The Title III court denied that motion on March 8, 2022 but set deadlines for the Board to move forward with the 9019 motion and Title III case.  SA150–63.

That same day, AAFAF exercised its contractual right to terminate the RSA, citing significant changes in circumstance since the RSA's execution, including "worldwide economic conditions, such as rising inflation and significant surges in the price of crude oil."  App1092–1102.

#### 5.    The 2022 Lift-Stay Motion

In September 2022, certain Appellant bondholders moved to dismiss PREPA's Title III case or, in the alternative, to lift the automatic stay.  App1103–46.  The movants asserted that their motion was "not premised on a lack of adequate protection or the extent of the bondholders' collateral."  App1139.  Instead, it was premised on an alleged "want of prosecution" and "unreasonable delay" in advancing PREPA's case.  *Id.*  Like the prior lift-stay motions, the 2022 motion did not rely on the MORs or argue that PREPA was generating or misappropriating Net Revenues.

At a hearing later that month, the Title III court stayed the 2022 lift-stay motion based on its finding that the motion could "disrupt an already complex

18

process"; the court instead ordered that the parties should first litigate the scope of bondholders' security interest and recourse rights. SA211. The bondholders did not object to that proposed course of action. To the contrary, some of them had proposed a similar approach. *See* SA190, 211.

### 6.    *The Lien-Challenge Litigation*

In accordance with the Title III court's scheduling order, the Board filed a revised complaint against Appellant U.S. Bank challenging the bondholders' lien and recourse rights. Dkt. No. 26, No. 19-ap-391 (D.P.R.). The bondholders filed an answer and counterclaim on October 7, 2022. It was in that answer and counterclaim that the bondholders first raised the allegation that PREPA may have possessed Net Revenues that it misappropriated; however, it did not cite to the MORs as the basis for the claim. SA618. The answer and counterclaim requested an "accounting" to address the alleged misappropriation. SA624. It did not ask for stay relief or payment of adequate protection.

At summary judgment, the Title III court held that (*i*) the bondholders' security interest was limited to Net Revenues deposited into certain named funds held with the Trustee; and (*ii*) the bondholders held an unsecured recourse claim, which the court later estimated. *See* App631–32, 695–96. The Title III court subsequently dismissed the bondholders' counterclaims (including the accounting counterclaim) as a matter of law. App736–800.

19

On appeal, this Court reversed in part, holding that (*i*) the bondholders' security interest extended to PREPA's present and future Net Revenues regardless of their deposit into certain funds; (*ii*) the bondholders' claim is limited to recourse against Net Revenues; and (*iii*) the accounting counterclaim could go forward but could only be satisfied from present and future Net Revenues. *Lien-Challenge Appeal*, 121 F.4th at 315–16.

### 7.    The 2023 Lift-Stay Motion

In August 2023, while the Title III court's lien-challenge decision was on appeal, Appellants GoldenTree (after changing counsel) and Syncora filed a new request for relief from the automatic stay. App1152–86. That motion was the first lift-stay motion to allege that PREPA had generated Net Revenues under the Trust Agreement and misappropriated them by spending them on inappropriate operating expenses. App1158. It was also the first time the bondholders relied on the MORs to assert any diminution in existing Net Revenues. App1164–65. The 2023 lift-stay motion nevertheless did *not* request adequate protection for the misappropriation of those alleged Net Revenues—it again sought stay relief so that bondholders could appoint a receiver to run PREPA. App1174.

On August 25, 2023, the Title III court stayed consideration of the 2023 lift-stay motion because it was "substantially duplicative" of the 2022 lift-stay motion that was already subject to a litigation stay. App1187–1190. On appeal, this Court

20

affirmed the Title III court's decision.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 91 F.4th 501 (1st Cir. 2024).

### 8.    *The 2024 Lift-Stay Motion*

In February 2024, certain bondholders filed another stay-relief motion. SA239–86.  This was styled as a "renewed" request for stay relief and was substantively similar to the 2023 lift-stay motion.  It similarly complained of Net Revenue misappropriation, but instead of requesting adequate protection of their security interest it once again sought appointment of a receiver.  SA264–67. Movants later filed a consensual request to postpone the hearing on the 2024 lift-stay motion.  SA300–08.

Following this Court's decision in the lien-challenge appeal in June 2024, the Title III court stayed all litigation in PREPA's Title III case and ordered the parties into mediation.  SA377–78.  The 2024 lift-stay motion remains subject to that litigation stay.

The Title III court has since amended the litigation stay twice to permit the bondholders to go forward with litigation concerning their claims in an orderly manner.  App1489; SA488.  Pertinent to this appeal, the court partially lifted the litigation stay to permit briefing on the bondholders' right to an administrative-expense claim.  App1489.  Subsequently, the Title III court partially lifted the litigation stay to permit the bondholders to go forward with their accounting claim

21

alleging—the same as the motion here—that PREPA misused Net Revenues during the Title III case.  SA488.

### E.    The Order Under Review

The bondholders argued below that they are entitled to a claim with administrative-expense priority of more than $3.7 billion.  In support, they argued that PREPA had allegedly been generating Net Revenues since 2017 and then misappropriating them by spending them on maintenance and other expenses required to keep the lights on in Puerto Rico but that the bondholders contend were neither "Current Expenses" under the Trust Agreement nor "necessary operating expenses" under § 928(b).  The motion contended that the bondholders were entitled to an administrative claim under either 11 U.S.C. § 503(b) or § 922(c).

The Title III court denied the motion on March 16, 2026.  The court first rejected administrative-expense priority under 11 U.S.C. § 503 because the bondholders were alleging a breach of the Trust Agreement, which "is a prepetition nonexecutory contract."  Addendum to Opening Briefs ("Add") at 27.  Moreover, the bondholders "did not proffer that they took any action, or entered into any transaction with PREPA, following the Title III filing for which they are seeking an administrative expense claim as compensation."  *Id.*  Because there

22

was no post-petition transaction between the bondholders and the debtor, there could be no administrative-expense claim under § 503. *Id.* at 28–29.

The Title III court also rejected the bondholders' invocation of the "fundamental fairness" doctrine in *Reading*, 391 U.S. 471, because that doctrine does not apply to "prepetition creditors like the Bondholders" complaining of a breach of their pre-petition bond indenture. Add31–37. The court further held that the bondholders failed to allege any plausible tort claims in any event, which precludes resort to the fundamental fairness doctrine. *Id.*

The Title III court also rejected the claim to administrative-expense priority under 11 U.S.C. § 922(c). As the court explained, a prerequisite to § 922(c) is that the debtor provided adequate protection to the creditor. Add38. Because the bondholders never obtained adequate protection for PREPA's supposed (mis)use of Net Revenues, this condition was not satisfied. *Id.* at 38–40. Moreover, the court explained that § 922(c) requires a showing of a loss arising directly from the automatic stay, which bondholders likewise did not allege. *Id.* at 40–41.

This appeal followed.

23

## SUMMARY OF ARGUMENT

**I.** The bondholders do not have an administrative-expense claim under 11 U.S.C. § 922(c) because they do not satisfy that provision's requirements. *First*, a creditor can obtain an administrative claim under § 922(c) only "[i]f the debtor provides, under section 362, 364, or 922 . . . adequate protection" to the creditor and the adequate protection subsequently proves to have been insufficient. PREPA never provided the bondholders with adequate protection. Indeed, the bondholders never even asked for adequate protection for their new and current allegations of misuse of their collateral. Absent the provision of adequate protection, their § 922(c) claim necessarily fails.

*Second*, for a claim to be accorded administrative-expense status under § 922(c), the creditor must "ha[ve] a claim arising from the stay of action against such property under section 362 or 922." The bondholders do not have a claim arising from the stay because the stay did not cause their alleged loss. They did not raise the issues they now complain about for years. To the contrary, they argued the opposite for more than a decade—that PREPA was not generating positive cash flow or enough money to pay bondholders, despite citing to the MORs for other purposes. Any harm they suffered springs from their own litigation decisions, not from the automatic stay. They had a remedy—they could have asked for a turnover of the purported Net Revenues. In light of 48 U.S.C. § 2165, the Court

24

could have told PREPA it would dismiss its Title III case if PREPA did not turn over monies.  They did not seek that remedy then or now, perhaps because they realize a turnover could easily force PREPA to stop operating.

The bondholders' position is that they are entitled to an administrative-expense claim simply because PREPA used its own revenues to keep its electrical system operational and some of those expenses were allegedly not permitted by the Trust Agreement.  But absent a contemporaneous and successful request for stay relief to allow them to take actions to recover the purported Net Revenues—which bondholders could have but did not make—such a claim is for the mere use of property, and § 922(c) does not provide an administrative-expense claim for the mere use of property.  Section 507(b) does provide for such a claim arising from "use" but that language was not carried over to § 922(c), unlike almost all the rest of § 507(b).  Construing § 922(c) to give rise to a claim from the debtor's mere use of cash collateral in these circumstances would go against the entire structure of PROMESA and this Court's precedents regarding 48 U.S.C. § 2165, which explicitly bar the Title III court from entering any kind of order that might interfere with the debtor's use of its revenues.

**II.**  The bondholders do not have an administrative-expense claim under § 503(b) either.  As a matter of statutory interpretation, when § 922(c) provides conditions that must be satisfied for a claim for the use of collateral to "be

25

allowable as an administrative expense under section 503(b)," it follows that

§ 503(b) cannot be interpreted to allow an administrative expense without

satisfaction of those conditions.  Moreover, to have a claim under § 503(b), a

claimant must have entered into a post-petition transaction with the debtor.  *See,*

*e.g.*, *UTIER v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.*

*Bd. for P.R.)*, 7 F.4th 31, 39 (1st Cir. 2021).  The bondholders have not entered

into any post-petition transaction with PREPA and thus are not eligible for an

administrative-expense claim under § 503(b).

All PREPA is alleged to have done is use its own monies to pay for goods

and services to maintain its system.  The bondholders were not involved in those

transactions.  The only nexus between the transactions and the bondholders is that

the bondholders allege PREPA breached the pre-petition Trust Agreement by using

Net Revenues for those transactions.  But it is well established that the breach of a

pre-petition agreement cannot give rise to an administrative-expense claim under

§ 503(b).

**III.**  Nor do the bondholders have an administrative-expense claim under

*Reading*, 391 U.S. 471.  *Reading* does not apply to a creditor alleging a post-

petition default of a pre-petition contract.  Instead, it recognizes a narrow set of

fairness claims for liabilities generated by the debtor's post-petition operations—

costs ordinarily incident to operating the business, such as tort injuries, regulatory

26

violations, and statutory employment claims. *See id.* at 477–78, 482–85; *In re Hemingway Transp., Inc.*, 954 F.2d 1, 5 (1st Cir. 1992). *Reading* relaxes the usual requirement that an administrative expense benefit the estate. But it does not erase the basic bankruptcy distinction between claims arising pre-petition and post-petition. *See Hemingway*, 954 F.2d at 7; *In re Bos. Reg'l Med. Ctr., Inc.*, 291 F.3d 111, 126 (1st Cir. 2002). This Court has therefore recognized that *Reading* does not encompass a right to payment originating in a pre-petition contract with the debtor. *Hemingway*, 954 F.2d at 7 & n.7. Moreover, Congress enacted PROMESA in 2016 and § 922(c) in 1978, well after *Reading* was decided in 1968.

This Court's rule resolves this appeal. However the bondholders style their theory—as conversion, taking, or fundamental unfairness—the asserted right to payment arises from the pre-petition Trust Agreement. Their complaint is that PREPA pledged Net Revenues, agreed to apply them through the Trust Agreement's waterfall, and then allegedly spent those revenues to maintain operations in derogation of that waterfall. As this Court stated, the bondholders' right to payment is "rooted in the covenants outlined in the Trust Agreement," and any remedy for alleged diversion of Net Revenues remains subject to the same nonrecourse limits that govern the bonds. *Lien-Challenge Appeal*, 121 F.4th at 311, 315–16. Relabeling their contractual grievance as a *Reading* claim does not

27

transform the bondholders' pre-petition contractual bargain into a post-petition administrative expense.

Moreover, *Reading* is only a priority doctrine. It does not create liability. The bondholders therefore must identify an independent tort claim before they can seek *Reading* administrative status. They have not done so. Their conversion theory fails under Puerto Rico law because conversion protects only an owner or possessor of property, and the bondholders are neither. *See Hull-Dobbs Co. v. Sup. Ct.*, 81 D.P.R. 221, 228–29, 234–40 (1959) (official translation included at SA1–12). It also fails because every asserted duty to preserve, segregate, deposit, or apply Net Revenues arises from the Trust Agreement. Puerto Rico law treats such a claim as contractual, not tortious. *See Ramos Lozada v. Orientalist Rattan Furniture Inc.*, 130 D.P.R. 712, 728–29 (1992) (official translation included at SA13–21); *TLS Mgmt. & Mktg. Servs. LLC v. Rodríguez-Toledo*, 2018 WL 1626100, at *12–13 (D.P.R. Mar. 30, 2018), *rev'd on other grounds*, 966 F.3d 46 (1st Cir. 2020).

The bondholders' taking theory similarly fails because (1) there was no taking by a governmental entity acting as such and (2) bondholders cannot invoke the Takings Clause to escape the terms of their contract. As to the first, it is well settled that "when a municipality acts in a contractual or proprietary capacity, actions such as contract termination or detention of property under the contract that

28

would constitute a simple breach of contract when a non-governmental entity is involved do not become a constitutional violation simply because the contracting party is a municipality." *Massó-Torrellas*, 845 F.3d at 468; *see also Preston Hollow Cap., LLC v. Cottonwood Dev. Corp.*, 23 F.4th 550, 554 (5th Cir. 2022). Here, PREPA is not even a municipality (*i.e.*, a city government). It is a utility owned by a government. PREPA's entry into the Trust Agreement, and its conduct in continuing to operate its electricity utility business, constitute commercial acts, not sovereign acts, and as such no taking can lie. Consequently, none of the bondholders' cases have any application, because they involved situations where the United States itself took property by enacting a statute or acquiring property and using sovereign immunity to render a lien unenforceable. There is no argument that PROMESA did that here and, even if it did, bondholders' remedy would be to sue the United States under the Tucker Act for compensation, not to assert a claim against PREPA.

As to the second, it is also well settled that "where, as here, a contract between a private party and the Government"—let alone a utility owned by the Government—"creates the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in contract, not taking." *Tamerlane, Ltd. v. United States*, 80 Fed. Cl. 724, 738 (2008). Here, the bondholders agreed to terms in the Trust Agreement limiting their remedy if PREPA misappropriated Net

Revenues or otherwise breached the Trust Agreement to their nonrecourse contractual claims. Those terms would have no meaning if bondholders could simply assert the same behavior also constituted a taking and evade those contractual limits. The contract governs, and again excludes the bondholders' taking claims.

**IV.** The Title III court's decision was correct for a separate reason: the Bonds' nonrecourse provisions. This Court has already ruled that any claim for misappropriation of Net Revenues to pay allegedly "unreasonable" Current Expenses "will not expand the Bondholders' recourse beyond the Net Revenues." *Lien-Challenge Appeal*, 121 F.4th at 315. As this Court put it, "that claim will not entitle them to reach any moneys or funds in which they do not already hold a security interest." *Id.* at 316. That means, here, that bondholders have no contractual or other basis to assert an administrative-expense claim separate from their bond claim for the alleged misappropriation of their collateral—they agreed that, even if their collateral was harmed, they would be cabined to their bond claims alone and their security interest in present and future Net Revenues.

**V.** The bondholders ask this Court to rule that the MORs are "binding" factual representations that $3.7 billion of Net Revenues existed between 2017–2023. That issue was not before the Title III court, does not answer any question that is on appeal, and thus should not be considered by this Court. In any event,

30

the argument relies on statutory language concerning "course of performance" not adopted into Puerto Rico law and, even if they were applicable, would not make the MORs "binding."

## STANDARD OF REVIEW

This Court "review[s] the Title III court's legal conclusions de novo" and its "application of the law to the facts for abuse of discretion." *Abraham Giménez Plaintiff Grp. v. Dep't of Transp. & Pub. Works (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 92 F.4th 355, 362 (1st Cir. 2024) (quoting *UTIER*, 7 F.4th at 36). "The Title III court's determination of whether a claim qualifies for administrative-expense treatment under [11 U.S.C.] § 503(b)(1)(A) is reviewed for abuse of discretion." *Id.* As shown by the foregoing authorities, within the abuse-of-discretion rubric, legal determinations are reviewed *de novo* and factual findings for clear error. *See United States v. Santana-Avilés*, 120 F.4th 7, 11 (1st Cir. 2024).

31

## ARGUMENT

**I. THE TITLE III COURT CORRECTLY HELD THE BONDHOLDERS DO NOT HAVE AN ALLOWABLE ADMINISTRATIVE-EXPENSE CLAIM UNDER § 922(c).**

### A. By Its Plain Terms, § 922(c) Does Not Provide the Bondholders with an Administrative-Expense Claim.

The Title III court correctly denied the bondholders an administrative-expense claim under 11 U.S.C. § 922(c) because they do not satisfy that provision's requirements.  Section 922(c) provides:

> If the debtor provides . . . adequate protection of the interest of the holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection such creditor has a claim arising from the stay of action against such property . . . , then such claim shall be allowable as an administrative expense under section 503(b) of this title.

11 U.S.C. § 922(c).  There are thus three prerequisites for an administrative-expense claim under § 922(c):  (*i*) the debtor must provide adequate protection of the creditor's security interest; (*ii*) the creditor must have a claim notwithstanding that adequate protection, and (*iii*) the claim must arise from the automatic stay.  As the Title III court held, however, the bondholders never sought or received adequate protection relating to any claimed misappropriation of their collateral, and they do not have a claim "arising from" the automatic stay where they never prosecuted an action for stay relief for turnover of the purported Net Revenues.

32

### 1.     The Bondholders Were Never Provided with Adequate Protection.

To invoke § 922(c), a creditor must first have been provided adequate protection under either §§ 362 or 922 (which provide for an automatic stay) or § 364 (which provides for priming post-petition financing and no one argues is applicable here).  11 U.S.C. § 922(c).  As the Title III court recognized, it never ordered adequate protection, and PREPA never provided it.  That decision was not in error, let alone an abuse of discretion.  The bondholders therefore cannot satisfy § 922(c)'s requirements and are not entitled to administrative-expense priority under § 922(c).  App48–50.

This Court previously held that the bondholders' collateral is limited to PREPA's present and future Net Revenues.  *See Lien-Challenge Appeal*, 121 F.4th at 290.  In their lift-stay motions filed prior to 2023, the bondholders did not argue that PREPA had any Net Revenues, let alone that they were being misappropriated.  Instead, the bondholders alleged that PREPA was *not* generating Net Revenues, which is why they needed a receiver to operate PREPA.  App807, 868, 872.  It is undisputed PREPA never provided the bondholders with adequate protection, either consensually or by court order.  Accordingly, § 922(c) by its terms does not provide an allowable administrative-expense claim.

This is not a mere technicality.  The requirement that a creditor first obtain adequate protection is critical to the operation of § 922(c).  Collateral can be

33

consumed for many different reasons, some of which may help creditors and others not.  Here, for example, the bondholders allege that PREPA used their alleged collateral to maintain operations, which they allege generated more Net Revenues.  SA410, 420.  Congress therefore required that the trial court have an opportunity to determine whether adequate protection is warranted and necessary, and that the creditor's harm sprung from an attempt to benefit the debtor, before the consumption of collateral can result in an allowable administrative claim.  *See* H.R. Rep. 100-1011 at 7 ("New subsection (c) gives administrative claim status to a secured creditor who has been given adequate protection to protect its interest, but who suffers loss anyway . . . This is justified because the loss to the creditor is not due to the creditor's action, but rather to an attempt to benefit the debtor.").

Cases interpreting 11 U.S.C. § 507(b) are instructive in this regard.  The parties agree that § 922(c) is modeled on § 507(b), which applies in chapter 11 cases.  *See* Point I.B, *infra*.  Under § 507(b), a creditor that fails to obtain adequate protection may not assert an administrative-expense claim.  *See LNC Invs., Inc. v. First Fid. Bank, N.A.*, 247 B.R. 38, 50 (S.D.N.Y. 2000) (under § 507(b), "the creditor is not automatically entitled to a priority for the decline in value but is so entitled only where the creditor has specifically been provided with adequate protection") (quoting 4 Collier on Bankruptcy ¶ 507.12(1)(c)(ii) (15th ed. rev. 1999)); *Volvo Commer. Fin. L.L.C. Ams. v. Gasel Transp. Lines, Inc. (In re Gasel*

*Transp. Lines, Inc.)*, 326 B.R. 683, 692 (B.A.P. 6th Cir. 2005) ("An administrative claim awarded under § 507(b) must be predicated upon an affirmative grant of adequate protection to a creditor.") (quotation marks omitted); *In re James B. Downing & Co.*, 94 B.R. 515, 520 (Bankr. N.D. Ill. 1988) (similar); *Zions Credit Corp. v. Rebel Rents, Inc. (In re Rebel Rents, Inc.)*, 291 B.R. 520, 534 (Bankr. C.D. Cal. 2003) (similar).  The same rule should apply to § 922(c), which contains nearly identical language.

The bondholders do not cite any instance when they were provided with adequate protection.  Instead, they cite the RSA, which discussed "Adequate Protection Payments" that would follow approval of the RSA by the Title III court. *See* Assured Br. 13–14.  But as the Title III court explained, the RSA was never approved by the court, so PREPA never made adequate protection payments. Add40.  And once the RSA was terminated, it was "deemed to have been *void ab initio*." App1003.

The bondholders try to manufacture adequate protection by quoting certain statements by the Board out of context.  *See, e.g.*, Assured Br. 62–63, 66.  Below, the Board observed that PREPA's expenditure of its revenues to pay expenses was the best protection the bondholders could receive because it was the only way

35

PREPA could generate Net Revenues in the future.[7]  *See* Objection at 14.  Devoid of any actual adequate protection, the bondholders argue that this argument in a brief about PREPA's alleged use of Net Revenues provided them with adequate protection.  It did nothing of the sort.  Indeed, the entire thesis of bondholders' argument is that PREPA's use of the Net Revenues harmed them and that harm gives rise to a claim—the opposite of saying it provided them with adequate protection.  The Board's argument aligns with the legislative history of 11 U.S.C. § 928, which explains that operating expenses must be paid ahead of debt service because those expenses are necessary to keep the project or system operating "to generate the revenue to repay bondholders."  H.R. Rep. No. 100-1011, at 8 (1988).

Because the bondholders have never been provided with adequate protection, their cases are inapposite.  In each case, the creditor had received adequate protection by court order and therefore satisfied the equivalent prong of § 507(b).  For example, in the chapter 13 case *Grundy Nat'l Bank v. Rife*, 876 F.2d 361 (4th Cir. 1989), the debtor violated court orders that provided the creditor adequate protection in the form of money payments.  *Id.* at 364.  Because the

---

[7] This point was consistent with this Court's decision in *Peaje Investments LLC v. García-Padilla*, 845 F.3d 505 (1st Cir. 2017), where the court held that a creditor was not entitled to adequate protection where its collateral consisted of a continuing stream of toll revenues that were "constantly replenished."  *Id.* at 510. *Peaje* shows that bondholders were never entitled to adequate protection, not that they received it.

36

creditor had suffered a loss notwithstanding the adequate protection order, the creditor was entitled to an administrative-expense claim under § 507(b).  Here, the bondholders never obtained an adequate protection order, and so *Grundy* is inapposite.[8]

The bondholders argue that *In re Ctr. Wholesale, Inc.*, 759 F.2d 1440 (9th Cir. 1985), held that adequate protection is not a necessary prerequisite to an administrative-expense claim under § 507(b).  Assured Br. 63–64, 66–67.  But that case has been limited to its unusual facts, which are not present here.  The bankruptcy court in *Center Wholesale* did not order adequate protection for a junior lienor because the debtor misrepresented that the junior lienor would not be prejudiced by the cash collateral order.  The order had been entered without giving the creditor constitutionally required notice of the motion.  759 F.2d at 1449–51.  The Ninth Circuit held that due to the lack of notice the cash collateral order should be void, but that, to avoid disturbing the myriad of transactions done in reliance on the order, the bankruptcy court should consider instead granting the junior lienor a § 507(b) superpriority claim.  *Id*. at 1451.  The Ninth Circuit observed that "although not literally within the provisions of section 507, [the

---

[8] The bondholders' other cases are similarly inapposite because the creditors in those cases likewise were provided adequate protection.  *See In re Cal. Devices, Inc.*, 126 B.R. 82, 84 (Bankr. N.D. Cal. 1991); *In re J.F.K. Acquisitions Grp.*, 166 B.R. 207, 209 (Bankr. E.D.N.Y. 1994); *In re Mendez*, 259 B.R. 754, 759 (Bankr. M.D. Fla. 2001).

secured creditor's] injury is clearly within its spirit and deserves to be remedied by granting its claim a superpriority." *Id.* at 1451 n.23.

The facts here are nothing like *Center Wholesale*. Here, PREPA misled no one, and there was no violation of due process. Moreover, as the Title III court recognized, *Center Wholesale* is an outlier case espousing a "minority" position on § 507(b). Add38 n.22; *see also James B. Downing*, 94 B.R. at 520 (*Center Wholesale* espouses "a minority approach" that the court "does not agree with nor subscribe to"); *In re U.S. Lines, Inc.*, 79 B.R. 542, 549 (Bankr. S.D.N.Y. 1987) (suggesting that *Center Wholesale*'s holding "was made in order to avoid unwinding transactions that had taken place in reliance on a bankruptcy court order" that was granted "without adequate notice" and distinguishing it on the facts); *Doolittle v. County of Santa Cruz (In re Metzger)*, 346 B.R. 806, 819 (Bankr. N.D. Ill. 2006) (explaining *Center Wholesale* as a case concerning the court's power to craft a flexible remedy where "cash collateral order [was] void for inadequate notice").

### 2. The Bondholders' Alleged Harm Did Not Arise from the Automatic Stay.

The bondholders cannot satisfy the third requirement of § 922(c), either— that notwithstanding the provision of adequate protection, they have "a claim arising from" the automatic stay. Add40–41. Even assuming that PREPA was spending the bondholders' collateral (which is not the case), any harm to the

bondholders did not arise from the automatic stay but rather from the bondholders' decisions not to raise any complaint that Net Revenues existed but were being misappropriated or to request a turnover of Net Revenues.  Had they raised these issues the Title III court could have announced it would dismiss the Title III case if PREPA failed to turn over the alleged Net Revenues—but that did not happen.  Moreover, the bondholders' contention that they were harmed by not receiving $3.7 billion of Net Revenues allegedly generated over many years is a fiction because once PREPA relinquishes the first money it uses to maintain itself, it loses ability to generate the balance of the $3.7 billion of Net Revenues.

Courts applying § 507(b) have interpreted functionally similar language to require a showing that the stay was the "sole" cause of the creditors' harm.  *See, e.g.*, *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 869 n.9 (4th Cir. 1994); *In re Second Timmon Hotel Co., Ltd.*, 91 B.R. 985, 988 (Bankr. M.D. Fla. 1988); *In re Alyucan Interstate Corp.*, 12 B.R. 803, 809 (Bankr. D. Utah 1981).  If the harm results from other circumstances, administrative-expense priority is unavailable.  *See In re Callister*, 15 B.R. 521, 530 (Bankr. D. Utah 1981); *In re Mandile*, 626 B.R. 915, 920 (Bankr. N.D. Ill. 2021).  Here, the other circumstances range from limits on how much a poor population can pay for electricity, the antiquated and decrepit state of PREPA's infrastructure due to years of neglect, and the bondholders' failure to request a turnover of Net Revenues.

39

As the Title III court found, the bondholders failed to diligently seek to protect their rights by failing to seek adequate protection of their collateral. Add41. This was not a mere oversight. The bondholders determined that their best approach in litigation was to seek a receiver to run PREPA and that their best argument for a receiver was to assert that PREPA was *not* generating Net Revenues and thus could not pay debt service. *See* App807, 868, 872. A motion seeking adequate protection of Net Revenues or, in the alternative, to seek stay relief to pursue nonbankruptcy remedies to do so, would have forced the bondholders to submit to a valuation of their collateral, something they have never been willing to do. Although the bondholders now argue that PREPA's MORs supposedly show that PREPA has been generating Net Revenues for years, the bondholders had access to those MORs throughout the Title III case. Yet they never previously took the position that (*i*) PREPA was generating Net Revenues or (*ii*) PREPA was misappropriating those Net Revenues.

The bondholders argue they were diligent because they filed stay-relief motions during the Title III case. *See, e.g.*, Assured Br. 67–69. But those stay-relief motions were only pursued episodically as the Title III court explained (Add41), did not seek adequate protection or turnover of Net Revenues, and did not allege that PREPA was destroying Net Revenues.

40

What's more, as the Title III court found, the bondholders did not diligently pursue the lift-stay motions they did file.  Add41.  They did not seek adequate protection in their first stay-relief motion in 2017, and then voluntarily abandoned their 2018 lift-stay motion to pursue the RSA.  They then consented to numerous continuances of the hearing to approve the RSA.  It was not until three years later that they brought another lift-stay motion, but that motion again did not seek adequate protection.

Contrary to Assured's contention, applying the terms of § 922(c) to bar an administrative-expense claim does not penalize the bondholders for attempting to reach a settlement.  *Contra* Assured Br. 69.  Instead, it effectuates the purpose of § 922(c), which is not optional.  As aforesaid, if the bondholders had pressed for adequate protection, the trial court would likely have to value the expected future Net Revenues.  The bondholders clearly preferred not to take that risk.  Moreover, Assured and the other bondholders are highly sophisticated and represented by some of the best legal professionals in the country.  It defies common sense that they could not have both negotiated the RSA and positioned themselves to satisfy § 922(c).

### 3.    *The Mere Use of Property by a Debtor Does Not Give Rise to an Administrative-Expense Claim Under § 922(c).*

Critical differences between § 507(b) (which is *not* incorporated into PROMESA) and § 922(c) confirm that the mere expenditure of collateral does not

41

constitute harm "arising from" the automatic stay so as to justify an administrative-expense claim under § 922(c). The language of § 922(c) and § 507(b) is nearly identical, but it differs in one crucial way: Section 507(b) grants administrative-expense priority to a claim "arising . . . from the use, sale, or lease of [the debtor's] property under section 363." 11 U.S.C. § 507(b). That language makes clear that, in a case where § 507(b) applies (such as in chapter 11), § 507(b) will give priority to certain claims arising from the debtor's use of its property (if the other requirements of § 507(b) are met). Section 922(c) lacks that language, however. Under § 922(c)'s more limited scope, administrative-expense priority is granted only to a claim arising from the automatic stay. Under § 922(c), no priority is accorded to a claim arising "from the use, sale, or lease" of the debtor's property.

"[Where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). That Congress took the language of § 507(b) in most respects when it crafted § 922(c) but did not include the "use" language shows that Congress did not intend for the debtor's mere use of property to create an administrative-expense claim under § 922(c). *See Bartenwerfer v. Buckley*, 598 U.S. 69, 78 (2023) (construing omission of language in § 523(a)(2)(C), as compared to language in § 523(a)(2)(A) and (B), to have

42

meaning because "'[w]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act,' we generally take the choice to be deliberate.").

That difference between § 507(b) and § 922(c) is a function of the differences between corporate and municipal restructurings. In a corporate restructuring, § 363 permits a corporate debtor to "use, sell, or lease cash collateral" only if either the creditor with an interest in the cash collateral consents or the court authorizes the proposed use subject to the creditor receiving adequate protection. 11 U.S.C. § 363(c)(2); *see also In re Cross Baking Co.*, 818 F.2d 1027, 1031 (1st Cir. 1987). Section 363 thus "balances competing interests in a Chapter 11 reorganization" between "a debtor reorganizing his business," which "has a compelling need to use cash collateral in order to meet its daily operating expenses and rehabilitate its business," and its "secured creditor by only allowing the debtor to use cash collateral after it has procured either the secured creditor's consent or the bankruptcy court's permission upon a showing that the secured creditor's interest is adequately protected." *Marathon Petroleum Co., LLC v. Cohen (In re Delco Oil, Inc.)*, 599 F.3d 1255, 1258 (11th Cir. 2010).

Section 363 is not incorporated into PROMESA or chapter 9, however. *See* 48 U.S.C. § 2161(a); 11 U.S.C. § 901(a). As a result, "the Bankruptcy Code's restrictions on use, sale, or lease of property do not apply" to a municipal debtor.

43

*Assoc. of Retired Emps. v. City of Stockton (In re City of Stockton)*, 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012).  Instead, in a municipal bankruptcy, "the debtor is free to use, sell or lease property without regard to the restrictions in section 363."  *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991).  That freedom is confirmed by 48 U.S.C. § 2165 (PROMESA) and 11 U.S.C. § 904 (chapter 9), which provide that a court may not interfere with "any of the property or revenues of the debtor" or "the use or enjoyment by the debtor of any income producing property."  48 U.S.C. § 2165(2)–(3); *cf.* 11 U.S.C. § 904(2)–(3).  The language of § 2165/904 makes clear that a municipal debtor can freely use its property—including cash collateral—without any form of approval or interference by a Title III court or bankruptcy court.  *Lyda v. City of Detroit (In re City of Detroit)*, 841 F.3d 684, 695–96 (6th Cir. 2016); *In re City of Stockton*, 478 B.R. at 20.

The inclusion of § 2165/904 and the exclusion of § 363 mean that, in municipal restructurings, "the bankruptcy court cannot prevent a chapter 9 debtor from spending its money for any reason, even foolishly or in a manner that disadvantages other creditors, unless the municipality consents to such judicial oversight."  *In re City of Stockton*, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013).  Under this framework, "[s]hould a debtor [use its property] irresponsibly, the sole

44

remedy provided is dismissal for cause pursuant to section 930." *In re Richmond Unified Sch. Dist.*, 133 B.R. at 225.

The upshot is that creditors in a municipal bankruptcy case have fewer protections than in a corporate restructuring. But that is a feature, not a bug. Unlike in chapter 11, "[t]he primary purpose of debt restructur[ing] for a municipality is not future profit, but rather continued provision of public services." *In re Hardeman Cnty. Hosp. Dist.*, 540 B.R. 229, 239 (Bankr. N.D. Tex. 2015). For that reason, chapter 9 and PROMESA provide the "debtor with an array of bankruptcy powers to enable it to achieve financial rehabilitation with very few, if any, corresponding limitations and duties of the type to which a Chapter 11 debtor is subject." *Ochadleus v. City of Detroit (In re City of Detroit)*, 838 F.3d 792, 803 (6th Cir. 2016); *see also In re City of Desert Hot Springs*, 339 F.3d 782, 789 (9th Cir. 2003) ("Many of the protections afforded to creditors in the other [bankruptcy] chapters are missing in chapter 9."). The absence of restrictions on a municipal debtor is required by the Tenth Amendment. *See Lyda*, 841 F.3d at 695; *In re County of Orange*, 179 B.R. 195, 199–200 (Bankr. C.D. Cal. 1995).[9]

These differences between corporate and municipal restructurings underscore the fallacy of the bondholders' position. The bondholders' position is

---

[9] Although the Tenth Amendment does not apply to Puerto Rico, in enacting PROMESA, Congress treated Puerto Rico as if it does by copying the structure of chapter 9.

45

that they are entitled to a nearly $4 billion administrative-expense claim solely because PREPA expended cash collateral.  Even in a chapter 11 case, that position would be an overreach because of the many issues bearing on whether the use of collateral is beneficial or detrimental to the creditor.  It is even more of an overreach here because an order from a federal court imposing a $4 billion financial penalty on PREPA for using its own revenues would violate the principles of federalism embodied in 48 U.S.C. § 2165.  *See Aurelius Capital Master, Ltd. v. Puerto Rico*, 919 F.3d 638, 647–48 (1st Cir. 2019) (holding that § 2165 precludes entry of declaratory judgment restricting the Commonwealth's use of its revenues).

This is not an unfair result—rather, it is part of the bargain that was struck by bondholders when they invested in a publicly owned utility.  The Supreme Court has long recognized that where bondholders invest in an enterprise that is run for the benefit of the public, they cannot expect their rights to be treated as "absolute." *New Haven Inclusion Cases*, 399 U.S. 392, 491 (1970).  Thus where a reorganization law stripped bondholders of their rights to foreclose on their collateral and required the continued operation of the debtor railroad, at a loss, for the benefit of the public, resulting in "substantial" loss to the bondholders, there was "no constitutional bar to that result." *Id.*  Such bondholders "invested their capital in a public utility that does owe an obligation to the public . . . . By their

46

entry into a railroad enterprise, [they] assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs." *Id.* at 491–92. The same could be said here, essentially verbatim.

### B.    The Bondholders' Contrary Contentions Fail.

The bondholders have no meaningful response to the points made above. They cite corporate restructuring cases under § 507(b) to argue that a debtor must pay an administrative-expense claim if it uses cash collateral (Assured Br. 27 (quoting *Grundy*, 876 F.2d at 363)), but those principles do not apply in restructurings governed by § 922(c) (let alone where the basic prerequisites of the provision are not met, as here).

The bondholders and their amici further argue that PROMESA provides "restrictions" on a debtor's use of collateral by incorporating 11 U.S.C. § 928(a), which specifies that a lien continues to attach to special revenues acquired by the debtor post-petition. Assured Br. 34–35; Amici Br. 7–9.[10] But § 928(a) does not

---

[10] Despite warning that the decision below threatens municipal finance in their states, only seven of the thirteen amici states permit their municipalities unrestricted access to chapter 9. Three states (Alaska, Georgia, and Kansas) do not permit chapter 9 filings at all—either because they have not authorized them or because they expressly prohibit them—and three others significantly restrict access. *See* 11 U.S.C. § 109(c)(2) (entity may be a chapter 9 debtor only if "specifically authorized . . . by State law"); Ga. Code Ann. § 36-80-5; *see also* Iowa Code Ann. §§ 76.16, 76.16A; La. Stat. Ann. §§ 39:1410.60, 39:1410.64; Neb. Rev. Stat. § 13-402(2)(a). Their concerns about the consequences of the decision below are therefore overstated. Moreover, amici's brief repeatedly misstates chapter 9 law. For example, it rests much of its argument on the premise that

provide any rules about the use of the debtor's property.  Rather, it is a limited exception to 11 U.S.C. § 552(a), which would otherwise prevent a security interest from attaching to special revenues acquired by the debtor after the commencement of a municipal restructuring case.  *See* S. Rep. 100-506 at 12 (explaining that § 928(a) was intended to "negate Section 552(a) . . . and to go no further.").  As this Court has held, § 928(a) means the bondholders' security interest attaches to Net Revenues as they are acquired by PREPA during the restructuring.  But nothing in § 928(a) provides the bondholders with an administrative-expense claim based on PREPA's use of its revenues.

Far from suggesting that the debtor's use of its cash collateral can give rise to an administrative-expense claim, § 928 goes on to explain that any security interest in special revenues becomes "subject to the necessary operating expenses" of the debtor's system upon the filing of a Title III case.  11 U.S.C. § 928(b).  And Congress intended the *debtor* to decide what constitutes a "necessary operating expense"—not bondholders.  Report of the National Bankruptcy Conference on Proposed Municipal Bankruptcy Amendments, reprinted in 134 Cong. Rec. H596–H600, at H600 (daily ed. Feb. 2, 1988) ("NBC Report") ("In determining whether

---

PROMESA "explicitly require[s] debtors to continue paying pledged special revenues to bondholders" during the case under § 922(d) (Amici Br. 2–3)—a proposition this Court expressly rejected in *Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 919 F.3d 121, 132–33 (1st Cir. 2019).

operating expenses are 'necessary,' as provided in subsection (b), the court should not step beyond the bounds of Bankruptcy Code sections 903 and 904. This provision, like all others in chapter 9, [is] subject to the limitations of those sections. The provision should not permit the court to become involved in possible control over political or governmental functions."). In other words, § 928 subordinates the bondholders' right to their collateral to expenses PREPA determines are necessary to keep PREPA operational.

The bondholders next argue that 48 U.S.C. § 2165 has no bearing on this appeal because there is a "'duality' of ownership" of the Net Revenues between PREPA and the bondholders. Assured Br. 35–36. It would be a shock to the law of commercial transactions if suddenly property owned by a debtor and subject to a lien is to be treated as owned by the debtor and lienor in a "duality of ownership." This Court has already rejected that position, holding that a Title III debtor's use of its revenues cannot be interfered with even at the behest of a creditor with a security interest in those revenues. *See Aurelius*, 919 F.3d at 647–49. The Court also rejected the bondholders' other argument that Net Revenues are not PREPA's property because they are subject to a trust in the bondholders' favor. *See Lien-Challenge Appeal*, 121 F.4th at 314; *contra* GoldenTree Br. 30.[11]

---

[11] The bondholders' argument that § 2165 is irrelevant because a plan has to pay all administrative claims in full (*see* Assured Br. 37) misses the point because the

49

The bondholders finally argue that the Title III court's decision "would convert Section 363's absence [from PROMESA] into an immunity . . . for the debtor's consumption of the Bondholders' collateral." Assured Br. 65. That is false. Nothing prevented the bondholders from trying to prove that PREPA's use of Net Revenues to maintain itself was actually harming them and ask for turnover of the Net Revenues or stay relief on that basis. They did not do that and as a result they did not satisfy § 922(c)'s requirements. Their tactical decisions do not mean a Title III debtor is "immune" from any meritorious claim for misuse of collateral.

## II.    APPELLANTS' ADMINISTRATIVE-EXPENSE PRIORITY CLAIM UNDER § 503(b) FAILS.

The Title III court did not abuse its discretion when it determined the bondholders are not entitled to an administrative-expense claim under 11 U.S.C. § 503(b)(1)(A). Add28, 37. *First*, this Court's precedent is clear that a creditor must engage in a *post-petition* transaction with the debtor to justify application of § 503(b)(1). Here, the bondholders' right to payment arises from an alleged breach of the pre-petition Trust Agreement and therefore cannot be given administrative-expense priority under § 503(b)(1). *See* Point II.A, *infra*. The only post-petition conduct alleged by the bondholders is PREPA's alleged expenditure of Net

_____

issue here is whether they have an allowable claim in the first place, not how a plan must treat their claim.

50

Revenues.  But PREPA's use of alleged Net Revenues did not involve a transaction with creditors, let alone a transaction where the creditors provided new value post-petition to the debtor.

*Second*, § 922(c) is a specific statute requiring three conditions be satisfied to warrant allowance of an administrative-expense claim under § 503(b).  The "general-specific" canon requires that the specific provision in § 922(c) prevail over the general provision in § 503(b) for allowance of expenses to preserve the estate.  This is especially true here where § 922(c) expressly refers to § 503(b).  The "negative implication" canon in turn shows that § 922(c)'s allowance of an administrative claim for collateral use under § 503(b) when three conditions are satisfied negates the allowance of another administrative claim for collateral use under § 503(b) when the three conditions are not satisfied.  Thus, for the reasons explained in Point I, *supra*, the bondholders do not satisfy § 922(c), and they cannot circumvent § 922(c) by invoking § 503(b)(1).  *See* Point II.B, *infra*.

### A.    Section 503(b)(1) Priority Was Properly Denied Because There Was No Post-Petition Transaction Between PREPA and the Bondholders.

Section 503(b)(1)(A) provides that a court shall allow "administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)(1)(A).  Administrative expenses, in turn, are given priority over pre-petition unsecured claims by 11 U.S.C. § 507(a)(2).  Together,

51

those provisions implement the bankruptcy policy of facilitating the rehabilitation of an insolvent debtor by encouraging creditors to offer new credit to the debtor during its restructuring case. *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976); *Hemingway*, 954 F.2d at 5. Creditors would have no incentive to extend credit to an insolvent debtor unless their claims are paid first, so § 503(b)(1) "provides a priority for expenses incurred by the debtor-in-possession in order to maintain, preserve, or rehabilitate the bankrupt estate." *Mammoth Mart*, 536 F.2d at 954.

Administrative-expense priority under § 503(b)(1) is an exception to the Bankruptcy Code's policy of equality of distribution, and § 503 therefore must be construed narrowly. *Id.* at 953; *Hemingway*, 954 F.2d at 4–5; *Bos. Reg'l Med. Ctr., Inc. v. Mass. Div. of Health Care Fin. & Pol'y*, 365 F.3d 51, 57 (1st Cir. 2004). To that end, priority is available under § 503(b)(1)(A) only if "the right to payment arose from a postpetition transaction with the debtor estate, rather than from a prepetition transaction with the debtor." *Hemingway*, 954 F.2d at 5; *see also UTIER*, 7 F.4th at 39 (similar); *Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 758 (9th Cir. 1998) ("'When third parties are induced to supply goods or services to the debtor-in-possession . . . the purposes of [§ 503] plainly require that their claims be afforded priority' . . . The same principle does not apply, however, when the third party transacted with the debtor prepetition.").

52

Claims arising from a post-petition breach of a pre-petition contract are not accorded priority under § 503(b)(1)(A). *Hemingway*, 954 F.2d at 5 n.4; *In re Jartran, Inc.*, 732 F.2d 584, 588 (7th Cir. 1984); *Pension Benefit Guar. Corp. v. LTV Corp.*, 87 B.R. 779, 796 (S.D.N.Y. 1988).

Those principles control here. The only transaction between PREPA and its bondholders was the pre-petition Trust Agreement, under which the bondholders' predecessors lent money to PREPA before the Title III case began in exchange for repayment rights secured by Net Revenues. App491–618. The motion below was premised on the bondholders' allegation that PREPA misused Net Revenues during the Title III case. *See* SA409–10. That allegation, if true, is nothing more than a claim of a post-petition breach of a pre-petition contract. And a claim based on a post-petition breach of a pre-petition contract does not receive administrative-expense priority under § 503(b)(1). *See, e.g.*, *Hemingway*, 954 F.2d at 5 n.4.

The bondholders contend that PREPA's expenditure of alleged Net Revenues during the Title III case somehow constitutes a post-petition transaction between them and PREPA. Assured Br. 30–44; GoldenTree Br. 22–30; Ad Hoc Br. 44–45. But the allegation is that PREPA used its property to pay third parties for services. The bondholders did not provide those services to PREPA and were not involved in those alleged transactions. The only nexus between the bondholders and the alleged post-petition conduct is the pre-petition Trust

Agreement, and, as stated, a post-petition breach of that pre-petition agreement cannot give rise to an administrative-expense claim under § 503(b)(1)(A).

*WMF/Huntoon, Paige Associates v. Citi-Equity Group, Inc. (In re Citi-Equity Group, Inc.)*, 1996 Bankr. LEXIS 2016 (Bankr. D. Minn. 1996), is instructive. There, like here, a lender provided a loan to the debtor prior to a bankruptcy case and was granted a security interest in the debtor's revenues. *Id.* at *4–5, *10–11. There, like here, the lender alleged that the debtor improperly expended those revenues and argued that its claim for dissipation of collateral was entitled to administrative-expense priority. *Id.* at *31–35. The court disagreed, holding that administrative-expense priority was unavailable because the lender had not engaged in a post-petition transaction with the debtor. *Id.* at *31–35 (citing *Mammoth Mart*, 536 F.2d at 954). Instead, the lender's "entire performance was rendered prepetition in lending the money." *Id.*

The same result applies here because the bondholders' entire performance was pre-petition, as numerous other cases also recognize. *See In re Advisory Info. & Mgmt. Sys., Inc.*, 50 B.R. 627, 630 (Bankr. M.D. Tenn. 1985) ("We do not agree with the proposition that a secured creditor 'contributes' to the administration of an estate as contemplated by § 503(b) where the debtor-in-possession merely continues using property which the prepetition debtor owned."); *In re Provincetown-Bos. Airline, Inc.*, 66 B.R. 632, 634 (Bankr. M.D. Fla. 1986) ("The

54

secured creditor is not contributing to the estate by allowing a Debtor-in-Possession to use collateral which [the debtor] already owns and has a statutory right to use."); *Williams v. IMC Mortg. Co. (In re Williams)*, 246 B.R. 591, 595 (B.A.P. 8th Cir. 1999) ("[T]he prepetition secured creditor is not contributing a benefit to the estate because the debtor is merely continuing to use property that the debtor already owns.").

The bondholders' cases do not hold otherwise. As the Title III court explained, *In re United Trucking* did not involve the use of collateral by a debtor during a bankruptcy case. Add27–28 (citing 851 F.2d 159, 162 (6th Cir. 1988)).[12] *United Trucking* was an executory contract/lease case, not a secured claim case. The jurisprudence governing executory contracts and leases requires the debtor to pay the lessor for the post-petition use of leased property regardless of diminution in value. *United Trucking*'s reliance on *American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119 (2d Cir. 1960)—the seminal case on executory contracts and leases—confirms that *United Trucking* was an executory lease case. Cases involving executory leases do not govern secured claims. In executory lease cases, the lessor owns the leased property and provides post-petition services, pursuant to an executory contract, by permitting the debtor

---

[12] The Title III court called out the bondholders for representing that *United Trucking* involved a secured claim when it did not. Add28. The Title III court has previously noted a pattern of misquotation in the bondholders' briefs. App769.

to continue to use the property.  It thus has an administrative claim for the value of the benefits provided post-petition.  851 F.2d at 162.  Congress partially codified and partially superseded *United Trucking* when it enacted § 365(d)(5) in 1994—a subsection housed in the provision governing *executory* contracts.  This is not such a case.  Here, there is no executory contract or lease between the bondholders and PREPA.  PREPA owns the Net Revenues, and did not perform under the executed pre-petition Trust Agreement after the Title III case commenced, so administrative-expense priority is unavailable.[13]  Applying *United Trucking* to a case involving a secured claim would engineer a sea change in bankruptcy jurisprudence and radically expand the circumstances in which pre-petition secured creditors would obtain administrative-expense claims (and the leverage over bankruptcy cases that attend such claims).

Nor does *Ford*, 35 F.3d 860, support the bondholders' position.  Assured Br. 41; GoldenTree Br. 26.  In *Ford*, administrative-expense priority was available

---

[13] The Title III court also correctly noted that in *United Trucking* the debtor and creditor had entered into a stipulation "that damages resulting from injuries to the trailers that occurred post-petition should be treated as an administrative expense." *In re United Trucking Serv.*, 851 F.2d at 161 n.2.  That is a post-petition transaction and absent here.  Even where there is a post-petition transaction, however, the court is required to consider whether the transaction benefitted the estate to determine whether to affirm the § 503 priority.  That is what the Fourth Circuit did.  That is not a dismissal of the relevance of the stipulation, as the bondholders claim (Assured Br. 43; GoldenTree Br. 25–26), but rather application of basic § 503 law.

only because the creditor satisfied § 507(b), including by obtaining a prior grant of adequate protection.  *See* 35 F.3d at 866.  The same is true of *In re American Toy & Furniture Co.*, 1997 Bankr. LEXIS 2495, at *17–18 (Bankr. E.D. Wis. Feb. 24, 1997) (allowing administrative-expense claim under § 507(b) where debtor had provided adequate protection).  As explained above, the bondholders do not satisfy § 922(c)—the PROMESA/chapter 9 analogue of § 507(b)—so cases granting administrative-expense priority under § 507(b) have no bearing on this appeal.[14]

The bondholders' other authorities are even further afield because they do not involve security interests or the misuse of collateral.  *See In re Athens/Alpha Gas Corp.*, 332 B.R. 578, 581 (B.A.P. 8th Cir. 2009) (claim of party that co-owned share of post-petition profits of oil well stolen by debtor accorded administrative-expense priority); *In re Espinosa*, 542 B.R. 403 (Bankr. S.D. Tex. 2015) (claim for debtor's taking possession of real estate as tenants at sufferance during chapter 13 case accorded administrative-expense priority); *In re Bluestem Brands, Inc.*, 2021 Bankr. LEXIS 1980 at *16–17 (Bankr. D. Del. Jul. 27, 2021) (according administrative-expense priority to vendor of goods that arrived post-petition); *In re Whistler Energy II, L.L.C.*, 931 F.3d 432, 442–43 (5th Cir. 2019) (party granted

---

[14] The bondholders contend that a post-petition transaction with the debtor "need not be a voluntary one."  Assured Br. 40; GoldenTree Br. 22.  The Title III court did not hold otherwise.  The court instead rightly found that the bondholders did not engage in any post-petition transaction with PREPA—voluntary or otherwise. Add27–29.

57

administrative-expense priority claim where it "continued working" with debtor following bankruptcy filing); *In re Lucre, Inc.*, 434 B.R. 807, 821–22 (Bankr. W.D. Mich. 2010) (administrative-expense priority denied to claims arising from post-petition use of AT&T's telephone systems because claim was "simply residue of a prepetition transaction that is no more deserving of priority than any other prepetition claim"). None of those cases supports an administrative-expense claim under § 503(b)(1)(A) merely because a debtor expends a creditor's collateral.

The bondholders also contend that the Trust Agreement is in some sense executory because it "involves the continuous generation of *new* collateral post-petition." Assured Br. 39. That is not true. Whether a contract is executory turns on remaining material obligations of both counterparties. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984) ("Congress intended the term to mean a contract 'on which performance remains due to some extent on both sides.'") (internal cites omitted). Here, the bondholders had no material post-petition obligations, which is why bonds and similar instruments are not considered executory contracts. *See In re F.B.F. Industries, Inc.*, 165 B.R. 544, 549 (Bankr. E.D. Pa. 1994) (promissory notes not executory contracts). Moreover, the bondholders did not provide value to PREPA during the Title III case. PREPA's continued operation and generation of revenues is not "performance" required by

58

the Trust Agreement nor value provided by bondholders.  *See Citi-Equity Grp.*,

1996 Bankr. LEXIS 2016, at \*32–33.

> ### B.    The Bondholders Cannot Invoke § 503(b)(1)(A) to Circumvent § 922(c).

The bondholders' claim to administrative-expense priority under § 503(b)

fails for the additional reason that it is an impermissible attempt to evade their

inability to satisfy § 922(c).  *See* Point I, *supra*.  Section 922(c) is a specific statute

requiring three conditions be satisfied before administrative-expense priority will

be granted under § 503(b) to a claim alleging the wrongful misuse of collateral.

Where a party argues that the same conduct falls within the scope of two statutory

provisions—one general and one specific—"the specific presumptively governs."

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 648 (2012).

That is especially true here given that § 922(c) expressly references § 503(b).  The

"negative implication" canon, in turn, shows that § 922(c)'s allowance of an

administrative claim for collateral use under § 503(b) when the three conditions are

satisfied negates the allowance of another administrative claim for collateral use

under § 503(b) when the conditions are not satisfied.  *See* Antonin Scalia & Bryan

A. Garner, *Reading Law: The Interpretation of Legal Texts* 107–12 (2012)

(discussing the negative-implication canon).

The Supreme Court rejected a similar attempt to evade the Bankruptcy

Code's requirements in *RadLAX*.  There, the debtor attempted to cram down a plan

on a secured claimholder under § 1129(b). 566 U.S. at 643–47. Section 1129(b) provides three claim treatments that can be imposed on secured claims without the claimholder's consent. One treatment is a sale of the creditor's collateral free and clear of its lien with the lien attaching to the sale proceeds and subject to the creditor's right to credit bid at the sale. 11 U.S.C. § 1129(b)(2)(A)(ii). Another treatment is for the plan to provide the claimholder the "indubitable equivalent" of the value of its secured claim. 11 U.S.C. § 1129(b)(2)(A)(iii). The *RadLAX* debtor proposed a plan providing the secured claimholder with the "indubitable equivalent" by selling its collateral free and clear of its lien, which would attach to the sale proceeds but without allowing the claimholder to credit bid at the sale. *Id.* at 641–42. The Supreme Court rejected that approach as "hyperliteral and contrary to common sense." *Id.* at 645. As the Court explained, the Bankruptcy Code is a "comprehensive scheme" that addresses specific situations, and a debtor cannot invoke general provisions to avoid specific restrictions. *Id.*

The same principle applies here. Under the "general-specific" canon, administrative-expense claims for collateral consumption not allowable under § 922(c) cannot be allowed under § 503(b). As the Title III court explained, "courts have warned against permitting a prepetition creditor to make an end-run around the adequate protection predicate" contained in § 922(c) (or § 507(b)) by asserting an administrative-expense claim under other provisions. Add26; *see also*

60

*Williams*, 246 B.R. at 595 ("Courts commonly recognize that § 503(b) is not intended to provide an administrative expense award to a prepetition secured lender based on the debtor's postpetition possession and use of collateral."); *Advisory Info. & Mgmt. Sys.*, 50 B.R. at 630 (refusing to grant § 503(b) priority to secured creditor where secured creditor had previously failed to ask for and obtain adequate protection); *Provincetown-Bos. Airline*, 66 B.R. at 634 ("There is no indication in § 503 which even remotely suggests that an administrative expense priority claim was intended as an optional remedy to adequate protection provided for by § 361 of the Code of a secured creditor's interest in property of the estate.").

As the District of Massachusetts recognized, allowing a creditor that has not been provided adequate protection as required by § 922(c)/507(b) to receive an administrative-expense claim under § 503 would open the door to gamesmanship:

> A creditor, or several creditors could either intentionally or unintentionally do nothing regarding seeking relief from the automatic stay or requesting adequate protection for a long period of time including up until a plan was proposed. Then long into the case, the creditors could step forward, make requests for payment of administrative expense which would at that point be a sum which the debtor would be unable to pay. Since § 1129(a)(9)(A) requires that all of these priority administrative expenses be paid in full on the effective date of confirmation, such creditors could effectively veto any plan.

*In re Briggs Transp. Co.*, 47 B.R. 6, 8 (Bankr. D. Mass. 1984). Here, the bondholders admit they seek a claim payable in full at confirmation. Dkt. No.

5700 at 1.  Despite long having access to PREPA's MORs and other information about PREPA's fiscal condition (and citing to them for other purposes for years), the bondholders never complained that PREPA was expending their collateral nor sought the turnover of the alleged Net Revenues.  Now, nine years into the Title III case, they are asserting a massive administrative-expense claim under § 503 that, if successful, would effectively permit them to veto any plan of adjustment and undermine PREPA's restructuring.  In accord with its precedent, the Court should hold that the bondholders' claim based on an alleged post-petition breach of the pre-petition Trust Agreement is not entitled to administrative-expense priority under § 503(b)(1)(A).

## III.  *READING* DOES NOT ENTITLE THE BONDHOLDERS TO AN ADMINISTRATIVE-EXPENSE CLAIM.

Because they do not qualify for administrative-expense priority under §§ 503(b) or 922(c), the bondholders fall back on the so-called "fairness" doctrine first recognized in *Reading*, 391 U.S. 471.  But *Reading* does not grant administrative-expense priority to a claim rooted in a pre-petition agreement specifying remedies for the precise breach at issue.  It applies to liabilities imposed by law independently of the claimant's pre-petition bargain with the debtor.  The bondholders' claims arise entirely from their pre-petition Trust Agreement and therefore fall outside *Reading*'s exception.

A.    The *Reading* Doctrine Does Not Apply to Claims Based on Pre-Petition Non-Executory Contracts.

*Reading* does not apply to the bondholders' claim.  The *Reading* analysis begins with § 503(b).  As discussed above, a claim satisfies § 503(b) only where "(1) the right to payment arose from a post-petition transaction with the debtor estate, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor." *Hemingway*, 954 F.2d at 5.

*Reading* did not displace that framework.  It relaxed only the benefit requirement, holding that certain liabilities generated by the debtor's post-petition operations may qualify for administrative priority even though they confer no benefit on the estate.  *See* 4 Collier on Bankruptcy ¶ 503.06; Add29.

In *Reading*, a receiver operating the debtor's business negligently caused a fire that destroyed neighboring property.  391 U.S. at 473–74.  The Supreme Court held that the resulting tort claims were "actual and necessary costs" of administering the estate even though they conferred no benefit on the estate.  *Id.* at 476, 485.  This Court has accordingly described *Reading* as recognizing "a special category of expense entitled to administrative priority status, based on considerations of fundamental fairness, consisting of amounts due entities 'injured by the debtor-in-possession's operation of the business even though their claims did not arise from transactions that were necessary to preserve or rehabilitate the

63

estate.'" *Hemingway*, 954 F.2d at 5 (quoting *Mammoth Mart*, 536 F.2d at 954). The *Reading* exception covers liabilities generated from a debtor's continued operations—tort injuries, regulatory violations, statutory employment wrongs, and similar operating costs. *See infra* pp. 66–67 (citing cases). It excuses claimants from showing that such liabilities conferred a benefit on the estate. But it does not excuse them from showing that the claim originated from something other than a pre-petition executed contract. *Hemingway*, 954 F.2d at 7.

*Reading* is thus a limited relaxation of the requirements of § 503(b) to provide "fairness" to involuntary creditors—it is not an entirely separate basis for the allowance of an administrative-expense claim. As a result, the same arguments discussed above with respect to § 503(b) apply with equal force to *Reading*— *Reading* cannot be read to give pre-petition contract creditors a claim that § 922(c) specifically excludes. Nothing in *Reading* suggests the Supreme Court was tying Congress' hands to limit claims for collateral use.

In *Hemingway*, this Court observed that it was "aware of no authority that the *Reading* . . . exception encompasses a right to payment originating in a prepetition contract with the debtor." *Id.* This Court noted that under *Reading* "the source of the claimant's right to payment in all of the decisions . . . invariably originated during the postpetition period." *Id.* at 7 n.7. A claim's "prepetition

64

genesis," by contrast, "ultimately distinguishes it from the postpetition losses accorded priority in *Reading* and" its progeny. *Id.* at 7.

The Court later confirmed that view, recognizing "the distinction, basic to bankruptcy, between the debtor's prepetition [obligations] and the bankruptcy estate's postpetition expenses—a distinction preserved by *Reading*." *Bos. Reg'l*, 291 F.3d at 126; *see also In re Old Carco, LLC*, 424 B.R. 650, 660 (Bankr. S.D.N.Y. 2010) ("The *Reading* exception does not include a right to payment emanating from a pre-petition contract with a debtor.").

Accordingly, the relevant inquiry under *Reading* is not whether the creditor alleges that some injury occurred or worsened after the petition date. The inquiry turns on the source of the asserted right to payment—whether it arises from a legally cognizable duty independent of the debtor's pre-petition bargain, or instead from the debtor's alleged failure to honor that bargain.

The bondholders' *Reading* theory fails that test. However they dress up their claims—as conversion, as a taking, or as anything else—their ultimate complaint is that PREPA pledged Net Revenues in the Trust Agreement and then breached the agreement by wrongfully diverting those Net Revenues. If the bondholders have any right to payment on their claims, the right originated in the pre-petition Trust Agreement. *See Lien-Challenge Appeal*, 121 F.4th at 311 (holding that the bondholders' "right to payment" is "rooted in the covenants outlined in the Trust

65

Agreement"). There is nothing inherently wrongful or tortious about a debtor using its own property to pay its own expenses. The only basis bondholders could have a claim for it is because they allege that use violated a pre-petition agreement with the debtor. Relabeling their breach-of-contract claim as a conversion, a taking, or anything else does not change the fundamental fact that their right to payment arises from a pre-petition contract—and, more so, a pre-petition contract prescribing a nonrecourse remedy. The *Reading* doctrine therefore has no application.

The animating principle behind *Reading* is that a debtor should not be permitted to operate during bankruptcy for the benefit of pre-petition creditors while shifting the costs of that operation to third parties injured by the operation itself. 391 U.S. at 478. Every application of *Reading* by the Supreme Court and this Court comports with that purpose: tort claims arising from the debtor's negligent operation during the case, *Reading*, 391 U.S. 471; civil fines for an operating debtor's deliberate violation of a zoning injunction in *In re Charlesbank Laundry, Inc.*, 755 F.2d 200, 203 (1st Cir. 1985); unemployment compensation reimbursements tied to post-petition work in *Boston Regional*, 291 F.3d at 124–26; employment discrimination in the operation of the debtor's workforce in *Villalobos-Santana v. Puerto Rico Police Department*, 171 F.4th 544, 550–52 (1st Cir. 2026); and penalties for violations of state environmental law in *In re Munce's*

66

*Superior Petroleum Products, Inc.*, 736 F.3d 567, 571–73 (1st Cir. 2013), and

*Cumberland Farms, Inc. v. Florida Department of Environmental Protection*, 116

F.3d 16, 21 (1st Cir. 1997). In each case, *Reading* applied because the liability at

issue arose from the debtor's ongoing operations.

The bondholders' claim is different in kind. The claim that PREPA used its

Net Revenues in a manner creating a default under a pre-petition contract is not a

tort or regulatory violation arising from PREPA's operations. It is at most a

contractual breach that the Trust Agreement expressly contemplated and assigned a

nonrecourse remedy. As the Title III court observed, if *Reading* applies here, there

would be no limiting principle: "any prepetition creditor could make the same

argument" whenever an operating debtor used property in which the creditor

claimed an interest or otherwise breached a pre-petition contract. Add31. Nothing

in *Reading* suggests that a pre-petition creditor can recast the alleged impairment

of collateral as a post-petition cost of operating a business to escape the nature of

its claim as a breach of a pre-petition contract, or to escape the remedy limitations

included in that contract. It would subvert bankruptcy's basic policy of equality of

treatment if a debtor having a pre-petition contract limiting remedies for default to

the creditor's collateral would nevertheless be liable to pay the creditor's claim in

full.

*Reading*'s focus on protecting innocent third parties confirms the point. *Reading* explained that the fire claimant "did not merely suffer injury at the hands of an insolvent business: it had an insolvent business thrust upon it by operation of law." 391 U.S. at 478. The Court contrasted such victims with "existing creditors" who hoped that continued operation of the debtor would improve their recoveries. *Id.* Here, the bondholders were "existing creditors" of PREPA at the time the Title III case commenced. They chose to invest in PREPA—they are not the type of innocent third parties injured by the debtor's operations that *Reading* is intended to protect. *See id*.

For these reasons, courts have refused to stretch *Reading* to cover a secured creditor's losses that result from a debtor's alleged failure to honor a pre-petition bargain. *See In re Baseline Sports, Inc.*, 393 B.R. 105, 130–31 (Bankr. E.D. Va. 2008) (declining to apply *Reading* to secured creditor's post-petition fraud-based claim arising from the treatment of its collateral); *In re Leroy M. Hull Co., Inc.*, 344 B.R. 466, 469 (Bankr. W.D. Va. 2004) (declining to apply *Reading* to a creditor who "is not an innocent third party whose property has been damaged by the reorganization proceeding, but rather a pre-petition creditor for whose benefit in part the attempted reorganization was being conducted").

This Court should follow the same approach. The bondholders are "existing creditors" who voluntarily purchased PREPA's pre-petition bonds. App35. Their

68

alleged injury was thus not "thrust upon" them by PREPA's continued operations; instead, it flows directly from the investment they made into PREPA under a pre-petition contract. As the Title III court explained, the bondholders "share (to at least some degree) in the prospective benefit of the successful rehabilitation of PREPA" and therefore cannot bring a *Reading* claim arising from PREPA's operations during the Title III case. Add31.

## B. The Bondholders' Arguments to the Contrary Are Unavailing.

The bondholders seek to expand *Reading* to cover any claimant injured by any post-petition legal wrong committed by the debtor, including the breach of a pre-petition contract. *See* Assured Br. 45–54; GoldenTree Br. 31–54; Ad Hoc Br. 44–50. That is not the law. *Reading* turns on the origin of the right to payment: A liability imposed by law independently of the claimant's pre-petition bargain with the debtor may fall within *Reading*; a right whose legal source is that pre-petition bargain does not. Here, the bondholders' claim exists entirely because of a pre-petition agreement. It thus falls outside the scope of *Reading*.

The bondholders note that this Court described *Reading*'s conception of administrative expenses as "broad" and "expansive." *See* Assured Br. 47 (citing *Villalobos-Santana*, 171 F.4th at 551). But *Villalobos* broadens *Reading* along an axis that has nothing to do with this case. It confirms that *Reading* is not limited to negligent torts and may reach intentional torts that arise from a debtor's ongoing

69

operations. It does not hold that every alleged post-petition legal wrong qualifies for administrative-expense priority regardless of the source of the asserted right to payment.

*Villalobos* instead reinforces the Board's point by reaffirming that *Reading* protects claimants "injured by" the debtor's "ongoing operations" during reorganization for liabilities that are "costs ordinarily incident to operation of a business." 171 F.4th at 550–51. The claims there arose from employment retaliation and discrimination in the operation of Puerto Rico's police force. *Id.* at 551–52. Those claims rested on freestanding statutory duties governing the debtor's treatment of its employees that applied to the debtor's post-petition operations, not on a pre-petition creditor's collateral bargain. *Villalobos* thus holds only that *Reading* is not confined to misconduct that is "merely negligent rather than intentional." *Id.* at 551. It did not disturb *Hemingway*'s controlling rule that *Reading* does not reach claims with "prepetition genesis" or "encompass[] a right to payment originating in a prepetition contract with the debtor." 954 F.2d at 7.[15]

---

[15] Similarly, *In re Al Copeland Enterprises, Inc.*, 991 F.2d 233 (5th Cir. 1993), involved a debtor's post-petition failure to comply with Texas tax law requiring timely remittance of sales taxes. *Id.* at 234–40. The State's claim did not arise from any pre-petition bargain with the debtor but instead arose from an independent statutory duty imposed on a business collecting sales taxes post-petition. That is why the Fifth Circuit treated the resulting statutory interest as a post-petition administrative expense under *Reading*. *Id.* at 239–40.

70

Nor does it help the bondholders to insist that *Reading* is "a post-petition-wrong rule, not a claimant-status rule." Assured Br. 53. The Board does not argue that a pre-petition creditor can never hold a *Reading* claim. The controlling question is not claimant status in the abstract. It is whether the asserted right to payment originates in the debtor's post-petition operations or instead, as relevant here, is governed by a pre-petition contract. *See Hemingway*, 954 F.2d at 7 & n.7. Bondholders do not have a disfavored "status"—they just have a pre-petition claim.

The bondholders claim to be "innocent parties" injured by the "post-petition misappropriation of their collateral." Assured Br. 54. But that misapprehends what "innocent" means under *Reading*. *Reading* asked whether the claimant was a person on whom the debtor's business had been "thrust . . . by operation of law," or instead an "existing creditor[]" who chose to deal with the debtor before bankruptcy and thus shared in the ordinary dilemma of insolvency. 391 U.S. at 478, 482–83. The victims in *Reading* were innocent in that sense because they had no connection to the debtor prior to the fire. The bondholders, by contrast, purchased pre-petition bonds and now seek priority for claims arising from those bonds. They chose to invest in the debtor's pre-petition securities. They are simply not the involuntary outsiders for whom *Reading* fashioned its exception.

71

The bondholders resist this conclusion by invoking *Charlesbank*, which they say involved claimants "with a pre-petition relationship to the debtor" and nevertheless recognized a *Reading* claim.  Assured Br. 54; *see also* GoldenTree Br. 50.  That argument conflates distinct concepts.  A pre-petition relationship is not the same as a pre-petition creditor.  The *Charlesbank* claimants were not creditors; they were neighbors who had secured a nuisance injunction years before the bankruptcy and who remained strangers to the case.  755 F.2d at 202.  Their post-petition claim did not arise from any pre-petition bargain with the debtor.  It arose from the debtor's post-petition operations, which resulted in a violation of the debtor's duties not to create a nuisance or violate the zoning laws.  *Id.* at 201–03.

The Board's rule would not "swallow" *Reading*'s exception.  *Contra* GoldenTree Br. 50.  *Reading* is fully available for involuntary tort victims, regulatory claimants, injured employees, and others whose claims arise from duties governing the debtor's post-petition operations independent of any pre-petition bargain.  It is the bondholders' rule that would swallow § 503(b), by allowing every secured creditor (possibly every single creditor) to seek administrative priority whenever an operating debtor allegedly used property in which the creditor claimed an interest or otherwise violated a pre-petition contract.  *See* Add31.[16]

---

[16] The bondholders contend that the Title III court limited *Reading* to "violations of regulations."  Assured Br. 52–53.  The Title III court announced no such rule.  It merely observed that this Court's *Reading* cases have "generally been limited to

Finally, the bondholders are wrong that the Title III court invoked "public policy" to deny their administrative-expense claim. GoldenTree Br. 51–54; Assured Br. 50–52; Ad Hoc Br. 10–12. The Title III court merely correctly applied the precedent and determined that *Reading* does not apply. Add31–32. The court's observation that *Reading*'s own fairness rationale reinforced its conclusion does not mean that the court elevated policy over doctrine. *Id.*

*Reading* asked who should bear the costs of post-petition operations carried on during reorganization. 391 U.S. at 477–83. Here, that fairness inquiry does not support giving the bondholders priority for the alleged impairment of collateral securing pre-petition debt, especially when the creditors agreed in a pre-petition contract to a nonrecourse remedy. PREPA continued because Puerto Rico cannot function without electricity, and PROMESA permits a public instrumentality to restructure while continuing to deliver indispensable public services. Treating PREPA's use of revenues to keep the lights on as a *Reading* "injury" would invert the doctrine's fairness premise by allowing one class of pre-petition creditors to be paid in full at the expense of other pre-petition creditors and the residents of Puerto Rico who rely on the electricity PREPA generates. *Reading* neither requires nor permits that result.

---

violations of regulations that harm the general public" and contrasted those cases with the bondholders' claim involving a pre-petition contract. Add31.

73

**C.      The Title III Court Correctly Held that the Bondholders Have No Allowable *Reading* Claim in Any Event.**

Even if *Reading* could theoretically reach a claim where the right to payment originated in a pre-petition contract, the bondholders still would not be entitled to administrative-expense priority because they have not stated a valid tort claim. *Reading* is a priority doctrine, not a source of liability.  The bondholders therefore must identify an independent claim under some other body of law before they can ask for administrative priority.

The bondholders assert claims for conversion under Puerto Rico law and a taking under the Fifth Amendment.  The two theories share a common and fatal flaw:  Every duty the bondholders allege that PREPA breached traces back to the Trust Agreement.  As a matter of law, a contractual breach does not support a conversion claim under Puerto Rico law or a Fifth Amendment takings claim.  As the Title III court recognized, the only claim the bondholders can assert is for an alleged breach of the pre-petition Trust Agreement, something not entitled to priority under *Reading*.

### 1.      *The Bondholders Have No Conversion Claim.*

The bondholders' conversion claim fails at the outset because, under Puerto Rico law, conversion protects only an owner or possessor, and the bondholders do not allege that PREPA took property they owned or possessed.

74

The Puerto Rico Supreme Court's decision in *Hull-Dobbs*, 81 D.P.R. 221 (SA1–12), controls.  There, the Court explained that conversion protects only those who possess property "as owner or [as] simple possessor."  *Id.* at 228–29 (SA4). The court then proceeded to reject a conversion claim nearly identical to the one asserted by the bondholders.  *Id.* at 234–35 (SA11).  The claim was brought by a lender who had a lien on an automobile that was sold without the lender's consent. *Id.*  The court held that the lender could not assert a conversion claim because holding a lien did not make the lender an owner or possessor of the automobile. *Id.*  As the court explained, Puerto Rico follows the lien theory, meaning that a mortgage "is a mere lien or security for the payment of money, and does not convey any title to the mortgagee."  *Id.* at 234–35 (SA5).  The mortgagee therefore could not state a conversion claim merely because its collateral was sold without consent; its remedies were the ordinary action on the debt against the debtor or foreclosure against the encumbered object.  *Id.* at 239–40 (SA8).

That rule controls here.  Under *Hull-Dobbs*, the bondholders were never owners or possessors of PREPA's Net Revenues.  As this Court explained, the bondholders hold a lien on Net Revenues.  *Lien-Challenge Appeal*, 121 F.4th at 308–09.  But a lien is not title.  *Hull-Dobbs*, 81 D.P.R. at 234–35 (SA5).  It is security for payment.  PREPA's alleged expenditure of the Net Revenues therefore may be an event of default under the Trust Agreement, but it does not constitute

75

conversion of property under Puerto Rico law because the bondholders never owned or possessed the Net Revenues. *See, e.g.*, *Rodriguez-Toledo*, 2018 WL 1626100, at *4, *12 (rejecting conversion claim where plaintiff "failed to prove that it was the lawful owner or possessor of much of the property"), *rev'd on other grounds*, 966 F.3d 46 (1st Cir. 2020).[17]

The conversion claim fails for the additional reason that it is merely a repackaged breach-of-contract claim. Under Puerto Rico law, a claim sounds in contract when the alleged damage "would not occur without the existence of a contract." *Ramos Lozada*, 130 D.P.R. at 728 (SA18). A tort claim, by contrast, may proceed only when the conduct breaches a general duty not to injure that would exist even if the parties had never contracted. *Id.* at 728–29 (SA18). A conversion claim therefore does not lie unless the claim arises from a "general (non-contractual) duty not to cause harm" rather than from a contractual duty. *Rodríguez-Toledo*, 2018 WL 1626100, at *13.

Here, every duty the bondholders invoke—the duty to preserve, segregate, deposit, or apply Net Revenues for debt service before other uses—arises from the Trust Agreement. And every dollar in damages they seek is a dollar they say should have flowed through the Trust Agreement's waterfall. They identify no

---

[17] This is a fatal flaw in the bondholders' conversion claim, regardless of whether they label it misappropriation, concealment, or destruction of collateral.

duty that PREPA allegedly breached that arose from any source other than the Trust Agreement.

Under those circumstances, the Title III court correctly held that the bondholders did not state a valid claim for conversion. Add33–34. As the court explained, the duties the Bondholders invoke were "created contractually" by the Trust Agreement; the alleged harm is "indistinguishable" from breach of that agreement; and the remedies for PREPA's alleged use of revenues "are those provided for under the Trust Agreement, not independent tort remedies." Add34. The claim is thus one for breach of contract, and labeling it a "postpetition conversion" does not create an independent tort. If the contract disappears, the claim disappears with it.

The bondholders' cases do not hold otherwise. For example, *In re Hayes Lemmerz International, Inc.* did not apply Puerto Rico law and, in any event, involved leased machines owned by the creditor, not revenues owned by the debtor. 340 B.R. 461, 480–81 (Bankr. D. Del. 2006). The debtor stripped parts from the lessor's machines and used those parts to repair the debtor's own equipment. *Id.* The court emphasized that the debtor had "no legal right" to strip parts from machines it "did not own." *Id.* at 481. That is conversion in the classic sense—taking someone else's property and using it as one's own. It has nothing to

77

do with the claim here, which alleges that PREPA used its own revenues in a manner inconsistent with a pre-petition contract.[18]

The bondholders' reliance on *United States v. GZ Construction ST, Inc.*, 155 F. Supp. 3d 147 (D.P.R. 2015), and *Oto Analytics, LLC v. Benworth Capital Partners PR, LLC*, 2025 WL 989954 (D.P.R. Apr. 2, 2025), is likewise misplaced. Neither federal decision displaces *Hull-Dobbs*'s holding that a lien is not title or *Ramos Lozada*'s holding that duties defined by contract do not support a tort claim. *GZ Construction* involved an alleged transfer of an aircraft after the IRS asserted a federal tax lien. 155 F. Supp. 3d at 149–52. *Oto* involved an alleged insider's fraudulent transfers of pledged loan proceeds for less than reasonably equivalent value. 2025 WL 989954, at *8–9. Whatever those courts found plausible at the pleading stage on materially different allegations, neither held that a private lienholder may sue in conversion when a debtor allegedly uses its own revenues contrary to a security agreement. Such a rule would conflict with *Hull-Dobbs* and *Ramos Lozada* and would impermissibly convert ordinary lien-enforcement disputes into tort claims.

---

[18] Notably, even if the bondholders could assert a valid conversion claim, it would be subject to the Commonwealth's one-year statute of limitations. *See Barretto Peat, Inc. v. Luis Ayala Colón Sucrs., Inc.*, 896 F.2d 656, 658 (1st Cir. 1990).

### 2. *The Bondholders Have No Takings Claim.*

Bondholders have no cognizable takings claim either. As explained above, bondholders' claim ultimately resides in the fact that PREPA is alleged to have used Net Revenues in a way that violates the Trust Agreement—a pre-petition contract between bondholders and PREPA. If asserted against a private entity, the claim would be one for breach of contract. The claim does not convert into a takings claim just because PREPA is owned by the Commonwealth of Puerto Rico. PREPA was an electric utility acting as such in a commercial capacity under the Trust Agreement, and the bondholders have not alleged otherwise. No governmental actions are alleged to have caused a taking. Moreover, bondholders agreed to a contract specifying particular remedies in the event that PREPA misused collateral—and a takings claim was certainly and unsurprisingly not one of them, given that PREPA is a utility. They do not get to escape those terms just because PREPA is in a Title III case and owned by the Commonwealth.

### a. PREPA Was Acting in a Commercial, Not Governmental, Capacity.

The Fifth Amendment provides that the government may not take private property for public use "without just compensation." U.S. Const. amend. V. Here, however, there is no alleged governmental taking.

This Court and others have recognized that "when a municipality acts in a contractual or proprietary capacity, actions such as contract termination or

79

detention of property under the contract that would constitute a simple breach of contract when a non-governmental entity is involved do not become a constitutional violation simply because the contracting party is a municipality." *Massó-Torrellas v. Mun. of Toa Alta*, 845 F.3d 461, 468 (1st Cir. 2017); *see also Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001) ("Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity."). Here, PREPA is also not a municipality. Thus, even where a governmental entity was alleged to have wrongfully withheld money loaned to it for a development project, the lender had no taking claim. *Preston Hollow Cap.*, 23 F.4th at 554. Such misconduct "involves 'commercial' and not 'sovereign' acts," and as such "any claim that [the lender] may have asserted should be a breach of contract claim, not a taking claim." *Id.*

A long line of authority holds that when a government and private party create a property right, the proper remedy lies in contract, not taking. *See, e.g., Tamerlane*, 80 Fed. Cl. at 738; *Hughes*, 271 F.3d at 1070; *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 740 (2004); *Klamath Irrigation Dist. v. United States*, 67 Fed. Cl. 504, 540–41 (2005); *Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 803 (7th Cir. 2018). Were it otherwise, "nearly all Government contract breaches would give rise to compensation under the Fifth

80

Amendment." *Klamath*, 67 Fed. Cl. at 531. This Court has expressed the same concern "with a regularity bordering on the echolalic," holding that "a simple breach of contract does not amount to an unconstitutional deprivation of property," because the contrary rule would "transmogrify[] virtually every dispute involving an alleged breach of contract by a state or a state agency into a constitutional case." *Massó-Torrellas*, 845 F.3d at 467.[19]

Those principles apply here, as the Title III court held. Add34–37. In accepting loans under the Trust Agreement, PREPA was acting in a commercial—not sovereign—capacity, just like the municipality in *Preston Hollow*. PREPA was equally acting in a commercial capacity in operating its electricity utility business and keeping that business operational by (allegedly) using Net Revenues. Consequently, no taking claim can lie on these facts.

As a result, none of the bondholders' cases have any relevance because they all involved situations where a government took property, usually by enacting a

---

[19] *Stockton East Water District v. United States*, 583 F.3d 1344, 1368 (Fed. Cir. 2009), is of no help to the bondholders. *See* Ad Hoc Br. 57–58. There, the court allowed contract and takings theories to proceed in the alternative because the claims rested on distinct acts. The contract claim challenged the federal government's failure to deliver water promised by a contract, and the takings theory challenged a separate sovereign act—specifically, Congress's enactment of a specific law—that allegedly impaired water rights vested under the contract. *Id.* at 1365, 1368–69. This case has no comparable second act. There is only PREPA's alleged failure to apply Net Revenues as the Trust Agreement directs. That is a single alleged contractual breach, not a breach plus an independent sovereign appropriation.

81

statute that itself eliminated property rights.  Thus in *Radford*, 295 U.S. at 602, there was a taking where the United States government enacted the Frazier-Lemke Act, a bankruptcy statute that deprived mortgagees of most of their rights in debtor collateral.[20]  In *Security Industrial Bank*, 459 U.S. at 75, the United States government enacted a bankruptcy statute that had the effect of entirely exempting certain debtor property from a creditor's collateral; the Supreme Court interpreted the statute as not applying retroactively to avoid the Fifth Amendment taking issue. And in *Armstrong v. United States*, 364 U.S. 40, 48 (1960), the United States government took ships subject to materialman's liens, then rendered those liens worthless by invoking sovereign immunity, and those combined acts were the taking.

Here, to the extent the bondholders argue that PROMESA itself effected a taking, they would be wrong and, in any event, they would be seeking the wrong remedy from the wrong party.  Nothing in PROMESA caused a taking.  PREPA is alleged to have continued using its Net Revenues the same way during the case as it was using them prior to entry into Title III.  PROMESA Title III left the

---

[20]  *Radford*'s holding was significantly limited by *Wright v. Union Central Life Ins.,* 311 U.S. 273 (1940), and *Wright v. Vinton Branch of Mountain Trust Bank*, 300 U.S. 440 (1937), in which the Supreme Court upheld extremely similar statutes eliminating virtually all the lien rights identified in *Radford* and protected by the Fifth Amendment.  *Helvering v. Griffiths*, 318 U.S. 371, 401 n.52 (1943) (referring to *Radford* as an "error" corrected by *Wright v. Vinton Branch*).

bondholders with whatever rights they have for those alleged breaches of contract. Nor did PROMESA authorize PREPA to simply misappropriate their collateral without consequence—as discussed above, the bondholders had and still have numerous remedies: They could have sought to lift the stay based on misuse of collateral—they just did not seek that relief despite knowing about and relying on the MORs for years. They also are currently litigating their accounting claim seeking relief for the same allegations raised here. Nothing in PROMESA blocked the bondholders from requesting a turnover of Net Revenues or, had they asked for such relief, prevented the Title III court from advising PREPA it would dismiss its Title III case if PREPA did not turn over the Net Revenues. The bondholders never asked. PROMESA is not the cause of the bondholders' problems—their own tactical decisions are. And, in any event, even if the enactment of PROMESA somehow constituted a taking, the bondholders' remedy for that is not obtaining a $4 billion claim *against PREPA*—it would be to file a Tucker Act claim against the U.S. for enacting an unconstitutional bankruptcy statute. *See Regional Reorganization Act Cases*, 419 U.S. 102, 136, 148 (1974) (railroad bondholders

whose collateral had been taken by railroad reorganization statute had remedy of filing Tucker Act claim against United States).

> b. The Bondholders Are Limited to the Contractual Limitations They Agreed to in the Trust Agreement.

The Title III court correctly held that the bondholders "contracted away" any takings remedy. Add35. The bondholders agreed in the Trust Agreement that for any possible default by PREPA of the Trust Agreement, their remedies would be limited to payment from the Net Revenues. *Lien-Challenge Appeal*, 121 F.4th at 313–14. No matter what the breach is, they agreed their only claim was to the Sinking Fund and other moneys available for the purpose of paying debt. App585 (TA § 704). That language would have no meaning if bondholders could just assert that the contractual default also constituted a taking and thereby resurrect additional damages claims they interred when they agreed to the terms of the Trust Agreement. Put simply, as the Title III court held, the bondholders lack a valid Fifth Amendment claim because the Trust Agreement contemplates consumption of collateral and provides the exclusive contractual nonrecourse remedy for it. The bondholders argue this is no ordinary contract case because the automatic stay has "substantially take[n] away the right to damages in the event of a breach" by preventing the bondholders from exercising contractual remedies. Assured Br. 58 (quoting *Piszel v. United States*, 833 F.3d 1366, 1377 (Fed. Cir. 2016)). As explained above, the bondholders never asked for a turnover of Net Revenues. To

84

this day they have not requested such relief.  Besides, a stay of enforcement is not the destruction of a remedy.  *See Cont'l Ill. Nat'l Bank & Trust Co. v. Chi., R. I. & P. R. Co.*, 294 U.S. 648, 684–85 (1935).

The bondholders' own authorities confirm this point.  *Piszel* found no taking because the plaintiff retained his "ability to seek compensation for breach of his employment contract in a traditional breach of contract suit."  833 F.3d at 1377. *Castle v. United States* likewise held that "the plaintiffs retained the full range of remedies associated with any contractual property right they possessed," and thus the government's action "did not constitute a taking."  301 F.3d 1328, 1342 (Fed. Cir. 2002).  Similarly here, the bondholders retain their remedies under the Trust Agreement and therefore cannot claim that their contractual remedies were taken.[21]

* * *

As a fallback to their arguments, the bondholders invoke the canon of constitutional avoidance.  *See* GoldenTree Br. 43; Ad Hoc Br. 50–55.  That argument fails because there is no meritorious taking issue for all the reasons given

---

[21] *Knick v. Township of Scott* does not salvage the takings theory either.  588 U.S. 180 (2019) (cited in Ad Hoc Br. 53–54).  *Knick* concerned when a takings claim accrues but did not change the threshold requirement that a taking actually occur. *Id.* at 189–94; *see also Preston Hollow*, 23 F.4th at 554 ("In sum, *Knick* concerns when a takings claim becomes ripe as a procedural matter—not what constitutes a 'taking' as a substantive matter.").  The question here is not when a takings claim accrued.  It is whether PREPA's alleged failure to comply with the Trust Agreement is a taking at all.  For the reasons stated, it is not.

above.  Moreover, the canon applies only when a statute is ambiguous and one plausible construction would avoid a constitutional problem.  *See Zucker v. Rodriguez*, 919 F.3d 649, 659 (1st Cir. 2019).  The bondholders identify no ambiguity in §§ 503(b) and 922(c)—or any other provision of PROMESA or the Bankruptcy Code—that a saving construction might resolve in their favor.  In any event, the canon presupposes a constitutional issue to avoid—none exists here.

## IV.    THE NONRECOURSE LIMITATIONS IN THE TRUST AGREEMENT BAR APPELLANTS' ASSERTED CLAIMS.

The Title III court's decision should be affirmed on the additional ground that the nonrecourse provisions in the Trust Agreement preclude the bondholders from asserting a claim under § 503(b), § 922(c), or *Reading.  See Sakab Saudi Holding Co. v. Aljabri*, 58 F.4th 585, 594 (1st Cir. 2023) ("'As always, we are also free to affirm on any basis apparent in the record.'" (quoting *Williams v. United States*, 858 F.3d 708, 714 (1st Cir. 2013))).  This Court has already ruled on the instant matter.  This Court has held that the PREPA bonds are nonrecourse instruments and that even remedies for PREPA's historical alleged misappropriation of Net Revenues are subject to those nonrecourse limitations. *Lien-Challenge Appeal*, 121 F.4th at 315–16.  That holding bars the bondholders' claim.

Neither § 922(c) nor § 503(b) create claims that do not exist under otherwise applicable law.  Section 922(c) gives priority to a claim "*if* . . . such creditor has a

86

claim arising from the stay." 11 U.S.C. § 922(c) (emphasis added); *Baybank-Middlessex v. Ralar Distribs. (In re Ralar Distribs.)*, 182 B.R. 81, 85 (D. Mass. 1995) ("It is obvious from this language that, as a threshold matter, in order to invoke the superpriority of § 507(b), a creditor must have an administrative claim as defined in § 507(a)(1)."). And § 503(b) similarly provides a specified priority to existing rights of payment—it does not in itself generate claims. *See, e.g., Mammoth Mart*, 536 F.2d at 955 (debtor's actions must "give rise to a legal liability" before "claimant is entitled to the priority of a cost and expense of administration"). *Reading* also gives priority to certain claims—it does not create any rights to payment. Thus, to invoke any of these doctrines, the bondholders would need to show that they have a claim for the alleged misappropriation of their collateral under otherwise applicable law. They disclaimed any such claims when they subscribed to the Trust Agreement.

This Court addressed the scope of the bondholders' remedies for allegations of collateral misappropriation in its November 2024 opinion. There, the Court was confronted with allegations in the bondholders' "accounting" counterclaim that PREPA had "wrongly diverted" Net Revenues "from debt service" by paying "unreasonable Current Expenses." *Lien-Challenge Appeal*, 121 F.4th at 315. In ruling on that counterclaim, the Court held that any remedy for those allegations "will not expand the Bondholders' recourse beyond the Net Revenues," because

87

the same nonrecourse limitations that apply to the bonds apply to allegations the bond collateral was misused. *Id.* at 315–16. No matter what that a historical accounting uncovered, the bondholders still "may only reach moneys available for debt service" on their bond claims—the existing and future Net Revenues to which their bonds give them a right. *Id.* at 316. They have no claim for misappropriation separate from their bond claim.

That holding makes sense because nonrecourse obligations like the PREPA bonds are payable solely from collateral, and nonrecourse lenders do not get additional claims for "misappropriation of collateral" unless they expressly negotiated for one in their indenture. *See, e.g.*, *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 438 n.3 (1999) ("A nonrecourse loan requires the Bank to look only to the Debtor's collateral for payment."); *Johnson v. Home State Bank*, 501 U.S. 78, 86 (1991) (describing "nonrecourse loan agreements" as agreements "where the creditor's only rights are against property of the debtor, and not against the debtor personally.") (citing H.R. Rep. No. 95-595 at 315); *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 2021 U.S. Dist. LEXIS 64017, at *79–81 (S.D.N.Y. Mar. 31, 2021) (nonrecourse provision barred damages claim for misappropriation of collateral); *In re Citi-Equity Group, Inc.*, 1996 Bankr. LEXIS 2016, at *30 (enforcing nonrecourse limitations in debt document in case of collateral misappropriation, subject to express carveouts from

88

nonrecourse language); *cf. USX Corp. v. Prime Leasing, Inc.*, 988 F.2d 433, 438 (3d Cir. 1993) (breaches of agreement in which non-recourse provision is contained are subject to non-recourse clause).

*Triaxx Asset Mgmt.* is directly on point. There, the plaintiff-trustee for a secured, nonrecourse loan filed a claim for breach of contract against the debtors, alleging that the debtors had diverted collateral to other parties. 2021 U.S. Dist. LEXIS 64017, at *79. The loan agreements contained a non-recourse provision similar to those in the Trust Agreement, limiting plaintiff's recourse to its collateral. *Id.* at *79–80. Plaintiff argued that the non-recourse provision did not apply to a damages claim alleging breach of covenants providing for the plaintiff to receive its collateral. *Id.* at *80. The court rejected that argument, holding that the plaintiff's recovery was limited to its collateral. In so ruling, the court noted that it was aware of "no authority, from any jurisdiction, that has permitted a damages claim against an issuer in the face of a similar no-recourse clause." *Id.* at *80–81. The same reasoning applies here: The bondholders' remedy is limited to its collateral, so it cannot assert a claim for damages that seeks payment from sources other than its collateral.

Outside bankruptcy, if PREPA had misappropriated the bondholders' collateral in the manner alleged, they would not have had a right to damages for such misappropriation. The Title III case does not change that result. The

89

nonrecourse limits in the Trust Agreement preclude the bondholders' asserted $4 billion claim for misappropriation.

The same recourse limitations independently foreclose the bondholders' taking claim. They cannot invoke the Trust Agreement to establish the property interest they claim was taken while disregarding the same agreement's limits on their remedies. At most, the bondholders have a limited-recourse lien on Net Revenues. They cannot invoke the Takings Clause to transform that limited-recourse lien into a recourse claim payable from PREPA's other assets. As the Title III court explained, the bondholders "contracted away" the remedy they seek. Add35; *see also Vandevere v. Lloyd*, 644 F.3d 957, 967 (9th Cir. 2011).

## V.    COURSE OF PERFORMANCE IS NOT BEFORE THIS COURT.

The Ad Hoc Group asks this Court to hold that the MORs are "binding on PREPA as a course of performance"—no doubt because it wants to use the MORs to determine what Net Revenues were produced, if any. Ad Hoc Br. 41, 42–43. The Title III court did not decide that issue, and the issue does not relate to the questions presented in this appeal, all of which concern whether the bondholders' administrative-expense claim fails as a matter of law. As a result, the issue is not appropriately before this Court. *See, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").

In any event, the Ad Hoc Group is wrong. Its argument relies on the definition of "course of performance" contained in a provision of the Uniform Commercial Code (§ 1-303) that Puerto Rico has not adopted. *See* 19 L.P.R.A. § 455 (reflecting prior version of Uniform Commercial Code not containing definition of "course of performance"). It goes without saying that an argument based on a statute not in force cannot be correct. *See, e.g.*, *Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242, 252 (2010) (adding a "term of art to a . . . statute from which it is conspicuously absent more closely resembles 'invent[ing] a statute rather than interpret[ing] one'").

Even if UCC § 1-303 did apply, it would not make the MORs "binding." Under the UCC, the parties' "course of performance" is an interpretive aid that can help construe (but not contradict) an agreement's "express terms." *A.J. Cunningham Packing Corp. v. Florence Beef Co.*, 785 F.2d 348, 351 (1st Cir. 1986); UCC § 1-303(e)(1) ("express terms prevail over course of performance."). In that respect, it is a variation on the parol evidence rule. *See, e.g.*, *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 9 (4th Cir. 1971) (referring to prior edition of UCC on course of performance, stating that it "reflects a more liberal approach to the introduction of parol evidence" than previously permitted). It does not make representations of fact (such as whether Net Revenues existed) "binding."

91

## **CONCLUSION**

For the foregoing reasons, the Title III court's order should be affirmed.

Dated:  July 10, 2026

Respectfully submitted,

*/s/ Martin J. Bienenstock*

JOHN E. ROBERTS
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
Tel: (617) 526-9600
jroberts@proskauer.com


PAUL V. POSSINGER
PROSKAUER ROSE LLP
70 West Madison, Suite 3800
Chicago, IL 60602
Tel: (312) 962-3570
ppossinger@proskauer.com

MARTIN J. BIENENSTOCK
EHUD BARAK
ELLIOT R. STEVENS
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
mbienenstock@proskauer.com
ebarak@proskauer.com
estevens@proskauer.com


*Counsel to the Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Electric Power Authority*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this document complies with the 22,000-word type-volume limitation established by the Court's July 2, 2026 order (Doc. 00118470863), which enlarged the limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(i). Excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 21,757 words.

The document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. As permitted by Federal Rule of Appellate Procedure 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  July 10, 2026

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which will send notifications of such filing to all CM/ECF counsel of record.

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock
